# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Civil Action No.

---

Care One Management, LLC; HealthBridge Management, LLC; Care One at Birchwood, LLC, d/b/a Care One at The Highlands; Care One at East Brunswick, LLC,  d/b/a Care One at East Brunswick; Care One at Hamilton, LLC, d/b/a Care One at Hamilton; Care One at Madison Avenue, LLC, d/b/a Care One at Madison Avenue; Care One at Mercer, LLC, d/b/a Care One at Ewing; Care One at Parsippany- Troy Hills, LLC, d/b/a Care One at Morris; Care One at Teaneck, LLC, d/b/a Care One at Teaneck; Care One at Wall, LLC, d/b/a Care One at Wall; Care Two, LLC, d/b/a Care One at Livingston; CareOne at Moorestown, LLC, d/b/a Care One at Moorestown; Elmwood Evesham Associates, LLC, d/b/a Care One at Evesham; HCC, LLC, d/b/a Care One at Holmdel; King James Care Center of Middletown, LLC, d/b/a Care One at King James; Millennium Healthcare Centers II, LLC, d/b/a Care One at Dunroven; Millennium Healthcare Centers II, LLC, d/b/a Care One at Valley; Millennium Healthcare Centers, LLC, d/b/a Care One at Pine Rest; Millennium Healthcare Centers, LLC, d/b/a Care One at The Cupola; 11 History Lane Operating Company, LLC, d/b/a Care One at Jackson; 301 Union Street, LLC, d/b/a Care One at Wellington; 493 Black Oak Ridge Road, LLC, d/b/a Care One at Wayne; 600 Kinderkamack Road Operating Company, LLC, d/b/a Oradell Health Care Center; 800 River Road Operating Company, LLC, d/b/a Woodcrest Health Care Center; 2 Cooper Plaza Operating Company, LLC, d/b/a South Jersey Health Care Center; 1621 Route 22 West Operating Company, LLC, d/b/a Somerset Valley Rehabilitation and Nursing Center; 341 Jordan Lane Operating Company II, LLC, d/b/a Wethersfield Health Care Center; 1 Burr Road Operating Company II, LLC, d/b/a Westport Health Care Center; 107 Osborne Street Operating Company II, LLC, d/b/a Danbury  Health Care Center; 240 Church Street Operating Company II, LLC, d/b/a Newington Health Care Center; 245 Orange Avenue Operating Company II, LLC, d/b/a West River Health Care Center; 710 Long Ridge Road Operating Company II, LLC, d/b/a Stamford Health Care Center; 162 South Britain Road Operating Company II, LLC, d/b/a River Glen Health Care Center; 2028 Bridgeport Avenue Operating Company II, LLC, d/b/a Golden Hill Health Care Center; 745 Highland Avenue Operating Company, LLC, d/b/a The Highlands Health Care Center; 135 Benton Drive Operating Company, LLC, d/b/a Redstone Health Care Center; 178 Lowell Street Operating Company, LLC, d/b/a Lexington Health Care Center; 19 Varnum Street Operating Company, LLC, d/b/a Lowell Health Care Center; 199 Andover Street Operating Company, LLC, d/b/a Peabody Glen Health Care Center; 2101 Washington Street Operating Company, LLC, d/b/a Newton Healthcare Center;  221 Fitzgerald Drive Operating Company, LLC, d/b/a New Bedford Health Care Center; 260 Easthampton Road Operating Company, LLC, d/b/a Holyoke Rehabilitation Center; 312 Millbury Avenue Operating Company, LLC, d/b/a Millbury Health Care Center; 49 Thomas Patten Drive Operating Company, LLC, d/b/a Cedar Hill Health Care Center; 548 Elm Street Operating Company, LLC, d/b/a Calvin Coolidge Nursing and Rehab. Center for Northhampton; 57 Old Road to Nine

Acre Corner Operating Company, LLC, d/b/a Concord Health Care Center; 64 Performance Drive Operating Company, LLC, d/b/a Weymouth Health Care Center; 70 Granite Street Operating Company, LLC, d/b/a North Shore Health Care Center; 750 Woburn Street Operating Company, LLC, d/b/a Wilmington Health Care Center; Park, and Marion and Vernon Streets Operating Company, LLC, d/b/a Brookline Health Care Center,

Plaintiffs,

vs.

United Healthcare Workers East, SEIU 1199; and
New England Health Care Employees Union, District 1199,

Defendants.

---

**COMPLAINT FOR MONETARY AND EQUITABLE RELIEF**

---

**K&L GATES LLP**
One Newark Center - Tenth Floor
Newark, New Jersey 07102
(973) 848-4000
Attorneys for Plaintiffs

## TABLE OF CONTENTS

NATURE OF THE ACTION .................................................................................1

PARTIES AND OTHER PARTICIPANTS ........................................................11

I.     The Plaintiffs.........................................................................................11

II.    The Defendants and the SEIU...............................................................12

III.   The 1199 Enterprise ..............................................................................14

JURISDICTION AND VENUE .........................................................................15

FACTUAL BACKGROUND .............................................................................16

I.     The Unions' Overarching Goals and Admitted Pattern of Reliance on Extortion in Conducting Corporate Campaigns ......................................................16

       A.     The Unions' Growth Strategy .......................................................16

       B.     Substantial Financial Pressure Facing the NEHCEU and UHWE.......................16

       C.     The Use of Corporate Campaigns.................................................18

       D.     The SEIU and its Affiliated Locals Follow the Manual to Extort Money and Other Concessions from Employers ......................21

II.    The Unions' Campaign of Extortion Directed Against Plaintiffs.......................25

       A.     The Goals of the Extortion Campaign ...........................................25

       B.     The Extortionate Tactics Employed by the Unions .......................28

              1.     Criminal Acts of Sabotage..................................................28

              2.     Abusing the Legal Process...................................................30

                     a.     Interfering with Straus's development projects in New York.......................................30

                     b.     "Ten Taxpayer" Petitions in Massachusetts .................31

                     c.     Improper Influence of Connecticut Elected Officials...................33

                     d.     Baseless Claims to Connecticut Regulators...................34

3.	Dissemination of False and Misleading Information
about Plaintiffs ........................................................................35

a.	"Care One Watch" and "HealthBridge Watch" Websites ............36

b.	False and Misleading Print and Media Advertisements ...............38

c.	False and Misleading Statements on Traveling Billboards............43

4.	Attacks on Mr. Straus .............................................................46

E.	Under the Corporate Campaign Model, Extortion Is Defendants and the
SEIU's Regular *Modus Operandi* .......................................................50

III.	The Continuity and Effects of the Defendants' Extortionate Campaign ..........................55

FIRST CAUSE OF ACTION
Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(a)............................57

SECOND CAUSE OF ACTION
Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(b) .........................59

THIRD CAUSE OF ACTION
Violation of 18 U.S.C. § 1962(c) ......................................................................61

FOURTH CAUSE OF ACTION
Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)...........................64

FIFTH CAUSE OF ACTION
Unfair Trade Practices .....................................................................................66

SIXTH CAUSE OF ACTION
Tortious Interference with Contractual and Economics Relationships...........................67

PRAYER FOR RELIEF ....................................................................................67

CERTIFICATION UNDER L. CIV. R. 11.2.............................................................70

LOCAL RULE 201.1 CERTIFICATION.................................................................70

## COMPLAINT FOR MONETARY AND EQUITABLE RELIEF

For their Complaint against Defendants 1199 SEIU United Healthcare Workers East ("UHWE") and New England Health Care Employees Union, District 1199 ("NEHCEU") (collectively "Defendants" or the "Unions"), the above-captioned Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs Care One Management, LLC ("Care One") and HealthBridge Management, LLC ("HealthBridge") are contract managers of sub-acute care, long term nursing care and assisted living healthcare facilities for the elderly.  Care One manages 21 facilities located throughout the State of New Jersey (the "Care One Facilities").[1]  HealthBridge manages 30 facilities located throughout the States of New Jersey, Connecticut, and Massachusetts (the "HealthBridge Facilities").[2]   Care One, HealthBridge, the Care One Facilities, and the

---

[1] The Care One Facilities are the following plaintiffs:  Care One at Birchwood, LLC, d/b/a Care One at The Highlands ("the Highlands"); Care One at East Brunswick, LLC, d/b/a Care One at East Brunswick ("East Brunswick"); Care One at Hamilton, LLC, d/b/a Care One at Hamilton ("Hamilton"); Care One at Madison Avenue, LLC, d/b/a Care One at Madison Avenue ("Madison Avenue"); Care One at Mercer, LLC, d/b/a Care One at Ewing ("Ewing"); Care One at Parsippany- Troy Hills, LLC, d/b/a Care One at Morris ("Morris"); Care One at Teaneck, LLC, d/b/a Care One at Teaneck ("Teaneck"); Care One at Wall, LLC, d/b/a Care One at Wall ("Wall"); Care Two, LLC, d/b/a Care One at Livingston ("Livingston"); CareOne at Moorestown, LLC, d/b/a Care One at Moorestown ("Moorestown"); Elmwood Evesham Associates, LLC, d/b/a Care One at Evesham ("Evesham"); HCC, LLC, d/b/a Care One at Holmdel ("Holmdel"); King James Care Center of Middletown, LLC, d/b/a Care One at King James ("King James"); Millennium Healthcare Centers II, LLC, d/b/a Care One at Dunroven ("Dunroven"); Millennium Healthcare Centers II, LLC, d/b/a Care One at Valley ("Valley"); Millennium Healthcare Centers, LLC, d/b/a Care One at Pine Rest ("Pine Rest"); Millennium Healthcare Centers, LLC, d/b/a Care One at The Cupola ("the Cupola");11 History Lane Operating Company, LLC, d/b/a Care One at Jackson ("Jackson"); 101 Whippany Road Operating Company, LLC d/b/a Care One at Hanover Township ("Hanover"); 301 Union Street, LLC, d/b/a Care One at Wellington ("Wellington"); and 493 Black Oak Ridge Road, LLC, d/b/a Care One at Wayne ("Wayne").

[2] The HealthBridge Facilities are the following plaintiffs:  600 Kinderkamack Road Operating Company, LLC, d/b/a Oradell Health Care Center ("Oradell"); 800 River Road Operating Company, LLC, d/b/a Woodcrest Health Care Center ("Woodcrest"); 2 Cooper Plaza Operating Company, LLC, d/b/a South Jersey Health Care Center ("South Jersey"); 1621 Route 22 West Operating Company, LLC, d/b/a Somerset Valley Rehabilitation and Nursing Center

1

HealthBridge Facilities (collectively referred to herein as "Plaintiffs") bring this action under the

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), and

under state law, to vindicate their ability to provide safe and effective care and their right to

conduct their businesses free from Defendants' ongoing campaign of intimidation, interference,

threats, deceptive trade practices, abuse of process, vandalism, and other illegal and extortionate

conduct.

2.     This case is not about traditional labor activity.  Rather, it is about two labor

organizations affiliated with the Service Employees International Union (the "SEIU") that have

abandoned traditional organizing methods and contract negotiations in favor of extortion and

("Somerset"); 341 Jordan Lane Operating Company II, LLC, d/b/a Wethersfield Health Care
Center ("Wethersfield"); 1 Burr Road Operating Company II, LLC, d/b/a Westport Health Care
Center ("Westport"); 107 Osborne Street Operating Company II, LLC, d/b/a Danbury Health
Care Center ("Danbury"); 240 Church Street Operating Company II, LLC, d/b/a Newington
Health Care Center ("Newington"); 245 Orange Avenue Operating Company II, LLC, d/b/a
West River Health Care Center ("West River"); 710 Long Ridge Road Operating Company II,
LLC, d/b/a Stamford Health Care Center ("Long Ridge"); 162 South Britain Road Operating
Company II, LLC, d/b/a River Glen Health Care Center ("River Glen"); 2028 Bridgeport
Avenue Operating Company II, LLC, d/b/a Golden Hill Health Care Center ("Golden Hill"); 745
Highland Avenue Operating Company, LLC, d/b/a The Highlands Health Care Center
("Highlands Health Care"); 135 Benton Drive Operating Company, LLC, d/b/a Redstone Health
Care Center ("Redstone"); 178 Lowell Street Operating Company, LLC, d/b/a Lexington Health
Care Center ("Lexington"); 19 Varnum Street Operating Company, LLC, d/b/a Lowell Health
Care Center ("Lowell"); 199 Andover Street Operating Company, LLC, d/b/a Peabody Glen
Health Care Center ("Peabody"); 2101 Washington Street Operating Company, LLC, d/b/a
Newton Healthcare Center ("Newton"); 221 Fitzgerald Drive Operating Company, LLC, d/b/a
New Bedford Health Care Center ("New Bedford"); 260 Easthampton Road Operating
Company, LLC, d/b/a Holyoke Rehabilitation Center ("Holyoke"); 312 Millbury Avenue
Operating Company, LLC, d/b/a Millbury Health Care Center ("Millbury"); 49 Thomas Patten
Drive Operating Company, LLC, d/b/a Cedar Hill Health Care Center ("Cedar Hill"); 548 Elm
Street Operating Company, LLC, d/b/a Calvin Coolidge Nursing and Rehab. Center for
Northhampton ("Northhampton"); 57 Old Road to Nine Acre Corner Operating Company, LLC,
d/b/a Concord Health Care Center ("Concord"); 64 Performance Drive Operating Company,
LLC, d/b/a Weymouth Health Care Center ("Weymouth"); 70 Granite Street Operating
Company, LLC, d/b/a North Shore Health Care Center ("North Shore"); 750 Woburn Street
Operating Company, LLC, d/b/a Wilmington Health Care Center ("Wilmington"); Park, Marion
and Vernon Streets Operating Company, LLC, d/b/a Brookline Health Care Center
("Brookline").

other criminal and fraudulent tactics.  It is about the "corporate campaign," a tactic set out in the SEIU's widely publicized "Contract Campaign Manual" (the "Manual") and scrupulously followed by the two Defendants in this case.  A copy of the Manual is attached as Exhibit A.

3.      The Manual is the antithesis of the orderly process established under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("NLRA").  The Manual, which was attached as an exhibit to the pleading in a similar RICO action filed against the SEIU and other affiliated unions and individuals, condones and encourages illegal, immoral and unethical behavior in the pursuit of the unions' goals.  It instructs SEIU members, and members of its affiliated local unions, to destroy businesses, ruin reputations, and invoke legal process improperly.  It candidly admits that breaking the law is often required and glamorizes extortionate behavior.  It discourages members from following the advice of counsel and instructs that a lawyer's job "is not to make decisions about when and how to obey the law."  *See* Exhibit A at 48.  It reflects the simple fact that the standard operating procedure of the SEIU – and affiliated locals including Defendants – is to do whatever it takes to accomplish their goals, however unlawful, extortionate, or fraudulent those tactics may be.

