NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CARE ONE MANAGEMENT, LLC, et al., | Civil Action No. 12-6371 (SDW) (MCA) |
| Plaintiffs, | |
| v. | |
| | **OPINION** |
| UNITED HEALTHCARE WORKERS EAST, SEIU 1199, et al., | |
| Defendant. | October 10, 2013 |

**WIGENTON**, District Judge.

Before the Court is defendants 1199SEIU United Healthcare Workers East ("UHWE") and New England Health Care Employees Union, District 1199's ("NEHCEU") (collectively "Defendants" or "Defendant Unions") motion to dismiss the Complaint of Care One Management, LLC ("Care One"), HealthBridge Management, LLC ("HealthBridge"), the Care One Facilities,[1] and the HealthBridge Facilities[2] (collectively "Plaintiffs") ("Motion to Dismiss").

---

[1] Care One manages 21 facilities located throughout the State of New Jersey including the following: Care One at Birchwood, LLC, d/b/a Care One at The Highlands; Care One at East Brunswick, LLC, d/b/a Care One at East Brunswick; Care One at Hamilton, LLC, d/b/a Care One at Hamilton; Care One at Madison Avenue, LLC, d/b/a Care One at Madison Avenue; Care One at Mercer, LLC, d/b/a Care One at Ewing; Care One at Parsippany- Troy Hills, LLC, d/b/a Care One at Morris; Care One at Teaneck, LLC, d/b/a Care One at Teaneck; Care One at Wall, LLC, d/b/a Care One at Wall; Care Two, LLC, d/b/a Care One at Livingston; Care One at Moorestown, LLC, d/b/a Care One at Moorestown; Elmwood Evesham Associates, LLC, d/b/a Care One at Evesham; HCC, LLC, d/b/a Care One at Holmdel; King James Care Center of Middletown, LLC, d/b/a Care One at King James; Millennium Healthcare Centers II, LLC, d/b/a Care One at Dunroven; Millennium Healthcare Centers II, LLC, d/b/a Care One at Valley; Millennium Healthcare Centers, LLC, d/b/a Care One at Pine Rest; Millennium Healthcare Centers, LLC, d/b/a Care One at The Cupola; 11 History Lane Operating Company, LLC, d/b/a Care One at Jackson; 101 Whippany Road Operating Company, LLC d/b/a Care One at Hanover Township; 301 Union Street, LLC, d/b/a Care One at Wellington; and 493 Black Oak Ridge Road, LLC, d/b/a Care One at Wayne (collectively referred to herein as the "Care One Facilities").

[2] The HealthBridge Facilities include the following: 600 Kinderkamack Road Operating Company, LLC, d/b/a Oradell Health Care Center; 800 River Road Operating Company, LLC, d/b/a Woodcrest Health Care Center; 2 Cooper Plaza Operating Company, LLC, d/b/a South Jersey Health Care Center; 1621 Route 22 West Operating

This Court considers this matter without oral argument pursuant to Federal Rule of Civil Procedure 78. This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 28 U.S.C. § 1367. Venue is appropriate pursuant to 28 U.S.C. § 1391.

For the reasons provided below, this Court **GRANTS IN PART AND DENIES IN PART** the Motion to Dismiss (Dkt. No. 10). The Court will permit Plaintiffs to amend their Complaint within fourteen (14) days from the date of this Opinion. The Court **DENIES** Plaintiffs' request for a surreply. (Dkt. No. 27.)

**FACTUAL AND PROCEDURAL BACKGROUND**

Defendant Unions are affiliated with the Service Employees International Union (the "SEIU"). (Compl. ¶ 2.) Plaintiffs allege that these groups have ceased with traditional organizing and negotiation tactics in favor of extortion and fraud. (*Id.*) According to Plaintiffs, SEIU produces a "Contract Campaign Manual" (the "Manual"), which Plaintiffs allege the two Defendants follow and that Plaintiffs believe "condones and encourages illegal, immoral and unethical behavior in the pursuit of the unions' goals." (*Id.* ¶¶ 2-3.) According to Plaintiffs, the

