IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Care One Management, LLC et al.,<br><br>Plaintiffs,<br><br>-v-<br><br>United Healthcare Workers East, SEIU 1199 and New England Healthcare Employees Union, District 1199,<br><br>Defendants. | Civil Action No. 2:12-cv-06371-SDW-MCA |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

R. Scott Thompson
LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, NJ 07068
Phone: (973) 597-2500
Fax: (973) 597-2400
*Counsel for Defendants*

Robert M. Weinberg*
W. Gary Kohlman*
Leon Dayan*
Jacob Karabell*
BREDHOFF & KAISER, PLLC
805 Fifteenth Street NW, Suite 1000
Washington, DC 20005
Phone: (202) 842-2600
Fax: (202) 842-1888
*Counsel for Defendants*

Richard A. Levy*
David M. Slutsky
Susan J. Cameron
LEVY RATNER, P.C.
80 8th Avenue, 8th Floor
New York, NY 10011
Phone: (212) 627-8100
Fax: (212) 627-8182
*Counsel for Defendant 1199 SEIU*
*United Healthcare Workers East*

*Admitted *pro hac vice*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ..................................................................................................1

A.    The Original Complaint and the Defects in It Identified by the Court ..........1

B.    The Amended Complaint ................................................................6

ARGUMENT .......................................................................................7

The Applicable *Twombly/Iqbal* Pleading Standards..................................................7

I.    ALL FOUR RICO COUNTS MUST AGAIN BE DISMISSED,
      AS THEY STILL FAIL TO ALLEGE FACTS SHOWING
      THAT DEFENDANTS ENGAGED IN ANY
      "RACKETEERING ACTIVITY" ...........................................................7

   A.    The Amended Complaint Does Not Adequately Plead Any
         RICO Predicate Acts of Mail or Wire Fraud, Instead Advancing
         a Legal Theory that Continues To Mistake Ordinary Defamation
         for Fraud ...............................................................................8

   B.    The Amended Complaint Does Not Adequately Plead Any
         RICO Extortion Predicate Acts "Chargeable Under State Law".........15

      1.    The Amended Complaint's Effort To Plead Predicate Acts of
            "Extortion Through Use of Peaceful Economic Pressure" Fails,
            Because the Use of Such Pressure Is Not "Wrongful" Where, as
            Here, It Is Being Exerted for a Legitimate Purpose ....................17

      2.    The Amended Complaint Fails To Plead a Predicate Act of
            "Extortion Through Use of Force or Violence," Because, Like
            the Original Complaint, It Lacks Sufficient Allegations To Hold
            the Unions Accountable for the Acts of Sabotage Committed by
            Unidentified Individuals..............................................................27

C.     Because the Elements of Extortion for Federal Travel Act Purposes Are Identical to Those for Extortion "Chargeable Under State Law," the Travel Act Extortion Predicates Fall Along with the State-Law Extortion Predicates ............................................................29

II.     THE ALLEGED JULY 2-3, 2012, EPISODE OF SABOTAGE CANNOT, STANDING ALONE, SATISFY RICO's "PATTERN" ELEMENT ...................................................................................................33

III.    IN ALL EVENTS, COUNTS I AND II MUST BE DISMISSED FOR FAILURE TO ALLEGE THE REQUISITE § 1964(c) "INJURY" .............36

CONCLUSION ...................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Adcock v. Freightliner, LLC*, 550 F.3d 369 (4th Cir. 2008) ........................ 3, 24, 26

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................6

*Beck v. Prupis*, 529 U.S. 494 (2000).............................................................. 37, 38

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).............................................6

*Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) ...........................14

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
 140 F.3d 494 (3d Cir. 1998) .................................................................... 17, 18, 19

*Chovanes v. Thoroughbred Racing Ass'n*,
 2001 WL 43780 (E.D. Pa. Jan. 18, 2001) ............................................................12

*Cintas Corp. v. Unite Here*, 601 F. Supp. 2d 571 (S.D.N.Y. 2009)................. 24, 32

*Cleveland v. U.S.*, 531 U.S. 12 (2000)...................................................................15

*Excelsior Underwear*, 156 N.L.R.B. 1236 (1966)..................................................27

*Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. 2009) ......................................7

*H.J. Inc. v. N.w. Bell Tel. Co.*, 492 U.S. 229 (1989) ........................................ 34, 35

*HERE Local 57 v. Sage Hospitality Resources*,
 390 F.3d 206 (3d Cir. 2004) .................................................................... 23, 24, 26

*Hughes v. Consol-Pa. Coal Co.*, 945 F.2d 594 (3d Cir. 1991)...............................34

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) ..........................7

*Kimm v. Lee*, 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) .......................................12

*Kolar v. Preferred Real Estate Invs., Inc.,*
316 F. App'x 354 (3d Cir. 2010) .........................................................................35

*Kredietbank, N.V. v. Joyce Morris, Inc.*, 1986 WL 5926 (D.N.J. Jan. 9, 1986)......12

*Kreisberg v. HealthBridge Mgmt., LLC*, 2012 WL 6553103
(D. Conn. Dec. 14, 2012) ...................................................................................35

*McNally v. U.S.*, 483 U.S. 350 (1987) .....................................................................9

*Mendez Internet Management Services, Inc. v. Banco Santander
de Puerto Rico*, 621 F.3d 10 (1st Cir. 2010) ................................................. 10, 15

*Middlesex Concrete Prods. & Excavating Corp. v. Carteret Indus. Ass'n,*
181 A.2d 774 (N.J. 1962) ...................................................................................38

*Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir. 2001)........... 13, 14

*Salinas v. United States*, 522 U.S. 52 (1997).........................................................37

*Santiago v. Warminster Township*, 629 F.3d 121 (3d Cir. 2010)...........................28

*Scheidler v. NOW*, 537 U.S. 393 (2003) ......................................................... 16, 31

*Sekhar v. United States*, 133 S. Ct. 2720 (2013) ...................................................25

*State v. Calonico*, 770 A.2d 454 (Conn. 2001).......................................................19

*Tabas v. Tabas*, 47 F.3d 1280 (3d Cir. 1995) .......................................................34

*UBC v. Bldg. & Constr. Trades Dep't,*
911 F. Supp. 2d 1118 (E.D. Wash. 2012) ...........................................................39

*United States v. Carrillo*, 229 F.3d 177 (2d Cir. 2000) ..........................................16

*United States v. Enmons* 410 U.S. 396 (1973)................................................. 18, 19

*United States v. Nardello*, 393 U.S. 286 (1969) ....................................................31

*Wackenhut v. SEIU*, 593 F. Supp. 2d 1289 (S.D. Fla. 2009)..................................26

## STATUTES AND RULES

18 U.S.C. § 1341 ................................................................................................ 4, 8, 9

18 U.S.C. § 1343 ................................................................................................ 4, 8, 9

18 U.S.C. § 1952 .............................................................................................. 4, 8, 29

18 U.S.C. § 1952(a) ..............................................................................................29

18 U.S.C. § 1952(b) ..............................................................................................30

18 U.S.C. §§ 1961 *et seq.* ......................................................................................1

18 U.S.C. § 1961(1) ........................................................................................ 4, 8, 15

18 U.S.C. § 1962 ....................................................................................................8

18 U.S.C. § 1962(a) ...................................................................................... 34, 36, 37, 39

18 U.S.C. § 1962(b) ...................................................................................... 34, 36, 37, 39

18 U.S.C. § 1962(c) ...............................................................................................34

18 U.S.C. § 1962(d) ...................................................................................... 36, 37, 38, 39

18 U.S.C. § 1964(c) ...................................................................................... 14, 37, 38, 39, 40

29 U.S.C. § 106 ....................................................................................................28

29 U.S.C. § 163 ....................................................................................................22

29 U.S.C. § 186 ....................................................................................................27

Fed. R. Civ. P. 12(b)(6) ........................................................................................1

## PRELIMINARY STATEMENT

On December 2, 2013, Plaintiffs—a group of 52 related nursing home operators collectively referred to as "Care One"—filed an Amended Complaint, Dkt. 37, in an effort to cure the numerous deficiencies in their original complaint that this Court had identified in its October 10, 2013 Opinion dismissing, with leave to amend, all four of the federal causes of action asserted in that complaint, Dkt. 32. In this brief, Defendants—New England Healthcare Employees Union (NEHCEU) and United Healthcare Workers-East (UHWE), collectively referred to as "the Unions"—will show that the Amended Complaint does not cure those deficiencies and that the federal causes of action again should be dismissed, this time with prejudice, for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## BACKGROUND

A.   <u>The Original Complaint and the Defects in It Identified by the Court</u>

1.   On October 10, 2012, Care One filed its original complaint, Dkt. 1, which purported to plead four causes of action under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, as well as two supplemental causes of action under state law.