4.      Facing significant underfunded pension liabilities and other considerable debt, Defendants launched a coordinated and multi-faceted "corporate campaign" against Plaintiffs and one of their indirect owners, Daniel E. Straus, in an effort to extort substantial money and property from Plaintiffs.  Defendants' members have followed the Manual's advice to ignore the law in their corporate campaign against Plaintiffs.  Their conduct has been extortionate and fraudulent and part of a longstanding pattern of criminal behavior.  Their conduct has been endorsed and facilitated by elected officials in the State of Connecticut beholden to the Defendants as a result of outsize campaign contributions.  Their conduct has even gone beyond

destroying businesses and the owners of businesses.  It has put at direct and immediate risk the lives of elderly and frail patients entrusted to Defendants' members care.

5.      Defendants have made their plan and intent clear.  Plaintiffs must relinquish their rights, agree to Defendants' extortionate demands, or have their businesses and the lives of their owners destroyed.  Both Defendants have directly and indirectly communicated their extortionate demands to Plaintiffs on multiple occasions.  Just by way of example:

- David Pickus, NEHCEU's President, told two representatives of Plaintiffs during a meeting on August 4, 2011, that HealthBridge needed to sign its "pattern" collective bargaining agreement that NEHCEU was insisting upon, or else it would have to leave the State of Connecticut as a result of its relentless illegal and extortionate corporate campaign against Healthbridge and the Connecticut-based plaintiffs.

- Ricky Elliott, UHWE's Vice President, candidly admitted to a now-former high-ranking UHWE organizer that UHWE has decided to deemphasize the traditional NLRA-sanctioned legal framework for organizing employees into unions in favor of a coordinated corporate campaign directed against Plaintiffs.  The UHWE's goal, according to Mr. Elliott, is to bring the Plaintiffs "to their knees" through its relentless illegal and extortionate corporate campaign so that the Plaintiffs would have no choice but to recognize Defendant UHWE as the exclusive collective bargaining representatives at all of the facilities managed by Plaintiff Care One.  The UHWE does not represent any Care One employees.

- This plan was confirmed by Elisabeth L. Daley, another senior UHWE official, in a telephone call with a representative of Plaintiffs in September 2012.  During this call, Daley told Plaintiffs that it would consider withdrawing its baseless hearing requests on applications for improvements to HealthBridge Facilities in Massachusetts if HealthBridge would agree to NEHCEU's pattern contract and agree to remain "neutral" in response to efforts by the Defendants to organize Plaintiffs' non-unionized facilities.

6.       Defendants have employed many means to bring home their extortionate point. Plaintiffs must agree to the pattern contract, adopt neutrality and recognize Defendants without need for secret ballots, or be run out of Connecticut and Massachusetts and brought to their knees.  Among other things, Defendants enlisted elected officials in the State of Connecticut to deprive Plaintiffs of normal legal processes and threaten groundless actions against them.  They

instituted baseless legal actions against Plaintiffs, for the sole purpose of harming their businesses, and "bringing them to their knees". They began a campaign of false statements designed to damage Plaintiffs' businesses. They attempted to block unrelated business ventures of Daniel E. Straus. They engaged in a campaign of false statements and attacks on Mr. Straus and his family. And most shockingly of all, they took actions against the frail and often helpless patients at Defendants' facilities – patients that the Defendants' members were legally and ethically charged to care for. The message could not be more clear. Agree to the Defendants' demands or lives and property would be lost.

7.      On July 2 and 3, 2012, prior to the start of a recent and ongoing strike at the HealthBridge Facilities in Connecticut, Defendant NEHCEU members committed numerous serious criminal acts designed to harm the elderly and frail patients under their care in an effort to force the Plaintiffs to accede to their extortionate demands. These acts included:

- Removing patient identification wrist bands from more than 30 patients

- Changing name plates on patient doors

- Removing name bands on patient wheel chairs

- Removing dietary stickers indicating how patients could safely be fed

- Switching the names of patients in a memory care unit

- Tampering with medication records

- Removing handles from equipment used to safely lift patients in and out of bed

- Hiding or damaging blood pressure cuffs and stethoscopes

- Throwing patient linens on the floor and rendering a facility washing machine inoperable due to damage

8.      The potential impact of these criminal actions is obvious, severe and life-threatening. Many of the memory care patients whose bracelets were removed and whose

5

records were tampered with were unable to assist in their care, leaving the patients and replacement workers to fend for themselves. As a consequence of Defendants' criminal acts, these patients' lives were made dependant upon the ability of Plaintiffs to unravel the criminal deceit, sort out the tampered records, and discover and remedy the tampered-with equipment before fatal harm occurred. The Defendants were well aware of this fact and, apparently did not care. Connecticut Attorney General George Jepsen was well aware of this fact when he spurned Plaintiffs' petition for assistance, but apparently he did not care. Knowing full well of this criminal conduct and the risk it imposed on Connecticut's most vulnerable citizens, he appeared on the picket line to support Defendants, and recused himself from the dispute only after negative press compelled him to do so. Connecticut Governor Dannell Malloy was aware of this fact when he appeared on the picket line with Defendants, and apparently he did not care. Defendants contributed approximately $400,000 to his last campaign and organized extensive grass roots support. As if the aforementioned unspeakable acts were not enough, the NEHCEU pressured religious leaders from a church across the street from Plaintiff Newington to discontinue providing religious services to Newington's patients despite repeated requests from several patients and Newington for the continuation of such services. Only a plea from the Connecticut Long Term Care Ombudsman Program to the Archdiocese in Connecticut finally afforded Newington's patients the dignity of receiving religious services.

9.     These tactics were not the isolated acts of individual disgruntled strikers. Rather, they were coordinated actions by NEHCEU organizers and are part of a long and shameful pattern of conduct by Defendant NEHCEU in anticipation of nursing home strikes. For example, in an April 10, 2001 report entitled, "Nursing Home Strike Incidents," the Division of Criminal Justice of the Connecticut Chief State's Attorneys Office determined that numerous similar heinous acts of sabotage took place prior to the arrival of replacement workers following a 2001

strike by NEHCEU's members at ten nursing homes unrelated to HealthBridge. A copy of the report is attached as Exhibit B. The report noted that "these types of incidents are common during work actions at facilities of this nature." *See* Exhibit B at 9. The Connecticut Chief State's Attorneys Office noted that many of these incidents mirrored the actions perpetrated by NEHCEU members in the hours leading up to a 1998 strike.

10. Similarly, in connection with the 2001 strike by NEHCEU members, law enforcement confirmed that the acts of vandalism and sabotage occurred. However, the individuals responsible were not held accountable "due to the heavily politically charged environment as well as the fear and inability of patients to assist in the investigation." Exhibit B at 9.

11. Defendants' actions in support of their extortionate demands did not stop with their actions against patients. Defendant UHWE interfered with applications for improvements to HealthBridge Facilities in Massachusetts designed for the betterment of patients' and employees' quality of life at those facilities. UHWE admitted that it has no substantive objections to the filed applications, but merely interfered in order to force Plaintiffs to accede to the Defendants' extortionate demands.

12. Defendants' extortionate campaign has also involved officials beholden to Defendants depriving and seeking to deprive Plaintiffs of their rights under law. Approval of a routine closure of a facility in Connecticut, which under law is to be granted in 90 days, was delayed for many months on order from state officials beholden to Defendants, causing in excess of six million dollars of damages. And Defendants have convinced government officials to threaten baseless legal action against Plaintiffs on trumped-up grounds unrelated to any labor-related grievances. True to Defendants' threat that Plaintiffs should agree to a pattern contract or be run out of Connecticut, Plaintiffs have been advised of threatened, baseless receivership

actions against their facilities in that State and indirectly received an unsolicited message from Governor Malloy's office to contact a prospective purchaser's counsel for the sale of the Connecticut Plaintiffs' facilities.

13.     Consistent with their "Manual," Defendants have also advanced their extortionate campaign by attempting to destroy Plaintiffs' businesses.  They have widely disseminated false and misleading information – much of it over the Internet and using the mails – for the purpose of impugning the Plaintiffs' quality of care and financial practices.  For example, Defendants have sought to deflect blame for their acts of sabotage by falsely claiming over the Internet that HealthBridge "staged" the vicious acts directed toward the elderly and frail patients of the HealthBridge Facilities in Connecticut and by disseminating the baseless and sensational claim that non-union workers killed a patient.  Defendants engaged in this and other conduct described more fully below for the purpose of exerting unfair pressure to force the Plaintiffs to stop resisting Defendants' demands.

14.     Also consistent with their Manual, Defendants' campaign has involved personal attacks on Mr. Straus and his unrelated business interests designed to invade his privacy, harass him, and impede his other business activities.  For example, Mr. Straus has been a trustee of New York University ("NYU") School of Law for many years.   In September 2009, the school inaugurated The Straus Institute for the Advanced Study of Law & Justice, thanks to a generous donation from Mr. Straus. The mission of the Straus Institute is to welcome Fellows from around the world and facilitate their high level research and scholarship on topics falling within a broad definition of law and justice.  In keeping with their extortionate campaign, Defendants have enlisted the NYU Student Labor Action Movement to apply pressure to the school's president to remove Daniel Straus as a trustee unless Plaintiffs accede to Defendants' demands.  Defendants have also enlisted their members to attempt to block unrelated real estate ventures in New York.

8

Among other things, they have testified at the New York Landmark Commission, in an attempt to block approval of a real estate development involving an investment of approximately $100 million dollars.  And coincidently, in the days leading up to the strike in Connecticut, unknown individuals, impersonating Mr. Straus, contacted various financial institutions with which he does business, attempting to obtain his account information.

15.     Defendants' extortionate campaign against Plaintiffs is not an anomaly.  Rather, as the Manual professes and Defendants' recent actions demonstrate, it is their regular and ordinary way of conducting business.

16.     The primary goal of Defendants' extortionate campaign is self-enrichment.   As described further below, Defendants seek to extort valuable property and property rights from Plaintiffs, including, among other things: millions of dollars in payments toward the crushing underfunded pension liabilities of the pension plans sponsored by Defendants; physical access to properties managed by Plaintiffs; Plaintiffs' rights under the NLRA to require a secret-ballot election for the selection of any collective bargaining representative; and effective control over Plaintiffs' business operations.

17.     Defendants' goals are part of a longstanding pattern of unlawful activities.  In fact, for many years, Defendants have used extortionate and fraudulent methods against facilities in the healthcare industry, including those managed by Plaintiffs, to improperly seek to organize Defendants' employees outside of the traditional legal framework for doing so in order to enjoy the financial benefits of new dues-paying members.

18.     As Defendants' tactics in Connecticut have demonstrated, even gaining a foothold into facilities Plaintiffs manage will not stop Defendants' extortionate, fraudulent, and other unlawful conduct.  Rather, under the guise of seeking to obtain collective bargaining agreements, Defendants will engage in conduct outside the traditional collective bargaining process in an

effort to extort substantial sums of money from Plaintiffs to pay down Defendants' crushing underfunded pension liabilities; to gain physical access to properties managed or owned by Plaintiffs; and to gain effective control over Plaintiffs' business operations.

19.     Moreover, even if Plaintiffs acceded to all of Defendants' current demands, collective bargaining is an ongoing process.  Defendants will continue to harass, intimidate, interfere with, smear and financially injure Plaintiffs until Defendants have achieved their organizing and unionization objectives at each of the current and future facilities managed by Plaintiffs.  Demands change over time, and Plaintiffs will face the same extortionate tactics over and over again as long as Defendants are allowed to get away with these tactics.  Defendants have made it clear that unless Plaintiffs relinquish all of their rights and submit to every one of Defendants' extortionate demands, Defendants will continue to extort money and property from Plaintiffs and continue in their myriad attempts to destroy Plaintiffs' business and those of Mr. Straus.

20.     In an already challenging economy, Defendants' campaign of fraud and extortion has irreparably damaged some of Plaintiffs' relationships with their customers, impacted patient care and caused their employees to spend substantial time and effort dealing with each new attack.  Plaintiffs are filing this action to bring Defendants' pattern of extortionate conduct to an end and to recover substantial damages they have incurred because of Defendants' unlawful actions.  This action is not about strikes or union organizing or collective bargaining.  It is about a corporate campaign, endorsed and effectuated by Defendants and facilitated by the politicians they support, that is in its essence a shake-down by a lawless enterprise.

## PARTIES AND OTHER PARTICIPANTS

**I.     The Plaintiffs**

21.     Plaintiff Care One is a limited liability company organized and operating under the laws of the State of New Jersey and is the contract manager of the Care One Facilities in New Jersey.  Its principal office is located at 173 Bridge Plaza North, Fort Lee, New Jersey 07024.

22.     The Care One Facilities are 21 limited liability companies managed by Care One and organized under the laws of the State of New Jersey, each owning and operating a skilled nursing facility in the State of New Jersey.

23.     Plaintiff HealthBridge is a limited liability company organized and operating under the laws of the State of New Jersey and is the contract manager of four HealthBridge Facilities in New Jersey (Oradell, Woodcrest, South Jersey, and Somerset); nine HealthBridge Facilities in Connecticut (Wethersfield, Westport, Danbury, Newington, West River, Long Ridge, River Glen, Golden Hill,  and Highlands Health Care); and 15 HealthBridge Facilities in Massachusetts (Cedar Hill, Redstone, Lexington, Lowell, Peabody, Newton, New Bedford, Holyoke, Millbury, Cedar Hill, Northhampton, Concord, Weymouth, Wilmington, and Brookline) each organized under the laws of the State of Delaware.  Its principal office is located at 173 Bridge Plaza North, Fort Lee, New Jersey   07024.

24.     The HealthBridge Facilities are 28 limited liability companies managed by HealthBridge and organized under the laws of the State of Delaware.   Four (Oradell, Woodcrest, South Jersey, and Somerset) are located in New Jersey.  Nine (Wethersfield, Westport, Danbury, Newington, West River, Long Ridge, River Glen, Golden Hill,  and Highlands Health Care) are located in Connecticut.  Fifteen (Wethersfield, Redstone, Lexington, Lowell, Peabody, Newton,

New Bedford, Holyoke, Millbury, Cedar Hill, Northhampton, Concord, Weymouth, Wilmington, and Brookline) are located in Massachusetts.

25.     The Plaintiffs are leaders in providing a continuum of care including Post-Hospital Care, Rehabilitation, Long-Term Care, Alzheimer's/Memory Care, Assisted Living, Medical Specializations, Respite Care and Long-Term Acute Care.   Plaintiffs develop specialized care coordination programs for outcome-oriented, cost-effective care plans for all major diagnoses, and pioneered the "Next Step Home" program for patient and family education and discharge preparation.

26.     The Plaintiffs are indirectly owned in part by Daniel E. Straus, a citizen and resident of the State of New Jersey.   As part of their coordinated effort to extort additional money and concessions from Plaintiffs, Defendants have leveled personal attacks against Daniel Straus and other unrelated businesses in which he has an interest.