---

Company, LLC, d/b/a Somerset Valley Rehabilitation and Nursing Center; 341 Jordan Lane Operating Company II, LLC, d/b/a Wethersfield Health Care Center; 1 Burr Road Operating Company II, LLC, d/b/a Westport Health Care Center; 107 Osborne Street Operating Company II, LLC, d/b/a Danbury Health Care Center; 240 Church Street Operating Company II, LLC, d/b/a Newington Health Care Center; 245 Orange Avenue Operating Company II, LLC, d/b/a West River Health Care Center; 710 Long Ridge Road Operating Company II, LLC, d/b/a Stamford Health Care Center; 162 South Britain Road Operating Company II, LLC, d/b/a River Glen Health Care Center; 2028 Bridgeport Avenue Operating Company II, LLC, d/b/a Golden Hill Health Care Center ("Golden Hill"); 745 Highland Avenue Operating Company, LLC, d/b/a The Highlands Health Care Center ("Highlands Health Care"); 135 Benton Drive Operating Company, LLC, d/b/a Redstone Health Care Center ("Redstone"); 178 Lowell Street Operating Company, LLC, d/b/a Lexington Health Care Center ("Lexington"); 19 Varnum Street Operating Company, LLC, d/b/a Lowell Health Care Center; 199 Andover Street Operating Company, LLC, d/b/a Peabody Glen Health Care Center; 2101 Washington Street Operating Company, LLC, d/b/a Newton Healthcare Center; 221 Fitzgerald Drive Operating Company, LLC, d/b/a New Bedford Health Care Center; 260 Easthampton Road Operating Company, LLC, d/b/a Holyoke Rehabilitation Center; 312 Millbury Avenue Operating Company, LLC, d/b/a Millbury Health Care Center; 49 Thomas Patten Drive Operating Company, LLC, d/b/a Cedar Hill Health Care Center; 548 Elm Street Operating Company, LLC, d/b/a Calvin Coolidge Nursing and Rehab. Center for Northampton; 57 Old Road to Nine Acre Corner Operating Company, LLC, d/b/a Concord Health Care Center; 64 Performance Drive Operating Company, LLC, d/b/a Weymouth Health Care Center; 70 Granite Street Operating Company, LLC, d/b/a North Shore Health Care Center; 750 Woburn Street Operating Company, LLC, d/b/a Wilmington Health Care Center; Park, Marion and Vernon Streets Operating Company, LLC, d/b/a Brookline Health Care Center (collectively referred to herein as the "HealthBridge Facilities").

Manual directly opposes the orderly process established under the National Labor Relations Act, 29 U.S.C. § 151 et seq. ("NLRA"), and the Manual "instructs SEIU members, and members of its affiliated local unions, to destroy businesses, ruin reputations, and invoke legal process improperly." (Compl. ¶ 3; Ex. A.)

To support their claims, Plaintiffs allege that Defendants engaged in various disruptive and criminal acts to create maximum chaos. (*Id.* ¶ 77.) For example, Plaintiffs allege that on July 3, 2012, NEHCEU members at five of the facilities that Plaintiffs manage went on strike and that "at the direction of lead organizers employed by NEHCEU, employees committed numerous criminal acts that jeopardized the lives and safety of the elderly and frail patients of these facilities." (*Id*. ¶ 79.) These alleged acts include switching name tags, losing or stealing equipment, placing screwdrivers in ceiling tiles, and removing daily living flow sheets. (*Id.*) At the Danbury Health Care Center, patient identifiers were switched and washing machines were tampered with, and at the Stamford facility a washing machine door was smashed and a call bell cord was removed. (*Id.*)

Plaintiffs essentially allege that the acts of sabotage at its facilities were to pressure Plaintiffs to resolve a strike against Plaintiffs and agree to collective bargaining agreements in Connecticut in NEHCEU's favor. (*Id.* ¶¶ 70-71.) Further, Plaintiffs assert that Defendants' demands were directly and indirectly communicated by David Pickus (NEHCEU President), Ricky Elliott (UHWE Vice President), and Elisabeth Daley (UHWE official). (*Id.*¶ 5.)

Plaintiffs also allege that Defendants disseminated false and misleading information to the public to further extort Plaintiffs. (*Id.* ¶ 77.) For example, Plaintiffs contend that despite the fact that they reported the July 3, 2012 incidents to the Connecticut Department of Public Health and the Connecticut Attorney General's office on the same day they occurred, a spokesperson for

NEHCEU posted on a Connecticut news blog that Plaintiffs "waited 'two whole weeks'" before reporting the incidents. (*Id.* ¶¶ 81-82.)