The complaint alleged that Care One and the two Unions were embroiled in two distinct labor disputes and that the Unions had been making two separate demands on Care One in connection with those disputes. First, the complaint alleged, Defendant NEHCEU was in a contract dispute with Care One over the

terms of a successor collective bargaining agreement covering the NEHCEU-represented employees at six of Care One's "HealthBridge" nursing homes in Connecticut. Dkt. 1 ¶ 72. According to the complaint, NEHCEU demanded, unsuccessfully, that Care One agree to the terms of the "pattern contract" that NEHCEU is seeking from nursing home employers throughout the State of Connecticut. *Id.* That pattern contract includes a term calling for increased employer contributions to the pension fund that provides NEHCEU-represented employees with their pension benefits. *Id.*

Second, Defendant UHWE was alleged to be in a dispute with Care One over union organizing issues at Care One's nonunion facilities. In particular, according to the complaint, UHWE was demanding that Care One enter into an agreement that would require Care One (i) to be neutral as to unionization; (ii) to allow union organizers access to Care One's facilities and employee contact-information lists so that they could communicate with employees about joining the union; and (iii) to accept a process whereby Care One would—instead of insisting as a condition of recognizing the union that the union establish its majority status through elections conducted by the National Labor Relations Board (NLRB)—grant recognition to the union through some other method of determining majority status, such as a showing of signed union authorization cards (often referred to as "card check" recognition). Dkt. 1 ¶¶ 3, 71, 75, 77. Agreements of this kind are

sometimes classified as organizing "ground rules" agreements. *Adcock v. Freightliner, LLC*, 550 F.3d 369, 374 (4th Cir. 2008).

The complaint further alleged that the two Unions made common cause and began jointly to support each other's demands on Care One. *See, e.g.,* Dkt. 1 ¶ 101.

The original complaint next alleged that the Unions, or persons alleged to be associated with the Unions, engaged in certain activities adverse to Care One in order to pressure Care One into acceding to one or both of the Unions' demands. In particular, the complaint alleged that, in support of *both* the pattern-contract demand *and* the organizing-ground-rules demand, the Unions, through use of the internet, mail, and other media, as well as through petitions with regulatory bodies and live protests, have been engaging in an ongoing campaign of peaceful speech, petitioning, assembly and other similar activities to publicly disparage the business and labor practices of Care One and one of its owners, Daniel Straus. *Id.* ¶¶ 4, 87, 96-97, 100-24, 127. In the course of that campaign (the "Care One Watch" campaign), the Unions were alleged to have disseminated false and defamatory statements about Care One and Straus. *Id.* ¶ 78.

The complaint also alleged that, in support of the pattern-contract demand, defendant NEHCEU commenced a strike at six of Care One's HealthBridge facilities in Connecticut on July 3, 2012. *Id.* ¶¶ 7, 27, 79. And, the complaint alleged, just before the strike, on July 2-3, unidentified Care One employees

engaged in a non-peaceful episode of sabotage involving property damage and attempted interference with patient care at three of Plaintiffs' facilities. *Id.* ¶¶ 7, 79. The complaint alleged, in conclusory terms, that these acts were directed by organizers employed by NEHCEU. *Id.* ¶ 79.

The original complaint alleged that the peaceful speech and expressive activities engaged in by the Unions in the course of the Care One Watch campaign were, insofar as they disseminated false and defamatory statements about Care One and Straus, acts of mail and wire fraud indictable under 18 U.S.C. §§ 1341 and 1343 and hence predicate offenses of racketeering under 18 U.S.C. § 1961(1), the section of RICO that lists the offenses that qualify as "racketeering" acts. Dkt. 1 ¶ 158. That complaint also alleged that the same peaceful activities constituted the predicate act of attempted extortion "chargeable under State law," 18 U.S.C. § 1961(1), Dkt. 1 ¶ 157, and the predicate act of attempted extortion "indictable" under the federal Travel Act, 18 U.S.C. § 1952, *id.* § 1961(1). Dkt. 1 ¶ 159. The complaint further alleged that the acts of sabotage by unidentified individuals also constituted both of those predicate extortion offenses. *Id.* ¶¶ 157, 159.

2.    On December 18, 2012, the Defendant Unions filed a motion to dismiss all of the federal counts. Dkt. 10. That motion asserted both that there was a defect common to *all* of the federal counts—namely, that no acts of racketeering attributable to the Unions had been sufficiently alleged—and that there were

various count-specific defects in each federal count as well.

As to the defects involving all four counts, the Unions contended that the allegedly false and defamatory statements made about Care One did not satisfy the essential "scheme to defraud" element of the mail/wire fraud criminal statutes on which a RICO "racketeering" allegation can be supported, but, at most, sounded in the tort of defamation, a non-criminal act that does not qualify as "racketeering" under RICO. The Unions further contended that none of the peaceful speech, petitioning and other expressive activities complained of constituted acts of attempted extortion under RICO. Lastly, the Unions contended that the acts of sabotage could not form a proper basis for the RICO claims because Plaintiffs' allegations were insufficient to tie those acts to either Union.

3.     On October 10, 2013, this Court decided the motion to dismiss, concluding in its Opinion that all of the RICO claims were deficient and stating that the "underlying defect in Plaintiffs' Complaint is with regard to predicate acts by the Defendant Unions to support a pattern of racketeering activities." Opinion (Dkt. 32) at 16-17. With regard to the mail and wire fraud predicate acts, the Court found that the complaint failed to differentiate the allegations of fraud from ordinary defamation and did not meet the Rule 9(b) pleading standard requiring that fraud be pled with particularity. Opinion at 16-17. With regard to the extortion predicate acts, the Court found deficient the allegations pertaining to the "obtaining

of property" element of extortion as well as the allegations seeking to hold the Unions responsible for the alleged acts of sabotage committed by unidentified persons. *Id.* at 12-13, 15. The Court stated that it would grant leave to amend and added that, because the complaint's deficiencies affected the basic "racketeering" element common to all four counts, the Court would not address the count-specific challenges to the complaint. *Id.* at 18.

Finally, the Court noted that, because "Plaintiffs' RICO claims would be subject to dismissal," it would not retain supplemental jurisdiction over Plaintiffs' state-law claims unless the RICO defects were cured. Opinion at 17 n.15.

B.    The Amended Complaint

On December 2, 2013, Plaintiffs filed their Amended Complaint. The Amended Complaint purports to state the same four RICO causes of action as the original complaint and the same supplemental state-law claims. A redlined version of the Amended Complaint is being submitted herewith as Exhibit A to the Motion to Dismiss. We will discuss the differences between the original and Amended Complaint below in the Argument section in the course of showing that the Amended Complaint has failed to cure the defects in the original complaint.

## ARGUMENT

### The Applicable *Twombly/Iqbal* Pleading Standards

Following *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), the Third Circuit has adopted the following

standards for evaluating the legal sufficiency of a complaint attacked by a Rule 12(b)(6) motion to dismiss. First, although the Court must accept all well-pleaded facts in the Complaint as true, it "may disregard any legal conclusions." *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210-11 (3d Cir. 2009). Second, putting such "legal conclusions" aside, the Court "must [] determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Iqbal,* 556 U.S. at 679). In this critical respect, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Id. See also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 370 (3d Cir. 2010) ("[T]he concern [over litigation abuses] expressed in *Twombly* is … applicable to a RICO case…. RICO cases … are 'big' cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim.").