## II.     The Defendants and the SEIU

27.     Defendant NEHCEU is an unincorporated labor organization with its principal place of business located at 77 Huyshope Ave., Hartford, Connecticut 06106.   It is a local affiliate of the SEIU.   NEHCEU is funded in part by dues collected from its members.   Each member of NEHCEU pays a fixed percentage of his or her wages to the union as dues. NEHCEU has approximately 29,000 members in Connecticut and Rhode Island.   NEHCEU contributed more than $3.5 million to the SEIU in per capita dues in the fiscal year ending June 30, 2010.   NEHCEU has collective bargaining relationships with six HealthBridge-managed facilities located in Newington, Westport, Danbury, Milford, Hartford, and Stamford Connecticut.   It is abusing those relationships by seeking to extort substantial sums of money from Plaintiffs and the facilities managed by Plaintiffs to help the NEHCEU pay down its crushing underfunded pension liabilities through its pattern contract.   If Plaintiffs do not agree to

that pattern contract, NEHCEU is intent on expelling the Connecticut Plaintiffs from doing business in that State through its illegal and extortionate conduct as more particularly described below and outlined in its Manual.  In exchange for fees in the form of union dues, which it collects from member-employees, NEHCEU provides services related to the terms and conditions of employment as well as other products and services.  NEHCEU transacts business activities in interstate commerce and on a national scale, including in this judicial district.

28.    Defendant UHWE is an unincorporated labor organization with its principal place of business located at 310 West 43rd Street, New York, New York 10036.   It is a local affiliate of the SEIU.  UHWE is funded in part by dues collected from its members.  Each member of UHWE pays a fixed percentage of his or her wages to the union as dues.  The UHWE is one of the largest local unions of the SEIU, with approximately 350,000 members.   The UHWE contributed almost $40 million to the SEIU in per capita dues in 2010.  UHWE has been actively and thus far unsuccessfully seeking to unionize workers of facilities managed by Plaintiff Care One to derive the financial benefit of more dues-paying members and to help it pay down its severely underfunded pension plan.  In exchange for fees in the form of union dues, which it collects from member-employees, UHWE provides services related to the terms and conditions of employment as well as other products and services.  UHWE transacts business activities in interstate commerce and on a national scale, including in this judicial district.

29.    Both NEHCEU and UHWE are affiliated with the SEIU but are legally distinct entities.  The SEIU is an unincorporated association of labor unions with its principal office at 1800 Massachusetts Ave. N.W., Washington, DC 20036.   Currently, the SEIU claims to represent over 2.1 million workers in North America and touts that it is the fastest-growing union and the largest healthcare union.  The SEIU exists to organize new members and to maintain existing members.  It does not generate revenue, other than investment income, without its dues-

13

paying members.   The SEIU transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

30.     In addition to making substantial monetary contributions to the SEIU, both NEHCEU and UHWE appoint delegates who participate in the SEIU's governance at quadrennial and special SEIU conventions.  Although the NEHCEU and the UHWE are legally distinct entities from the SEIU, the SEIU's website explains that each local union "is a chartered branch that carries forth the mission and goals of the [SEIU] while representing the specific interests of locally based memberships." (http://www.the SEIU.org/local/). A copy of the webpage is attached as Exhibit C.  As noted above and as shown further below, the "mission and goals" of the SEIU include the expansion of membership and extraction of substantial monies from employers through corporate extortion campaigns.

### III.    The 1199 Enterprise

31.     At all relevant times there has been and continues to be an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "1199 Enterprise").  The 1199 Enterprise consists of at least UHWE, NEHCEU, the 1199 SEIU Health Care Employees Pension Plan ("UHWE Pension Plan"), and the New England Health Care Employees Pension Fund ("NEHCEU Pension Plan").

32.     At all relevant times the 1199 Enterprise has been and continues to be engaged in activities affecting interstate commerce, including but not limited to representing employees for collective bargaining purposes and providing pension benefits for UHWE and NEHCEU members, retirees, and their family members.

33.     The 1199 Enterprise is separate and distinct from the Defendants and from each of the other members of the 1199 Enterprise.  The 1199 Enterprise is an ongoing organization and exists to advance the interests of the individual entities that comprise its membership.

14

34.     The 1199 Enterprise exists for the legitimate purpose of representing employees for collective bargaining purposes and providing pension benefits for UHWE and NEHCEU members, retirees, and their family members.  However, Defendants conspired to acquire or maintain an interest in or control of the 1199 Enterprise through a separate and distinct "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), described more fully in this Complaint.

35.     Each member of the 1199 Enterprise performs a role in the group consistent with its organizational structure, which furthers the activities of the 1199 Enterprise.  For example, the UHWE Pension Plan and the NEHCEU Pension Plan provide pension benefits for UHWE and NEHCEU members, retirees, and their family members.  The UHWE and NEHCEU seek to recruit new members and obtain money from employers in order to adequately fund the UHWE Pension Plan and the NEHCEU Pension Plan.

## JURISDICTION AND VENUE

36.     Plaintiffs' claims for relief include alleged violations of 18 U.S.C. § 1961 *et seq.* This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1961 *et seq.*, 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (commerce jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

37.     Personal jurisdiction and venue in this district are proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) because all of the Defendants have sufficient minimum contacts with the State of New Jersey and, as alleged below: (i) the Defendants are found in, have agents in, and/or transact their business and affairs in this district; (ii) a substantial part of the events or omissions giving rise to the claims for relief occurred in this district; and (iii) the ends of justice require that those of the Defendants residing outside this district be brought before the Court to answer for their conduct engaged in and directed toward this District.

## FACTUAL BACKGROUND

I.     **The Unions' Overarching Goals and Admitted Pattern of Reliance on Extortion in Conducting Corporate Campaigns.**

    A.     **The Unions' Growth Strategy**

38.     The Unions' overarching goal is to expand their membership by organizing non-union facilities.  The SEIU and its local unions have become particularly aggressive in targeting industries for unionization and launching vast and expensive forced unionization campaigns.

39.     The SEIU purports to be the largest healthcare union in North America, and its former president, Andrew Stern, has publicly targeted the healthcare industry as a focus of its organizing efforts for more than a decade.  (*See, e.g.*, Steve Proffitt, Interview with Andrew Stern: Jumping into the Health-Care Fray as the Voice of the Medical Classes, L.A. Times (July 4, 1999)).

40.     In 2008, the SEIU amended its constitution to expand the powers of its chief officer, the International President, over organizing efforts and to toughen the constitutional requirement that local unions devote 20% of their annual budgets on organizing efforts consistent with the SEIU's "union-wide strategic unity plan."  (SEIU Const. Art. XV, Sec. 16.)

41.     The NEHCEU and the UHWE have been heavily involved in the SEIU's aggressive organizing in the healthcare industry, and both have added bargaining units at multiple healthcare facilities in the past two years.

    B.     **Substantial Financial Pressure Facing the NEHCEU and UHWE**

42.     Organizing campaigns require substantial funds, and the requirement that 20% of the annual budget be committed to such campaigns is burdensome, particularly given that many unions – including the NEHCEU and the UHWE – spend significant sums of their members' dues on political and lobbying activities.

43.     In addition, it has been publicly reported that the pension plans sponsored by both NEHCEU and the UHWE are substantially underfunded.  For example, on April 24, 2009, the NEHCEU Pension Plan announced that its enrolled actuary certified that it was in an endangered status for the plan year beginning in January 1, 2009.  By letter dated July 21, 2009, its actuaries informed the NEHCEU Pension Plan that it would require minimum contributions of in excess of nine percent of payroll from each of its members in order to remain neither endangered nor in critical status.  Its Pension Plan Form 5500 for 2010 continued to report accrued liabilities of $471,132,762 far exceeding the reported value of assets of $363,664,704 for a total deficit of over 107 million dollars.

44.     Meanwhile, the UHWE Pension Plan also has a history of serious financial problems.  On March 31, 2009 and again on March 31, 2010, the plan actuary for the UHWE Pension Plan certified to the U.S. Department of Treasury that the plan was in critical status for the plan years beginning January 1, 2009 and January 1, 2010.  According to notices issued by the U.S. Department of Labor, the plan was considered to be in "critical status" for those plan years because it had "funding or liquidity problems, or both," and that the "the plan's actuary determined that over the next three Plan years, the plan is projected to have an accumulated funding deficiency beginning in the 2011 plan year."

45.     Thus, the NEHCEU and the UHWE face considerable pressure to increase their revenues and grow their membership.  Because union dues are a fixed percentage of members' wages, it is politically expedient for affiliates of the SEIU, such as the NEHCEU and the UHWE, to increase revenues by growing their membership.  Also, the NEHCEU and the UHWE need additional members and continuing, increased pension contributions to avoid increasing unfunded pension liabilities of the UHWE Pension Plan and the NEHCEU Pension Plan.

17

### C.      The Use of Corporate Campaigns

46.      The SEIU's primary method of exacting concessions from an employer is the so-called "corporate campaign," a comprehensive series of maneuvers designed to bring outside pressure to bear on the employer.  Often, such pressure has nothing whatsoever to do with the actual labor dispute and is designed merely to impede the employer's business until it gives the union whatever it wants.

47.      Corporate campaigns are designed to destroy public confidence in the target employer, dissuade its customers and potential customers from doing business with it, and impede its normal business operations. Ray Rogers, who led one of the first successful corporate campaigns, has described the method as follows: "The ultimate goal of the corporate campaign was, if necessary, to polarize the entire corporate and Wall Street community away from [the target employer], thereby pulling that company's most crucial underpinnings out from underneath it." (Ray Rogers, How to Confront Corporations: The Man Who Devised the Corporate Campaign Against JP Stevens Offers Some Advice, Bus. & Soc'y Rev. 1981).

48.      As courts have noted, a union corporate campaign "encompasses a wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer ... [including] litigation, political appeals, requests that regulatory agencies investigate and pursue employer violations of state or federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public." *Food Lion, Inc. v. UFCW*, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997) (quoted by *Smithfield Foods, Inc. v. UFCW*, 633 F. Supp. 2d 214, 219 (E.D. Va. 2008)).

49.      Corporate campaigns are different in kind from traditional union organizing and contract-negotiating campaigns.  In a traditional union organizing campaign, the union seeks to convince employees that unionization is in their best interests.  The union recognition process

governed by the NLRA and administered by the National Labor Relations Board ("NLRB") contemplates the union initially making informal contact with a group of non-union employees. Once at least 30% of the workers in a potential bargaining unit are convinced, they can require a secret-ballot election, which the union must win in order to be certified as the bargaining agent for the employee group.

50.    In a corporate campaign, on the other hand, unions seek to avoid the NLRB-regulated election process.  Instead, they bring outside pressure to bear on the employer in order to obtain an advantage in the unionization process, often by forcing the employer to: (1) forego its right to a secret-ballot election in favor of a "card-check" system in which the union need only obtain the signature of more than 50% of the workers at issue in order for the union to be recognized; (2) forego its right to speak to its employees about the disadvantages to unionization during an organizing effort; (3) provide the union with open access to its facilities and workers; and (4) recognize the union outright as the bargaining agent for a particular group of employees.

51.    Similarly, in traditional contract negotiations, the union seeks to obtain the best deal for its constituents through good-faith bargaining, and, if necessary, through lawful strikes and pickets.  The union may also publicize its position in an effort to arouse community support for its position.

52.    In a corporate campaign, on the other hand, the union brings outside pressure unrelated to the workers' legitimate bargaining position in an effort to economically cripple the employer until it accedes to the union's demands.  Rather than focusing on the union's bargaining position (*i.e.*, its requested wages or benefits), corporate campaigns often smear the target employer and its owners and managers on utterly unrelated matters.  The goal is not to convince the public that the union's demands are reasonable.  Rather, the goal is to harm the

employer's business and/or personally embarrass its managers and owners to force submission to the union.

53.     Unions employ corporate campaigns because of the substantial benefits that flow from union recognition and favorable contract negotiations.   Union recognition automatically gives the union a substantial say over the employer's operations, and it results in an influx of new cash in the form of union dues.   The employer and union must engage in good-faith bargaining over *all* terms and conditions of the represented workers' employment, including the most minor details of the workers' jobs.   Most importantly, the union gains access to a new revenue stream that is largely under its control, as all wage rates for unionized employees must be approved by the union.

54.     Similarly, contract negotiations give the union an opportunity to demand increased revenues, the funding of unfunded liabilities, and any other concessions the union may desire.   Because unions are not entitled to dues during any gap periods between collective bargaining agreements, unions have a strong incentive to bring contract negotiations to a quick close, which makes the use of pressure-driven corporate campaign tactics all the more attractive.

55.     In or around August 2007, a representative of Change to Win, an umbrella organization of which the SEIU is a founding member, stated: "It's no longer sufficient to use a strike or other work disturbance to pressure a company to do the right thing. Increasingly, it's necessary to pressure a company by causing a crisis of confidence among its customers, shareholders, directors or other constituents."   (http://mydd.com/2007/8/10/yearlykos-catching-up-with-change-to-win).  A copy of the webpage is attached as Exhibit D.

56.     At bottom, corporate campaigns relieve unions of the burden of persuading employees and community members that their demands are reasonable.   Instead, they need only convince the target employer that the union campaign of smear, deception, interference,

vandalism, and threats will harm the employer's business and the managers' and owners' personal lives.  Through a corporate campaign, union organizing and contract negotiations go from being fair processes with uncertain outcomes to being old-fashioned, mafia-style shakedowns in which the employer has no choice but to surrender its money to the unions in return for a temporary end to the extortionate campaign.

**D.     The SEIU and its Affiliated Locals Follow the Manual to Extort Money and Other Concessions from Employers**

57.     The SEIU and its affiliated local unions follow the SEIU's widely publicized Manual in developing and executing corporate campaigns. The Manual candidly admits that effective corporate campaigns often require breaking the law. (See Exhibit A, Manual at 3-47).

58.     In the section called "Pressuring the Employer," the Manual details how unions can bring outside pressure to bear on employers through the use of smear and intimidation tactics. According to the Manual, one goal of outside pressure is to "jeopardize[e] relationships between the employer and lenders, investors, stockholders, customers, clients, patients, tenants, politicians, or others on whom the employer depends for funds."  The Manual advises that: "You have to put pressure in many ways so that the total cost of your campaign to the employer begins to outweigh the benefits of rejecting your proposals." (*See* Exhibit A, Manual at 3-2 to 3-3).

59.     In a section called "Evaluating Possible Tactics," the Manual lists the first goal of any pressure campaign as "**Costing the employer money**."  In that vein, the Manual advises campaigners to consider whether a potential tactic will:

- Reduce productivity?

- Increase costs?

- Affect a private company's relationship with sources of income, such as customers, clients, investors, or lenders?

    . . . .

- Create bad publicity, which would, in turn, affect the relationships described above?

- Cause the courts or regulatory agencies to enforce laws or regulations the employer has failed to obey?