In 2010, Defendants and others launched the websites entitled, "Care One Watch" and "HealthBridge Watch" (hereinafter "COW"), where Plaintiffs claim they "disseminate false and misleading information about Care One, HealthBridge, and Daniel E. Straus over the Internet",[3] and suggest quality-of-care problems and overbilling issues.[4] (*Id.* ¶¶ 101, 103, 104.) Plaintiffs allege that Defendants communicated similar statements in advertisements to print and radio media via e-mail, fax, and/or U.S. mail before these publications printed them. (*Id.* ¶ 108.) Plaintiffs also allege that Union organizers in Connecticut and New Jersey mailed and gave patients' family members flyers inquiring whether they were "Overbilled at a Care One Facility?" and encouraging them to check for errors in their Care One bills. (Compl. ¶106.)

Further, on November 17, 2011, November 23, 2011, and December 2, 2011, NEHCEU allegedly sponsored advertisements in Boston and Connecticut newspapers directing readers to review their HealthBridge bills for overbilling. (*Id.* ¶¶ 107-08.) Between 2011 and 2012, numerous COW billboard trucks parked in front of various Care One sites with similar sentiments regarding billing and quality of care. (*Id.* ¶¶ 116-122.)

Additionally, Plaintiffs allege that Defendants abused the legal process in order to extort Plaintiffs. (*Id.* ¶ 77.) For instance, in fall 2011, UHWE filed three "Ten Taxpayer" petitions in Massachusetts to object to Plaintiffs' Applications for Need. (*Id.* ¶ 87.) The Applications for Need, according to Plaintiffs, "were filed [in order] to complete necessary upgrades and renovations to provide better care for the patients in [Plaintiffs'] facilities." (*Id.*) However,

---

[3] Daniel Straus ("Straus") is an "indirect" owner of Plaintiffs. (Compl. ¶ 4.)
[4] According to Plaintiffs, while "COW purports to be 'a coalition of concerned citizens and nursing home caregivers dedicated to quality care and healthy communities,' upon information and belief, it is composed almost exclusively of Local Union members and is deceptively designed to look like a grassroots community effort." (Compl. ¶ 102.)

allegedly between September 20, 2012 and September 24, 2012, via e-mail and telephone, Elisabeth Daley (UHWE's Senior Research Analyst) admitted to HealthBridge's outside auditor that Defendants' petitions were filed in response to the collective bargaining disputes rather than any concerns relating to Plaintiffs' facility upgrade and renovation plans. (*Id.* ¶¶ 89-90.)

With regard to Straus, an "indirect" owner of Plaintiffs' facilities, Plaintiffs claim Defendants have tried to extort him as well. (Compl. ¶ 4.) Straus is a trustee of New York University ("NYU") School of Law, and Plaintiffs allege that "Defendants have enlisted the NYU Student Labor Action Movement to apply pressure to the school's president to remove Daniel Straus as a trustee unless Plaintiffs accede to Defendants' demands." (*Id.* ¶¶ 4, 14.) Plaintiffs also allege that Defendants sought to embarrass and disparage Straus to NYU Law School by, for example, having a page entitled "Institute for Injustice" on the COW website with images from September 8, 2011 when Defendants and others demonstrated outside NYU Law School. (*Id.* ¶ 127.) According to Plaintiffs, "[a]t the event, performers staged a mock opening of the 'Straus Institute for Worker Injustice.'" (*Id.*)

On September 24, 2011, David Pickus (NEHCEU President) emailed Straus, and then on October 30, 2011, emailed Straus Institute Fellows allegedly to pressure Straus and to gain sympathy. (*Id.* ¶ 129.) Further, Defendant Unions allegedly worked with NYU students and organizations, including the Student Labor Action Project, Law Students for Economic Justice and NYU for Occupy Wall Street to advance their union agenda. (*Id.* ¶ 132.) Subsequently, NYU students have published "union-friendly" articles and petitioned to get Straus off the NYU board of trustees.[5] (*Id.* ¶¶ 132-36.)

---

[5] Plaintiffs allege this publication is to advance the Unions' objective to remove Straus as a trustee of NYU and to put pressure on Straus. (*Id.* ¶¶ 132-36.)