## I.     ALL FOUR RICO COUNTS MUST AGAIN BE DISMISSED, AS THEY STILL FAIL TO ALLEGE FACTS SHOWING THAT DEFENDANTS ENGAGED IN ANY "RACKETEERING ACTIVITY"

Plaintiffs have asserted the same four separate RICO counts in their Amended Complaint as in their original complaint. Am. Compl. (Dkt. 37) ¶¶ 258-323. Under RICO, an essential element of each of these counts is that the defendant has engaged, or conspired to engage, in a "pattern of racketeering

activity." 18 U.S.C. § 1962. "'[R]acketeering activity' means" the felony crimes listed in RICO, 18 U.S.C. § 1961(1)—commonly referred to as "predicate acts."

Also echoing their original complaint, Plaintiffs attempt in their Amended Complaint to plead predicate acts of (1) mail and wire fraud under 18 U.S.C §§ 1341 & 1343; (2) extortion "chargeable under State law;" and (3) extortion "indictable under … [the federal Travel Act] 18 U.S.C. § 1952."

As noted, the Court's earlier Opinion found that the original complaint had failed adequately to plead the commission of *any* racketeering acts by Defendants. We show in Part A that the Amended Complaint still fails to make out the elements of mail or wire fraud, and we show in Parts B and C, respectively, that the Amended Complaint still fails to make out the elements of RICO extortion chargeable under State law or indictable under the Travel Act.

A.   The Amended Complaint Does Not Adequately Plead Any RICO
     Predicate Acts of Mail or Wire Fraud, Instead Advancing a Legal
     Theory that Continues To Mistake Ordinary Defamation for Fraud

In their original complaint, Plaintiffs' mail and wire fraud theory proceeded as follows: The Defendant Unions, in the course of carrying out their public media campaign critical of Care One's business practices, disseminated, through the wires and the mail, certain "defamatory" and "false" or "misleading" information about Care One "with the specific intent to … deceive the community, patients, prospective patients, and their family members [*i.e.*, Care One's current and future

8

customers] into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly." *See* Dkt. 1 ¶¶ 101-09, 111, 115, 158, 168, 180, 192. Defendants' purpose, the complaint alleged, was to induce Plaintiffs' customers to cease doing business with Plaintiffs, which in turn would cause Plaintiffs to lose money. *E.g.*, *id.* ¶ 100. That course of conduct, according to the complaint, constituted a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses" under the mail and wire fraud statutes, 18 U.S.C. §§ 1341 & 1343, and hence a RICO predicate act.

In our earlier motion to dismiss, we argued that these allegations sounded in the tort of defamation, not the crime of mail and wire fraud. Dkt. 10-1 at 27-30. As we showed, whereas defamation concerns false statements that harm another's *reputation*, mail and wire fraud are *property* crimes, *see McNally v. U.S.*, 483 U.S. 350, 358 (1987), involving deception of a very different and particular kind: namely, a misrepresentation that causes either (i) the deceived person to be *deprived* of his or her property, (ii) the deceiver to *obtain* property through the deceit; or (iii) both. *See* Dkt. 25 at 3-6. In contrast, ordinary business defamation *not* involving fraud occurs where the defendant makes false statements about a company with no intention of depriving the deceived persons (the company's customers) of their property and no intention of obtaining any property for itself through the deception. *Id.* at 6.

9

And, we further showed, because there were no allegations in the complaint here that the Unions' alleged defamatory statements about Care One either were intended to *deprive* Care One's current or future customers of any property or to *obtain* property for the Defendants themselves, no scheme to *defraud* was alleged; instead, only a scheme to *defame* was alleged. *Id.*

In developing these points, we cited an unbroken line of cases rejecting efforts to charge as mail or wire fraud conduct that sounded only in defamation, including *Mendez Internet Management Services, Inc. v. Banco Santander de Puerto Rico*, 621 F.3d 10 (1st Cir. 2010), a RICO case involving mail/wire fraud allegations closely analogous to those made here. There the plaintiff was a company engaged in the business of trading in foreign currency and the defendant was the operator of a consumer watchdog website. The complaint alleged that the defendant, on his website, made various false statements intended to drive the plaintiff out of business. The First Circuit held that the plaintiff company's allegations sounded in "defamation" and failed to make out the predicate of mail or wire fraud. That was so, the court of appeals explained, because the defendant's alleged misrepresentations were *not* allegedly intended to cause the plaintiff company's deceived customers (i) to engage in any transaction that would "inflict[]" economic loss" on the those customers by depriving the customers of their

property, or (ii) to engage in any transaction from which the defendant would acquire a financial gain through his deceit. *Id.* at 15.

This Court, in its decision on the motion to dismiss, ruled that the fraud allegations in the original complaint were insufficient, holding that those allegations lacked the requisite particularity demanded by Rule 9(b) and that Plaintiffs, on repleading, "need to clearly inform Defendants of the misrepresentations alleged to support a specific scheme for fraud, *beyond general allegations of defamatory statements*." Opinion at 16 (emphasis added).

Plaintiffs' Amended Complaint fails to cure the fraud deficiencies in their original complaint. Indeed, the Amended Complaint's fraud allegations are not materially different from those in the original complaint.

Like the original complaint, the Amended Complaint avers that the Unions, in the course of carrying out their public media campaign critical of the company's business practices, made certain misleading statements aimed at damaging Care One's reputation and causing its customers to refrain from patronizing the company. *E.g.*, Am. Compl. ¶¶ 113, 123, 130. Also like the original complaint, the Amended Complaint makes *no* allegation that the Unions, through their alleged misrepresentations, sought either to *deprive* the allegedly deceived customers of Care One of any property or to induce a transaction between those customers and the Unions through which the Unions themselves would *obtain* any property. The

11

fraud allegations thus continue to mirror those found deficient by the First Circuit

in *Mendez. See also Kredietbank, N.V. v. Joyce Morris, Inc.*, 1986 WL 5926, at *4

(D.N.J. Jan. 9), *aff'd mem.* 808 F.2d 1516 (3d Cir. 1986) (holding that "a scheme to

defame … does not amount to a 'scheme or artifice to defraud'" and dismissing, on

that basis, RICO claims predicated on mail fraud); *Chovanes v. Thoroughbred*

*Racing Ass'n,* 2001 WL 43780, at *5 (E.D. Pa. Jan. 18, 2001) (rejecting RICO

"plaintiff['s] attempt[] to collapse the distinction between defamation and fraud");

*Kimm v. Lee,* 2005 WL 89386, at *5 (S.D.N.Y. Jan. 13, 2005) ("it is firmly

established that defamation and many other similar allegations do not provide the

requisite predicate for RICO violations").

 Where the Amended Complaint does differ from the original complaint in

regard to the mail and wire fraud theory is that it includes new language that

appears aimed at bringing this case within the class of fraud cases where the

defendant, without intending to deprive the deceived party of any property,

nevertheless intends to obtain property for itself through the alleged false

representations. *See* Am. Compl. ¶ 139. If that is, in fact, the aim of the new

language, it misses the mark, for it does not allege that *the Unions* would obtain

property if Care One's customers were to believe and act on the alleged

misrepresentations about Care One; it alleges only that *Care One's competitors* in

the nursing home industry would obtain property, in the form of "increase[d]

market share [caused] by diverting Plaintiffs' existing and future customers" to

Care One's competitors. *Id.*

The reason why this allegation fails to transform the complaint from one

sounding in defamation to one sounding in mail and wire fraud is that in *every* case

of business defamation, it is foreseeable that the competitors of the defamed

company would acquire additional business from those who believe the

misrepresentations. Thus, unless the defendant itself is one of the competitors

seeking, through deception, to acquire that additional business for itself and

thereby obtain property, only a civil defamation suit, and not a criminal mail or

wire fraud prosecution, will lie. *Compare Procter & Gamble Co. v. Amway Corp.*,

242 F.3d 539, 564-65 (5th Cir. 2001) (mail fraud allegations sufficient where

defendant was plaintiff's direct competitor who lied about plaintiff to plaintiff's

customers to obtain their business for itself) *with Mendez*, *supra* (mail fraud

allegations insufficient where defendant was *not* plaintiff's competitor and did *not*

seek to obtain business from allegedly deceived customers).[1]