- Directly affect the careers or other interests of individual management officials. (See Exhibit A, Manual at 3-6).

60.    That same section lists another goal as "**Making daily life difficult for management**."  On that front, the Manual advises campaigners to consider whether a proposed tactic will:

- Distract management officials from other work they need to do?

- Embarrass them in front of their superiors, associates, families, neighbors, or friends in the community?  (*Id.*)

61.    According to the Manual, bringing outside pressure to bear on the employer is often the key to a successful corporate campaign.  Thus, the Manual notes that employers depend on customers and other stakeholders to provide funds to operate the business.  "The most effective outside pressure tactics are often those which could put that flow of funds in jeopardy."  The Manual further notes that owners and managers value their "reputations" and "privacy."  By implication, tactics that harm their reputation and invade their privacy are recommended.  (*Id.* at 3-18).

62.    With regard to attacking customer relationships, the Manual admits that customers are unlikely to care about the union's demands.  "Therefore, it is often necessary to show how *they* [the customers] are affected by employer practices – how prices or taxes are higher, products or services are of lower quality, or public health or safety are threatened."  (*Id.* at 3-19).  Notably, these attacks need not have anything to do with the union's demands.  As noted above, the goal is simply to "put [the employer's] flow of funds in jeopardy."

63.     The Manual also advises employees to seek out violations of the employer's legal obligations.  The purpose in doing so is not to seek legitimate redress of legal violations, but rather to ratchet up the expense and negative publicity associated with the campaign.  The Manual candidly admits that the violations of law may be "completely unrelated to bargaining issues."  That is not a problem because the employer will still face:

- Extra expense to meet regulatory requirements or qualify for necessary permits or licenses.

- Costly delays in operations while those requirements are met.

- Fines or other penalties for violating legal obligations.

- Damage to the employer's public image, which could jeopardize political or community support, which in turn could mean less business or public funding.  (*Id.* at 3-21).

64.     The Manual advises employees to bring political pressure to bear on the employer.  In particular, the Manual suggests that employees tell management that, if their demands are not met, they will push for legislative action in unrelated areas that will adversely affect the target employer, such as "changes in the way employers are taxed, awarded public funds, or required to provide services."  (*Id.* at 3-25).

65.     The Manual further advises exerting outside pressure on individual owners and managers.  The Manual specifically suggests that employees seek and publicize "dirt" on owners and managers, focusing on such things as: (1) involvement in lawsuits, including divorce actions, (2) ties to other businesses involved in controversies, (3) past controversial activities, and (4) links with politicians.  The Manual admits that threatening to release such information if an owner or manager does not accede to the union's demands "**may be a violation of blackmail and extortion laws**."  Nonetheless, the Manual encourages union members to "uncover and publicize" such information about individual owners and managers because "there is no law against union members who are angry" engaging in such activities.  (*Id.* at 3-27; emphasis

23

added).  In other words, the Manual encourages unions to violate extortion laws and then pretend

that the idea to dig up and disclose "dirt" originated with individual union members.

66.     The Manual also advises employees to use the media in their campaigns.

According to the Manual, a primary goal in using the media is to "[g]ive customers, clients,

investors and others in the community reasons to cut off economic ties with the employer."  In

keeping with the Manual's general theme, the media attention need not be related to the union's

position or alleged grievances.  Rather, it can simply be designed to "make businesses or

individuals feel that they don't want to be involved with the employer while it is getting such bad

publicity," whatever the cause of such publicity.  This tactic is also designed to enhance the

effect of any potential "dirt" that employees may gather, as the Manual states that "[owners or

managers who] see that you have the ability to use the media successfully . . . may worry that

you will be able to publicize unfavorable information about their activities." (*Id.* at 3-56).

67.     Complying with the law is decidedly not the goal of a corporate campaign.  To the

contrary, the Manual notes that pressure tactics may violate laws against "libel, slander, and

extortion."  Nonetheless, the Manual encourages employees to consider breaking these laws by

likening their activities to civil disobedience "in the tradition of Dr. Martin Luther King and

Mahatma Gandhi."  The Manual discourages employees from taking the advice of legal counsel

by noting that a lawyer's job "is not to make decisions about when and how to obey the laws."

Rather, employees should "weigh the risks and benefits of potential action," which includes

weighing the risk of illegal action against the benefits associated with "doing what it takes to win

a fair contract."  (*Id.* at 3-47).  The Manual further notes that employers may not follow-up on

employees' violations of the law because, among other things, legal action will require the

employer to engage in discovery, and some illegal acts may raise public sympathy for the union.

Finally, the Manual urges employees to consider the potential penalty for violating the law,

overtly suggesting that illegal activity may be worth it if the penalty is low or a judgment against the employee would be difficult to collect.  (*Id.* at 3-48).

68.     The central message of the Manual is clear: the SEIU encourages employees and local unions to abandon traditional organizing and bargaining in favor of multi-faceted extortion schemes designed to bring pressure entirely unrelated to any legitimate labor-related concerns in order to beat employers into submission.  No subject is off-limits; in fact, the invasion of owners' and managers' privacy is actively lauded.  Legality is, at best, a minor concern that can easily be overridden in favor of "doing what it takes to win."

## II.     The Unions' Campaign of Extortion Directed Against Plaintiffs

### A.     The Goals of the Extortion Campaign

69.     The Unions have used extortionate tactics to manipulate their relationships with HealthBridge over the past several years.

70.     In late 2010, anticipating the expiration of multiple collective bargaining agreements with six HealthBridge Facilities in Connecticut and the loss of these facilities' substantial contributions to NEHCEU's severely underfunded pension plan, the Unions began planning a comprehensive extortion campaign against the Plaintiffs and their owners.

71.     The extortion campaign has two interrelated objectives, both rooted in Defendants' self-interest.  First, Defendants seek to compel Plaintiffs to agree to NEHCEU's pattern agreement or be run out of business in Connecticut.  Defendants seek to compel Plaintiffs to make millions of dollars in contributions to the grossly underfunded pension liabilities of the pension plans they sponsor that would be required under the pattern agreement.  Second, in the Plaintiffs' facilities where there are no established collective bargaining relationships – including the Care One and HealthBridge Facilities in New Jersey; three non-union HealthBridge Facilities in Connecticut; and fifteen HealthBridge Facilities in Massachusetts – Defendants want to

compel Plaintiffs to adopt neutrality and recognize defendants without an election, or else be brought to their knees.  Defendants want more unionized facilities which translate into more revenue from dues-paying members and more money to pay down the underfunded pension liabilities of the pension plans sponsored by Defendants.

72.     NEHCEU has collective bargaining relationships with six HealthBridge Facilities in Connecticut.  In the course of seventeen months of ultimately unsuccessful negotiations for successor collective bargaining agreements, NEHCEU steadfastly insisted that HealthBridge agree to NEHCEU's "pattern" collective bargaining agreement under which, among other things, HealthBridge would need to keep in place the existing arrangement for the HealthBridge Facilities to pay into NEHCEU's underfunded pension plan, and increase the amount of those payments.

73.     Unable to achieve these aims through traditional collective bargaining, Defendants are now seeking to compel HealthBridge to agree to these demands through extortionate tactics.  NEHCEU admitted as much during a meeting with representatives of Plaintiffs on August 4, 2011 at the Hilton Garden in Milford, Connecticut.  During this meeting, NEHCEU's President, David Pickus, stated that HealthBridge would need to agree to NEHCEU's "pattern" collective bargaining agreement and increase payments into the underfunded pension plan sponsored by NEHCEU; otherwise it would force HealthBridge to leave the State of Connecticut.  The relentless illegal corporate campaign was in full force.

74.     Since HealthBridge did not agree, Defendants continued to make good on this threat to drive HealthBridge out of Connecticut.   Among other things, Defendants are:  seeking to compel the sale of HealthBridge's Connecticut facilities; filing legal process and prompting regulatory and compliance actions in Connecticut for improper purposes, and exerting political

26

pressure from elected officials beholden to Defendants as a consequence of outsize campaign contributions.

75.    Meanwhile, apparently dissatisfied with the progress it has made to organize Plaintiffs' non-union facilities using the traditional NLRA-sanctioned legal framework for organizing employees into unions, Defendants are now increasing their extortionate tactics in order to induce the Plaintiffs to agree to recognize the Unions without the NLRA-sanctioned secret ballot process.  Indeed, in or around the Fall of 2011 and following a meeting of the UHWE "brain trust," UHWE Vice President Ricky Elliot candidly admitted to a now-former high-ranking UHWE organizer that UHWE had decided to deemphasize the traditional NLRA-sanctioned election process in favor of coordinated corporate campaign designed to bring Plaintiffs "to their knees" so that the Plaintiffs would have no choice but to recognize the UHWE as the exclusive collective bargaining representatives at all of the facilities managed by Plaintiff Care One, and not utilizing the NLRA-sanctioned processes for such recognition.

76.    This plan was confirmed by Elisabeth L. Daley, another senior UHWE official, in a telephone call with a representative of Plaintiffs in September 2012.  During this call, Daley told Plaintiffs that UHWE would consider withdrawing its baseless hearing requests on applications for improvements to HealthBridge Facilities in Massachusetts if HealthBridge would agree to NEHCEU's contract demands and agree to remain "neutral" in response to efforts by the Defendants to organize non-unionized facilities managed by Plaintiffs.

77.    Ultimately, Defendants want Plaintiffs to cede valuable property rights to Defendants.  These include (i) the millions of dollars in contributions to the underfunded pension plans sponsored by Defendants as part of NEHCEU's pattern contract or be driven out of the state; (ii) Plaintiffs' recognition of both Defendants as the exclusive collective bargaining agent of current non-union employees at current and at future facilities managed by Plaintiffs; (iii)

Plaintiffs' rights under the NLRA to require a secret-ballot election for the selection of any collective bargaining representative; (iv) Plaintiffs' corresponding rights under the NLRA to participate in that election process and express their opinions about unionization efforts; (v) physical access to Plaintiffs' properties to facilitate Defendants' forced unionization objectives; and (vi) ultimately, control over Plaintiffs business operations as the result of recognition , since recognition of a union as the exclusive bargaining representative of Plaintiffs' employees gives the union the immediate right to have a significant say in the operation of the employer's business affairs.

### B.      The Extortionate Tactics Employed by the Unions

78.     Defendants' extortion campaign has utilized four (4) principal tactics: (1) engaging in vandalism and other criminal acts to endanger patients and disrupt Plaintiffs' ability to provide quality services and bring about negative outcomes before the Connecticut regulatory authorities; (2) disseminating false, misleading, and defamatory information about Plaintiffs designed to dissuade patients and their family members from doing business with Plaintiffs; (3) publicly smearing Mr. Straus concerning items completely unrelated to any labor-related grievances; and (4) abusing the legal process on unrelated matters solely to drive up costs for Plaintiffs.

### 1.      Criminal Acts of Sabotage

79.     On July 3, 2012, NEHCEU members at five of the Connecticut facilities managed by Plaintiff HealthBridge went on strike.  In connection with the strike, at the direction of lead organizers employed by NEHCEU, employees committed numerous criminal acts that jeopardized the lives and safety of the elderly and frail patients of these facilities.  These acts included but were not limited to the following:

- At the Newington Health Care Center, employees: (1) purposefully mixed up names on patient's doors for the Alzheimer's ward and the photos attached to their medical records, making it nearly impossible to identify and care for patients; (2) removed dietary stickers which provided how patients could safely be fed; (3) lost, hid, or stole all stethoscopes and blood pressure cuffs; (4) vandalized half the building's Hoyer lifts; (5) lost or stole patient safety lift handles, pads and foot rests; (6) removed the label from a wheelchair; (7) removed photos; (8) mismatched cushions; (9) removed labels from all of the flow books; (10) placed screwdrivers in the ceiling tiles; and (11) removed June 2012 activities of daily living flow sheets.

- At the Danbury Health Care Center, employees: (1) dropped clean linens on the floor; (2) placed patients' clean personal laundry in the laundry chute; (3) removed approximately 30 patients' identification wristbands; (4) removed patient identifiers from room doors and wheelchairs; (5) placed clean patient safety lift pads and linens in garbage bags; and (6) tampered with washing machine settings so that soap was not dispensed during wash.

- At the Stamford facility, employees: (1) smashed a washing machine door and (2) removed a call-bell cord.

80.    These acts of sabotage put the lives and safety of the patients at these facilities in grave danger.  They delayed and disrupted the medical treatment for these patients and exposed these patients to injury and unsanitary conditions.

81.    HealthBridge reported each of these incidents to the state and local authorities, including the Connecticut Department of Public Health and the Connecticut Attorney General's office.  The Attorney General refused to offer meaningful assistance and directed HealthBridge to file separate police reports with local law enforcement authorities.  Copies of these police reports are attached as Exhibit E.  Then, on July 17, 2012, Attorney General George Jepsen walked the picket lines with striking employees. A day later the Attorney General recused himself from matters involving HealthBridge and NEHCEU, citing the apparent conflict of interest.  Following Jepsen's recusal and at Healthbridge's request, the Connecticut Chief State's Attorney opened a criminal investigation into the strike-related sabotage by NEHCEU members. This investigation is ongoing.

82.     Despite the fact that Plaintiffs first reported these incidents on July 3, 2012, a spokesperson for NEHCEU falsely claimed, in a Connecticut News blog that she posted on the Internet on July 20, 2012, that HealthBridge "staged" the sabotage to make the union look bad and falsely asserted that HealthBridge waited for "two whole weeks" after the sabotage to report the incidents.  A copy of the blog post is attached as Exhibit F.

83.     These acts of sabotage are jarringly similar to those conducted by NEHCEU members during the 2001 strikes, making it all the more obvious that these acts were a coordinated effort orchestrated by the Defendants.

84.     On August 23, 2012, Defendants bused approximately 100 members from Connecticut who were joined by several UHWE members to participate in a further public disruption targeting Plaintiffs' headquarters in Fort Lee, New Jersey.   In order to create maximum chaos and further Defendants' extortionate goals, the protestors marched across the George Washington Bridge to get to Plaintiffs' headquarters. Approximately 16 members of Defendants then gained unauthorized access to the building and attempted to confront Daniel Straus and other senior Care One and HealthBridge Management officials and present them with their extortionate demands, including their demand to continue contributing to the NEHCEU's underfunded pension.  The police had to be called to remove the trespassers from the building.

## 2.      Abusing the Legal Process

### a.      Interfering with Straus's development projects in New York

85.     Defendants have also attempted to compel agreement to their demands by disrupting and attempting to block a condominium development planned by JZS Madison, a company in which Daniel Straus has an interest.  On October 18, 2011, Defendants attempted to block required approvals for the project by staging a satirical street theater performance and having members of Defendants protest outside the Landmark Preservation Committee hearing on

the project at One Centre Street in New York City.  Flyers calling the project a "DISRUPTIVE, TASTELESS, MONSTROSITY with the charm of a railroad boxcar" and promoting the COW website were distributed outside the hearing.  Attached as Exhibit G is a copy of the "DISRUPTIVE, TASTELESS, MONSTROSITY" flyer distributed outside the Landmark Preservation Committee hearing on October 18, 2011.