On October 10, 2012, Plaintiffs filed their Complaint in the United States District Court for the District of New Jersey with the following six causes of action: four claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO") (Counts One through Four), Unfair Trade Practices (Count Five), and Tortious Interference with Contractual and Economic Relationships (Count Six). (*See* Compl.) On December 18, 2012, Defendants filed the instant Motion to Dismiss Plaintiffs' Complaint. On February 15, 2013, Plaintiffs filed opposition, and on March 11, 2013, Defendants filed their reply. On March 15, 2013, Plaintiffs filed a motion for permission to file a surreply.[6]

**LEGAL STANDARD**

In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. Cnty of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 374 n.7 (3d Cir. 2002)). However, the claims must call "for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Id.* at 234 (internal citation and quotation marks omitted). Similarly, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Generally, when evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic

---

[6] Defendants and Plaintiffs each filed additional letters regarding points of law on July 2, 2013 and July 17, 2013, respectively.

documents if the complainant's claims are based upon these documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir.1993).

Pursuant to Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Warden v. McLelland*, 288 F.3d 105, 114 n.6 (3d Cir. 2002).

## DISCUSSION

Plaintiffs allege a pattern of racketeering activity under RICO, 18 U.S.C. § 1961(1) and (5),[7] in addition to mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. (Compl. ¶ 158.) These allegations include claims that Defendants disseminated false and misleading communications by facsimile, e-mail, internet, radio and U.S. mail, as well as violations of the Travel Act, 18 U.S.C. § 1952. (*Id.* ¶¶ 158-59.)

Plaintiffs claim that Defendants violated RICO by conspiring and acting with the intent "to acquire substantial sums of money through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5)" or alternatively "to acquire or maintain, directly or indirectly, an interest in or control of Plaintiffs." (*Id.* ¶¶ 156, 166.) Plaintiffs also claim that Defendants engaged in unfair trade practices as well as tortious interference with contractual and economic relationships by intentionally disseminating "false and misleading information to the consuming public . . . in violation of Conn. Gen. Stat. Ann. § 42-110b, Mass. Gen. Laws ch. 93A § 11, and/or N.J. Stat. Ann. §§ 56:8-1 et seq." (*Id.* ¶¶ 199, 203.)

As discussed below, this Court reviews Plaintiffs' claims in the light most favorable to Plaintiffs, as is required at this stage when considering a motion to dismiss. However, as there

---

[7] Section 1961(1) defines "racketeering activity" and 1961(5) defines a "pattern of racketeering activity." 18 U.S.C. § 1961(1), (5).

are certain deficiencies in Plaintiffs' pleadings, Plaintiffs will be permitted to amend their Complaint.

## I.    RICO Claims

Plaintiffs' Complaint includes the following RICO Counts:

- Violation of 18 U.S.C. § 1962(d) by conspiring to violate § 1962(a) (Count I)
- Violation of 18 U.S.C. § 1962(d) by conspiring to violate § 1962(b) (Count II)
- Violation of 18 U.S.C. § 1962(c) (Count III)
- Violation of 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c) (Count IV)

(Compl. ¶¶ 152-95.)  For Counts I through IV, Plaintiffs allege a pattern of racketeering activity under 18 U.S.C. §§ 1961 (1) and (5), where "Defendants have engaged in this scheme with the specific intent to defraud – specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to the Defendants' demands." (Compl. ¶ 180.)

Defendants argue that all four of Plaintiffs' RICO counts should be dismissed. Defendants make overarching arguments regarding the factual allegations related to racketeering activities, as well as assert that there are count specific issues with the Complaint.  First, the Court will address the broader issues that Defendants raise with respect to RICO and claims for wire and mail fraud.

Pursuant to 18 U.S.C. § 1962, for a viable RICO claim, plaintiffs need to allege racketeering violations, a pattern of racketeering activities, and/or RICO enterprise, and a nexus to interstate or foreign commerce.  18 U.S.C. § 1962 (a)-(c).[8]  Section 1962(d) makes it

---

[8] Pursuant to 18 U.S.C. § 1962,

"unlawful for any person to conspire to violate any of the provisions of sections (a), (b), or (c) of this subsection."

RICO civil claims require predicate acts. RICO lists crimes that constitute racketeering activities including extortion under the Hobbs Act, 18 U.S.C. § 1951,[9] extortion under State law, and extortion under the Travel Act, 18 U.S.C. § 1952. 18 U.S.C. § 1961. "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2)); *see also United States v. Enmons*, 410 U.S. 396, 397 (1973). "The 'fear' may be of economic loss as well as of physical harm." *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 503 (3d Cir. 1998) (citing *United States v. Addonizio*, 451 F.2d 49, 72 (3d Cir. 1972)).

---

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code . . . any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . .

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(a)-(d).
[9] Plaintiffs assert that they allege predicate acts under the extortion statutes of Connecticut, Massachusetts and New Jersey, not under the Hobbs Act. (*See* Pls.' Opp'n Br. 13; Compl. ¶¶157, 167, 179, 191.) This Court does recognize that where tactics of violence, threats, and force are used to obtain property for non-legitimate union purposes, courts have found the use of such tactics are "wrongful" under the Hobbs Act. *See, e.g., United States v. Larson*, 807 F. Supp. 2d. 142, 157 (W.D.N.Y. 2011). Non-legitimate purposes have included where a union was not authorized to act on behalf of employees. *Id.* at 154-55.

In the instant matter, Defendants assert that their tactics are "peaceful economic pressure tactics" that cannot be considered attempted extortion under RICO. (Defs.' Br. 9-11.) Defendants argue that their non-economic tactics include websites, media, and flyers which cannot be the basis for Plaintiffs' claims. (Defs.' Br. 4; Compl. ¶¶ 100, 101-24.)

According to Plaintiffs, Defendants have utilized four main tactics: (1) "vandalism and other criminal acts to endangers patients and disrupt Plaintiffs' ability to provide quality services and bring about negative outcomes before the Connecticut regulatory authorities"; (2) disseminating false and misleading information about Plaintiffs to dissuade patients from doing business with Plaintiffs; (3) "publicly smearing [Straus] concerning items completely unrelated to any labor-related grievances"; and (4) abusing the legal process regarding various unrelated matters with the sole objective of driving up Plaintiffs' costs. (*Id.* ¶ 78.) Plaintiffs allege criminal and dangerous actions in their Complaint including mishandling equipment and patient identification that endangers patients. (*Id.* ¶ 79.) If adequately pled such acts can form the basis for Plaintiffs claims; however, as discussed below there are flaws in Plaintiffs' pleadings which must be addressed.

Defendants assert that Plaintiffs have failed to plead a "property" that Defendants seek to obtain, and that the right to enter an agreement should not be considered a property right for the purpose of the statute. (Defs.' Br. 15-18.) Defendants also argue that Plaintiffs' allegations do not meet the definition for "generic" extortion. *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003); *see also Brokerage Concepts, Inc.*, 140 F. 3d at 522. For a state offense to be "extortion" that is "chargeable under State law," for the purposes of RICO under the Hobbs Act "the conduct must be capable of being generically classified as extortionate," where "generic" extortion is defined as "obtaining something of value from another with his consent

induced by the wrongful use of force, fear, or threats." *Scheidler*, 537 U.S. at 409; *see also* 18 U.S.C. § 1961(1).  Defendants argue that Plaintiffs' Complaint refers to "attempted extortion" and as pled fails to meet the requirements for a predicate act under RICO because Defendants "obtaining" property or something of value from Plaintiffs is not articulated.  (Defs.' Br. 10; *see Wilkie v. Robbins*, 551 U.S. 537, 567 (2007); 18 U.S.C. §1951(b).  In contrast, Plaintiffs assert first that they "do not allege predicate acts under the Hobbs Act", but rather, state law.  (Pls.' Opp'n Br. 13; *see also* Compl. ¶¶157, 167, 179, 191.)  Plaintiffs also argue that by forcing Plaintiffs to give up rights under the NLRA and to require a secret-ballot election for the selection of any collective bargaining representative, Defendants seek "effective control over Plaintiffs' business operations", which is Plaintiffs' property interest. (Compl. ¶16.)

Plaintiffs' Complaint includes allegations that the Defendant Unions are engaged in "attempted extortion" under RICO, 18 U.S.C. § 1961 *et seq.*  Plaintiffs assert that "Defendants are now increasing their extortionate tactics in order to induce the Plaintiffs to agree to recognize the Unions without the NLRA-sanctioned secret ballot process." (Compl. ¶ 75.)[10]  Defendants assert that they are merely seeking a "neutrality agreement."[11] (Defs.' Br. 4.)

The Third Circuit has held that a party that seeks to induce another to enter into a "legitimate" business transaction, not through force or violence, but through "economic fear in business negotiations between private parties" does not commit extortion or render a defendant guilty of "attempted extortion."  *See Brokerage Concepts, Inc.*, 140 F.3d at 523.  In the *Brokerage Concepts* case, the Court considered whether "hard business bargaining constitutes

---

[10] For example, Plaintiffs allege that "[Elizabeth] Daley told Plaintiffs that UHWE would consider withdrawing its baseless hearing requests on applications for improvements to HealthBridge Facilities in Massachusetts if HealthBridge would agree to NEHCEU's contract demands and agree to remain neutral in response to efforts by Defendants to organize non-unionized facilities managed by Plaintiffs." (Compl. ¶ 76.)