---

[1] The Amended Complaint includes a conclusory allegation that Plaintiffs' existing and future customers would foreseeably take their business to "Defendants' preferred unionized facilities" if they believed the alleged misrepresentations. Am. Compl. ¶ 139. Even if, contrary to the *Twombly-Iqbal* pleading standard, this conclusory allegation were credited, the allegation would not rescue the fraud theory, for on that allegation, it would be *Care One's competitors*, and not the Defendant Unions, who would be obtaining property through the business transactions that Plaintiffs speculate might occur. That is insufficient under *Mendez*. We also note that the items of Union literature alleged to contain the false

The Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), the case on which Plaintiffs principally relied in the earlier briefing, is in accord with the analysis set out above. The holding in *Bridge* was that where the plaintiff in a RICO civil action has adequately alleged that the defendant violated the mail fraud statute by engaging in a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses," the plaintiff, in order to satisfy RICO's distinct "injur[y]" requirement in 18 U.S.C. § 1964(c), need only show that he was injured by the fraudulent scheme and need not also show that he was one of the deceived persons who relied on the defendant's misrepresentations. 553 U.S. at 646. In explaining that holding, the *Bridge* Court gave, as a hypothetical example of a scheme to defraud that would cause injury to a non-deceived plaintiff, the circumstance where the plaintiff is a commercial enterprise and the defendant is a direct competitor that mails lies about the plaintiff to the plaintiff's customers in order to steal those customers and thereby obtain the rival's business for itself. *Id.* at 649-50. That hypothetical states, in essence, the fact pattern addressed in *Procter & Gamble*, *supra*, a case that we already have shown is easily distinguishable. *Bridge* is therefore inapposite, as it does not address the critical issue here of the line between defamation and fraud.

and defamatory statements are attached as exhibits to the Amended Complaint, Am. Compl. Exs. G, H, M-Z, BB-CC, GG-NN, TT-ZZ; and none of that literature urges Care One's customers to patronize any specific nursing home, let alone a nursing home where one of the Unions is the bargaining representative.

In contrast to *Bridge*, the numerous cases we have cited—including the First Circuit's *Mendez* case, which postdates *Bridge* and distinguishes it, *see Mendez*, 621 F.3d at 15 n.5—*do* address the critical issue here. And, those cases address the issue in a sound way that preserves the distinction between civil defamation and criminal fraud and thereby avoids the serious chilling effect on First Amendment speech that would result from arming businesses unhappy about being publicly criticized with the power to subject their critics to punishing RICO treble damages actions for allegedly making false statements in the course of their criticism. It also avoids violating the admonition in *Cleveland v. U.S.*, 531 U.S. 12, 27 (2000), that "[a]bsent clear statement by Congress," the federal criminal fraud statutes should not be read "to place under federal superintendence a vast array of conduct traditionally policed by the States"—here, conduct traditionally policed by State civil defamation law.

### B.   The Amended Complaint Does Not Adequately Plead Any RICO Extortion Predicate Acts "Chargeable Under State Law"

In addition to invoking the mail and wire fraud statutes to support their theory that Defendants have engaged in RICO predicate acts, Plaintiffs invoke the provision in RICO that makes "extortion … chargeable under State law" a RICO predicate act. *See* 18 U.S.C. § 1961(1).

As this Court stated previously, "[f]or a state offense to be 'extortion' that is 'chargeable under State law,' for the purposes of RICO … 'the conduct must be

15

capable of being generically classified as extortionate,' where 'generic' extortion is defined as 'obtaining something of value from another with his consent induced by the *wrongful use* of force, fear, or threats.'" Opinion at 10-11 (quoting *Scheidler v. NOW*, 537 U.S. 393, 409 (2003) (emphasis added)).[2]

The Amended Complaint, like its predecessor, attacks as RICO extortion "chargeable under State law" two very different types of activity allegedly carried out by the Unions in support of each Union's alleged demand on Care One.

The first type of activity, which forms the core of the Amended Complaint (as it did with respect to the original complaint), includes numerous ongoing instances of *peaceful* speech, petitioning, assembly and other *non-violent* protest activities critical of the business and labor practices of Care One and its owner Daniel Straus. The Amended Complaint alleges that the Unions' objective in undertaking and pursuing this entirely peaceful "Care One Watch" campaign is to put economic pressure on Care One to agree to the Unions' alleged pattern-contract demand and to their alleged organizing-ground-rules demand.[3]

---

[2] Furthermore, where a RICO plaintiff elects to base its RICO claim on extortion "chargeable under State law," the plaintiff must satisfy *both* the generic test *and* any additional elements required by the underlying state criminal statute being invoked. *See United States v. Carrillo*, 229 F.3d 177, 183-84 (2d Cir. 2000).

[3] Though for convenience we refer to the demands in the plural as "the Unions'" demands, in point of fact the Amended Complaint alleges that UHWE and NEHCEU have separate demands: The pattern-contract demand is attributed to NEHCEU and the organizing-ground-rules demand to UHWE. Am. Compl. ¶ 3.

The second type of activity attacked as extortionate was *non*-peaceful. That activity occurred in a July 2-3, 2012, episode of sabotage committed by unidentified persons at three Connecticut Care One facilities on the eve of a strike.

It is critically important that the multiple, ongoing *peaceful* activities engaged in by the Unions as part of the "Care One Watch" campaign be considered separately from the single episode of *non*-peaceful acts committed by unidentified persons. That is so because, as will be shown in the next section, the legal framework for analyzing generic extortion—specifically, the "*wrongful* use of force [or] fear" element of generic extortion—distinguishes in critical ways between the peaceful use of "[economic] fear" to back up a demand and the non-peaceful use of "force."

      1.     The Amended Complaint's Effort To Plead Predicate Acts of "Extortion Through Use of Peaceful Economic Pressure" Fails, Because the Use of Such Pressure Is Not "Wrongful" Where, as Here, It Is Being Exerted for a Legitimate Purpose

The starting point for addressing the non-violent union activities forming the core of Plaintiffs' RICO extortion case is this Court's statement of the test for RICO extortion established by the Third Circuit in *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 523 (3d Cir. 1998):

> The Third Circuit has held that a party that seeks to induce another to enter into a "*legitimate" business transaction*, not through force or violence, but through "economic fear in business negotiations between private parties" does not commit extortion or render a defendant guilty of "attempted extortion."

Opinion at 11 (quoting *Brokerage Concepts,* 140 F.3d at 523 (emphasis added)).

Under this controlling Third Circuit test, if the "transaction[s]" that the Unions allegedly are seeking to induce Care One to enter into are "legitimate" business transactions, then the numerous non-violent union speech, petitioning, and other activities about which the Plaintiffs complain do not, as a matter of law, satisfy the "wrongful use of [economic] fear" element of generic extortion, and the core of Plaintiffs' RICO extortion case disintegrates.

The transactions that the Unions are alleged to be seeking *are* "legitimate" business transactions. As we have stressed, the Amended Complaint alleges that the Unions have made two demands on Care One, corresponding to two different proposed transactions. And, as we now show, each of those proposed transactions is entirely legitimate.

a.     The first transaction that the Amended Complaint alleges that the Unions are demanding is that Care One's Connecticut nursing homes (the HealthBridge facilities) enter into the "pattern" collective bargaining agreement ("CBA") that Defendant NEHCEU is also seeking from other nursing home employers throughout the State of Connecticut. Am. Compl. ¶ 110. That transaction is a "legitimate" transaction as a matter of law.