86.     Another flyer, paid for by UHWE, NEHCEU and UnitedNY.org and distributed at the event, disparaged Daniel Straus' development project, claiming that "[h]e can afford to put people before profits."  Attached as Exhibit H is a copy of the "99% of Americans are struggling but Daniel Straus is not one of them" flyer.  Defendants also had former employees testify before the Committee.  One former employee of a facility managed by Care One and an agent of Defendants, who protested outside the Landmark Preservation Committee hearing, testified under oath that it was her understanding from one of the Defendants that "the purpose of going there was to block business activities of Mr. Straus."  Neither the protest nor testimony had anything to do with the merits of the project or anything germane to the Committee.  Both were merely attempts by the Unions to interrupt and abuse the process, for the purpose of compelling agreement to their demands or to cause Daniel Straus to suffer embarrassment, increased costs, delay and loss of the benefit of a substantial investment, for the ultimate purpose of enriching the Defendants.

### b.     "Ten Taxpayer" Petitions in Massachusetts

87.     In the Fall of 2011, Defendant UHWE filed three "Ten Taxpayer" petitions in the State of Massachusetts to object to Applications for Need filed with the Massachusetts Department of Public Health ("DPH") by HealthBridge-managed Massachusetts facilities located in Brookline, Concord and Lexington, Massachusetts.  Attached as Exhibit I are letters from the Commonwealth of Massachusetts acknowledging receipt of the "Ten Taxpayer"

31

petitions.   As a consequence of these petitions, several other HealthBridge Massachusetts applications have also been delayed. These Applications for Need were filed to enable these facilities to complete necessary upgrades and renovations to provide better care for the patients in these facilities.   The requested renovations include:   (i) transitioning to electronic medical record systems to improve the quality of care and reduce the risk of medication errors, among other benefits; (ii) important upgrades to these facilities' power generators and heating, air conditioning, and electrical systems; and (iii) other upgrades and renovations designed to enhance the safety and quality of life of these facilities' patients and employees.

88.    By filing Ten Taxpayer petitions, UHWE has delayed the processing of the Applications for nearly a year, substantially increased the costs associated with the Applications for Need, created costly and unnecessary delays in their approval, and dissuaded potential patients from these facilities.   Hearings on the proposed applications, which generally are approved expeditiously, have yet to be scheduled.

89.    UHWE has candidly admitted to the governmental agency authorized to process the applications that it has no substantive objection to the Applications for Need.  In fact, in an e-mail exchange and telephone conversation between September 20-24, 2012, Elisabeth L. Daley, UHWE's Senior Research Analyst, openly admitted to HealthBridge's outside auditor that the UHWE filed the "Ten Taxpayer" petitions in response to HealthBridge's collective bargaining disputes with the NEHCEU.  The UHWE representative stated that the UHWE would consider withdrawing its objections and request for a hearing if Plaintiffs would agree to the NEHCEU's contract demands – including the demand that Plaintiffs help pay down the NEHCEU's underfunded pension liabilities as part of its pattern contract – and if Plaintiffs would agree to remain "neutral" in response to efforts by the Defendants to organize non-unionized facilities managed by Plaintiffs.  (*See* Exhibit K).

90.     Since Healthbridge refused Defendants' extortionate demands, Ms. Daley confirmed in her ominous email to DPH dated September 20, 2012 that UHWE intends to proceed with hearings on the baseless "Ten Taxpayer Petitions." Thus, these petitions are admitted abuses of the legal process by Defendants that have no purpose other than to compel Plaintiffs' agreement with Defendants' extortionate demands by causing Plaintiffs to suffer increased costs, delay, the loss of the benefit of a substantial investment and, worst of all, the negative impact upon the quality of life of Plaintiffs' patients and employees.

91.     To further Defendants' smear campaign against Plaintiffs and cause even more harm, Ms. Daley falsely represented to DPH in her September 20 email that Wethersfield closed its facility in Connecticut without State approval, when in fact, the State had granted Wethersfield such approval on June 11, 2012.  (*See* Exhibit K; *cf.* Exhibit J).  Ms. Daley's September 20, 2012 e-mail makes it clear that, just as Mr. Pickus and the NEHCEU are seeking to drive Plaintiffs out of Connecticut unless Plaintiffs agree to Defendants' extortionate demands, the UHWE is likewise intent on driving the Massachusetts Plaintiffs out of the Commonwealth of Massachusetts unless those Plaintiffs accede to Defendants' demands.

### c.     Improper Influence of Connecticut Elected Officials

92.     Governor Malloy has publicly expressed support for NEHCEU's positions. Malloy, the beneficiary of $400,000 in campaign expenditures by the SEIU and an affiliated local union for his 2010 election campaign, joined workers on the picket line at the Newington Health Care Center on July 11, 2012 despite the acts of sabotage and vandalism that occurred eight days earlier against the HealthBridge managed facilities' patients.

93.     On November 2, 2011, HealthBridge filed an application with the State of Connecticut, seeking approval to close its Wethersfield facility.  Upon information and belief, as part of its extortionate corporate campaign, the Unions interfered with HealthBridge's closure of

this facility by exerting its political influence over Governor Dannel Malloy who initially refused to allow HealthBridge's application to be processed until a lockout with union members at another HealthBridge facility was resolved.

94.     On or around March 6, 2012, the state of Connecticut initially rejected HealthBridge's application for closure of its Wethersfield facility, claiming that Wethersfield's application was incomplete. Upon information and belief, the information sought that supposedly rendered the application "incomplete" had never been sought of any other applicant seeking closure.     Ultimately, on June 11, 2012, the State Department of Social Services approved the closure of Wethersfield Health Care Center.   However, the Unions' interference with the closure process resulted in a delay of approximately six months, and cost Wethersfield in excess of six million dollars.

95.     Upon information and belief, Defendants were able to persuade Connecticut Governor Dannell Malloy and the Connecticut Attorney General's office to threaten to take the assets of the Connecticut facilities managed by Plaintiff HealthBridge under receivership.   On August 13, 2012, Mr. Straus learned from a Connecticut Receiver that a broker "approached [this Receiver ] about some facilities, apparently of your[s], that the AG's office in [Connecticut] will be taking and giving to an interim operator."   To Plaintiffs' knowledge, there is no legal basis for declaring a receivership.   Upon information and belief, this receivership threat has been made at the behest of Defendant NEHCEU as part of NEHCEU's extortion campaign against Plaintiffs.

**d.        Baseless Claims to Connecticut Regulators**

96.     On June 21, 2012, one day after Connecticut union members met to vote on a strike, one or more of the Unions sent a memo dated February 7, 2012 and titled "Questionable Medicare Billing Practices at Connecticut HealthBridge Nursing Homes," to the Connecticut Department of Public Health, to the Connecticut Department of Social Services and, upon

information and belief, to the U.S. Department of Health and Human Services - Office of Inspector General.  A copy of the Memo is attached as Exhibit L.  Upon information and belief, the Unions sent this memo via e-mail, fax, and/or U.S. mail.

97.     The memo falsely accuses HealthBridge of engaging in fraudulent Medicare billing practices.  The Unions claim that HealthBridge receives the highest standardized daily payment rate of any system in Connecticut, resulting in "over $15 million in potentially excess payments" from 2006-2010.  (See Exhibit L at 1).  It also alleges that HealthBridge receives $50 more per patient per day from Medicare than the average Connecticut facility despite the SEIU's conclusion that there is no significant difference in HealthBridge's patients that could explain the "questionable billing."  (*Id.*)  Following the Manual's guidance yet again, the memo also raises a completely unrelated claim concerning another entity where Daniel Straus is also the Principal Stockholder and a Board member, Aveta, Inc. (the largest Medicare Advantage plan in Puerto Rico).  (Id. at 2).  The Memo falsely suggested that the existence of an investigation of the company necessitated a thorough investigation of management decisions at HealthBridge.

98.     Upon information and belief, and as a result of the Unions' memo, the United States Attorney's Office for Connecticut issued a subpoena to the HealthBridge managed facility River Glen Health Care Center ("River Glen") seeking information concerning its billing practices. River Glen has expended a substantial amount of time and money in responding to the U.S. Attorney's Office's inquiry and that inquiry is ongoing.

### 3.     Dissemination of False and Misleading Information about Plaintiffs

99.     Despite Plaintiffs' laudable record for patient care, and consistent with the extortionate practices described in the SEIU's Manual, Defendants have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs.

Defendants have often disseminated this false and misleading information over through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

100.     Defendants have engaged in this scheme of disseminating the false, fraudulent, and misleading information about Plaintiffs with the specific intent of discouraging the community, patients, potential patients, and their family members from doing business with Plaintiffs, and increasing the costs through frivolous filings, on the theory that destroying Plaintiffs' business will eventually force them to accede to Defendants' extortionate demands.

### a.     "Care One Watch" and "HealthBridge Watch" Websites

101.     Commencing in or around 2010, Defendants conspired among themselves and with other currently unknown parties to launch the Internet sites entitled, "Care One Watch" (http://careonedswatch.org/)   and   "HealthBridge   Watch"   (http://HealthBridgewatch.org) (hereinafter "COW"), through which they disseminate false and misleading information about Care One, HealthBridge, and Daniel E. Straus over the Internet.

102.     While COW purports to be "a coalition of concerned citizens and nursing home caregivers dedicated to quality care and healthy communities," upon information and belief, it is composed almost exclusively of Local Union members and is deceptively designed to look like a grassroots community effort.

103.     The COW website contains numerous false and misleading statements about Plaintiffs.  These include:

- A page on the COW website entitled, "Who is in Charge at Care One Nursing Homes," citing alleged turnover at Care One-managed facilities, falsely and misleadingly suggests that there is a quality-of-care problem at Care One facilities by claiming that turnover in a nursing home's administrator "has been linked to quality-of-care deficiencies including higher rates of bed sores."   The page concludes with: "Should we be concerned for our loved ones in Care One nursing homes?"  (*See* Exhibit M at 1).

- A page on the COW website entitled, "About CareOnewatch," states that "[o]verbilling and violations of labor law at Care One and HealthBridge facilities

may indicate a pattern of valuing profits above people." The page makes the false representation that the Plaintiffs have engaged in a "pattern" of "overbilling" and have jeopardized the care of their patients. (*See* Exhibit M at 2).

- A page on the COW website entitled "Management Forces Concessions on Caregivers" states that "HealthBridge chose to put quality of care at risk by removing caregivers from the bedsides of their patients," falsely suggesting that HealthBridge left its patients uncared for when the union members elected to go on strike. (*See* Exhibit M at 3-4).

- A page on the COW website entitled "Overbilling" advises customers to "Check Your Bill!" and asks: "Have you or a loved one been overbilled at a Care One or HealthBridge facility?" The page further implies that customers have suffered "unexplained charges," "charges for services you did not consent to or did not receive," "charges for equipment you did not receive," "calculation errors," "sharp increases in charges from your previous bill," "increase in charges for the same or lesser services," or "charges for services provided to another resident" and provides a link for customers to "tell their overbilling story." The only basis cited for these inflammatory inquiries and implied accusations is a single alleged billing issue at a single facility managed by Care One wherein no overbilling even occurred. This page is designed to provoke a visceral reaction against Care One and HealthBridge for alleged financial mismanagement and overbilling and to deter patients from using their facilities lest they be overcharged. This page is extremely misleading and misrepresents the facts of one isolated alleged case at an assisted living facility. In that instance, the resident involved required an immediate change to a higher level of care. The family was informed, and while at first there was a misunderstanding about the applicable charges for this higher level of care, the bill was in fact 100% accurate and fair. (*See* Exhibit M at 5).

104.     Contrary to these false and misleading statements on COW's website, there is neither a quality-of-care problem nor an overbilling problem at facilities managed by Care One or HealthBridge. Nearly 60% more centers managed by Plaintiffs and their affiliates have been awarded Five Star or Four Star ratings from the Centers for Medicare & Medicaid Services than the average statewide. 94% of patients at facilities managed by Plaintiffs report high satisfaction with their rehabilitation program. Further, patients at facilities managed by Plaintiffs realized a 90% discharge rate to their prior living situation following a sub-acute stay, versus an average of 39.5% nationwide. They also realized 94.6% of goal in Functional Mobility and exceeded 100% of goal in Activities of Daily Living and Speech and Language. Facilities managed by Plaintiffs surpassed national averages on key quality measures, in some instances by over 50%. For

example, they performed 52.5% better than the national average in annual quality surveys on keeping patients safe and secure in 2011.  Moreover, the fall rate at these centers averaged 16.9% less than the national average in 2011.

105.    Additionally, Plaintiffs coordinate and manage more than 120,000 claims for payment each year. Every bill is subject to a pre-bill validation and reconciliation process, involving up to four disciplines and up to 29 separate verifications.  Financial statements for Plaintiffs' facilities are certified annually by independent auditors for accuracy and compliance. Plaintiffs have never been cited by any consumer protection agency for billing errors.

**b.        False and Misleading Print and Media Advertisements**

106.    In addition to the mis-information on the COW website, Defendants have distributed flyers and taken out media advertisements urging patients to check their bills, falsely insinuating that patients of facilities managed by Care One and HealthBridge are regularly overbilled when they are not.   For example, on or about September 17, 2011, Union organizers in Connecticut and New Jersey provided patients' family members with a flyer inquiring whether they were "Overbilled at a Care One Facility?" and encouraging them to look for various errors in their Care One bills.   Upon information and belief, copies of these flyers were sent to family members of patients via U.S. mail.  Copies of that same flyer were distributed to families of patients at some of the non-unionized facilities managed by Care One in New Jersey on November 4, 2011.  Again, upon information and belief, copies of that flyer were sent to these family members of patients via U.S. mail.  A copy of that flyer is attached as Exhibit N.

107.    Despite the fact that NEHCEU does not represent any of the employees at any of the facilities managed by Plaintiff HealthBridge in Massachusetts, on November 17, 2011, NEHCEU sponsored an advertisement in the *Boston Herald* urging people to check their HealthBridge bills for overbilling, and listing each of HealthBridge-managed facilities in

Massachusetts.   Upon information and belief, one or more of the Unions disseminated this advertisement to the Boston Herald via e-mail, fax, and/or U.S. mail before the *Boston Herald* printed it.

108.   On November 23, 2011, NEHCEU sponsored a similar advertisement in the *Hartford Courant* and *Milford Mirror*.   On December 2, 2011, NEHCEU sponsored a similar advertisement in the *Newington Town Crier*, urging patients and their families to check their bill and directing them to HealthBridgeWatch.org for more information.   Attached as Exhibits O, P and Q are copies of the November 17, 2011 *Boston Herald*, November 23, 2011 *Hartford Courant* and *Milford Mirror*, and December 2, 2011 *Newington Town Crier* advertisements, respectively.   Again, upon information and belief, one or more of the Unions disseminated these advertisements to these publications via e-mail, fax, and/or U.S. mail before these publications printed them.