[11] Labor-management neutrality agreements have been found to be valid and lawful.  *See Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Res.*, 390 F.3d 206, 219 (3d Cir. 2004).

wrongful conduct amounting to extortion for civil RICO purposes." *Id.* at 501. The plaintiff in *Brokerage* ultimately did yield to pressure. *Id.* at 522. However, the *Brokerage* Court determined that "the defendants' use of the fear of economic loss in the context of hard business bargaining was not (legally) wrongful." *Id.*

Additionally, Defendants largely rely on *Scheidler v. Nat'l Org. for Women, Inc.*, when stating that Plaintiffs have not properly pled the "obtaining property" requirement rather than something intangible under the Hobbs Act or related statute. 537 U.S. 393; *see also Sekhar v. United States,* 570 U.S. __, 133 S.Ct. 2720, 2725, 186 L. Ed. 2d 794 (2013) (explaining that for property to be the basis of an extortion claim it must be transferable or "capable of passing from one person to another."). This Court notes that Plaintiffs do need to demonstrate some action beyond an interference with Plaintiffs' property right for RICO. *See Scheidler*, 537 U.S. at 404-05. [12] Here, Plaintiffs allege numerous bases for which they assert Defendants want them to concede valuable property rights including:

> (i) the millions of dollars in contributions to the underfunded pension plans sponsored by Defendants as part of NEHCEU's pattern contract or be driven out of the state; (ii) Plaintiffs' recognition of both Defendants as the exclusive collective bargaining agent of current non-union employees at current and at future facilities managed by Plaintiffs; (iii) Plaintiffs' rights under the NLRA to require a secret-ballot election for the selection of any collective bargaining representative; (iv) Plaintiffs' corresponding rights under the NLRA to participate in that election process and express their opinions about unionization efforts; (v) physical access to Plaintiffs' properties to facilitate Defendants' forced unionization objectives; and (vi) ultimately, control over Plaintiffs['] business operations as the result of recognition, since recognition of a union as the exclusive bargaining representative of Plaintiffs' employees gives the union the immediate right to have a significant say in the operation of the employer's business affairs.

---

[12] Defendants also cite to case from the Southern District of Florida, which found that NLRA rights were not "property." (Defs.' Br. 17-18); *Wackenhut Corp. v. SEIU*, 593 F. Supp. 2d 1289 (S.D. Fla. 2009) ("The court agrees that these allegations satisfy the 'property' prong of the Hobbs Act. However, it finds that the allegations fall short of satisfying the 'obtaining' prong of the extortion statute.").

(Compl. ¶ 77.) Plaintiffs also allege that Defendants sought to "*acquire* substantial sums of money." (Compl. ¶¶ 16, 156) (emphasis added).

This Court determines that, as pled, Plaintiffs have articulated a "property" right and "something of value" for the purposes of the statute. Plaintiffs are not required by law to enter into such an agreement or turn over such control or funds. However, this Court does recognize that Plaintiffs would need to clarify the "obtaining property" component of "extortion" in their pleadings were they to proceed under the Hobbs Act or related statute. Plaintiffs do suggest transferrable property that Defendants sought to control or acquire, but much of the Complaint focuses on nontransferable property interests.

In addition, Plaintiffs argue that they plead potential violations of state statutes including subsections of the extortion statutes for Connecticut, New Jersey, and Massachusetts, not the Hobbs Act.[13] *See* Conn. Gen. Stat. Ann. § 53a-119(A), (B), (C) (including threat to "expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule"); N.J. Stat. Ann. § 2C:20-5(c) (extortion under New Jersey law includes a threat to "[e]xpose or publicize any secret or any asserted fact, whether true or false, tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute"); and Mass. Gen. Laws Ann. ch. 271, § 39 (which includes "verbally or by a written or printed communication, threaten[ing] an economic injury to another" and "threaten[ing] to deprive [Plaintiffs] of an economic opportunity, with intent to compel [Plaintiffs] to do any act, involving the use or disposition of anything of value against [Plaintiffs'] will."); 18 U.S.C. § 1951. The extortion claims under these state statutes are permissible to the extent that they do

---

[13] However, properly pled, the actions Plaintiffs allege could be "wrongful" under the Hobbs Act. Coercion is not extortion, and alone would not be sufficient to meet the requirements of the Hobbs Act. *Scheidler*, 537 U.S. at 407-09.

not require "obtaining property"; however, as indicated, Plaintiffs will be permitted to amend their Complaint.