In *Brokerage Concepts*, the Third Circuit, taking "direction" from the Supreme Court's decision in *United States v. Enmons* 410 U.S. 396 (1973),

identified examples of demands in the labor arena that would, for purposes of extortion analysis, qualify as "legitimate" or "lawful" demands and examples of demands that would not so qualify. 140 F.3d at 523-24. As classic examples of *legitimate* demands, the Third Circuit cited collective bargaining demands made by unions on employers to pay their employees better "wages and other employment benefits." *Id.* at 524. Because demands of this kind are legitimate, unions can pursue them by engaging in strikes and other non-violent economic pressure activities against the employer without triggering RICO extortion liability. *Id.*[4]

As examples of *illegitimate* demands, the *Brokerage Concepts* court cited: (i) the situation where union officials demand "personal payoffs" for themselves rather than wages and benefits for the employees they represent; and (ii) the situation where unions seek to extract bogus "'wage' payments in return for 'imposed, unwanted, superfluous and fictitious services' of workers." *Brokerage Concepts,* 140 F.3d at 524 (quoting *Enmons*, 410 U.S. at 400).

---

[4] Indeed, because a union, when seeking better collective bargaining agreement terms, is acting to benefit the employees it represents rather than the union in its institutional capacity, many extortion statutes—including the federal Hobbs Act, the New York extortion statute on which the Hobbs Act was modeled, and the Connecticut extortion statute, which likewise was modeled on the New York statute, *see State v. Calonico*, 770 A.2d 454, 466 (Conn. 2001)—do not treat even *violent* union acts used to obtain better collective bargaining terms as acts that can form the basis of an extortion prosecution. *See generally Enmons*, 410 U.S. at 406 n.16, 410-11. We note that the alleged sabotage here occurred in Connecticut. But, for purposes of the argument made in text, our submission is limited to establishing the proposition that allegations of *nonviolent* use of economic pressure in support of collective bargaining demands cannot constitute "generic extortion."

The Amended Complaint's allegations establish conclusively that the pattern-contract demands NEHCEU has been making here are legitimate demands for purposes of the *Brokerage Concepts* RICO extortion analysis.

According to the Amended Complaint, the pattern-contract demands concern the terms of "successor collective bargaining agreements" being negotiated between NEHCEU and the Plaintiffs to set the terms and conditions of employment at Plaintiffs' NEHCEU-represented Connecticut nursing homes. Am. Compl. ¶ 110. The specific terms that NEHCEU is allegedly demanding in the negotiations would call for (a) increased contributions to the pension fund that finances the provision of pension benefits to Plaintiffs' NEHCEU-represented employees, *id.*; and (ii) maintenance of the same nurse-to-patient staffing ratios and the same employer contributions to the pertinent employee training funds as those that had been agreed on in the predecessor CBA, *id.* ¶¶ 109, 110.

All of the terms demanded would, if agreed to, improve or maintain the wages, benefits and conditions of employment for NEHCEU's represented employees that previously were agreed to in collective bargaining. Plaintiffs' agreement to the demanded terms would thus plainly result in a "legitimate" transaction of the kind that, under *Brokerage Concepts*, unions may lawfully use economic pressure tactics to induce. Indeed, were it otherwise, every strike to improve wages, benefits, or working conditions would, even if non-violent and

20

otherwise lawful under the National Labor Relations Act, become a criminal act of RICO attempted extortion. That is because each such strike would necessarily involve the "use" by the union of the tactic of instilling "fear" of economic loss in the employer in order "to obtain something of value" for the represented employees in the form of better wages, benefits and working conditions. *See supra* at 15-16 (setting out elements of generic extortion). That cannot be the law and is not the law under the Third Circuit's controlling decision in *Brokerage Concepts*.

Plaintiffs seek to escape the force of these principles by including in their Amended Complaint assertions of pure legal conclusions that, under the *Twombly/Iqbal* pleading standard, must be disregarded in evaluating a Rule 12(b)(6) motion. *See supra* at 6-7.

In particular, the Amended Complaint asserts that, because the pattern contract demanded would keep in place a clause requiring Plaintiffs to staff their facilities at levels that "far outpace" the bare minimum nurse-to-patient "staffing ratios" "required by Connecticut law," NEHCEU is illegitimately asking Plaintiffs to compensate their Connecticut employees for "unwanted, unnecessary, and superfluous" services under *Brokerage Concepts*. Am. Compl. ¶ 149.[5]

---

[5] Notably, the Amended Complaint makes *no* allegations to the effect that the staffing levels sought by NEHCEU in its pattern contract would result in employees showing up for work with nothing to do; the staffing levels are alleged to be excessive *only* in the sense that they exceed the bare Connecticut statutory minimum. *See* Am. Compl. ¶ 149 ("[T]he staffing ratios to which Defendant

That allegation not only asserts a legal conclusion, it asserts an outlandishly wrong legal conclusion, as that conclusion is premised on a serious misreading of *Brokerage Concepts*. Neither that case nor any other case stands for the proposition that a union proposes an "illegitimate" transaction when, in collective bargaining, it demands a contract providing for wages, benefits, or working conditions—including employee workload levels—that are more favorable to the represented employees than the bare minima required by general public law. And, of course, unions may properly strike for wages above the minimum wage and other conditions of employment that exceed rock-bottom statutory standards. *See* 29 U.S.C. § 163.

What *Brokerage Concepts* (and, before it, *Enmons*) condemns as illegitimate are *not* efforts by unions to raise standards for represented workers above the bare legal minima applicable to all employees, but rather practices in the nature of featherbedding, where the union demands that the employer pay bogus "wages" to individuals doing no bona fide productive work for the employer but whom the union wishes to see paid anyway. That is why, in the pertinent passage from *Enmons* that is quoted in *Brokerage Concepts*, the Supreme Court put quotation marks around the word "wages"; the Court was conveying the idea that when

---

NEHCEU has demanded Plaintiffs agree far outpace those required by Connecticut state law. *In this way*, Defendant NEHCEU has made demands that impose unwanted, unnecessary and superfluous labor on Plaintiffs." (emphasis added)).

payments are being demanded of an employer, but not for bona fide work, those payments are not really "wages," and hence the union demanding them is not engaged in genuine collective bargaining. Here, the allegations in the Amended Complaint establish that NEHCEU, in seeking the *preservation* of staffing ratios *already agreed upon* in the predecessor contract, was engaged in genuine collective bargaining in which it was making a wholly "legitimate" collective bargaining demand on Care One.

      b.     The second transaction that the Amended Complaint alleges the Unions are demanding of Care One is an organizing-ground-rules agreement. That agreement allegedly would include terms providing for Care One to be neutral as to unionization; to allow union organizers access to Care One's facilities and employee lists to communicate with employees about joining the union; and to recognize the union based on proof of majority support through authorization cards rather than an NLRB election.

      (i) The Unions' alleged demand for such an organizing-ground-rules agreement is a demand for a "legitimate business transaction" under *Brokerage Concepts*.

The leading case in this area is the Third Circuit's decision in *HERE Local 57 v. Sage Hospitality Resources*, 390 F.3d 206, 219 (3d Cir. 2004). There, as this Court recognized, the court of appeals squarely held that labor-management

23

neutrality agreements are lawful and enforceable under federal labor law. Opinion at 11 n.11 ("Labor-mangement neutrality agreements have been found to be valid and lawful." (citing *Sage Hospitality*, 390 F.3d at 219)). And, following the Third Circuit's lead, the Fourth Circuit, in *Adcock*, *supra*, addressed an agreement between a union and an employer that provided *both* for neutrality *and* for the additional "ground rules" terms—access to employer premises, access to employee lists, and card-check recognition—allegedly sought by the Unions here, holding *all* of the terms of the agreement to be lawful and legitimate. 550 F.3d at 374-76. Thus, while Plaintiffs attempt, through their insistent repetition of the pejorative phrase "forced unionization," to suggest that organizing-ground-rules agreements are illegitimate or unlawful, *e.g.,* Am. Compl. ¶¶ 17, 111, 139, the case law just cited holds to the contrary. *See also Cintas Corp. v. Unite Here,* 601 F. Supp. 2d 571, 577-78 (S.D.N.Y.), *aff'd mem.* 355 F. App'x 508 (2d Cir. 2009) (citing *Brokerage Concepts* and *Sage Hospitality* in support of Rule 12(b)(6) dismissal of RICO claims predicated on extortion allegations identical to those here).