109.   As part of its media blitz, in or around November 2011, Defendants sponsored a radio advertisement in the New York metropolitan area, on CBS affiliate 880am, falsely stating that Care One and HealthBridge were engaged in overbilling the elderly.   In addition, an advertisement with the same content aired on New England Cable News (NECN).   Several family members of patients heard these advertisements on or around November 22, 2011, and reported to Plaintiffs that they were upset by their content.

110.   This "overbilling" smear campaign is intentionally false and deceptive because it is based on a single alleged miscommunication at one private pay assisted living facility managed by Care One in New Jersey (a facility in which Defendants do not represent any of the employees), when no such overbilling took place.   The flyers and advertisements have been distributed far and wide.   Defendants know they lack evidence of an overbilling problem at any

39

of the facilities managed by Plaintiffs and are merely attempting to destroy public confidence in Plaintiffs and the facilities they manage.

111.    In addition to the false representations on the COW website that the facilities managed by Plaintiffs were overbilling and jeopardizing the care of patients, Defendants distributed flyers with similar false and deceptive statements – carrying out the practice as suggested by the Manual – of scare tactics, fear-mongering and illegal behavior, including, but not limited to, the following:

- On April 6, 2011, a NEHCEU sponsored flyer entitled "BUSTED" was found at the Danbury Health Care Center.   The flyer stated that "HealthBridge Management / Care One LLC will do ANYTHING – even violate labor law-in their ruthless pursuit of more profit."   The flyer further "reported" that HealthBridge / Care One accepts hundreds of millions of dollars in public funding from Medicaid and Medicare and stated that "[t]hese dollars should be used for patient care-not lining the pockets of the owners," falsely and maliciously suggesting that the Owners are engaging in Medicaid and Medicare fraud.  The flyer further stated that HealthBridge / Care One were "exploiting the elderly…to boost their own bottom line."  On April 13, 2011, a similar "BUSTED" leaflet was distributed outside HealthBridge's Wethersfield, Stamford and Milford unionized facilities.  That same day, the "BUSTED" flyer was also distributed outside HealthBridge's Southbury non-unionized facility.  The following day, April 14, 2011, a similar "BUSTED" leaflet was distributed at the Westport Health Care Center.   Copies of the "BUSTED" flyer distributed at the HealthBridge's Danbury and Westport facilities are attached as Exhibits R and S, respectively.

- As part of its scheme to instill fear in Plaintiff's customers and the public, the Defendants also sponsored "BUSTED" advertisements in various media platforms.  On April 6, 2011, the History Channel aired a television commercial sponsored by Defendants that specifically named each of the HealthBridge's six unionized Connecticut facilities and alleged that there was poor quality of care at those facilities.  Defendants sponsored the television commercial again during a baseball game on ESPN on April 10, 2011.

- Defendants also sponsored "BUSTED" advertisements in the Newington Town Crier and the Stamford Advocate on April 8, 2011, suggesting that HealthBridge was engaged in "scare tactics, fear-mongering and illegal behavior to get their way."  A similar "BUSTED" advertisement appeared in the Danbury News-Times around April 7, 2011.  A copy of the "BUSTED" advertisement from the Newington Town Crier is attached as Exhibit T.

112.    Defendants used their rhetoric to increase the pressure on Plaintiffs by continuing to republish this inflammatory content by different means through multiple media outlets, to reach a wider audience.  For example:

- On May 2, 2011, NEHCEU distributed a brochure entitled "HealthBridge Nursing Home Negotiations:  The Real Story—Demands Destroy Standards for Caregivers and Patients" to Plaintiffs' staff physicians, purporting to summarize the status of the negotiations at the Danbury Health Care Center.   Upon information and belief, NEHCEU disseminated this brochure over the Internet, via facsimile, and/or by U.S. mail.  The brochure included baseless accusations of "reckless behavior" on the part of HealthBridge and claimed that they "continue[] to violate both the law and all standards of human decency."  The back page of the brochure further inaccurately suggests that resident care had suffered or was suffering with the section title "Cuts for workers = decline in quality care."  A copy of the "Real Story" brochure is attached as Exhibit U.

- NEHCEU repurposed and reused the content of the same brochure at the HealthBridge-managed Westport Health Care Center and Newington Health Care Center on or about May 13, 2011, when it distributed a brochure entitled "A Mother's Day Message For Our Patients, Families and Friends From the Caregivers at Westport Health Care Center."  This Mother's Day Message was designed to provoke anxiety and alarm concerning the baseless allegations of "reckless behavior" and substandard care that a reader would infer the HealthBridge provided.  A copy of the "Mother's Day Message" is attached as Exhibit V.

- On or about December 16, 2011 NEHCEU distributed a flyer at the HealthBridge-managed Danbury, Connecticut facility entitled "What Kind of Employer Locks Out Trusted Caregivers And Leaves Patients Alone With Strangers on Christmas?" inviting recipients of the flyer to "Call HealthBridge …Tell them that stable care comes from stable caregivers."  A copy of this flyer is attached as Exhibit W.  Without justification, this flyer recklessly and falsely suggests that HealthBridge provides substandard care to its patients.

- On December 19, 2011, NEHCEU issued an invitation to a Candlelight Vigil, which stated that HealthBridge was "forcing caregivers into the cold and leaving patients alone with total strangers 12 days before Christmas."  To further incite sympathy and fear, the flyer intimated that HealthBridge had "put our frail and elderly at risk."  A copy of the Candlelight Vigil invitation is attached at Exhibit X.

- On February 8, 2012, residents of the town of Milford, Connecticut received a flyer designed to provoke fear and distrust.  The flyer sought a Milford citizens call to action and declared as its central premise that "RESIDENTS ARE AT RISK."  The flyer falsely claimed that "The Residents at West River Health Care Center are in Real Danger and in the Hands of Strangers…," that patients were

41

"being dropped on the floor," and that "wrong medications given – patients hospitalized." The flyer provided contact information for the local mayor, state senator, state representative, congresswoman, and a United States senator. Along with that flyer, patients received a NEHCEU flyer purporting to provide a status update on negotiations that again denounced the quality of care given by "strangers" to nursing home patients. Upon information and belief, Defendants distributed these flyers via U.S. mail to Milford citizens' homes. A copy of the "PATIENTS ARE AT RISK" and status update flyers are attached as Exhibit Y.

- In February 2012, Defendants distributed a flyer at an open house at a non-union facility in Morris, New Jersey managed by Care One. This flyer falsely suggests that high levels of administrator turnover at Care One's facilities led to "higher rates of catheterization, pressure sores, psychoactive drug administration, and more quality-of-care deficiencies" and directed those concerned to the COW website for more information. A copy of the "Who's in charge?" flyer is attached as Exhibit Z. A billboard truck carrying a similar message was driven in front of several facilities managed by Care One, as discussed *infra*.

- On May 2, 2012, NEHCEU issued a press release in which its President David Pickus falsely and defamatorily accused HealthBridge of showing willingness to "destroy workers' lives and sacrifice the quality of care for the frail elderly entrusted to their care, all to increase investors' profits" and, without any basis, claimed that HealthBridge was "siphoning off millions of taxpayer dollars in Medicaid and Medicare reimbursement for elder care." A copy of the press release is attached as Exhibit AA.

113.   On or about July 4, 2012, NEHCEU sponsored a flyer entitled, "Thinking about Where to Turn for your loved ones" aimed at HealthBridge's Westport Health Care Center in Westport, Connecticut. The flyer incites fear by making unfounded claims that "[d]uring negotiations this corporation repeatedly exploited the concerns of nursing home patients and their families, just so they could maximize their bottom-line profits-at workers' expense." A similar flyer was distributed near HealthBridge's West River Health Care Center the next day, as well as at the Milford Post Mall on July 17, 2012. Attached as Exhibit BB is a copy of the flyer entitled, "Thinking about Where to Turn for your loved one's."

114.   Also on July 17, 2012, NEHCEU sponsored a similar flyer aimed at family members of patients at the Newington Health Care Center. This flyer questions whether HealthBridge can be trusted "to care for your loved ones" in Newington or at any facility and

suggests that replacement workers are "strangers, creating fear, mistrust and uncertainty about the future of resident care." Attached as Exhibit CC is the flyer titled "Who should you trust to care for your loved ones?"

115.    On July 30, 2012, NEHCEU posted a headline on the social media Internet site, Facebook, entitled, "Did 'replacement' care lead to one resident's death at a HealthBridge nursing home?" (https://www.facebook.com/NEHCEU1199/timeline?filter=3). A screenshot of the Facebook post is attached as Exhibit DD. NEHCEU's Facebook post links to a newspaper story with a different headline. The text of the story neither states nor implies that replacement care led to a patient's death. Accordingly, the NEHCEU post is false, defamatory, and intentionally deceptive. It is designed to erode public confidence in the Plaintiffs and the facilities they manage.

### c.      False and Misleading Statements on Traveling Billboards

116.    The Unions have also engaged in their pattern of disseminating false and misleading information about Plaintiffs by hiring trucks – in at least some cases driven by non-union drivers – displaying billboards containing false and misleading information about the Plaintiffs.

117.    For example, in or around November 2011, the Unions hired a billboard truck to drive throughout Connecticut and New Jersey and display the "overbilled" message outside facilities managed by Plaintiffs. The billboard also directed the public to the COW website. That truck was spotted in front of the Highlands Health Care Center on November 18, 2011, and was at each of the Connecticut facilities managed by HealthBridge – both union and non-union – over the course of the next several days following the November 18th sighting.

118.    In or around May 2012, the Unions hired additional trucks containing the billboard entitled, "Who's in Charge at HealthBridge Nursing Homes?" The billboard suggested

that substandard care at HealthBridge facilities led to "higher catheterization rates, bed sores" and other deficiencies. This billboard truck was at HealthBridge's Wethersfield Health Care Center in Wethersfield, Connecticut on May 1, 2012.

119.    The same or a similar billboard truck was outside HealthBridge's West River facility in Milford, Connecticut on May 2, 2012; at its River Glen facility in Southbury, Connecticut on May 3, 2012; at its Westport Health Care Center on May 4, 2012; and at its Newington facility on May 9, 2012. These billboards falsely and maliciously insinuate that administrator turnover at the HealthBridge-managed facilities has led to chaos and poor care. Attached as Exhibit EE is a photo of this truck. In fact, Defendants know that they lack any evidence of substandard care linked to administrator turnover and are merely attempting to destroy public confidence in HealthBridge and the facilities it manages.

120.    In or around August 2012, the Unions again hired billboard trucks to park at or near facilities in New Jersey managed by Care One. The billboards attempt to dissuade patients and their family members from doing business with Care One by falsely insinuating that Care One-managed facilities provide low-quality care. For example, one billboard asks, "Should we be concerned for our loved ones in Care One nursing homes?" The only evidence cited for such concern is an incident that allegedly occurred at a North Carolina facility managed by an affiliate of Plaintiffs, but the billboard implies that "quality of care problems" are prevalent throughout "all" of Plaintiffs operations. The billboard directs viewers to the COW website for additional information.

121.    On August 8 and 9, 2012, a truck displaying this billboard message was parked outside Care One's headquarters in Fort Lee, New Jersey. Attached as Exhibit FF is a photograph of the billboard truck. On August 10, the same or similar billboard sign trucks were parked outside Care One's Moorestown and Hamilton, New Jersey facilities. Attached as

Exhibits GG and HH are photos of these billboard sign trucks seen outside the Moorestown and Hamilton facilities, respectively. The billboards are designed to evoke a visceral reaction against doing business with Care One and HealthBridge despite the absence of evidence of poor-quality care at any of the facilities at which the billboard is displayed.

122. In addition to the defamatory content of the billboards, the trucks intentionally impeded Care One and HealthBridge's businesses by trespassing on the property of the facilities it manages, blocking access to the facilities, and forcing residents and visitors to park in fire lanes and/or away from the facility on certain occasions. For example, on August 10, 2012, the driver of the billboard truck parked outside of the Hamilton facility obstructed traffic, interfered with parking the facility, and forced some visitors to park in the fire zone. The police were called after the driver refused to move when asked to do so by the Administrator. Upon the arrival of the police, the driver confirmed that he was a non-union driver employed by "Gorilla Trucking Company" located in southern New Jersey. He stated that drivers employed by his company had been ordered to stay in front of specific Care One sites for one hour and then move on to the next site, and he had one more Care One site to visit that day.

123. In On August 23, 2012, Defendants again unleashed their COW billboard trucks carrying the billboards asking "Should we be concerned for our loved ones in Care One nursing homes?" and deceptively suggesting that Care One has prevalent "quality of care problems" that put patients in "immediate jeopardy." This billboard was seen at various locations throughout northern New Jersey on August 22nd, 23rd and 24th, 2012. A photograph of the billboard truck is attached as Exhibit HH.

124. None of the false or misleading statements disseminated by Defendants are motivated by legitimate concern for patient care or well-being. Rather, their purpose is to deceive the community, patients, prospective patients, and their family members into thinking

that facilities managed by Plaintiffs are unsafe and/or run improperly so that all of the facilities will lose money and be forced to accede to Defendants' extortionate demands.

### 4.    Attacks on Mr. Straus

125.    In accordance with the Manual, Defendants have targeted Mr. Straus for personal attacks designed to embarrass him, invade his privacy, and impede business ventures completely unrelated to Plaintiffs.

126.    A page on the COW website entitled "Bad Neighbors?" focuses on a Manhattan development planned by JZS Madison, a company in which Daniel E. Straus has an ownership interest.   The page claims that "neighbors and representatives of neighborhood community groups" have unidentified "concerns" with the project.   The page insinuates that there is something wrongful or nefarious about the project without any factual basis and is designed to discourage members of the public from doing business with Daniel Straus or Plaintiffs.  A copy of the page is attached as Exhibit II.   The Defendants have also distributed flyers and other materials to the same effect and enlisted their members in a campaign to sabotage Daniel Straus' unrelated businesses, and to force him to have Plaintiffs accede to their demands in bargaining or be deprived of the benefits of his substantial investment in JZS.