## Travel Act

Defendants assert that Plaintiffs have not stated a RICO claim based on the Travel Act. The Travel Act makes it a crime to travel

> in interstate or foreign commerce or [use] the mail or any facility in interstate or foreign commerce, with intent to-- (1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform [an act listed].

18 U.S.C. § 1952.

Plaintiffs base their claims regarding the Travel Act on the approximately 100 Connecticut union members bused to the George Washington Bridge to protest at Plaintiffs' Fort Lee, New Jersey headquarters, where some members allegedly forced their way into the facility to confront senior officials with demands. (Compl. ¶ 84.) Plaintiffs allege Defendants hired billboard trucks to drive throughout Connecticut and New Jersey displaying false and misleading statements about Plaintiffs' facilities in front of the facilities. (*Id.* ¶¶ 117, 122.) The trucks allegedly trespassed, and obstructed traffic and access to the facilities. (*Id.*) Defendants disagree with the characterization of the facts presented; however, viewed in the light most favorable to Plaintiffs, Plaintiffs meet the basic requirements to plead a claim under the Travel Act.

## Norris-LaGuardia Act

Next, Defendant Unions argue that they cannot be held responsible for individual acts merely due to the sentiment of blaming the unions. Pursuant to the Norris-LaGuardia Act, "[n]o officer or member of any association or organization, and no association or organization

participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon *clear proof of actual participation* in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." 29 U.S.C. § 106 (emphasis added).

As a general rule, "[t]he prohibition of the [Norris–LaGuardia Act] must give way when necessary to enforce a duty imposed by another statute." *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n*, 965 F.2d 1224, 1237 (2d Cir. 1992) (internal citations omitted).

Here, the Norris-LaGuardia Act would not bar Plaintiffs' claims of violence and extortion. *See, e.g., Local 1814, Int'l Longshoremen's Ass'n,* 965 F.2d at 1238 ("the NLGA's prohibitions must yield to RICO's broadly-construed remedial powers.") However, as discussed further below, Plaintiffs do need to specifically plead a basis for which Defendants should be held accountable for many of the alleged acts of unidentified individuals in furtherance of a conspiracy or enterprise and for wire and mail fraud.

***Wire and Mail Fraud Claims***

Defendants assert that Plaintiffs' claims sound in defamation rather than predicate acts of "mail and wire fraud" under RICO. (Defs.' Br. 27-28.)

The federal statutes 18 U.S.C. §§ 1341 and 1343, prohibit using the mail and wires, respectively, to conduct "any scheme or artifice to defraud." To state a claim for mail fraud under 18 U.S.C. § 1341, a plaintiff must allege: "(1) the existence of a scheme to defraud; (2) the use of the mails, whether the United States Postal Service or a private carrier, in furtherance of the fraudulent scheme; and (3) culpable participation by the defendant (*i.e.*, participation by the defendant with specific intent to defraud). *United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005)). Further, when mail fraud is alleged as a predicate act, a plaintiff must plead the elements

of mail fraud and satisfy the Rule 9(b) heightened pleading standard. *See Warden*, 288 F.3d at 114 n.6.

Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). As the Third Circuit noted in *Frederico v. Home Depot*, 507 F.3d 188 (3d Cir. 2007), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which [it is] charged." *Id.* at 200 (internal citations and quotation marks omitted).

Here, Plaintiffs do not just assert defamation, but rather that defamatory statements and misrepresentations were part of a multifaceted scheme to defraud. In tandem with Plaintiffs' other examples of alleged sabotage and tampering there is a potential basis for RICO claims, but Plaintiffs' Complaint does need to clearly inform Defendants of the misrepresentations alleged to support a specific scheme for fraud, beyond general allegations of defamatory statements.[14] *See generally Care One, LLC v. Burris*, 2011 WL 2623503 *10-11 (D.N.J. 2011).