Because, in sum, what the Unions are alleged to have been seeking through their organizing-ground-rules demand was a legitimate and lawful agreement, the Amended Complaint fails in its effort to plead the "wrongful use" element of extortion in connection with the speech, petitioning, and other non-violent pressure activities used to support that demand.

(ii)     While what we have just said is sufficient to dismiss the portions of the Amended Complaint that seek to label as "extortionate" the Unions' non-violent conduct in support of both of their alleged demands, there is a separate and independent flaw in Plaintiffs' extortion case insofar as it challenges the Unions' conduct in support of their alleged organizing-ground-rules demand.

As this Court recognized, one of the elements of generic extortion is the "obtaining" property element—that is, the element that the defendant obtained (or attempted to obtain) from the plaintiff property or something of value that is "transferable." Opinion at 13. The Plaintiffs cannot satisfy this element as to the aspect of their extortion theory that involves the organizing-ground-rules demand. That is because none of the terms of the ground rules agreement allegedly sought by the Unions would entail Care One's conveyance of any transferable property; they would entail only Care One's changing of its behavior.

As to the neutrality term, a demand for employer neutrality is nothing more than a demand that the employer refrain from exercising its right to speak in opposition to unionization. No transferable property is conveyed, and thus no property is "obtained" by the union, when an employer accedes to such a union demand that the employer exercise its free speech rights in a certain manner. *See Sekhar v. United States*, 133 S. Ct. 2720 (2013) (pressuring someone to express a particular opinion can be "coercion" but not "extortion," because no transferable

25

property is sought to be conveyed and "[n]o fluent speaker of English … would say that a person '*obtained and exercised* another's right to free speech.' He would say …that a person 'forced another to make a statement.'"); *Wackenhut v. SEIU*, 593 F. Supp. 2d 1289, 1296 (S.D. Fla. 2009) (union seeking voluntary-recognition agreement with employer through economic pressure attempted to coerce employer behavior changes but "has not attempted to obtain [the employer's] property").

As to the access-to-premises term, an employer likewise does not convey transferable property to a union when allowing such access. Rather, the employer merely exercises its own right not to exclude the union from its property; it conveys nothing to the union in the nature of an easement that the union could, in turn, transfer to a third party. *See Adcock*, 550 F.3d at 374 (an employer providing access to union organizers is not delivering or conveying a "thing of value"). As to employee contact-information lists, the same is true: The employer shares non-confidential information with the union for a limited purpose and does not convey to the union any transferable right in the information.[6]

---

[6] Furthermore, although the Amended Complaint, in a conclusory manner, labels employee "names and contact information" as "confidential business information," Am. Compl. ¶ 156, the NLRB has ruled that "[a] list of employee names and addresses is not like a customer list, and an employer would appear to have no significant interest in keeping the names and addresses of his employees secret (other than a desire to prevent the union from communicating with his employees-an interest we see no reason to protect)." *Excelsior Underwear*, 156 N.L.R.B. 1236, 1243 (1966). *See also Sage Hospitality*, 390 F.3d at 219 (citing with approval an appellate decision holding that "transmitting [a] list of names and

2.    The Amended Complaint Fails To Plead a Predicate Act of
"Extortion Through Use of Force or Violence," Because, Like
the Original Complaint, It Lacks Sufficient Allegations To Hold
the Unions Accountable for the Acts of Sabotage Committed by
<u>Unidentified Individuals</u>

Because the *Brokerage Concepts* test for extortion applies only to "the use of [economic] fear" to induce a legitimate business transaction, and not to the "use of force" exercised for that purpose, the alleged acts of sabotage that took place in Connecticut on July 2-3, 2012, do not fall within the coverage of that test. Nevertheless the allegations concerning the acts of sabotage fail for an independent reason to make out a RICO predicate offense of extortion.

This Court, in its opinion dismissing the original complaint, found that Plaintiffs had failed to plead "a basis for which Defendants should be held accountable for many of the alleged acts of unidentified individuals." Opinion at 15. The original complaint's most notable failing in that regard was with respect to the allegations concerning the July 2012 Connecticut episode of sabotage. The complaint identified no perpetrators and sought to hold the Unions responsible solely on the ground that similar acts were committed at a strike *in 2001,* by unnamed employees of other facilities at which NEHCEU was the bargaining agent—incidents that the complaint acknowledged were investigated by the police with no finding that NEHCEU was responsible and with no charges brought

addresses to union for election purposes is not [a] violation of" 29 U.S.C. § 186, a statute prohibiting employers from delivering a "thing of value" to a union).

against anyone. *See* Dkt. 1 Ex. B; Am. Compl. Ex. B. The complaint also added a

conclusory allegation that the sabotage in 2012 occurred "at the direction of lead

organizers employed by NEHCEU." Dkt. 1 ¶ 79.

We showed in the earlier briefing that, even without regard to the heightened

agency requirements of the federal Norris-LaGuardia Act (NLGA), 29 U.S.C.

§ 106, which this Court has held do not apply here, Opinion at 15, the allegation

that the sabotage occurred "at the direction of" NEHCEU's organizers was entirely

conclusory and hence insufficient under the basic *Twombly-Iqbal* standard to hold

the Unions responsible for the acts of unidentified individuals. Dkt. 25 at 17. In

fact, we showed that in *Iqbal* itself, the Supreme Court disregarded the same type

of conclusory allegations in a non-NLGA case, and that, in *Santiago v. Warminster

Township,* 629 F.3d 121, 131 (3d Cir. 2010), the Third Circuit, also in a non-

NLGA case, disregarded as "fundamentally conclusory" an allegation *identical* to

the allegation made by Plaintiffs here: that certain defendants were liable because

they "directed others" to take an unlawful act. *Id.*

The Amended Complaint repeats the same deficient factual allegations as

the original complaint and makes only one change worth mentioning: It adds

language that seeks to hold the Unions responsible for the acts of sabotage based

on the allegation that NEHCEU failed to discipline anyone for engaging in those

acts under its internal disciplinary procedures. Am. Compl. ¶ 163 ("not a single

28

Union member has been charged under this section of Defendant NEHCEU's Bylaws as a result of the blatant criminal activity engaged in during the strikes").

That new allegation is wholly deficient because NEHCEU cannot, of course, institute disciplinary charges without a basis for knowing whom to charge. And the Amended Complaint's own allegations establish that neither the police who investigated the incidents nor Care One itself, which was managing the facilities when the alleged acts of sabotage occurred, have been able to identify the perpetrators or any suspects. Thus the Amended Complaint affords no basis for inferring that NEHCEU knows the identity of the perpetrators and has chosen not to discipline them. Consequently, the new allegation does nothing to cure the failure to "plead a basis for which Defendants should be held accountable" for the acts of sabotage of the unidentified perpetrators. Opinion at 15.

> C. Because the Elements of Extortion for Federal Travel Act Purposes Are Identical to Those for Extortion "Chargeable Under State Law," the Travel Act Extortion Predicates Fall Along with the State-Law Extortion Predicates

The final RICO "predicate act" issue that must be resolved is whether the Amended Complaint adequately pleads that Defendants violated the Travel Act, 18 U.S.C. § 1952. As we now show, the answer to that question plainly is "no."

The Travel Act prohibits "travel[ ] in interstate or foreign commerce" with intent to promote or carry out specified "unlawful activity." 18 U.S.C. § 1952(a). The phrase "unlawful activity" under the Travel Act is a specialized defined term

narrowly limited to (1) engaging in an illegal "business enterprise involving gambling," "liquor," "narcotics," or "prostitution"; (2) "*extortion*, bribery, or arson in violation of the laws of the State in which committed or of the United States"; or (3) money laundering. *Id.* § 1952(b) (emphasis added).