127.    Defendants, in concert with one another, have sought to pressure and embarrass Daniel Straus, a trustee of NYU Law School, by disparaging him in front of the NYU community.   A page on the COW website entitled "Institute for Injustice" promoted a demonstration conducted by the Defendants and others outside NYU Law School on September 8, 2011.  At the event, performers staged a mock opening of the "Straus Institute for Worker Injustice," contending that it was replacing the presently named Straus Institute for the Advanced Study of Law and Justice, which is endowed by Daniel Straus.   The Defendants further attempted to shame Daniel Straus by distributing flyers welcoming people to the newly-named

facility.  Attached as Exhibit JJ is a copy of the "Welcome to the Straus Institute for Worker Injustice" flyer distributed at the event.  According to the page on COW's website, "[o]ne performer proposed to do a project on how to get workers to work for longer hours with less pay. 'Free no-doze and Red Bull for everyone,' she said. Another suggested cutting staffing ratios because, 'What nursing home resident needs more than 30 seconds of care in a day?' She explained how to best fire workers without getting in trouble – 'You just hire them back at lower wages!'"  The page claims that the performance "drew largely from real occurrences in the nursing homes."  Thus, the page falsely charges that Care One and HealthBridge provide low-quality service that endangers the lives of their patients.  The page is designed to discourage members of the public from doing business with Plaintiffs or Daniel Straus.

128.   Following their attack on Daniel Straus at NYU on September 8, 2011, the Unions distributed a flyer describing its efforts to publicly denigrate Daniel Straus and the Institute for the Advanced Study of Law & Justice at NYU that he endowed. The Unions acknowledged that they "distributed leaflets to passing NYU students, tourists and neighbors" to attempt to dissuade them from supporting the Institute.  In the September 8, 2011 flyer, the Unions revealed that their true motive and plan was that it was going to continue the campaign of extortion against Plaintiffs and Daniel Straus in any way that they could, including lodging accusations at entirely unrelated business ventures of Daniel Straus, until they forced the Plaintiffs to accede to their demands.  The flyer stated that the Unions were "**not going to let HealthBridge beat us** at the table, with the Labor Board, or anywhere else.  **We're taking this fight to them, wherever they are**."  (emphasis in original).  A copy of this flyer is attached as Exhibit JJ.

129.   On September 24, 2011 NEHCEU President David Pickus emailed Straus Institute Fellows, explaining why Defendants staged the "Welcome to the Straus Institute for

Worker Injustice" event in an attempt to further embarrass Straus in front of esteemed NYU officials.  Again following the Manual's suggested extortion procedures, on October 30, 2011, David Pickus emailed Straus Institute Fellows, requesting that they use their position of influence (albeit entirely unrelated to the on-going labor negotiations between Defendants and Plaintiffs) to contact Daniel Straus about Defendants' disputes with Plaintiffs.  Both emails to the Straus Institute Fellows contained false, misleading, and defamatory information about Plaintiffs designed to gain sympathy and assistance from high-ranking officials in the NYU community. For example, both emails referenced LPNs in New Jersey who allegedly were wrongfully terminated for standing up for their patients and themselves, when in fact, LPNs like Jillian Jacques were terminated for grave errors in patient care.

130.    The Unions repeated their threat to continue their campaign against Plaintiffs until they give in to the Union's demands in a document entitled, "1199 Nursing Home Contract Update," discussing the status of NEHCEU's new contracts with other nursing homes in Connecticut.  In that publication issued on October 18, 2011, NEHCEU confirmed that it was building support for its campaign "among family members, patients and local clergy and elected officials, isolating HealthBridge and demanding that they follow the pattern" set in other nursing homes.  A copy of this publication is attached as Exhibit LL.

131.    On January 30, 2012, the Unions coordinated a street performance of "Sheriff 99% and the 1% Corporate Outlaw" outside NYU law school.  At the event, members of the Unions, students and street performers ominously announced a "manhunt" against Daniel Straus, handing out flyers and displaying posters that "NYU Law School Trustee and Corporate Outlaw Daniel Straus" was "Wanted for Corporate Greed & Robbing Workers of Their Rights." Attached as Exhibit MM is a copy of the "Wanted for Corporate Greed & Robbing Workers of Their Rights" flyer.

132.    The Unions have worked in concert with NYU students, including members of the Student Labor Action Project, Law Students for Economic Justice and NYU for Occupy Wall Street to advance their agenda.  For example, NYU students worked in tandem with the Unions in providing pre and post-promotion of the "manhunt" event.  On January 29, 2012, NYU for Occupy Wall Street, a student group that worked in concert with the Unions on numerous occasions, issued a press release promoting the event, which contained a number of links to the NEHCEU's website.  On January 31, 2012, the NYU Local, a pro-union student blog, published an article entitled, "Sheriff 99% And The 1% Corporate Outlaw: NYU Law School" further advancing the Unions' agenda.

133.    Approximately 50 NEHCEU and UHWE members protested alongside students near NYU Law School on July 25, 2012.  During the protest, an undergraduate student delivered a letter on behalf of NEHCEU to Professor J.H.H. Weiler, Director of the Straus Institute, seeking to induce HealthBridge to continue paying into NEHCEU's severely underfunded pension plan and stating," [w]hile caregivers are seeing $30 million in wages, pensions and health benefits destroyed, their boss continues to endow NYU Law with money unlawfully taken from their pockets."  Attached as Exhibit NN is a copy of the Appeal to Prof J.H.H. Weilman, Director of the Straus Institute delivered on July 25, 2012.

134.    In keeping with their extortionate tactics, the Unions have enlisted NYU students to support their effort to have NYU remove Mr. Straus from his position as a trustee at NYU Law School.  In a February 12, 2012 email sent to the Law Students for Economic Justice distribution list, a representative of the student organization solicited help "[o]btaining the by-laws regarding the process by which trustees are appointed to the NYU law school board."  The email alleges that "Care One has been engaging in some pretty terrible union-busting tactics" and

offers to put interested parties "in touch with our contacts at SEIU 1199, who is organizing the labor force."

135.    In furtherance of the Unions' objective to remove Straus as a trustee, on March 19, 2012 the NYU Local published a union-friendly article "Know Your Trustees: Daniel E. Straus." The article reads eerily familiar to the propaganda promulgated by the Unions in their crusade against Plaintiffs.  For example, the article misrepresents the aforementioned termination of employees in Care One's New Jersey facilities.  The article also falsely reports of "inaccurate medications and stress resulting from the replacement of familiar comfortable caregivers with temporary labor," without providing any basis for such reports.  On March 26, 2012, NEHCEU provided a link to the article on its Facebook page.

136.    Upon information and belief, an NYU student group has since petitioned the law school to oust Daniel Straus from its board.   The Unions' attempt to remove Straus as a trustee of NYU Law School is another example of their willingness to use any means to compel Straus and Plaintiffs to cede to unionization and negotiation extortionate demands.

      **E.**    **Under the Corporate Campaign Model, Extortion Is Defendants and the SEIU's Regular *Modus Operandi***

137.    Extortion is Defendants and the SEIU's regular means of conducting business, particularly in the context of organizing employees and extracting substantial sums of money from employers to fund the severely underfunded pension plans of its affiliated locals.  Both within and outside the healthcare industry, Defendants, the SEIU, and other locals affiliated with the SEIU have recently conducted extortionate corporate campaigns against numerous corporations and other organizations, including, but not limited to: Sodexo USA; Beth Israel Deaconess Medical Center; Iroquois Nursing Homes; Prime Healthcare Services; Beverly Enterprises; Executive Management Services; Sutter Health; Bank of America; Yale-New Haven Hospital; Wackenhut Services Inc.; Somers Building Maintenance; Professional Janitorial

Services; JPMorgan Chase; Brookfield Properties; Catholic Healthcare West; Pocono Medical

Center; Aramark; Corporation of Fine Arts Museums; Fresno County; Fresno County,

California; Wal-Mart; General Growth Properties; Enloe Medical Center; Catholic Healthcare

Partners; Advocate Health Care; Tenet Healthcare Corp. Genesis Health Ventures Inc.; Vencor,

Inc.; and Carlyle Group.

138.    The campaigns against these other organizations have been similar to those

launched against Plaintiffs in that they used tactics from the Manual to apply pressure completely

unrelated to any labor-related concerns, all to force the target company to recognize the union

outside the NLRA-sanctioned processes or agree to additional contract concessions.

139.    Examples of prior recent unlawful acts of extortion by Defendants include:

- Defendant UHWE recently launched a smear campaign against Beth Israel
  Deaconess Medical Center in Massachusetts, in which UHWE disseminated
  misleading information about the hospital's quality of care, billing practices, and
  financial management, all with the goal of forcing the hospital to recognize
  NEHCEU without a secret-ballot election.  (www.eyeonbi.org).

- Defendant NEHCEU recently interfered with Yale-New Haven Hospital's
  development plans for the building of the $430 million Smilow Cancer Hospital
  by, among other things, influencing government officials to block construction
  plans until hospital agreed to allow NEHCEU access to hospital employees to
  further its seven-year effort to organize hospital employees without a secret-ballot
  election.

- Defendant UWHE recently threatened to generate negative publicity for
  Community General Hospital in Syracuse, New York, unrelated to any labor-
  related grievances, unless it would agree to pressure its member of the Iroquois
  Nursing Home Board of Directors to accede to UHWE's contract demands.

140.    These and other examples demonstrate that the campaign against Plaintiffs is not

an anomaly; rather, the extortionate tactics used are the Defendants' ordinary and regular means

of conducting unionization drives and contract negotiations.

141.    Likewise, the concerted sabotage and vandalism carried out at the HealthBridge Connecticut facilities is typical of the Unions' regular way of doing business designed to extort employers in the course of strikes.

142.    For example, in March 2001, in an effort to extort collective bargaining concessions from ten Connecticut healthcare facilities unrelated to Plaintiffs, members of Defendant NEHCEU purportedly committed numerous criminal acts prior to the arrival of replacement workers designed to endanger the patients and impede business operations at the striking facilities. These unlawful acts were documented in an April 10, 2001 report of the Connecticut Chief State's Attorneys Office – Division of Criminal Justice entitled, "Nursing Home Strike Incidents," which noted that these types of incidents are common during work actions at facilities of this nature." (*See* Exhibit B at 9). These acts, which are strikingly similar to those perpetrated against patients in Plaintiffs' HealthBridge Facilities in Connecticut in July 2012, included:

- Patient wristbands were removed from 67 patients.

- Patient photographs were removed from Kardex

- Damage to blood pressure cuffs

- The removal or theft of mechanical patients lift chains

- The loosening of bolts to a mechanical patients lift resulting in its collapse while being used to lift a patient

- Non-narcotic medications were found missing from a medcart on one of the wings

- Doors to offices and the oxygen storage room had super glue or its equivalent injected into the lock mechanism

- A shower was smeared with feces

- The distribution of chocolates by a staff member to patients despite their dietary restriction

- The pulling of a false fire alarm (a suspect was arrested)

- The theft of license plates from an employee's car

- Patient name plates were switched

- The jamming of fax machines

- The loosening of a door jam and the removal of a hinge pin in a patient's room

- Towels and face clothes that were thrown into a dumpster

- The puncture of inner seals of formula feeding bottles (with the outer seals being replaced concealing the contamination)

- The use of an unsterile urethral catheter kit on a patient. The kit's condition was not discovered as punctures to it had been concealed. Multiple kits were found to have been damaged in this manner

- Patient's narcotics cards were put in disarray

- Johnny coats (hospital gowns) were tied in knots

- A supply room was ransacked and sprayed with shaving cream

- The temperature log which reflects daily temperature readings of water was missing from the kitchen

- The thermostats were turned up in various patient rooms

143.    Although law enforcement authorities determined that NEHCEU members perpetrated these heinous acts in the hours leading up to the 2001 strike, the individuals responsible were not held accountable "due to the heavily politically charged environment as well as the fear and inability of patients to assist in the investigation."  (*See* Exhibit B at 9).

144.    Prior to these incidents, in 1998, NEHCEU members purportedly engaged in similar heinous conduct in the hours leading up to another strike, again with the goal of seeking to extort substantial monetary concessions from the employers involved in this 1998 strike.

145.    Moreover, Defendants' unlawful tactics are consistent with the SEIU's and its other affiliated locals' regular way of doing business.  For example, the SEIU and its affiliated locals have engaged in the following conduct:

- Launching a brutal smear campaign against Sodexo USA, utilizing a myriad of tactics designed to harm the company including but not limited to:  throwing plastic roaches onto food at a high-profiled event catered by Sodexo; scaring hospital patients by insinuating that Sodexo food contained bugs, rat droppings, mold and flies; lying to interfere with Sodexo business and sneaking into elementary schools to avoid security; violating lobbying laws to steer business away from the company; and threatening Sodexo employees with public exposure of alleged wrongdoing, all to force Sodexo to recognize the SEIU, to the exclusion of other unions, without a secret-ballot election.  Sodexo filed a RICO action against the SEIU in March 2011 (1:2011cv00276) and the matter settled in September 2011 following the denial of the SEIU's motion to dismiss.

- Threatening criminal charges against Prime Healthcare Services' senior executives unless they agreed to the SEIU's contract demands, and, after Prime refused, the SEIU made numerous false public claims about the safety of Prime's facilities.

- Attempting to divert customers from Beverly Enterprises by publishing false reports about workers tying nursing home patients to their beds and allowing them to remain in their own urine and excrement for hours, all because Beverly did not accede to the SEIU's unionization demands.

- Attempting to strong-arm Executive Management Services, Inc. ("EMS") into signing a neutrality agreement and telling EMS's Chief Executive Officer, "[w]e enjoy conversation, but we embrace confrontation. We are going to attack you, your employees, and your customers in the next 90 days."

- Attempting to organize employees of Sutter Health in Northern California through numerous tactics including blocking development projects, calling on the state to revoke its tax-exempt status, and urging donors to stop contributing to the organization.

- Exploiting the teachings of the Catholic faith by attempting to turn Catholic Healthcare West's ("CHW") religious leadership and executive management against each other (through a public relations campaign) so that CHW would agree to card check recognition and company neutrality.

- Trespassing the headquarters of ESSA Bank and infiltrating the bank's shareholders meeting demanding that the bank's president and CEO, who is chair of the Pocono Medical Center's board of directors, discuss the striking Pocono Medical Center workers' demand for a closed shop.

54

- Launching a smear campaign in numerous cities (including New Haven) against Aramark, disseminating falsehoods that the company does not practice safe food distribution as part of the SEIU's effort to obtain a card-check neutrality agreement and gain union recognition.

- Organizing a rally and press conference to release a report misrepresenting the workforce of the Enloe Medical Center outside the office of the investment firm owned by the vice chair of Enloe's board of trustees as a ploy during a disputed the SEIU election.

- Launching a smear campaign against the Catholic Healthcare Partners ("CHP") in which the SEIU disseminated publications with misrepresentations about the hospitals' financial arrangements for the uninsured and questioned CHP's charitable purpose to advance the SEIU's goal of unionizing CHP workers.

- Launching a smear campaign against the non-profit healthcare system, Advocate Health Care, disseminating falsehoods that Advocate overcharges the uninsured and harasses patients who cannot pay with the goal of organizing Advocate's healthcare workers.

- Launching a smear campaign against Tenet Healthcare Corp.; distributing publications that questioned Tenet's patient safety and nurse staffing levels; and exerting political influence over California regulators and lawmakers leading to scrutiny that Tenet effectively gouged Medicare and charged excessive hospital rates.