Plaintiffs cites several sections of their Complaint to support their allegations of wire and mail fraud; however, conclusory statements alone are not sufficient to support their pleadings of a fraudulent scheme. Plaintiffs need to clearly articulate a pattern of such activities and how the communications contributed to the alleged fraudulent scheme. As discussed above, the underlying defect in Plaintiffs' Complaint is with regard to predicate acts by the Defendant

---

[14] Contrary to arguments raised by Defendants, Plaintiffs do not need to show that *they* relied on the false or misleading statements to their detriment. *See Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 642, 648 (2008). Of course, "it may well be that a RICO plaintiff alleging injury by reason of a pattern of mail fraud must establish at least third-party reliance in order to prove causation." *Id.* at 659. Here, Plaintiffs argue Defendants scheme to defraud was to induce third-parties into believing their facilities were not safe and that they have lost money and prospective clients as a result. (Pls.' Opp'n Br. 11.)

Unions to support a pattern of racketeering activities for RICO claims.[15]  Plaintiffs need to clarify the scheme to defraud and circumstances of the alleged mail and wire fraud, as they claim they differ from allegations of defamation.[16]

Plaintiffs requested leave to amend their Complaint if necessary.  (Pls. Opp'n Br. 49.)  As amendment would not be futile, this Court will grant Plaintiffs leave to amend the Complaint.  *See generally Phillips*, 515 F.3d at 245 (3d Cir. 2008).[17]

### Count-Specific Arguments

Defendants claim that Plaintiffs' Counts I and II (RICO conspiracy claims) must be dismissed for failure to state an injury.[18]  (*See* Defs.' Br. 31-32.)  Defendants also argue that Plaintiffs have not claimed Defendants received any income from racketeering activities or acceded to the alleged demands, and have failed to specify a pattern of racketeering activities, concerted action or conspiracy for the purposes of Counts I and II (*Id.* 31-35, 39.)  Defendants also assert that Plaintiffs have not set forth a clear basis for an association-in-fact enterprise for Count III or enterprise-related or conspiracy allegations for the purposes of Count IV.  (*Id.* at 35-37, 39.)

---

[15] Notably, as Plaintiffs' RICO claims would be subject to dismissal for the reasons stated above, this Court would not retain supplemental jurisdiction over the state law claims.  *See Shaffer v. Bd. of Sch. Directors of Albert Gallatin Area Sch. Dist.*, 730 F.2d 910, 912 (3d Cir. 1984); *Livingston v. Shore Slurry Seal, Inc.*, 98 F. Supp. 2d 594, 602 (D.N.J. 2000).

[16] This would also impact Plaintiffs' conspiracy claims, even though "a plaintiff may plead a RICO conspiracy in the absence of an actionable claim under §§ 1962(a)-(c) so long as the complaint complies [ ] and the substantive claims fail only for lack of a causative injury." *Kolar v. Preferred Real Estate Investments, Inc.*, 361 Fed. Appx. 354, n.13 (3d Cir. 2010) (citing *Beck v. Prupis*, 529 U.S. 494, 506 (2000)).  The Third Circuit in *Kolar* noted that where plaintiff "failed to allege a pattern of racketeering activity, he has consequently failed to establish a substantive violation of §§ 1962(a) or (c)."  *Kolar*, 361 Fed. Appx. at 8.

[17] As leave to amend will be granted, this Court will not address the arguments regarding dismissal of the state law claims for unfair trade practices and tortious interference herein.

[18] The Court notes, however, that a completed violation of §§1962(a) and (b) are not necessary to properly plead a violation of §1962(d).  *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993); *Rehkop v. Berwick Healthcare Corp.*, 95 F.3d 285, 290 (3d Cir. 1996).

For the reasons set forth herein, Plaintiffs may amend their Complaint. As such, this Court will not address the count-specific arguments further at this time, as many of them are dependent on or related to the broader allegations that Plaintiffs have been given leave to amend.

**II.      Motion for Leave to File Surreply**

On March 15, 2013, Plaintiffs filed a request for leave to file a surreply. Plaintiffs request to file a surreply is denied. A surreply is not warranted under the circumstances.

**CONCLUSION**

For the reasons set forth above, this Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss (Dkt. No. 10) and the Court will permit Plaintiffs to amend their Complaint within fourteen (14) days from the date of this Opinion. This Court **DENIES** Plaintiffs' request for a surreply. (Dkt. No. 27.)

<u>s/ Susan D. Wigenton, U.S.D.J.</u>

Orig:        Clerk
cc:          Parties
             Magistrate Judge Arleo