The only type of Travel Act "unlawful activity" that Plaintiffs have alleged, in either their original or Amended Complaint, is extortion. *See* Dkt. 1 ¶¶ 159, 169, 181, 193; Am. Compl. ¶¶ 271, 281, 301, 321. Therefore, in order to make out their claim that Defendants have violated the Travel Act, Plaintiffs are required to plead two elements: *first,* the basic Travel Act element that distinguishes it from other federal crimes, which is that Defendants traveled in interstate commerce; and *second,* that Defendants did so in order to promote or carry out extortion.

Here, Plaintiffs have adequately pled the interstate "travel" element. *See* Opinion at 14. But our showing in Part I.B *supra*—that Plaintiffs have not adequately pled extortion "chargeable under State law"—necessarily establishes that they have not adequately pled extortion indictable under the Travel Act. The reason is straightforward: The Supreme Court's Travel Act and RICO cases establish with unmistakable clarity that the Travel Act's reference to "extortion … in violation of the laws of the State in which committed" means precisely the same thing as RICO's reference to "extortion … chargeable under State law."

To begin, in *United States v. Nardello*, 393 U.S. 286 (1969), the Court held that the Travel Act phrase "extortion … in violation of the laws of the State in which committed" meant "those acts prohibited by state law *which would be generically classified as extortionate*, i.e., obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." *Id.* at 290 (emphasis added); *see also id.* at 296. In other words, a State could not, by labeling as "extortion" conduct that was not extortionate under the generic test, make that conduct indictable under the Travel Act.

Next, in *Scheidler v. NOW*, 537 U.S. 393 (2003), a RICO case, the Supreme Court left no doubt that this was the import of *Nardello*, including for purposes of RICO cases where a Travel Act violation is alleged as a predicate act of racketeering. In *Scheidler*, the plaintiffs in a civil RICO action had obtained a jury verdict against the defendants finding that the defendants had, in addition to committing the predicate act of Hobbs Act extortion, committed *both* the predicate act of "extortion … chargeable under State law" *and* the predicate act of Travel Act "extortion … in violation of the laws of the State in which committed." The *Scheidler* Court, in addressing the latter two species of extortion, found them both to be governed by the identical test: the generic test set out in *Nardello. Id.* at 409-10. The Court then held that, because it had previously found as a matter of law that the 23 counts alleging "extortion … chargeable under State law" had to be

31

dismissed for failure to meet the elements of *generic extortion,* it necessarily followed that the 23 counts alleging *Travel Act extortion* had to be dismissed as well. *Id.* at 410 (because "we have already determined that petitioners did not commit or attempt to commit extortion" chargeable under state law, the "23 acts of attempting to violate the Travel Act also fail").

The lesson of *Nardello* and *Scheidler* is clear: Where a RICO plaintiff cannot establish the elements of the predicate act of extortion "chargeable under State law," the plaintiff necessarily cannot establish the elements of the predicate act of Travel Act extortion. *Accord, Cintas,* 601 F. Supp. 2d at 578 (where plaintiff failed adequately to plead the "wrongful use" element of generic extortion, it followed that *both* the RICO claims predicated on extortion "chargeable under State law" *and* those predicated on extortion "indictable under" the Travel Act had to be dismissed "regardless of what extortion is under Ohio state law").

For these reasons, our showing in Part I.B establishes that Plaintiffs' effort to invoke Travel Act extortion as a RICO predicate act fails.[7] Therefore, Plaintiffs'

---

[7] Plaintiffs have suggested that the Court, in its earlier opinion, found their extortion claims deficient as to the RICO "chargeable under State law" predicate but found them sufficient as to the Travel Act predicate. *See* Dkt. 52 at 1. That suggestion cannot be squared with the fact that the Court (i) stated that all of the RICO counts were deficient because of an "underlying defect" in the predicate act allegations, Opinion at 16-17; and (ii) stated for good measure that the supplemental state law claims "would be subject to dismissal" unless the Plaintiffs could cure the deficiencies in their RICO claims, *id.* at 17 n.15. In light of those statements—and given the case law clearly equating RICO extortion "chargeable

Amended Complaint fails to allege any predicate acts of racketeering, dictating the Rule 12(b)(6) dismissal of all RICO counts in this case.

II.   THE ALLEGED JULY 2-3, 2012, EPISODE OF SABOTAGE CANNOT, STANDING ALONE, SATISFY RICO's "PATTERN" ELEMENT

As we have said, the core of Plaintiffs' extortion case rests on the series of *non-violent* speech, petitioning and other economic pressure activities engaged in to back up the Unions' alleged pattern-contract and organizing-ground-rules demands. If that core component of Plaintiffs' extortion case is found deficient, as we have shown it should be, all that would remain are the allegations pertaining to a single episode of sabotage committed by unidentified persons on July 2-3, 2012, at three Connecticut facilities. We showed in Part II.B.2 that those sabotage allegations are deficient for the basic reason that they afford no basis for inferring, in a manner consistent with the *Twombly/Iqbal* standard, that the Unions were responsible for the acts in question. We now show that, if only those allegations remain after the core of Plaintiffs' RICO case is rejected, there is an additional reason for dismissing each of the RICO counts: that no "pattern" of racketeering acts has been sufficiently alleged.

---

under State law" and Travel Act extortion "in violation of the laws of the State"—it is clear that the Court's comments on the Travel Act predicate acts are properly understood in context as stating only that the basic "travel" element had adequately been pled with respect to certain incidents identified in the complaint, not that the *extortion* element of the Travel Act had been adequately pled.

To prevail on any of their RICO claims, Plaintiffs must show that Defendants committed a "*pattern* of racketeering activity." 18 U.S.C. §§ 1962(a), (b), & (c) (emphasis added). And, to elaborate, this "pattern" element includes a requirement of "continuity"—in other words, that "the predicates themselves amount to, or that they otherwise constitute a threat of, *continuing* racketeering activity." *H.J. Inc. v. N.w. Bell Tel. Co.*, 492 U.S. 229, 240 (1989) (emphasis in original).

Under the controlling case law, there are only two ways in which this "continuity" requirement can be satisfied. The first is by showing "closed-ended" continuity, which requires "a series of related predicates extending over a substantial period of time." *Id.* at 242. If the alleged sabotage is the only predicate racketeering activity that Plaintiffs have adequately pled, that activity—confined to a single episode allegedly occurring over a mere *two days* from July 2 to 3, 2012— plainly did not occur over a sufficiently "substantial period" of time to satisfy closed-ended continuity. Indeed, the Third Circuit squarely has held that *twelve months* is insufficient in this regard. *Hughes v. Consol-Pa. Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991); *see also Tabas v. Tabas*, 47 F.3d 1280, 1293 (3d Cir. 1995) (en banc) ("this court has faced the question of continued racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for closed-ended continuity").

That would leave the Plaintiffs needing to show "open-ended" continuity—that the single non-violent episode of sabotage created a "specific threat of repetition extending indefinitely into the future." *H.J. Inc.*, 492 U.S. at 242. They could not do so because, on Plaintiffs' allegations, the sabotage occurred over a two-day period and was in connection with a strike called by NEHCEU at several of Plaintiffs' facilities in Connecticut. Am. Compl. ¶ 8. Plaintiffs do not allege that any other violence occurred in connection with this strike, which has long since ended. *See Kreisberg v. HealthBridge Mgmt., LLC*, 2012 WL 6553103 (D. Conn. Dec. 14, 2012) (noting that the strikers were willing to return to work and granting the NLRB's request for injunctive relief to reinstate the strikers as a result of HealthBridge having committed various unfair labor practices), *stay denied*, 133 S. Ct. 1002 (Feb. 6, 2013), *aff'd*, 732 F.3d 131 (2d Cir. Oct. 15, 2013). Such a one-off incident is the antithesis of a threat that will "extend[ ] indefinitely into the future" as is necessary for open-ended continuity. *See also Kolar v. Preferred Real Estate Invs., Inc.,* 316 F. App'x 354, 365 (3d Cir. 2010) ("[a] single, finite transaction cannot by itself underpin a pattern of racketeering activity").