- Disseminating a report disparaging the quality of patient care at Genesis Health Ventures Inc. ("GHV") in an effort to damage the reputation and stock value of GHV that GHV would unilaterally allow the SEIU to unionize all of its facilities unopposed.

- Launching a smear campaign against healthcare provider Vencor, Inc. to influence insurers and investors to turn against the company and force Vencor out of California. After initially claiming that the "Vencor/Hillhaven Family & Advocates Network" was established by "a group of family members" and was "not related to contract negotiations," the SEIU later admitted that the network was created as an economic weapon to achieve their bargaining goals in labor negotiations with Vencor.

- Targeting equity buyout funds, including the Carlyle Group in a "Behind the Buyouts" smear campaign (www.behindthebuyouts.org) with the motive of winning union representation at Plaintiffs partly or fully owned by the equity firms. Union members wearing business suits busted into a conference at Manhattan's Waldorf-Astoria Hotel, where the Carlyle Group's co-founder was giving a speech, holding up a sign "Why does he pay taxes at a lower rate than the hotel's doorman?" One Halloween, union members wore masks in the likeness of the Carlyle Group's co-founder and paraded in front of Carlyle offices handing out Sugar Daddy candy bars.

### III.     The Continuity and Effects of the Defendants' Extortionate Campaign

146.    As noted above, the overriding purpose of Defendants' extortionate campaign is self-enrichment and acquisition of Plaintiffs' valuable property rights.  These property rights include, but are not limited to:

- Millions of dollars in payments by Plaintiffs toward the crushing unfunded pension liabilities of the NEHCEU Pension Plan through its pattern contract  and the UHWE Pension Plan otherwise lose its rights to conduct business by being driven out of the states in which Plaintiffs do business.

- Plaintiffs' recognition of both Defendants as bargaining agent of current non-union employees at current and at future facilities managed by Plaintiffs.

- Physical access to the properties managed by Plaintiffs.

- Plaintiffs' rights under the NLRA to require a secret-ballot election for the selection of any collective bargaining representative.

- Plaintiffs' rights guaranteed by the NLRA to participate in that election process and to express their opinions about the unionization efforts, thereby allowing Defendants to fill the void created by Plaintiffs' forced silence with additional communications to employees regarding unionization

- Control over Plaintiffs business operations, since immediate recognition of a union as the exclusive bargaining representative of Plaintiffs' employees gives the union the immediate right to have a significant say in the operation of the employer's business affairs.

147.    There is no end in sight to Defendants' extortionate campaign against Plaintiffs.  In fact, in accordance with the Manual's emphasis on constant escalation of activity, the campaign grows bigger and more obtrusive by the day.  It will not stop until the Courts or law enforcement officials compel an end to it.

148.    Even acceding to Defendants' current demands would not end the pattern of extortionate behavior.  Plaintiffs manage numerous non-union facilities in several states.  It will take the Defendants many years of sustained effort to unionize them all.  Even then, collective bargaining agreements are not static, and, in each round of contract negotiations, whether they

occur when a contract expires or simply when Defendants' demand change, Defendants will bring the same extortionate conduct to bear on Plaintiffs and Daniel Straus.   The cycle of extortion will continue indefinitely.

149.    Although the NEHCHU currently represents some workers in Connecticut in five facilities managed by HealthBridge, these union employees represent a very small fraction of the total number of employees who work at Plaintiffs' facilities.  Defendants have no legal right to engage in collective bargaining with, or make demands of the Plaintiffs on behalf of the non-union employees in Plaintiff's facilities.

150.    Nonetheless, Defendants' extortionate corporate campaign will continue until the Plaintiffs accept their demands and accord recognition to each of the Defendants in this case.

151.    The effects of Defendants' extortionate conduct are severe.  In already difficult economic times, particularly in the elder care industry, the most likely results of extended extortionate campaigns are poor patient care, unprofitable facilities that may be forced to close, layoffs of union and non-union employees, and monetary losses for the owners of the Plaintiffs.

## FIRST CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(a)

152.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

153.    Each of the Plaintiffs is a "person" under 18 U.S.C. § 1961(3).

154.    Each of the Defendants is a "person" under 18 U.S.C. § 1961(3).

155.    The 1199 Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The 1199 Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

156.    Defendants conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a).   Specifically, each of the Defendants agreed and

intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to acquire substantial sums of money through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5), and to use or invest such income in the establishment or operation of the 1199 Enterprise.

157.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) includes multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Plaintiffs' property rights described above, at least including, but not limited to, the following: Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.  Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

158.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  As set out more fully above, Defendants have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs to a large number of recipients.  Defendants have engaged in this scheme with the specific intent to defraud – specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to the Defendants' extortionate demands.  Moreover, Defendants have disseminated these false and misleading communications through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

159.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous violations of the Travel Act, 18 U.S.C. § 1952.  As

discussed more fully above, Defendants have:  (i) travelled in interstate commerce, and used the mails and other facilities in interstate commerce; (ii) with the intention of promoting, managing, establishing, carrying on, or facilitate the promotion, management, establishment or carrying on their unlawful activity within the meaning of 18 U.S.C. § 1952; and (iii) have performed or attempted to perform one or more additional acts in furtherance of this unlawful activity.  This unlawful activity includes extortion and attempted extortion in violation of Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.

160.    Defendants' activities described herein have obstructed, delayed, or otherwise affected commerce.

161.    As a direct result of Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of Defendants' unlawful conspiracy described herein, the Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from patients leaving the Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, and (ii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

## SECOND CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(b)

162.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

163.    Each of the Plaintiffs is a "person" under 18 U.S.C. § 1961(3).

164.    Each of the Defendants is a "person" under 18 U.S.C. § 1961(3).

165.    Plaintiffs are each an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b).  Each was engaged in activities affecting interstate commerce at all times relevant to this Complaint.

166.    Defendants conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b). Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to acquire or maintain, directly or indirectly, an interest in or control of Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

167.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) includes multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Plaintiffs' property rights described above, at least including, but not limited to, the following: Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.  Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

168.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  As set out more fully above, Defendants have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs to a large number of recipients.  Defendants have engaged in this scheme with the specific intent to defraud – specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to Defendants' extortionate demands.  Moreover, Defendants have disseminated these false and misleading communications

through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

169.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous violations of the Travel Act, 18 U.S.C. § 1952.  As discussed more fully above, Defendants have:  (i) travelled in interstate commerce, and used the mails and other facilities in interstate commerce; (ii) with the intention of promoting, managing, establishing, carrying on, or facilitate the promotion, management, establishment or carrying on their unlawful activity within the meaning of 18 U.S.C. § 1952; and (iii) have performed or attempted to perform one or more additional acts in furtherance of this unlawful activity.  This unlawful activity includes extortion and attempted extortion in violation of Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.

170.    Defendants' activities described herein have obstructed, delayed, or otherwise affected commerce.

171.    As a direct result of Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of Defendants' unlawful conspiracy described herein, Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from patients leaving the Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, and (ii) the costs in time,  person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

**THIRD CAUSE OF ACTION**
**Violation of 18 U.S.C. § 1962(c)**

172.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

61

173.    Each of the Plaintiffs is a "person" under 18 U.S.C. § 1961(3).

174.    Each of the Defendants is a "person" under 18 U.S.C. § 1961(3).

175.    The SEIU is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The SEIU was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

176.    The 1199 Enterprise is another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The 1199 Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

177.    Each Defendant was and is associated with the SEIU and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the SEIU in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

178.    Each Defendant also was and is associated with the 1199 Enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the 1199 Enterprise in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

179.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) includes multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would have resulted in obtaining the property rights described above, at least including, but not limited to, the following: Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1. Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

180.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.   As set out more fully above, Defendants have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs to a large number of recipients.   Defendants have engaged in this scheme with the specific intent to defraud – specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to the Defendants' demands.   Moreover, Defendants have disseminated these false and misleading communications through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

181.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous violations of the Travel Act, 18 U.S.C. § 1952.   As discussed more fully above, Defendants have:  (i) travelled in interstate commerce, and used the mails and other facilities in interstate commerce; (ii) with the intention of promoting, managing, establishing, carrying on, or facilitate the promotion, management, establishment or carrying on their unlawful activity within the meaning of 18 U.S.C. § 1952; and (iii) have performed or attempted to perform one or more additional acts in furtherance of this unlawful activity.   This unlawful activity includes extortion and attempted extortion in violation of Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.

182.    Defendants' activities described herein have obstructed, delayed, or otherwise affected commerce.

183.     As a direct result of Defendants' violation of 18 U.S.C. § 1962(c), the Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from patients leaving the Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, and (ii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

## FOURTH CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)

184.     Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

185.     Each of the Plaintiffs is a "person" under 18 U.S.C. § 1961(3).

186.     Each of the Defendants is a "person" under 18 U.S.C. § 1961(3).

187.     The SEIU is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).   The SEIU was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

188.     The 1199 Enterprise is another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The 1199 Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

189.     Each of the Defendants was and is associated with the SEIU, and has conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).  Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the SEIU in relation to the Plaintiffs through a pattern of racketeering activity 18 U.S.C. § 1961(1) and (5).

190.    Each of the Defendants also was and is associated with the 1199 Enterprise, and has conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c). Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the 1199 Enterprise in relation to the Plaintiffs through a pattern of racketeering activity 18 U.S.C. § 1961(1) and (5).

191.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) includes multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would have resulted in obtaining the property rights described above, at least including, but not limited to, the following: Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1. Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

192.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.   As set out more fully above, Defendants have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs to a large number of recipients.  Defendants have engaged in this scheme with the specific intent to defraud – specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to Defendants' demands. Moreover, Defendants have disseminated these false and misleading communications through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

193.   The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous violations of the Travel Act, 18 U.S.C. § 1952.  As discussed more fully above, Defendants have:  (i) travelled in interstate commerce, and used the mails and other facilities in interstate commerce; (ii) with the intention of promoting, managing, establishing, carrying on, or facilitate the promotion, management, establishment or carrying on their unlawful activity within the meaning of 18 U.S.C. § 1952; and (iii) have performed or attempted to perform one or more additional acts in furtherance of this unlawful activity.  This unlawful activity includes extortion and attempted extortion in violation of Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.

194.   Defendants' activities described herein have obstructed, delayed, or otherwise affected commerce.

195.   As a direct result of Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of Defendants' unlawful conspiracy described herein, Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from patients leaving the Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, and (ii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

### FIFTH CAUSE OF ACTION
### Unfair Trade Practices

196.   Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

197.   The Plaintiffs and the Defendants are engaged in the conduct of trade and/or commerce.

198.    As set forth above, Defendants have disseminated substantial false, deceptive, and misleading information to the public concerning the Plaintiffs and the facilities Plaintiffs manage, all designed to interfere with customer's relationships with the Plaintiffs and to deter potential customers from doing business with Plaintiffs.

199.    The intentional dissemination of such false and misleading information to the consuming public constitutes an unfair and/or deceptive trade practice in violation of Conn. Gen. Stat. Ann. § 42-110b, Mass. Gen. Laws ch. 93A § 11, and/or N.J. Stat. Ann. §§ 56:8-1 *et seq*.

200.    As a result of Defendants' unfair and deceptive trade practices, the Plaintiffs have suffered quantifiable and ascertainable losses, including but not limited to (i) lost revenue from patients leaving Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, and (ii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

201.    Defendants' engaged in these unfair and deceptive practices willfully, wantonly, intentionally, and maliciously, for the express purpose of causing Plaintiffs the above losses.

### SIXTH CAUSE OF ACTION
### Tortious Interference with Contractual and Economics Relationships

202.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

203.    As set forth above, Defendants have disseminated substantial false, deceptive, and misleading information to the public concerning Plaintiffs and the facilities they managed, all designed to interfere with customer's relationships with Plaintiffs and to deter potential customers from doing business with Plaintiffs.

204.    Defendants at all times knew about Plaintiffs' relationships with their customers and purposefully and without justification tailored their extortionate campaign to interfere with those relationships and incite customers to stop doing business with Plaintiffs.

205.   As a result of Defendants' extortionate activities, certain customers have stopped doing business with Plaintiffs all incited by Defendants' intentional interference.  Thus, Plaintiffs have suffered actual losses caused by Defendants' intentional interference with their contractual and economic relationships.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against all Defendants, jointly and severally, as follows:

1.   Compensatory and consequential damages resulting from injury to Plaintiffs' business and property in the millions of dollars, as set forth above and to be further established at trial;

2.   Treble the damages sustained by Plaintiffs as described above;

3.   The costs of this suit (including reasonable attorneys' fees) and post-judgment interest;

4.   Exemplary and/or punitive damages under applicable State law for Defendants' intentional, willful, wanton, outrageous or malicious misconduct, characterized by their evil or rancorous motive, ill will and intent to injure Plaintiffs; or Defendants' gross recklessness or gross negligence evincing a conscious disregard for Plaintiffs' rights;

5.   Equitable relief as might be appropriate pursuant to applicable law, including but not limited to enjoining Defendants from continuing their scheme to extort Plaintiffs as follows:

i.   Enjoining Defendants from continuing to interfere unlawfully with the Plaintiffs' contractual and/or economic business relationships by wrongfully inducing the Plaintiffs' patients to end and/or not renew their contractual and/or business relationships with the Plaintiffs;

      ii.     Enjoining Defendants from continuing to make threats to harm the Plaintiffs unless and until Plaintiffs deliver to Defendants the property described herein;

      iii.     Enjoining Defendants from engaging in independent violations of federal, state and local laws with regard to Plaintiffs' business relations, including but not limited to the violations of the manner and type described in the Complaint;

      iv.     Imposing reasonable restrictions on the future activities and conduct of any of the Defendants; and

      v.     Any other and further relief as the Court deems just and proper.

Respectfully submitted,

**K&L GATES LLP**

One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Fax:  (973) 848-4001
*Attorneys for Plaintiffs*

By:  /s/ Rosemary Alito_____
           Rosemary Alito

Dated:  October 10, 2012

## <u>CERTIFICATION UNDER L. CIV. R. 11.2</u>

I certify that the matter in controversy is not the subject matter of any other action pending in any court or of any pending arbitration or administrative proceeding.

**K&L GATES LLP**

One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel: (973) 848-4000
Fax: (973) 848-4001
*Attorneys for Plaintiffs*

By:  /s/ Rosemary Alito_____
Rosemary Alito

Dated: October 10, 2012

## <u>LOCAL RULE 201.1 CERTIFICATION</u>

I certify under penalty of perjury that the matter in controversy is not eligible for compulsory arbitration because the damages recoverable by plaintiff exceed the sum of $150,000, exclusive of interest and costs.

**K&L GATES LLP**

One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel: (973) 848-4000
Fax: (973) 848-4001
*Attorneys for Plaintiffs*

By:  /s/ Rosemary Alito_____
Rosemary Alito

Dated: October 10, 2012