Moreover, the fact that, on Plaintiffs' allegations, other episodes of strike-related sabotage occurred in 2001 and 1998 at facilities where the employees were NEHCEU represented could not help Plaintiffs plead open-ended continuity. This is most fundamentally because Plaintiffs do not allege—even in the conclusory

terms they use to allege the July 2012 incident—that the Defendant Unions had anything to do with this alleged misconduct, nor do they even say anything more than that unnamed "members" of NEHCEU "purportedly" committed the acts. *Id.* ¶ 248. But even if, contrary to reality, Plaintiffs had alleged that Defendant NEHCEU had itself directed or authorized the sabotage that took place in each of these incidents, more than eleven years separated the last incident from the one alleged in the Amended Complaint, and it is not plausible to infer that episodes of sabotage separated by eleven years would create the "*specific* threat of repetition" necessary to satisfy open-ended continuity and establish a "pattern" of sabotage.

III.    IN ALL EVENTS, COUNTS I AND II MUST BE DISMISSED FOR FAILURE TO ALLEGE THE REQUISITE § 1964(c) "INJURY"

In all events, and for reasons independent of every other argument we have made, the Court must dismiss Counts I and II.

Count I alleges that Defendants conspired, in violation of RICO's general conspiracy provision, 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(a), the RICO substantive provision that makes it a substantive RICO offense for a defendant to "use or invest" "income" earned through racketeering in certain enterprises. Count II alleges that Defendants conspired in violation of § 1962(d) to violate § 1962(b), the provision that makes it a substantive RICO offense to "acquire" "any interest in or control of any enterprise" through racketeering. Both counts are fatally flawed for the same basic reason.

36

A RICO *civil* plaintiff, to state a viable conspiracy claim, may not merely allege that the defendant participated in a prohibited § 1962(d) conspiracy (which is all that a federal prosecutor must allege and prove in a criminal case, *see Salinas v. United States*, 522 U.S. 52 (1997)). A RICO civil plaintiff must *also* satisfy the separate "injur[y] [to plaintiff's] business or property by reason of a violation of section 1962" requirement of 18 U.S.C. § 1964(c), which does not apply to criminal prosecutions. *See Beck v. Prupis*, 529 U.S. 494, 496 & n.1 (2000).

Plaintiffs have failed to satisfy this added element in Counts I and II of their Amended Complaint, for with respect to Count I, they make no allegation that anyone has been injured by the "use or invest[ment]" of any racketeering income under § 1962(a), and with respect to Count II, they make no allegation that anyone has been injured by the "acqui[sition]" of an interest in any of the identified enterprises under § 1962(b). *See* Am. Compl. ¶¶ 273, 283. Nor could they make such injury allegations, because they do not allege that any defendant or any other co-conspirator has even completed a violation of § 1962(a) by using or investing any racketeering income or completed a violation of § 1962(b) by acquiring an interest in any of the specified enterprises. *See id.* If no violation has been completed, there plainly can be no injury "by reason of a violation."

The Supreme Court's decision in *Beck v. Prupis* makes it clear that these twin failures to plead any substantive violation causing a § 1964(c) injury are fatal

to Counts I and II. In *Beck*, the Court held that where, as here, a private party is seeking to bring a civil cause of action under RICO § 1964(c) to redress an alleged "injur[y] [to] … business or property" caused by a violation of RICO's conspiracy provision, § 1962(d), "our task is to interpret *§§ 1964(c) and 1962(d) in conjunction, rather than § 1962(d) standing alone*," in determining whether the requisite "injury" has been properly pled. *Id.* at 501 n.6 (emphasis added). Further, the Court stated, *common-law* principles govern that interpretation, *id.* at 500, and the "obvious source in the common law for the combined meaning of these provisions is the law of *civil* conspiracy," *id.* at 500 n.6 (emphasis added).

The Court in *Beck* then stated that, at common law, "a [civil] conspiracy claim was *not an independent cause of action*, but was only the mechanism for subjecting co-conspirators to liability when one of their member[s] *committed* a tortious act." *Id.* at 503 (emphases added). In so stating, the Court quoted a New Jersey common-law case with approval as follows: "'[A] conspiracy cannot be made the subject of a civil action unless something has been done which, *absent the conspiracy*, would give a right of action.'" *Id.* at 502 (quoting *Middlesex Concrete Prods. & Excavating Corp. v. Carteret Indus. Ass'n*, 181 A.2d 774, 779 (N.J. 1962) (emphasis added)).

The position that Plaintiffs have taken here—that a RICO civil conspiracy plaintiff somehow can satisfy the "injur[y]" requirement of § 1964(c) *without*

pleading that any RICO substantive offense has been completed and caused an injury that would "give a right of action" under § 1964(c) "absent the conspiracy"—is thus directly contrary to *Beck*'s reasoning. It follows that, in this situation—with Plaintiffs indisputably failing to allege that *any* co-conspirator has completed a substantive violation of either §§ 1962(a) or 1962(b), let alone a violation that has caused them an injury to their business or property—§ 1964(c) precludes Plaintiffs from proceeding here on the theory that Defendants engaged in a § 1962(d) conspiracy to violate either of these two subsections. Counts I and II are therefore defective for failure to plead the requisite injury. *See also UBC v. Bldg. & Constr. Trades Dep't*, 911 F. Supp. 2d 1118, 1134 (E.D. Wash. 2012) (under *Beck*, "[l]iability for a criminal conspiracy may be complete at an early stage, but for there to be civil liability under RICO, section 1964(c) requires among other elements, the actual commission of a pattern of predicate RICO offenses").

In Plaintiffs' brief in opposition to Defendants' motion to stay discovery, Plaintiffs claim that this Court "rejected" this argument in its earlier opinion. Dkt. 52 at 5. Not so. The sentence in the Court's opinion that Plaintiffs latch onto says: "The Court notes, however, that a completed violation of §§ 1962(a) and (b) are not necessary to properly plead a violation of § 1962(d)." Opinion at 17 n.18. That sentence correctly states the requirements for pleading a *§ 1962(d) violation* whether in a criminal or civil case, and is in no way inconsistent with our position

39

that, under *Beck*, a *civil* RICO plaintiff must also meet the requirements of

§ 1964(c), including most particularly, the requirement of an "injur[y]" to the

plaintiff's "business or property by reason of a violation." *See* Dkt. 25 at 20-22.

    Our position thus was *not* "rejected" by this Court. To the contrary, it was

expressly deferred. *See* Opinion at 17-18 (identifying the argument that "Plaintiffs'

Counts I and II (RICO conspiracy claims) must be dismissed for failure to state an

injury" as a "count-specific" argument that "this Court will not address" given its

earlier finding of defects that cut across all four RICO counts). If the Court now

chooses to reach the issue, it should follow *Beck* and dismiss Counts I and II for

failure to meet the § 1964(c) injury requirement.

## CONCLUSION

    For the foregoing reasons, the RICO Counts should be dismissed, with

prejudice, for failure to state a claim, and the state-law claims should be dismissed,

without prejudice, for lack of supplemental jurisdiction.

                         Respectfully submitted,

                         /s/ R. Scott Thompson
                         R. Scott Thompson
                         LOWENSTEIN SANDLER LLP
                         65 Livingston Avenue
                         Roseland, NJ 07068
                         Phone: (973) 597-2500
                         Fax: (973) 597-2400

                         *Counsel for Defendants*

Robert M. Weinberg*
W. Gary Kohlman*
Leon Dayan*
Jacob Karabell*
BREDHOFF & KAISER, PLLC
805 Fifteenth Street NW, Suite 1000
Washington, DC 20005
Phone: (202) 842-2600
Fax: (202) 842-1888

*Counsel for Defendants*

Richard A. Levy*
David M. Slutsky
Susan J. Cameron
LEVY RATNER, P.C.
80 8th Avenue, 8th Floor
New York, NY 10011
Phone: (212) 627-8100
Fax: (212) 627-8182

*Counsel for Defendant 1199SEIU*
*United Healthcare Workers East*

*Admitted *pro hac vice*