## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

### Document Electronically Filed

| | |
|---|---|
| Care One Management, LLC <u>et al.</u><br><br>    Plaintiffs,<br><br>       vs.<br><br>United Healthcare Workers East, SEIU 1199 <u>et al.</u><br><br>    Defendants. | Civil Action No.<br>2:12-cv-06371-SDW-MAH<br><br>**DECLARATION OF ROSEMARY ALITO** |

    I, **ROSEMARY ALITO,** pursuant to 28 U.S.C. § 1746, hereby declare the following:

    1.    I am an attorney at law of the State of New Jersey, a member of the Bar of this Court, and a member of the law firm K&L Gates, LLP, attorneys for the Plaintiffs' in this matter.  I make this declaration in opposition to Defendants' motion to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

    2.    Annexed hereto as Exhibit A-M are true copies of the following unpublished opinions cited in Plaintiffs' brief in opposition to Defendants' motion to dismiss the Amended Complaint:

Exhibit A:   <u>Asbestos & Lead Removal Corp. v. Severino,</u>
                No. 06-5949, 2007 WL 925485 (E.D.N.Y. Mar. 23, 2007)

Exhibit B:   CareOne, LLC v. Burris,
             No. 10-2309 (FLW), 2011 WL 2623503
             (D.N.J. June 28, 2011)

Exhibit C:   Chevron Corp. v. Donziger,
             No. 11-691, 2012 WL 3223671
              (S.D.N.Y. May 24, 2012)

Exhibit D:   Chevron Corp. v. Donziger,
             No. 11-691, 2014 WL 815923
             (S.D.N.Y. Mar. 4, 2014)

Exhibit E:   Chovanes v. Thoroughbred Racing Ass'n,
             2001 WL 43780 (E.D. Pa. Jan. 18, 2001)

Exhibit F:   Desmond v. Siegel,
             No. 10-5562 (DRD), 2012 WL 3228681 (D.N.J. Aug. 6, 2012)

Exhibit G:   Kimm v. Lee,
             No. 04-5724, 2005 WL 89386
             (S.D.N.Y. Jan. 13, 2005)

Exhibit H:   Kredietbank N.V. v. Joyce Morris, Inc.,
             No. 84-1903, 1986 WL 5926 (D.N.J. Jan. 9),
             aff'd, 808 F.2d 1516 (1986)

Exhibit I:   Pappa v. Unum Life Ins. Co. of Am.,
             No. 07-0708, 2008 WL 744820
             (M.D. Pa. Mar. 18, 2008)

Exhibit J:   SCI Illinois Svcs., Inc. v. Coli,
             No. 11-7762, 2012 WL 2152829
             (N.D. Ill. June 6, 2012)

Exhibit K:   Texas Air Corp. v. Air Line Pilots Ass'n Int'l,
             No. 88-0804, 1989 WL 146414
             (S.D. Fla. Jul. 14, 1989)

Exhibit L:    United States v. Caggiano,
              No. 07-CR-304S, 2014 WL 104968
              (W.D.N.Y. Jan. 9, 2014)

Exhibit M:    United States v. Larson,
              No. 07–CR–304S, 2013 WL 5573046
              (W.D.N.Y. Oct. 9, 2013)

I declare under penalty of perjury that the foregoing statement is true and

correct to the best of my knowledge, information and belief.

Dated:  March 31, 2014

                              ___/s/Rosemary Alito_____
                                   Rosemary Alito

**EXHIBIT A**

2007 WL 925485
United States District Court,
E.D. New York.

ASBESTOS & LEAD REMOVAL CORPORATION
and George Kourkounakis, Plaintiffs,
v.
Edison SEVERINO, in his capacity as President of
Laborers International Union of North America
Local 78, et al., Defendants.

No. CV-06-5949 (BMC)(MDG). | March 23, 2007.

**Attorneys and Law Firms**

Peter M. Kutil, King & King, LLP, Long Island City, NY, for Plaintiffs.

Lowell Peterson, Meyer, Suozzi, English & Klein, P.C., Jacques Semmelman, Curtis, Mallet-Prevost, Colt & Mosle LLP, New York, NY, Samuel Rosenthal, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC, Terrance G. Reed, Lankford, Coffield & Reed, PLLC, Alexandria, VA, for Defendants.

**Opinion**

*MEMORANDUM DECISION AND ORDER*

COGAN, District Judge.

**\*1** This is a RICO case against a labor union local arising out of a series of violent acts allegedly authorized by union leaders and committed by union members in order to force the plaintiff to recognize the union for collective bargaining purposes. Presently before me is plaintiffs' motion for leave to file a second amended complaint and defendants' motion to dismiss, which is directed at that proposed complaint. The motion to amend is granted and the motion to dismiss is granted in part and denied in part as set forth below.

*BACKGROUND*

Plaintiffs' second amended complaint alleges that at various times beginning in the Fall of 2003 and sharply escalating in October 2006, Laborers International Union of North America Local 78 ("Local 78"); its Business Manager, Edison Severino (sued as its President); Local 78 members Fabian Derewiecki, Nguren Rivera, Angel Rivera, Carlos Severino, and other John Doe defendants, undertook a series of illegal and improper acts, seemingly intended to extort plaintiff Asbestos & Lead Removal Corporation ("ALR") and its President, George Kourkounakis, into entering a collective bargaining agreement with Local 78. The most serious of these are breaking Kourkounakis' hand with a billy-club (for which Derewiecki has been arrested, although he denies responsibility); trying to run him over with a car; vandalizing ALR vans and employee vehicles; menacing an ALR employee with a vehicle on the Long Island Expressway; and spray painting and throwing bricks at Kourkounakis' house.

The second amended complaint contains three counts. Count I is a RICO count against Local 78, accusing it of being an "enterprise" engaged in a pattern of racketeering activity. The predicate acts are extortion under the New York Penal Law and the Hobbs Act, 18 U.S .C. § 1951. Count II is a collection of state law intentional tort claims, stated only against particular defendants who are alleged to have committed each act. Count III is a RICO claim against Edison Severino and individual Local 78 employees.

*DISCUSSION*

**I. Standard of Review**

A court should dismiss a complaint under Fed.R.Civ.P. 12(b)(6) for failure to state a claim only if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46; 78 S.Ct. 99, 102 (1957); *Curto v. Edmundson,* 392 F.3d 502, 503 (2d Cir.2004). In deciding whether a complaint states a claim, the court must accept as true all factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. *Phelps v. Kapnolas,* 308 F.3d 180, 184 (2d Cir .2002).

**II. The RICO Claims**

**A. Hobbs Act Violation**

The primary ground on which defendants attack the RICO claims is that the Hobbs Act does not apply in the context

181 L.R.R.M. (BNA) 2796, 154 Lab.Cas. P 10,830, RICO Bus.Disp.Guide 11,270

of a labor dispute, and thus an alleged Hobbs Act violation cannot be a predicate act under RICO.

**\*2** Local 78's argument is premised on *U.S. v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007 (1973). There, the Supreme Court affirmed dismissal of a criminal indictment under the Hobbs Act where a union was alleged to have destroyed company property during a lawful strike. Because there was a legal object of the strike-to obtain a new collective bargaining agreement at higher wages-the Court found that violence to obtain that lawful end was not subject to indictment under the Hobbs Act. The Court noted that: "the Nation has witnessed countless economic strikes, often unfortunately punctuated by violence. It is unlikely that if Congress had indeed wrought such a major expansion of federal criminal jurisdiction in enacting the Hobbs Act, its action would have so long passed unobserved." *Id. at 410, 93 S.Ct at 1015.*

Plaintiffs, in turn, point out correctly that courts have narrowly applied *Enmons* despite some broad language in the decision. Plaintiffs rely on *A. Terzi Productions, Inc. v. Theatrical Protective Union, Local No. One, I.A.T.S.E., AFL-CIO,* 2 F.Supp.2d 485 (S.D.N.Y.1998), in which Judge Sotomayor held that the Hobbs Act did apply to violent acts committed by union members seeking to obtain a union contract, where the union had not been recognized as the bargaining representative for employees and there was no strike out of which the violence arose. Since it is a fundamental precept of labor law that a union may not demand employer recognition in the absence of support from a majority of employees, the Court held that the violence was not part of an effort to obtain a "lawful objective," was subject to Hobbs Act prosecution, and constituted a predicate act under RICO.

Faced with this argument, Local 78 asserts that *Terzi* was a fashion industry case, whereas the present case arises in the construction industry. The difference, Local 78 argues, is that § 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f), permits a union to seek to enter a collective bargaining agreement with an employer in the construction industry, as opposed to other industries, even without majority employee recognition. Section 8(f) provides that: "It shall not be an unfair labor practice ... for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged ... in the building and construction industry," even if those employees have not elected the union as their bargaining agent. Local 78 concludes that since it was authorized by this section to enter into such a "pre-hire" agreement with ALR, it was seeking a lawful objective, and thus, violence in connection with that objective is excluded from the Hobbs Act under *Enmons.*

At this point, the parties' positions bog down into an argument over whether arguably inconsistent NLRB decisions concerning the right of a union to picket to enforce a pre-hire agreement make Local 78's attempt to organize ALR "lawful." *Compare NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO,* 434 U.S. 335, 98 S.Ct. 651 (1977) ("*Higdon* ") (deferring to Board's position that a minority union cannot picket to enforce a pre-hire contract) *with John Deklewa & Sons, Inc v. NLRB,* 843 F.2d 770 (3rd Cir.1988) (upholding Board's revised interpretation of the NLRA as not permitting employer to repudiate pre-hire agreement). This debate misses the point.

**\*3** The parties have not entered into a pre-hire agreement. The decisions of the NLRB, like those that formed the basis of *Higdon* and *Deklewa,* as to whether a pre-hire agreement is terminable at will or what actions a union may take to enforce an existing pre-hire agreement, thus are of no relevance in construing the scope of the phrase "lawful objective" in *Enmons.* Here, defendants assert that the allegedly unlawful acts were intended to force a pre-hire agreement in the first instance.

*NVE Constructors, Inc. v. NLRB,* 934 F.2d 1084 (9th Cir.1991), is more closely on point. There, the Ninth Circuit affirmed a decision of the Board that an uncertified union did not violate the NLRA when it picketed for less than 30 days to force a pre-hire agreement. Specifically, the Board held that "we do not believe that recognitional and organizational picketing by a minority union in the construction industry is prohibited by Section 8(b)(7)(C) of the Act if the picketing meets the time limitations set forth in that section." *Id. at 1085.*

According to plaintiffs' complaint, Local 78's activities took place over a period of more than two years, taking their conduct outside of the 30 day time limit for "recognitional and organizational picketing" in the construction industry. However, even excluding the earlier conduct and focusing only on the allegations of violence beginning in October 2006, I am not satisfied at this stage of the case that *Enmons* extends to the acts alleged in the complaint.

*Enmons* involved a strike by a union recognized by the employees as the bargaining agent in order to obtain higher wages following the expiration of a prior collective bargaining agreement-a labor tactic that was not only lawful, but almost hallowed as the primary legal bargaining tool that a union may employ in those circumstances. The Supreme Court was clearly concerned

Asbestos & Lead Removal Corp. v. Severino, Not Reported in F.Supp.2d (2007)

181 L.R.R.M. (BNA) 2796, 154 Lab.Cas. P 10,830, RICO Bus.Disp.Guide 11,270

about the criminalization, or at least the "chilling," of this essential union labor tool if the Hobbs Act was read to unleash prosecutors to indict based on incidental violent acts that attended a carefully protected activity, the right to strike. To include such acts, the Court held, would "put the Federal Government in the business of policing the orderly conduct of strikes." *Enmons*, 410 U.S. at 411, 93 S.Ct. at 1015. *Enmons* itself did not reach the question of what activity besides striking for higher wages constitutes "legitimate labor ends," *Terzi*, 2 F.Supp.2d at 505 (citing *Enmons*, 410 U.S. at 407, 93 S.Ct. 1007), but courts have been careful to apply *Enmons* restrictively, limiting it almost exclusively to the strike context. *See Terzi*, 2 F.Supp.2d at 505-08 (collecting cases).

Significantly, none of the material facts in *Enmons* is present here. There is no strike. There is no expired collective bargaining agreement. There is no apparent effort, at this stage, to get higher wages for workers. There are no facts demonstrating or even suggesting support among ALR employees for union representation. There is only an alleged demand for union recognition based on several incidents of violence.

**\*4** True, unlike in *Terzi*, defendants were not required to achieve authorization from a majority of employees in order to picket for a pre-hire agreement, and in that sense, § 8(f) affords defendants a "lawful" basis to demand recognition. However, not only did defendants long exceed the time period provided in the Act for them to employ coercive tactics to achieve recognition, but there is no allegation in the complaint that the violent acts alleged were incidental to bona fide bargaining in the context of a labor dispute. To apply *Enmons*, where the strike to obtain higher wages was unambiguously protected activity and the violence was clearly incidental to it, to this case would have the tail wagging the dog. It would require a holding that as long as violent acts occur between a labor union and a company where a pre-hire agreement was possible, there are no circumstances in which the Hobbs Act would prohibit any level of violence. I am not prepared at this stage to extend *Enmons* to shield defendants from liability for numerous incidents of illegal conduct simply because this is a construction industry case and they assert that the conduct was in the course of seeking a pre-hire agreement.

Of course, this is a 12(b)(6) motion, and it may develop when all of the facts are placed before the Court that the alleged misconduct in this case was incidental to lawful organizing activity. However, for purposes of this motion, the allegations of the complaint do not fall within the exemption from the Hobbs Act recognized in *Enmons*.

**B. *Garmon* Preemption**

The weight of authority in this Circuit has rejected defendants' argument that the NLRA preempts plaintiffs' RICO claims because the claims are essentially unfair labor practices, an argument derived from *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773 (1959). I agree with this authority, and hold that *Garmon* preemption applies only to state law claims, not federal RICO claims. *See Terzi*, 2 F.Supp.2d at 502-04 (collecting cases).

**C. Continuity**

I find that for the limited purpose of surviving a motion to dismiss, plaintiffs have sufficiently alleged open-ended continuity of the scheme at issue here to meet the standard of *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893 (1989). (The alleged conduct spans over two years, but I decline to decide whether this is substantial enough for closed-ended continuity.) Specifically, I find that the allegations establish a threat of long-term racketeering activity because they involve explicit and implicit threats of long-term conduct.

We are not dealing here with a couple of incidents of violence during a union struggle. The second amended complaint recites numerous incidents, starting over two years ago and greatly escalating in October 2006. Some of them involve explicit threats that confirm the alleged goal: "You should join the union;" "You just crossed the line by calling the police; I will investigate where you live and break your windows." The inference of relationship is apparent and indeed not challenged. The inference of continuity may be reasonably drawn given both the number and nature of incidents, and the fact that the goal of the alleged scheme has not yet been achieved. *See GICC Capital Corp. v. Technology Fin. Group*, 67 F.3d 463 (2d Cir.1995); *Norstar Bank v.. Pepitone*, 742 F.Supp. 1209, 1211-12 (E.D.N.Y.1990) ("when the predicate acts only last a few weeks in actuality but at the time of their occurrence threaten future criminal activity, the continuity requirements is met").

**\*5** I am not dissuaded from this conclusion by Local 78's assertion that since the filing of this action, there have been no further incidents, or by the fact that Local 78 has fired one defendant and suspended another based on its verification that one of the acts alleged in the second amended complaint did, in fact, occur. First of all, this is a Rule 12(b)(6) motion and I am confined to the face of the complaint. *See, e.g., Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir.1991); *see also Welch*

*Foods, Inc. v. Gilchrist,* 1996 WL 607059, at *6 (S.D.N.Y. Oct. 18, 1996) ("the threat of continuity in the context of an open-ended racketeering activity must be viewed at the time the racketeering activity allegedly occurred"). Indeed, if I were permitted to draw an inference from post-filing occurrences, I might conclude that Local 78 was in control of the actions that occurred and caused them to cease once suit was filed, but I will not draw that inference either. Second, it would set a dangerous precedent to base the continuity determination on a cessation of hostilities immediately after the filing of a RICO case, as it might suggest a strategy on the part of a defendant to "lay low" until a case was dismissed.

I therefore find that the complaint satisfies the requirement of continuity necessary under RICO.

### III. Individual Liability

Defendants seek dismissal of the individual Local 78 defendants pursuant to § 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106. That statute prohibits vicarious liability against any union, officer, or member, requiring "clear proof" of "actual participation," "actual authorization," or "ratification" of tortious acts of union members. Although defendants assert that the statute requires dismissal of the claims against all of the individual defendants, they discuss only the allegations against Edison Severino, Local 78's Business Manager.

Section 6 is phrased in terms of proof, not pleading requirements, and thus the issue is whether Severino has notice under Fed.R.Civ.P. 8(a) of what he is being sued for. Paragraph 7 of the second amended complaint, which alleges that Severino "is being sued in his capacity as Local 78's president ... [u]pon information and belief, Mr. Severino controlled all actions of Local 78 and is, therefore, jointly and severally liable for all acts committed on Local 78's behalf," sounds like vicarious liability by its use of the word "control"; however, the complaint goes on to plead participation by Severino in the acts alleged in Counts II and III. Likewise, the complaint alleges actual participation by the other individual named and John Doe defendants. Even if "clear proof" of actual participation or authorization is ultimately lacking, plaintiffs' allegations against the union and the individual defendants are sufficient to survive the motion to dismiss.

### IV. State Law Claims

Much of defendants' reply focuses on the dismissal of plaintiffs' state law claims. Although plaintiffs could have pled each element of their claims more artfully, the second amended complaint includes a section that outlines "Illegal Activity Against ALR and its Employees," listing 11 "Events" in detail. Although the claims themselves are presented in conclusory fashion, the allegations contained in each of the "Events" sufficiently states a claim for assault and battery, intentional infliction of emotional distress, trespass, conversion and defamation.

**\*6** The complaint fails, however, to state a claim for tortious interference with business relations. To prevail on such a claim under New York law, a party must allege that (1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship. *See St. St. Bank & Trust Co. v. Inversiones Errazuriz Limitada,* 374 F.3d 158, 171 (2d Cir.2004). Plaintiffs have not alleged any actual or prospective contractual relationship with a third party. Events 9 and 10 of the complaint allege that defendants littered asbestos debris, removed a warning sign, and removed a notebook containing ALR's work permits in such a manner that ALR was, or could have been, fined by the Department of Environmental Protection (it is not clear from the complaint whether a fine ever issued). However, the description of these Events and the conclusory allegation in paragraph 99 that defendants took these measures "so as to cause termination of ALR contracts" is insufficient to state a claim for tortious interference.

Therefore, defendants' motion is granted as to the tortious interference section of Count II.

### *CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss is granted as to plaintiffs' claim for tortious interference with business relations, and otherwise denied.

### SO ORDERED.

### Parallel Citations

181 L.R.R.M. (BNA) 2796, 154 Lab.Cas. P 10,830, RICO Bus.Disp.Guide 11,270

**Asbestos & Lead Removal Corp. v. Severino, Not Reported in F.Supp.2d (2007)**

181 L.R.R.M. (BNA) 2796, 154 Lab.Cas. P 10,830, RICO Bus.Disp.Guide 11,270

**End of Document**                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

 © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT B**

CareOne, LLC v. Burris, Not Reported in F.Supp.2d (2011)

RICO Bus.Disp.Guide 12,084

2011 WL 2623503
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

CAREONE, LLC, et al., Plaintiffs,
v.
William G. BURRIS, Jr., et al., Defendants.

Civil No. 10–2309 (FLW). | June 28, 2011.

**Attorneys and Law Firms**

Ian Seth Shainbrown, Philip R. Sellinger, Roger B. Kaplan, Greenberg Traurig LLP, Florham Park, NJ, for Plaintiffs.

Kerri E. Chewning, Steven J. Fram, Archer & Greiner, PC, Haddonfield, NJ, Raymond Charles Bogle, Malsbury & Armenante PA, Allentown, NJ, for Defendants.

Opinion

**OPINION**

WOLFSON, District Judge.

**\*1** Against a backdrop of numerous state-court litigations between the parties, which litigations all arise out of Plaintiffs CareOne, LLC's ("CareOne's"), Burris & Straus Beach Development/Cranmer, LLC's ("Burris & Straus–Cranmer's"), and Burris & Straus Beach Developers, LLC's ("Burris & Straus–Developers' ") (collectively "Burris & Straus'," and the three plaintiffs collectively referred to as the "CareOne Companies' ") construction of assisted living facilities in New Jersey, Plaintiffs obtained leave from a state court judge to bring this Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.,* action in this Court. In their complaint here, Plaintiffs allege that a former, high-ranking employee of the CareOne Companies, William G. Burris, Jr., orchestrated and operated a kickback scheme with several construction vendors ("Vendor Defendants")[1] whom he directed to fraudulently inflate their invoices and, thereby, used the CareOne Companies to line his own pockets. After the complaint was filed, CareOne settled with Burris and all but one of the Vendor Defendants. The sole remaining Vendor Defendant, Daniel Bossi, has filed a motion to dismiss

Plaintiffs' Complaint and a motion to strike Plaintiffs' Amended Complaint. Defendant Bossi, further, seeks sanctions against Plaintiffs' counsel pursuant to Federal Rule of Civil Procedure 11 for filing a suit without conducting an appropriate pre-filing verification of facts alleged in the complaint. For the reasons that follow, the Court grants Defendant Bossi's motions to dismiss and to strike, but denies the request for sanctions.

**I. BACKGROUND**

The following facts are taken from Plaintiffs' Complaint, which facts must be taken as true on a motion to dismiss. The gravamen of Plaintiff's Complaint is that William Burris, along with his wife Linda Burris and other of their relatives, engaged in "a long-continuing pattern of mail fraud and wire fraud" involving "fraudulent and inflated invoices submitted to plaintiffs by vendors who are defendants herein, arising from a kickback scheme between and among those vendor defendants and defendants Burris and his wife." Compl., ¶ 1. Before delving into the details of Plaintiffs' Complaint, the Court first explains the genesis of the parties' dispute and the several state-court litigations of which this suit is a part.

According to the complaint, "[f]or nearly ten years, Burris was the Executive Vice President for Construction and Development of CareOne and a member of Burris & Straus performing the same functions for those entities." *Id.* at ¶ 2.

> As part of CareOne's and Burris & Straus' senior management team, Burris had significant control and influence over CareOne and Burris & Straus, as he directed their construction and development activities. With respect to his position at CareOne, Burris was responsible for selecting and acquiring land and existing properties, and then designing, developing and converting that real estate into assisted living or healthcare facilities to be run by CareOne, its affiliates or subsidiaries. Similarly, Burris selected and acquired land and existing properties on behalf of the Burris & Straus entities, and then designed, developed and converted that real estate for resale.

**\*2** *Id.* As part of his job responsibilities, Burris selected and hired vendors to perform construction work on the properties. *Id.* at ¶ 3.

Plaintiffs allege that, throughout his ten-year tenure, "Burris regularly used the Vendor Defendants for his own personal gain at the expense of the CareOne Companies by ... convert[ing], steal[ing] and embezzl[ing] millions of dollars from the CareOne Companies...." *Id.* at ¶ 4. Specifically, the complaint alleges, "Burris abused his senior management position at the CareOne Companies by conducting the affairs of the CareOne Companies to pressure and obtain kickbacks from the Vendor Defendants in exchange for dispensing with competitive bidding resulting in the Vendor Defendants submitting padded and excessive invoices to the CareOne Companies which were, as a result, false and fraudulent." *Id.* at ¶ 5. Once the Vendor Defendants "submitted false and fraudulent invoices to the CareOne Companies ... Burris, with the assistance of another CareOne employee, defendant Joseph Foy, would approve these invoices, arrange for payment of the fraudulent invoices by the CareOne Companies, and affirmatively conceal the no-bid, kickback scheme from the principal of the CareOne Companies." *Id.*

It is alleged that Bossi, as owner of Extreme Construction, Inc. ("Extreme Construction"), "a New Jersey corporation that was formed specifically for the purpose of performing work on CareOne projects," *id.* at ¶ 21, provided kickbacks to Burris in response to Burris' demand for such payments. *Id.* "As a result, Bossi conspired with Burris to conduct and to participate in the conduct of the affairs of the CareOne Companies and Extreme Construction through the pattern of mail and wire fraud arising from Burris' false and fraudulent invoice scheme." *Id.*

Noticeably, the complaint does not describe in what manner the invoices are fraudulent other than to state that they "were for work performed at an inflated price, made possible by the lack of competitive bidding and the kickbacks to Burris." *Id.* at ¶ 37. Plaintiffs attach copies of the invoices to the complaint, and state summarily that "[e]ach one of the transactions listed in [an exhibit attached to the complaint] caused or resulted in the use of mails or the interstate wires in violation of 18 U.S.C. §§ 1341 and 1343." *Id.* at ¶ 38. These invoices, the complaint alleges, constitute "The Bossi and Extreme Construction Pattern of Fraudulent Invoices and Payments." *Id.* at ¶¶ 37–8.

Burris was terminated in March of 2009 for conduct unrelated to the alleged kickback scheme. *Id.* at ¶ 6.

Following Burris' termination, Plaintiff brought several state court actions against Burris and others. *See* Fram Decl., ¶¶ 2–9 (detailing litigations). One suit was filed in 2009 in the New Jersey Chancery Division, Bergen County. Through discovery obtained in that action, Plaintiffs encountered testimony that Burris allegedly orchestrated and operated the aforesaid RICO scheme to defraud the CareOne Companies. Plaintiffs then sought permission from the judge, who presided over the Bergen County action, to bring the instant suit in federal court. While noting that New Jersey's Entire Controversy Doctrine would ordinally require such claims to be brought in the pending state court action, the Judge granted Plaintiffs' request because requiring that the RICO claims be brought in that suit would have unduly delayed trial. *See generally* Tr. of Motion dated Apr. 30, 2010 at 8–9, Exh. J to Def. Open. Br. This suit followed.

**\*3** Plaintiffs filed their initial complaint in May of 2010 asserting federal RICO claims under 18 U.S.C. § 1962(c), conspiracy to commit federal RICO claims under § 1962(d), common law fraud, and civil conspiracy under New Jersey Law. With respect to the RICO and conspiracy to commit RICO claims, the complaint contains 19 counts that each focus on distinct RICO enterprises. For example, Count I is titled "RICO § 1962(c)-The CareOne Enterprise" and is directed at Burris' and Foy's alleged conduct together with all Vendor Defendants in orchestrating an all-encompassing scheme to defraud. *See* Compl., ¶¶ 47–53. Count II is titled "RICO § 1962(d)-The CareOne Enterprise" and alleges that Bossi and the other Vendor Defendants "conspired among themselves and with Burris and Foy to conduct and participate in the conduct of the affairs of CareOne through a 'pattern of racketeering' violation of 18 U.S.C. § 1962(c)." *Id.* at ¶ 56. Thereafter, the complaint delineates numerous enterprises, including "The Burris & Straus Enterprises," Counts III and IV, "The Pulaski Construction Enterprise," Counts XXII and XXIII, and, notably, "The Extreme Construction Enterprise," Counts X and XI, with a matching RICO, and conspiracy to commit RICO, count for each enterprise.[2]

As suggested by the counts' titles, The Extreme Construction Enterprise allegations focus on Defendant Bossi's alleged conduct as owner of Extreme Construction. *Id.* at ¶¶ 93–102. No detail is provided in these counts as to the nature of Bossi's alleged fraudulent conduct, other than the assertion that Bossi transmitted "false invoices, checks, and wires, in furtherance and as a result of the schemes and artifices to defraud, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343." *Id.* at ¶ 96. Plaintiffs, further, attach to the Complaint a spreadsheet identifying payments made by the CareOne Companies to

Extreme Construction. Compl., Exh. B. The spreadsheet lists the project for which Extreme Construction performed work, *e.g.,* CareOne at Evesham Assisted Living, the amount invoiced, the invoice date, the check amount paid, and the check number.

Piggy-backing on the RICO allegations, the common law fraud claim alleges simply that "Defendants Burris, Linda Burris, Foy, DeAngelis, Heiler, Bossi, Pulaski, Borglund, Yeager, and Linda Burris Inc., directly and indirectly, engaged in such fraud, as described in detail in the Complaint and Exhibits." *Id.* at ¶ 147. Similarly, the civil conspiracy claim alleges that "Defendants Burris, Linda Burris, Foy, DeAngelis, Heiler, Bossi, Pulaski, Borglund, Yeager, and Linda Burris Inc., directly and indirectly, conspired to, aided, abetted and facilitated the fraud and conversion, as described in detail in the Complaint and Exhibits ." *Id.* at ¶ 150.

Defendants Borglund, Linda Burris, William G. Burris, Jr, Nancy Deangelis, Linda Burris Inc., Richard Pulaski, and David Yeager jointly moved to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) in June of 2010, arguing that the complaint's RICO allegations failed to satisfy Rule 9(b)'s heightened pleading requirement and, since Plaintiffs' fraud and civil conspiracy claims rely upon the RICO allegations, the complaint should be dismissed in its entirety.[3] Defendant Bossi subsequently joined in the other defendants' motion.

**\*4** While the motion was pending, and prior to submitting opposition to the defendants' motion, Plaintiffs filed an Amended Complaint without leave of Court. Attached to the Amended Complaint was a letter from Plaintiffs' counsel stating that "[a]s a result [of the filing of Plaintiffs' Amended Complaint], the previously filed motions to dismiss the initial Complaint are moot...." Sellinger Letter dated July 30, 2010 (Docket Entry No. 27). In response, Defendants filed a motion to strike the Amended Complaint as violative of Rule 15(a), arguing that Rule 15(a) permits amendment as of right only if made within 21 days of service of a responsive pleading.[4]

Thereafter, the suit was stayed for a series of months while the parties negotiated settlement. Once settlement was reached with certain parties, disputes arose as to enforcement of the settlement's terms. Finally, all parties with the exception of Bossi settled their claims in this suit. Accordingly, the only remaining counts in the suit are those that are asserted against Defendant Bossi—the substantive RICO claims and RICO conspiracy claims found in Counts II, IV, VII, X, XI, as well as the common law fraud claim (Count XX) and the civil conspiracy

claim (Count XXI).

With the dust settled, and as the only remaining defendant, Bossi then reopened the previously-filed motions to dismiss the initial complaint and to strike the amended complaint. Bossi then filed his own reply brief, attaching to that brief copies of construction contracts and state-court litigation documents involving Bossi and Plaintiffs. These submissions were provided to the Court in support of Bossi's contention that Plaintiffs' suit here is without merit and that sanctions should be imposed against Plaintiffs' counsel. With the motion to dismiss and motion to strike fully briefed, the motions are ripe for decision.

## II. STANDARD OF REVIEW

### A. Motion to Strike Amended Complaint

Under Federal Rule of Civil Procedure 15(a), as amended effective December 1, 2009, "a party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed.R .Civ.P. 15(a)(1). Otherwise, the party must seek leave of court to amend. *Id.* at 15(a)(2).

### B. Motion to Dismiss

The Federal Rules of Civil Procedure provide that a complaint "shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a). The purpose of a complaint is "to inform the opposing party and the court of the nature of the claims and defenses being asserted by the pleader and, in the case of an affirmative pleading, the relief being demanded." 5 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1182 (3d ed.2004).

**\*5** In reviewing a motion to dismiss for failure to state a claim under 12(b)(6), a court must take all allegations in the complaint as true, viewed in the light most favorable to the plaintiff "and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008) (citation and quotations omitted). In *Bell Atlantic Corp. v. Twombly,* 550 U.S.

CareOne, LLC v. Burris, Not Reported in F.Supp.2d (2011)

RICO Bus.Disp.Guide 12,084

544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), the Supreme Court "retired" the language in *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 550 U.S. at 561 (quoting *Conley*, 355 U.S. at 45–46). Rather, the factual allegations in a complaint "must be enough to raise a right to relief above the speculative level." *Id.* at 555. The Third Circuit summarized the pleading requirement post-*Twombly:*

> The Supreme Court's *Twombly* formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element. This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of 'the necessary element.'

*Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).

In affirming that the *Twombly* standard applies to all motions to dismiss, the Supreme Court recently further clarified the 12(b) (6) criteria. "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, ——U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 129 S.Ct. at 1950. Accordingly, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* In short, "a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir.2009). The Third Circuit recently reiterated that "judging the sufficiency of a pleading is a context-dependent exercise" and "[s]ome claims require more factual explication than others to state a plausible claim for relief." *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir.2010). This means that, "[f]or example, it generally takes fewer factual allegations to state a claim for simple battery than to state a claim for antitrust conspiracy." *Id.* That said, the *Rule 8* pleading standard is to be applied "with the same level of rigor in all civil actions." *Id.* (quoting *Iqbal*, 129 S.Ct. at 1953).

**\*6** Moreover, in evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly

authentic documents if the complainant's claims are based upon these documents. *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 98 F.2d 1192, 1196 (3d Cir.1993). Importantly "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. Otherwise a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied." *Id.* (emphasis added).

Here, Defendant Rossi has attached to his reply papers copies of state-court litigation documents relating to a dispute over the monies paid to Extreme Construction for work on various construction projects, as well as copies of construction contracts for some of the projects that are the subject of the parties' dispute in this case. While public records may be considered on a motion to dismiss, a Court may not consider the state-court litigation documents for the truth of the matters asserted therein. *See Lum v. Bank of America*, 361 F.3d 217, 222 (3d Cir.2004) *abrogated on other grounds by Twombly*, 550 U.S. at 561–63; *Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426 n. 7 (3d Cir.1999) ("[A] court that examines a transcript of a prior proceeding to find facts converts a motion to dismiss into a motion for summary judgment.") As for the construction contracts, Plaintiffs' complaint does not refer in any way to the contracts and it is not clear from the complaint that Plaintiffs' claims are based on those contracts. Moreover, these exhibits were attached to Defendant Bossi's reply papers and Plaintiffs did not have the opportunity to respond to the exhibits.[5] Accordingly, the Court will not rely upon the contracts, or the state-court litigation documents, in ruling on the instant motion to dismiss.

## C. **Rule 11** Sanctions

Federal Rules of Civil Procedure Rule 11 places an obligation on counsel to sign any pleading submitted to the Court. Fed.R.Civ.P. 11(a). In signing the pleading, counsel "certifies that to the best of [his or her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances [that, *inter alia*,] the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *Id.* at 11(b)(3). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney" who violated that subsection of the rule. *Id.* at 11(c)(1). However, for a party to request sanctions against

opposing counsel, such a request must be made "separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)." *Id.* at 11(c)(2).

## III. DISCUSSION

**\*7** As a threshold issue, the Court notes that while Defendant Bossi expresses his frustration with the piecemeal manner in which the parties' claims have been litigated, Bossi does not argue that New Jersey's entire controversy doctrine bars this suit. Review of the case law reveals that Bossi is correct not to challenge Plaintiffs' suit on this ground because "the Entire Controversy Doctrine does not preclude the initiation of a second litigation before the first action has been concluded." *Rycoline Prods., Inc. v. C & W Unlimited,* 109 F.3d 883, 889 (3d Cir.1997) *cited in Youssef v. Department of Health and Senior Services,* No. 10–3628, 2011 WL 1444226, \*2 (3d Cir.2011). Moreover, neither party has informed the Court that the state court action in Bergen County has reached final adjudication.

As a second threshold issue to deciding the motion to dismiss, and in ruling on Defendant Bossi's motion to strike, the Court must determine whether Plaintiffs' filing of the Amended Complaint was proper under Rule 15(a). It is clear that Plaintiffs' filing did not comport with the Rule's dictates because it was not filed within 21 days of the filing of the first motion to dismiss on June 29, 2010; Plaintiffs' Amended Complaint was not filed until a month later, on July 29, 2010. Fed.R.Civ.P. 15(a)(1) ("a party may amend its pleading once as a matter of course within: (A) 21 days after serving it, or (B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."). Indeed, twenty-one days from the date of Defendants' Rule 12(b)(6) motion was July 20, 2010, and the Amended Complaint was not filed until nine days thereafter. Accordingly, the Court will focus its inquiry, in adjudicating the motion to dismiss, on the initial complaint's allegations and Bossi's motion to strike the Amended Complaint is granted.[6]

Finally, and before turning the merits of the motion to dismiss, the Court denies Bossi's request for sanctions against Plaintiffs' counsel. In order for a party to request sanctions against opposing counsel, such a request must be made "separately from any other motion and must describe the specific conduct that allegedly violates Rule 11(b)." *Id.* at 11(c)(2). Here, Defendant Bossi raised his request for sanctions in his reply brief to the motion to dismiss. This method of seeking sanctions is simply not

permitted under the plain text of Rule 11. *Accord Curtis & Assoc., P.C. v. Law Offices of David M. Bushman, Esq.,* 758 F.Supp.2d 153, 182 (E.D.N.Y.2010) (denying sanctions request for failure to bring in a separate motion although RICO suit allegations were not pled with particularity, there was a "long history of litigation between some of the parties in this case, and the currently ongoing state court litigation involving many of these same parties," and certain of counsel's argument went against the weight of legal authority).[7]

**\*8** Turning now to the merits, 18 U.S.C. § 1962(c) "makes it unlawful 'for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.' " *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 362 (3d Cir.2010) (citing 18 U.S.C. § 1962(c)). For Plaintiffs to plead a civil RICO claim under 18 U.S.C. § 1962(c), they must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima v. Imrex Co.,* 473 U.S. 479, 482–83, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The term "enterprise" includes " 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.' " *Ins. Brokerage,* 618 F.3d at 362–63 (citing 18 U.S.C. § 1961(4)). With respect to the pattern of racketeering activity, the statute "requires at least two acts of racketeering activity within a ten-year period" which "may include, *inter alia,* federal mail fraud under 18 U.S.C. § 1341 or federal wire fraud under 18 U.S.C. § 1343." *Id.* (citing 18 U.S.C. § 1961(1)(5) and *Lum,* 361 F.3d at 223).

When the predicate acts alleged are mail fraud, a plaintiff must not only plead the elements of mail fraud but must also satisfy the heightened Rule 9(b) pleading standard. *See Warden v. McLelland,* 288 F.3d 105, 114 (3d Cir.2002). To state a claim for mail fraud under 18 U.S.C. § 1341, a plaintiff must allege: "(1) the existence of a scheme to defraud; (2) the use of the mails, whether the United States Postal Service or a private carrier, in furtherance of the fraudulent scheme; and (3) culpable participation by the defendant (*i.e.,* participation by the defendant with specific intent to defraud). *United States v. Dobson,* 419 F.3d 231, 236–37 (3d Cir.2005)).

Rule 9(b) further requires that "a party must state with particularity the circumstances constituting fraud or mistake." Fed .R.Civ.P. 9(b). The plaintiff may accomplish this by "identify[ing] the purpose of the mailing within the defendant's fraudulent scheme and

CareOne, LLC v. Burris, Not Reported in F.Supp.2d (2011)

RICO Bus.Disp.Guide 12,084

specify[ing] the fraudulent statement, the time, place, and speaker and content of the alleged misrepresentation." *Annulli v. Panikkar,* 200 F.3d 189, 200 n. 10 (3d Cir.1999) overruled on other grounds by *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000).[8] In other words, Plaintiffs' pleading must contain the "who, what, when and where details of the alleged fraud." *District 1199P Health and Welfare Plan v. Janssen, L.P.,* ——F.Supp.2d ——, 2011 WL 1086004 at *13 (D.N.J.2011) (quoting *Allen Neurosurgical Assoc., Inc. v. Lehigh Valley Health Network,* No. 99–4653, 2001 U.S. Dist. LEXIS 284, at *8, 2001 WL 41143 (E.D.Pa. Jan.18, 2001)). Indeed, "[t]he purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are charged" in order to give them an opportunity to respond meaningfully to the complaint, "and to prevent false or unsubstantiated charges." *Rolo v. City of Investing Co. Liquidating Trust,* 155 F.3d 644, 658 (3d Cir.1998) abrogated on other grounds by *Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 1078–80, 145 L.Ed.2d 1047 (2000).

**\*9** Here, each of Plaintiffs' claims rise and fall on whether the RICO allegations satisfy Rule 9(b)'s heightened pleading standard since, as noted, Plaintiffs' state law fraud and civil conspiracy claims rely on the RICO mail fraud allegations. For this reason, each of Plaintiffs' claims is also subject to the strictures of Rule 9(b). *Cf. Lum,* 361 F.3d at 228 (holding that, while antitrust claims are typically not subject to Rule 9(b), "[b]ecause plaintiffs allege that the defendants accomplished the goal of their [antitrust] conspiracy through fraud, the [c]omplaint is subject to Rule 9(b)."); *Gray v. Bayer Corp.,* 2009 U.S. Dist. LEXIS 48181, at *5–*6 (D.N.J. June 8, 2009) ("[A] plaintiff cannot escape Rule 9(b) by alleging claims that do not traditionally involve fraud; rather, the test is whether the particular claim alleged in this matter sounds in fraud. If so, the pleading is subject to 9(b).").

The fraudulent scheme alleged in the complaint is arguably two-fold, that—(1) Burris and the other CareOne employee-defendants fraudulently concealed that Burris hand-picked the vendors to whom he awarded vendor contracts for the building of CareOne facilities rather than competitively bidding those contracts; and (2) Burris directed Bossi and the other Vendor Defendants to fraudulently inflate their invoices so that Burris could skim off the top of the CareOne Companies' payments to the Vendor Defendants, retaining the difference in payment for himself as a kickback. However, Plaintiffs make clear in their opposition papers that

[t]he only racketeering activity alleged in the Complaint—and, as a

result, the only activity that needed to be alleged with particularity—was the false and fraudulent invoices defendant submitted to plaintiffs, and that plaintiffs paid, which form the basis of the mail fraud and wire fraud pattern of racketeering activity.

Pl. Opp. at 4. In Plaintiffs' words, "[i]t was these submissions of false invoices resulting in payments by plaintiffs—and nothing else—that violated the mail and wire fraud statutes." *Id.* Accordingly, the Court's reads Plaintiffs' mail fraud allegations as stating simply that the inflated invoices allegedly submitted by Bossi were fraudulent.

As to these allegations, Defendant argues that they fail to satisfy Rule 9(b)'s particularity requirement. In Defendant's view, while Plaintiffs attach to their complaint a summary of the alleged invoices (which summary identifies the payments made by the CareOne Companies to Extreme Construction, the amount invoiced, the invoice date, the check amount paid, and the check number), Plaintiffs have failed to specify what aspect of the Extreme Construction invoices is fraudulent.[9] Indeed, the complaint does little more than state that the invoices were "false" and "padded and excessive invoices." *See* Compl., ¶ 5 ("padded and excessive invoices"); *id.* at 14 ("false and fraudulent invoices"); *id* . at ¶ 21 ("false and fraudulent invoice scheme").[10]

**\*10** Plaintiffs counter that the listing of the allegedly fraudulent transactions is sufficient to meet the particularity requirement, arguing that "each invoice listed [in the summary] was padded and excessive and thus misrepresented the value of the actual work performed." Pl. Opp. at 6. Further, in Plaintiffs' view, they have complied with Rule 9(b) by alleging "who, what, when, where and how" of the transactions at issue. *Id.* at 13.

The problem with Plaintiffs' argument is that they underestimate what the "who, what, when, where and how" embodiment of the Rule 9(b) standard requires. As explained by the Third Circuit in *Frederico v. Home Depot,* 507 F.3d 188 (3d Cir.2007), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the 'precise misconduct with which [it is] charged." *Id.* at 200 (quoting *Lum,* 361 F.3d at 223–24). In *Frederico,* the Third Circuit held that the allegations pled in that case failed to satisfy the stringent pleading

**CareOne, LLC v. Burris, Not Reported in F.Supp.2d (2011)**

RICO Bus.Disp.Guide 12,084

requirements of Rule 9(b).[11] The plaintiff in that case challenged the defendant-truck renting company's late fees as being fraudulently imposed, alleging in her complaint that the late fees were "excessive," that the defendant failed to disclose the lack of after-hours locations at which the truck could be returned, and that the defendant misrepresented that the truck rental and late fees would not "would not accumulate beyond the time at which Plaintiff and class members returned or attempted to return rented vehicles...." *Id.*

Rejecting the plaintiff's argument on appeal that these allegations "disclose [d] the substance" of the alleged misrepresentation, *i.e.,* that the defendant misrepresented the actual hours during which trucks could be returned, the Third Circuit concluded that the complaint's allegations did not put the defendant "on notice of the precise misconduct" with which it was charged. *Id.* (quoting *Lum,* 361 F.3d at 223–24). Specifically, the plaintiff read the parties' agreement as stating that the store closed at 10 pm and, therefore, the truck could be returned at any time prior to 10 pm. Contrary to the plaintiff's understanding, the rental department closed earlier than the remainder of the store and the parties' agreement did not disclose that fact. "[T]hus[,] any attempt to return the vehicle before closing but after the rental department closed resulted in the unexpected overnight accumulation of late fees." *Id.* at 201 n. 10.

In short, the plaintiff argued on appeal that the "fees were excessive because of the undisclosed gap between the time the rental department closes (a time not disclosed in the Agreement) and the time the store closes (a time disclosed in the Agreement)." *Id.* at 201 n. 9. The plaintiff's complaint, however, did not include allegations to that effect. "Without such detail appearing in the complaint, [the court reasoned, the defendant] was not placed on notice of the precise misconduct with which it is charged." *Id.* (alterations and citation omitted).[12]

**\*11** Similarly, here, Plaintiffs fail to allege in what manner the Extreme Construction invoices were excessive. Plaintiffs' description of the invoices merely lists the invoice and the amount. While the complaint describes the invoices as "padded," "excessive," and "false," nowhere in the complaint (or summary of invoices) do the Plaintiffs allege the substance of the alleged misrepresentation. It is unclear whether the Plaintiffs are alleging that the *number* of invoices submitted are excessive or whether the *amounts sought* in each individual invoice is excessive, or a combination of both. Without this sort of detail, Plaintiffs fail to place Defendant Rossi on notice of the "precise misconduct" against which he must defend. *Id.*

Moreover, to the extent that Plaintiffs argue that requiring allegations that detail the numerical amount of the overcharges would require them to prematurely present their damage calculation, and further which Plaintiffs assert they could not accomplish without the benefit of discovery, their argument is misdirected. It is not the numerical amount of alleged overcharges that need be specified, but the "general content of the misrepresentation," that is missing from their allegations. *Lum,* 361 F.3d at 224.

The decision in *Ford Motor Co. v. Edgewood Properties, Inc.,* No. 06–1278, 2009 WL 150951 (D.N.J. Jan.20, 2009), further illustrates what is lacking from Plaintiffs' allegations here. In that case, the plaintiff alleged that the defendants "formed an enterprise through the wires and mails, with the intent to distribute *contaminated concrete that they knew was contaminated* so as to avoid incurring costs of legally disposing of the concrete." *Id.* at \*16 (emphasis added). In other words, the complaint alleged that the defendants were invoicing a damaged product at full price. Furthermore, the plaintiff alleged, that the mails were used "to avoid the significant expenses of properly and lawfully handling, testing and/or disposing of the contaminated concrete." *Id.* This sort of language, the court in *Edgewood* held, sufficiently placed the defendants on notice of the fraudulent conduct they were alleged to have committed. While each individual mailing did not include misrepresentations, when read as a whole, the plaintiff's allegations still informed the defendants of the nature of the misrepresentations alleged. *Id.* Here, in contrast to the allegations pled in *Edgewood,* Plaintiffs have not alleged anything about Defendant Bossi's submission of invoices other than the conclusory statements that the invoices were "false" and "padded."

Plaintiffs correctly argue that even "innocent mailings" that further a scheme to defraud may satisfy the mailing requirement of a mail fraud claim. *See U.S. v. Al–Ame,* 434 F.3d 614, 617 (3d Cir.2006) ("the Supreme Court has definitively rejected the assertion that routine or innocent mailings are per se excluded from the scope of 18 U.S.C. § 1341."). But the complaint here alleges that the invoices *are the fraud*—not that they are mere instrumentalities by which the fraud was accomplished. Indeed, as Plaintiffs acknowledge in their papers, while "[a] scheme or artifice to defraud need not be fraudulent on its face, [it] must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons or ordinary prudence and comprehension ." Pl. Opp. at 12–13 (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1415 (3d Cir.1991)). This is because "the statutory term "defraud" [found in the mail fraud statute]

usually signifies 'the deprivation of something of value by trick, deceit, chicane or overreaching." *Id.* (citations omitted). What is lacking in Plaintiffs' allegations here is that they do not describe the "trick."

**\*12** Furthermore, Plaintiffs' citation to *HT of Highlands Ranch, Inc. v. Hollywood Tanning Systems, Inc.,* 590 F.Supp.2d 677 (D.N.J.2008), is unhelpful to them. The plaintiffs in *HT* alleged in their complaint and RICO Case Statement that the defendants:

> induced Plaintiffs into entering into deceptively vague leasing agreements with [one defendant] that contained little to no description of the equipment they were leasing, and that [the defendant] thereafter exploited such vagueness by mailing and faxing to the leasee-Plaintiffs misleading invoices that *charged these Plaintiffs for equipment they did not receive, and for new equipment when they received used equipment.*

*Id.* at 686–87 (emphasis added). The district court found that these allegations satisfied Rule 9(b)'s particularity requirement.

Ironically, Plaintiffs' reference to *HT* highlights the deficiencies in their own pleading. The allegations in *HT* specified the precise reason why the invoices were misleading: they were alleged to have "charged [the] Plaintiffs for equipment they did not receive, and for new equipment when they received used equipment." *Id.* Charging someone for requirement that is not provided is clearly a form of fraud and deceit. So too is charging someone for new equipment when, in fact, used equipment was provided. These sort of allegations fairly place a defendant on notice of the fraudulent conduct against which he must defend. The most descriptive allegations in Plaintiffs' Complaint are that the invoices "greatly exceeded the actual value of the work performed," Compl., ¶ 5, and that the they "were for work performed at an inflated price...." Compl., ¶ 37. But these statement do not allege how the "value" is calculated or what constitutes an "inflated" price. The phrases "exceeded the actual value" and "inflated price," without setting forth the baseline by which a value is deemed excessive or a price deemed inflated, does not assert fraudulent conduct. Thus, in stark contrast to the allegations in *HT,* Plaintiffs' allegations do not explain the nature of the trickery Defendant Bossi is alleged to

have completed by mailing the invoices.[13]

For these reasons, the Court concludes that Plaintiffs fail to sufficiently plead predicate acts of mail fraud with particularity. Because Plaintiffs do not properly plead the predicate acts, the Court need not address Defendant's remaining challenges to Plaintiffs' RICO claims. Accordingly, Defendant Rossi's motion to dismiss Plaintiffs' RICO claims is granted without prejudice.[14]

As for Plaintiffs' common law fraud and civil conspiracy claims, those claims likewise fail to satisfy Rule 9(b) and must be dismissed. *See Frederico,* 507 F.3d at 202–03 (dismissing common law fraud claim for failure to satisfy Rule 9(b)); *Spitz v. Medco Health Sol., Inc.,* No. 10–cv–01159, 2010 WL 4615233, \*4 (D.N.J. Nov.3, 2010) (dismissing civil conspiracy claim for failure to satisfy Rule 9(b)); *see also Brown ex rel. Estate of Brown v. Philip Morris Inc.,* 228 F.Supp.2d 506, 517 n. 10 (D.N.J.2002) ("Civil conspiracy is not an independent cause of action, and conspiracy liability depends on the presence of an underlying finding of ... liability ... The dismissal of plaintiff's other causes of action demands the dismissal of her conspiracy claim .").[15]

**\*13** The Third Circuit directs that plaintiffs be given an opportunity to amend unless amendment would be futile. *Alston v. Parker,* 363 F.3d 229, 235 (3d Cir.2004) ("[E]ven when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile."). Defendant Bossi argues that granting leave to amend would be futile here because the construction contracts governing the relationship between Extreme Construction and Plaintiffs are lump sum contracts. In other words, that the agreements are for a lump sum makes it implausible, if not impossible, that Defendant Bossi could have actually padded the invoices. To the extent that the agreements attached to Defendant's reply brief are authentic documents, the Court agrees that those contracts may preclude Plaintiffs' RICO claims. As noted, however, the Court cannot rely on those contracts at this juncture and, consequently, may not rely upon the contracts to conclude that amendment would be futile. Nonetheless, Plaintiffs are cautioned to consider this argument in determining how, or whether, to replead. Accordingly, Defendant Rossi's motion to dismiss is granted and Plaintiffs are granted leave to amend their RICO claims, common law fraud, and civil conspiracy claims in a manner consistent with the dictates of this Opinion.

## IV. CONCLUSION

CareOne, LLC v. Burris, Not Reported in F.Supp.2d (2011)

RICO Bus.Disp.Guide 12,084

For the foregoing reasons, the Court grants both Defendant Rossi's motion to strike and to dismiss. The motion to dismiss is granted without prejudice and Plaintiffs are granted leave to amend their complaint within twenty (20) days of the date of this Opinion. Defendant's request for sanctions is denied.

**Parallel Citations**

RICO Bus.Disp.Guide 12,084

Footnotes

1    The Defendants named in the complaint are William G. Burris, Jr. ("Burris"), Linda Burris (Linda Burris"), Linda Burris, Inc., Joseph Foy ("Foy"), Nancy DeAngelis ("DeAngelis"), Robert Heiler ("Heiler"), Daniel Bossi ("Bossi"), Richard Pulaski ("Pulaski"), Roland Borglund ("Borglund") and David Yeager ("Yeager"). Of this group, Defendants DeAngelis, Heiler, Pulaski, Borglund, Yeager and Bossi are the Vendor Defendants. Compl., ¶ 3.

2    There are two types of enterprises asserted in the complaint. The first type is those linked to a particular Plaintiff-entity, *e.g.,* Count IV ("The Burris & Straus Enterprises"), and Count VII ("The Linda Burris, Inc., Immobiliare and Prestatori Immobiliare Enterprises"). The second type is linked to a particular Vendor Defendant, *e.g.,* The Pulaski Construction Enterprise described in Counts XXII and XXIII.

3    Initially, the suit was brought in the Camden vicinage. The case was reassigned to this Court in Trenton during the pendency of the motion to dismiss.

4    As with the motion to dismiss, Defendants Borglund, Linda Burris, William G. Burris, Jr, Nancy Deangelis, Linda Burris Inc., Richard Pulaski, and David Yeager first moved to strike and Defendant Bossi subsequently joined their motion.

5    For this reason, the Court declines Defendant's suggestion to convert the motion to one for summary judgment under Federal Rule of Civil Procedure 12(d). In order to so convert a motion, "all parties must be given the opportunity to present material to the court." *Rose v. Bartle,* 871 F.2d 331, 340 (3d Cir.1989) *quoted in Youssef v. Department of Health and Senior Services,* No. 10–3628, 2011 WL 1444226, *3 (3d Cir.2011). Here, Plaintiffs did not have an opportunity to address the contracts submitted by Defendant Rossi or submit any materials that might affect the Court's interpretation and reliance upon of the contracts. Thus, conversion under Rule 12(d) would not be appropriate.

6    Even if the Amended Complaint was properly filed, the complaint's RICO allegations at issue in this motion remain unchanged in the Amended Complaint. Plaintiffs' stated purpose in amending the complaint was solely to "add as plaintiffs the individual CareOne LLC subsidiaries that issued payment for each of the fraudulent invoices submitted by the various Vendor Defendants." Pl. Opp. at 9. Thus, this Court's ruling on this motion directed to the complaint would be equally applicable to assessing the sufficiently of the Amended Complaint.

7    Because Defendant's request for sanctions was not properly filed, the Court does not comment on Defendant's reliance upon the opinion in *South Broward Hosp. Dist. v. MedQuist Inc.,* 516 F.Supp.2d 370 (D.N.J.2007), by another judge sitting in this district, that issued a written warning to one of Plaintiffs' counsel here for his conduct in that case.

8    "The Third Circuit permits federal common law or 'garden variety' fraud, including mail and wire fraud." *District 1199P Health and Welfare Plan v. Janssen,* 2008 U.S. Dist. LEXIS 103526, at *39, 2008 WL 5413105 (D.N.J. Dec.23, 2008) (citing *Tabas v. Tabas,* 47 F.3d 1280, 1290 (3d Cir.), cert. denied, 515 U.S. 1118, 115 S.Ct. 2269, 132 L.Ed.2d 275 (1995)). The two elements of a mail and wire fraud charge are 1) a scheme to defraud; and 2) mailing or wiring in furtherance of the scheme to defraud. *Id.* (citing *Greenberg v. Brewster,* 816 F.Supp. 1039, 1049 (E.D.Pa.1993)).

9    Relatedly, Defendant Bossi argues that Plaintiffs' allegations fail to satisfy Rule 9 because the allegations do not reference the various construction contracts Plaintiffs entered into with Extreme Construction. However, as indicated above, the Court may not consider the contracts attached to Defendant's reply brief on the instant motion to dismiss. Accordingly, the Court does not consider this argument herein.

10   *Id.* at ¶ 96 ("As set forth above and in Exhibit B, Bossi used, and caused numerous uses of, the United States mails and interstate wires, including, but not limited to, the transmission therein of false invoices, checks, and wires, in furtherance and as a result of the schemes and artifices to defraud, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343. Each of these violations constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).").

11   Although *Frederico's* analyzes a common law fraud claim, as opposed to mail fraud, its application of the Rule 9(b) heightened pleading standards is equally applicable here.

**CareOne, LLC v. Burris, Not Reported in F.Supp.2d (2011)**

RICO Bus.Disp.Guide 12,084

12    Another deficiency in that plaintiff's complaint was a failure to assert which person made the alleged false misrepresentation. *Id.* at 201–02. That type of deficiency is not at issue in this case.

13    Plaintiffs' citation to *Darrick Enterprises v. Mitsubishi Motors Corp.,* No. 05–4359, 2007 WL 2893366 (D.N.J. Sept.28, 2007), is equally unavailing. It was alleged, in that case, that the defendants "dumped" unordered cars on the plaintiffs and mailed invoices for the unordered cars to the plaintiffs. The invoices were (obviously) fraudulent because they were for cars that had not been purchased. *Id.* at *8.

14    The Court is aware that Rule 9(b) does not apply to the RICO conspiracy claims asserted under 18 U.S.C. § 1962(d). *See Rose v. Bartle,* 871 F.2d 331, 366 (3d Cir.1989). "But a § 1962(d) claim must be dismissed if the complaint does not adequately allege an endeavor which, if completed, would satisfy all of the elements of a substantive RICO offense." *In re Ins. Brokg. Antitrust Litig.,* 618 F.3d at 373 (alterations and citations omitted). Because the Court concludes that Plaintiffs' substantive RICO claims fail, so too do their conspiracy claims. In addition, the Court notes that Defendant Bossi is mistaken when he argues that the complaint alleges that he violated section 1962(c) as a member of the CareOne and related enterprises. *See* Def. Reply at 13. For those enterprises, only RICO conspiracy claims under section 1962(d) are brought against Bossi. *See* Compl., Counts I–VII. The Court's analysis of the Extreme Construction enterprise claims under section 1962(c) applies equally to the CareOne and related enterprise claims.

15    Because the Court dismisses, without prejudice, Plaintiffs' claims for failure to satisfy Rule 9(b), the Court does not reach Defendant Bossi's alternative arguments for dismissal of Plaintiffs' various claims.

---

**End of Document**                          © 2013 Thomson Reuters. No claim to original U.S. Government Works.

---

**EXHIBIT C**



Not Reported in F.Supp.2d, 2012 WL 3223671 (S.D.N.Y.)
**(Cite as: 2012 WL 3223671 (S.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
CHEVRON CORPORATION, Plaintiff,
v.
Steven DONZIGER, et al., Defendants.

No. 11 Civ. 0691(LAK).
May 24, 2012.

**MEMORANDUM AND ORDER**

LEWIS A. KAPLAN, District Judge.

**\*1** The Court recently issued an opinion granting in part and denying in part the Donziger Defendants' motion to dismiss.[FN1] The Court assumes familiarity with that opinion.

> FN1. *Chevron Corp. v. Donziger,* No. 11 Civ. 691(LAK), Slip Op., at 1 (S.D.N.Y. May 14, 2012) [hereinafter "Slip Op."] (granting in part, denying in part Donziger Defendants' motion to dismiss).

The matter is now before the Court on the Stratus Defendants' motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted. As this Court's opinion on the Donziger Defendants' motion to dismiss disposes of many of the arguments raised here, there is no need to address those common issues again. Accordingly, the Court addresses only those questions uniquely raised by the Stratus Defendants.

*Discussion*

*I. Federal Rule of Civil Procedure 9(b)*

Before addressing the Stratus Defendants' arguments with regard to specific claims, the Court con-

siders their initial argument that Chevron fails to plead its claims sounding in fraud with the requisite particularity.[FN2] The Stratus Defendants principally take issue with the amended complaint's use of such a term "RICO Defendants" and assert that using such a term impermissibly "lump[s]" all defendants together "so as to leave unclear" the particular allegations against each defendant.[FN3] They assert also that Chevron has not alleged *scienter* sufficiently.[FN4] These arguments lack merit.

> FN2. DI 322, at 7–12.

> FN3. *Id.* at 7.

> FN4. *Id.* at 13–15.

First, Chevron is required to plead with particularity only "circumstances constituting fraud." [FN5] This includes only aspects of the mail and wire fraud predicate acts [FN6] and the common law fraud claim.

> FN5. FED. R. CIV. P. 9(b).

> FN6. The Stratus Defendants assert that "[t]he RICO and fraud claims ... utterly fail to meet [the Rule 9(b) ] standard[ ]." DI 322, at 8. Many of the RICO predicate acts, however, do not sound in fraud need not be pled with Rule 9(b) particularity. *See, e.g., McLaughlin v. Anderson,* 962 F.2d 187, 194 (holding that allegations of extortion are considered under Rule 8's pleading standard).

Second, while the Stratus Defendants catalog each use of the term "RICO Defendants" in the amended complaint and assert that they did no more than provide professional services,[FN7] they do not engage with Chevron's allegations of fraud asserted

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3223671 (S.D.N.Y.)
**(Cite as: 2012 WL 3223671 (S.D.N.Y.))**

against them specifically.

FN7. DI 322, at 9–11, 14–15.

Chevron's claims that sound in fraud are alleged sufficiently with regard to the Stratus Defendants. For example, the amended complaint alleges that the Stratus Defendants: (1) had meetings with the "independent" global expert Richard Cabrera in which they planned how the Stratus Defendants would draft the Cabrera report that eventually was submitted in Cabrera's name,FN8 (2) drafted the vast majority of the Cabrera report but removed evidence that they authored any part of it,FN9 (3) responded to comments on the Cabrera report in Cabrera's name,FN10 (4) defended Cabrera as "a neutral 'expert' " when they knew otherwise FN11 and worked to lineup other experts to endorse the allegedly fraudulent Cabrera report,FN12 (5) made false statements through counsel to the U.S. District Court for the District of Colorado FN13 and attempted to obstruct Chevron's discovery in depositions to prevent it from discovering their role in drafting the Cabrera report,FN14 and (6) attempted to mislead staff members of Stratus to influence their potential testimony in a Section 1782 proceeding in Colorado. FN15 Moreover, the amended complaint outlines each of the predicate acts alleged against the Stratus Defendants FN16 and details selected mail and wire fraud predicate acts.FN17

FN8. Cpt. ¶¶ 129–31; *id.* ¶ 130 (During the March 3, 2007 meeting, Fajardo stated that "[a]nd here is where we do want the support of our entire technical team ... of experts, scientists, attorneys, political scientists, so that all of us will contribute to that [Cabrera] report—in other words—you see ... *the work isn't going to be the expert's. All of us bear the burden."* ); *id.* ¶ 134 (Donziger explaining to Maest and others that the lack of evidence that contamination from the pits had spread to the groundwater in Ecuador was not a problem *"[b]ecause at the end of the*

*day, this is all for the Court just a bunch of smoke and mirrors and bullshit."*); *id.* ¶ 146 ("The participants in this meeting [including several Stratus defendants] also discussed how they could leverage the Cabrera Report, once it was filed in the Lago Agrio court, as a supposedly independent endorsement of their position.").

FN9. *Id.* ¶¶ 145–54; *id.* ¶ 149 ("As Donziger has now admitted, '[T]he general idea' was 'that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera.");" *id.* ¶ 153 ("Prior to the Cabrera Report's submission, Beltman followed up to ensure that those consultants who had actually written certain annexes had their 'name[s] taken off' the documents that Cabrera would actually submit to the court.").

FN10. *Id.* ¶¶ 165–68; *id.* ¶ 167 ("Beltman likewise expressed his desire that work performed by U.S. consultant 3TM 'be in a form that someone in Ecuador could have written,' and another Stratus employee noted that Stratus needed to revise their work to 'clean up the language so it [would] sound[ ] more like [Cabrera] and less like a comment.' ").

FN11. *Id.* ¶¶ 177–79 ("Stratus's 'review' was intended to deceive, as one of the lawyers retained by the RICO Defendants who reviewed the submission in 2010 recognized.").

FN12. *Id.* ¶ 181 ("In seeking the sham 'endorsements' of the Cabrera Report, Stratus falsely represented to numerous third parties that the report was written by Cabrera."); *id.* ¶¶ 182–84.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3223671 (S.D.N.Y.)
**(Cite as: 2012 WL 3223671 (S.D.N.Y.))**

FN13. *Id.* ¶ 275.

FN14. *Id.* ¶ 292.

FN15. *Id.* ¶¶ 160, 274, 365.

FN16. *Id.* ¶¶ 372–74.

FN17. *Id.,* Ex. B.

*2 These allegations are sufficient to satisfy Rule 9(b) with regard to so much of the the common law fraud claim that survives and the predicate acts to which Rule 9(b) applies.

*II. RICO—Section 1962(c)*

With regard to the substantive RICO claim, the Stratus Defendants assert three arguments in addition to those raised by the Donziger Defendants.FN18 They argue that Chevron fails to allege adequately (1) that they were associated with the enterprise, (2) a "pattern" of racketeering activity, and (3) its predicate acts.FN19

FN18. To the extent that the Stratus Defendants argue that Chevron fails to allege causation, the Court's opinion on the Donziger Defendants' motion to dismiss disposes of that argument. Slip Op., at 33–36.

FN19. *See* DI 322, at 12–28.

*A. Association With the Enterprise*

"An association-in-fact enterprise must have at least three structural features a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." FN20

FN20. *United States v. Boyle,* 556 U.S. 938, 946 (2009); *see also United States v. Tur-*

*kette,* 452 U.S. 576, 583 (1981) (noting that an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct.").

The Stratus Defendants argue that Chevron fails to allege that they shared in the enterprise's alleged purpose.FN21 They contend that they (1) have no economic interest in the Ecuadorian judgment, (2) simply performed their customary environmental consulting work, and (3) became involved more than 15 years after the allegedly baseless Ecuadorian litigation began.FN22 These arguments are unpersuasive.

FN21. DI 322, at 15–17.

FN22. *Id.*

First, the Stratus Defendants need not have an economic interest in achieving the goal or purpose of the enterprise.FN23

FN23. *See, e.g., Nat'l Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 258 (1994) ("We do not believe that the usage of the term "enterprise" in subsections (a) and (b) leads to the inference that an economic motive is required in subsection (c).").

Second, the Stratus Defendants' assertion that they did no more than "perform [ ] their customary environmental consulting work" ignores the allegations of the amended complaint. Chevron alleges that the Stratus Defendants (1) knew that they were ghostwriting a report for a supposedly independent court expert, FN24 (2) attempted to conceal their authorship,FN25 (3) and misrepresented Cabrera's independence after the report was filed.FN26 Moreover, far from alleging that the Stratus Defendants were conducting typical consulting work, Chevron alleges that all of the predicate acts committed by the Stratus De-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3223671 (S.D.N.Y.)
**(Cite as: 2012 WL 3223671 (S.D.N.Y.))**

fendants were "in furtherance of the RICO Defendants' scheme to defraud [Chevron]."[FN27]

> FN24. *E.g.,* Cpt. ¶¶ 131, 149, 167.

> FN25. *Id.* ¶¶ 151–53, 160, 175–79.

> FN26. *Id.* ¶¶ 160, 175–79, 244, 274–76, 292.

> FN27. *Id.* ¶ 372; *see id.* ¶¶ 373–74.

Third, there is no requirement that all participants in an enterprise be involved in the scheme for equal or similar amounts of time. Indeed, an individual or entity can join a RICO enterprise long after it originates.[FN28]

> FN28. *See, e.g., United States v. Coonan,* 938 F.2d 1553, 1560 (2d Cir.1991) (noting that there was "overwhelming proof of the charged enterprise, and Kelly's participation in that enterprise" even though Kelly joined the enterprise after it began its scheme).

For these reasons, the Stratus Defendants' argument that the amended complaint does not sufficiently allege that they were part of the alleged RICO enterprise is without merit.[FN29] Whether they in fact were part of it must await proof.

> FN29. The Stratus Defendants do not argue that they did not "participate in operation or management" of the enterprise. *See Reves v. Ernst & Young,* 507 U.S. 170 (1993). The Court therefore need not consider that issue here.

*B. Sufficiency of the Pattern Allegation: The Continuity Requirement*

The Stratus Defendants challenge the sufficiency of the "pattern" allegation on the ground that Chevron fails to allege continuity.[FN30]

> FN30. DI 322, at 18–21; *see H.J. Inc. v. Nw. Bell Telephone Co.,* 492 U.S. 229, 242 (1989).

The continuity requirement "can be satisfied either by showing a 'closed-ended' pattern—a series of related predicate acts extending over a substantial period of time—or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed."[FN31] The "duration of a pattern of racketeering activity [for the purposes of closed-ended continuity] is measured by the RICO predicate acts the defendants commit."[FN32]

> FN31. *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 184 (2d Cir.2008).

> FN32. *E.g., Cofacrèdit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229, 242 (2d Cir.1999) (citing *H.J., Inc., 492 U.S. at 242*).

*1. Closed–Ended Continuity*

**\*3** The Stratus Defendants argue that Chevron fails to allege closed-ended continuity as to them because they were not involved in the alleged scheme for a "substantial period of time."[FN33] They assert that they were not retained until August 2007 and that their work was finalized around March 2008.[FN34] These assertions, however, are contradicted by Chevron's allegations.

> FN33. DI 322, at 18–19.

> FN34. *Id.* at 19.

The amended complaint alleges that the Stratus Defendants' predicate acts began at least by September 2007 and that the Stratus Defendants committed

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3223671 (S.D.N.Y.)
**(Cite as: 2012 WL 3223671 (S.D.N.Y.))**

predicate acts at least until April 2010, when they allegedly attempted to obstruct justice in a Section 1782 proceeding.[FN35] The amended complaint alleges also that the Stratus Defendants committed other predicate acts during this nearly three-year span.[FN36]

> FN35. Cpt. ¶ 275.

> FN36. *E.g., id.* ¶¶ 145–68 (regarding the Cabrera report); *id.* ¶ ¶ 182–84 (regarding endorsements of the Cabrera report).

While the Court has held that the "series of related predicates [must] extend [ ] over a substantial period of time,"[FN37] the time period alleged here is sufficiently substantial to amount to closed-ended continuity at this stage, especially considering that the alleged scheme began as early as 1993.[FN38] Indeed, the Second Circuit has held that shorter periods were sufficiently substantial to make out closed-ended continuity.[FN39]

> FN37. *H.J. Inc.,* 492 U.S. at 242.

> FN38. Cpt. ¶¶ 58–59.

> FN39. *Compare, e.g., Metromedia Co. v. Fugazy,* 983 F.2d 350, 369 (holding that jury instruction that "a few weeks or months" might constitute a "substantial period of time" was harmless error where related predicate acts spanned about two years), and *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.,* 879 F.2d 10, 18 (2d Cir.1989) (concluding, prior to H.J. Inc., that allegations of predicate acts occurring over "period of nearly two years" as part of a five-part fraudulent scheme were sufficient to plead pattern of racketeering activity), *cert. denied,* 493 U.S. 1022 (1990), *with Yemco, Inc. v. Camardella,* 23 F.3d 129, 134 (6th Cir.) (finding a single-victim scheme lasting sev-

enteen months insufficient for continuity purposes), *cert. denied,* 513 U.S. 1017 (1994), and *Hughes v. Consol–Pennsylvania Coal Co.,* 945 F.2d 594, 611 (3d Cir.1991) (holding that "twelve months is not a substantial period of time" to establish a pattern), *cert. denied,* 504 U.S. 955 (1992).

*2. Open–Ended Continuity*

"To satisfy open-ended continuity, the plaintiff ... must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed."[FN40] "Where the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful, there is a threat of continued criminal activity, and thus open-ended continuity."[FN41] Where, however, the enterprise's primary business is legitimate, "[t]he continuity requirement is likewise satisfied where it is shown that the predicates are a regular way of conducting defendant's ongoing legitimate business ... or of conducting or participating in an ongoing and legitimate RICO 'enterprise.' "[FN42]

> FN40. *Cofacrèdit,* 187 F.3d at 243.

> FN41. *Id.* at 242–43 (citing *H.J. Inc.,* 492 U.S. at 242–43).

> FN42. *H.J. Inc.,* 492 U.S. at 243.

The Stratus Defendants' central argument that open-ended continuity is not alleged here depends on the assertion that their role was "inherently limited" to "the creation of the Cabrera Report."[FN43] But the amended complaint alleges otherwise. As noted, it alleges that the Stratus Defendants endorsed the Cabrera report to create the false impression that it in fact was the independent work of the court-appointed expert and attempted in various proceedings in the United States to obscure the fact that they were its true authors.[FN44] Moreover, the Stratus Defendants' alleged

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3223671 (S.D.N.Y.)
**(Cite as: 2012 WL 3223671 (S.D.N.Y.))**

actions after they allegedly drafted the Cabrera report permit an inference that they are likely to play a role in any enforcement proceedings based on the Ecuadorian judgment, proceedings in which Chevron inevitably will attack the Cabrera report as fraudulent as it has done here.[FN45]

FN43. DI 322, at 21.

FN44. Cpt. ¶¶ 160, 167–68, 177–79, 274–75, 292, 365.

FN45. *Id.* ¶¶ 333–35.

In sum, the amended complaint sufficiently alleges both closed-ended and openended continuity. The Stratus Defendants' argument that Chevron fails to allege a "pattern of racketeering activity" is without merit.

*D. Sufficiency of the Alleged Predicate Acts*

*1. Mail and Wire Fraud*

**\*4** The Stratus Defendants argue that Chevron fails to allege its mail and wire fraud predicate acts with specificity because it (1) does not plead that anyone relied on the alleged misrepresentations by the Stratus Defendants and (2) alleges nothing more than instances of nondisclosure, which they argue cannot constitute predicate acts because they owed no duty to disclose anything to Chevron or the Ecuadorian court.[FN46]

FN46. DI 322, at 22–25. The Stratus Defendants' arguments regarding *scienter* are rejected, *supra,* Part I.

The reliance argument is incorrect as a matter of law and was rejected by this Court in its opinion on the Donziger Defendants' motion to dismiss.[FN47]

FN47. Slip Op., at 29–30; *see Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639 (2008).

The argument regarding non-disclosure fares no better because, like the reliance argument, the Stratus Defendants are attempting to import common law fraud requirements into pleading mail and wire fraud predicate acts. They cannot properly do so.[FN48]

FN48. *Cf. Bridge,* 553 U.S. at 648 ("If petitioners' proposed requirement of first-party reliance seems to come out of nowhere, there is a reason Nothing on the face of the relevant statutory provisions imposes such a requirement. Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, even if no one relied on any misrepresentation.").

"The elements of mail and wire fraud are three: (1) the formation of a scheme to defraud victims (2) of money or other property (as the object of the scheme), and (3) the use of the mails or interstate or foreign wire communications in furtherance of the scheme."[FN49] The Stratus Defendants' non-disclosure argument does not suggest that Chevron has failed to plead any of these requirements.[FN50]

FN49. Slip Op., at 27 (citations omitted).

FN50. *Cf. Bridge,* 553 U.S. at 648; *Neder v. United States,* 527 U.S. 1, 25 (1999).

*2. Obstruction of Justice and Witness Tampering*

The Stratus Defendants' single argument regarding the obstruction of justice and witness tampering predicate acts is that both are "devoid of factual allegations."[FN51] They, however, neglect the allegations in the amended complaint.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 3223671 (S.D.N.Y.)
**(Cite as: 2012 WL 3223671 (S.D.N.Y.))**

FN51. DI 322, at 25.

Chevron alleges that the Stratus Defendants violated Section 1503 of the Criminal Code FN52 because they "[falsely] represented through counsel to the District of Colorado on April 27, 2010 that Stratus was 'astonish[ed]' to see 'similarit[ies]' between their own work product and the Cabrera Report." FN53 It asserts also that the they violated Section 1512 of the Criminal Code FN54 by tampering with the potential testimony of several Stratus employees.FN55 All of this, it contends, was designed to conceal the RICO Defendants' alleged fraud in Ecuador and the falsity of its misrepresentations in this country concerning Chevron.FN56

FN52. 18 U.S.C. § 1503.

FN53. Cpt. ¶¶ 275, 350–60.

FN54. 18 U.S.C. § 1512.

FN55. Cpt. ¶ 365.

FN56. *Id.* ¶¶ 360, 362.

Accordingly, these predicate acts are pled sufficiently.FN57

FN57. The predicate acts of extortion are sufficient for the reasons outlined in the Court's opinion on the Donziger Defendants' motion to dismiss. Slip Op., at 23–27.

*III. RICO Conspiracy—Section 1962(d)*

The Stratus Defendants argue that the RICO conspiracy claim should be dismissed because Chevron (1) fails sufficiently to allege its substantive RICO claim FN58 and (2) fails to allege that they "knowingly" agreed to take part in the scheme.FN59 For the reasons

specified in the opinion on the Donziger Defendants' motion to dismiss FN60 and outlined in the Rule 9(b) section above,FN61 both arguments fail.

FN58. DI 322, at 30–31.

FN59. *Id.* at 31–32.

FN60. Slip. Op., at 37.

FN61. *See supra* notes 8–17 and accompanying text.

*Conclusion*

For the foregoing reasons and those outlined in this Court's opinion on the Donziger Defendants' motion to dismiss, the Stratus Defendants' motion to dismiss the amended complaint [DI 320] is granted to the extent that so much of the third claim for relief as is premised on detrimental reliance by Chevron and the fourth through sixth claims for relief all are dismissed. It is denied in all other respects.

**\*5** SO ORDERED.

S.D.N.Y.,2012.
Chevron Corp. v. Donziger
Not Reported in F.Supp.2d, 2012 WL 3223671 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT D**



--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

Only the Westlaw citation is currently available.Note: Due to its length, this opinion has been divided into 7 parts, each with its own WL citation. Part 1 is 2014 WL 815553; Part 2 is 2014 WL 815613; Part 3 is 2014 WL 815715; Part 4 is 2014 WL 815869; Part 5 is 2014 WL 815923; Part 6 is 2014 WL 815961; Part 7 is 2014 WL 816086.

United States District Court,
S.D. New York.
CHEVRON CORP.
v.
DONZIGER.

No. 11 CIV. 0691 LAK.
March 4, 2014.

KAPLAN.

**\*1** Consistent with its statement that it would not "refer at all" to Chevron's specific allegations "of fraud and corruption of plaintiffs, counsel and representatives," the intermediate appellate court failed largely to address the question whether these commonalities supported Chevron's claim of misconduct.

*3. The Appellate Clarification Order*

The LAPs sought clarification of the appellate court's decision.[FN1167] They referred to the appellate court's statement that it "ha[d] no competence to rule on" Chevron's fraud allegations that were "pending resolution before" this Court [FN1168] and asked that "the [appellate] Division clarify and state that in fact it *ha[d]* analyzed Chevron's accusations, and that it *ha[d] not* found any fraud in the activities of the plaintiffs or their attorneys." [FN1169]

The appellate court issued its clarification order on January 13, 2012. [FN1170] It stated that, while it did

"not find evidence of 'fraud,' " it was "stay[ing] out of these [fraud] accusations, preserving the parties' rights to present formal complaint to the Ecuadorian criminal authorities or to continue the course of the actions that have been filed in the United States of America." [FN1171] It noted that "[t]his was a determining factor for the [Appellate] Division's considerations in the judgment that is being clarified, since it is obvious that it was not its responsibility to hear and resolve proceedings that correspond to another jurisdiction...." [FN1172]

Nonetheless, the court stated conclusorily that "all of the samples, documents, reports, testimonies, interviews, transcripts and minutes, referred to in the judgment, are found in the record without the defendant identifying any that is not—the defendant's motions simply show disagreement with the reasoning, the interpretation and the value given to the evidence, but they do not identify correctly legal evidence that is in the record." [FN1173] But the clarification order—like the underlying appellate order—did not address any of Chevron's specific ghostwriting claims. Nor did it identify where in the record it had located the documents it claimed were there and—as noted previously—its statements concerning what it allegedly found in the record may not be considered for their truth. It posited instead that "[i]f there had been any 'secret assistance,' the presumed concordance between the plaintiffs' internal documentation, and the text of the judgment would not be limited to a fairly simple interpretation of evidence that is contained in the record." [FN1174]

*B. The National Court of Justice Affirms the Judgment in All But One Respect*

Chevron sought review in the Ecuadorian National Court of Justice on January 20, 2012.[FN1175] The National Court of Justice is a court of cassation. It reviews only the legal arguments and does not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)

**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

re-examine the facts.

**\*2** Despite its limited scope of review, Chevron made a plethora of arguments—both legal and factual—to the National Court. Most relevant, however, were its contentions that the trial court proceedings should have been "nullified" because, *inter alia,* the LAPs had submitted fraudulent reports by Dr. Calmbacher, Cabrera had been appointed illegally and had illegally carried out his duties, and the LAPs had ghostwritten the Judgment.[FN1176]

The National Court issued its opinion affirming in large part the appellate court's decision on November 12, 2013, while trial in this case was underway.[FN1177] It noted that "the cassation appeal is an extraordinary appeal granted to the losing party so that the Cassation Court may annul not every unfair judgment, but only those in which their own specific unfairness has been proved to have been founded on a wrongful interpretation of the law."[FN1178]

With respect to Chevron's allegations concerning Calmbacher and Cabrera, the National Court noted that Chevron had not "mentioned which legal rule ha[d] been supposedly infringed" or "which procedural rules have rendered the proceeding absolutely null" and stated that it had concluded that the cassation court therefore was unable to pass on them.[FN1179] It accepted the trial court's statement that it had not relied on the Cabrera Report.[FN1180] The National Court "concluded that ... [t]he court of appeals ha[d] adequately addressed the requests of the defendant with respect to the report of Mr. Cabrera and has properly weighed the evidence in accordance with the rules of the sound judgment, within which it has considered that the aforementioned report was not taken in consideration by the trial judge ...."[FN1181] The National Court therefore "discard[ed] the [Cabrera] allegation inasmuch as it is shown that there has been a correct weighing of the evidence in accordance with legal standards ..."[FN1182] It pointed out, however, that it had not reviewed the record as the trial court as "one

cannot attempt to re-evaluate the evidence through a cassation appeal...."[FN1183]

The National Court stated also that Chevron's ghostwriting allegations were inappropriate for cassation review.[FN1184] The court wrote:

"appellant has alleged that the judgment rendered by the trial judge was drafted by the plaintiffs, and making reference even to the commission of a procedural violation, which would result in the nullity of the trial court's judgment. The nullity of any judgment, according to the Code of Civil Procedure, arises for reasons expressly provided for in the law itself, which is something different from the grounds for nullity of a proceeding, as we discussed herein, therefore allegations such as those involving the perpetration of a crime are not sufficient legal foundation to lodge a cassation appeal and allege the nullity of a judicial proceeding, since the record also does not show any judicial determination on the commission of a crime."[FN1185]

**\*3** The National Court affirmed the appellate court in all but one respect. It "quashed" the punitive damages award "since punitive damages are not contemplated under Ecuadorian law and public apologies are not admissible nor, therefore, is any award for that concept."[FN1186] It therefore cut the LAPs' damages award to $8.646 billion.

*XIII The Pressure Campaign Continues*

*A. The Invictus Strategy Deployed—Attempts to Enforce the Lago Agrio Judgment*

As noted, the Invictus Memo set out a plan to enforce the Judgment "quickly, if not immediately, on multiple enforcement fronts—in the United States and abroad."[FN1187] It laid out also a so-called "keystone nation" strategy:

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

"As with the domestic enforcement analysis, proceeding as an initial matter in a jurisdiction housing the highest concentration of Chevron's domestic assets would offer certain obvious advantages, including efficiency. Nonetheless, it is more important for Plaintiffs to proceed *initially* in a jurisdiction that promises the most favorable law and practical circumstances. To that end, Plaintiffs' Team will identify and potentially target certain 'keystone' nations—that is, nations that enjoy reciprocity, or, better yet, are part of a judgment recognition treaty—with nations that serve as the locus for greater Chevron assets."[FN1188]

In pursuit of this strategy, the LAPs currently are seeking enforcement of the Judgment against subsidiaries of Chevron in Argentina,[FN1189] Brazil,[FN1190] and Canada.[FN1191] The Court finds that they intend to do so in the United States when they conclude that it is tactically advantageous to do so.[FN1192]

The LAPs are enforcing the Judgment in Ecuador despite that Chevron never has operated in the country and has no subsidiaries there. As noted, Invictus foreshadowed the LAPs' plan of seeking "attachment of Chevron's assets prior to successful recognition of the Ecuadorian judgment." [FN1193] It noted that "attachment would undoubtedly compound the pressure already placed on Chevron vis a vis an international enforcement campaign, and force Chevron to focus its resources on the proceedings initiated by the Plaintiffs, rather than its sideshows." [FN1194] The LAPs recently have attempted to employ this strategy in Ecuador.

A few months after the intermediate appellate court affirmed the Judgment, the Provincial Court of Sucumbíos issued orders attaching Chevron's assets and the assets of its subsidiaries worldwide. In furtherance of enforcement of the Judgment, it attached Chevron's intellectual property rights in Ecuador, funds going into or leaving Ecuador to Chevron's bank accounts abroad, and a $96 million arbitration award

issued against the Republic of Ecuador ("Embargo Order").[FN1195] More will be said on this below, but it suffices now to note only that it is another important aspect of the LAPs' multi-pronged enforcement plan.

*B. The Purpose of All of These Efforts*

**\*4** Donziger's and the LAPs' purposes in pursuing the expansive media campaign previously discussed, in their attempts to instigate the criminal prosecution of Chevron lawyers, in their efforts to precipitate disinvestments in Chevron stock, and in their overtures to government officials and agencies to investigate Chevron and in related activities, always have included driving Chevron to the settlement table.

On October 6, 2007, Donziger confided to his personal notebook the following:

"The key issue is criminal case. Can we get that going? What does it mean? I really want to consolidate control with contract before going down a road that I think could force them to the table for a possible settlement." [FN1196]

Later that month, Donziger, on the eve of a mediation with settlement, wrote confidentially to another of his hired PR people that "[w]e need to get more press and increase the pressure b/w now and then, to get the price up." [FN1197]

In August 2009, Donziger sent a new prospective PR firm a memorandum outlining his ideas for their efforts. It began by stating that the "primary objective is to pressure Chevron such that they will have to settle the case at a level that would allow for a comprehensive environmental clean-up" and then discussed generating pressure from shareholders, disinvestment, pressure from governmental investigators, diplomatic pressure, celebrity endorsements, and pressure from Congress and NGOs.[FN1198]

To be sure, Donziger's long-time head PR person,

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

Karen Hinton, testified at trial that Donziger's interest was only in taking the case to verdict and not in settling it:

> "I had numerous conversations with Mr. Donziger about resolving the case. Mr. Donziger repeatedly told me that in the settlement talks Chevron refused to agree to pay for a full and complete remediation of the concession area. As a result, Mr. Donziger made it clear during this time that his clients did not want to settle the case. As Mr. Donziger repeatedly told me, settlement meant, by definition, compromise and his clients deserve a full recovery, not a compromised recovery. Since the sample data overwhelmingly proved contamination, Mr. Donziger and his clients wanted a full trial and verdict so the Amazon would get completely cleaned up (and not just partially). He also wanted Chevron to provide medical facilities and clean drinking water. Throughout the time I worked on the case, the team prepared the case for trial, not settlement." [FN1199] But she quickly admitted on cross-examination that Donziger wanted to get more press attention to get the settlement price higher.[FN1200] The Court finds disingenuous Hinton's efforts to deny or to equivocate about Donziger's objective to use media and other outside attention of various sorts to force Chevron to the settlement table and to induce it to offer more in settlement than it otherwise would have done. Moreover, trying the case to judgment (and even through appeals) and achieving a favorable settlement are not mutually exclusive goals. There are indications that Donziger and the LAPs concluded long ago that trying the case to a decision could provide the best chance for a significant settlement.[FN1201]

**\*5** This Court finds that Donziger and the LAPs were very much interested from the outset in settling the Lago Agrio case. Logic dictates the finding also that they are, and will remain, at least as interested in doing so now and in the future. The objects of all of Donziger's media and outside pressure efforts, in-cluding his attempt to have Chevron lawyers prosecuted criminally in Ecuador, prominently included increasing the pressure on Chevron to make it more willing to compromise, and at a higher amount, than otherwise would have been the case. The questions whether and to what extent those efforts were actionable, which is not quite as simple as the defendants would have them, are dealt with below.

*Prior Proceedings in this Litigation*
*The Pleadings*

This action was filed on February 1, 2011 against the LAPs, Donziger, Fajardo, Yanza, the ADF, Selva Viva, and a number of other individuals and entities.[FN1202] All defendants were duly served. Fajardo, on behalf of himself, the LAPs, and all of the other Ecuadorian defendants, sought and obtained an extension of time within which to move or answer.[FN1203] Two of the LAPs—Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje (the "LAP Representatives") answered and have defended the action. None of the other Ecuadorian defendants answered or moved with respect to the complaint. A certificate of default has been entered against them.[FN1204]

*The Amended Complaint*

The amended complaint contained nine causes of action. As the Court has granted defendants' dismissal motions as to some,[FN1205] only five remain—(1) counts 1 and 2, which assert substantive and conspiracy claims against Donziger under RICO, (2) Counts 3 and 7, which assert, respectively, fraud and civil conspiracy claims against all defendants, and (3) Count 8, which asserts that Donziger violated Section 487 of the New York Judiciary Law.[FN1206]

Count 9 sought a declaration that the Judgment was unenforceable and unrecognizable "on, among others, grounds of fraud, failure [by Ecuador] to afford procedures compatible with due process, lack of impartial [Ecuadorian] tribunals, lack of personal jurisdiction, [and] contravention of public policy." [FN1207] As discussed below, Count 9 has been disposed of as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

well.

*The Answers*

Two aspects of the defendants' answers [FN1208] are relevant here.

*First,* Donziger's seventh affirmative defense asserts that "Chevron's claims are barred, in whole or in part, by the doctrines of collateral estoppel and/or res judicata." [FN1209] Likewise, the LAP Representatives' thirty-third affirmative defense asserts that "[t]he claims asserted in the Complaint and any relief sought thereunder are barred, in whole or in part, under the doctrines of res judicata and/or collateral estoppel." [FN1210]

*Second,* both assert unclean hands and in pari delicto affirmative defenses. [FN1211] Moreover, the LAP Representatives' pleading explicitly and significantly relies, in this respect, on findings by the Lago Agrio court of misconduct by Chevron in the defense of the Lago Agrio case. [FN1212]

*Discovery and Motion Practice*

*Discovery and Discovery Sanctions*

**\*6** During discovery, the defendants refused to comply with Chevron's request for production of documents insofar as it sought documents located in Ecuador that were not in the personal physical possession of Donziger or the LAP Representatives—in principal part documents physically in the hands of Fajardo and the Ecuadorian LAP lawyers as well as Yanza, the ADF, and Selva Viva.

The Court granted Chevron's motion to compel production and, when the defendants did not comply, its motion for sanctions. [FN1213] As will be discussed below, the only sanction ultimately imposed was the striking of the LAP Representatives' personal jurisdiction defense. [FN1214]

*The Partial Summary Judgment Motions*

Chevron made four motions for partial summary judgment on various aspects of the case. Three motions were denied in their entirety and the fourth in all but one small respect. [FN1215]

*Attempts to Recuse the Judge or Require Reassignment of the Case*

From the very outset of this case, the defendants made repeated efforts to get rid of the judge, who previously had ruled against them and been affirmed in both the Berlinger and Donziger Section 1782 proceedings. [FN1216] The several early efforts, which began within a week of the filing of this action, are recounted in the Court's ruling denying the first formal recusal motion. [FN1217] Defendants then unsuccessfully sought a writ of mandamus or an order reassigning the case to a different judge. The Court of Appeals summarily denied both requests. In denying mandamus, it stated that "[B]ias cannot be inferred from a mere pattern of rulings by a judicial officer, but requires evidence that the officer had it in for the party for reasons unrelated to the officer's view of the law[.]" [FN1218] It rejected the reassignment request without comment. [FN1219]

Undaunted, Donziger within days of the Court of Appeals' decision, made another motion for recusal, [FN1220] which this Court denied summarily. [FN1221] Still undaunted, defendants later filed yet another mandamus petition, that one ostensibly to challenge a number of interlocutory rulings by this Court, but in which they again asked the Court of Appeals to reassign the case to another judge. [FN1222] Those applications too were denied summarily. [FN1223]

*The Trial*

Chevron waived all claims for damages and sought only equitable relief. The case was tried without a jury [FN1224] from October 15 through November 26, 2013. In conformity with common prac-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

tice in this district in non jury cases, the direct testimony of most witnesses was taken in the form of written statements, the truth of which was affirmed on the witness stand. The witnesses so testifying then were tendered for cross-examination, redirect, and any subsequent questioning as usual. Some exhibits were offered through witnesses in the usual way. Many were offered and received in bulk, subject to the filing and, where appropriate, rulings on objections to exhibits so offered.

**\*7** Chevron called 25 witnesses live and offered deposition testimony of 22 additional witnesses. The defendants called only six witnesses live—Donziger, Hinton, Ponce, Javier Piaguaje, Selva Viva employee Donald Moncayo, and Assembly leader Humberto Piaguaje. They did not call Fajardo, Yanza, Sáenz, Prieto, or Cabrera, none of whom was deposed. The record thus lacks any testimony from them.

The trial was conspicuous for the fact that the defendants sought to offer extensive evidence of environmental conditions in the Orienté and of Texaco's alleged responsibility for them notwithstanding the Court's numerous pretrial rulings that those questions were not at issue in this case.

*Post–Trial Briefing*

The post-trial briefing in this matter was notable for the fact that the defendants made little effort to address the evidence presented at trial or to argue the facts. They confined themselves, for the most part, to rearguing the contentions they made in Ecuador with respect to alleged environmental pollution in the Orienté and to legal arguments that, they contend, require dismissal even if the facts are as Chevron contends.[FN1225]

One consequence of this approach is that the defendants—who offered only a handful of their proposed exhibits through witnesses in open court [FN1226]—made little effort to show the relevance or

significance of most of the more than 1,000 exhibits they tendered in a mass submission on the last day of the trial. The Court therefore does not have the benefit of much reasoned discussion by defendants as to what defendants think they proved or disproved even assuming their exhibits are admissible, which many quite obviously are not. Nevertheless, the Court has considered the evidence on both sides and, to the extent it is admissible, given it such weight as it deserves.[FN1227]

*Discussion and Additional Findings*

Chevron's principal remaining claims seek equitable relief with respect to the Judgment both on non-statutory grounds and under RICO. These two claims are entirely independent of each other [FN1228] although, of course, they rely to a great but not complete extent on the same facts. Chevron asserts in addition certain other claims.

The Court begins by disposing of Donziger's claim, raised only after trial, that the Court lacks subject matter jurisdiction because Chevron lacks Article III standing. It then turns to the merits of Chevron's claims, the affirmative defenses, and then to relief. The appendices to this opinion, filed separately for convenience, are an integral part of it and contain additional findings of fact and conclusions of law.

*I. This Court Has Subject Matter Jurisdiction*

**[3]** Following the completion of the trial and all post-trial briefing, defendants moved to dismiss the case for lack of subject matter jurisdiction. They argue that Chevron lacks Article III standing by virtue of its recent withdrawal of its damage claim and its decision to limit the geographic scope of injunction against enforcement of the Judgment to the United States. Defendants claim that these recent changes in the relief sought eliminated any "case or controversy" between them and Chevron. Parenthetically, that is a proposition that defies common sense given the bitter adversity of the parties on the central issue between them, whether the Lago Agrio Judgment was procured

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

by fraud. But putting that aside, their argument is completely baseless.

**\*8** **[4]** *First,* subject matter jurisdiction—including standing [FN1229]—is determined as of the time the action is brought.[FN1230] But defendants do not suggest that Chevron lacked standing when the action was brought. The basis for their present motion—Chevron's limitation of the relief it seeks—occurred only recently. So they have posed the wrong question. The right question is whether these recent changes have mooted the case. [FN1231] The answer to that question quite plainly is "no."

*Second,* even were the Court to engage defendants' standing argument—thereby ignoring the horn book law that subject matter jurisdiction and its standing component are determined as of the time the action is brought—it would reject it. Defendants' arguments ignore the factual record in this case. Given the record and this Court's findings, there would be standing here even if the matter were determined as of this moment.

In sum, this Court has subject matter jurisdiction.

*A. This Case Is Not Moot*
**[5–7]** Article III of the Constitution limits the judicial power of the United States—and thus the jurisdiction of federal courts—in relevant part to "Cases, in Law and Equity, arising under this Constitution [and] the Laws of the United States" and "to Controversies between ... Citizens of different States" [FN1232]—or, as it often is stated more broadly, to "cases and controversies." [FN1233] Assuming the existence of a case or controversy at the time an action is brought—and defendants' motion, not to mention their behavior in litigating this case over the past three years so assumes—the federal court continues to have subject matter jurisdiction unless and until "a suit becomes moot," *i.e.,* until " 'the issues presented are no longer "live" or the parties lack a legally cognizable interest

in the outcome.' " [FN1234] But, as the Supreme Court held just months ago, "a case 'becomes moot only when it is impossible for a court to grant *any effectual relief whatever* to the prevailing party.' " [FN1235] "As long as the parties have a concrete interest, *however small,* in the outcome of the litigation, the case is not moot." [FN1236]

**[8]** *First,* the litigants here plainly retain a "concrete interest" in the resolution of this case. Chevron insists that it has been a victim of defendants' fraud and racketeering activity. It alleges that it is threatened with additional injury. It seeks equitable relief both to rectify past injuries and prevent further injury. Donziger and the LAP Representatives argue in response that Chevron's claims are spurious, that this Court lacks jurisdiction to provide Chevron with any effective relief, and that comity in any event demands respect for the Lago Agrio Judgment and the various enforcement courts. Nevertheless, "there is not the slightest doubt that there continues to exist between the parties 'that concrete adverseness which sharpens the presentation of issues.' " [FN1237]

**\*9** *Second,* Chevron's withdrawal of its damage claim and its limitation of the geographic scope of the anti-enforcement injunction it seeks did not make it "impossible for [this] court to grant any effectual relief whatever." [FN1238] This Court can and, as will appear below, does impose a constructive trust on the proceeds of the Judgment to these defendants, including the proceeds of intellectual property and royalties already seized from Chevron in Ecuador in Judgment enforcement proceedings and a $96 million arbitration award in favor of Chevron against the ROE, in order to prevent these defendants from profiting unjustly at Chevron's expense. It can and, as will be appear below, does enjoin these defendants from pursuing any proceedings in the United States to enforce the Judgment, once again to prevent them from profiting from the fraud. Regardless of whether those and any other remedies granted would afford Chevron all the relief it could hope for with respect to the fraud and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

racketeering of which it complains, Chevron certainly has "a concrete interest, [even if others might characterize it as] small," in obtaining them. The fact that the Court can afford Chevron such relief means this case is not moot.[FN1239]

*B. This Court Had Subject Matter Jurisdiction When the Action Was Brought*

Defendants have not questioned the existence of subject matter jurisdiction generally, or Chevron's standing in particular, as of the time this action was brought. But subject matter jurisdiction goes to the Court's power to hear a case, and the Court therefore is obliged to raise the issue of its own motion whenever a question appears. Accordingly, the Court does so now.

One element of a "case" or "controversy," the existence of which is essential to the jurisdiction of a federal court, is that the plaintiff have standing to sue. The determination, as the Court has shown, is made "on the basis of what was known at the time a suit was initially filed."[FN1240]

**[9]** "[T]he irreducible constitutional minimum of standing contains three elements:" (1) "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not conjectural or hypothetical," that is (2) " 'fairly traceable to the challenged action of the defendant,' " and (3) "likely" to "be redressed by a favorable decision."[FN1241] Although an "injury-in-fact" exists when a defendant has inflicted a "present harm" on a plaintiff, the "Supreme Court has recognized that a plaintiff in some circumstances may have standing to sue even when the plaintiff shows only an imminent threat of future harm or a present harm incurred in consequence of such a threat."[FN1242]

The complaint in this case alleged that the defendants (1) corrupted the judicial process in Ecuador, (2) colluded with the Ecuadorian government, (3)

improperly procured the appointment of Cabrera and secretly ghostwrote his report, (4) improperly induced the Ecuadorian government to prosecute two former Texaco lawyers, and (5) mounted a public relations blitz, aimed at Chevron and based in part on knowing misrepresentations, all to extort a payment from Chevron, and that they also had obstructed justice and tampered with witnesses in U.S. discovery proceedings to prevent proof of their misconduct.[FN1243] Chevron asserted that it already had suffered substantial damages, that the entry of a large judgment against it was imminent as a result of the alleged corruption, that the defendants would move promptly to seek to enforce that judgment, and that it was threatened with irreparable injury absent equitable intervention.[FN1244] Chevron sought damages as well as an injunction barring the defendants from seeking to enforce the imminent judgment anywhere in the world.[FN1245]

**\*10 [10]** Those allegations satisfied Article III's standing requirements. And while a plaintiff ultimately bears the burden of proving, not merely alleging, facts sufficient to satisfy the standing requirements as of the date an action is begun, Chevron did so. The findings in this opinion demonstrate that Chevron proved the substantial truth of the facts alleged in the complaint. Finally, the remedy it initially sought—*damages and a global injunction* prohibiting the LAPs and both their Ecuadorian and U.S. counsel from enforcing or profiting in any way from the Judgment—would obviously redress Chevron's injuries by compensating it for injuries already incurred and by preventing future injuries stemming from both the Judgment and attempts to enforce it.[FN1246]

Chevron had standing, and the Court had subject matter jurisdiction, as of the commencement of this action.

*C. The Court Would Have Subject Matter Jurisdiction Even on Defendants' Erroneous Premise*

Even were this Court to accept defendants' erroneous premise that the standing requirements that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

apply at the commencement of a lawsuit persist through the twists and turns that litigation can take—in other words, their invitation to ignore (1) the foundational principle that standing is determined at the time the complaint is filed, (2) the fact that Chevron both pleaded and proved that it had standing at the outset, and (3) the fact that this action is far from moot—the Court still would conclude that Chevron has standing here.

*First,* defendants' enforcement of the Judgment in Ecuador already has resulted in the loss by Chevron of Ecuadorian trademarks and related revenue streams, which are being applied to the satisfaction of the Judgment.[FN1247] The value of those trademarks is between $15,703,986 and $23,195,020, and the value of lost future royalties amounts to $5,138,596.[FN1248] And it has lost its $96 million arbitration award against the ROE to the extent that the award otherwise would have been enforceable in Ecuador.[FN1249] As the attachment orders say, all of that property is applicable to the satisfaction of the Judgment under Article 2367 of the Ecuadorian Civil Code.[FN1250] The application of that property to the satisfaction of the Judgment—that is, to the benefit of the Judgment creditors and, through his contingent fee arrangement, Donziger—is a concrete, particular, and direct consequence of the fraudulent Judgment, not merely "fairly traceable" to it.[FN1251]

Those injuries are redressable by the constructive trust the Court today imposes on, and the related relief it grants with respect to, Donziger's right to share in those proceeds and any benefits accruing to the other defendants and the LAP Representatives. The constructive trust with respect to the any royalties and other income generated by the trademarks will deprive Donziger and these other defendants of any benefit from the Judgment and restore that value to its rightful owner, Chevron.[FN1252]

**\*11** *Second,* Chevron has established that it is threatened with additional, imminent injury as a direct

result of defendants' continued efforts to enforce the Judgment. It currently is incurring substantial legal fees and other expenses to defend enforcement proceedings,[FN1253] all concrete and direct consequences of the fraud perpetrated by these defendants. In addition, it is threatened with the risk of further disruptive pre-judgment attachment in foreign countries, as occurred in Argentina,[FN1254] with the risk that some foreign country will enforce the Judgment, and with additional enforcement proceedings, including pre-judgment attachment, in the United States. All of these threatened injuries are direct consequences of the Judgment.

Defendants nevertheless argue that the risk of further attachments and of foreign enforcement are not certain to be realized and, even were they certain, would be products of the actions of other courts and thus not "fairly traceable" to defendants. But these arguments are not persuasive.

The suggestion that the risks of attachments or a foreign decision enforcing the Ecuadorian Judgment are merely speculative is disingenuous. Defendants' own written enforcement strategy lays out the plan to use prejudgment attachment wherever possible,[FN1255] and they have pursued that course in Argentina already. If the possibility of a foreign judgment enforcing the Judgment entered in Ecuador were as speculative as defendants argue, they would not be pursuing such judgments in Argentina, Brazil, and Canada, spending large sums doing so, and obtaining investors willing to fund those (and doubtless other) efforts in exchange for percentages of the result.[FN1256] Finally, the attempt to lay any outcome adverse to Chevron at the doorstep of whatever foreign court might render a decision adverse to it, and thus to disconnect defendants' fraud from the threatened harm, does not withstand analysis. Defendants' fraud produced the Judgment. Their enforcement efforts present the foreign tribunals with the opportunities to enforce that Judgment. If any does so, it would be in consequence of defendants' actions and arguments.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

Thus, there is a substantial risk that the harm Chevron apprehends will come to pass and, should that occur, it would have come to pass as a direct result of defendants' actions. That would suffice to give Chevron standing to seek relief even if the existence of standing now matter, which for reasons already discussed it does not.[FN1257]

Finally, the fact that the relief sought in this case would not remedy all of the past harms nor prevent all of the threatened harms of which Chevron is at substantial risk would not deprive it of standing even if standing were viewed as of the present rather than as of the commencement of the action. The requirement of redressability is satisfied if the relief would "relieve *a discrete injury.*"[FN1258] A plaintiff "need not show that a favorable decision will relieve his *every* injury."[FN1259] Because Chevron "would benefit in a tangible way from the [C]ourt's intervention,"[FN1260] it has standing here.

## II. The Non–Statutory Claims for Equitable Relief With Respect to the Judgment

**\*12** Chevron asserts that the Judgment was procured by bribery and coercion of Ecuadorian judges and, even if that were not so, that it nevertheless was procured by fraud in other respects. It nevertheless does not seek to set aside the Judgment in the Ecuadorian court—an institution of a sovereign nation—or even to enjoin its enforcement outside the United States. Rather, it seeks equitable relief "that will strip Defendants of any profits they are able to procure as a result of their corrupt judgment"[FN1261] and to enjoin enforcement of the Judgment in the United States.[FN1262]

### A. Equitable Relief With Respect to Fraudulent Judgments Generally

Three basic principles underlie Chevron's non-statutory claim for relief from the Judgment.

*First,* independent equitable actions long have

afforded relief from judgments obtained by fraud, whether by enjoining their enforcement, preventing those responsible from benefitting from their fraudulent actions, or otherwise.[FN1263] The willingness of equity to "enjoin a judgment obtained by fraud" has existed at least since the seventeenth century.[FN1264] While the merger of law and equity altered the procedural context in which such actions are pursued and other changes in the legal environment have reduced the frequency with they are brought, all relief traditionally granted in equity remains available.[FN1265]

**[11, 12]** *Second,* equity acts *in personam*—it acts on the person subject to its jurisdiction and, in this context, not on the challenged judgment, whether foreign or domestic.[FN1266] It therefore "may command persons properly before it to cease or perform acts outside its territorial jurisdiction."[FN1267] Since the time of Lord Coke, this principle has resulted, in proper cases, in equitable decrees "enjoin[ing] parties from enforcing judgments obtained by them at law when it was unconscionable for them to do so" even "leav[ing] the judgment in peace."[FN1268] Moreover, the principle that equity acts *in personam* means that a court of equity having jurisdiction over individual parties may enjoin those parties from enforcing, or afford other equitable relief with respect to, a judgment of another state or another nation.[FN1269] Thus, the fact that equity acts *in personam* affords ample scope for equitable relief short of voiding or setting aside a fraudulent judgment.

**[13]** *Third,* fraud in its procurement is an ancient basis for enjoining enforcement of or granting other equitable relief with respect to a judgment where other requisites of the exercise of equitable power are present.[FN1270]

With this background, the Court proceeds to the claim that the Judgment was procured by fraud.

### B. Fraud on the Court—Corruption and Coercion of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

*Judges and Judicial Official*

**[14–16]** There is a good deal of learning concerning the kinds of fraud that support an independent action for relief from a judgment.[FN1271] But there is uniform agreement on the proposition that "a judgment may be avoided ... if the judgment ... [r]esulted from corruption of or duress upon the court ..."[FN1272] "Where ... the situation is clear cut, as where a judge accepts a bribe ..., the person injured thereby is entitled to equitable relief."[FN1273] The position is equally clear with respect to the coercion of judicial officers. "[E]quitable relief will be given from a valid judgment to a party ... injured thereby because of ... duress upon the court ... by the other party or a third person" if the judge "submits to duress."[FN1274] Indeed, defendants do not contend otherwise.

**\*13** This record establishes both of these types of fraud on the Lago Agrio court.

*1. The Bribery of Zambrano*

**[17]** This Court has found by clear and convincing evidence that Zambrano was corrupted by Donziger and the LAPs. Fajardo—with Donziger's approval—agreed to pay Zambrano $500,000 out of proceeds of the Judgment in exchange for Zambrano deciding the Lago Agrio case in the LAPs' favor and signing a decision provided by the LAPs. The principle that such a bribe warrants equitable relief is so well established that counsel for the LAP Representatives recently conceded before the Second Circuit that they "would not have a problem" with "the alternative relief that [Chevron] would be seeking, such as enjoining the person who paid the bribe from benefitting from it," assuming that the judge was bribed.[FN1275] Thus, the bribery of Zambrano establishes a clear basis for relief provided that other equitable considerations are satisfied.

*2. The Coercion of Judge Yánez*

**[18]** The Court has found, also by clear and convincing evidence, that Fajardo and Donziger coerced Judge Yánez to allow the LAPs to terminate their

remaining judicial inspections, to appoint a global expert, and to designate their hand-picked choice, Richard Cabrera, for that position. They did so by threatening him with the filing of a misconduct complaint at a time when he was especially vulnerable, and by other pressure as well.

Defendants do not dispute that the coercion of Judge Yánez would be fraud on the court and afford a basis for equitable relief if it were material to the outcome. Rather, they argue that the coercion of Judge Yánez was immaterial because the Cabrera Report played no role in the ultimate decision. But they are mistaken.

The only basis for the contention that the Cabrera Report played no role in the ultimate decision is the statement in the Judgment that the Lago Agrio court did not rely on it.[FN1276] But that disclaimer does not carry the day for the defendants on this point for at least two reasons.

*First,* the disclaimer is inadmissible hearsay—it is nothing more than an out-of-court statement by the author or authors of the Judgment, and it is offered for its truth. It therefore is inadmissible hearsay, and it would be so even if Zambrano were the author.[FN1277]

*Second,* even if the disclaimer were admissible for its truth, it would be only some evidence on the question. But this Court has found, on the basis of other evidence, that the Cabrera Report in fact was relied upon by the author or authors of the Judgment and that it played an important role in holding Chevron liable to the extent of more than $8 billion. The most material respect in which that was true was the reliance on the Cabrera Report for the count of 880 pits, which was an essential predicate to more than $5 billion of the damage award.[FN1278]

Accordingly, the coercion of Judge Yánez, coupled with the important reliance on the Cabrera Report

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

by the author or authors of the Judgment, is a second material fraud on the Lago Agrio court, and it is entirely independent of the bribery of Zambrano.

*3. The Corruption of Cabrera*

**\*14** In late February and early March 2007, Donziger and Fajardo, having concluded that Cabrera would cooperate them, were giving him the 'hard sell' to accept the global expert appointment. They promised him a lifetime of work on the remediation if the LAPs won the case. Even before Cabrera was sworn in as the global expert on June 13, 2007, Donziger and the LAPs began covertly paying him through the secret account in addition to paying him via the public and established court process. They provided him also with a secretary and life insurance.

**[19]** The Court finds, by clear and convincing evidence, that at least some of these payments and benefits, actual and promised, were bribes given to influence Cabrera's actions as the court-appointed global expert. The *quid pro quo* were Cabrera's repeated representations to the Lago Agrio court and others that he was impartial and independent, his putting of his name to the Report largely prepared by Stratus and it subcontractors and claiming that Report as his own product, and his filing as his own purported response (actually written mostly by Stratus and the LAPs) to the LAPs' and Chevron's comments on the Cabrera Report.

Cabrera took an oath administered by and was an officer of the court. When Donziger and the LAPs covertly paid him and provided him with other benefits under the table to make sure he "totally play[ed] ball" with them, they bribed or corrupted a judicial official.[FN1279] The same principles that apply to the bribery of Zambrano apply to this behavior.[FN1280] In light of the reliance by the author(s) of the Judgment on the Cabrera Report, this corruption of Cabrera is highly material.

*C. Fraud—Ghostwriting and Deception*

Donziger and the LAPs committed fraud on the court and/or extrinsic fraud by means independent of the bribery of Zambrano, the corruption of Cabrera, and the coercion of Judge Yánez.

*1. The LAPs' Ghostwriting of All or Part of the Judgment and Zambrano's Adoption of Their Product Was Fraud Warranting Equitable Relief Even Absent Bribery*

**[20]** This Court has found that the LAPs wrote the Judgment, in whole or in major part, that they gave the draft to Zambrano, and that Zambrano (whether with or without Guerra's participation) made little or no contribution apart from his signature and perhaps some light editing. Even if Zambrano had not been bribed to take these actions, his actions and those of the LAPs would have been fraud on the court and/or extrinsic fraud, the choice being only a matter of one's verbal preference.

In *Morgan v. United States*,[FN1281] upon which Chevron relies, the plaintiffs challenged rates fixed by the Secretary of Agriculture on the ground that the Secretary signed findings submitted to him *ex parte* by department staff without notice to the unsuccessful litigant and without hearing or considering the evidence submitted by the plaintiffs. In holding the order invalid, the Supreme Court reasoned that the Secretary's action would have been improper in a court of law and that no lesser standard applied to the rate making proceeding before it:

**\*15** "If in an equity cause, a special master or the trial judge permitted the plaintiff's attorney to formulate the findings upon the evidence, conferred ex parte with the plaintiff's attorney regarding them, and then adopted his proposals without affording an opportunity to his opponent to know their contents and present objections, there would be no hesitation in setting aside the report or decree as having been made without a fair hearing. The requirements of fairness are not exhausted in the taking or consid-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

eration of evidence, but extend to the concluding parts of the procedure as well as to the beginning and intermediate steps."[FN1282]

Even more pointed, in present circumstances, is *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation,*[FN1283] the misconduct in which shares some elements with that in this case. In *Bridgestone/Firestone,* the Mexican plaintiffs in a U.S. wrongful death action sought to avoid a *forum non conveniens* dismissal of their U.S. case on the ground that Mexican courts were not an adequate and available alternative forum. They pointed to the fact that they had sued in Mexico but that the Mexican court had dismissed their action. Upon inquiry into the circumstances of that dismissal, however, it turned out that (1) the plaintiffs' had sought the dismissal of their own Mexican case in order to bolster their opposition to the *forum non conveniens* motion in the United States, (2) the plaintiffs' Mexican lawyers had been given $20,000 "for expenses" plus 10 percent of plaintiffs' gross recovery (in the U.S.) if they obtained the dismissal of the Mexican action, (3) the Mexican lawyers manipulated the proceedings in Mexico to have the case assigned to a particular judge and to a *secretaria de acuerdos*—essentially a permanent law clerk whose job was "to draft all orders issued in a case prior to the final judgment and present those orders to the judge for final approval"—who was a sister of one of the plaintiffs' Mexican lawyers, (4) the plaintiffs' Mexican lawyers improperly submitted to the judge a proposed order dismissing the Mexican case, and (5) the judge signed the order thus provided. Moreover, as has been the case here with Fajardo, Yanza, Prieto, and Sáenz, the Mexican lawyers in *Bridgestone/Firestone* refused to testify in the U.S. proceeding. The U.S. court held that the Mexican dismissal had been obtained by fraud.

Neither *Morgan* nor *Bridgestone/Firestone* was an independent action for relief from an allegedly fraudulent judgment. They nevertheless illustrate the fact that the Judgment here was obtained by fraud

regardless of whether Zambrano was bribed and even without regard to whether Yánez was coerced or Cabrera corrupted. Judges and a judicial officer, at the behest of the LAPs, abandoned their sworn responsibilities of fairness and impartiality. Even without that misconduct, the actions of the LAPs and Zambrano—the secret submission of a form of judgment desired and written by the LAPs and Zambrano's adoption of that form of judgment in whole or in part, respectively—would have deprived Chevron of a fair determination of the Lago Agrio case. Those actions constituted fraud on the court because they involved misconduct by both court officials and a litigant that went directly to the integrity of the process. In any case, they satisfied the classic definition of extrinsic fraud—"by reason of something done by the successful party to a suit, there was in fact no adversary trial or decision of the issue in the case.... [T]he unsuccessful party [Chevron w]as ... prevented from exhibiting fully [its] case, by fraud or deception practised on [it] by [its] opponent."[FN1284]

*2. The Deception of the Lago Agrio Court By The Misrepresentations that Cabrera Was Independent and Impartial and By the Passing Off of the Ghostwritten Report as His Work Was Fraud Warranting Equitable Relief Even Absent Bribery*

**\*16 [21]** The facts concerning the Cabrera Report and Cabrera's response to the LAPs' Stratus-authored critique, as well as Chevron's critique, of the Cabrera Report, are not disputed, at least seriously. These two documents were presented to the Lago Agrio court on the basis that the documents had been prepared by Cabrera and that Cabrera himself was impartial and independent. The representations and pretenses that Cabrera was impartial, that he wrote the documents and, in this Court's view, that he was independent all were inaccurate.[FN1285] These false pretenses and representations to the Lago Agrio court—engaged in by Cabrera as a court official at the instance of Donziger and the LAPs—constituted fraud warranting equitable relief.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

Particularly relevant here is the Supreme Court's decision in *Hazel–Atlas Glass Co. v. Hartford–Empire Co.,*[FN1286] also heavily relied upon by Chevron, in which the Court reversed a ruling that had denied equitable relief against a previous judgment and, indeed, in which the Court directed that the prior judgment be vacated. Attention to the facts is useful, as they parallel those of this case in important respects.

The first suit had been for patent infringement. Hartford, the eventual patentee, had met with resistance from the Patent Office during prosecution of its patent application. In order to overcome that resistance, it ghostwrote and procured publication of an article, signed by a supposedly disinterested expert whom Hartford procured, that described the alleged invention as "a remarkable advance in the art." It brought the article to the attention of the Patent Office, and the patent issued.

Hartford then sued Hazel–Atlas for infringement. The ghostwritten article played no role in the trial, and the district court dismissed the case on the ground that the accused device did not infringe. Hartford appealed and drew the appellate court's attention to the ghostwritten article. The court of appeals reversed and reinstated the infringement suit, which then was settled on terms favorable to Hartford.

Over time, the facts concerning the article, some small part of which had been known to Hazel–Atlas at the time of trial, came out, many after the court of appeals' ruling in favor of the patentee. Hazel–Atlas then commenced a new action in the court of appeals seeking relief from the prior judgment.[FN1287] The court of appeals ruled against it, but the Supreme Court reversed and directed that the prior judgment be vacated.

The basis for the Supreme Court's ruling was that Hartford's actions constituted fraud on the court. As

the Court put it:

"Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of afterdiscovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals. *Cf. Marshall v. Holmes, supra.* Proof of the scheme, and of its complete success up to date, is conclusive. *Cf. United States v. Throckmorton, supra.*

* * *

**\*17** We have, then, a case in which undisputed evidence filed with the Circuit Court of Appeals in a bill of review proceeding reveals such fraud on that Court as demands, under settled equitable principles, the interposition of equity to devitalize the 1932 judgment despite the expiration of the term at which that judgment was finally entered.[FN1288]

* * *

Hartford's fraud, hidden for years but now admitted, had its genesis in the plan to publish an article for the deliberate purpose of deceiving the Patent Office. The plan was executed, and the article was put to fraudulent use in the Patent Office, contrary to law. [citations omitted] From there the trail of fraud continued without break through the District Court and up to the Circuit Court of Appeals. Had the District Court learned of the fraud on the Patent Office at the original infringement trial, it would have been warranted in dismissing Hartford's case. * * * So, also, could the Circuit Court of Appeals have dismissed the appeal had it been aware of Hartford's corrupt activities in suppressing the truth concerning the authorship of the article. The total effect of all this fraud, practiced both on the Patent

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

Office and the courts, calls for nothing less than a complete denial of relief to Hartford for the claimed infringement of the patent thereby procured and enforced.[FN1289]

The Court went on to direct that the earlier judgment of the court of appeals be set aside, that the mandate be recalled, that Hartford's original appeal be dismissed, and that the district court be directed to dismiss the infringement suit in addition to "tak[ing] such additional action as may be necessary and appropriate."[FN1290]

The situation here, even without regard to the fact that Cabrera was paid covertly by Donziger and the LAPs, is at least as egregious. That is so notwithstanding that, in retrospect, the Lago Agrio court was aware of what might appear to have been a few drops in what in fact was a heavy downpour:

• The Lago Agrio court knew that Cabrera was the LAPs' ultimate choice because Fajardo and Donziger had lobbied and coerced it *ex parte* for his appointment. Moreover, Cabrera in February 2007 had written the court to ask that Chevron be ordered to pay him certain fees he claimed with respect to alleged prior services as a settling expert and, in the course of doing so, said he had made an arrangement with the LAPs, who already had paid him their share of the fees allegedly due for settling expert work.[FN1291]

• The Lago Agrio court knew also that Chevron had suspicions about Cabrera's neutrality and independence, as Chevron brought them to its attention more than once.[FN1292]

But those inklings were a far cry from a full and fair disclosure. Neither the Lago Agrio court nor Chevron knew anything approaching the whole story of the overall Cabrera fraud—the thoroughgoing deception that Cabrera was impartial and independent, that he did his own work with his own independent

helpers, that he wrote the Report and other documents that he purported to have written, and that he was compensated only through the court process. Indeed, the first important evidence did not leak out until March 2010, after the Netflix release of *Crude,* and the production of the Stratus documents later that year in the Denver Section 1782 proceeding. Confirmation came still later.[FN1293]

**\*18** Nor may *Hazel–Atlas* be distinguished successfully on the basis of the statement in the Lago Agrio Judgment that the Lago Agrio court did not rely on the Cabrera Report. As we hold below, that statement is not even admissible in evidence for its truth. In any event, the evidence persuasively establishes that the Judgment rests in material respects on the Cabrera Report.

*D. The Other Requirements for Relief Have Been Satisfied*

**[22]** In considering whether a litigant is entitled to relief from a prior judgment on the ground of fraud, courts frequently consider whether (1) the fraud (whether intrinsic or extrinsic) prevented a full and fair presentation or determination of the litigant's claim or defense in the prior action or otherwise would render it unconscionable to give effect to the prior judgment, (2) the party seeking relief was diligent in discovering the fraud and attacking the judgment, and (3) evidence of the fraud is clear and convincing.[FN1294] For present purposes, only the first of these considerations warrants discussion.[FN1295]

**[23]** When courts are asked to grant relief from or to decline to recognize a prior judgment on the ground of fraud, a central question is whether such an outcome is appropriate to "protect the fairness and integrity of litigation."[FN1296] In cases in which the tribunal has been corrupted, "no worthwhile interest is served in protecting the judgment."[FN1297] The point is analogous to that made by the Second Circuit in the infamous *Manton* case, a criminal prosecution of a Court of Appeals judge where the Circuit rejected a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

contention that there had been no obstruction of justice by a judge because the cases would have been decided the same way in any case.[FN1298] The Circuit's view in that case has equal bearing here.

[24, 25] Even in cases of extrinsic fraud short of judicial corruption, a plaintiff need not prove that the outcome of the prior case would have been different absent the fraud.[FN1299] It ordinarily must show only that the fraud "prevented the losing party from fully and fairly presenting his case or defense" or otherwise significantly tainted the process.[FN1300] Implicit in this latter criterion is a requirement of materiality, as judgments will not be set aside or denied recognition where the only impact of the misconduct or other taint is to prevent a litigant from presenting cumulative evidence, to deceive as to a peripheral issue, or the like.[FN1301]

Zambrano's exchange of a favorable decision and his signature on the LAPs' proposed judgment for a promise of $500,000 of the judgment proceeds was corruption that went to the integrity of the judicial process and requires relief from that judgment. Its materiality is beyond question.

The same would be true of Zambrano's signature on a judgment ghostwritten by the LAPs and submitted to him *ex parte,* even absent the promise of the $500,000. That alone would have been a classic case of fraud on the court. As the Supreme Court recognized in *Morgan,* "there would be no hesitation in setting aside" such a decision "as having been made without a fair hearing." [FN1302] The actions of Zambrano and the LAPs would have deprived Chevron of a full opportunity to makes its defense.[FN1303]

**\*19** The coercion of Judge Yánez, the corruption of Cabrera, the ghostwriting of the Cabrera Report and associated documents, and the misrepresentations to the Lago Agrio court of Cabrera's impartiality and independence stand somewhat differently, as the sig-

nificance of these events, assuming they stood alone, would depend upon whether the Cabrera Report ultimately mattered in any significant way. The Court, however, already has found that the Ecuadorian court relied significantly on the Cabrera Report despite the disclaimer of reliance. These fraudulent elements therefore were material to the outcome.[FN1304]

*E. Conclusion*

All of the elements required for equitable relief from the Judgment as against all defendants have been satisfied in this case subject only to the resolution of two remaining questions—whether (1) the Ecuadorian appellate decisions alter this conclusion, and (2) the *sine qua non* for the exercise of equitable jurisdiction, the inadequacy of legal remedies, is present here. The first of these issues implicates the import of and the effect, if any, of the appellate decisions, which is dealt with in Point VII below. The second is common to the non-statutory claim for equitable relief and to Chevron's RICO and other claims. The Court defers discussion of it to the section of this opinion dealing with relief.

*III. The RICO Statute Applies Here*

Chevron asserts that Donziger, though not the LAP Representatives, has violated two sections of the RICO statute.[FN1305] The first, 18 U.S.C. § 1962(c) makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." The second, Section 1962(d), prohibits "any person" from "conspir[ing] to violate" the preceding section. The Court begins by disposing of certain arguments common to both claims.

*A. RICO Applies to Prohibited Conduct Regardless of Whether a Defendant Is a Member of Organized Crime*

RICO was drafted as a weapon in the fight against

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

organized crime. Some therefore argue that the statute is limited to mobsters of the sort portrayed in *The Godfather, Goodfellas,* or *The Sopranos.* That argument is misconceived.

"Congress drafted RICO broadly to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways."[FN1306] Thus, while the statute's legislative history focused on "the predations of mobsters," it "shows [also] that Congress knew what it was doing when it adopted commodious language capable of extending beyond organized crime."[FN1307] Hence, the Supreme Court has made it clear that RICO applies "not just [to] mobsters" but to "*any person*" who violates its provisions.[FN1308] The statute, moreover, is intended "to be read broadly," in accordance with "Congress' selfconsciously expansive language and overall approach," as "an aggressive initiative to supplement old remedies and develop new methods for fighting crime," regardless of whether the defendant is associated with organized crime or a "respected business."[FN1309]

**\*20** Against this clear background, the RICO claims against Donziger are entirely appropriate despite the fact that he is a Harvard-educated lawyer. The RICO question in this and all other such cases is whether all of the statutory requirements are satisfied with respect to each defendant, not whether the defendant fits a particular popular stereotype. Nevertheless, it bears mention also that this is a *civil* RICO case in which the plaintiff's burden is to prove its case by a preponderance of the evidence—that is, that "its version of the facts is more probable than its adversary's"[FN1310]—rather than beyond a reasonable doubt, as would be the case in a criminal prosecution.[FN1311]

### B. Equitable Relief Is Available in Private RICO Actions

Two circuits have ruled definitively on whether equitable relief is available to private plaintiffs under RICO. They are divided.[FN1312] The question is open in our own.[FN1313] Unsurprisingly, Chevron asserts that the statute affords such relief to private litigants where otherwise appropriate while defendants argue for the opposite conclusion. This Court thus far has not passed on the issue though pressed by both sides to do so. The case now has been tried and the facts determined. The time for a decision on this point is at hand.

**[26]** Judge Diane Wood's opinion for the Seventh Circuit in *National Organization for Women v. Scheidler,*[FN1314] which held that equitable relief is available under the statute to prevailing civil RICO plaintiffs, is the most persuasive analysis of the issue thus far. In this Court's view, the conclusion reached by the Seventh Circuit is demanded by the plain language of the statute[FN1315] and draws added support from the context in which the statute was enacted.

RICO's civil remedies provision contains three parts. The first, Section 1964(a), grants district courts jurisdiction to "prevent and restrain" RICO violations.[FN1316] It does not limit the breadth of that jurisdictional grant.

The second part of the remedies provision is Section 1964(b),[FN1317] which states that the Attorney General may institute proceedings under Section 1964(d) and authorizes the court to enter restraining orders, prohibitions, or take such other actions as it deems proper.

The third and final part, Section 1964(c),[FN1318] provides that any person injured in his business or property by a violation of the statute may sue in a district court and shall recover, *inter alia,* treble damages and attorneys' fees.[FN1319]

Read together, as they must be, Sections 1964(b) and (c) plainly provide remedies in addition to, and not in place of, the remedies provided for in Section 1964(a). Section 1964(a) empowers district courts to "prevent and restrain" RICO violations, thus author-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

izing injunctive relief. It does so generally rather than limiting the jurisdiction conferred only to cases brought by the Attorney General or some other public actor. Section 1964(b) specifically authorizes suits by the Attorney General and confers additional powers on the district courts in such actions—the issuance of restraining orders, prohibitions, or other relief they deem appropriate. Finally, Section 1964(c) creates a private right of action for treble damages.

**\*21** "[T]his reading of the statute gives the words their natural meaning and gives effect to every provision in the statute." [FN1320] It is consistent also with Congress's intent "not merely to compensate victims but to turn them into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity." [FN1321] The Supreme Court repeatedly has rejected efforts to curtail the scope of civil RICO actions where courts ignore Congress's insistence that the statute be "liberally construed to effectuate its remedial purposes." [FN1322] "Indeed, if Congress' liberalconstruction mandate is to be applied anywhere, it is in § 1964, where RICO's remedial purposes are most evident." [FN1323]

This reading is supported also by the context in which RICO was enacted, a context of which Congress is deemed to have been aware. [FN1324] Article III of the Constitution provides that the judicial power of the United States extends "to all Cases, in Law *and Equity*." [FN1325] Congress implemented Article III in 1789 by conferring "jurisdiction over 'all suits ... in equity.' " [FN1326] The Supreme Court has rejected efforts to curtail the equitable powers of district courts in cases in which they otherwise have subject matter jurisdiction unless "a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity." [FN1327]

RICO does not "in so many words, or by a necessary and inescapable inference," foreclose equitable relief in actions brought by private plaintiffs. Accordingly, this Court agrees with *Motorola Credit*

*Corp. v. Uzan* that "[i]t would be extraordinary indeed if Congress, in enacting a statute that Congress expressly specified was to be 'liberally construed to effectuate its remedial purposes,' intended, without expressly so stating, to deprive the district courts of utilizing this classic remedial power in private civil actions brought under the act." [FN1328] Absent just such an express Congressional deprivation, the Court declines to divest itself of equitable powers that the Framers intended district courts to have and that they have possessed since 1789.

This Court holds that RICO empowers a district court to grant such equitable relief as may be warranted in cases in which the court finds a violation of the statute and that the principles of equity support relief sought. It respectfully shares Judge Rakoff's view that the contrary reading of the statute in *Religious Technology Center v. Wollersheim* [FN1329] is unpersuasive.

*C. Morrison v. National Australia Bank Does Not Require Dismissal*

Donziger argues that *Morrison v. National Australia Bank, Ltd.,* [FN1330] requires dismissal of Chevron's RICO claims on the ground that application of the statute here would be extraterritorial and therefore improper.

**[27]** As the Court noted in denying in part defendants' motion to dismiss, [FN1331] the Supreme Court in *Morrison* reiterated the longstanding principle "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." [FN1332] "This principle," the Supreme Court said, "represents ... a presumption about a statute's meaning." [FN1333] "When a statute gives no clear indication of an extraterritorial application, it has none." [FN1334] Accordingly, the analysis of statute-based claims that involve foreign aspects involves two steps. The first is to determine whether Congress has given sufficient indication of an intention that the statute apply outside the United

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

States. If it has not, the second step is to determine whether the proposed application of the statute in fact would be extraterritorial. This, the Court said, turns on "the 'focus' of congressional concern" or the activity "that the statute seeks to 'regulate.' " [FN1335] The determination is informed by the "objects of the statute's solicitude" and "th[e] transactions that the statute seeks to regulate." [FN1336]

**\*22** The first step in the analysis is not open to significant discussion. Our court of appeals has ruled that RICO does not apply extraterritorially. [FN1337] The second step, however, is another matter entirely, as it requires determination of the focus of congressional concern, a matter not yet addressed by the Second Circuit.

The decisions to have considered the matter have taken essentially one of two approaches to determining whether application of RICO to situations involving conduct both in the United States and abroad would be extraterritorial. Some have taken the view that RICO's focus is on the enterprise, an approach that would make the domestic or foreign character of the enterprise, however that is to be determined, dispositive of whether the alleged conduct falls within RICO. [FN1338] Others, including this Court, have rejected that analysis. They have concluded that the focus of RICO is on the alleged pattern of racketeering activity. [FN1339] Chevron maintains that application of RICO to the conduct in question here would not be extraterritorial under either approach.

**[28]** This Court adheres to its determination that the focus of RICO for *Morrison* purposes cannot properly rest on the domestic or foreign character of the enterprise for the reasons this Court previously has expressed, which have been amplified by the Ninth Circuit in *Chao Fan Xu.* [FN1340] "RICO's focus is on the pattern of racketeering activity for purposes of analyzing the extraterritorial application of the statute." [FN1341] The next question, then, is how a court should look at the alleged pattern of racketeering activity.

This much is clear. RICO defines "racketeering activity" as an act "chargeable" or "indictable" under enumerated state and federal statutes. [FN1342] Thus, we first must direct our attention to acts "chargeable" or "indictable" under state or federal law, giving due regard in each case to *Morrison,* as only such acts are eligible for inclusion in a pattern of racketeering activity. If no pattern of racketeering activity, as that term is defined in the statute, has occurred, no substantive violation of RICO has taken place. But what more is required, if anything, is not evident.

Donziger contends that the answer is found in *Norex Petroleum Ltd. v. Access Industries, Inc.,* [FN1343] which, he contends, requires dismissal of the RICO claims as improper extraterritorial applications of the statute. As this Court concluded in denying his motion to dismiss the amended complaint, however, he is mistaken. [FN1344] It suffices for present purposes to quote the discussion from that opinion:

"In *Norex,* a Canadian plaintiff alleged that the defendants had engaged in a racketeering scheme, using Russian companies, to take over control of another Russian company in which the plaintiff was a minority shareholder, leaving the Canadian plaintiff as 'a powerless minority shareholder.' {631 F.3d at 31.} The district court dismissed the complaint under the pre-*Morrison* conduct-and-effects test. The Second Circuit affirmed. Insofar as the brief opinion addressed the question now before this Court, it said only that 'simply alleging that some domestic conduct occurred cannot support a claim of domestic application. "[I]t is a rare case of prohibited extraterritorial application that lacks all contact with the territory of the United States." [*Morrison,* 130 S.Ct.] at 2884 (emphasis in original). The slim contacts with the United States alleged by *Norex* are insufficient to support extraterritorial application of the RICO statute.' {*Id.* at 33 .}

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

**\*23** The allegations of the amended complaint here are entirely different. Unlike the *Norex* complaint, the scheme alleged here was conceived and orchestrated in the United States to injure a U.S. plaintiff, involved a predominately U.S. enterprise, and was carried out in material respects, though by no means entirely, here. *Norex* therefore does not control. Indeed, as the Circuit in *Norex* found it unnecessary to articulate an approach to deciding whether application of RICO in a given situation is extraterritorial, beyond drawing a conclusion with respect to the particular complaint before it, that case sheds no light on the pivotal question before this Court. {*See* Note, *Life After Morrison: Extraterritoriality and RICO,* 44 VAND. J. TRANS-NAT'L L .. 1385, 1402 (2011) (*Norex* did not 'offer [ ] much guidance as to what might constitute domestic application.').}[FN1345]

So *Norex* does not answer the question before the Court. Nor is this the only Court to reach that conclusion on analogous facts.[FN1346]

*Chao Fan Xu*[FN1347] is relevant also. The RICO conspiracy indictment in that case charged "a scheme to steal funds from the Bank of China" in China and to escape prosecution and retain the proceeds by transferring proceeds to the United States and fleeing here by, among other things, passport and visa fraud.[FN1348] The only predicate acts charged, however, were violations of U.S. criminal statutes.[FN1349]

On appeal from convictions, the Ninth Circuit first held that RICO's focus is on the pattern of racketeering activity.[FN1350] It then stated that it would "look at the pattern of Defendants' racketeering activity taken as a whole" in order "to determine whether Defendants' count one [*i.e.,* RICO] convictions are within RICO's ambit."[FN1351] It next observed that the first part of the alleged scheme "center[ed] on the Bank of China fraud and, to that extent it was predicated on extraterritorial activity [and therefore] beyond the reach of RICO."[FN1352] But it went on to note

that the "second part [of the scheme] involved racketeering activities conducted within the United States," that those racketeering activities were within RICO's focus, and affirmed the RICO conspiracy conviction on the ground that they fell "within the ambit of the statute."[FN1353] It reached that conclusion, despite its view that the pattern of racketeering activity "may have been conceived and planned overseas," because "it was executed and perpetuated in the United States."[FN1354]

*Chao Fan Xu* thus seems to cut in two directions. At one point it suggested that the presence of a domestic pattern of activity is sufficient even where it is bound up with extensive foreign conduct. At another it indicated that it looked at the defendants' actions as a whole. In either case, however, it concluded that the conception and planning of the scheme overseas and the embezzlement in China as an integral part of the overall scheme did not foreclose application of RICO to the domestic pattern of racketeering activity.

**\*24** In the last analysis, these cases yield no clear, authoritative principle for determining whether a given application of RICO is or is not extraterritorial. Quite understandably given the difficulty of the issue, they bring to mind Justice Stewart's famous observation with respect to hardcore pornography—"I know it when I see it."[FN1355]

In this case, the evidence at trial established that Donziger, a New York lawyer and resident, here formulated and conducted a scheme to victimize a U.S. company through a pattern of racketeering. That pattern included substantial conduct in the United States—*e.g.,* the bulk of Donziger's overall supervision of the entire operation; much of Donziger's fund raising activity; the ghostwriting of the Cabrera Report, which occurred mainly in Boulder, Colorado, and was supervised by Donziger from New York; much of the pressure and lobbying campaign designed to injure Chevron's reputation and impact its bottom line and its stock price, a campaign micromanaged by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

Donziger that employed many U.S. public relations advisors and lobbyists; the making of *Crude* by a New York-based and recruited film maker; and the improper efforts to ward off discovery through U .S. courts of what really had taken place with Cabrera, Stratus, and the LAPs. Much of the funding came principally from Kohn in Philadelphia and Burford, which operated at least partly in the United States. Absent the U.S. activity, there would have been no scheme. Even had there been one, it would have been doomed to failure, without that activity. Unlike *Norex,* this is not a case "simply [involving] some domestic conduct." [FN1356]

[29] As we demonstrate below, all of the elements of the RICO claims, including the existence of a domestic pattern of racketeering activity, have been proved. It therefore suffices for purposes of this case to hold that the application of RICO to that domestic pattern of racketeering activity would not be extraterritorial.

*IV. The Section 1962(c) Claim*

The first RICO claim is that Donziger and others who did not appear at trial conducted, and continue to conduct, the affairs of an enterprise—essentially, the LAP team—through a pattern of racketeering activity that includes extortion, wire fraud, money laundering, obstruction of justice, witness tampering, and violation of the Travel Act through violation of the Foreign Corrupt Practices Act ("FCPA").

The Court begins the analysis by setting out the elements of a Section 1962(c) violation, knowledge of which is indispensable to all that follows. It then conducts a detailed analysis of whether there has been a Section 1962(c) violation and whether further violations are likely.

*A. The Elements of a Section 1962(c) Violation*

"A violation of § 1962(c) ... requires (1) conduct (2) of an enterprise (3) through a pattern (4) of rack-

eteering activity." [FN1357] Here, the alleged enterprise in substance is the LAP team and its associated persons—an enterprise over which Donziger long has presided. The alleged pattern of racketeering activity by which Donziger and others conducted the affairs of that enterprise includes many of the wrongful, improper, and illegal actions discussed above.

*B. The Enterprise*

**\*25 [30, 31]** Section 1961(4) defines "enterprise" to "include[ ] ... any union or group of individuals associated in fact although not a legal entity." An enterprise may consist of "a group of persons associated together for a common purpose of engaging in a course of conduct," the existence of which is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." [FN1358] It "need not have a hierarchical structure or a 'chain of command,' " and "decisions may be made on an ad hoc basis and by any number of methods." [FN1359]

[32, 33] A RICO enterprise "is an entity separate and apart from the pattern of activity in which it engages" and must be proved separately. [FN1360] Importantly, an enterprise need not be illegitimate or illegal, and the enterprise itself (or the members of an associated-in-fact enterprise) need not commit any of the racketeering acts at all. [FN1361] Indeed, the enterprise frequently is itself a victim of the racketeering activity perpetrated by its participants.

[34] In this case, the LAP team and its affiliates were a group of persons associated in fact for the common purpose of pursuing the recovery of money from Chevron via the Lago Agrio litigation, whether by settlement or by enforceable judgment, coupled with the exertion of pressure on Chevron to pay. The group included (1) Donziger, (2) the U.S. and Ecuadorian lawyers, including Kohn, Patton Boggs, and others, (3) Yanza, the ADF, and Selva Viva, (4) the investors who gave money to finance the operation, usually in exchange for shares of any recovery, (5) the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

LAPs' public relations, media, and lobbying arms, (6) the LAPs' technical people, including Stratus, Beltman, Maest, Russell, Calmbacher, Champ, Quarles, E–Tech, UBR, and 3TM, and (7) others. In accordance with the authorities just cited, the Court emphasizes that it does not imply that each and every member of the enterprise committed acts of racketeering activity or, for that matter, acted improperly in any respect, although some did. The findings are that all of these persons and entities were associated in fact for the purposes stated and that they constituted an enterprise within the meaning of the RICO statute.

*C. Donziger Conducted and Participated in the Conduct of the Affairs of the Enterprise*

[35, 36] Liability under Section 1962(c) does not attach unless an individual "employed by or associated with any enterprise ... conduct[s] or participate[s], directly or indirectly, in the conduct of [the] enterprise's affairs." In sum, a defendant must have "participated in the operation or management of the enterprise" in order to be liable under Section 1962(c).[FN1362] Section 1962(c) liability, however, is not confined "to those with *primary* responsibility for the enterprise's affairs," or to "those with a *formal position* in the enterprise."[FN1363] In the Second Circuit, "discretionary authority in carrying out the instructions of the [enterprise's] principals" is sufficient to satisfy the "operation or management" requirement.[FN1364]

*26 For reasons amply detailed above, the Court finds that Donziger was in ultimate command and, in any case, certainly conducted, and participated in the conduct of, the affairs of the enterprise at all relevant times.

*D. The Predicate Acts*

*1. Extortion*

Hobbs Act extortion, which is a RICO predicate act, requires "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right" and attempts to do so.[FN1365] As Chevron has not paid the Judgment and nor settled the case, we are concerned here with attempted extortion.

One of Donziger's principal objectives from the early days of the Lago Agrio case was to subject Chevron to pressure sufficient to produce a generous settlement prior to judgment. Failing that, his aim was to obtain the largest possible judgment in the hope that the threat of enforcement would bring Chevron to the table or, if that did not occur, that the judgment actually could be collected.

[37, 38] These objectives, of course, are shared by every plaintiff in every lawsuit. As long as a lawsuit is pursued by lawful and proper means, it is not extortion, in the criminal sense, because the means are not wrongful.[FN1366] Indeed, some courts have held that even the filing of a meritless lawsuit is not extortionate lest every unsuccessful lawsuit lead to an extortion claim and thus chill resort to the courts.[FN1367] As we will see, however, this case is far more complicated than this simple proposition because it was not pursued by lawful methods alone.

*a. The Elements of Extortion and Their Application Here*

[39] The Hobbs Act's principal elements are two: "wrongful means and wrongful objective."[FN1368] The "means"—in other words, the threat—"can be wrongful because it causes the victim to fear a harm that is itself wrongful, such as physical injury, or because the means is wrongful, such as violence."[FN1369] Moreover, there is no need for a threat of violence. "[T]he Hobbs Act may ... be violated by a threat that causes the victim to fear only an economic loss."[FN1370]

[40] In this case, the allegedly extortionate be-

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

havior included Donziger's efforts to pressure Chevron to settle without exhausting the legal process—in other words, to pay before the marshal literally came to its door and took away its property to satisfy a final, enforceable judgment. Donziger wrote, for example, that the LAPs' "key leverage point ... is our ability to threaten Chevron's cash position—*i.e., to get their money without going through a lengthy appeals process that drags this out for years.*" [FN1371] On another such occasion, he said that, at "the end of the day[,] it is about brute force; who can apply the pressure and who can withstand the pressure. And can you get them to the breaking point." [FN1372] And he engaged in two categories of conduct to apply that pressure. Both were wrongful.

**\*27** The first category was the corrupt and fraudulent behavior in and relating to the Lago Agrio litigation itself. It included the coercion of Judge Yánez to appoint a global expert and to select Cabrera, the secret payments to Cabrera and other means used to ensure that he would cooperate with the LAPs, the covert use of Stratus and others to write most of the Cabrera Report, the passing off of the Stratus–LAP product as that of a supposedly impartial and independent neutral expert, the payments to Guerra to influence the content of Zambrano's decisions during Zambrano's first tenure on the case, the ghostwriting of the Judgment, and the bribery of Zambrano.

The connection between Donziger's wrongdoing in the Lago Agrio case itself and his objective "to get [Chevron's] money without going through a lengthy appeals process that drags out for years" was straightforward. The bribery of Cabrera and Stratus's secret preparation of the report were intended to ensure that the court-appointed, supposedly impartial and independent expert—whose appointment Donziger and the LAP team engineered—would recommend damages "in the multiple billions of dollars." [FN1373] Inflating Chevron's potential exposure by means of that ostensibly neutral expert was a means to "threaten Chevron's cash position." So too with the

ghostwriting of the Judgment, the corruption of Zambrano, and the LAPs' efforts to enforce that Judgment. The object all along was to maximize Chevron's possible exposure and to increase *both* the risk that the Ecuadorian court in fact would rule for the LAPs and the additional risk that any such judgment would be enforceable outside Ecuador, all in order to bring Chevron to its knees.

The other category of activities designed to pressure Chevron to pay was the use of the media, NGOs, the disinvestment campaign, celebrity advocacy, lobbying, incitement of official investigations and inquiries, and the attempt to incite criminal prosecution of former Texaco lawyers in order to pressure Chevron to settle. As will appear, by no means all of this activity was wrongful, but some certainly was.

*b. Much of Donziger's Conduct Was Not Protected*

Chevron contends that every act in furtherance of this plan was an act of racketeering activity because it was indictable under the Hobbs Act. Donziger makes essentially two rejoinders. The net of this clash is that both sides overreach, but that some of Donziger's means were wrongful.

*First,* Donziger contends that the LAPs were entitled to the recovery that was obtained in Ecuador, that Donziger so believed, and that a threat of economic harm is not extortionate, *i.e.,* wrongful, "unless (1) the defendant is not legally entitled to the property that he or she seeks *and* (2) does not hold a good-faith belief in that entitlement." [FN1374]

*Second,* he asserts that he did nothing more than conduct a lawsuit. Lawsuits, he correctly notes, all inherently instill fear of adverse results, and most settle for that reason. But the bringing of a lawsuit, he argues, is not extortion, at least not in the criminal sense, notwithstanding that it always exerts some pressure on the defendant to part with something of value in exchange for peace. Indeed, he understanda-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

bly invokes the First Amendment in his defense.

**\*28** Ultimately, the parties' respective arguments are not completely persuasive as to either categorical position.

*i. Donziger's Entitlement Argument Is Without Merit*

The first of Donziger's arguments rests on the uncontroversial proposition, derived from *United States v. Jackson*[FN1375] and its predecessors, that some perfectly lawful activities instill fear of economic harm and thus are not wrongful. The distinction between legitimate and wrongful (*i.e.,* extortionate) threats of economic harm turns, he argues, upon whether the threatener in good faith believes it is entitled, and in fact has a plausible claim, to the property it seeks. But that is where Donziger's argument goes off the tracks.

The *Jackson* panel did not hold that no threat of economic harm to obtain property is extortionate as long as the threatener, with the benefit of hindsight, could be said to have been entitled to the property demanded. Rather, it said that "Congress meant to adopt the traditional concept of extortion, which includes an element of wrongfulness." [FN1376] The element of wrongfulness may be supplied by (1) the lack of a plausible claim of entitlement to the property demanded, *or* (2) the lack of a good faith belief of entitlement, *or* (3) the lack of a nexus between the threat and the claim of right. It may be supplied also, in this Court's view, by inherently wrongful conduct. The existence of this element of wrongfulness is a question of fact for the fact finder.[FN1377] Finally, neither the plausibility of a claim of right nor the threatener's good faith belief is established merely by proof that the threatener in fact thought that the threatener, in some cosmic, moralistic or personal ethical sense, was entitled to the property.

One may assume, without deciding, that there was a plausible basis for bringing the Lago Agrio case in

the first place and that Donziger at its inception had a good faith belief that his clients were entitled to recover something. One may assume further that the mere bringing of the lawsuit, though it of course carried with it some threat of economic harm to Chevron, was not wrongful. This does not get Donziger where he wishes to go.

It would be fundamentally wrong to view the threat of economic harm in this case in static terms. It was Donziger's purpose to magnify the pressure on Chevron by increasing both the perceived magnitude of its potential exposure and the perceived likelihood that the exposure in the end would culminate in huge liability. He repeatedly did so by manifestly wrongful means, which included corruption of the litigation and a pressure campaign premised on misrepresentations. Within the litigation, he coerced Judge Yánez to allow the LAPs to drop their remaining judicial inspections and to appoint their hand-picked global expert, coordinated the ghostwriting of the Cabrera Report to threaten Chevron for the first time with more than $16 billion of exposure; coopted Cabrera to put his name to it; supervised the ghostwriting for Cabrera's signature on the response to the LAP and Chevron comments on the Cabrera Report, which raised the ante to more than $22 billion; and bribed Zambrano to allow the LAP team to ghostwrite the multibillion Judgment. His pressure campaign relied upon his repeated dissemination of estimates of Chevron's damages exposure and the magnitude of the harm allegedly created by Texaco that he knew to be false.

**\*29** Each of these tactics increased the perceived threat of harm to Chevron, either by increasing the dollar exposure, by increasing the probability of a judgment that could be enforced outside Ecuador, or by both. They were inherently wrongful by any definition. Chevron "had a preexisting right to be free from the threats invoked" by the illegitimate means employed. [FN1378] Viewing them in terms of the *Jackson* formulation, they destroyed the nexus between the original plausible claim and the fear of a catastrophic

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
(Cite as: 2014 WL 815923 (S.D.N.Y.))

adverse result on that claim because the fear of such a result was a product not solely of the original plausible claim, but of the illegitimate means used to increase the exposure on that claim, the likelihood that Chevron would be found liable, and the likelihood that any such finding ultimately would prove enforceable. In other words, the illegitimate means that Donziger and his confederates used provided them with "leverage to force the payment of money" that arose uniquely from the illegitimate means. Moreover, the "actual disclosure" of those illegitimate means would have been, and even today would be, "counterproductive." [FN1379] Put still another way, one engaged in litigation either accepts the risk of an adverse result reached by fair and honest methods or settles, and that is fine. But a litigant who magnifies the risks to its adversary by corrupting the litigation in order to "get the price up" creates leverage purely attributable to the corruption, which is inherently wrongful, which bears no proper nexus to any plausible claim that may have been asserted in the first place, and from which the victim has a right to be free.

ii. Donziger's Conduct is Not Protected Petitioning Activity

Implicit in what has been said already, this Court accepts that litigation is a constitutionally protected right in the United States and assumes it should be afforded ample scope even when conducted abroad. It serves the important purpose of permitting resolution of disputes by means more desirable than otherwise might be employed. Accordingly, while the authorities already referred to do not compel a conclusion so broad, it assumes without deciding that even "meritless litigation is not extortion" under the Hobbs Act. [FN1380] But we are dealing here with something else entirely.

[41] Chevron's claim with respect to the Lago Agrio case itself, insofar as it pertains to the predicate acts of attempted extortion, is not that the case was entirely baseless. Rather, it is that Donziger and others corrupted the case by bribing the judge and by other

corrupt and fraudulent means and that they did so, among other reasons, to instill fear in Chevron of a catastrophic result sufficient "to get [Chevron's] money without" litigating the case to judgment, without "going through a lengthy appeals process that drags this out for years," and without the need for time consuming and expensive judgment enforcement proceedings.[FN1381] It is clear from cases in the NoerrPennington area [FN1382] that corruption of an adjudicative process removes any shield that the First Amendment otherwise would provide. [FN1383] That is so because "bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right to petition." [FN1384] Accordingly, the actions in the Lago Agrio case itself, which are said to have been corrupt, to the extent proved, were wrongful means for Hobbs Act and RICO purposes.

c. Donziger's Extortionate Conduct

i. Donziger's Misconduct in the Litigation

*30 As amply detailed above, Donziger's actions in increasing the pressure on Chevron by dishonest and corrupt steps in the litigation—coercion, bribery, ghostwriting, and so on—were intended to communicate threats to Chevron. Their purpose was to instill fear of a catastrophic outcome in order to increase the amount Chevron would pay to avoid the worst.

[42] The Hobbs Act requires only obtaining, or attempting to obtain, "property from another, with his consent, induced by wrongful use of ... fear." [FN1385] No verbal or explicit threat is required.[FN1386] Thus, subject to the constraints of Morrison, which are discussed below, Donziger's misconduct in the litigation that was undertaken for the purpose of instilling fear of economic harm in order to induce payment by Chevron were indictable under the Hobbs Act, chargeable under the New York extortion statute, and therefore

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

acts of racketeering activity.

*ii. Donziger Made Representations He Knew Were Materially False in Order to Exert Pressure on Chevron*

Donziger's misconduct outside the courthouse went hand in hand with his misconduct within it. Both were parts of an offensive to produce a multi-billion dollar payout. Donziger's "brute force" campaign depended largely on his ability to threaten Chevron by portraying the litigation as a likely source of huge liability for the company.[FN1387]

As an initial matter, although the existing case law perhaps does not go so far, the Court assumes for purposes of this decision that advocacy through public statements and lobbying activities for the purpose of inflicting economic harm, except to the extent it rests on knowingly false statements or statements as to the truth of which the speaker in fact entertains serious doubt, is not extortionate. But Donziger in some instances relied upon estimates and comparisons that he knew were false or the truth of which he seriously doubted. These included Russell's $6 billion SWAG, claims that contamination in the Orienté exceeded that of the Exxon Valdez by a factor of thirty, and assertions of Cabrera's impartiality and independence. Accordingly, these are proper subjects of the extortion predicate act claim.

As we have seen, Donziger exercised virtually total control over the specific content and timing of the press campaign.[FN1388] He rebuffed repeatedly Hinton's and Amazon Watch's efforts to exercise discretion over the substance or wording of particular materials.[FN1389] Donziger accordingly made or caused these assertions to be made in press releases and sought to have them repeated by prominent figures to create "pressure ... to get the price up"[FN1390] and induce Chevron to settle.

*(A) Donziger Repeatedly Used Damages Estimates He*

*Knew Were False or the Truth of Which He Doubted*

The LAPs' former chief scientist, David Russell, disavowed his initial damages assessment and repeatedly requested that the LAPs and Amazon Watch cease using his $6 billion figure.[FN1391] Russell warned that the estimate "was prepared in a very short time, with only a week of review ..., and [was] heavily influenced by [Donziger] in the writing."[FN1392] He said the number "[was] too high by a substantial margin, perhaps by a factor of ten, or more."[FN1393] As a result, he warned, the "2003 cost estimate is a ticking time bomb which will come back to bite you, and very badly if anyone attempts due diligence on it."[FN1394]

**\*31** Donziger and Amazon Watch both promised to stop citing Russell's estimate in their press releases and statements to the public. But these promises were broken. The ADF[FN1395] and Amazon Watch—at Donziger's direction—continued to tout the $6 billion figure[FN1396] and continued to attribute it to Russell's firm.[FN1397] Donziger knew that Russell had disavowed his cost estimate and had revealed that it was wildly inaccurate. His continued reliance on the figure thus was deliberately deceitful or, at best, highly misleading.

Donziger now claims that his team had prepared a new, higher estimate, which satisfied him that it was acceptable to continue using Russell's cost estimate despite Russell's repeated demands that he stop doing so.[FN1398] But the Court does not credit that claim. The "replacement" estimates were prepared under Donziger's direction by junior lawyers who worked for him.[FN1399] They were intended to "make media/court/CVX [Chevron] itself start thinking in terms of billions,"[FN1400] and potentially to be used to pique the SEC's interest in the litigation.[FN1401] To the extent they ever were publicly quoted or relied upon, they too were weapons in Donziger's scheme to ratchet up the pressure on Chevron to settle.

Evocation of the Exxon Valdez disaster was another such weapon. Donziger's allegiance to the hy-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

perbolic and highly misleading comparison between the contamination in the Orienté and the oil spilled by the Exxon Valdez further demonstrates Donziger's willingness to disregard the truth in order to inflate Chevron's perceived exposure. Despite repeated warnings from the LAPs' own scientific experts about the inaccuracy of the comparison,[FN1402] ADF press releases and other materials continued to maintain that "[e]xperts for the plaintiffs have concluded the disaster is at least 30 times larger than the Exxon Valdez spill."[FN1403] And they did so at Donziger's direction. Indeed, when the director of Amazon Watch suggested removing references to the spill from its website,[FN1404] Donziger insisted that it stick to the claim. He warned that there would be "HUGE implications for the legal case" if they disavowed the comparison to Exxon Valdez, and told Amazon Watch that it "[w]ould terribly prejudice the people it is trying to help if it makes this change."[FN1405]

It is no accident that the substance of the misrepresentation pertained to the scale of the disaster and, consequently, the supposed scope of Chevron's exposure. In dogged pursuit of headlines and, ultimately, support for a number likely to "get the price up,"[FN1406] Donziger ignored warnings that those claims were "off by [a] factor of ten" or more.[FN1407]

*(B) Donziger Sought to Pressure Chevron by Causing Third Parties to Act on His Misrepresentations*

Donziger devoted particular attention to promulgating the misrepresentations related to Cabrera, the Russell SWAG, and the Exxon Valdez to elected officials, the SEC,[FN1408] and Chevron investors in the hope of inducing them to pressure Chevron themselves.

**\*32** Donziger targeted then-New York Attorney General Andrew Cuomo and New York State Comptroller Thomas DiNapoli, the latter of whom is "the sole Trustee of the Common Retirement Fund ... whose portfolio includes more than 7.5 million shares of Chevron Corporation ... valued at approximately

$556 million."[FN1409] In response to lobbying efforts by Donziger's team,[FN1410] Cuomo and DiNapoli wrote to Chevron chief executive officer, David O'Reilly, repeating what they were told and doubtless believed—that an independent, court-appointed expert (Cabrera) had recommended billions in damages against Chevron.[FN1411] Comptroller DiNapoli repeatedly urged the company to settle.[FN1412] He even wrote a Huffington Post piece recounting his request that "Chevron's board of directors settle this marathon litigation and spare the company's battered reputation any further damage."[FN1413] Both Amazon Watch and the ADF (*i.e.,* Donziger) then publicized Cuomo and DiNapoli's positions.[FN1414]

Donziger fed DiNapoli and Cuomo the same misrepresentations he was feeding the press.[FN1415] And he sought to use their influence, both as public officials and in the case of the Comptroller as a major Chevron stockholder, to "increase the leverage and increase the cost [to] Chevron," including "the cost of all the hassle [it has] to put up with from the environmental groups" and "the cost of their sullied reputation ... ."[FN1416] That leverage was intended to convince Chevron to settle with Donziger and the LAPs.

*(C) Donziger Pressed the Republic of Ecuador to File Criminal Charges Against Chevron Attorneys in Order to Pressure Chevron into Settlement*

We have discussed already Donziger's efforts to incite the ROE to prosecute two Chevron lawyers—Reis Veiga and Pérez–Pallares—criminally. Donziger viewed a "criminal case" against the two lawyers, premised on alleged fraud in connection with the release signed with the ROE, as "a road that ... could force [Chevron] to the table for a possible settlement."[FN1417] Donziger was convinced that such a prosecution would be a potential source of "major press in [the] U.S." and a way to "really raise the cost to CVX."[FN1418]

To that end, he asked Chris Lehane to prepare a plan to "fully leverage the criminal investigation of ...

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

Chevron executives." [FN1419] The priority of the plan was "to apply shareholder pressure on Chevron, including" letters to Chevron board members, "elected officials who head major pension funds," and "major investors" such as "public and university funds ...." [FN1420] The plan called also for "Meetings with State Pension Fund Elected Officials" (to persuade them "to publicly demand a meeting with Chevron to discuss the matter"), an "Analyst Road Show," a "Google ad that [would] put[ ] out some provocative information for anyone who types in a search for Chevron," and "SEC letters calling for an investigation of Chevron" in the "days and weeks" following the release of a story about the criminal investigation in order "to keep imposing tremendous pressure on Chevron." [FN1421]

**\*33** Although the LAPs' efforts to stimulate such a prosecution initially met resistance, the tide turned following President Correa's election in 2007. After a series of meetings with Donziger and the LAP team, the president announced his support for the prosecution. [FN1422] On April 29, 2010, the Prosecutor General's office issued an opinion citing the Cabrera Report and formally accusing Reis Veiga and Pérez–Pallares of the crime of *falsedad ideologica.*

Donziger knew that, "[i]n the US, threatening to file a criminal case to get an advantage in a civil case is considered a violation of ethical rules of the profession." [FN1423] He nevertheless used the criminal prosecutions in an attempt to "keep the hammer over [Chevron's] head" [FN1424] and to "force [Chevron] to the table." [FN1425] His action in doing so, moreover, was wrongful irrespective of whether there was a plausible claim of wrongdoing by the lawyers and of any belief by Donziger in the merit of the claim of such wrongdoing. In terms of *Jackson's* formulation, there was no nexus between the property Donziger sought to obtain by threatening the Chevron lawyers with criminal prosecution and any plausible claim that the lawyers had violated Ecuadorian law in connection with the release of Texaco years earlier. Moreover, Donziger and the LAP lawyers were well aware of the wrongful

nature of their actions. They "resort[ed] to very sophisticated means" to prevent being "tied to the matter." [FN1426] Their efforts to distance themselves is probative of their awareness of the wrongful nature of their attempts to procure these prosecutions.

*d. Application of the Hobbs Act to This Conduct Is Consistent With Morrison*

Donziger's media, lobbying, and public relations campaign, as well as the Cabrera scheme, took place largely in the United States. Much of it was directed by Donziger in major part from his New York City apartment. As a result, *Morrison* has no bearing on the bulk of Donziger's conduct. Among Chevron's allegations of extortion, however, are various actions that took place, in whole or in part, in Ecuador or abroad, including the bribery of Zambrano, efforts to persuade the ROE to criminally charge Chevron attorneys, efforts to enforce the judgment abroad, and quite possibly the ghostwriting of the Judgment. The Court therefore must determine whether the presumption against extraterritoriality applies to the Hobbs Act.

The Hobbs Act has two basic components—(1) the wrongful use of fear, in this case, of economic or reputational harm (2) in order to obtain the property of another—neither of which evinces a Congressional intent that the statute be applied to extraterritorial conduct. To determine which of defendants' conduct properly is considered part of the domestic pattern, the Court therefore must discern the focus of the statute or the "object[ ] of the statute's solicitude." [FN1427]

The defining element of extortion is the pursuit of "something of value from the victim that can be exercised, transferred, or sold ." [FN1428] By the statute's very terms, the conduct prohibited is to, "in any way or degree," "obstruct[ ], delay[ ], or affect[ ] commerce or the movement of any article or commodity in commerce, by ... extortion ... ." [FN1429] In *Scheidler v. National Organization for Women, Inc.,* [FN1430] the Supreme Court explained that, "[a]t common law, extortion was a property offense" [FN1431] and demon-

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

strated the significance of the defendant's objective to the definition of extortion by examining the claim alongside the crime of coercion. Coercion, the Court explained, targeted those who "employed threats and acts of force and violence to dictate and restrict the actions and decisions of businesses," but stopped short of seeking and acquiring property, which the crime of extortion requires.[FN1432] Thus, it is the defendants' desire "ultimately to enrich themselves" at the target's expense that transforms merely *coercive* tactics into *extortion.*[FN1433]

**\*34 [43]** As a result, the fact that certain of Donziger's wrongful efforts to force Chevron to pay took place in Ecuador is of no moment. While Donziger's activities in Ecuador were important, they in many respects were merely tools. Regardless of where the conduct creating the threat took place, the plan was hatched and run from the United States and its object was a multi-billion dollar payment from Chevron, a U.S. based company. The application of the Hobbs Act to the extortionate behavior therefore would not be extraterritorial.

*2. Wire Fraud*

Donziger engaged in multiple acts that are indictable under the wire fraud statute and that therefore are acts of racketeering activity.

*a. The Elements of Wire Fraud*

**[44–46]** The wire fraud statute prohibits the use of the wires "for the purpose of executing" a "scheme or artifice to defraud."[FN1434] A "scheme or artifice to defraud" is a plan to deprive a person of something of value by trick, deceit, chicane or overreaching. "[A]ny 'mailing that is incident to an essential part of the scheme satisfies the mailing element,' even if the mailing itself contain[s] no false information."[FN1435] Nor need the defendant personally communicate by wire—he or she need only cause the wires to be or initiate a series of events which foreseeably would result in their use.[FN1436] The scheme need not even be successful in order for liability to obtain under the

statute.[FN1437]

**[47–48]** Fraudulent intent is established by proof of intentional fraud or by demonstrating "reckless indifference to the truth."[FN1438] Intentional fraud is established by "a 'conscious knowing intent to defraud ... [and] that the defendant contemplated or intended some harm to the property rights of the victim."[FN1439]

**[49]** The statute requires also that the plaintiff prove the defendants used materially false or fraudulent pretenses, representations, or promises in the scheme.[FN1440] The materiality element is satisfied if the false pretense or representation has "some independent value" or "bear[s] on the ultimate value of the transaction."[FN1441]

Finally, although many of the wires at issue were interstate, a number of them were sent to or from the United States. In any event, "the wire fraud statute punishes frauds executed 'in interstate or foreign commerce,' so this is surely not a statute in which Congress had only 'domestic concerns in mind.' "[FN1442]

*b. The Conduct*

**[50]** Donziger's overriding goal was to extract a large payment from Chevron in exchange for peace. In pursuit of that objective, however, he engaged, as we have seen, in a number of deceitful schemes, each of which was intended to play its part in achieving that end and each of which was furthered by use of the wires. These included, but were not limited to: (1) the ghostwriting of the Cabrera Report by Stratus and the LAPs and the passing off of the report as the work of Cabrera, together with the misrepresentations of his supposed impartiality and independence; (2) the false portrayal of Cabrera as neutral and impartial, (3) the concealment of the true relationship among Cabrera, Stratus and the LAPs, including concealment of the secret payments to Cabrera; (4) the ghostwriting by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
(Cite as: 2014 WL 815923 (S.D.N.Y.))

Stratus of the response to Chevron's objections to the Cabrera Report, which too were passed off as Cabrera's work; (5) the attempts to deceive Chevron and courts in the Section 1782 proceedings concerning what actually had transpired among Cabrera, Stratus, and the LAPs; (6) the ghostwriting of all or much of the Judgment and Zambrano's false claim of authorship; and (7) the false statements to the media and to public officials that were made to increase the pressure on Chevron.

**\*35** In each of these schemes, Donziger specifically intended to mislead Chevron by falsely portraying the extent of its potential exposure and the likelihood of an adverse result, both material matters designed to induce it to settle the case and to do so at a higher figure than otherwise might have been available. He sought also to portray those same matters falsely to others in a position to exert pressure on Chevron toward the same end. Thus, he acted with *scienter,* and the schemes involved deception as to material matters. The jurisdictional means requirement was satisfied by the extensive use of the wires by Donziger, Fajardo, and Yanza, among others, to transmit messages—chiefly emails—both within the United States and between the United States and Ecuador in furtherance of the schemes.[FN1443]

*3. Money Laundering*

Money laundering, a violation of Section 1956 of the Criminal Code,[FN1444] is a RICO predicate act.[FN1445] Section 1956 in pertinent part states that:

"Whoever transports, transmits, or transfers ... funds [1] from a place in the United States to or through a place outside the United States or [2] to a place in the United States from or through a place outside the United States—

"(A) with the intent to promote the carrying on of specified unlawful activity ..."

thereby commits a felony.[FN1446] "[S]pecified unlawful activity" includes, with an exception irrelevant to this case, "any act or activity constituting an offense listed in section 1961(1) of this title...."[FN1447] "[S]pecified unlawful activity" thus includes any act of racketeering activity, including Hobbs Act and state law extortion, wire fraud, obstruction of justice, witness tampering, and violation of the Travel Act. Section 2(b) of the Criminal Code, moreover, provides that "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States is punishable as a principal."[FN1448] Thus, whoever transfers, or willfully causes another to transfer, funds into the United States from abroad, or from the United States to another country, "with the intent to promote the carrying on of" a RICO predicate offense violates the money laundering statute.

**[51]** As the "cabeza" of the Lago Agrio litigation for the LAPs, Donziger's responsibilities included: (1) obtaining money to fund the litigation and related activities, including public relations and media, and (2) disbursing, or causing the disbursement of, the funds thus raised to vendors and to recipients in Ecuador, most notably Selva Viva, which managed most of the money sent there. To whatever extent he (1) obtained money from outside the United States or (2) sent or caused money to be sent from the United States to another country, in each case with the requisite intent and to promote the carrying on of a RICO predicate offense, he committed money laundering.

The record in this case contains persuasive evidence of a number of such offenses by Donziger.[FN1449] The following are illustrative.

**\*36** Donziger on March 23, 2007 received in his Chase attorney account in New York $1.75 million from a Gibraltar account controlled by Russell DeLeon, a law school friend Donziger recruited to help fund the case.[FN1450] He promptly transferred $1 million of that money to the Kohn firm in Philadel-

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

phia, where it was controlled by Donziger and Kohn pending its use for case-related expenditures.[FN1451] Donziger then caused that money to be transmitted to entities in the United States and Ecuador.[FN1452]

In the United States, that money paid in part for the production of the Cabrera Report: both Stratus and Cristobal Villao, an author of one of the Report's annexes, through his American employer, Uhl, Baron, Rana and Associates, received payments from Kohn, the money for which came from DeLeon's contribution to the case.[FN1453]

[**Editor's Note:** For part 6 of 7, see 2014 WL 815961]

FN1167. PX 2551 (LAPs' Appellate Clarification Request); PX 2552 (Chevron Response to LAPs' Appellate Clarification Request); PX 431 (Appellate Clarification Order).

FN1168. PX 2551 (LAPs' Appellate Clarification Request), at 4; PX 2552 (Chevron Response to LAPs' Appellate Clarification Request), at 9 (citing PX 430 (Appellate Judgment), at 10).

FN1169. PX 2551 (LAPs' Appellate Clarification Request), at 5 (emphasis added).

FN1170. PX 431 (Appellate Clarification Order).

FN1171. *Id.* at 4.

FN1172. *Id.*

FN1173. *Id.* at 3.

FN1174. *Id.* at 4.

FN1175. DX 1022 (Chevron Cassation Appeal).

FN1176. *Id.*

FN1177. PX 8095 (Opinion of Ecuadorian National Court of Justice).

FN1178. *Id.* at 96.

FN1179. *Id.; see also id.* at 97–98.

FN1180. *Id.* at 156–57 (citing PX 400 (Lago Agrio Judgment), at 50–51).

FN1181. *Id.* at 157.

FN1182. *Id.*

FN1183. *Id.*

FN1184. The National Court did not consider Chevron's allegations concerning Guerra or the bribe scheme. Chevron did not raise them in its cassation petition, as Guerra had not yet approached Chevron by the time the petition was filed.

FN1185. *Id.* at 99 (footnotes omitted).

FN1186. *Id.* at 222.

FN1187. PX 2382 (Invictus Memo), at 29.

FN1188. *Id.* at 35 (emphasis in original).

FN1189. PX 2461 (Order Issued by the National Civil Trial Court No. 61 of Argentina in *Aguinda Salazar Maria v. Chevron Corp.*).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

In the Argentine case, the LAPs successfully convinced a trial court to embargo Chevron's Argentine subsidiary's assets, dividends, and future bank deposits. *Id.* at 2–4. The decision ultimately was reversed by the Argentine Supreme Court, which held that Chevron Argentina—the defendant in the Argentine case—was separate from Chevron Corporation—the defendant in the Lago Agrio case—and that the LAPs had failed to pierce the corporate veil. PX 273 (Order Issued by the Supreme Court of Justice of Argentina in *Aguinda Salazar Maria v. Chevron Corp* ).

**FN1190.** PX 2306 (Filing in the Superior Court of Justice of Brazil).

The Brazilian action, *see* Tr. (J. Piaguaje) 2398:7–2399:3, so far as the record discloses still is in its initial stages.

**FN1191.** PX 1004 (Amended Statement of Claim, filed in *Yaiguaje v. Chevron Corp.,* Court File No. CV–12–454778, Ontario Superior Court of Justice).

An Ontario court stayed the LAPs' enforcement action against Chevron's Canadian subsidiary, holding that the LAPs had failed to pierce the corporate veil. The court held that the case could not proceed unless and until the LAPs located assets of Chevron Corporation in Canada. PX 660 (Order, *Yaiguaje v. Chevron Corp.,* File No. CV–12–9808–00CL, Ontario, Canada). The stay of proceedings later was vacated by the Ontario Court of Appeal, http://cdn5.lettersblogatory .com/wp-content/uploads/2013/12/C5701 9.rere—.pdf, which then stayed its deci-

sion pending Chevron's motion for leave to the Supreme Court of Canada, http://cdn5.lette                  rsblogatory.com/wp-content/uploads/2014/01/2014 ONCA0040.pdf.

**FN1192.** As noted, attempts to enforce the Judgment in the United States always have been part of the plan. Indeed, even when the defendants sought to defeat the preliminary injunction in this case by disclaiming any then present intention to seek enforcement in New York, they conspicuously did not disclaim any such intention elsewhere in the United States.

Moreover, the reasons for their failure to seek enforcement to date in the United States are fairly obvious.

As an initial matter, the defendants' repeated efforts to have this case assigned to a different judge make clear their preference for almost any other forum. Any attempt, however, to enforce the Judgment in the United States while this action remains pending would carry a substantial risk that the enforcement proceeding would be litigated here for two reasons.

*First,* as long as this action remains pending, any suit in a federal court by any of the LAPs (other than the two LAP Representatives who defended this case at trial) to enforce the judgment likely would be a compulsory counterclaim in this case, as the defaulting LAPs are defendants here and have not answered the complaint in this case. FED.R.CIV.P. 13(a)(1).

*Second,* there in any event would be a substantial chance that any enforcement

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

action brought in a federal court other than this one would be transferred to this Court under 28 U.S.C. § 1404(a) or 1407, as occurred with Patton Boggs' related lawsuit in the District of New Jersey. *Patton Boggs LLP v. Chevron Corp.,* No. 12 Civ. 9176(LAK), DI 42 (filed Dec. 14, 2012). Moreover, as the LAPs all are aliens, any enforcement action brought in a state court, other than those of the two states of which Chevron is a citizen (California and Delaware), could and quite likely would be removed by Chevron to federal court and then likely transferred to this Court.

FN1193. PX 2382 (Invictus Memo), at 31.

FN1194. *Id,*

FN1195. PX 432 (Oct. 15, 2012 Order issued in Summary Proceeding No. 21100–2003–0002), at 4 (attaching intellectual property, cash, and other assets in Ecuador, along with a $96,355,369 arbitration award issued against the ROE); PX 418 (Oct. 25, 2012 Order issued in Summary Proceeding No. 21100–2003–0002) (expanding attachment order); PX 7087 at *4 et seq.* (Oct. 3, 2013 Official Letter of Ecuadorian Intellectual Property Inst. informed Lago Agrio court of notations of attachment of Chevron trademark registrations pursuant to attachment).

FN1196. PX 169R (Donziger Notebook), at 6.

FN1197. PX 931 (Oct. 29, 2007 Memo from S. Donziger to C. Lehane); *see also* PX 728 (Apr. 27, 2005 email from C. Lehane to S. Donziger and J. Kohn), at 2 ("As we have discussed, the Ecuadorian Amazon Chev-

ronTexaco project can be reduced, in the end, to a single strategic imperative: **Bringing ChevronTexaco to the negotiation table by inflicting real economic pain on the company.**") (bold in original).

FN1198. PX 7450 (Aug.2009 Memo from S. Donziger to New Partners re "Idea for Campaign").

FN1199. DX 1500 (Hinton Direct) ¶ 11.

The Court does not credit her assertions that Donziger told her that the sample data overwhelmingly proved contamination or that he would not compromise the case in any way meaningful to Chevron for that reason. Nor does it credit her testimony that "[t]hroughout the time [she] worked on the case, the team prepared the case for trial, not settlement." *Id.*

FN1200. She testified on cross examination as follows:

"Q. And at any time did Mr. Donziger tell you that his goal was to get more press, increase the pressure in order to get that settlement price higher? A. Are you speaking about a particular time frame?

Q. At any time, Ms. Hinton. A. Repeat it again.

Q. At any time, ma'am, *did Mr. Donziger tell you that his goal was to increase press so that he could increase the pressure in order to get the settlement price higher? A. Yes.*

Q. At any point in time, Ms. Hinton, did Mr. Donziger tell you that he wanted to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

force Chevron to the table for possible settlement? [Objection and ruling omitted] A. Not in those words." Tr. (Hinton) 2159:3–18 (emphasis added).

FN1201. *See* PX 1184 (Nov. 10, 2009 Ltr. from J. Kohn to P. Fajardo and L. Yanza re: "EcuadorTexaco Case"), at 2; PX 1187 (Nov. 19, 2009 Ltr. from J. Kohn to P. Fajardo and L. Yanza re: "Ecuador–Texaco Case"), at 2 (noting reported "decision to not raise settlement before [they] 'win' the trial").

FN1202. Among these were the Stratus Defendants—Stratus Consulting, Inc., the consulting firm that allegedly ghost-wrote all or most of the Cabrera Report, and two of its personnel, Douglas Beltman and Ann Maest. The Stratus Defendants ultimately settled with Chevron.

FN1203. DI 128 (Letter from P. Fajardo to Court, Feb. 23, 2011); DI 127 (Order extending time).

FN1204. DI 205.

FN1205. *Chevron Corp. v. Donziger,* No. 11 Civ. 0691(LAK), 871 F.Supp.2d 229 (S.D.N.Y.2012) (Donziger); DI 634 (LAP Representatives).

FN1206. *Id.* ¶¶ 420–26.

FN1207. *Id.* ¶ 430.

FN1208. DI 307 (Donziger answer); DI 350 (LAP Representatives' answer).

FN1209. DI 307 (Donziger answer), at 71.

FN1210. DI 350 (LAP Representatives' answer), at 106.

FN1211. *Id.* at 91–105; DI 307 (Donziger answer), at 71.

FN1212. Indeed, they allege that:

"*As observed by the Ecuadorian Court in its final judgment,* Chevron also engaged in the following procedural misconduct: raising at the eleventh hour 'unresolved issues' previously abandoned by Chevron in an effort to delay resolution of the case; obstructing the evidence gathering process by launching frivolous attacks upon each and every expert report not submitted by a Chevron-affiliate, which the Court found to be designed to 'impede the normal advance of the evidence gathering process, or even prolong it indefinitely;' and frontally attacking the court in a display of shocking disrespect for the judicial process. Further, In [*sic* ] summation of Chevron's behavior throughout the course of the litigation, *the Court observed that* 'the following constitutes a display of procedural bad faith on the defendant's part: failure to ... [produce] ... documents ordered coupled with a failure to submit an excuse on the date indicated; attempting to abuse the merger between Chevron Corp. and Texaco Inc. as a mechanism to evade liability; abuse of the rights granted under procedural law, such as the right to submit the motions that the law allows for [ ... ]; repeated motions on issues already ruled upon, and motions that by operation of law are inadmissible within summary verbal proceedings, and that have all warranted admonishments and fines against defense counsel defendant from the various Judges who have presided over this Court; [and] delays provoked

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

through conduct that in principle is legitimate, but ... [which have] ... unfair consequences for the proceedings ... such as refusing and creating obstacles for payment of the experts who took office, thus preventing them from being able to commence their work....' " *Id.* at 103–04 (emphasis added). *See also* DI 350 (LAP Representatives' answer), at 101–04.

FN1213. *Chevron Corp. v. Donziger,* 296 F.R.D. 168, 2013 WL 5575833 (S.D.N.Y. Oct.10, 2013).

FN1214. *Id.* at *40 (striking defense unless documents relevant to personal jurisdiction were produced by Oct. 24, 2013, which they were not).

The Court concluded also that defendants' failure to comply with the order compelling production warrants (a) the inference that the documents requested but not produced would have been unfavorable to defendants, and (b) exclusion at trial of documents ordered but not produced. But it reserved for trial the questions whether to draw that inference and to exclude such documents. *Id.* at *40–43. In any event, the Court drew no such inference from the defendants' failure to comply and excluded no documents on that ground. In some instances, it drew inferences from the failure of the Ecuadorian lawyers to testify. As noted however, it would have made the same findings in the absence of such inferences.

FN1215. *Chevron Corp. v. Donziger,* No. 11 Civ. 0691(LAK), 2013 WL 4482691 (S.D.N.Y. Aug.22, 2013) (denying motion in the exercise of discretion without considera-

tion of the merits); DI 1063 (Order, Apr. 24, 2013) (denying motion for partial summary judgment dismissing collateral estoppel affirmative defense); DI 878 (Order, Mar. 4, 2013) (denying motion for partial summary judgment on Count 8); *Chevron Corp. v. Donziger,* 886 F.Supp.2d 235 (S.D.N.Y.2012) (substantially denying motion for partial summary judgment dismissing former adjudication affirmative defenses). (The first of the cited decisions mistakenly spoke of three rather than four motions for partial summary judgment.)

FN1216. *Chevron Corp. v. Berlinger,* 629 F.3d 297, 305–06 (2d Cir .2011) (noting July 15, 2010 order to produce); *In re Chevron Corp.,* 749 F.Supp.2d 141, 170 (S.D.N.Y.2010), aff'd sub nom. *Lago Agrio Plaintiffs v. Donziger,* 409 F. App'x 310 (2d Cir.2010) (summary order).

FN1217. *Chevron Corp. v. Donziger,* 783 F.Supp.2d 713, 718 (S.D.N.Y.2011).

FN1218. *Chevron Corp. v. Donziger,* No. 11–2259–op, 2011 WL 4375022 (2d Cir. Sept.19, 2011) (quoting *McLaughlin v. Union Oil Co. of Calif.,* 869 F.2d 1039, 1047 (7th Cir.1989)).

FN1219. *Chevron Corp. v. Naranjo,* 667 F.3d 232, 239 n. 11 (2d Cir .2012), cert. denied, —— U.S. ——, 133 S.Ct. 423, 184 L.Ed.2d 288 (2012).

FN1220. DI 391 (Feb. 17, 2012 Mot. for Recusal).

FN1221. DI 392 (Feb. 24, 2012 Memo. Endorsement).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

FN1222. Petition for writ of mandamus, *Naranjo v. Chevron Corp.,* No. 13–772 (2d Cir. filed Mar. 5, 2013), at 31–40.

FN1223. *Naranjo v. Chevron Corp.,* No. 13–772, DI 182 (2d Cir. filed Sept. 26, 2013).

FN1224. *See Chevron Corp. v. Donziger, No. 11 Civ. 691(LAK), 2013 WL 5526287 (S.D.N.Y. Oct.7, 2013)* (no right to jury trial in this case).

FN1225. *See* DI 1850 (Donziger Defs.' Post-trial Mem. of Law); DI 1857 (Donziger Defs.' Post-trial Reply); DI 1851 (LAPs Reps.' Post-trial Mem. of Law); DI 1858 (LAPs Reps.' Post-trial Reply).

FN1226. That is true also, albeit not to the same extent, of Chevron. Chevron, however, has explained its case extensively both in summation and in extensive post-trial submissions.

FN1227. As frequently occurs in bench trials, most of the exhibits on both sides were received subject to subsequent rulings on (1) motions to strike, where such motions were made, and (2) objections, which in the case of Chevron's objections are set forth in an extensive spreadsheet listing each exhibit, Chevron's objections, and defendants' responses. A similar practice was employed with respect to the parties' designations of deposition testimony.

Some of these motions and objections were ruled upon during or after the trial. Others are dealt with in this opinion, including in Appendix III. Beyond that, little purpose would be served by the making of specific rulings as to the admissibility of hundreds or possibly thousands of exhibits and many pages of deposition testimony that do not figure in the outcome. Suffice it to say that the Court has received in evidence any exhibit or testimony upon which it relies in this opinion.

FN1228. There is a basis of subject matter jurisdiction over these and other non-federal claims completely independent of the RICO claims, namely 28 U.S.C. § 1332. *See generally* DI 283 (Am.Compl .), ¶¶ 8–17, 20, 23.

At the outset of the action, there was some uncertainty as to the existence of complete diversity, viz. the allegation that defendant Selva Viva Selviva CIA, LTDA (actually Selva Viva Viva CIA, LTDA, subsequently referred to as "Selva Viva") is an Ecuadorian limited liability company. *Id.* ¶ 14. Had that been true, it would have been a citizen of every state or nation of which any of its members was a citizen. *E.g., Handlesman v. Bedford Vill. Green Assocs. L.P.,* 213 F.3d 48, 52 (2d Cir.2000). There is no allegation as to the identity or citizenship of its members. Accordingly, if paragraph 13 of the complaint (paragraph 14 of the amended complaint) had been accurate, plaintiff's failure to have alleged that none of Selva Viva's members was a citizen of Delaware or California, the states in which Chevron is organized and in which it has its principal place of business, respectively, would have been fatal to diversity or alienage jurisdiction. But that pleading flaw has been rendered immaterial by the proof at trial.

The Court finds that Selva Viva is, and from its inception always has been, an Ecuadorian corporation with its principal place of business in Ecuador. Tr.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

(Donziger) 2635:4–6 (Selva Viva is an entity created under corporate law of Ecuador); Donziger June 24, 2013 Dep. Tr. at 103:6–16 (acknowledging incorporation of Selva Viva and Donziger's designation as president); Tr. (H.Piaguaje) 2677:12–2678:3 (stating that witness is a 40 percent shareholder of Selva Viva); PX 6906 (record of incorporation of Selva Viva, its entry into the Register of Companies, and the designation of Donziger as president); PX 426 (Ecuadorian court record reflecting Fajardo's description of Selva Viva as a corporation); Tr. (Kohn) 1420:11–20 (Selva Viva headquartered in Quito, Ecuador); Tr. (Donziger) 10:6–17 (Selva Viva's office is in office of LAPs' Ecuadorian counsel); Donziger June 26, 2013 Dep. Tr. at 737:7–14 (Selva Viva office is in Ecuador); DX 226T–227T (same). It therefore is a citizen of Ecuador. Thus, plaintiff Chevron is a citizen of California and Delaware, and defendants all are citizens of Ecuador or of states other than California and Delaware. The matter in controversy, exclusive of interest and costs, obviously exceeds the sum of $75,000. Subject matter jurisdiction exists under 28 U.S.C. § 1332(a) and (c). For the sake of good order, the complaint and the amended complaint are deemed amended to conform to the proof that Selva Viva is an Ecuadorian corporation with its principal place of business in Ecuador. *See* FED.R.CIV.P. 15(b)(2); 28 U.S.C. § 1653. Accordingly, even a pretrial dismissal of the RICO claims would not have permitted dismissal of the non-RICO claims for want of subject matter jurisdiction.

FN1229. 15 MOORE'S FEDERAL PRACTICE § 101.32 (3d ed. 2013) ("Standing is determined as of the time suit is filed.").

FN1230. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 184, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (rejecting challenge to plaintiffs' standing because "unlawful conduct ... was occurring at the time the complaint was filed"); *Grupo Dataflux v. Atlas Global Grp., L.P.,* 541 U.S. 567, 570–71, 124 S.Ct. 1920, 158 L.Ed.2d 866 (2004) (footnote omitted) ("It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.' *Mollan v. Torrance,* 9 Wheat. 537, 539, 6 L.Ed. 154 (1824). This time-of-filing rule is hornbook law (quite literally) taught to first-year law students in any basic course on federal civil procedure."). *Accord, e.g., Utah Ass'n of Counties v. Bush,* 455 F.3d 1094, 1099 (10th Cir.2006); *Focus on the Family v. Pinellas Suncoast Trans. Auth.,* 244 F.3d 1263, 1275 (11th Cir.2003).

FN1231. *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990); *U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) ("One commentator has defined mootness as 'the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (quoting Henry P. Monaghan, *Constitutional Adjudication: The Who and When,* 82 YALE L.J. 1363, 1384 (1973)).

FN1232. U.S. CONST., art. III, § 2.

FN1233. *See Clapper v. Amnesty Int'l USA,* —— U.S. ——, ——, 133 S.Ct. 1138, 1146, 185 L.Ed.2d 264 (2013) (internal quotation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

marks omitted).

FN1234. *Chafin v. Chafin,* ⸺ U.S. ⸺, ⸺, 133 S.Ct. 1017, 1023, 185 L.Ed.2d 1 (2013) (quoting *Already, LLC v. Nike, Inc.,* 133 S.Ct. 621, 726 (2013)).

FN1235. *Id.* (quoting *Knox v. Serv. Empls.* ⸺ U.S. ⸺, ⸺, 132 S.Ct. 2277, 2287, 183 L.Ed.2d 281 (2012) (emphasis added)).

FN1236. *Knox,* 132 S.Ct. at 2287 (quoting *Ellis v. Ry. Clerks,* 466 U.S. 435, 442, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984)) (emphasis added).

FN1237. *Id.* at 1024; *see also Cabala v. Crowley,* 736 F.3d 226, 229 (2d Cir.2013) ("Because the parties continued to dispute the form and extent of the relief to which [plaintiff] was entitled, the case never became moot.").

FN1238. *Chafin,* 133 S.Ct. at 1023.

FN1239. *Chafin,* 133 S.Ct. at 1026 ("[T]he availability of a partial remedy is sufficient to prevent [a] case from being moot.") (quoting *Calderon v. Moore,* 518 U.S. 149, 150, 116 S.Ct. 2066, 135 L.Ed.2d 453 (1996) (*per curiam* )); *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) ("Even though it is now too late to prevent, or to provide a fully satisfactory remedy for [plaintiff's injury], ... the availability of [any] possible remedy is sufficient to prevent this case from being moot.").

FN1240. *Hargrave v. Vermont,* 340 F.3d 27, 34 n. 7 (2d Cir.2003); *see also Davis v. Fed. Election Comm'n,* 554 U.S. 724, 734, 128

S.Ct. 2759, 171 L.Ed.2d 737 (2008) (although the "proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed* " (emphasis added) (internal citation omitted)).

FN1241. *Rothstein v. UBS AG,* 708 F.3d 82, 91 (2d Cir.2013) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

FN1242. *Hedges v. Obama,* 724 F.3d 170, 188–89 (2d Cir.2013).

FN1243. *See* DI 1 (Feb. 1, 2011 Compl.).

FN1244. The Judgment was entered thirteen days following the filing of the original complaint in this case, thus demonstrating that Chevron's claim that this event was imminent was well founded. *See Hargrave,* 340 F.3d at 34. In any case, Chevron alleged other, already consummated, injuries.

FN1245. *See, e.g.,* DI 1 (Feb. 1, 2011 Compl.) Prayer for Relief.

FN1246. Defendants argue that even a global anti-enforcement injunction could not have redressed Chevron's injuries "because foreign courts would first have to decide to give it effect." *See* DI 1861 (Defs.' Mem. of Law in Supp. Mot. to Dismiss for Lack of Jurisdiction), at 6 n. 4. That argument ignores the fact that even the possibility that foreign enforcement might enforce the Judgment is a threat directly caused by the fraudulent procurement of the judgment in the first place. It ignores also the facts that "[c]ourts often

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

adjudicate disputes where the practical impact of any decision is not assured" and that "[c]ourts also decide cases against foreign nations, whose choices to respect final rulings are not guaranteed." *Chafin,* 133 S.Ct. at 1025–26. Such potentialities have no bearing on jurisdiction.

FN1247. *See* DI 1847 (Chevron Corp.'s Post-trial Mem. of Law), at 197–98; DI 1848 (Chevron Corp.'s Proposed Findings of Fact) ¶ 127.

FN1248. PX 6000 (Anson Direct) ¶¶ 48–49.

FN1249. PX 432 (Oct. 15, 2012 Order issued in Summary Proceeding No. 21100–2003–0002), at 4 (attaching $96,355,369 arbitration award issued against the ROE).

FN1250. *See, e.g.,* PX 432 ("Therefore, in strict compliance with Article 2367 of the Civil Code, which states that, 'every personal obligation gives the creditor the right to satisfy it with all real property or personal property of the debtor, whether present or future, only excepting those that cannot be attached ...', since none of the assets for which attachment is being requested is covered under this exception, and since it is necessary to comply with that ordered in the judgment being executed, against the defendant in this proceeding, Chevron Corp., it is ordered that the execution of this judgment be applicable to the entirety of the assets of Chevron Corporation, until such time as the entire obligation has been satisfied.").

FN1251. Defendants' argument that subsequent appellate proceedings constitute an intervening cause ignores the fact that "the

'fairly traceable' standard is lower than that of proximate cause." *Rothstein v. UBS AG,* 708 F.3d 82, 91 (2d Cir.2013). Defendants' actions need not be "the very last step in the chain of causation" in order to establish causation for the purposes of Article III. *Bennett v. Spear,* 520 U.S. 154, 168–69, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). It ignores also this Court's conclusion, *infra,* that the subsequent appellate rulings are not entitled to any recognition in consequence of the systemic deficiencies of the Ecuadorian legal system.

FN1252. *Counihan v. Allstate Ins. Co.,* 194 F.3d 357, 361 (2d Cir .1999) ("A constructive trust is properly imposed in this situation in order to make [a plaintiff] whole for its loss of the value of the Property....").

FN1253. *See, e.g.,* PX 3000 (Veiga Direct), ¶ 132.

FN1254. PX 2461 (Order, National Civil Trial Court No. 61, Argentina, in *Aguinda Salazar Maria v. Chevron Corporation* ).

The Argentine attachment ultimately was vacated by Argentina's highest court. *See* PX 273 (Order, Supreme Court of Justice of Argentina, in *Aguinda Salazar, Maria v. Chevron Corporation* ).

FN1255. PX 2382 (Invictus Memo), at 17 ("Consistent with its aggressive approach, Plaintiffs' Team will look for ways to proceed against Chevron on a prejudgment basis, largely as a means of attaining a favorable settlement at an early stage.").

FN1256. *See Friends of the Earth,* 528 U.S. at 184 (plaintiffs' evidence of direct effects of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

defendants' conduct could not "be equated with the speculative 'some day' intentions" upon which plaintiffs relied in *Lujan* ) (quoting *Lujan,* 504 U.S. at 564).

FN1257. Defendants' reliance on *Clapper* for the proposition that the harm must be certain and that plaintiffs may not rely on "speculation about the unfettered choices made by independent actors not before the court," 133 S.Ct. 1150 n. 5 (quotation marks and citation omitted), is misplaced. *Clapper* acknowledged that the "substantial risk" and "clearly impending" standards may be coextensive and, even if they are not, did not abandon the former. *See id.* There is no proper comparison to be made between the chain of speculation that the *Clapper* Court condemned as too attenuated and the far more direct relationship between defendants' fraud in this case and any foreign judgment enforcing the Ecuadorian Judgment.

Even more basic, *Clapper* must be read in the context in which it was written—an attempt to use the courts to cabin the actions of the executive branch. The Court made clear that its "standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Id.* at 1146–47 (quoting *Raines v. Byrd,* 521 U.S. 811, 819–20, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997)) (internal quotation marks omitted).

This purely private dispute implicates none of the separation of powers concerns that inform the standing doctrine, particularly in cases like *Clapper.* It therefore would be entirely wrong to apply literally some of the language used in *Clapper,* assuming that the language was meant to impose standards higher than usual in the first place, to purely private litigation. Such application could alter dramatically, to cite but one example, the law governing preliminary injunctions in trade secret cases by transforming the requirement of impending dissemination into a jurisdictional question, rather than a question on the merits. *See Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110 (2d Cir.2009) (finding that plaintiff had standing, but vacating preliminary injunction for lack of irreparable harm where plaintiff failed to show imminent disclosure of trade secrets).

FN1258. *Larson v. Valente,* 456 U.S. 228, 244 n. 15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (emphasis added).

FN1259. *Id.*

FN1260. *Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 103 n. 5, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

FN1261. DI 1847 (Chevron Post-trial Mem. of Law), at 326.

FN1262. *Id.* at 347–49.

FN1263. E.g., 4 JOHN NORTON POMEROY, A TREATISE ON EQUITY JURISPRUDENCE § 1364, at 984 (Symons 5th ed. 1941) ("POMEROY") ("where the legal judgment was obtained or entered through fraud, ... then a court of equity will interfere ... and restrain proceedings on the judgment which cannot be conscientiously enforced"); Note, *Injunctions—Foreign Judg-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

ment—Enforcement Abroad Restrained, 38 YALE L.J. 261 (1928). FED.R.CIV.P. 60(b) indeed provides that "the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules *or by an independent action.*" *See id.* Comm. Note 2007 Amdt. (emphasis added).

FN1264. *See, e.g.,* HENRY L. MCCLINTOCK, MCCLINTOCK ON EQUITY ("McClintock") § 4, at 11, 459 (1948); *see also id.* § 171, at 459 ("Since [the seventeenth century] ... there has been no serious question as to the power [of equity] to enjoin the enforcement of a judgment obtained by fraud....").

FN1265. *Stainback v. Mo Hock Ke Lok Po,* 336 U.S. 368, 382 n. 26, 69 S.Ct. 606, 93 L.Ed. 741 (1949) ("Notwithstanding the fusion of law and equity by the Rules of Civil Procedure, the substantive principles of Courts of Chancery remain unaffected."); *Union Mut. Life Ins. Co. v. Friedman,* 139 F.2d 542, 544 (2d Cir.1944) ("Under the present practice there is no longer a law side and an equity side of the court, but only a civil action in which all relief must be obtained that could formerly be secured either at law or in equity."); 4 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1043, at 177 (3d ed. 2002) ("[T]he merger of law and equity and ... abolition of ... forms of action furnish a single uniform procedure by which a litigant may present his claim in an orderly manner to a court empowered to award whatever relief is appropriate and just; the substantive and remedial principles that applied prior to the advent of the federal rules are not changed."); *see also, e.g., Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 318–19, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) ("[T]he substantive prerequisites for obtaining an equitable remedy as well as the general availability of injunctive relief are not altered by [Rule 65] and depend on traditional principles of equity jurisdiction.") (quoting 11 A CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE: FEDERAL RULES OF CIVIL PROCEDURE § 2941, at 31 (2d ed.1995) (internal quotation marks omitted) (alteration in original)).

FN1266. E.g., 2 POMEROY § 428; MCCLINTOCK § 34, at 85; *see also, e.g., Hart v. Sansom,* 110 U.S. 151, 155, 3 S.Ct. 586, 28 L.Ed. 101 (1884) ("[A] court of equity acts in personam, by compelling a deed to be executed or canceled by or on behalf of the party. It has no inherent power, by the mere force of its decree, to annul a deed or to establish a title."); *Massie v. Watts,* 10 U.S. (6 Cranch) 148, 158, 3 L.Ed. 181 (1810) (Marshall, C.J.) ("[T]he principles of equity give a court jurisdiction wherever the person may be found, and the circumstance, that a question of title may be involved in the inquiry, and may even constitute the essential point on which the case depends, does not seem sufficient to arrest that jurisdiction.").

FN1267. *Steele v. Bulova Watch Co.,* 344 U.S. 280, 289, 73 S.Ct. 252, 97 L.Ed. 319 (1952) (affirming injunction prohibiting use of trademark in Mexico); *accord, e.g., Cole v. Cunningham,* 133 U.S. 107, 111, 10 S.Ct. 269, 33 L.Ed. 538 (1890) (affirming Massachusetts decree restraining Massachusetts citizens from prosecuting attachment actions in New York); *NML Capital, Ltd. v. Republic of Argentina,* 699 F.3d 246, 263 (2d Cir.2012) (federal court sitting in equity having personal jurisdiction over party may "enjoin him from committing acts else-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

where" (quoting *Bano v. Union Carbide Corp.,* 361 F.3d 696, 716 (2d Cir.2004) (internal quotation marks omitted))); *City of Jamestown v. Pennsylvania Gas Co.,* 1 F.2d 871, 878 (2d Cir.1924) ("Where the necessary parties are before a court of equity, it is immaterial that the res of the controversy, whether it be real or personal property, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary, according to the lex loci rei sitae, which he could do voluntarily, to give full effect to the decree against him.") (internal quotation marks and citation omitted); *Storm LLC v. Telenor Mobile Commc'ns AS,* No. 06 Civ. 13157(GEL), 2006 WL 3735657, at * 14 (S.D.N.Y. Dec.15, 2006) (Lynch, J.) (enjoining initiation of lawsuits in Ukraine that would disrupt or delay New York arbitration proceedings); *Penn v. Lord Baltimore,* 1 Ves. Sen. 444, 447–48, 27 Eng. Rep. 1132, 1134–35(Ch.) (1750) (Lord Chancellor entertained in England bill seeking specific performance of contract to determine boundary between provinces of Maryland and Pennsylvania).

FN1268. MCCLINTOCK § 34, at 85; *accord,* 73 N.Y. JUR.2D,*Judgments* § 226 (2011) ("The equitable remedy against a judgment is not a proceeding in rem but is a proceeding in personam against a party to the judgment seeking to deprive him or her of the benefit of the judgment by enjoining the enforcement of it. The remedy in equity does not assail the court in which the judgment was rendered ... but may be employed to secure relief against the judgment on the ground that the rights acquired cannot be retained in good conscience."); 73 N.Y JUR.2D,*Judgments* § 234 ("By a decree operating in personam or upon parties personally subject to its jurisdiction, a court of eq-

uity may grant relief from a judgment rendered in a foreign state even though the court that rendered the judgment had jurisdiction.") (footnote omitted).

This principle underlies also the rule that "[w]hen ... both parties to a suit in a foreign country[ ] are resident within the territorial limits of another country [or subject to its *in personam* jurisdiction], the courts of equity in the latter may act *in personam* upon those parties, and direct them, by injunction, to proceed no further in such suit." JOSEPH STORY, COMMENTARIES ON EQUITY JURISPRUDENCE § 899 (1st Eng. ed. Grigsby ed. 1884).

FN1269. *Gray v. Richmond Bicycle Co.,* 167 N.Y. 348, 358–59, 60 N.E. 663 (1901) ("a court of one state may, where it has jurisdiction of the parties, determine the question whether a judgment between them, rendered in another state, was obtained by fraud, and, if so, may enjoin the enforcement of it, although its subject-matter is situated in such other state") (quoting *Davis v. Cornue,* 151 N.Y. 172, 179, 45 N.E. 449 (1896) (internal quotation marks omitted)); *Venizelos v. Venizelos,* 30 A.D.2d 856, 293 N.Y.S.2d 20 (App.Div.1968) (affirming injunction barring, inter alia, enforcement of a Greek court decree); *Browning v. Navarro,* 826 F.2d 335 (5th Cir.1987) (instructing district court to consider whether state court judgment was procured by fraud and may be set aside); *Ellerman Lines, Ltd. v. Read,* [1928] 2 K.B. 144 (C.A.1928) (English plaintiff entitled to injunction barring enforcement of Turkish judgment that was procured by fraud); *Title Ins. & Trust Co. v. Cal. Dev. Co.,* 171 Cal. 173, 152 P. 542, 550–51, 553, 557–58 (Cal.1915) (affirming injunction barring en-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

forcement in Mexico of Mexican judgment obtained by fraud); *Ochsenbein v. Papelier,* (1873) L.R. 8 Ch. (Eng.) 695 (English equity court had jurisdiction to enjoin enforcement of French judgment procured by fraud but declined to grant relief in light of adequacy of legal remedy); *Bowles v. Orr,* (1835) 1 Younge & Collyer, 464, 160 Eng. Rep. 189 (1835) (enjoining action to enforce in England a French judgment allegedly obtained by fraud); *Injunction Against Enforcement of Judgment Rendered in Foreign Country or Other State,* 64 A.L.R. 1136 (1930); *see also Tamimi v. Tamimi,* 38 A.D.2d 197, 328 N.Y.S.2d 477 (App.Div.1972) (declaring void a Thai divorce decree on the ground that the decree had been procured by fraud).

FN1270. *E.g., supra* note 1263; 12 MOORE'S FEDERAL PRACTICE § 60.81.

FN1271. Fraud in the context of independent actions or other applications for relief from a judgment generally falls into two or three categories. "Relief is always possible for 'extrinsic' fraud" and for "fraud on the court," which often is confused with or treated as a subset of extrinsic fraud. 12 MOORE'S FEDERAL PRACTICE § 60.81[1][b]. Relief for so-called "intrinsic fraud" often has been available less frequently. *Id.* § 60.81[1][b][ii]. There is more recent discussion as to whether the supposed distinction between extrinsic and intrinsic fraud is or should be meaningful. *Id.* § 60.81[1][b][iv]; *see Gleason v. Jandrucko,* 860 F.2d 556, 560 (2d Cir.1988) ("Relief from a judgment by way of an independent action need not be premised on a showing of extrinsic as opposed to intrinsic fraud.") (citations and emphasis omitted).

FN1272. RESTATEMENT (SECOND) OF

JUDGMENTS § 70(1)(a) & cmt b (1982); *see* 11 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2870 ("Fraud on the court" most commonly has been invoked in cases involving " 'the most egregious conduct involving a corruption of the judicial process itself.' The concept clearly includes bribery of a judge ...."); *accord,* RESTATEMENT OF JUDGMENTS § 124 (1942); *United States v. Buck,* 281 F.3d 1336, 1342 (10th Cir.2002) (bribery of judge or juror is fraud on court and ground for relief from judgment) (internal quotations omitted); *Wilkin v. Sunbeam Corp.,* 466 F.2d 714, 717 (10th Cir.1972) (corruption of judicial officers is fraud on the court); *Root Ref. Co. v. Universal Oil Prods. Co.,* 169 F.2d 514, 517, 541 (3d Cir.1948) (vacating judgments obtained by bribery of Third Circuit judge), *cert. denied sub nom. Universal Oil Products Co. v. William Whitman Co.,* 335 U.S. 730 (1949); *In re Ibanez,* 834 N.W.2d 306, 312 (S.D.2013) (same); *Pizzuto v. Ramirez,* No. 1:92–cv–00241–BLW, 2013 WL 1222560, at *8 (D.Ida. Mar. 22, 2013) (bribery of judge or juror is fraud on court and ground for equitable relief against judgment); *Ellett v. Ellett,* 35 Va.App. 97, 101, 542 S.E.2d 816, 818 (2001) ("[e]xtrinsic fraud includes such circumstances as bribery of a judge or juror"); *In re Miller,* 273 Mont. 286, 902 P.2d 1019, 1022 (Mont.1995) ("[e]xtrinsic fraud includes such circumstances as bribery of a judge or juror").

For the sake of completeness, the defendants have not asserted that the question whether the bribery of Zambrano and the coercion of Judge Yánez were lawful under Ecuadorian law should be decided under Ecuadorian law. In the absence of a party's demonstration of a conflict of laws,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

the law of the forum, here New York, applies. 19A N.Y. JUR.2D, *Conflict of Laws* § 2 (2014). Citations are unnecessary to establish the proposition that bribing a judge is unlawful here. Moreover, an Ecuadorian law expert for defendants testified, and this Court holds, that the law in Ecuador is the same. DI 1413–12 (Albán Dep. Tr.), at 31:21–32:2; DI 1400–4 (Ex. D), at 48:1–12.24.

FN1273. RESTATEMENT OF JUDGMENTS § 124 cmt. a.

FN1274. *Id.*

FN1275. DI 1496–2 (Tr., Sept. 26, 2013), at 25:3:15, *Naranjo v. Chevron Corp.,* No. 13–772–cv (2d Cir.).

FN1276. The National Court of Justice accepted that statement and therefore disregarded the allegations regarding Cabrera. Supra Facts § XII.B.

FN1277. Infra Discussion VII.A.

FN1278. Infra App'x III.I.

FN1279. As discussed, experts are prohibited under Ecuadorian law from accepting "anything of value" from parties, as the fees are established by the judge, and it is illegal to bribe a courtappointed expert. *Supra Facts* § V.C.1; *see also* DI 1413–4 (ECUADOR CRIM.CODE Arts. 355, 359), at 48, 49; DI 1413–7 (ECUADOR CODE OF CIV. P. Arts. 251, 252, 839), at 56; DI 1413–9 (Rules Governing the Activities and Fee Schedule of Experts in the Civil Criminal and Similar Areas of the Judiciary, Arts. 9, 14, 15), at 21; DI 1413–12 (Albán Dep. Tr.), at 31:25–32:2,

54:7–23.

FN1280. *See Morgan v. United States,* 304 U.S. 1, 19–20 (1938) (addressed below).

FN1281. 304 U.S. 1.

FN1282. *Id.* at 20.

FN1283. 470 F.Supp.2d 917 (S.D.Ind.2006).

FN1284. *United States v. Throckmorton,* 98 U.S. 61, 65, 25 L.Ed. 93 (1878).

FN1285. The Court recognizes that the parties referred to their respective nominated judicial inspection experts and others they hired as "independent" in certain public statements notwithstanding that those individuals had been selected and paid by those who selected them and sometimes interacted with the lawyers who engaged them. *See, e.g.,* Tr. (Reis Veiga) 107:4–109:8, Tr. (McMillen) 428:1–429:6; DX 1416 (Filing of A. Callejas). Those situations, however, were quite different from that of Cabrera, who was (1) court-appointed to be a single global expert rather than someone openly nominated by and working with one side or the other, (2) sworn to be independent and impartial, (3) to be paid only through an open court process. The representations and pretenses that Cabrera was "independent" therefore are not properly comparable to the manner in which the parties treated experts whom they openly had hired and who would have been regarded by any reasonable observer as partisan or, at least, beholden to the hiring party.

FN1286. 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

FN1287. The procedure, now unfamiliar, involved the filing in the court of appeals of a petition for leave to file a bill of review in the district court to set aside the decree that had been entered in the district court following the issuance of the court of appeals' mandate in the first case. 322 U.S. at 239.

FN1288. *Id.* at 245–47.

FN1289. *Id.* at 250.

FN1290. *Id.* at 251.

FN1291. PX 4300X (Callejas Direct) ¶ 50.

FN1292. *Id.* ¶¶ 47–60.

FN1293. *See* PX 3300 (McMillan Direct) ¶¶ 5–6, 33–60.

FN1294. *See* RESTATEMENT (SECOND) OF JUDGMENTS § 70 cmt. d (1982); *see also Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 421, 43 S.Ct. 458, 67 L.Ed. 719 (1923) ("[I]t must appear that the fraud charged really prevented the party complaining from making a full and fair defense"); *Marshall,* 141 U.S. at 596; *Lundborg v. Phoenix Leasing, Inc.,* 91 F.3d 265, 271 (1st Cir.1996) (due diligence; clear and convincing evidence); *Diaz v. Methodist Hosp.,* 46 F.3d 492, 497 (5th Cir.1995) (full and fair opportunity to present case); *Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 71 (2d Cir.1990) (due diligence and lack of fault on part of party attacking judgment); *Green v. Foley,* 856 F.2d 660, 665 (4th Cir.1988) (fully and fairly presenting case), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989).

The same considerations are pertinent in determining whether a judgment should be recognized or enforced, either offensively or by means of an affirmative defense, under the Uniform Act, which in New York is CPLR Article 53.

FN1295. The Court finds both the fraud and that Chevron has been diligent in discovering the fraud and attacking the Judgment by clear and convincing evidence. Indeed, the defendants do not suggest any lack of diligence by Chevron.

FN1296. 12 MOORE'S FEDERAL PRACTICE § 60.43[1][d] (3d ed.2012) (quoting *Lonsdorf v. Seefeldt,* 47 F.3d 893, 898 (7th Cir.1995)).

FN1297. RESTATEMENT (SECOND) OF JUDGMENTS § 70, cmt. b (1982).

FN1298. The Circuit wrote:

"We cannot doubt that the other judges who sat in the various cases acted honestly and with pure motives in joining in the decisions. No breath of suspicion has been directed against any of them and justly none could be. And for aught that now appears we may assume for present purposes that all of the cases in which Manton's action is alleged to have been corruptly secured were in fact rightly decided. But the unlawfulness of the conspiracy here in question is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it. *Judicial action, whether just or unjust, right or wrong, is not for sale; and if the rule shall ever be accepted that the cor-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

*rectness of judicial action taken for a price removes the stain of corruption and exonerates the judge, the event will mark the first step toward the abandonment of that imperative requisite of even-handed justice proclaimed by Chief Justice Marshall more than a century ago; that the judge must be 'perfectly and completely independent with nothing to influence or control him but God and his conscience.' "* United States v. Manton, 107 F.2d 834, 846 (2d Cir.1939) (emphasis added).

FN1299. *E.g., Ty Inc. v. Softbelly's Inc.,* 353 F.3d 528, 536–37 (7th Cir.2003); *Schultz v. Butcher,* 24 F.3d 626, 631 (4th Cir.1994); *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 924 n. 10 (1st Cir.1988); RESTATEMENT (SECOND) OF JUDGMENTS § 70, cmt c, d (1983) (party seeking relief must show either corruption of court or that fraud goes to a material matter and that party seeking relief had "a substantial case to present"); RESTATEMENT (FIRST) OF JUDGMENTS § 124, cmt. d (1942) ("It is of the essence of a fair trial that a judicial tribunal should have an uncorrupted mind and if it does not the trial is not fair even though it may be shown that the tribunal would have reached the same result had there been no corruption or duress. Thus where a party, although believing that he can prove his case, nevertheless out of excess of caution bribes a tribunal, equitable relief will be given against him even though, on the facts presented, the tribunal would have reached the same decision.").

FN1300. *Rozier v. Ford Motor Co.,* 573 F.2d 1332, 1339 (5th Cir.1978); *see Ty Inc.,* 353 F.3d at 536–37.

FN1301. *See* RESTATEMENT (SECOND)

OF JUDGMENTS § 70 cmt. d (1982); *see Greiner v. City of Champlin,* 152 F.3d 787, 789 (8th Cir.1998) (denying relief on ground of fraud consisting of alleged withholding of report that would have been cumulative); *see also Robinson v. Volkswagenwerk AG,* 56 F.3d 1268, 1274 n. 5 (10th Cir.1995) ( "[C]oncealment of material information by a party may justify a refusal to give preclusive effect to a judgment.") (emphasis added); *Standard Chlorine of Del., Inc. v. Sinibaldi,* 821 F.Supp. 232, 253 (D.Del.1992).

FN1302. *Morgan,* 304 U.S. at 20.

FN1303. This is especially obvious with respect to one of Chevron's most significant defenses, viz. that it was not liable because it never had operated in Ecuador and that there was no basis for holding it liable for any actions of Texaco—not a defendant in the Lago Agrio case—because Chevron did not succeed to Texaco liabilities by virtue of its indirect acquisition of its shares years after the events in question. Much of the portion of the Judgment rejecting Chevron's position was copied directly out of the Fusion Memo, part of the LAPs' unfiled work product. *Supra Facts* § IX.B. But it would have been true in any case because Chevron never was afforded any opportunity to respond directly to anything that was given to Zambrano *ex parte.*

FN1304. Camacho and Piaguaje, the LAP Representatives, are liable for the actions of Donziger, Fajardo, and the other Ecuadorian and U.S. lawyers for the LAPs, and Stratus and the other LAP experts, consultants, and advisers. Under New York law, a principal is liable for the acts of its agents, committed within the scope of their employment or actual or apparent authority. *E.g., American*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

*Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 566, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982); *Standard Sur. & Cas. Co. v. Plantsville Nat'l Bank,* 158 F.2d 422 (2d Cir.1946), *cert. denied,* 331 U.S. 812, 67 S.Ct. 1203, 91 L.Ed. 1831 (1947); *Gen. Overseas Films, Ltd. v. Robin Int'l, Inc.,* 542 F.Supp. 684, 687 (S.D.N.Y.1982), *aff'd* 718 F.2d 1085 (2d Cir.1983).

These defendants dispute their liability for the acts of their agents only under New York law and only on the theory that their awareness of Chevron's complaint and other claims of misconduct was insufficient to constitute ratification. DI 1858 (LAP Reps.' Post-trial Mem. of Law), at 15–17. There are two fundamental problems with the argument.

*First,* a principal is liable for the torts of an agent under New York law as long as the agent acted within the scope of the agent's actual or apparent authority. Ratification is immaterial except in the absence of actual or apparent authority. *E.g., Dover, Ltd. v. A.B. Watley, Inc.,* 423 F.Supp.2d 303, 318–19 (S.D.N.Y.2006) (mag.op.); RE-STATEMENT (THIRD) OF AGENCY §§ 7.03(1)(a), 7.04 (principal liable for torts of agent committed with actual authority or ratified by principal), 7.03(2)(b), 7.08 (principal liable for torts of agent committed with apparent authority). Moreover, an Ecuadorian law expert for Chevron explained, and this Court holds, that the law in Ecuador is the same. DI 1413–11 (Apr. 5, 2013 Velazquez Decl.), Ex. 92, Ann. B. ("According to rules of contractual and tort liability, the client is held liable for the actions of his agent, even when the client does not become aware of the agent's conduct until after it has occurred, if he

takes no action to reject it or, failing that, to withdraw the agency authorization and, even more so, if he benefits from such conduct.").

*Second,* the Court finds that these defendants knowingly ratified the misconduct, substantially for the reasons set forth by Chevron. DI 1847 (Chevron Corp. Post-trial Mem. of Law), at 254–56.

FN1305. The amended complaint states RICO claims also against Fajardo, Yanza, the ADF, Selva Viva, Stratus Consulting, Inc., Ann Maest, and Doug Beltman. *See* DI 283 (Am.Compl.) ¶ 1. Each of these other defendants either has settled or defaulted. Accordingly, this opinion deals with the RICO liability only of Donziger.

FN1306. *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 248–49, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

FN1307. *Id.* at 245–46.

FN1308. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 495 (1985) ("Section 1962 ... makes it unlawful for 'any person'—not just mobsters—to use money derived from a pattern of racketeering activity to invest in an enterprise, to acquire control of an enterprise through a pattern of racketeering activity, or to conduct an enterprise through a pattern of racketeering activity.") (emphasis added); *see also H.J. Inc., 492 U.S. at 247* (quoting 116 CONG. REC. 35204 (1970)).

FN1309. *Sedima,* 473 U.S. at 497–99 ("The fact that § 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

hardly a sufficient reason for assuming that the provision is being misconstrued.").

FN1310. *M.O.C.H.A. Soc'y Inc. v. City of Buffalo,* 689 F.3d 263, 277–78 (2d Cir.2012).

FN1311. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 491 (1985); *Cullen v. Margiotta,* 811 F.2d 6989, 731 (2d Cir.1987), *abrogated on other grounds, Agency Holding Co. v. Malley–Duff & Assocs., Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).

The Court has found certain facts that are common to the RICO and non-statutory claims by clear and convincing evidence. Nevertheless, the Court wishes to be clear that it makes no findings based on the "beyond a reasonable doubt" standard.

FN1312. *Compare Religious Tech. Ctr. v. Wollersheim,* 796 F.2d 1076, 1980–89 (9th Cir.1986) (reading legislative history of RICO statute as foreclosing injunctions for private plaintiffs), *with Nat'l Org. for Women, Inc. v. Scheidler,* 267 F.3d 687, 695–98 (7th Cir.2001) (hereinafter "*NOW* ") (ruling that RICO statute's text expressly provides for private injunctive relief), *overruled on other grounds sub nom. Scheidler v. Nat'l Org. for Women, Inc.,* 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003).

Circuits to have addressed the question in *dicta* likewise are divided. *Compare Johnson v. Collins Entm't Co.,* 199 F.3d 710, 726 (4th Cir.1999), *In re Fredeman Litig.,* 843 F.2d 821, 828–30 (5th Cir.1988) (suggesting injunctive relief unavailable), *with Bennett v. Berg,* 710 F.2d 1361, 1366 (8th Cir.1983) (McMillan, J., concurring) (suggesting injunctive

relief is available); *see also Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 848 (1st Cir.1990); *Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc.,* 262 F.3d 260, 267 n. 4 (4th Cir.1989) (noting controversy but expressing no opinion).

FN1313. *See, e.g., Trane Co. v. O'Connor Sec.,* 718 F.2d 26, 28–29 (2d Cir.1983) (expressing doubt in dicta about availability of injunctive relief for private plaintiffs).

FN1314. 267 F.3d 687 (7th Cir.2001).

FN1315. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 462, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are un-ambiguous, then, this first canon is also the last: 'judicial inquiry is complete.' ") (quoting *Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)).

FN1316. 18 U.S.C. § 1964(a).

FN1317. *Id.* § 1964(b).

FN1318. *Id.* § 1964(c).

FN1319. *See id.* § 1964(a), (b), (c).

FN1320. *NOW,* 267 F.3d at 696.

FN1321. *Rotella v. Wood,* 528 U.S. 549, 557, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000) (Congressional intent was to "encourag[e] civil litigation to supplement Government efforts to deter and penalize the ... prohibited

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

practices"); *see also NOW,* 267 F.3d at 698 (quoting *Rotella* and noting that "this role for civil RICO litigation" is "fully consistent" with the view that "the statute gives private citizens the ability to seek injunctive relief as well as damages").

FN1322. Pub.L. No. 91–452, § 904(a), 84 Stat. 947 (1970).

FN1323. *Sedima,* 473 U.S. at 491 n. 10.

FN1324. *S. New England Tel. Co. v. Global NAPs,* 624 F.3d 123, 135 (2d Cir.2010) ("Because we presume that 'Congress legislates against the backdrop of existing jurisdictional rules that apply unless Congress specifies otherwise, a clear statement from Congress is required before we conclude that a statute withdraws the original jurisdiction of the district courts ....'" (citations and internal quotation marks omitted)).

FN1325. U.S. CONST. art. III, § 2 (emphasis added).

FN1326. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 318, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) (quoting Judiciary Act of 1789, § 11, 1 Stat. 78).

FN1327. *Porter v. Warner Holding Co.,* 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946) (stating that the "comprehensiveness" of a court's "equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command"); *see also Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 291, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960) (holding that, where the statute provided that "the [d]istrict [c]ourts are given

jurisdiction ... 'for cause shown, to restrain violations' " of a statute, district courts have full equitable powers).

FN1328. 202 F.Supp.2d 239, 244 (S.D.N.Y.2002).

FN1329. 796 F.2d 1076.

FN1330. 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010).

FN1331. *See Chevron v. Donziger,* 871 F.Supp.2d at 239.

FN1332. *Morrison,* 130 S.Ct. at 2877 (quoting *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)).

FN1333. *Id.*

FN1334. *Id.* at 2878.

FN1335. *Morrison,* 130 S.Ct. at 2884.

FN1336. *Id.* (citation omitted).

FN1337. *Norex Petroleum Ltd. v. Access Indus., Inc.,* 631 F.3d 29, 32–33 (2d Cir.2010).

Although the Court adheres to *Norex,* it respectfully questions whether RICO's "silence" as to extraterritorial application, the basis for the *Norex* holding, correctly resolves the question whether Congress intended that RICO apply outside the territorial limits of the United States. As the Supreme Court observed in *Morrison,* its reliance on the presumption against extra-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

territorial application was not intended to impose a "clear statement" requirement, "if by that is meant a requirement that a statute say 'this law applies abroad,' " before it could be so applied. *See* 130 S.Ct. at 2883. "Assuredly, context can be consulted as well" in pursuit of statutory meaning and Congressional intent. *Id.*

Given RICO's heritage as a weapon of choice in prosecuting the Sicilian Mafia, *see, e.g., United States v. Casamento,* 887 F.2d 1141 (2d Cir.1989), and the more recent application of racketeering statutes to transnational drug and terrorism networks, *e.g., United States v. Leija–Sanchez,* 602 F.3d 797 (7th Cir.2010) (reversing dismissal of indictment charging murder of Mexican citizen under 18 U.S.C. § 1959 in Mexico where defendant paid for and arranged murder in United States); *United States v. Guzman Loera,* No. 3:12–cr–006849–FM1, Indictment [DI 1] ¶¶ 10–11 (W.D. Tex. filed Apr. 11, 2012), it seems likely that Congress intended it to have extraterritorial application. *See* Gideon Mark, *RICO's Extraterritoriality,* 50 AM. BUS. L.J. 543, 573–85 (2013) (hereinafter "*RICO's Extraterritoriality* ").

FN1338. *See United States v. Chao Fan Xu,* 706 F.3d 965, 975–79 (9th Cir.2013) (discussing the different approaches and holding that the proper focus is on the pattern of activity); *see also Mitsui O .S.K. Lines, Ltd. v. Seamaster Logistics, Inc.,* 871 F.Supp.2d 933, 938–40 (N.D.Cal.2012) (focusing on the enterprise); *Cedeño v. Intech Grp., Inc.,* 733 F.Supp.2d 471, 473 (S.D.N.Y.2010), *aff'd,* 457 F. App'x 35 (2d Cir.2012).

FN1339. *Chao Fan Xu,* 706 F.3d at 975–79;

*Chevron Corp. v. Donziger,* 871 F.Supp.2d at 245; *Hourani v. Mirtchev,* 943 F.Supp.2d 159, 165–66 (D.D.C.2013); *Borich v. BP, P.L.C.,* 904 F.Supp.2d 855, 862 (N.D.Ill.2012); *CGC Holding Co. v. Hutchens,* 824 F.Supp.2d 1193, 1209 (D.Colo.2011).

FN1340. *Chao Fan Xu,* 706 F.3d at 977–78; *Chevron Corp. v. Donziger,* 871 F.Supp.2d at 245–46; *see also RICO's Extraterritoriality,* 50 AM. BUS. L.J. at 595–603.

FN1341. *Chao Fan Xu,* 706 F.3d at 977–78; *accord Chevron Corp. v. Donziger,* 871 F.Supp.2d at 245–46.

Recognizing that a reviewing court might disagree and focus instead on the character of the enterprise, this Court finds that the character of the enterprise here at issue was predominantly domestic by any reasonable standard. The enterprise, as will appear, was essentially the LAP team, including Donziger and the LAPs' other lawyers (both U.S. and Ecuadorian), and its host of consultants, PR people, financiers, and advisors including Stratus, Beltman, Maest, Hinton, Lehane, Russell, Calmbacher, H5, and many others. With the exception of the handful of Ecuadorian lawyers, Yanza, and the two entities that he and Donziger controlled, virtually every member of the enterprise—and there were a great many—were American. The nerve center of the entire operation, *see Chao Fan Xu,* 706 F.3d at 976–77, was in New York City, where Donziger was based and, despite roughly monthly visits to Ecuador, spent most of his time. In any case, it was in the United States. This is where almost all of the important decisions were made, the location from which the Ecuadorian

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

lawyers were supervised (except when Donziger actually was in Ecuador), and the place from which the pressure campaign with all of its many different aspects was organized, supervised, and run.

FN1342. 18 U.S.C. § 1961(1).

FN1343. 631 F.3d 29 (2d Cir.2010); *see also Cedeño v. Castillo,* 457 F. App'x 35 (2d Cir.2012).

FN1344. *Chevron Corp. v. Donziger,* 871 F.Supp.2d 229, 240–42 (S.D.N.Y.2012).

FN1345. *Id.* at 240–41 (footnotes included in curly brackets).

FN1346. *Id.* at 244 (quoting *CGC Holding Co. v. Hutchens,* 824 F.Supp.2d 1193, 1209–10 (D.Colo.2011) (distinguishing *Norex* on the basis of pattern of racketeering activity in that case that occurred largely in the United States and was directed at U.S. victim)); *Aluminum Bahrain B.S. C. v. Alcoa Inc.,* Civ. Action No. 8–299, 2012 WL 2093997, at *2–4 (W.D.Pa. June 11, 2012) (distinguishing *Norex* on similar grounds).

FN1347. 706 F.3d 965.

FN1348. 706 F.3d at 972–74; *United States v. Xu Chaofan,* No. 2:02–cr–00674–PMP–LRL, Second Superseding Indictment [DI 151] ¶¶ 1–13 (D. Nev. filed Jan. 31, 2006).

FN1349. *Xu Chaofan,* No. 2:02–cr–00674–PMP–LRL [DI 151] ¶ 11.

FN1350. *Chao Fan Xu,* 706 F.3d at 975–78.

FN1351. *Id.* at 978.

This formulation conflates "pattern of racketeering activity," which is defined by statute as a pattern of acts indictable or chargeable under U.S. or state law, *see* 18 U.S.C. § 1961(1), and thus domestic in nature, with all of the defendants' alleged misconduct, whether domestic or foreign. Referring to the latter as "Defendants' pattern racketeering activity taken as a whole," while perfectly normal in ordinary conversation, can be confusing in this context.

FN1352. *Id.*

FN1353. *Id.* at 978–79.

FN1354. *Id.* at 979.

FN1355. *Jacobellis v. Ohio,* 378 U.S. 184, 197, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964) (concurring opinion).

FN1356. *Norex,* 631 F.3d at 33.

FN1357. *Sedima,* 473 U.S. at 496.

In a suit for damages for such a violation, the plaintiff would be obliged to prove "injury to [its] business or property ... caused by the violation of Section 1962." *Chevron v. Donziger,* 871 F.Supp.2d 229, 239 (S.D.N.Y.2012) (quoting *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 184 (2d Cir.2008)). Chevron at this point, however, seeks only equitable relief. The Court deals below with the proof required to entitle it to such relief,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

assuming proof of a violation of the statute.

FN1358. *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

FN1359. *Boyle v. United States,* 556 U.S. 938, 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009).

FN1360. *Turkette,* 452 U.S. at 583.

FN1361. *Id.* ("The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise.") (citation omitted).

FN1362. *Reves v. Ernst & Young,* 507 U.S. 170, 179, 183–84, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993) ("An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management.").

FN1363. *Id.* at 179 (emphasis added).

FN1364. *Baisch v. Gallina,* 346 F.3d 366, 376 (2d Cir.2003) (quoting *United States v. Diaz,* 176 F.3d 52, 93 (2d Cir.1999)).

FN1365. 18 U.S.C. § 1951(b)(2). The New

York Penal Law, upon which Chevron relies also for predicate act purposes, is to the same effect. N.Y. PENAL L. §§ 155.05(2)(e), 105.17, 110.00 (McKinney 2013).

The Hobbs Act makes it unlawful to attempt "in any way or degree," to "obstruct[ ], delay[ ], or affect[ ] commerce or the movement of any article or commodity in commerce, by ... extortion." 18 U.S.C. § 1951(a) "[I]t is well established that the burden of proving ... a nexus [with interstate or foreign commerce] is *'de minimis.'* " *United States v. Arena,* 180 F.3d 380, 389 (2d Cir.1999) (quoting *United States v. Farrish,* 122 F.3d 146, 148 (2d Cir.1997)). "[A]ny interference with or effect upon interstate [or foreign] commerce, whether slight, subtle or even potential ... is sufficient to uphold a prosecution under the Hobbs Act," *Jund v. Town of Hempstead,* 941 F.2d 1271, 1285 (2d Cir.1991), and proof of the defendants' intent to affect commerce is unnecessary where the interference is a natural consequence of the offense, *see United State v. Daley,* 564 F.2d 645, 649 (2d Cir.1977). The nexus with interstate and foreign commerce in this case is plain: the potential of a payment by Chevron to the LAPs. The commerce requirement is satisfied here, and the defendants do not claim otherwise.

FN1366. *Deck v. Engineered Laminates,* 349 F.3d 1253, 1258 (10th Cir.2003); *see also Vemco, Inc. v. Camardella,* 23 F.3d 129, 134 (6th Cir.1994) ("A threat of litigation if a party fails to fulfill even a fraudulent contract ... does not constitute extortion.").

FN1367. *Deck,* 349 F.3d at 1258.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

FN1368. *Viacom Int'l, Inc. v. Icahn,* 747 F.Supp. 205, 210 (S.D.N.Y.2010).

FN1369. *United States v. Jackson,* 180 F.3d 55, 70, *on reh'g,* 196 F.3d 383 (2d Cir.1999).

FN1370. *Id.,* 180 F.3d at 69–70.

FN1371. PX 1146 (July 2, 2009 Memorandum from "SRD" to "Kohn Team" re: "Activity Going Forward"), at 2 (emphasis added).

FN1372. PX 77A (June 13, 2007 *Crude* Clip). Donziger's comments in full:

> "We have to keep pushing on all fronts at all times. That simple. All fronts at all times; push, push, push. It's just a matter of force. It's pure force. Who can put the most pressure and who can resist. It's just like ... You know, all this bullshit about the law and facts, ... yeah, that factors into it, 'cause that affects the level of force. But in the end of the day it is about brute force; who can apply the pressure and who can withstand the pressure. And can you get them to the breaking point."

FN1373. PX 33A[S] (Mar. 3, 2007 *Crude* Clip), CRS–187–01–01.

FN1374. DI 1850 (Donziger Defs.' Post-trial Mem. of Law), at 71 (emphasis added).

FN1375. 180 F.3d 55 (2d Cir.1999).

FN1376. *Id.* at 70.

FN1377. *Id.* at 70–71.

FN1378. *United States v. Tobin,* 155 F.3d 636, 640 (3d Cir.1988) (Alito, J.).

FN1379. *Jackson,* 180 F.3d at 70–71.

FN1380. *Deck v. Engineered Laminates,* 349 F.3d 1253, 1258 (10th Cir.2003) (collecting cases and holding that "meritless litigation is not extortion" under Hobbs Act); *United States v. Pendergraft,* 297 F.3d 1198, 1205 (11th Cir.2002).

FN1381. *See* PX 1146 (July 2, 2009 Memo), at 2; PX 33A[S] (Mar. 3, 2007 *Crude* Clip), CRS187–01–01.

FN1382. That doctrine sharply restricted, on the basis of First Amendment considerations, antitrust liability based on litigation, lobby and petitioning of public agencies for allegedly anticompetitive purposes. *See generally* ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS (SIXTH) ) 292–94 (2007). Nevertheless, antitrust liability may be imposed for (1) "filing of baseless lawsuits or administrative actions not in order to prevail ... but to impede a competitor's ability to compete," (2) litigation "brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival," and (3) "intentional misrepresentations made to a judicial or administrative body" for anticompetitive purposes. *Id.* at 293–94. Accordingly, "activities of this sort have been held beyond the protection of *Noerr.*" *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n,* 663 F.2d 253, 263 (D.C.Cir.1981) (collecting cases); *see also Clipper Exxpress v. Rocky Mtn. Motor Tariff Bur., Inc.,* 690 F.2d 1240, 1261 (9th Cir.1982) ("In the adjudicatory sphere, ...

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

information supplied by the parties is relied on as accurate for decision making and dispute resolving. The supplying of fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve immunity" from liability).

FN1383. *Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 513, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (there are "many ... forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations" because "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process"); *see also R.A.V. v. City of St. Paul,* 505 U.S. 377, 420, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (Stevens, J., concurring) (while "the First Amendment broadly protects 'speech,' it does not protect the right to 'fix prices, breach contracts, make false warranties, place bets with bookies, threaten, [or] extort.' " (quoting Schauer, *Categories and the First Amendment: A Play in Three Acts,* 34 VAND. L.REV.. 265, 270 (1981)) (brackets in original)).

FN1384. *Fed. Prescription Serv.,* 663 F.2d at 263.

FN1385. 18 U.S.C. § 1951(b)(2).

FN1386. *See, e.g., United States v. Coppola,* 671 F.3d 220, 241 (2d Cir.2012) ("[T]he Hobbs Act 'leaves open the cause of the fear' inducing a party to consent to part with property and does not require that such fear be 'created by implicit or explicit threats.' ") (quoting *United States v. Gotti,* 459 F.3d 296, 333 (2d Cir.2006)).

FN1387. PX 1146 (July 2, 2009 Memorandum from "SRD" to "Kohn Team" re: "Activity Going Forward"), at 2.

FN1388. *See supra Facts* § III.B.1–2.

FN1389. *See, e.g.,* PX 6817 (Mar. 11, 2009 Email from S. Donziger to K. Hinton) ("do not change headlines ever without telling me"); PX 6814 (Dec. 3, 2009 Email from S. Donziger to K. Hinton) ("[w]hen I send a final copy of a press release for posting, the issue of the headline is settled. never change it at that point. tks."); PX 1214 (Jan. 27, 2010 Email from S. Donziger to S. Tegel, A. Soltani, K. Koenig, M. Anderson re: "another thought"), at 1 ("Suggestions are welcome for any press release we do; final editing authority is something we would never grant to any outsider—especially somebody not in a position to understand the art and feel of this campaign and its daily developments.").

FN1390. PX 931 (Oct. 29, 2007 Email from S. Donziger to C. Lehane re: "let's talk") ("Totally confidential, but Chevron is hurting and they have asked to go to mediation at end of November. We need to get more press and increase the pressure b/w now and then, to get the price up.").

FN1391. *See supra Facts* § III.C–D.

FN1392. PX 764 (Feb. 14, 2006 Ltr. from D. Russell to S. Donziger re "Cease and Desist"), at 1.

FN1393. *Id.*

FN1394. *Id.* at 2.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

FN1395. As noted above, the ADF uses the name the Amazon Defense Coalition. Although its press releases are issued under the latter name, we continue to use ADF to prevent confusion.

FN1396. *See, e.g.,* PX 477R (Sept. 13, 2006 Amazon Watch press release), at 1, 2, 3 ("[a]n independent expert has estimated a clean-up would cost $6.1 billion"); PX 480R (Oct. 30, 2006 Amazon Watch press release) at 2 (alleged contamination "would cost at least $6 billion to remediate"); PX 481R (Nov. 8, 2006 Amazon Watch press release) at 2 (Chevron's "Ecuador liability" was "estimated at $6 billion"); PX 482R (Nov. 15, 2006 Amazon Defense Coalition press release) at 1–2 ("Clean-up is estimated at $6 billion.").

FN1397. *See, e.g.,* PX 494R (Aug. 30, 2007 Amazon Defense Coalition press release) at 3 ("Global Environmental Services, an Atlanta-based company that assessed the damage, called the area the 'Rainforest Chernobyl' and estimated clean-up would cost at least $6 billion."); PX 483R (Mar. 6, 2007 Amazon Watch press release), at 2 (referencing an "independent damage assessment, by the U.S. firm Global Environmental Operations" that "estimates clean-up to cost at least $6.14 billion"); PX 485R (Mar. 20, 2007 Amazon Watch press release) at 2 (stating that an "independent damage assessment, by the U.S. firm Global Environmental Operations puts clean-up costs at $6.14 billion").

FN1398. *See supra Facts* § III.C–E.

FN1399. They were prepared by Donziger's associate, Aaron Marr Page, and his wife,

Daria Fisher. *See* DX 731 (Apr. 16, 2006 Email from S. Donziger to A. Page, D. Fisher re: "excellent work on remediation/questions"); *see also supra Facts* § III.F.

FN1400. PX 3240 (Apr. 20, 2006 Email from A. Page to S. Donziger re: "DOJ ltr").

FN1401. DX 731 (Apr. 16, 2006 Email from S. Donziger to A. Page, D. Fisher re: "excellent work on remediation/questions"), at 1 ("[W]ill releasing this now help with the SEC ... ?").

FN1402. *See supra Facts* § III.E.

FN1403. PX 527R (Oct. 22, 2009 Amazon Defense Coalition press release), at 2; *see* PX 533R (June 2, 2010 post, "The Chevron Pit"), at 3 ("Experts have concluded that the Chevron [sic] discharged at least 345 million gallons of pure crude oil directly into the rainforest ecosystem .... and approximately 11 million gallons of pure crude was spilled during the Exxon Valdez disaster."); PX 513R (Oct. 15, 2008 ChevronToxico post), at 2 ("All told, the amount of oil dumped in Ecuador by Texaco is at least thirty times greater than the amount spilled during the Exxon Valdez disaster, according to the plaintiffs in the civil suit."); *see also* PX 4400 (Kim Direct), at Attachments C & D (chart and timeline of "Donziger and/or Co–Conspirators' Use of '30 times Exxon Valdez' Claim").

FN1404. PX 861 (May 24, 2007 Email from A. Soltani to S. Donziger re: "exxon valdez 30x").

FN1405. PX 860 (May 24, 2007 Email from S. Donziger to S. Tegel re: "private").

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

FN1406. PX 931 (Oct. 29, 2007 Email from S. Donziger to C. Lehane re: "let's talk") ("Totally confidential, but Chevron is hurting and they have asked to go to mediation at end of November. We need to get more press and increase the pressure b/w now and then, to get the price up.").

FN1407. PX 861 (May 24, 2007 Email from A. Soltani to S. Donziger re: "exxon valdez 30x"); PX 764 (Feb. 14, 2006 Ltr. from D. Russell to S. Donziger re: "Cease and Desist"), at 1 (stating that the estimate was "too high by a substantial margin, perhaps by a factor of ten, or more").

FN1408. *See* PX 754 (Jan. 30, 2006 Amazon Watch Ltr. from A. Soltani and S. Aird to C. Cox); PX 497R (Mar. 18, 2008 Amazon Watch Ltr. from A. Soltani to C. Cox).

FN1409. PX 5801 (Nov. 17, 2008 Letter from T. DiNapoli to D. O'Reilly), at 1 ("It appears that Chevron's strategy remains that of denying responsibility for the contamination and, instead, protracting the legal proceedings. I question whether that strategy best serves the company and its shareholders.").

FN1410. This team included Hinton, Amazon Watch staffer Mitch Anderson, and LAP lobbyist Ben Barnes. PX 1048 (July 11, 2008 Email from K. Hinton to S. Donziger re: "Cuomo") ("I spoke with Andrew Cuomo this morning and told him about the lawsuit and the comptroller's office, etc. He said he would be helpful, if we gave him a good idea about how to do that. You should discuss with Patrick Doherty about how we might leverage Cuomo."); PX 7441 (Apr. 2, 2009

Email chain from S. Donziger to S. Martin, S. Moorhead, K. Caperton, M. Anderson, K. Koenig, and A. Soltani re: "draft ltr for Cuomo"); PX 1106 (Feb. 13, 2009 Email from S. Donziger to B. Barnes, S. Moorhead, P. Thomasson, and K. Hinton re: "DeNapoli info/instructions for Ben") ("Instructions: (1) That DiNapoli call Andrew Cuomo's office, or write a letter, requesting assistance on the Chevron disclosure matter to enable Cuomo to write a letter to Chevron seeking more information. The person to call is Steve Cohen, Cuomo's chief of staff."); PX 7426 (Feb. 9, 2008 Email from S. Donziger to M. Anderson, P. Paz y Mino, and K. Koenig re: "For Pat Doherty"), at 2 (touting $6 billion damages estimate and claiming that "[t]he amount of pure crude dumped is more than 30 times greater than that spilled during the Exxon Valdez disaster"); PX 7422 (Mar. 23, 2007 Email from K. Koenig to S. Alpern, J. Gresham, A. O'Meara, M. Rosenthal, P. Doherty, I. Lowe, T. Symonds, G. Wong, and S. Donziger re: "Ecuador Court Speeds Up Chevron's $6 Billion Amazon Trial Over Rainforest Contamination") (including press release referring to "only independent damage assessment" of $6 billion and discussing coordination for Chevron annual meeting).

FN1411. PX 5801 (Nov. 17, 2008 Letter from T. DiNapoli to D. O'Reilly), at 1; PX 1131 (May 4, 2009 letter from A. Cuomo to D. O'Reilly) (referring to Cabrera as "a technical expert [who] has estimated that ... damages assessed against Chevron may be as high as $27 billion").

FN1412. E.g., PX 7480 (May 2011 Investor Statement on Chevron and *Aguinda v. Texaco* ), at 1 ("We also call upon the Company to reevaluate whether endless litigation in the Aguinda case is the best strategy for the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

Company and its shareholders, or whether a more productive approach, such as reaching an equitable negotiated settlement, could be employed to protect shareholder investments and prevent any further reputational harm due to protracted litigation."); PX 5803 (May 25, 2011 press release, "DiNapoli to Chevron: Resolve Amazon Lawsuit, Standoff on Poor Ecological Record Bad for Business"); PX 7498 (May 25, 2012 press release, "NYS Pension Fund Renews Call for Chevron to Resolve Ecuador Lawsuit").

FN1413. PX 7490 (Sept. 26, 2011 Email from E. Sumberg, S. Thompson, P. Grannis, C. Calhoun, N. Groenwegen, B. Anastassiou, E. Evans re: "Huffington Post: What Chevron Owes the People of Lago Agrio").

FN1414. PX 7542 (May 25, 2009 Amazon Watch Ltr. to Shareholders), at 2; PX 5804 (May 26, 2011 Amazon Defense Coalition press release), at 1 ("New York State Comptroller Thomas DiNapoli, who manages $780 million in Chevron stock called on the company 'to face reality' and resolve the lawsuit, which is currently under appeal by both parties in Ecuador. 'The entire case is looming like a hammer over shareholders' heads. Investors don't derive any benefit from this never-ending courtroom drama.' ").

FN1415. *Tobin,* 155 F.3d 636 (finding extortionate campaign of harassment consisting, among other things, of threats to report the victim to Internal Revenue Service and threats to interfere with business by maligning reputation).

FN1416. PX 7537 (*Crude* Transcript, Theatrical Version), at 52.

FN1417. PX 172 (Donziger Notebook).

FN1418. PX 2373R (May 11, 2005 Email from S. Donziger to A. Wray, C. Bonifaz, J. Kohn, J. Bonifaz re: "sked conference call Monday at 10 a.m."), at 1–2; PX 170 (Donziger Notebook).

FN1419. PX 734 (Oct. 3, 2005 Email from S. Donziger to J. Kohn re: "Lehane's first press plan"), at 2.

FN1420. *Id.* at 2–3.

FN1421. *Id.* at 3–4.

FN1422. *See discussion supra Facts* § VI; *see also* PX 7537 (*Crude* Transcript, Theatrical Version), at 43 (Donziger: "Correa just said that anyone in the Ecuadorian government who approved the so-called remediation is now going to be subject to litigation in Ecuador. Those guys are shitting in their pants right now.").

Fajardo and Donziger lobbied the Prosecutor General's office as intently as they did the Office of the President. *See, e.g.,* PX 75A (June 8, 2007 *Crude* clip), at CRS376–03–CLIP01 (noting Correa's suggestion that "if we put in a little effort at the Public Prosecutors' office, the Attorney General will yield, and will re-open that investigation into the fraud of ... the contract between Texaco and the Ecuadorian Government"); PX 992 (Mar. 11, 2008 Email from P. Fajardo to S. Donziger re: "urgent that we speak about next week"), at 1 ("I have an appointment with the Prosecutor tomorrow morning, we are insisting that he reopen the criminal investigation against Texaco for the remedia-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

tion."); PX 1067 (Sept. 18, 2008 Email from P. Fajardo to J. Saenz, J. Prieto, S. Donziger, and others re: "Prosecutor's Case") ("the bread is almost ready to be taken out of the oven, but that's a good time to get burned ... Let's all do our best to make sure this action moves forward. I wonder if it's possible to put on more pressure at Court Monday or Tuesday").

FN1423. PX 8058 (July 18, 2010 Email from S. Donziger to J. Saenz, J. Prieto, and P. Fajardo). PX 169R (Donziger Notebook), at 41.

FN1424. PX 172 (Donziger Notebook), at 2.

FN1425. PX 172 (Donziger Notebook), at 2.

FN1426. PX 1103 (Feb. 4, 2009 Email from J. Saenz to S. Donziger, M. Garces, P. Fajardo, and others re: "Nuevo Boletin/importante"), at 3 ("The problem is that in Ecuador, our discourse has been that we haven't had ANYTHING to do with the process at the prosecutor general's office.... So, to publically [*sic* ] say that the discovery comes from one of our collaborators ties us in some way to the prosecutorial investigation. And we all agree that we don't want that to happen.").

FN1427. *Morrison,* 130 S.Ct. at 2884.

FN1428. *Sekhar v. United States,* ––– U.S. –––, –––, 133 S.Ct. 2720, 2726, 186 L.Ed.2d 794 (2013).

FN1429. 18 U.S.C.1951(a).

FN1430. 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003).

FN1431. 537 U.S. at 402.

FN1432. *Id.* at 405–06; *see also United States v. Gotti,* 459 F.3d 296, 323 (2d Cir.2006) ("We ... read *Scheidler II* as ... simply clarifying that before liability can attach, the defendant must truly have obtained (or, in the case of attempted extortion, sought to obtain) the property right in question.").

FN1433. *Gotti,* 459 F.3d at 324.

FN1434. 18 U.S.C. §§ 1341, 1343.

FN1435. *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 647, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008) (quoting *Schmuck v. United States,* 489 U.S. 705, 712, 715, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (alteration in original)); *United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (mails need only be "for the purpose of executing" the scheme) (quoting *Kann v. United States,* 323 U.S. 88, 94, 65 S.Ct. 148, 89 L.Ed. 88 (1944)).

FN1436. *See, e.g., United States v. Bortnovsky,* 879 F.2d 30, 39 (2d Cir.1989) (noting that "defendant need not actually intend, agree to or even know of a specific mailing to 'cause' mail to be sent as long as he or she 'does an act with knowledge that the use of mails will follow in the ordinary course of business, or where such can reasonably be foreseen' " (internal citations omitted)).

FN1437. *United States v. Walker,* 191 F.3d 326, 335 (2d Cir.1999); *see also United States v. Pierce,* 224 F.3d 158, 166 (2d Cir.2000) ("The wire fraud statute punishes

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

the scheme, not its success.") (quotation marks and brackets omitted).

FN1438. *O'Malley v. New York City Transit Auth.,* 896 F.2d 704, 706 (2d Cir.1990) (citations omitted).

FN1439. *Autuori,* 212 F.3d at 116 (quoting *United States v. Guadagna,* 183 F.3d 122, 129 (2d Cir.1999)).

FN1440. *Neder v. United States,* 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding materiality is an element of a "scheme or artifice to defraud" under the mail and wire fraud statutes).

FN1441. *Autuori,* 212 F.3d at 118 (quoting *United States v. Mittelstaedt,* 31 F.3d 1208, 1217 (2d Cir.1994)); *id.* ("[U]nder the mail fraud statute, it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." (internal quotation marks omitted)).

FN1442. *Pasquantino v. United States,* 544 U.S. 349, 371–72, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005) (citations omitted).

FN1443. Numerous emails were sent in furtherance of these schemes.

For example, the ghostwriting of the Cabrera Report by Stratus was coordinated through wire communications. *See, e.g.,* PX 2433 (Feb. 8, 2008 Email from D. Beltman to S. Donziger, A. Maest, P. Fajardo, J. Peers, B. Lazar), supervised by Donziger, PX 979 (Feb. 27, 2008 Email from S. Donziger to D. Beltman re: "Start

on report text; human tox annex"), translated into Spanish, PX 980 (Feb. 29, 2008 Email from D. Beltman to info@translatingspanish.com, and A. Maest re: "Ecuador Project"), sent to Ecuador, PX 1019 (Mar. 31, 2008 Email from S. Donziger tocriscadena @hotmail.com re: "table"), and revised by Donziger, PX 1018 (Mar. 30, 2008 Email from D. Beltman to S. Donziger re: "what do u think of this?"). So too were the attempts to conceal it. *See, e.g.,* PX 1315 (May 3, 2010 Email from S. Donziger to E. Westenberger, and others re: "Fajardo edits"); PX 1321 (May 4, 2010 Email from A. Wilson to S. Donziger, and others re: "Fajardo Declaration"); PX 2452 (May 5, 2010 Email from S. Donziger, and others re "aguinda litigation").

Other examples are the communications regarding the ghostwriting by Guerra of Zambrano orders and the early preparation by the LAP team for preparing the judgment. Fajardo kept Donziger apprised of the team's arrangements during Zambrano's first tenure on the case, PX 1751 (Oct. 27, 2009 Email from P. Fajardo to L. Yanza, S. Donziger re "News"), Donziger and Fajardo coordinated research assignments for the judgment, PX 11 37 (June 5, 2009 Email from P. Fajardo to S. Donziger re: "BRYAN"), and the two discussed case law and proposed arguments, PX 1141 (June 18, 2009 Email from P. Fajardo to S. Donziger and others re: "THIS IS THE MOST COMPLETE ONE").

"Each of these [wires] was an 'act which is indictable' as [wire] fraud...." *Bridge,* 553 U.S. at 648. They are not, moreover, a complete list of the wire communications in furtherance of these schemes. The rec-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

ord in this case is replete with other emails in furtherance of the schemes, including many cited elsewhere in this opinion. Still others are included in Appendix 1 to Chevron's Proposed Findings of Fact, although the exhibit is somewhat overinclusive. *See* DI 1848 (Chevron Corp. Proposed Findings of Fact), App'x 1.

FN1444. 18 U.S.C. § 1956.

FN1445. *Id.* § 1961(1).

FN1446. *Id.* § 1956(a)(2).

FN1447. *Id.* § 1956(b)(7)(A).

FN1448. *Id.* § 2(b).

FN1449. In Appendix 2 of its Proposed Findings of Fact, Chevron lists a number of wire transfers it asserts were money laundering. *See* DI 1848 (Chevron Corp. Proposed Findings of Fact), App'x 2. The Court need not find that each of these transfers constituted money laundering.

FN1450. PX 586 (Collection of Chase Bank statements for accounts referred to as "Law Firm Account" and "Ecuador Case Account"), at 3 (reflecting deposit of $1.75 million on March 23, 2007 from Gibraltar-based account); Donziger Jan. 18, 2011 Dep. Tr. at 3212:20–23 (acknowledging that "Russ DeLeon is someone [he] introduced to the Lago Agrio case as a source of financing").

FN1451. PX 846 (Mar. 29, 2007 Email from S. Donziger to R. DeLeon re: "Update memo"), at 1 (discussing deposit of DeLeon's funds); PX 586 (Collection of Chase Bank

statements for accounts referred to as "Law Firm Account" and "Ecuador Case Account"), at 3 (reflecting deposit of $1.75 million on March 23, 2007 from Gibraltar-based account and subsequent transfer to Kohn Swift & Graf).

FN1452. PX 585 (Summary of 2005–2013 Transfers to Selva Viva Acct. Ending 5004 from S. Donziger, Kohn Swift & Graf, and Foreign Entities), at 1, 2 (listing wire transfers from Kohn Swift & Graf to Selva Viva); PX 641 (June 12, 2009 Texaco–Ecuador Kohn Swift & Graf Expenses 1993 to May 31, 2009), at 2.

Kohn Swift & Graf identified the expenses for which DeLeon's funds were used in its record keeping. *See* PX 641 (June 12, 2009 Texaco–Ecuador Kohn Swift & Graf Expenses 1993 to May 31, 2009), at 2 (identifying "Investor's Expenses"). There is no evidence of any other investor during that period of the case.

FN1453. *See* PX 641 (June 12, 2009 Texaco–Ecuador Kohn Swift & Graf Expenses 1993 to May 31, 2009), at 2 (reflecting payments to Stratus and UBR between March 30, 2007 and November 30, 2007); PX 2430 (July 24, 2007 Ltr. From J. Kohn to V. Uhl reflecting payment to Uhl, Baron, Rana & Assocs.); PX 596 (Sept. 6, 2007 Ltr. From J. Kohn to V. Uhl reflecting payment to Uhl, Baron, Rana & Assocs.); PX 635 (Oct. 18, 2007 Ltr. From J. Kohn to V. Uhl reflecting payment to Uhl, Baron, Rana & Assocs.); PX 4900R (Dahlberg Direct) ¶ 122 (regarding payments to UBR and Villao).

S.D.N.Y.,2014.
Chevron Corp. v. Donziger

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)
**(Cite as: 2014 WL 815923 (S.D.N.Y.))**

--- F.Supp.2d ----, 2014 WL 815923 (S.D.N.Y.)


END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT E**

2001-1 Trade Cases P 73,166, RICO Bus.Disp.Guide 10,003

2001 WL 43780
United States District Court, E.D. Pennsylvania.

Dr. Michael J. CHOVANES,
v.
THOROUGHBRED RACING ASSOCIATION, et al.

No. CIV. A. 99-185. | Jan. 18, 2001.

Opinion

### MEMORANDUM

O'NEILL.

**\*1** The Complaint makes claims under RICO, the Lanham Act, and state law. Presently before me is defendants' motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). For the reasons stated below, the motion will be GRANTED.

## I. BACKGROUND

Plaintiff Dr. Michael J. Chovanes has practiced veterinary medicine at the Philadelphia Park Race Track since 1981. Complaint ¶ 5. Defendant Thoroughbred Racing Association ("TRA") is a horse racing trade organization that is financially supported by approximately one-half of the thoroughbred racetracks in the United States and Canada. *Id.* ¶ 12. Defendant Thoroughbred Racing Protective Bureau ("TRPB") is a private investigative agency affiliated with TRA that offers security and other services to the horse racing industry. *Id.* ¶ 13. Defendants Paul W. Berube and Lance T. Morrel are officers and/or employees of TRPB. [1] *Id.* ¶¶ 9 and 18. Defendant Dr. Deborah A. Mood is a also a veterinarian who practices at Philadelphia Park.

The complaint alleges that the TRPB defendants and Dr. Mood formed a relationship that is alternately referred to as a RICO enterprise and a RICO conspiracy with the dual goals of providing information to TRPB that could give it some kind of unspecified commercial advantage and promoting Dr. Mood's practice "by whatever means possible." *Id.* ¶¶ 39, 40. The complaint further alleges a series of events to illustrate the operation of this enterprise and/or conspiracy. The complaint makes claims under RICO (Counts I, II, III, IV, V, and VI), the Lanham Act (Count VIII), and state law (Counts VII, IX, X, and XI).

## II. DISCUSSION

### A. Standard of Review

A motion for judgment on the pleadings under Rule 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6). *See Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994); *Craigs, Inc. v. Gen. Elec. Capital Corp.,* 12 F.3d 686, 688 (7th Cir.1993); *Regalbuto v. City of Philadelphia,* 937 F.Supp. 374, 376 (E.D.Pa.1995). Judgment will be granted only if it is clearly established that no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law. *See Inst. for Scientific Info., Inc. v. Gordon and Breach, Science Publishers, Inc.,* 931 F.2d 1002, 1005 (3d Cir.1991). I must accept all well-plead factual allegations in the complaint as true, *Sheppard,* 18 F.3d at 150, and all inferences must be drawn in the light most favorable to the non-moving party. *See Janney Montgomery Scott v. Shepard Niles,* 11 F.3d 399, 406 (3d Cir.1993). However, I need not accept bald assertions, unwarranted inferences, or legal conclusions. *See Maio v. Atena, Inc.,* 221 F.3d 472, 485 n. 12 (3d Cir.2000); *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). "[C]ourts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable. We do draw on the allegations of the complaint, but in a realistic, rather than a slavish, manner." *City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir.1998).

### B. RICO Claims

**\*2** The RICO statute, 18 U.S.C. § 1961 et seq., makes it unlawful to: 1) conduct or participate, directly or indirectly, in an enterprise that engages in a pattern of racketeering activity; 2) derive income, directly or indirectly, from such an enterprise; or 3) conspire to conduct or derive income from such an enterprise. *See* 18 U.S.C. § 1962(c), (a) and (d). A RICO "enterprise" can be "virtually any de facto or de jure association." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 789 (3d Cir.1984). A "pattern of racketeering activity" is statutorily defined to "require[ ] at least two acts of racketeering activity." *See* 18 U.S.C. § 1961(5). Such activity includes mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and a long list of other specifically enumerated "predicate acts." *See* 18 U.S.C. § 1961(1); *Annulli v. Panikkar,* 200 F.3d 189, 200 (3d Cir.1999)

Case 2:12-cv-06371-SDW-MAH Document 89-1 Filed 03/31/14 Page 93 of 163 PageID: 2033
Giovannis v. Thoroughbred Racing Ass'n, Not Reported in F.Supp.2d (2001)
2001-1 Trade Cases P 73,166, RICO Bus.Disp.Guide 10,003

(noting that § 1961(1)'s "list of acts constituting predicate acts of racketeering is exhaustive."). RICO is primarily a criminal statute, but it provides treble damages for "any person injured in his business or property by reason of a violation of [the criminal provisions]." *See* 18 U.S.C. § 1964(d).

The complaint alleges violations of §§ 1962(a), (c), and (d). In order to state a claim for a violation of any of those provisions, plaintiff must adequately plead a pattern of racketeering activity, i.e., at least two predicate acts of racketeering. *See* 18 U.S.C. § 1961(5). The complaint alleges seven potential predicate acts. I conclude, however, that none of the seven qualify as an act of racketeering as defined in § 1961(1) and the RICO counts must therefore be dismissed. [2]

**1. The Mislabeled Blood Sample**

The first potential predicate act involves a mislabeled blood sample. The complaint alleges that in late 1996 or early 1997 Morrel and Dr. Mood deliberately mislabeled a blood sample sent to a testing lab, thereby "inventing a fictitious horse and trainer." Complaint ¶ 44. The complaint alleges that this act is "fraud" (*id.* ¶ 45) and the RICO Case Statement claims that it was "transmitted in whole or part by mail, courier, or wire." [3] *See* RICO Case Statement at 4. Since it is unclear to me how a blood sample could be transmitted by wire, I will assume that plaintiff is alleging a predicate act of mail fraud under 18 U.S.C. § 1341.

As such, the averments in the complaint fail under Fed.R.Civ.P. 9(b), which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." When the predicate acts in a RICO complaint sound in fraud, Rule 9(b) applies. *See Rose v. Bartle,* 871 F.2d 331, 356 n. 33 (3d Cir.1989). "Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place defendants on notice of the precise misconduct with which they are charged, and to safeguard against spurious charges of immoral and fraudulent behavior." *Seville,* 742 F.2d at 791. While a complaint need not set out "precise words," it should adequately describe the nature and subject of an alleged misrepresentation. *Id.*

Plaintiff's averments regarding the mislabeled blood sample fail the Rule 9(b) test in two respects. First, plaintiff does not adequately describe the blood sample at issue. Plaintiff does not state when this event happened (other than "late 1996 or early 1997"), which testing lab the blood was

sent to, or the name of the horse and/or trainer that was allegedly invented. Presumably sending blood to a testing lab is a routine act for a veterinarian. Without more precise pleading, defendants could not possibly distinguish between this allegedly fraudulent act and the other instances where Dr. Mood sent blood samples to labs during the period in question. Second, plaintiff does not adequately state "who received the [fraudulent] information." *See Saporito v. Combustion Eng'g,* 843 F.2d 666, 675 (3d Cir.1988), *cert. granted and judgment vacated on other grounds,* 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 576 (1989). Plaintiff merely claims that Morrel and Dr. Mood "made their representations with an intent to deceive and to induce *at least the testing lab* to act in reliance thereon to its detriment." Complaint ¶ 45 (emphasis added). However, it is unclear how a testing lab could ever "act in reliance" on a representation of which animal's blood it was testing. The use of the words "at least" make it more likely that the testing lab was not the intended victim of the alleged fraud, but that plaintiff is alluding to some other scheme or artifice. Such allusions are insufficient under Rule 9(b). Plaintiff's averments regarding the mislabeled blood sample therefore do not qualify as a predicate act of racketeering.

**2. Morrel's "Obstruction of Justice"**

**\*3** Sometime during 1997, the state Racing Commission allegedly conducted searches of veterinarians' offices at Philadelphia Park "to ensure that only federally approved medications are present." Complaint ¶ 49. Morrel allegedly stopped the officials from inspecting Dr. Mood's office by saying "[she is] under our protection." *Id.* ¶ 52. The complaint labels this act "obstruction of justice." *Id.* ¶ 56.

Obstruction is a predicate act of racketeering under the RICO statute. *See* 18 U.S.C. § 1961(1). However, it is unclear whether Morrel's alleged statement could be deemed "corrupt," a "threat or force," or a "threatening letter or communication" under the obstruction statute. *See* 18 U.S.C. § 1503. It is also unclear whether there is any federal nexus to the search that was allegedly impeded. Plaintiff avers that the search was "carried out under state and, it is believed, federal law" (complaint ¶ 48), but that reference seems to refer to the drugs at issue and not to the officials who conducted the search. It is clear, however, that plaintiff does not allege that the search involved "any grand or petit juror, or officer in or of any court of the United States." *See* 18 U.S.C. § 1503. As the Supreme Court has stated in construing § 1503: "The action taken by the accused must be with an intent to influence judicial or grand jury proceedings; it is not enough that there

Case 2:12-cv-06371-SDW-MAH Document 89-1 Filed 03/31/14 Page 94 of 163 PageID: 2034
Chavares v. Thoroughbred Racing Ass'n, Not Reported in F.Supp.2d (2001)
2001-1 Trade Cases P 73,166, RICO Bus.Disp.Guide 10,003

be an intent to influence some ancillary proceedings, such as an investigation independent of the court's or grand jury's authority." *United States v. Aguilar,* 515 U.S. 593, 599, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995). Assuming there was some federal nexus, at most the search may have been an administrative search that might fall under the ambit of 18 U.S.C. § 1505 (obstruction of proceedings before federal departments, agencies, and committees), which, although otherwise patterned after § 1503, is not a predicate act of racketeering under the RICO statute. *See* 18 U.S.C. § 1961(1); *Annulli,* 200 F.3d at 200 (noting that § 1961(1)'s "list of acts constituting predicate acts of racketeering is exhaustive.").

Therefore, even assuming a federal nexus, Morrel's "obstruction" of the search of Dr. Mood's office was not a predicate act of racketeering.

### 3. Dr. Mood's "Perjury"

**\*4** In 1997, Dr. Mood testified in *United States v. Patrick,* the criminal trial of Dr. Leonard Patrick, another veterinarian at Philadelphia Park. Complaint ¶¶ 61-63. On a post-trial motion, my colleague Judge Newcomer granted Dr. Patrick a new trial because the prosecution had failed to produce documents that could have been used to impeach Dr. Mood's credibility. *Id.* ¶¶ 64-65. *See also United States v. Patrick,* 985 F.Supp. 543, 563-64 (E.D.Pa.1997). The complaint labels Dr. Mood's testimony in that case "perjury." *Id.* ¶ 68. Assuming for the purposes of this motion that plaintiff's allegations of perjury are true, [4] I nonetheless conclude that perjury is not a predicate act of racketeering under the RICO statute.

I note from the outset that there is a split in authority as to whether perjury is a predicate act. *Compare Sellers v. General Motors Corp.,* 590 F.Supp. 502, 504-05 (E.D.Pa.1984) ("[T]he common-law absolute immunity for witnesses' testimony precludes perjury alone from amounting to the corrupt influencing, obstructing or impeding of the administration of justice for which a damage action may be maintained under RICO") *and Rand v. Anaconda-Ericsson, Inc.,* 623 F.Supp. 176, 182 (E.D.N.Y.1985) ("Perjury ... is not a RICO predicate act") *with C & W Constr. Co. v. Bhd. of Carpenters & Joiners of Am., Local 745,* 687 F.Supp. 1453, 1467 (D.Haw.1988) ("The more reasoned rule would allow perjury to be a predicate act under 18 U.S.C. § 1961(1), through 18 U.S.C. § 1503, where the plaintiffs allege that the perjury was part of the pattern of a racketeering activity"). I side with those courts who have held that perjury is not a predicate act for three reasons.

First, perjury is not listed as a predicate act under 18 U.S.C. § 1961(1). The maxim *expressio unius est exclusio alterius* counsels that the specific enumeration of numerous predicate acts in § 1961(1) necessarily excludes other acts that are not listed.

Second, the Court of Appeals' decision in *Annulli v. Panikkar,* 200 F.3d 189, 200 (3d Cir.1999), clearly states that § 1961(1)'s "list of acts constituting predicate acts of racketeering activity is exhaustive." The *Annulli* Court further stated that a judicial expansion of the list of predicate acts would "usurp the role of Congress" and unnecessarily add to the "behemoth" of civil RICO law. *Id.*

Finally, I am in substantial agreement with the view expressed by my colleague Judge VanArtsdalen in *Sellers,* which relied on the Supreme Court's decision in *Briscoe v. LaHue,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). In *Briscoe,* the Court held that a convicted state defendant could not bring a Section 1983 claim against a police officer who had given perjured testimony at the defendant's trial. The Court found that Section 1983 had not abrogated the "absolute immunity" from subsequent damage claims that the common law provided to witnesses who give testimony in judicial proceedings. *Id.* at 330. This absolute immunity was intended to protect against a fear of future litigation that might make witnesses reluctant to come forward to testify and/or lead to self-censorship. *Id.* at 333. In *Sellers,* Judge VanArtsdalen reasoned that recognizing perjury as a predicate act under RICO would be analogous to the cause of action for perjured testimony under Section 1983 that was rejected in *Briscoe. See Sellers,* 590 F.Supp. at 504-05. I agree that the two situations are analogous. However, Judge VanArtsdalen went on to say that common law immunity "precluded" perjury from being a RICO predicate act. *Id.* at 504. In my view, the RICO statute, or for that matter any other federal or state statute, could abrogate this common law immunity if there were a clear statement of the intent to abrogate it in the text or legislative history. No such clear statement exists in the RICO statute; therefore, Dr. Mood's alleged perjury is not a predicate act of racketeering activity. [5]

### 4. TRPB's "Violation" of the Hobbs Act

**\*5** In late 1996 or early 1997, during a period in which plaintiff had been suspended by the state Racing Commission and could practice only off the track premises in an adjacent property, Morrel allegedly told unspecified third-

parties that plaintiff "was of insufficient character to be associating or operating in any way in the vicinity of the racetrack." Complaint ¶¶ 72, 75, and 83. Remarkably, the complaint labels this conduct a violation of the Hobbs Act, 18 U.S.C. § 1951, a provision of the U.S.Code that deals with interference with interstate commerce by means of robbery or extortion.[6] *See generally Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 522-27 (3d Cir.1998) (discussing the Hobbs Act in the context of civil RICO). This characterization is completely unfounded. At worst, the complaint alleges garden-variety defamation and/ or commercial disparagement.[7] It does not plead any conduct that could reasonably be construed to constitute "robbery," "extortion," or "physical violence" as defined in the Hobbs Act.[8] *See* 18 U.S.C. § 1951(b)(1) and (b)(2).

### 5. TRPB's First "Mail Fraud"

Sometime in July or early August 1997, Dr. Mood allegedly told the TRPB defendants that plaintiff had killed a horse named Bleu Madura as part of an insurance fraud scheme. Complaint ¶ 96. Plaintiff alleges that the claim was false and Bleu Madura is alive. *Id.* ¶¶ 97, 104. The complaint labels this act "fraud" (*id.* ¶ 97) and "defamatory and libelous per se" (*id.* ¶ 98). However, the RICO Case Statement does not claim that it was a predicate act, and there is no allegation that Dr. Mood used the mail or wires in communicating the claim to TRPB.

However, on August 19, 1997, TRPB allegedly sent a letter "to numerous entities" that repeated Dr. Mood's claim about Bleu Madura. *Id.* ¶ 102. Plaintiff does not allege that TRPB knew the accusation was false. Rather, plaintiff alleges that "[p]rior to issuing its letter, TRPB failed to conduct any investigation of Mood's allegations, or to make any inquiry of the alleged participants of the insurance fraud scam as to its truth or falsity ... If TRPB had conducted even the most minimal investigation, it would have quickly discovered" that the allegation was false.[9] *Id.* ¶¶ 103-04. Plaintiff nonetheless labels this correspondence "mail fraud." *See* RICO Case Statement at 4.

The August 19th letter is not mail fraud for at least two reasons. First, plaintiff does not allege that TRPB made an intentional misrepresentation. At worst, TRPB is alleged to have acted negligently by failing to conduct an investigation of Mood's allegations. Therefore, it cannot be said that TRPB had the "specific intent to defraud" that is required by the mail fraud statute. *See United States v. Hannigan,* 27 F.3d 890, 892 (3d Cir.1994). There is no such thing as

negligent mail fraud.[10] Second, plaintiff attempts to collapse the distinction between defamation and fraud. Defamation is "[a]n intentional false communication, either published or publicly spoken, that injures another's reputation or good name." *Black's Law Dictionary* 288 (Abridged 6th ed.1991). Fraud is "[a]n intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right."[11] *Id.* at 455. Assuming for the purposes of this motion that plaintiff's allegations are true, TRPB defamed Dr. Chovanes by publishing an untrue allegation that was likely to injure him in his reputation and trade. However, the third parties who heard that defamatory falsehood were not induced to part with anything of value as a result. The victim of defamation is the person who is lied *about;* the victim of fraud is the person who is lied *to.*

Therefore, the August 19, 1997 letter was not a predicate act of mail fraud.

### 6. TRPB's Second "Mail Fraud"

**\*6** On August 26, 1997, TRPB sent a second letter regarding Bleu Madura. It stated in relevant part:

> By letter dated August 19, 1997, TRPB reported to you information confidentially received that the horse "Bleu Madura" was killed in an effort to collect on a fraudulent insurance claim.

> On August 25, the above information was discredited when TRPB was reliably advised that "Bleu Madura" is alive and is receiving treatment for the injuries previously alluded to. No death claim has been filed.

> TRPB regrets any inconvenience and alarm this report may have caused and we are properly embarrassed to have to issue this retraction. However, at the time (and even now) TRPB did not have any reason to question the authenticity of the information and thus we felt an obligation to pass it along to you.

*Id.* ¶ 112-13 (Exhibit C). Plaintiff characterizes this letter as a refusal to retract the allegation regarding Bleu Madura (*id.* ¶ 113) and claims it is another instance of mail fraud. *See* RICO Case Statement at 4.

However, characterizing this letter as a refusal to retract the allegation is disingenuous. Plaintiff focuses on the parenthetical in the final sentence and argues that if Berube

(the author of the letter) did not "question the authenticity" of the false information "even now," he must have been reaffirming the contents of the earlier letter. As plaintiff puts it, Berube had "in effect adopted [the allegations regarding Bleu Madura] once again." *Id.* ¶ 112. There is no doubt that the final sentence is poorly drafted. Berube seems to have meant that he had no reason to doubt the reliability of the source of the information, not the authenticity of the information itself. However, his imprecise wording does not negate the import of the remainder of the letter, which clearly and unequivocally states that: 1) it is a "retraction" of the August 19th letter; 2) the information in the August 19th letter had been "discredited"; and 3) Bleu Madura was alive and receiving treatment. *Id.* (Exhibit C).

Moreover, even if the August 26th letter could reasonably be construed as reaffirming the allegations regarding Bleu Madura, it still would not be mail fraud for the same reasons as the August 19th letter. Plaintiff does not allege that TRPB acted with the specific intent to defraud [12] and once again attempts to collapse the distinction between fraud and defamation. For these reasons, the August 26, 1997 letter is not a predicate act of mail fraud.

### 7. TRPB's "Wire Fraud"

Plaintiff labels the final potential predicate act as "wire fraud." However, it is unclear to me whether there is any "act" at issue. Rather, plaintiff constructs an "act" of wire fraud out of what might be called "syllogistic pleading."

The major premise of plaintiff's syllogism is that "the Conspiracy will not admit the horse [i.e., Bleu Madura] is alive and was not killed for insurance money or otherwise." *Id.* ¶ 132. The minor premise is that "the horse, Bleu Madura, was tattooed with TRPB's own [tattoo branding] system, touted by TRPB as 'the single most effective, secure, practical and economical method of horse identification available'." *Id.* ¶ 134. From these premises, plaintiff argues for the following conclusion:

> *7 The failure by the Conspiracy to act in accordance with TRPB's statements-transmitted by interstate wire and specifically the Internet at www.trpb.com/tatobrnd.htm-regarding the efficacy of the tattoo method means that: 1) either Berube is committing fraud when he refused, [sic] in sworn proceedings to

acknowledge the horse is alive; or, 2) the TRPB is committing fraud, via the interstate wires, when it promulgates false information about the tattoo method of identification.

*Id.* ¶ 137. The RICO Case Statement then refers to the TRPB defendants' website as "wire fraud." *See* RICO Case Statement at 4. This argument fails both as a matter of logic and as a matter of law.

As a matter of logic, plaintiff might have a valid argument if: 1) the TRPB defendants affirmatively continued to maintain that Bleu Madura is dead; 2) the TRPB defendants claimed that their tattoo branding system was perfect; *and* 3) the TRPB defendants were presented with a branded (and living) horse that they refused to acknowledge was, in fact, Bleu Madura. However, none of these conditions have been pled. As to # 1, plaintiff pleads that defendants "will not admit" that Bleu Madura is alive. Complaint ¶ 132. That is different than affirmatively claiming that the horse is dead. As to # 2, plaintiff pleads that the TRPB defendants call their branding system "the single most effective, secure, practical and economical method of horse identification available." *Id.* ¶ 134. That is different than saying the system is perfect or fool-proof. As to # 3, plaintiff pleads that "Berube has sworn that he has not attempted to determine if the horse is alive." *Id.* ¶ 133. That is different than claiming that the TRPB defendants attempted to determine whether Bleu Madura is alive but were lead into error because their tattoo branding system is faulty.

Moreover, assuming *arguendo* that plaintiff's syllogism was logically valid, his claim would still fail as a matter of law. If Berube was wrong in failing to admit under oath that Bleu Madura is still alive, then he may (though it is unlikely) have committed perjury but he certainly did not commit fraud (including mail fraud and wire fraud). If TRPB's website is inaccurate in its claims regarding the tattoo branding system, then it may be in violation of some consumer protection law, [13] but it certainly is not a "scheme or artifice to defraud" within the meaning of the wire fraud statute. *See* 18 U.S.C. § 1343.

Plaintiff has failed to adequately plead a single predicate act of racketeering activity; therefore, all of plaintiff's RICO claims will be dismissed.

### C. Lanham Act Claim

2001-1 Trade Cases P 73,166, RICO Bus.Disp.Guide 10,003

**\*8** Count VIII of the complaint asserts a claim under Section 43(a) of the Lanham Act, which provides in relevant part:

> Any person who, or in connection with any goods or services, or any container for goods, uses in commerce any word, term name, symbol, or device, or any combination thereof, or any false destination of origin, false or misleading description of fact, or false or misleading representation of fact, which ... in commercial advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. *See* 15 U.S.C. § 1125(a).

I conclude that plaintiff fails to state a claim for a violation of the Lanham Act because the statements complained of are not "commercial advertising or promotion" within the meaning of § 1125(a). The test of what constitutes commercial advertising or promotion was first enunciated by the Court of Appeals for the Fifth Circuit in *Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1384 (5th Cir.1996). Under the *Seven-Up* test, commercial advertising or promotion consists of: 1) commercial speech; 2) by a defendant who is in commercial competition with the plaintiff; 3) for the purpose of influencing consumers to buy the defendant's goods or services; and 4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry. *Id.* at 1384. The *Seven-Up* test has since been adopted by other circuit courts and by the courts of this District. *See Proctor & Gamble, Co. v. Haugen,* 222 F.3d 1262, 1273-74 (10th Cir.2000); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 735 (9th Cir.1999); *Peerless Heater Co. v. Mestek, Inc.,* No. 98-6532, 2000 WL 637082, at \*10 (E.D.Pa. May 11, 2000); *Synygy, Inc. v. Scott-Levin, Inc.,* 51 F.Supp.2d 570, 576 (E.D.Pa.1999); *J & M Turner, Inc. v. Applied Bolting Tech. Prods., Inc.,* No. 96-5819 & 95-2179, 1997 WL 83766, at \*16 (E.D.Pa. Feb.24, 1997); *Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assurance Co.,* No. 95-3997, 1995 WL 723186, at \*3 (E.D.Pa. Nov.14, 1995).

The statements at issue in this case fail the second and fourth prongs of the *Seven-Up* test: they were not disseminated by plaintiff's commercial competitors and/or were not sufficiently disseminated to the relevant purchasing public. Plaintiff complains of two sets of statements. The first are oral statements allegedly made by Morrel to unspecified third parties that accused plaintiff of having "insufficient character to be associating or operating in any way in the vicinity of the race track." Complaint ¶¶ 72, 75, and 83. The second are the allegations regarding the supposed murder of Bleu Madura that were made in Berube's letter of August 19, 1997. *Id.* ¶ 102 (Exhibit B). In both cases, the statements at issue were made by TRPB, which is not in the practice of veterinary medicine and therefore is not in commercial competition with plaintiff. [14] Moreover, in neither case does plaintiff sufficiently allege that the statements were disseminated to the relevant purchasing public. Plaintiff never alleges to whom the Morrel statements were disseminated, and the August 19, 1997 letter was clearly disseminated to insurance companies, not horse owners who might potentially retain plaintiff's services.

For these reasons, I conclude that the statements at issue were not commercial advertising or promotion and plaintiff has failed to state a claim for violation of the Lanham Act.

### D. State Law Claims

**\*9** Because the federal claims will be dismissed, I will not exercise jurisdiction over the state law claims in Counts VII, IX, X, and XI. [15] *See* 28 U.S.C. § 1367(c)(3).

### E. Leave to Amend

Fed.R.Civ.P. 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Plaintiff has not sought leave to amend the complaint. In previous cases, however, I have granted leave to amend *sua sponte* in RICO cases where I felt it was appropriate. *See, e.g., Smith v. Berg,* No. 99-2133, 1999 WL 1081065, at \*6 (E.D.Pa. Dec.1, 1999).

This case does not warrant leave to amend for two reasons. First, plaintiff had an opportunity to refine his complaint by filing a RICO Case Statement, which I considered in ruling on this motion. Second, leave to amend can be denied on the basis of undue delay, bad faith, dilatory motive, prejudice, and futility. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997). Granting leave to amend would be futile because plaintiff's claims are essentially state

Case 2:12-cv-06371-SDW-MAH Document 89-1 Filed 03/31/14 Page 98 of 163 PageID: 2038

Chovanes v. Thoroughbred Racing Ass'n, Not Reported in F.Supp.2d (2001)
2001-1 Trade Cases P 73,166, RICO Bus.Disp.Guide 10,003

claims for defamation and/or commercial disparagement that are not predicate acts of racketeering under RICO. Therefore, leave to amend will be denied.

### III. CONCLUSION

The complaint does not allege violations of RICO or the Lanham Act. At worst, plaintiff complains of garden-variety defamation and/or commercial disparagement that has no place in a federal forum absent some other basis for jurisdiction. The RICO statute, which serves a vital role in some situations, should not be used to federalize routine state matters or to award treble damages for injuries that could fairly be compensated through the tort system.

An appropriate Order follows.

### CIVIL ACTION

### *ORDER*

AND NOW, this day of January, 2001, after consideration of defendants' motion

for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c), and plaintiff's response thereto, and for the reasons contained in the accompanying memorandum, it is ORDERED that the motion is GRANTED. It is further ORDERED that:

1. Judgment is entered against plaintiff and in favor of defendants on Counts I, II, III, IV, V and VI (RICO) and Count VIII (Lanham Act); and

2. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over the state law claims in Counts VII, IX, X, and XI.

**Parallel Citations**

2001-1 Trade Cases P 73,166, RICO Bus.Disp.Guide 10,003

Footnotes

1   TRA, TRPB, Berube and Morrel will be collectively referred to as the "TRPB defendants."

2   Defendants also argue that plaintiff's claims fail the pattern, enterprise, and injury requirements of the RICO statute. Although those arguments likely have merit, I need not address them since the failure to sufficiently plead any predicate acts of racketeering activity justifies judgment on the pleadings.

3   The RICO Case Statement is a pleading that may be considered part of the operative complaint for the purposes of a motion to dismiss or a motion for judgment on the pleadings. *See Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413 (3d Cir.1993); *Smith v. Berg,* No. 99-2133, 1999 WL 1081065, at *3-*5 (E.D.Pa. Dec.1, 1999).

4   I note, however, that it is unlikely Dr. Mood's testimony constituted perjury. Judge Newcomer found that the prosecution had failed to produce documents that could have been used to impeach Dr. Mood on the issue of whether she had "ulterior motives" for testifying against Dr. Patrick. *See Patrick,* 985 F.Supp. at 563-64. Impeachment of a witness is commonplace, and an indictment or conviction for perjury based on a witnesses' stated lack of ill-motive would be unlikely.

5   Of course, there is some overlap between the perjury and obstruction statutes. *See United States v. Langella,* 776 F.2d 1078, 1082 (2d Cir.1985). It is therefore conceivable that in some circumstances an act of perjury could constitute a predicate act of racketeering by way of the obstruction statute. However, the Court of Appeals has held that the mere act of perjury, without something more, does not constitute obstruction. *See United States v. Rankin,* 870 F.2d 109, 111-12 (3d Cir.1989). Although the *Rankin* Court declined to determine "how much more than a perjurious act" is required to prove obstruction (*id.* at 122), I need not attempt such a determination because plaintiff has, at best, alleged mere perjury and has not argued that Dr. Mood endeavored to obstruct or impede "the due administration of justice" with her testimony. *See* 18 U.S.C. § 1503.

6   18 U.S.C. § 1951(a) provides: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires to so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both."

7   The plaintiff makes no claim for defamation or commercial disparagement.

8   Moreover, it is unclear whether Dr. Chovanes was engaged in interstate commerce as defined in 18 U.S.C. § 1951(b)(3).

9   I note that if the allegations in the complaint are true, Dr. Mood knew that the allegations regarding Bleu Madura were false but the TRPB defendants did not. This admission rebuts the inference that Dr. Mood and the TRPB defendants acted in concert and could

2001-1 Trade Cases P 73,166, RICO Bus.Disp.Guide 10,003

be fatal to the RICO enterprise and conspiracy claims. However, I need not reach this issue because those claims will be dismissed on other grounds.

10    The specific intent to defraud can be found where a defendant acted with reckless disregard of the truth. *See United States v. Boyer,* 694 F.2d 58 (3d Cir.1982). However, the mere failure to investigate a defamatory statement is not reckless disregard of the truth. *See St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact had serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity."). Plaintiff does not allege that TRPB had any doubts about the Bleu Madura allegations when the August 19th letter was written, and the August 25th letter (*see* discussion *infra* ) shows that TRPB subjectively believed the allegations to be true when the August 19th letter was written. *See* Complaint (Exhibit C).

11    Unlike common law fraud, actual reliance is not an element of mail fraud. *See United States v. Sanders,* 893 F.2d 133, 138 (7th Cir.1990). However, most courts now agree that reliance must be shown when mail fraud is a predicate act in a civil RICO case. *See Summit Properties, Inc. v. Hoechst Celanese Corp.,* 214 F.3d 556, 559 (5th Cir.2000); *Chisolm v. TranSouth Fin. Corp.,* 95 F.3d 331, 337 (4th Cir.1996); *Appletree Square I v. W.R. Grace & Co.,* 29 F.3d 1283, 1286 (8th Cir.1994); *Central Distribs. of Beer, Inc. v. Conn.,* 5 F.3d 181, 184 (6th Cir.1993); *Pelletier v. Zweifel,* 921 F.2d 1465, 1499-1500 (11th Cir.1991); *County of Suffolk v. Long Island Lighting Co.,* 907 F.2d 1295, 1311 (2d Cir.1990).

12    Plaintiff does claim that TRPB "acted at least recklessly in publishing" the August 25th letter. Complaint ¶ 113. However, at least in this context, arguably poor draftsmanship is not reckless behavior.

13    I note that it is unlikely that the TRPB website could even be deemed inaccurate. Plaintiff objects to the description of the tattoo branding system as "the single most effective, secure, practical and economical method of horse identification available today." *See* http:// www.trpb.com/tatobrnd.htm. Since the law is very tolerant of "puffing" in commercial advertising, it is unlikely that such vague language would ever be actionable. *Cf. U.S. Healthcare v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 926 (3d Cir.1990) ("This strikes us as the most innocuous kind of 'puffing,' common to advertising and presenting no danger of misleading the consuming public. Consequently, we find that no cause of action lies.").

14    Plaintiff also alleges that Dr. Mood, who is a veterinarian and therefore is a commercial competitor of plaintiff, first made the allegations regarding Bleu Madura to Morrel. *See* Complaint ¶ 96. However, a single "isolated, individualized, informal and oral" misrepresentation to someone who is not a potential client of plaintiff is not "commercial advertising or promotion." *Cf. Synygy,* 51 F.Supp.2d at 577.

15    Count X asks for a declaratory judgment that the horse Bleu Madura is still alive. The complaint does not state whether the claim arises under the federal or state Declaratory Judgment Act and the parties have argued the issue with reference to both federal and state law. By declining to exercise supplemental jurisdiction, I am construing the claim to arise under state law. However, even if it were a federal claim I would dismiss it. Some courts and commentators have suggested that courts in an exercise of their equitable powers can declare defamatory publications untrue so that a party may have an official vindication of their reputation even when monetary damages cannot be awarded. *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 772-74, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (White, J., concurring); Thomas Kane, *Malice, Lies and Videotape: Revisiting New York Times v. Sullivan in the Modern Age of Political Campaigns,* 30 Rutgers L.J. 755, 791-92 (1999). In my view, however, the Federal Declaratory Judgment Act is not an appropriate jurisdictional vehicle for having such a claim heard in federal court.

---

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

---

**EXHIBIT F**

2012 WL 3228681
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
D. New Jersey.

Dermot DESMOND, Plaintiff,

v.

Paul Eli SIEGEL and Globecon Group Holdings,
L.C.C. a/k/a "Starweaver", Defendants.

Civ. No. 10–5562 (DRD). | Aug. 6, 2012.

**Attorneys and Law Firms**

Cooper Levenson April Niedelman & Wagenheim, P.A.,
by: William J. Hughes, Jr., Esq., Mark A. Fiore, Esq.,
Atlantic City, NJ, Sullivan & Worcester LLP, by: Barry
S. Pollack, Esq., Joshua L. Solomon, Esq., Boston, MA,
for Plaintiff.

McCusker, Anselmi, Rosen & Carvelli, P.C., by: Bruce S.
Rosen, Esq., Kathleen A. Hirce, Esq., Florham Park, NJ,
for Defendants.

**Opinion**

### OPINION

DEBEVOISE, Senior District Judge.

**\*1** This matter arises out of a fictitious and crude website
about a well-known Irish entrepreneur. On October 27,
2010, Plaintiff Dermot Desmond filed a Complaint
against Defendants Paul Siegel and Globecon Group
Holdings, L.L.C.[1] setting forth claims of defamation,
defamation per se, false light, and intentional infliction of
emotional distress, and seeking compensatory and
punitive damages and injunctive relief.

On June 8, 2011, Mr. Desmond filed a Motion to Amend
the Complaint, along with a proposed Amended
Complaint adding claims of harassment under N.J.S.A.
2C:33–4, impersonation under N.J.S.A. 2C:21–17(a)(4),
New Jersey RICO, N.J.S.A. 2C:41–1 et seq., and Federal
RICO, 18 U.S.C. § 1961 et seq., and seeking injunctive
relief, restitution, and punitive and treble damages.
Defendants opposed the motion. On January 31, 2012,
Magistrate Judge Shipp filed a Letter Opinion and Order
granting Mr. Desmond's Motion to Amend the

Complaint.

Defendants now appeal Judge Shipp's January 31, 2012
Order. For the reasons set forth below, that Order is
AFFIRMED.

### I. BACKGROUND

In 1990, Mr. Siegel was employed at a company called
Daiwa Securities ("Daiwa"). After a mere seven months
at Daiwa, Mr. Siegel was terminated "for misconduct."
(Amend.Compl.¶ 13.) Specifically, on January 25, 1990,
"Mr. Siegel caused a letter to be sent to" Edward J.
Hammel, an employee of one of Daiwa's potential clients,
"filled with false material statements concerning the
status of [a] potential engagement." (*Id.* ¶ 14.) Mr. Siegel
"then embarked on a campaign of contacting more than
twenty people and entities in an effort to cause the failure
of the pertinent transaction on which Mr. Hammel was
working." (*Id.*)

On November 9, 1992, Mr. Siegel formed a corporation
called International Development Partners ("IDP"). In
June 1993, Mr. Siegel "materially misrepresented to
Thomas Lipcomb and Alan Alpern of Infosafe Systems,
Inc. ('Infosafe') that: (a) he had relationships of
confidence with significant venture fund managers; (b) he
had a significant following of individual clients who
could assist him in raising capital for Infosafe; (c) he had
recently effected a $25,000,000 transaction in connection
with a merger involving a publicly owned finance
company; (d) that prior clients owed him and had already
agreed to provide a minimum of $500,000 for his next
financing proposal; (e) he would prefer to make the
investment himself on a loan he would take; and (f) he
was in continuous contact with numerous principals and
managers of financial institutions that provided venture
capital for new technology firms." (*Id.* ¶ 16.) Then, in
June 1994, Mr. Siegel contacted Robert Nagel and
Charlton H. Calhoun of Infosafe "for the purpose of
harassing them and extorting concessions by Infosafe
through threats that otherwise Infosafe was 'history' and
would 'go down the drain.' " (*Id.* ¶ 17.)

On May 10, 1995, "an entity known as "Emergency
Medical Systems, Inc. ("EMS")" was formed in
Delaware." (*Id.* ¶ 18.) EMS's registration in New York
identified Mr. Siegel as the company's president. On
January 18, 1997, Mr. Siegel changed the company's
name to MediVault, Inc. At one point, Mr. Siegel
terminated David Hirsch's employment at MediVault and

Desmond v. Siegel, Slip Copy (2012)

"sent a threatening letter" to him "attempting to extort him into relinquishing his rights." (*Id.* ¶ 20.) In addition, Mr. Siegel "seized and reassigned to another employee an automobile that had been leased to Mr. Hirsch." (*Id.*) On August 13, 1998, Mr. Siegel "utilized bankruptcy proceedings to purchase MediVault's assets for himself ... while avoiding its liabilities." (*Id.* ¶ 20.)

**\*2** IDP was later restructured and, on September 9, 1999, changed its name to Starweaver, LLC. On August 7, 2000, Mr. Siegel registered Starweaver in New Jersey and identified himself as the company's Managing Partner and CEO. On March 12, 2001, Mr. Siegel registered Globecon in New York to "continue his 'Starweaver' operations."[2] (*Id.* ¶ 23.) Globecon is a company that "provide[s] professional development services for corporate and investment banking customers." (*Id.* ¶ 7.) The Amended Complaint sets forth several unsavory acts committed by Mr. Siegel through Globecon.

**A. Inflated Insurance Claims and Default on Promissory Note Arising out of 9/11 Attacks**
Through Globecon, Mr. Siegel purchased a number of insurance claims held by The Globecon Group Ltd. ("Old Globecon"), a bankrupt entity, against Hartford Financial Services Group ("Hartford") for "for the purported disruption" of Old Globecon's business operations arising out of the World Trade Center attacks of September 11, 2001. (*Id.* ¶ 24.) "Prior to the acquisition of these assets out of bankruptcy proceedings," Mr. Siegel knew that Old Globecon had suffered "minimal damage" as a result of the attacks and in fact "had suffered financial difficulties in the dot-com industry and faced insolvency before the events of September 11, 2001." (*Id.*)

Moreover, after acquiring Old Globecon's claims, Gerald Kramer, Old Globecon's former principal shareholder, told Mr. Siegel that Old Globecon's "insurance claims were worth only nominal amounts." (*Id.* ¶ 25.) However, Mr. Siegel submitted a vastly inflated insurance claim for $6.5 million, "of which $5.7 million was purportedly for business interruption and lost business that never occurred." (*Id.* ¶ 26.) When Hartford denied the claim, Mr. Siegel and a Globecon affiliate "filed fraudulent and frivolous litigation seeking purported damages to property, business income losses, and other losses in excess of $1,879,017." (*Id.*)

On December 22, 2003, Mr. Siegel and a Globecon affiliate "signed a promissory note acknowledging receipt of $100,000 from the Structured Employment Economic Development Corporation ("SEEDCO") in connection with the Lower Manhattan Small Business and Workforce Retention Project." (*Id.* ¶ 27.) According to the Amended Complaint, Mr. Siegel and Globecon never intended to perform under the note and consequently defaulted on it.

**B. Use of Forged Signatures in Litigation**
In April 2007, Mr. Siegel and Globecon "utilized a forged signature of a former employee, David Askin, to defend against litigation brought by him in the Supreme Court of the State of New York, New York County." (*Id.* ¶ 28.) Specifically, the Amended Complaint alleges that Mr. Siegel used a "facsimile cut-and-paste of Mr. Askin's signature on a document purportedly dated March 24, 2003" stating that he agreed to forego salary payments, although he neither signed any such document nor agreed to any such terms. (*Id.*) In doing so, Mr. Siegel "utilized a 'Microsoft' Paint' graphics software program on [his] computer to manipulate an electronic graphics image of Mr. Askin's signature."[3] (*Id.*)

**\*3** One month earlier, Mr. Siegel, though a Globecon affiliate, initiated a lawsuit against Norman Joyce, a former Globecon employee, "who had witnessed Siegel's forgery of Mr. Askin's signature and who provided Mr. Askin with evidence to that effect." (*Id.* ¶ 29.) According to the Amended Complaint, Mr. Siegel "forged the initials of Mr. Joyce on a purported attachment to a 2005 confidentiality agreement" to show that Mr. Joyce breached the terms of a restrictive covenant after leaving Globecon to work at Terrapin Financial Trading, which Mr. Siegel contended was a Globecon competitor. (*Id.*) Mr. Joyce never signed any such document. The Amended Complaint further alleges that Mr. Siegel thwarted business opportunities between Mr. Joyce and an entity known as "7city" by "plac[ing] several telephone calls and sen[ding] several threatening emails to 7city" claiming that "Mr. Joyce was bound to the forged restrictive covenant." (*Id.* ¶ 30.)

On April 9, 2007, in a third litigation, Mr. Siegel allegedly "used and relied on a forged signature of Patrick Pancoast on a restrictive covenant agreement that Mr. Pancoast in fact did not sign ... to facilitate demands for payment from Mr. Pantcoast's subsequent employer and later from" Mr. Desmond. (*Id.* ¶ 31.)

**C. Impersonation of Others**
In December 2009, Mr. Siegel and Globecon created fake email addresses for Fernando Botargues and Kenneth Loso—two individual to whom Mr. Siegel and Globecon owed money—and fake websites for Mr. Botargues, Mr. Loso, and their business entities that provided links to

pornographic material. These websites "referred to Mr. Botargues as a 'sickening a—hole, the 'biggest world class a—hole,' an 'incontinent gay Chihuahua that sh—on your carpet and can't be trained to do otherwise.' " (*Id.* ¶ 32.)

**D. Obstruction of Justice**

On August 21, 2008, Mr. Siegel and Globecon "filed a petition in the United States Tax Court in which he originally blamed Globecon's former bookkeeper for having failed to file its taxes." (*Id.* ¶ 33.) In connection with Globecon's failure to file its taxes, Mr. Siegel "lodged various complaints against IRS Agent Reubel, including assertions that Agent Reubel was acting out of personal animus and was not qualified to handle the case." (*Id.*)

Shortly before a trial on the matter, Mr. Siegel faxed to the IRS a signed stipulation to the IRS's determination of the amount that Globecon owed in taxes, but "intentionally delayed final resolution of the proceedings by failing to return the original copy of the stipulation as he was supposed to do" and "thereafter remained unresponsive." (*Id.*)

**E. Dealings with Mr. Desmond**

*i. Attempted Extortion of Mr. Desmond*

On June 15, 2010, Mr. Siegel, through Globecon, sent a letter to Mr. Desmond, via fax, from New Jersey to Ireland, stating that one of Mr. Desmond's companies, Intuition Publishing, "has perpetrated a multimillion dollar theft and is now illegally using [Globecon's] company's intellectual property." (Rosen Cert., Ex. C.) The letter referred to "many undisputed facts" to support this claim. (*Id.*) The letter goes on to say that "while I am not a speck as successful or powerful as you, I wager I am certainly one of the most tenacious people you would ever meet. Thus, my character requires me to achieve a just resolution on my own terms if I do not hear from you further." (*Id.*) The letter seeks to "resolve ... [the] unfortunate situation[ ] in a reasonable manner," but notes that "immoral and unethical business practice will logically lead to ruin," and that "that is not something that you are I desire regardless of the potential reward." (*Id.*)

**\*4** On June 18, 2010, Mr. Desmond sent a letter to Mr. Siegel in response to the June 15, 2010 letter. *See* (Rosen Cert., Ex. D.) Mr. Desmond's letter stated the following:

Your allegations are wholly defamatory and unfounded

and have been previously dismissed in court. Our investigations show you have extorted money from a long list of victims, employees, creditors and the local and Federal Government. Nothing you say is credible in any forum.

If you repeat any of the allegations in your fax I will sue you personally and see that the full range of your criminal activities are exposed. You will then understand the meaning of the word tenacity.

(*Id.*)

On June 23, 2010—apparently before receiving Mr. Desmond's June 18, 2010 letter—Mr. Siegel sent a second letter to Mr. Desmond, via fax, offering "additional factual data" in support of his claim that Intuition stole Globecon's intellectual property.[4] (Rosen Cert., Ex. E.) Mr. Siegel concluded the letter by saying that he "look[ed] forward to a fair commercial arrangement to resolve this matter." (*Id.*)

On July 2, 2010, Mr. Siegel sent a third letter to Mr. Desmond, via fax, calling Mr. Desmond's June 18, 2010 letter "outrageous and defamatory" and "demonstrate[ing] a weakness of personality and character." (Rosen Cert., Ex. F.) The letter maintains that the tone of Mr. Desmond's letter "is exactly that of [the] rapist who blames the rape victim for the rape" and states that "when the facts of your financial rape and copyright theft are in the open there will be little denying it ... light will truly be the best disinfectant." (*Id.*) The letter concludes by stating that "[i]f you cannot gather the courage to act like a man then you will do as you want, as will we." (*Id.*) According to the Amended Complaint, this language "expressly and impliedly indicated that [Mr. Siegel and Globecon] would subject [Mr. Siegel] to public assertions of 'financial rape,' 'theft,' and the like, as well as other firms of public ridicule." (Amend.Compl.¶ 37.)

*ii. meetdermotdesmond.com*

On October 16, 2010, Mr. Siegel and Globecon anonymously[5] launched the website meetdermotdesmond.com, which contains "numerous harassing and abusive statements."[6] (*Id.* ¶ 42.) Shortly after it was clear that the site was attributable to them, *see* Note 5, "Siegel and Globecon made several of the internal links of the meetdermondesmond.com website accessible only by use of a password." (Amend.Compl.¶ 41.) However, the homepage that was still available to any internet user "containe[d] a heading of 'Tax Evasion' " and displayed a picture of Mr. Desmond and a business associate playing golf "bearing the caption 'pickpocket,' "

going onto state that " 'if you play golf with Dermot, as our unwitting dupe in the blue at the right did, you better check your pockets closely' and '[a]s a punter in his heart, Wee Dermot grew to a man and learned "don't pay for anything you can get by pinching someone's pocket." So pinch he did."[7] (*Id.* ¶¶ 45(a), (b).) The homepage also stated that " 'public ridicule' was good for [Mr. Desmond] because his 'chromosomes and breeding may drive' him 'in the exact opposite direction' of being 'legal.' " (*Id.*)

**\*5** The internal links that Mr. Siegel and Globecon made password protected[8] contained "harassing and abusive statements" (*id* . ¶ 41), including accusations that Mr. Desmond committed crimes and associated with criminals and child molesters, and attacks on his family along with links to sexually explicit content. The site also "falsely impersonates" Mr. Desmond by making "many of the statements on it falsely purport to be [his] own words" and linking to a blog "that [Mr. Desmond] supposedly authored (but did not)."[9] (*Id.* ¶ 43.)

The site also (1) refers to Mr. Desmond as "a rapist" and encourages visitors to " '[c]ontact my hardened criminal friends' who are stated to be 'hardened criminals, murders, and pederasts' " (*id.* ¶ 45(c)); (2) lists Mr. Desmond's " 'role models,' which include Oliver O'Grady (a former Catholic priest who allegedly 'raped molested and abused many children in California'), Colonel Thomas Blood (an alleged thief, would-be kidnapper and murderer) and 'Tiger' Roche (an alleged thief and murderer)" (*id.* ¶ 45(d)); (3) accuses Mr. Desmond of sodomy and quotes "his 'closest friend' " as saying: " 'Once a bugger, always a bugger-er' " (*id.* ¶ 45(e)); (4) portrays Mr. Desmond as saying " '[m]y grandmother's teeth were as tight as the cheeks on this fellow's butt' " and provides a link "to an unknown user's Facebook page, showing a photograph of a man exposing his naked buttocks" (*id.* ¶ 45(f)); and (5) state that Mr. Desmond is " 'London City's Biggest Crook' "[10] (*id.* ¶ 48).

Finally, the site contained a link to a page entitled "Contact Dermot." That page lists Mr. Dermot's address, phone number, and business email, and states that, in exchange for money, Mr. Desmond "will buy members of the public an obscene tee-shirt" that "portray[s] ... an Irish stereotype." (*Id.* ¶ 45(h).)

### F. Magistrate Judge Shipp's Opinion Granting Mr. Desmond's Motion to Amend
Based on the aforementioned allegations, Judge Shipp granted Mr. Desmond's Motion to Amend the Complaint

to add claims for harassment and impersonation under federal and New Jersey law, as well as federal and New Jersey RICO claims. In doing so, Judge Shipp noted that while Mr. Desmond's "factual allegations" in support of his RICO claims "are [not] particularly strong," in light of RICO's "exceptionally broad" reach and the Third Circuit's 'particularly liberal approach in favor of permitting pleading amendments,' " Mr. Desmond's RICO claims are "sufficiently well-grounded" to be deemed "not a frivolous pursuit." (Opinion, January 31, 2012, [ECF No. 70], 6–7.)

## II. DISCUSSION

Defendants now appeal Judge Shipp's Order granting Mr. Desmond's Motion to Amend the Complaint to add federal and New Jersey RICO claims. In doing so, they argue that Mr. Desmond (1) lacks RICO standing; (2) fails to plead a RICO enterprise; and (3) fails to plead a pattern of racketeering activity.[11]

### A. Standard of Review
**\*6** A Magistrate Judge's decision is to be overturned only to the extent that the ruling is "clearly erroneous or contrary to law." L.Civ.R.72.1(c)(1)(A). The burden of showing that a ruling is "clearly erroneous or contrary to law rests with the party filing the appeal." *Marks v. Struble,* 347 F.Supp.2d 136, 149 (D.N.J.2004). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Dome Petroleum Ltd. v. Employers Mut. Liab. Ins. Co.,* 131 F.R.D. 63, 65 (D.N.J.1990) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948)). "A ruling is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law." *Pharmaceutical Sales and Consulting Corp. v. J.W.S. Delavau Co., Inc.* 106 F.Supp.2d 761, 764 (D.N.J.2000).

A Magistrate Judge's decision granting leave to amend a complaint is given a high level of deference, as "leave should be 'freely given when justice so requires.' " *Winer Family Trust v. Queen,* 503 F.3d 319, 330 (3d Cir.2007) (quoting *Fed.R.Civ.P.* 15(a)). However, "a District Court may deny leave to amend on the grounds that amendment would cause undue delay or prejudice, or that amendment would be futile." *Id.* at 331–32 (quotation omitted). "[A]n amendment would be futile when the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re NAHC, Inc. Secs. Litig.,* 306 F.3d

Desmond v. Siegel, Slip Copy (2012)

1314, 1332 (3d Cir.2002) (quotation omitted). Accordingly, the allegations in the complaint must be enough to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "The District Court determines futility by taking all pleaded allegations as true and viewing them in a light most favorable to the plaintiff." *Winer Family Trust,* 503 F.3d at 331.

**B. Mr. Desmond's RICO Claims**
18 U.S.C. § 1962(c) provides that "[i]t shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1964(c) provides a private right of action to those who are "injured in [their] business or property by reason of a violation of" 18 U.S.C. § 1962. "To plead a RICO claim under § 1962(c), the plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 362 (3d Cir.2010) (quotation and citation omitted). Similarly, "[t]he gravamen of a New Jersey Jersey RICO violation, frequently referred to as 'racketeering,' is the involvement in the affairs of an enterprise through a pattern of racketeering activity." *State v. Ball,* 141 N.J. 142, 155 (1995).

**\*7** Defendants argue that Mr. Desmond (1) lacks standing under the federal and New Jersey RICO statutes; (2) fails to plead a RICO enterprise; and (3) fails to plead a pattern of racketeering activity. The Court will address each argument in turn.

*i. RICO Standing*
For a party to have standing to bring RICO claims under 18 U.S.C. § 1964(c), he must show that (1) he "suffered an injury to business or property"; and (2) his "injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962." *Maio v. Aetna,* 221 F.3d 472, 483 (3d Cir.2000) (citations omitted). "[T]he injury to business or property element of section 1964(c) can be satisfied by allegations and proof of actual monetary loss, i.e., an out-of-pocket loss." *Id.* (citations omitted). Similarly, "[i]n order to establish standing to institute a civil action under NJRICO, it must be shown that plaintiff's harm was proximately caused by the NJRICO predicate acts alleged, *i.e.,* that there was a direct relationship between plaintiff's injury and defendant's conduct." *Franklin Med. Assocs. v. Newark Public Schs.,* 362 N.J.Super. 494, 514

(App.Div.2003) (quotation omitted). "This requires a showing not only that the offender's alleged NJRICO violation was the 'but for' cause of the plaintiff's injury, but also that the violation was the proximate cause." *Id.* (citation omitted).

The Amended Complaint alleges that, "[a]s a direct and proximate result of these racketeering activities by Siegel and Globecon, Plaintiff has suffered costs to remediate harm and attorneys' fees," and that he "suffered economic losses in the hundreds of thousands of dollars engaging in remedial action to investigate and block criminal conduct by Siegel and Globecon and to remove their illegal website." (Amend.Compl.¶¶ 51, 64, 69.) Costs associated with remediating or taking legal action against RICO conduct amount to an "out-of-pocket loss" that is actionable under RICO. *See Weiss v. First Unum Life Ins. Co.,* 482 F.3d 254, 258 n. 2 (3d Cir.2007) (losses from sale of home and personal property to remediate harm and payment of IRS fees and penalties arising from defendant's racketeering scheme involving illegal policy of rejecting long-term disability benefits "were out-of-pocket expenses ... and thus qualify as an injury to property for RICO purposes"); *Walter v. Palisades Collection, LLC,* 480 F.Supp.2d 797, 804 (E.D.Pa.2007) ("[P]ayment of legal fees can be actionable injuries under RICO."); *Pappa v. Unum Life Ins. Co. of Am.,* 2008 WL 744820, at \*9 (M.D.Pa.2008) (payment of legal fees is an injury "proper to a RICO claim."). Indeed, as Mr. Desmond notes in his brief, "if a RICO enterprise member threatened to shoot someone unless he paid monthly sums, the victim's costs incurred for medical expenses or in hiring a bodyguard pose just as much of an out-of-pocket loss as would paying the extorted sum." (Pl.Br.13–14.)

**\*8** The Amended Complaint also satisfies the but for and proximate cause elements of RICO standing, as it makes clear that Mr. Desmond's remedial expenses arose out of Defendants' attempted extortion and subsequent harassment campaign through meetdermotdesmond.com and dermotdesmond666@gmail.com. *See Weiss,* 482 F.3d at 258 n. 2 (a plaintiff need show "out-of-pocket expenses fairly traceable to [the defendant's] conduct" to satisfy the elements of RICO standing). Consequently, Mr. Desmond has satisfied the elements of federal and New Jersey RICO standing.

*ii. RICO Enterprise*
Under the federal RICO statute, an "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §

Desmond v. Siegel, Slip Copy (2012)

1961(4). A RICO enterprise under the New Jersey RICO statute is analyzed in the same manner as a federal RICO enterprise. *See Ball,* 141 N.J. 156–161 (noting the New Jersey Supreme Court's "understanding of the term 'enterprise' is derived from the extensive legislative history and decisional law dealing with both the State and federal RICO statutes" and that a New Jersey RICO enterprise "is framed broadly to include any group of persons 'associated in fact.' ").

The Supreme Court has made clear that (1) "an enterprise 'is an entity separate and apart from the pattern of activity in which it engages,' " *Boyle v. United States,* 556 U.S. 938, 954 (quoting *United States v. Turkette,* 452 U.S. 576, 583 (1981)); and (2) that a RICO defendant must be a person that is legally distinct from the alleged RICO enterprise. *See Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001) ("[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.").

The Amended Complaint alleges that "Siegel, Globecon, Starweaver, [IDP,] and Medivault have been associated-in-fact in an enterprise (the 'Starweaver–Globecon Enterprise')." (Amend.Compl.¶¶ 7, 67.) "[A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Boyle,* 556 U.S. at 948. Accordingly, "an association-infact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."[12] *Id.* at 946.

The Amended Complaint sets forth the features of an association-in-fact enterprise. Specifically, the allegation that Mr. Siegel and Globecon used the Starweaver–Globecon Enterprise "to gain unfair advantage over other parties" and avoid various business obligations through threats and intimidation, (Amend.Compl.¶ 34), satisfies the purpose requirement. And the allegation that, since January 18, 1997, Mr. Siegel and Globecon "engaged in a pattern of unlawful conduct through a network of corporate entities that [Mr. Siegel] formed," (*id.* ¶¶ 11, 66), namely IDP, Starweaver, MediVault, and Globecon, satisfies the relationship and longevity requirements.[13] This allegation also satisfies the separateness requirement between a RICO defendant and a RICO enterprise. *See Cedric Kushner Promotions,* 533 U.S. at 163 (unanimous decision rejecting limitation that president and sole shareholder of a company is not distinct "person" from wholly-owned company "enterprise" because "[t]he corporate owner/employee, a natural person, is distinct

from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that."). Thus, the Amended Complaint successfully pleads a RICO enterprise.

### iii. Pattern of Racketeering Activity
**\*9** Under federal RICO, "[r]acketeering activity" is "any act or threat involving" a variety of criminal activity, including extortion, mail fraud, and wire fraud, as the Amended Complaint alleges. 18 U.S.C. § 1961(1). "A 'pattern of racketeering activity' is defined as 'requir[ing] at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity .' " *Bergrin,* 650 F.3d at 266–67 (quoting 18 U.S.C. § 1961(5)). "It is the 'person' charged with the racketeering offense—not the entire enterprise-who must engage in the 'pattern of racketeering activity.' " *Id.* at 267 (citing *H.J., Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 244 (1989)).

Similarly, under New Jersey RICO, "racketeering activity" includes a number of crimes alleged in the Amended Complaint under New Jersey law, such as extortion, forgery, and impersonation. N.J.S.A. 2C:41–1a. A "pattern of racketeering activity" requires (1) "[e]ngaging in at least two incidents of racketeering conduct ... the last of which shall have occurred within 10 years ... after a prior incident of racketeering activity;" and (2) "A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J.S.A. 2C:41–1d.

With respect to Mr. Desmond's federal RICO claim, the Amended Complaint alleges that Mr. Siegel engaged in "a pattern of racketeering activity that included, extortion, forgery and fraudulent practices" in violation of 18 U.S.C. §§ 1951 and 1952 (the Hobbs Act), N.J.S.A. 2C:20–5(c) (extortion), N.J.S.A. 2C:13–5 (criminal coercion), and 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), "having the same and similar purposes, results, and participants, and methods of commission otherwise interrelated, and otherwise constituting the enterprise's regular way of doing business...." (Amend.Compl.¶¶ 66, 67.) With respect to Mr. Desmond's New Jersey RICO claim, the Amended Complaint alleges that Mr. Siegel's and "[t]he enterprise's pattern of unlawful conduct included extortion in violation of 18 U.S.C. §§ 1951 & 1952 and

Desmond v. Siegel, Slip Copy (2012)

N.J.S.A. 2C:13–5" and "knowingly, intentionally and willfully impersonated" Mr. Desmond in violation of N.J.S.A. 2C:21–17(a)(4). (*Id.* ¶ 62.)

Defendants argue that the Amended Complaint fails to establish (1) predicate acts of mail fraud, wire fraud, extortion, or criminal coercion; and (2) a pattern of racketeering activity.

**a. *Predicate Acts***

"The federal mail and wire fraud statutes prohibit the use of the mail or interstate wires for purposes of carrying out any scheme or artifice to defraud." *Lum v. Bank of America,* 361 F.3d 217, 223 (3d Cir.2004) (citing 18 U.S.C. §§ 1341 and 1343). "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentation or omission reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* (quotation omitted).

**\*10** "Where ... [a] plaintiff[ ] rel[ies] on mail and wire fraud as a basis for a RICO violation, the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity." *Id.* (citation omitted). "In order to satisfy Rule 9(b), plaintiffs must plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged." *Id.* at 223–24 (quotation omitted). "Plaintiffs may satisfy this requirement by pleading the date, place or time of the fraud, or through alternative means of injecting precision and some measure of substantiation into their allegations of fraud." *Id.* at 224 (citation omitted). "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Id.* (citation omitted).

The Amended Complaint sufficiently alleges three acts of mail fraud.[14] First, Mr. Siegel, through Globecon, purchased insurance claims from Old Globecon and submitted those claims to Hartford for an amount that Mr. Siegel knew was vastly inflated.[15] Second, in April 2007, Mr. Siegel, through Globecon, submitted a document in a litigation to the Supreme Court of the State of New York, dated March 24, 2003, that contained the forged signature—forged by Mr. Siegel by using Microsoft Paint graphics software—of David Askin, a former Globecon employee, as evidence that Mr. Askin agreed to forego salary payments, although he never agreed to do so. Third, in March 2007, Mr. Siegel forged the initials of Norman Joyce, another former Globecon employee, on a document and submitted it in a litigation in the Supreme

Court of the State of New York to show that Mr. Joyce breached the terms of a restrictive covenant after leaving Globecon to work for another company, even though Mr. Joyce never signed any such restrictive covenant.

The Amended Complaint also sets forth acts of attempted extortion committed by Mr. Siegel against Mr. Desmond in violation of the Hobbs Act.[16] To establish a violation of the Hobbs Act, there must be a showing that "(1) the defendant committed 'robbery or extortion' or attempted or conspired to do so, and (2) that the conduct 'obstruct[ed], delay[ed], or affect[ed] commerce or the movement of any article or commodity in commerce.' " *United States v. Walker,* 657 F.3d 160, 178–79 (3d Cir.2011) (quoting 18 U.S.C. § 1951(a)). "The Hobbs Act defines the term 'commerce' broadly to include 'all ... commerce over which the United States has jurisdiction.' " *Id.* at 179 (quoting 18 U.S.C. § 1951(b)(3)); *see also Stirone v. United States,* 361 U.S. 212, 215 (1960) ("[The Hobbs Act] speaks in broad language, manifesting a purpose to use all the constitutional power Congress has to punish interference with interstate commerce by extortion, robbery or physical violence.").

Mr. Siegel attempted to extort money from Mr. Desmond through fear. Specifically, On June 15, 2010, Mr. Siegel sent a letter on Globecon letterhead from New Jersey to Mr. Desmond in Ireland stating that one of Mr. Desmond's companies stole intellectual property from Globecon and that "while I am not a speck as successful or powerful as you, I wager I am certainly one of the most tenacious people you would ever meet. Thus, my character requires me to achieve a just resolution on my own terms if I do not hear from you further." (Amend. Compl. ¶ 35; Rosen Cert., Ex. C.) In a July 2, 2010 letter to Mr. Desmond, Mr. Siegel wrote: "when the facts of your financial rape and copyright theft are in the open there will be little denying it ... light will truly be the best disinfectant," and "[i]f you cannot gather the courage to act like a man then you will do as you want, as will we." (Amend. Compl. ¶ 37; Rosen Cert., Ex. F.)

**\*11** Defendants argue that these statements merely amount to a business dispute between Mr. Siegel and Mr. Desmond, for which Mr. Siegel was seeking a just resolution. While Mr. Siegel's letters stated that he sought to "resolve ... [the] unfortunate situation[ ] in a reasonable manner" (Rosen Cert., Ex. C), and that he "look[ed] forward to a fair commercial arrangement to resolve this matter" (Rosen Cert., Ex. D), such statements are not inconsistent with an act of attempted extortion. Indeed, they serve to encourage Mr. Desmond to compensate Mr. Siegel for the alleged theft of intellectual property under threat of being subject to public allegations of "financial

Desmond v. Siegel, Slip Copy (2012)

rape and copyright theft" and a "a just resolution on [Mr. Siegel's] own terms." Further supporting an inference of attempted extortion is the fact that Mr. Siegel followed through on these threats by creating meetdermotdesmond.com, which, as discussed above, contained statements suggesting that Mr. Desmond was a thief who associated with criminals.

These allegations also satisfy the elements of attempted extortion, criminal coercion, and impersonation under New Jersey State Law. *See* N.J.S.A. 2C:20–5(c) (extortion) ("A person is guilty of theft by extortion if he purposely and unlawfully obtains property of another by .... Expos[ing] or publiciz[ing] any secret or any asserted fact, whether true or false, tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute"); N.J.S.A. 2C:13–5 (criminal coercion) ("A person is guilty of criminal coercion if, with purpose unlawfully to restrict another's freedom of action to engage or refrain from engaging in conduct, he threatens to ... [a]ccuse anyone of an offense ... [e]xpose any secret which would tend to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute"); N.J.S.A. 2C: 21–17(a)(4) (impersonation) ("A person is guilty of an offense if the person ... [o]btains any personal identifying information pertaining to another person and uses that information, or assists another person in using the information, in order to assume the identity of or represent himself as another person, without that person's authorization and with the purpose to fraudulently obtain or attempt to obtain a benefit or services ...").

Thus, the Amended Complaint sufficiently sets forth sufficient predicate acts of racketeering activity under the federal and New Jersey RICO statutes.

**b.** *Pattern*

Under federal RICO, "to prove a pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." H.J., Inc., 492 U.S. at 239 (emphasis in original). "Relatedness" can be established through evidence that the predicate acts "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at 240 (quoting 18 U.S.C. § 3575(e)).

**\*12** "Continuity" is "both a closed—and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." Id. at 241. "Closed-ended continuity" can be shown "by proving a series of related predicates extending over a substantial period of time." Id. at 242. "Open-ended continuity," however, "depends on whether the *threat* of continuity is demonstrated." Id. (emphasis in original). "Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case." Id. For example, Open-ended continuity may be satisfied "where it is shown that the predicates are a regular way ... of conducting or participating in an ongoing and legitimate RICO 'enterprise.' " Id. at 243. "For analytic purposes these two constituents of RICO's pattern requirement must be stated separately, though in practice their proof will often overlap." Id. at 239.

Under New Jersey RICO, as previously mentioned, the "pattern" element of a pattern of racketeering activity requires "[a] showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J.S.A. 2C:41–1d.

Here, the alleged predicate acts of mail fraud, attempted extortion, criminal coercion, and impersonation are related in that they were perpetrated by Mr. Siegel and involved a misrepresentation—whether an inflated insurance claim, forged signature, unfounded allegation of theft, or false suggestion of criminal behavior—for the purpose of extracting money or a concession from, or intimidating another party.[17] Similarly, these acts exhibit open-ended continuity because they show Mr. Siegel's regular way of participating in the StarweaverGlobecon Enterprise. Thus, the Amended Complaint has established a pattern of racketeering activity under both federal and New RICO statutes.

### III. CONCLUSION

For the foregoing reasons, Magistrate Judge Shipp's January 31, 2012 Order granting Plaintiff's Motion to Amend the Complaint is AFFIRMED.

The Court will enter an order implementing this opinion.

Desmond v. Siegel, Slip Copy (2012)

Footnotes

1    Mr. Desmond also sued GoDaddy.com, Inc., but subsequently dismissed its claims against GoDaddy voluntarily.

2    According to the Amended Complaint, "Starweaver has held itself out, under the control of Siegel and Globecon, as a 'family' of funds and 'group' of associated professionals that have engaged in activities for which Siegel and Globecon have taken credit." (Amend.Compl.¶ 7.)

3    In addition, Mr. Siegel "sought to enlist one of [Globecon's] employees to help backdate an email from Mr. Askin to facilitate forgery efforts." (Amend.Compl.¶ 28.)

4    The letter offered a list of certain of Globecon's "registered copyright content" for Mr. Desmond to view from a secure online location. (Rosen Cert., Ex. E.)

5    They were able to "hide their identities by using the proxy service Domains by Proxy, Inc. ('DBP'), an Arizona-based proxy service that masks the identity of the registrant of an Internet domain name." (Amend.Compl.¶ 40.) On October 25, 2010, "DBP canceled their privacy for the meetdermotdesmond.com internet domain, which allowed [Mr. Desmond] to identify Siegel and Globecon as responsible for the content on that website." (*Id.*)

6    In addition to this website, Mr. Siegel and Globecon "illegally impersonated [Mr. Desmond] by registering an email address with his name, 'Dermot Desmond' displayed for an email address of dermotdesmond666 @gmail.com, and using it to send out offensive messages utilizing coarse language." (Amend.Comp.¶ 45(i).)

7    Another area of the site "repeats this allegation of thievery." (Amend.Compl.¶ 45(a).)

8    To be sure, Mr. Siegel could at any time lift the password protected areas of meetdermondesmond.com and make them available to all visitors to the site.

9    The blog, entitled "Dermot's Blog," contained a number of "untruthful and defamatory statements" in a section called "Timeline of a Crime." (Amend.Compl.¶ 45(g).)

10   This section, among others, contains the statement "Facts and Figures to be added soon," suggesting that Mr. Siegel and Globecon planned to add further defamatory content to the site. (Amend.Compl.¶ 48.)

11   Defendants also argue that, to the extent the Court reverses Judge Shipp's January 31, 2012 Order, it should strike any reference to Defendants' "Criminal Acts" as scandalous and immaterial.

12   Such an enterprise "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence." *Boyle,* 556 U.S. at 948.

13   To be sure, the corporate entities that comprise the Starweaver–Globecon Enterprise did not all exist at the same time. MediVault existed from 1997–1998, and IDP existed from 1992–1999, while Starweaver and Globecon were formed in 1999 and 2001, respectively. However, there is no requirement that the "continuing unit" of a RICO enterprise maintain the same membership throughout its existence. Indeed, the Supreme Court has recognized the flexibility and "breadth of the 'enterprise' concept in RICO." *Boyle,* 556 U.S. at 949; *see also United States v. Bergrin,* 650 F.3d 257, 268 ("In numerous instances, the [Supreme] Court has been asked to impose limits on how RICO may be applied, and it has consistently declined to do so.").

14   To be sure, the Amended Complaint sets forth allegations of other acts of mail and wire fraud; however, those allegations are not sufficiently detailed to satisfy Rule 9(b).

15   While the Amended Complaint fails to note the specific date of the submission of the fraudulent claim via interstate mail, it nonetheless sets forth other particular circumstances surrounding the fraud in order to satisfy Rule 9(b), such as (1) Mr. Siegel's knowledge that Old Globecon did not suffer substantially from the attacks of September 11, 2001 and being told as such by Old Globecon's former principal shareholder; and (2) the amount by which Mr. Siegel inflated Old Globecon's insurance claims against Hartford.

16      The Hobbs Act criminalizes conduct that "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose ..." 18 U.S.C. § 1951. "The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Id.*

17      The relationship between Mr. Siegel's forgeries of former Globecon employees' signatures in litigation and his impersonation of Mr. Desmond through meetdermotdesmond.com and dermotdesmond666@gmail.com is particularly acute. Those acts involve Mr. Siegel engaging in fictitious representations on behalf an individual in order to extract concessions from that same individual.

---

**End of Document**                                                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT G**

2005 WL 89386
United States District Court,
S.D. New York.

Michael S. KIMM, Plaintiff,
v.
Chang Hoon LEE, Champ, Inc., in Chul Yeon,
Safenet, Inc., Chung Seng Koh, Joon Hwan Lee,
Korea Central Daily, Jin Se Kim, Segye Times,
Jason Yoon, Bergen News, d/b/a Korean Bergen
News, WMBC-TV,[1] John Does/Jane Does 1-10,
and ABC Companies 1-10, Defendants.

No. 04 Civ. 5724(HB). | Jan. 13, 2005.

Opinion

*OPINION & ORDER*

BAER, J.

**\*1** Plaintiff Michael S. Kimm ("Kimm") filed suit against the above-listed individual, corporation, and media defendants in which he alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.,* and state law claims for breach of fiduciary duty and defamation based on the defendants' alleged conspiracy to destroy his professional name and reputation. Defendants Inchol Yon ("Yon"),[2] Safenet Communications Corp. (collectively, "the Safenet defendants"), Chang Hoon Lee ("Hoon"), and Champ International Gift and Award (sued as "Champ, Inc.") (collectively, "the Champ defendants") filed counterclaims against Kimm, which allege defamation and frivolous or vexatious litigation. Present before the Court are a number of motions. Defendants Jin Se Kim, the *Segye Times* (collectively, "the Seyge defendants"),[3] Chung Seng Koh ("Koh"), the Safenet defendants, and the Champ defendants have moved to dismiss the complaint. In addition, Kimm has moved to dismiss the counterclaims filed against him by the Safenet and Champ defendants and to strike the defendants' pleadings. For the reasons set forth below, the defendants' motions to dismiss are granted and Kimm's motion to dismiss and strike the pleadings is granted in part and denied in part as moot.

## I. BACKGROUND

The pertinent facts as alleged in the Complaint are as follows. Kimm is a lawyer who has practiced in New York and New Jersey for the last fourteen years. During the course of his career, he has provided extensive *pro bono* services to, *inter alia,* members of the Korean communities in New Jersey and the New York metropolitan area. In the 1990s, towns in Bergen County, New Jersey adopted ordinances that restricted the use of "foreign language" signs in business storefronts and the operation of Korean karaoke clubs. Kimm represented a group of Korean businesses *pro bono* and asserted federal civil rights claims on their behalf to challenge these ordinances. Thereafter, the Palisades Police Department allegedly began to unlawfully enforce another ordinance, this one against Korean barbershops and beauty salons. Chang Won Lee ("Won"),[4] who was then the President of the Palisades Park Chamber of Commerce ("Chamber of Commerce"), organized a group of eleven barbershops and beauty salons ("Kimm's former clients" or "his former clients") to challenge the enforcement of the ordinance. After several discussions, Kimm agreed to represent this group of barbershops and beauty salons for a fee. In August 1997, Kimm filed suit in the District of New Jersey and obtained a preliminary injunction on consent.[5]

During May and June of 1998, Kimm met with Won on several occasions and Won requested that Kimm be his "personal lawyer." Kimm's refusal allegedly prompted Won "to retaliate against [Kimm] by engaging in a long campaign of extortionate threats, defamation, innuendo, and actions which were *ultra vires* to the Chamber of Commerce's lawful purposes...." Compl. ¶ 42. According to Kimm, "Won ... made it his personal 'mission' to lodge numerous acts of vicious attacks against [Kimm's] professional name and reputation." *Id.* ¶ 43. As part of this design, Won allegedly persuaded Kimm's former clients not to cooperate with Kimm in his prosecution of the action to challenge enforcement of the ordinance against the barbershops and beauty salons and instead to work with another attorney Won had apparently retained, who filed suit to challenge enforcement of the ordinance in Bergen County Superior Court. Notwithstanding the clients' refusal to participate, Kimm proceeded to trial. The district court ultimately dismissed the case in February 1999 based on the inadequate evidence of continuous unlawful discrimination by Palisades Park.

**\*2** In July 2000, Kimm attempted to collect his legal fees and costs and presented his bill to the Chamber of

Commerce. Kimm's effort to collect was allegedly thwarted by Won (who was at this time just a member of the Chamber of Commerce), who allegedly told Kimm's former clients not to pay Kimm and accused Kimm of unethical conduct by seeking to be paid for his services. When the Chamber of Commerce informed Kimm it considered the fee dispute a private dispute between him and his former clients, Kimm filed suit in Bergen County State Court against his former clients for attorneys' fees and costs .[6]

In March 2001, Koh was elected the next President of the Chamber of Commerce and in August 2001, he used funds from the Chamber of Commerce to retain a lawyer to defend Kimm's former clients in the fee suit. During the pendency of the fee suit, Koh, Yon, Won, and others held a series of meetings and advised Kimm's former clients that Kimm's lawsuit for his fees and costs was unethical and illegal and that they should not pay Kimm. During August 2001 and December 2002, Koh, Yon, and Lee allegedly used interstate wires and the U.S. mails to transmit legal and other papers pertaining to the fee litigation that contained false statements. On at least two occasions during August and September 2001, an unspecified defendant used the telephone to threaten a witness. Following a bench trial, the Superior Court found Kimm's former clients liable for Kimm's fees and costs. That suit was on appeal at the time the Complaint in the instant action was filed.

During "the second half of 2003, defendants began to escalate their vicious, unfounded, malicious attacks against [Kimm] by disseminating false 'news' stories in print and television media ... placing [Kimm] in a false and defamatory light." Compl. ¶ 70. Kimm asserts that the defendants have "disseminated more than two dozen false stories" and "have agreed, expressly or tacitly, that they will continue to do so 'until Michael Kimm is forced out of the Korean community.' " *Id.* ¶ 71. In furtherance of the alleged conspiracy, Kimm avers that in July 2003, Won, Yon, and other purported community leaders, met with reporters from the *Korea Central Daily News, Segye Times,* and other New York based newspapers at a karaoke club in Palisades Park and bribed them with expensive alcohol (at a cost of approximately $2,000) and a female "social partner" to induce them to "to manufacture 'news articles' attacking [Kimm's] professional name and reputation." *Id.* ¶ 72; *see also id.* ¶¶ 73-74. Thereafter, the fruits of this meeting allegedly emerged in false and defamatory articles in *The News Hankook, Korea Central Daily News, Segye Times, The Bergen News,* and in "numerous other Korean newspapers and other Korean media outlets." *Id.* ¶ 75J.

As a result of the foregoing, Kimm seeks $5 million in compensatory damages, $5 million in punitive damages, and $15 million in statutory treble damages, as well as attorneys' fees and costs.

## II. DISCUSSION

### A. Standard of Review

**\*3** On a motion to dismiss, the Court "accept[s] all of plaintiff's factual allegations in the complaint as true and draw[s] inferences from those allegations in the light most favorable to the plaintiff." *Desiderio v. Nat. Ass'n of Sec. Dealers, Inc.,* 191 F.3d 198, 202 (2d Cir.1999). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985). Therefore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). The complaint "need only meet the requirements of our 'simplified notice pleading standard [which] relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.' " *Courtenay Communications Corp. v. Hall,* 334 F.3d 210, 213 (2d Cir.2003) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002)) (alteration in original).

### B. Plaintiff's Claims

In Counts One, Two, and Three, Kimm alleges that Won, Yon, and Koh violated 18 U.S.C. §§ 1962(a)-(c). In Count Four, Kimm avers that all of the defendants committed a RICO conspiracy in violation of 18 U.S.C. § 1962(d). Section 1964(c) authorizes suit under RICO by "[a]ny person injured in his business or property by reason of a violation of section 1962." A substantive RICO claim "requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985). Racketeering activity consists of a statutorily defined list of acts, including, *inter alia,* conduct that is indictable under the wire and mail fraud statutes, 18 U.S.C. §§ 1341, 1342, and the Hobbs Act, 18 U.S.C. § 1951, which prohibits interference with commerce by robbery or extortion. 18 U.S .C. § 1961(1). A pattern of racketeering activity "requires at least two acts of racketeering activity" within

a ten year period. 18 U.S .C. § 1951(5). As for the RICO conspiracy claim alleged in Count Four, "the requirements ... are less demanding: A 'conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive [ ] offense, but it suffices that he adopt the goal of furthering or facilitating the [scheme].' " Baisch v. Gallina, 346 F.3d 366, 376 (2d Cir.2003) (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)).

To support his RICO claims, Kimm has alleged that the Chamber of Commerce constitutes a RICO enterprise, as defined by 18 U.S.C. § 1961(4), and alternatively or in addition, that an association-in-fact of Yon, Koh, and Won, and the other defendants constitutes an enterprise. As for the pattern of racketeering activity, Kimm avers that between May 1998 and July 2004 and continuing thereafter, Koh, Yon, and Won mailed documents that contained false information about the fee dispute, made false statements about him to his former clients and newspaper reporters via telephone, and caused newspaper articles to be disseminated through the U.S. mails and wires that contained false information. Finally, Kimm contends that Koh, Yon, and Won made repeated threats to Kimm that if his fee suit were not dropped, he would be banished from the Korean community. All this was allegedly undertaken in furtherance of the defendants' alleged scheme to destroy Kimm's professional reputation.

*4 The defendants, not surprisingly, have raised a number of issues with respect to these contentions. However, I need only address their arguments with respect to the sufficiency-or lack thereof-of the requisite predicate acts, an essential element in a RICO claim. Though Kimm has pleaded the predicate acts of mail fraud, wire fraud, and Hobbs Act extortion, they are-at best-thinly clothed defamation claims. The predicate acts alleged to constitute mail and wire fraud consist solely of the alleged transmission of false information to "destroy [Kimm's] professional name and reputation." Compl. ¶¶ 84, 86, 88, 90, 92. Moreover, Kimm has alleged that the purpose of the alleged RICO enterprise was to, inter alia, obtain and preserve political power and business gain, to promote the enterprise, and enhance the business activities of certain members. These allegations do not constitute properly pleaded violations of the wire and mail fraud statutes, which prohibit, inter alia, "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses" by use of the U.S. mails or wires. 18 U.S.C. §§ 1341, 1343. "The mail and wire fraud statutes do not define 'scheme to defraud,' but it has been described as a plan to deprive a person 'of something of value by trick, deceit, chicane or overreaching." ' United

States v. Autuori, 212 F.3d 105, 115 (2d Cir.2000) (quoting McNally v. United States, 483 U.S. 350, 358 (1987)). Essential to any scheme to defraud is the "the requisite scienter (or fraudulent intent) on the part of the defendant." Id.

Kimm falters on the two critical components of a mail or wire fraud claim. First, Kimm has not alleged a "scheme to defraud." Instead, he has merely alleged that the false information was transmitted via the wires and mails to harm his business and reputation. It is plain that "[i]ntent to injure is not the equivalent of intent to defraud." Kreditbank, N.V. v. Joyce Morris, Inc., No. Civ. A. 84-1903, 1986 WL 5926, at *4 (D.N.J. Jan. 9, 1986), aff'd, 808 F.2d 1516 (3d Cir.1986). As another court has said:

> Defamation is "[a]n intentional false communication, either published or publicly spoken, that injures another's reputation or good name." Black's Law Dictionary 288 (Abridged 6th ed.1991). Fraud is "[a]n intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right." Id. at 455.

> Chovanes v. Thoroughbred Racing Ass'n, No. Civ. A. 99-185, 2001 WL 43780, at *5 (E.D.Pa. Jan. 18, 2001) (alteration in original).

Though Kimm may well have suffered reputational injury as a result of the defendants' alleged acts, no one was "induced to part with anything of value as a result." Id. Moreover, there is no indication in the pleadings that Kimm, Kimm's former clients, or anyone else relied upon the allegedly false statements. Metromedia Co. v. Fugazy, 983 F.2d 350, 368 (2d Cir.1992) ("In the context of an alleged RICO predicate act of mail fraud, ... to establish the required causal connection, the plaintiff [i]s required to demonstrate that the defendant's misrepresentations were relied on."); Ideal Steel Supply Corp. v. Anza, 373 F.3d 251, 263 (2d Cir.2004), petition for cert. filed, 73 USLW 3216 (Sept. 28, 2004) (No. 04-433), (ruling that a RICO claim may lie "where the scheme depended on fraudulent communications directed to and relied on by a third party rather than the plaintiff.").

*5 Second, Kimm has not alleged actionable harm under the mail or wire fraud statutes. As one court has noted, "while one can be compensated under the law for injury to one's reputation, that compensation is not based on an injury to what has commonly been known as 'property." ' United States v. Ferrara, 701 F.Supp. 39, 43 (E.D.N.Y.1988), aff'd, 868 F.2d 1268 (2d Cir.1988) (internal citation omitted). Particularly relevant to this case, the Ferrara court further reasoned that "if one's

reputation-standing alone-could be construed as property, then any ordinary defamation action could be brought under the mail fraud statute-a startling proposition." *Id.* Following this reasoning, another court ruled that damage to the plaintiff's reputation and his resulting inability to secure employment was a personal injury as opposed to a property injury and thus not actionable under the mail and wire fraud statutes. *Roitman v. New York City Transit Authority,* 704 F.Supp. 346, 348-49 (E.D.N.Y.1989).[7]

This is certainly not the first attempt to spin an alleged scheme to harm a plaintiff's professional reputation into a RICO claim. *E .g., Marks v. City of Seattle,* No. C03-1701P, 2003 WL 23024522, at *1 (W.D.Wash. Oct. 16, 2003) (alleging a racially-motivated conspiracy to undermine their employment positions); *Mansmann v. Smith,* No. Civ. A. 96-5768, 1997 WL 145009, at *2 (E.D.Pa. March 21, 1997) (alleging a scheme to put plaintiff psychologists out of business and discredit them within the professional and general community); *Manax v. McNamara,* 660 F.Supp. 657, 658 (W.D.Tex.1978), *aff'd,* 842 F.2d 808 (5th Cir.1988) (alleging a conspiracy to harm plaintiff's medical practice). Appropriately, such claims are rarely successful because it is firmly established that defamation and many other similar allegations do not provide the requisite predicate for RICO violations. *E.g., Contes v. City of New York,* No. 99 Civ. 1597, 1999 WL 500140, at *8 (S.D.N.Y. July 14, 1999) ("Defamation is not a predicate act under § 1961."); *Mount v. Ormand,* No. 91 Civ. 125, 1991 WL 191228, at *2 (S.D.N.Y. Sept. 18, 1991) ("Section 1961(1) does not include defamation[ ][or] libel ... as predicate acts....").[8]

It is unfortunate-to say nothing of expensive and time consuming-to have watched the proliferation of alleged RICO claims. While some show a degree of creativity, they are more frequently an effort to construct a treble damage suit from what, at best, is a civil wrong, something that was never the intention of those who drafted the statute in the Justice Department or of Congress when it became law. Organized Crime Control Act of 1970, Pub.L. No. 91-451, § 1, 84 Stat. 922, 1073 (1970) (Statement of Findings and Purpose) ("It is the purpose of this Act to seek the eradication of organized crime in the United States by strengthening the legal tools in the evidence-gathering process, by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime."); *Russello v. United States,* 464 U.S. 16, 25 (1983) ("The legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots."). Indeed, another court in this District has found that a

plaintiff, like Kimm, came "perilously close to violating Rule 11 in his pleading of ... RICO claims" because, *inter alia,* "[t]he insufficiency of a defamation charge as a RICO predicate act is ascertainable from the face of the statute." *Creed Taylor, Inc. v.. CBS, Inc.,* 718 F.Supp. 1171, 1180 (S.D.N.Y.1989). In sum, Kimm's allegations do not fall within the scope of the mail and wire fraud statutes, whose purpose is "to punish wrongful transfers of property from the victim to the wrongdoer, not to salve wounded feelings." *Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Employees & Rest. Employees Union, AFL-CIO,* 215 F.3d 923, 927 (9th Cir.2000).

**\*6** The predicate acts alleged to constitute Hobbs Act extortion are on equally precarious footing. Here, Kimm contends that Koh, Yon, and Won repeatedly threatened him and other persons that "if [Kimm's] [f]ee [s]uit w [as] not 'voluntarily dropped,' [Kimm] would be "banished from the Korean community." Compl. ¶ 94. While surely it must be difficult to have such strife in one's own ethnic community, the Hobbs Act was enacted to address something significantly more violent and sinister. The Hobbs Act penalizes, *inter alia,* "[w]hoever ... obstructs, delays, or affects commerce ... by robbery or extortion ... or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section." 18 U.S.C. §§ 1951(a). Extortion, in turn, is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). Nothing in the Complaint remotely approximates an offense under this section. Kimm has not alleged any affect upon commerce, but perhaps more fundamentally, he has failed to allege any threat of force, violence, or fear. Suffice to say, the alleged conduct falls significantly short of Hobbs Act extortion.

As Kimm has not alleged a legally sufficient substantive RICO claim, his RICO conspiracy claim in Count Four cannot survive. *Citadel Mgmt., Inc. v. Telesis Trust,* 123 F.Supp.2d 133, 156 (S.D.N.Y.2000) ("[A] RICO conspiracy claim cannot stand where, as here, the elements of the substantive RICO provisions are not met ."). Having concluded that Kimm's federal claims must be dismissed, I decline to exercise supplemental jurisdiction over his state law claims.

### C. Defendants' Counterclaims

The Safenet and Champ defendants have filed five counterclaims against Kimm, which are largely duplicative. Suffice to say that the first three counterclaims allege, in essence, that this lawsuit

Kimm v. Lee, Not Reported in F.Supp.2d (2005)

RICO Bus.Disp.Guide 10,811

constitutes frivolous litigation and seek attorneys' fees, costs, and sanctions. The fourth and fifth counterclaims appear to allege defamation. As these defendants have not referenced a specific statute, rule or claim with regard to their frivolous litigation counterclaims it is unclear what precisely affords them the relief they seek. I decline both to impose sanctions under either Fed.R.Civ.P. 11 or 29 U.S.C. § 1927 and to exercise supplemental jurisdiction over the state law counterclaims. However, should Kimm wish to file an amended complaint, he must apply for leave to do so and submit a letter to Chambers on or before January 21, 2005 that outlines how he thinks the deficiencies in his current pleadings can be remedied.[9]

## III. CONCLUSION

For the foregoing reasons, defendants' motions to dismiss the Complaint are granted and Kimm's motion to dismiss the counterclaim is granted, but the portion of his motion that seeks to strike the defendants' pleadings is denied as moot. The Clerk of the Court is instructed to close these motions and any remaining motions.

**\*7** SO ORDERED.

## Parallel Citations

RICO Bus.Disp.Guide 10,811

Footnotes

1    On October 21, 2004, Kimm and defendant WMBC-TV entered into a stipulation and order of discontinuance, which was "so ordered" by the Court on that same date. Accordingly, WMBC-TV's cross-claim, which was not explicitly addressed in the stipulation, is dismissed.

2    This individual was sued as "In Chul Yeon," but has identified himself as "Inchol Yon" in his motion papers and he will therefore be referred to as such herein.

3    By letter dated October 22, 2004, defendant *Korea Central Daily News* (sued as *Korea Central Daily* ) joined the Seyge defendants' motion to dismiss.

4    This is not the same individual as "Chang Hoon Lee." Chang Won Lee is referred to in the Complaint as a defendant in this matter, but his name does not appear in the caption.

5    *Venus Beauty Salon v. Palisades Park,* No. 97 Civ. 3903(MTB).

6    *Kimm v. Venus Beauty Salon,* No. BER-L-2812-01.

7    Moreover, Kimm's allegations of harm to his professional reputation are not compensable in a RICO claim. *E.g., Hamm v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.,* 187 F.3d 941, 954 (8th Cir.1999) ( "Damage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)."); *Burnett v. Al Baraka Inv. & Dev. Corp.,* 274 F.Supp.2d 86, 101 (D.D.C.2003) ("The overwhelming weight of authority ... holds that the 'business or property' language of Section 1964(c) does not encompass personal injuries.").

8    *See also Monterey Plaza Hotel Ltd. P'ship v. Local 483 of Hotel Employees & Rest. Employees Union, AFL-CIO,* 215 F.3d 923, 926-27 (9th Cir.2000); *Marks,* 2003 WL 23024522, at *6; *Jernryd v. Nilsson,* No. 84 C 7551, 1985 WL 3590, at *16 (N.D.Ill. Nov. 8, 1985); *Segarra v. Messina,* 153 F.R.D. 22, 30 (N.D.N .Y.1994); *Manax,* 660 F.Supp. at 660-61.

9    On this score I should note that I have not addressed the entirety of the defendants' arguments regarding the sufficiency of the Complaint and Kimm, should he decide to exercise this option, ought to study the motions to dismiss, as I believe they contain numerous other meritorious arguments, which I have not had to reach.

**End of Document**                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT H**

Kredietbank, N.V. v. Joyce Morris, Inc., Not Reported in F.Supp. (1986)

1986 WL 5926
Only the Westlaw citation is currently available.
United States District Court, D. New Jersey.

KREDIETBANK, N.V., Plaintiff,
v.
JOYCE MORRIS, INC., ISAAC GINDI, and
MORRIS GINDI, Defendants,
v.
LUC PHILIPS and K.B. BUSINESS CREDIT, INC.,
Additional Defendants on the Counterclaim.

Civ. A. No. 84–1903. | Jan. 9, 1986.

Opinion

OPINION

SAROKIN, District Judge.

*1 This is an action to recover on a loan, in which the defendants have interposed a number of defenses and counterclaims, including breach of contract, breach of an obligation to act in good faith and in a commercially reasonable manner, tortious interference with defendants' business opportunities, fraud, usury, violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., and its New Jersey equivalent, N.J. Stat.Ann. 2C:41–1, et seq., and violations of the Sherman Antitrust Act, 15 U.S.C. § 1. In an Opinion issued October 10, 1985, the Court dismissed with prejudice the fifth and sixth counts of defendants' individual counterclaims, alleging violations of RICO and N.J. Stat. Ann. 2C:41–1, et seq., and dismissed with leave to replead Count Three of defendants' 'Class Counterclaims', alleging violations of RICO on behalf of a putative class of defendants' borrowers. In addition, the court indicated that it would dismiss Counts One and Two of defendants' 'Class Counterclaims' insofar as they were based upon New York's usury laws upon a showing by plaintiff/counterclaim defendants that interest charged to defendants under the loan agreements in question did not exceed eight percent above the average prime rate as defined in New York's General Obligations Law § 5–526.

Defendants now move for reconsideration of the court's Opinion on three grounds. First, with regard to the fifth and sixth counts of the individual counterclaims,

defendants argue that the allegations in those counts charging plaintiff/counterclaim defendants with filing two fraudulent affidavits in the context of this litigation are, without more, sufficient to meet the 'pattern' requirement of RICO and its New Jersey equivalent, N.J. Stat. Ann. 2C:41–1, et seq., contrary to the court's conclusion in its Opinion, and that, in any event, the individual counterclaims plead additional acts of racketeering activity beyond the filing of the false affidavits sufficient to establish a 'pattern' of such activity. Second, with regard to Count Three of the class counterclaims, defendants object to the court's requirement that they make clear their theory as to the relationship between the various counterclaim defendants as 'persons' and 'enterprises' within the meaning of the RICO statute. Finally, with regard to the first and second counts of defendants' class counterclaims, defendants urge the court to reconsider its ruling that New York's General Obligations Law § 5–526, adopted in September, 1984, applies retroactively to exempt certain commercial loans from criminal usury ceilings under certain conditions. Defendants point out that the court's October 10th Opinion was apparently premised on the assumption that KB Business Credit, Inc., which initially extended the loan in question to defendants, was a banking institution within the meaning of New York's General Obligations and Banking Laws. Absent said assumption, which is assertedly erroneous, defendants argue, the court would have resolved the question differently. Considering each argument in turn, the court declines to grant defendants' motion for reconsideration.

DISCUSSION

I. The Requirement of a Pattern of Racketeering Activity

*2 In Sedima S.P.R.L. v. Imrex Co., Inc., 105 S.Ct. 3275 (1985), the most recent treatment by the Supreme Court of the 'civil RICO' provision, 18 U.S.C. § 1964(c), the Supreme Court rejected the Second Circuit Court of Appeals' requirement of predicate criminal convictions and 'racketeering injury' as an inappropriate means of cutting back on the seemingly boundless scope of RICO. At the same time, however, the Court hinted broadly that the 'pattern' requirement of RICO might be a more appropriate focus for efforts aimed at trimming the expansive reach of the statute. Noting that 'the definition of a 'pattern of racketeering activity' differs from the other provisions in § 1961 in that it states that a pattern requires least two acts of racketeering activity, . . . not

that it 'means' two such acts,' the Court concluded that 'two isolated acts of racketeering activity do not constitute a pattern.' Id. at 3285 n.14. The Court quoted and emphasized language from the statute's legislative history explaining that

> [t]he target of [RICO] is . . . not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of continuity plus relationship which combines to produce a pattern.

Id., quoting S.Rep. No. 91–617, p.158 (1969). Thus, while the holding of Sedima rejects the Second Circuit's attempt to trim the broad reach of RICO, Sedima's language suggests that these efforts were not necessarily wrong, but only misdirected. The Court suggests that reexamination of the pattern requirement is the key to defining a proper scope for the RICO statute.

In its October 10th Opinion, this court responded to the Supreme Court's cue in Sedima and ruled that the mere filing of two false affidavits in the context of a single lawsuit could not constitute a pattern of racketeering activity within the meaning of RICO. Defendants now contend that, in so ruling, the court read the 'pattern' requirement of RICO, and New Jersey's equivalent anti-racketeering law, too narrowly. Defendants rely primarily on a recent decision of the Fifth Circuit Court of Appeals, R.A.G.S. Couture, Inc. v. Hyatt, No. 84–3827 (5th Cir. October 30, 1985), in which the Fifth Circuit ruled rather conclusorily that the mailing of two false invoices as part of a single fraudulent scheme could constitute a 'pattern' of racketeering activity, at least where the mailings were related rather than isolated acts.[1]

The Fifth Circuit's conclusory ruling in R.A.G.S. does not convince this court that its prior ruling was incorrect, however. Admittedly, a divergence of opinion has emerged regarding the correct interpretation of Sedima's footnote 14 in the short months since the opinion's issuance, compare, e.g., Trak Microcomputer Corp. v. Wearne Bros., No. 84 C 7970 (N.D. Ill. October 25, 1985); Conan Properties, Inc. v. Mattel, Inc., No. 84 Civ. 5799 (S.D.N.Y. September 26, 1985) with Allington v. Carpenter, No. CV 84–8403 Carpenter, No. CV 84–8403 Bank of Waukegan, No. 84 C 6251 (N.D. Ill. August 28, 1985); Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc., 615 F.Supp. 828 (N.D. Ill. 1985). Like the Fifth Circuit, at least one court has required only that the predicate acts alleged be 'related' to one another. Conan Properties, Inc. v. Mattel, Inc., supra. Another court has recognized that

Sedima requires a RICO plaintiff 'to demonstrate both a continuity and a relationship' among the predicate acts, but has refused to find that the acts must have taken place in furtherance of separate fraudulent schemes. Trak Microcomputer Corp. v. Wearne Bros, supra. Still other courts have interpreted Sedima's 'continuity' requirement to indicate that the predicate acts must have taken place in the course of different criminal episodes, Allington v. Carpenter, supra, or in the furtherance of different fraudulent schemes. Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc., supra ('continuity' requirement implies 'repeated criminal activity, not merely repeated acts to carry out the same criminal activity') (emphasis in original); Morgan v. Bank of Waukegan, supra.

**\*3** Consistent with its ruling in its October 10th Opinion, this court finds the latter interpretation of Sedima to be most convincing. Sedima makes clear that the mere relatedness of two criminal acts is not enough to establish a 'pattern': the formation of a pattern requires 'continuity' in addition to 'relationship'. Sedima, 105 S.Ct. at 3285 n.14. In Allington and Northern Trust Bank, the courts recognized that this 'continuity' requirement implies some separation as well as relatedness in the acts in question. See Allington, supra ('a 'pattern' of racketeering activity must include racketeering acts sufficiently unconnected in time or substance to warrant consideration as separate criminal episodes'); Northern Trust Bank, supra ("pattern . . . connotes a multiplicity of events' as well as 'similarity').

The requirement of separation in addition to relatedness comports with our common sense notion of the meaning of the word 'pattern'. As noted in Sedima, 'in common parlance two of anything do not generally form a 'pattern'.' 105 S.Ct. at 3285 n.14. Rather, in the language of one of the more trusted sources for the definitions of English words, a 'pattern' is '[a]n arrangement or composition that suggests or reveals a design; a configuration . . .' WEBSTER'S NEW COLLEGIATE DICTIONARY (C & G Merriam Co. 1961). Two acts alone might form a 'pattern' under this definition, but only where they are not only sufficiently connected, but also sufficiently differentiated, to suggest a design or configuration.

Congress, in setting out the definition of a 'pattern of racketeering activity' for the purposes of the RICO statute, indicated that, at a minimum, two acts must be proved in order to meet the pattern requirement, 18 U.S.C. § 1961(c), but Congress nowhere indicated that we should redefine our common notion of what constitutes a pattern of activity to include a single repetition of a single act in some circumscribed circumstance, simply because two acts have occurred. Where a single criminal act is

Kredietbank, N.V. v. Joyce Morris, Inc., Not Reported in F.Supp. (1986)

repeated against a second victim, or repeated in a time and place removed from its first commission, the two acts arguably suggest a design or configuration, and may satisfy the pattern requirement. But the repetition of an act taken against a single victim or set of victims following closely on the heels of the original wrong, in some circumscribed circumstance, is completely unidimensional. It suggests no expansion, no ongoing design, no continuity, such as was the target of Congress in RICO. As the Supreme Court noted in Sedima, RICO is not concerned with such 'sporadic activity.' 105 S.Ct. at 3285 n.14, quoting S.Rep. No. 91–617, p. 158 (1969).

The court need not reach here the question of formulating a test for determining when two acts will constitute a RICO 'pattern'. Regardless of the test, whether it be based on differentiating 'fraudulent schemes', Northern Trust Bank, supra, or 'criminal episodes', Allington v. Carpenter, supra, it is clear that the two acts alleged in this case, the mailing of two false affidavits in support of a single application in this lawsuit, do not constitute a 'pattern' of racketeering activity. Accordingly, the court will deny defendants' motion for reconsideration on this ground.[2]

**\*4** As an alternative ground for their claim that the individual counterclaims do allege a RICO pattern, defendants argue that, in addition to alleging the mailing of two false affidavits, they alleged 'the mailing of letters to numerous accounts of Defendant Joyce Morris, Inc., which improperly told the accounts not to pay Joyce Morris and which conveyed to the industry the false impression that Defendants were in trouble, not to be trusted and had breached their obligations.' Defendant's Mem. at 9. Defendants claim that these constitute additional acts of racketeering. In its Opinion, the court found otherwise. Opinion at 16 n.3.

The court notes that, in order to avoid plaintiff/counterclaim defendants' original motion to dismiss these factual allegations for failure to plead fraud with particularity, defendants described their claim based on these allegations as 'not a fraud claim', explaining that '[i]t is a claim for conveying false information to third parties about Counterclaimants—it is similar to a claim for prima facie tort or defamation.' Defendants' Mem. in Opposition to Motion to Dismiss at 39. Even in the section of their original memorandum dealing with plaintiff's motion to dismiss their individual RICO counts, defendants describe these mailings as part of a 'scheme to harm the Counterclaimants' business and reputation . . .' id. at 25, rather than as a scheme designed to defraud either the defendants' accounts or the defendants. It requires no extended discussion to conclude that a scheme to defame or to commit a tort does not amount to a 'scheme or artifice to defraud' within the

meaning of the mail fraud statute, 18 U.S.C. § 1341. At the very least, that statute requires allegations of 'a recognizable scheme formed with intent to defraud . . .' U.S. v. Frankel, 721 F.2d 917, 920 (3d Cir. 1983). Intent to injure is not the equivalent of intent to defraud. Accordingly, the court will not reconsider its ruling that the defendants' have failed to plead a 'pattern of racketeering' in their individual RICO claims because the only acts of racketeering properly alleged are the mailing of two allegedly false affidavits in the context of this litigation.

## II. The Requirement of Differentiating Between 'Person' and 'Enterprise'

In its October 10th Opinion, the court noted that defendants' RICO class counterclaims allege that any one or all of the counterclaim defendants, or unnamed 'other persons', constitutes an 'enterprise' for the purpose of any one or all of the counts based on individual RICO subsections, and that any one or all of the counterclaim defendants 'and others' constitutes a 'person' for the purpose of any one or all of the subsections. Opinion at 21–22. The court concluded that such wholesale pleading was insufficient to place the counterclaim defendants on notice of the theories advanced against them, or to establish that a claim is stated against each of them, and dismissed these claims with leave to replead.

**\*5** By way of reaching its conclusion to dismiss defendants' RICO class counterclaims, the court noted that, in considering an alleged violation of 18 U.S.C. § 1962(c), the Third Circuit has ruled that the 'person' alleged cannot be the same individual or entity as the 'enterprise'. B.F. Hirsch v. Enright Refining Co., Inc., 751 F.2d 628, 633–34 (3d Cir. 1985). In its Opinion, this court ruled that this requirement of differentiation between the 'person' and the 'enterprise' pleaded in any RICO claim applies to all of the subsections of 18 U.S.C. § 1962, the section of RICO defining the behavior outlawed. Opinion at 21 n.5. Moreover, the court ruled that, with regard to each RICO subsection, only the alleged 'person' could properly be named as the defendant. Id. at 20.

Defendants now argue that the court took too strict a view of the pleading rules and urge the court to reinstate their RICO class counterclaims. In addition, they argue, relying on a recent decision by Judge Fisher of this court, B.F. Hirsch, Inc. v. Enright Refining Co., 617 F.Supp. 49 (D.N.J. 1985),[3] that a RICO 'person' and an 'enterprise' can be a single entity in claims alleging a violation of 18 U.S.C. § 1962(a).

The court's ruling in its Opinion dismissing defendants'

Kredietbank, N.V. v. Joyce Morris, Inc., Not Reported in F.Supp. (1986)

RICO class counterclaims with leave to replead was based on the fact that the jumble of allegations made by defendants could not apprise the counterclaim defendants of the theories being advanced against them and made it impossible to determine whether defendants claims stated a cause of action. Nothing in the defendants' argument cause the court to alter its view. First of all, the court respectfully differs from Judge Fisher's view that a properly pleaded RICO claim can ever identify the 'person' and the 'enterprise' as a single entity. This court believes that the only consistent way to read the statute is to recognize a differentiation between the 'person' guilty of the unlawful acts, and the 'enterprise' in connection with which the unlawful acts were perpetrated, as suggested in the Third Circuit's decision in B.F. Hirsch, 751 F.2d at 633–34, regardless of the particular RICO subsection involved.[4]

Second, although RICO claims are no less subject to the liberal pleading requirements of the federal rules than are any other claims, Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786, 790 (3d Cir. 1984), a pleading must nevertheless fulfill the minimum requirement of giving notice to the defendant of the claim stated and must, of course, allege a cognizable cause of action. Here, defendants' muddling of the 'persons' and 'enterprises' alleged in each claim makes it impossible to determine whether each claim states a cause of action. For example, in defendants' second substantive RICO class counterclaim, defendants allege that counterclaim defendants K.B. Business Credit, Kredietbank, and Luc Philips, conducted and participated in the affairs of certain listed enterprises through a pattern of racketeering activity. Yet the listed enterprises include K.B. Business Credit, Kredietbank, and Luc Philips, individually and in combination. Because of the fact that RICO requires a differentiation between 'person' and 'enterprise', neither K.B. Business Credit, Kredietbank, nor Luc Philips, could be guilty of a RICO violation if he simply conducted his own affairs as an enterprise through a pattern of racketeering activity. Notably, neither could each counterclaim defendant as an individual be guilty of conducting the affairs of the group as an enterprise, absent some allegation that the combination of them constitutes an 'enterprise' separate and apart from the pattern of racketeering activity alleged. Seville, 742 F.2d 790 n.5, which allegation nowhere appears in the counterclaims. Because of these problems, defendants' second RICO class counterclaim only possibly states a cause of action as against each individual counterclaim defendant for conducting the affairs of one of the other individual counterclaim defendants as an enterprise. Even pared to that extent, there may well be additional problems with any suggestion in the counterclaim that K.B. Business Credit or Kredietbank conducted the affairs of Philips as

an enterprise through a pattern of racketeering. See Opinion at 26.

**\*6** Counterclaim defendants are entitled to 'a short and plain statement of the claim showing the pleader is entitled to relief,' Fed. R. Civ. P. 8(a), without the extraneous verbiage that appears in this complaint. In light of the court's rulings on these issues, it is not too much to ask the defendants to go through the reasoning required of them by the caselaw to determine what viable counterclaims caselaw permits them, and to allege only those specific claims which can be asserted in good faith. It is no violation of the liberal pleading rules to require a party to engage in some filtering of his claims, or at least to set forth a separate and clear statement of each claim against each individual defendant, if not for the benefit of the defendant, then at least for the benefit of the court. Accordingly, the court will not reconsider its original ruling dismissing defendants' RICO class counterclaims with leave to replead.

### III. Retroactivity of New York Gen. Oblig. Law § 5–526

Defendants' final argument is that the court erred in according retroactive effect to New York's Gen. Oblig. Law § 5–526, adopted August 5, 1984, as Chapter 844 of New York's 1984 Session Laws. Defendants argue that the court erred in assuming that K.B. Business Credit was a 'banking institution' within the meaning of New York's General Obligations and Banking Laws at the time the loans in question were extended, and that, but for the court's erroneous assumption, the court would have found § 5–526 not to be retroactive.

As noted in the court's Opinion, under New York's Gen. Oblig. Law § 5–511 and Banking Law § 108(6), banking institutions are exempt from the general rule that contracts charging illegal rates of interest are unenforceable. A banking institution is subject only to forfeiture of interest and liability to the borrower for twice the amount paid. See Hempstead Bank v. DeBuona, 421 N.Y.S.2d 95 (App. Div. 1979); Flushing National Bank v. Pinetop Building Corp., 387 N.Y.S.2d 8 (App. Div. 1976), aff'd mem., 399 N.Y.S.2d 210 (1977). In its Opinion, the court assumed that the loans in question in this case were subject to this exemption because plaintiff/counterclaim defendants' reliance on Flushing National Bank, Plaintiff's Mem. of Law in Support of Motion to Dismiss at 36, went unanswered in defendants' opposition papers. Regardless of whether this assumption was correct, however, it was not essential to the court's holding on the question.[5]

The court's discussion of the special provisions regarding loans extended by banking institutions was purely an attempt to clarify what was at stake in its decision as to

Kredietbank, N.V. v. Joyce Morris, Inc., Not Reported in F.Supp. (1986)

the retroactivity of Gen. Oblig. Law § 5–526, and was not an essential element in the court's analysis. As the court noted in its Opinion, the most important determinant of a statute's retroactivity is the legislative intent. Opinion at 39–40, citing Becker v. Huss Co., Inc. 402 N.Y.S.2d 980, 984 (1978); State v. Wolowitz, 468 N.Y.S.2d 131, 141 (App. Div.1983). After a review of the legislative history of the enactment, supplied by defendants, the court concluded that the legislature viewed the existing usury ceiling for asset-based commercial loans as an 'imperfection[ ] in the law', and that § 5–526 was enacted as a corrective measure. Opinion at 42, quoting Cady v. Broome County, 451 N.Y.S.2d 206,207 (App. Div.), appeal denied, 454 N.Y.S.2d 1027 (1982). In light of the statute's remedial purpose, the court determined that the legislature did not intend to leave intact any of the penalties from which commercial lenders were exempted under § 5–526. Whether the penalties consisted of forfeiture of principal, or merely forfeiture of interest and additional liability to the borrower, was not material to the court's decision. Consistent with this holding, no distinction among types of forfeitures was made in the one New York decision most closely analogous to the circumstances here. Curtis v. Leavitt, 15 N.Y. 9 (1857).

**\*7** Nothing in the additional legislative materials supplied by defendants in connection with this motion convinces the court to the contrary. See Defendants' Reply Mem., Exhibits. Nor is the court convinced that K.B. Business Credit's status as a non-banking institution has any bearing on the distinction between the circumstances in this case and those of Eikenberry v. Adirondack Spring Water, 490 N.Y.S.2d 484 (1985), which the court distinguished in its Opinion. The court did rely on the distinction in penalties between loan agreements entered into by banking institutions and loan contracts between individuals in distinguishing Eikenberry. See Opinion at 44. But that is by no means the only distinction between the two cases.

First of all, as the court in Eikenberry recognized, legislative intent is the key to determining the retroactivity of a statute. Eikenberry did not deal with § 5–526, and so is not controlling on the question of whether that provision was intended to apply retroactively.

Second, to make a point not raised in the court's earlier Opinion, § 5–526 was not simply an 'interest rate ceiling raising provision', as defendants have characterized it.[6] Rather, it provided that interest charged on certain loans, meeting criteria set forth in the statute, would not be 'subject to the limitations of this title [General Obligations Law, Title 5] or sections 190.40 and 190.42 of the penal law . . .' § 5–526(1). Among the 'limitations

of this title' are the voiding provisions of § 5–511. Of course, §§ 190.40 and 190.42 are the provisions defining criminal penalties for loans in excess of the criminal usury ceiling. Thus, for a certain class of loans 'made to corporations for business or commercial purposes', § 5–526(1) repealed all applicable penalty and forfeiture provisions. Like the act in question in Curtis v. Leavitt,

> The effect of [§ 5–526] is to repeal the statute of usury so far as it applies [to the class of loans defined in the section]. The condition of this class . . . . becomes the same as if the usury laws never existed . . . [t]he general rule of the common law is, that a statute shall be so construed as not to have a retrospective operation . . . the effect of a repealing clause, upon a previous statute which imposes a penalty, takes away all right to the penalty . . .. The borrower can have no vested interest in the penalty or forfeiture which follows the proof of usury in an action where that defense is interposed.

15 N.Y. at 152–54.

In Eikenberry, in contrast, the only question for the court was whether interest rates currently within the usury rate ceiling could be imposed retroactively to cover a period during which usury rate ceilings were lower. The New York Court of Appeals found that they could not, and that any contract so providing was unenforceable. There was no statute analogous to § 5–526 in Eikenberry which eliminated penalties applicable to the loan at issue. Eikenberry therefore does not disturb the holdings of Curtis v. Leavitt and the cases following it, that, where a remedial statute eliminates a penalty, whether the penalty be unenforceability of a contract or some other measure, which penalty has been determined by the legislature to be deleterious and against the public interest, the penalty ought not to be imposed in any case coming before the court subject to the repealing act, after the effective date of the repealing act.[7]

**\*8** In sum, the court is not moved to reconsider its prior ruling by defendants' clarification of K.B. Business Credit's non-banking status, or by any of the other objections raised by defendants. Accordingly, the court's prior ruling will stand.

## CONCLUSION

For the foregoing reasons, defendants' motion to reconsider the court's Opinion and Order of October 10, 1985, is denied.

### ORDER

This matter having been opened to the court upon the motion of the defendants/counterclaimants, for reconsideration of the Opinion and Order of the court dated October 10, 1985, and the court having read and considered the moving papers, and the opposition thereto, and for the reasons expressed in the Opinion of the court even dated herewith,

IT IS this 9 day of January, 1986, hereby ORDERED that the motion of the defendants/counterclaimants for reconsideration of the Opinion and Order of the court dated October 10, 1985, be and it hereby is denied.

### ORDER

IT IS this 9 day of January 1986, hereby ORDERED that the Opinion of the court in this matter dated October 10, 1985, be and it hereby is amended as follows:

On page 30, the last sentence of the first full paragraph is amended to read.

'The only question before the court, therefore, is whether the plaintiff is subject to penalties in attempting to enforce the contract, not whether the contract itself is unenforceable.'

### Footnotes

1    Defendants also apparently object that '[t]he 'pattern' issue was not previously briefed or argued by the parties.' Defendants' Mem. at 9. The court notes, however, that defendants prior Memorandum in Opposition to Plaintiff/Counterclaim Defendant's Motion to Dismiss contained a section entitled 'The Counterclaims Allege a 'Pattern of Racketeering Activity', id. at 22, in which the defendant contended that

     [m]ultiple violations of either the mail fraud or conspiracy statutes is sufficient to constitute a 'pattern of racketeering activity' and it does not matter if the multiple violations are part of the same scheme . . . The element of a RICO claim known as a 'pattern of racketeering activity' is defined in the statute itself. It means 'two or more acts of racketeering activity' within ten years, 18 U.S.C. § 1961(c) . . .

     Id. and n.6. In addition, at oral argument, the court expressed incredulity at defendants' suggestion that the mailing of two false affidavits in this very litigation could itself satisfy the requirements of RICO. When Sedima was issued during the pendency of this court's decision, contradicting defendants' statement of the law regarding the requisites for pleading a 'pattern of racketeering activity', the court was, of course, not free to ignore it. In light of the Supreme Court's emphasis on the 'pattern' issue, it was not inappropriate to address the issue here. Cf. Northern Trust Bank/O'Hare, N.A. v. Inryco, Inc., 615 F.Supp. 828, 830 n.5 (N.D. Ill. 1985).

2    Defendants also suggest that the 'pattern' requirement in New Jersey's anti-racketeering law is broader than its equivalent in RICO. Defendant's Mem. at 9. Defendants cite no caselaw for this proposition, however. Moreover, the court notes that it is common practice for New Jersey courts to construe New Jersey statutes modelled after federal enactments in a way consistent with the construction given the federal statute by the federal courts. See, e.g., Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 81 (1978) (in the interests of uniformity, New Jersey would follow federal precedent in employment discrimination actions under state law analogous to federal Title VII); Goodman v. London Metals Exchange, 86 N.J. 19, 31 (1981); Anderson v. Exxon Co., 89 N.J. 483, 492 (1982). Given the consistency between New Jersey's anti-racketeering law and RICO, the court sees no reason to depart from this practice. Accordingly, the court will not treat defendants anti-racketeering counterclaim based on New Jersey law any differently than it has treated defendants' RICO counterclaim.

3    This decision issued after the remand of the matter by the Court of Appeals in B.F. Hirsch v. Enright Refining Co., Inc., 751 F.2d 628 (3d Cir. 1985).

4    The reason offered for treating § 1962(a) differently from other subsections of § 1962 is the unique language of the subsection, which makes it unlawful for 'any person who has received any income derived . . . from a pattern of racketeering activity . . . to use or invest . . . any part of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise . . .' 18 U.S.C. § 1962(a) (emphasis supplied). This language has been interpreted to indicate that '[u]nder subsection (a) . . . the liable person may be a corporation using the proceeds of a pattern of racketeering activity in its operations.' B.F. Hirsch, Inc. v. Enright Refining Co., 617 F.Supp. at 51–52, quoting Haroco, Inc. v. American National Bank & Trust Co., 747 F.2d 384, 402 (7th Cir. 1984), aff'd on other grounds, 105 S.Ct. 3291 (1985). This court notes, however, that subsection (a), like each of the other subsections of § 1962, speaks of a 'person' committing the unlawful act in connection with, but distinct from, an 'enterprise.' As

Kredietbank, N.V. v. Joyce Morris, Inc., Not Reported in F.Supp. (1986)

the court noted in its Opinion, it is convinced that the consistent use of the two different words 'person' and 'enterprise' throughout § 1962 indicates an intention to distinguish between those actors throughout.

5   Plaintiff/counterclaim defendants appear to concede that K.B. Business Credit is not a 'banking institution' within the meaning of New York's General Obligations and Banking Laws. Plaintiff's Mem. in Opposition to Motion at 2.

6   Indeed, § 5–526 does not even result in any effective increase in the interest rate ceiling where the average prime rate is below 17 percent.

7   Defendants' objection that this would result in 'disparate treatment of litigants depending upon the fortuity of the status of their cases on that date,' Defendants' Reply Mem. at 5, is misconceived. In any case prior to final judgment, a party may urge the application of a change in the law by a procedural or remedial statute. In cases in which final judgment has been entered and the time for appeal has passed, it is true that a change in the law, regardless of the posture of the act effecting the change, will not normally provide grounds for reopening a matter after a final judgment, C. Wright & A. Miller, 11 Federal Practice and Procedure § 2864, pg. 223, but the 'unfairness' of this rule is not specific to this case, and is in any event well supported by the interests of repose and judicial economy.

---

**End of Document**                                             © 2013 Thomson Reuters. No claim to original U.S. Government Works.

---

**EXHIBIT I**

Case 2:12-cv-06371-SDW-MAH Document 89-1 Filed 03/31/14 Page 126 of 163 PageID: 2066
Pappa v. Unum Life Ins. Co. of America, Not Reported in F.Supp.2d (2008)

RICO Bus.Disp.Guide 11,466, 43 Employee Benefits Cas. 2389

2008 WL 744820

United States District Court,

M.D. Pennsylvania.

Cheryl PAPPA, Plaintiffs,

v.

UNUM LIFE INSURANCE COMPANY OF
AMERICA, Unumprovident Corporation,
International Claims Specialists, Inc., Examination
Management Services, Inc., Defendants.

No. 3:07-CV-0708. | March 18, 2008.

**Attorneys and Law Firms**

Michael G. Gallacher, Roth & Dempsey, P.C., Scranton, PA,
for Plaintiffs.

Steven Schildt, Post & Schell, Johnathan F. Bloom, Stradley,
Ronon, Stevens & Young, LLP, Philadelphia, PA, for
Defendants.

**Opinion**

### MEMORANDUM

A. RICHARD CAPUTO, District Judge.

*1 Presently before the Court is Defendants' motion to
dismiss the Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6), or in the alternative, for summary
judgment pursuant to Federal Rule of Civil Procedure 56.
(Docs.8, 9). Pursuant to this Court's Order of December 3,
2007, the Court will rule on this motion as a motion to dismiss.
As Plaintiff has failed to allege the continuity and relatedness
requirements to show a pattern of racketeering, Counts I and
III will be dismissed. Because Plaintiff failed to allege the
substantive RICO claim of 18 U.S.C. § 1962(c), the claims
for conspiracy to violate that section in Counts II and IV will
also be dismissed. Count VI will also be dismissed, as ERISA
preempts Plaintiff's ability to bring an intentional infliction
of emotional distress claim. The motion to dismiss on Counts
V and VII will be denied, as Plaintiff has properly alleged a
claim for defamation and for intrusion upon seclusion.

The Court has jurisdiction pursuant to 28 U.S.C. § 1331
("federal question") under the federal RICO statute, 18 U.S.C.
§ 1962, as well as pursuant to 28 U.S.C. § 1332 ("diversity").

### BACKGROUND

The facts as alleged in Plaintiff's Complaint are as follows.

Plaintiff Cheryl Pappa is an adult residing in Lackawanna
County, Pennsylvania. (Compl. ¶ 1, Doc. 2 Ex. A.) Defendant
Unum Life Insurance Company of America ("Unum
Life") is a corporation authorized to conduct insurance
business in the Commonwealth of Pennsylvania. (Id. ¶ 2.)
Defendant UnumProvident Corporation ("UnumProvident")
is a corporation authorized to conduct insurance business
in Pennsylvania, and is the parent company of Defendant
Unum Life, its wholly owned subsidiary. (Id. ¶ 3.) Defendant
International Claim Specialists, Inc. ("ICS") is a corporation
authorized to conduct business in Pennsylvania. (Id. ¶
4.) Defendant Examination Management Services, Inc.
("Examination Management") is a corporation authorized to
conduct business in Pennsylvania, and is the parent company
of Defendant ICS, its wholly owned subsidiary. (Id. ¶ 5.)
Defendant alleges diversity in its removal action, as Plaintiff
is a citizen and resident of Pennsylvania. (Removal Petition,
¶ 6, Doc. 1.) Defendant Unum Life is incorporated in
Maine, with principal place of business in Maine. (Id. ¶ 7.)
Defendant UnumProvident is incorporated in Delaware with a
principal place of business in Tennessee. (Id. ¶ 8.) Defendant
Examination Management is a Nevada corporation with a
principal place fo business in Texas. (Id. ¶ 10.) Defendant
ICS is not a legal entity, as it is an unincorporated division
of Examination Management. (Id. ¶ 9.) Plaintiff's complaint
does not allege a specified amount of damages, although the
removal petition states that Plaintiff's damages are in excess
of $75,000. (Id. ¶ 11.)

In May 2005, Plaintiff Pappa was receiving disability benefits
from Defendants Unum Life and UnumProvident pursuant
to a long-term disability policy. (Compl. ¶ 6.) Plaintiff was
receiving these benefits due to a spinal injury which prevented
her from working as a Senior Corporate Account Executive
at Vanguard Cellular One. (Id.) These injuries made it
impossible for the Plaintiff to sit or drive for long periods of
time, or to set up displays as required by her employment.
(Id.) During the spring of 2005, Defendants Unum Life
and UnumProvident placed an interstate telephone call and/
or sent an interstate telefax to Examination Management
and ICS requesting that they conduct video surveillance
of the Plaintiff. (Id. ¶ 8.) Defendants Unum Life and
UnumProvident requested this video surveillance intending to
terminate the Plaintiff's disability benefits, regardless of what

the video surveillance disclosed or failed to disclose. (*Id.* ¶ 9.) The Defendants conspired with each other to obtain video surveillance to terminate the Plaintiff's disability benefits. (*Id.* ¶ 10.)

**\*2** On May 3, 4, and 5, 2005, as part of the conspiracy between Unum Life, UnumProvident, Examination Management, and ICS, video surveillance was conducted at and of the Plaintiff's place of residence in Lackawanna County, Pennsylvania. (*Id.* ¶ 11.) In accordance with the conspiracy, Defendants Examination Management and ICS trespassed onto Plaintiff's private property and conducted video surveillance of the Plaintiff's bedroom and bathroom windows without the Plaintiff's knowledge, consent, or approval. (*Id.* ¶ 12.) When the Defendants Examination Management and ICS failed to videotape the Plaintiff, they began following and videotaping Plaintiff's daughter, Erika Pappa, intending to claim that Erika Pappa was the Plaintiff. (*Id.* ¶ 13.) Defendants Examination Management and ICS observed Erika Pappa enter a vehicle at Plaintiff's home, drive on the interstate highways, stop along the way, exit and enter the vehicle, and ultimately end her trip in Hoboken, New Jersey. (*Id.*) This surveillance was done with the intent to falsely claim the automobile trip was taken by the Plaintiff. (*Id.*) During the course of the trip from Pennsylvania to New Jersey, Defendants Examination Management and ICS exchanged multiple interstate telephone calls with Defendants Unum Life and UnumProvident during which the conspiracy was furthered. (*Id.* ¶ 14.)

Erika Pappa was thirty-one (31) years old, five (5) feet seven (7) inches tall, weighed one-hundred and fifteen (115) pounds, and had red hair. (*Id.* ¶ 15.) In contrast, Plaintiff was fifty-two (52) years old, five (5) feet four (4) inches tall, weighed one-hundred and thirty-five (135) pounds and had brown hair. (*Id.*) After the interstate phone calls between the Defendants, Defendants Examination Management and ICS either failed to videotape the face and identity of Erika Pappa despite multiple opportunities to do so, or otherwise videotaped her knowing the video footage establishing her identity would later be erased. (*Id.* ¶ 16.)

After obtaining the videotaped footage of Erika Pappa, Defendants created a digital video disc (DVD) from the videotaped footage. (*Id.* ¶ 17.) However, the Defendants then eliminated from the DVD all original video footage establishing Erika Pappa in the video. (*Id.*) The Defendants then claimed that the DVD depicted the Plaintiff driving

to New Jersey, an activity that Plaintiff would not be able to perform due to her spinal injuries. (*Id.*) After the video footage of Erika Pappa was obtained and altered by the Defendants, Defendants Examination Management and ICS created a false and fraudulent report alleging that Plaintiff made the trip to New Jersey. (*Id.* ¶ 18.) This report states that the person followed from Pennsylvania to New Jersey was the Plaintiff, when Defendants knew it was not. (*Id.* ¶ 19.) The original videotape and/or the altered DVD were sent via interstate United States mail by the Defendants to Benjamin Nakkache, M.D., who was retained by Defendants Unum Life and UnumProvident to perform an allegedly independent medical evaluation. (*Id.* ¶ 20.) Dr. Nakkache was retained by Unum Life and UnumProvident by interstate telephone and/or interstate telefax. (*Id.*) Defendants falsely represented to Dr. Nakkache that the DVD depicted the Plaintiff driving from Pennsylvania to New Jersey in order to manipulate the opinion of Dr. Nakkache. (*Id.* ¶¶ 21, 22.) Dr. Nakkache viewed and relied upon the false DVD and false representations made by the Defendants. (*Id.* ¶ 23.) Based upon the false representations and false DVD, Dr. Nakkache erroneously concluded that the Plaintiff could return to work. (*Id.* ¶ 24.)

**\*3** The same false DVD was also sent by interstate United States mail by the Defendants to Pameal Costello, M.D., Plaintiff's treating physician, with the false representation that the video depicted the Plaintiff driving to New Jersey. (*Id.* ¶ 25.) Defendants Unum Life and UnumProvident also forwarded to Dr. Costello a copy of Dr. Nakkache's medical report. (*Id.*)

These activities by Defendants Unum Life and UnumProvident were in violation of the Regulatory Settlement Agreement ("RSA") entered into by Defendant Unum Life and other insurance regulators. (*Id.* ¶ 26.) In the 2004 RSA, Unum Life agreed to change its claims procedures to fairly interpret and apply information from a claimant's attending physician and independent medical examiners without any attempt to influence the medical professionals. (*Id.* ¶ 27.) In the RSA, Unum Life further agreed to provide all available evidence in the claim file to the medical professionals. (*Id.* ¶ 28.) The Defendant Unum Life entered into this RSA after it and its wholly owned subsidiaries engaged in a pattern of deceptive, fraudulent, and illegal claim practices. (*Id.*) As part of this pattern, Defendants Unum Life and UnumProvident and/or other wholly owned subsidiaries of the Defendant conducted surreptitious video surveillance of the child of another disabled claimant. (*Id.*) This video

footage showed the child performing physical activities that the claimant could not perform. (*Id.*) Defendants Unum Life and UnumProvident falsely claimed the child was the claimant and terminated the claimant's benefits. (*Id.*)

Defendants Unum Life and UnumProvident, by knowingly providing the false DVD and misrepresentations to Drs. Nakkache and Costello, continued their pattern of deceptive and fraudulent claim practices, and attempted to influence the opinions of the medical professionals in violation fo the RSA and the rights of the Plaintiff. (*Id.* ¶ 29.) Defendants withheld the most important portions of the video footage from Drs. Nakkache and Costello-the portions which established that Plaintiff's daughter Erika Pappa was the driver of the vehicle. (*Id.* ¶ 30.)

After providing the false DVD to Dr. Nakkache and receiving an erroneous medical report from him, Defendants Unum Life and UnumProvident terminated Plaintiff's disability benefits and forcing the Plaintiff to retain an attorney and expend thousands of dollars to have her benefits reinstated. (*Id.* ¶ 31.) After Defendants terminated her benefits, Plaintiff was required to liquidate her retirement funds to pay for necessary living expenses. (*Id.* ¶ 32.)

During the course of the proceedings to have her disability benefits reinstated, the Plaintiff obtained a court order requiring Defendants Unum Life and UnumProvident to produce the true, complete and unaltered original video surveillance taken by the Defendants in May 2005. (*Id.* ¶ 34.) Two videotapes were produced. (*Id.* ¶ 35.) Both tapes were viewed by counsel for Plaintiff and Defendants at the office of Defendants' counsel prior to the Plaintiff receiving possession of the tapes. (*Id.* ¶ 36.) At the viewing of Tape No. 1, it was determined that the footage contained twenty-two (22) minutes and thirty (30) seconds of footage. (*Id.* ¶ 40.) However, the case containing Tape No. 1 sent to the Plaintiff states that the tape contains eleven (11) minutes and twenty (20) seconds of footage. (*Id.* ¶ 39.)

**\*4** The Plaintiff filed her original Complaint in the Court of Common Pleas of Lackawanna County. (Doc. 2 Ex. A.) Plaintiff's Complaint includes seven (7) counts, including violations of 18 U.S.C. § 1962(c) and (d), defamation, intentional infliction of emotional distress, and invasion of privacy via intrusion upon seclusion. Defendants removed the case to the Middle District of Pennsylvania on April 16, 2007 (Doc. 1-1.) Defendants filed the present motions to dismiss, or in the alternative, for summary judgment on May 8, 2007.

(Docs.8, 9.) On December 3, 2007, the Court ordered that it will rule on this motion as a motion to dismiss. (Doc. 29.)

The motions are fully briefed and ripe for disposition.

## LEGAL STANDARD

Rule 12(b) (6) of the Federal Rules of Civil Procedure provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Dismissal is appropriate only if, accepting as true all of the facts alleged in the complaint, Plaintiff has not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. ----, 127 S.Ct. 1955, 1960, 167 L.Ed.2d 929 (2007) (abrogating "no set of facts" language found in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). As a result of the *Twombly* holding, Plaintiffs must now nudge their claims "across the line from conceivable to plausible" to avoid dismissal thereof. *Id.* The Supreme Court noted just two weeks later in *Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) (per curiam), that *Twombly* is not inconsistent with the language of Federal Rule of Civil Procedure 8(a) (2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Id.* (citing *Twombly,* 127 S.Ct. at 1959 (quoting *Conley,* 355 U.S. at 47)).

There has been some recent guidance from the Courts of Appeals about the apparently conflicting signals of *Twombly* and *Erickson.* The Second Circuit Court of Appeals reasoned that "the [Supreme] Court is not requiring [in *Twombly* ] a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (emphasis in original). Similarly, the Seventh Circuit Court of Appeals stated that "[t]aking *Erickson* and *Twombly* together, we understand the Court to be saying only that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT & T Mobility LLC,* 499 F.3d 663, 667 (7th Cir.2007).

Case 2:12-cv-06371-SDW-MAH   Document 89-1   Filed 03/31/14   Page 129 of 163 PageID: 2069
Pappa v. Unum Life Ins. Co. of America, Not Reported in F.Supp.2d (2008)
RICO Bus.Disp.Guide 11,466, 43 Employee Benefits Cas. 2389

**\*5** Until further guidance, this Court will follow the guidance of the Second and Seventh Circuit Courts of Appeals, and apply a flexible "plausibility" standard, on a case-by-case basis, in those contexts in which it is deemed appropriate that the pleader be obliged to amplify a claim with sufficient factual allegations.

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994). The Court may also consider "undisputedly authentic" documents where the plaintiff's claims are based on the documents and the defendant has attached a copy of the document to the motion to dismiss. *Id.* The Court need not assume that the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. West Penn Power Co.,* 147 F.3d 256, 263 (3d Cir.1998), nor credit a complaint's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997).

When considering a Rule 12(b)(6) motion, the Court's role is limited to determining whether the plaintiff is entitled to offer evidence in support of the claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court does not consider whether the plaintiff will ultimately prevail. *See id.* In order to survive a motion to dismiss, the plaintiff must set forth information from which each element of a claim may be inferred. *See Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). The defendant bears the burden of establishing that the plaintiff's complaint fails to state a claim upon which relief can be granted. *See Gould Elecs. v. United States,* 220 F.3d 169, 178 (3d Cir.2000).

## DISCUSSION

**I. Counts I and III-Violation of 18 U.S.C. § 1962(c)**

*A. Standing*

Defendants argue that the Plaintiff lacks standing to bring a RICO claim pursuant to 18 U.S.C. § 1962(c) based upon Plaintiff's lack of reliance based upon the ICS surveillance and the lack of the proper *mens rea* by Defendants. To have standing, Plaintiff must further plead injury to her business or property, and that the Defendants proximately caused such injury.

*1. Reliance*

Defendants' first argument states that Plaintiff Pappa lacks standing to bring a civil RICO claim because she has not been "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c) (emphasis added). Defendants argue that Plaintiff has failed to allege reliance to establish injury "by reason of" a predicate act of mail or wire fraud. Defendants further argue that to have standing, the Plaintiff must allege that she relied on and was deceived by the alleged misconduct. Noting that Plaintiff relies on mail and wire fraud as her predicate acts, Defendant states that there must be reliance to create such a predicate act. In opposition, Plaintiff argues that there is no requirement that the Plaintiff demonstrate reliance.

**\*6** The mail fraud statute provides in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purposes of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... shall be fined under this title or imprisoned not more than 20 years, or both.

See 18 U.S.C. § 1341. Similarly, the wire fraud statute of 18 U.S.C. § 1343 holds, in relevant part, that:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title

or imprisoned not more than 20 years,
or both.

The Third Circuit Court of Appeals has held that "A scheme or artifice to defraud need not be fraudulent on its face, but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension." *Kehr Packages, Inc. v. Fidelcor,* 926 F.2d 1406, 1415 (3d Cir.1991). "The scheme need not involve affirmative misrepresentation, but the statutory term 'defraud' usually signifies the deprivation of something of value by trick, deceit, chicane or overreaching." *Id.* (internal quotations and citations omitted).

The Supreme Court has recently granted certiorari to *Bridge v. Phoenix Bond & Indem. Co.,* 128 S.Ct. 829 (Jan. 4, 2008), specifically limited to the question of "Whether reliance is a required element of a RICO claim predicated on mail fraud and, if it is, whether that reliance must be by the plaintiff." *Id.* Although certiorari has been granted to clarify this issue, at this time, the Court finds that reliance is necessary, although it is not necessary on part of the plaintiff.

"[M]ost courts now agree that reliance must be shown when mail fraud is a predicate act in a civil RICO case." *Allen Neurosurgical Assoc., Inc. v. Lehigh Valley Health Network,* No. Civ. A. 99-4653, 2001 WL 41143, at *4 (E.D.Pa. Jan.18, 2001) (citing cases from the Fifth, Fourth, Eighth, Sixth, Eleventh, and Second Circuit Courts of Appeals). The reliance requirement is derived from RICO's proximate cause requirement in 18 U.S.C. § 1964(c), which limits recovery "[a]ny person injured in his business or property *by reason of* a violation." *See Allen,* 2001 WL 41143 at *4.

In this case, Plaintiff states that she herself need not have relied on the misrepresentations. Rather, she claims that reliance exists on the part of third parties. Plaintiff states that she was the target of Defendants' scheme to defraud her from her benefits, and that the reliance occurred on the part of the physicians who recommended the termination of her benefits based upon the tapes of Plaintiff's daughter.

 **7** In *Phoenix Bond & Indem. Co. v. Bridge,* 477 F.3d 928, 932 (7th Cir.2007), the case now before the Supreme Court, the Seventh Circuit Court of Appeals considered a RICO claim where no false statements were made to the plaintiff. The court stated that "[t]he mail fraud statute ... defines a fraudulent *scheme,* rather than a particular false statement, as

the crime." *Id.* In its finding, the court did not require that the plaintiff be taken in by any false statement. *Id.*

Furthermore, in *Procter & Gamble Co. v. Amway,* 242 F.3d 539, 564-65 (5th Cir.2001), the Fifth Circuit Court of Appeals noted a narrow exception to the reliance requirement, holding that "a target of fraud that did not itself rely on the fraud may pursue a RICO claim if the other elements of proximate causation are present." *Id.*

In the present case, Plaintiff has sufficiently plead reliance on the part of third parties, in this case, doctors Nakkache and Costello, who ultimately concluded that Plaintiff could return to work and therefore no longer entitled to benefits. (Compl. ¶¶ 18-25, Doc. 2 Ex. A.) As Plaintiff has sufficiently plead that she was the "target" of the fraud, and that reliance occurred on the part of a third party, Plaintiff has sufficiently plead the reliance element of mail and wire fraud.

### 2. Mens Rea

Defendants further argues that Plaintiff's RICO claim fails on the basis of the Defendants' *mens rea.* In *Genty v. Resolution Trust Corp.,* 937 F.2d 899, 908 (3d Cir.1991), the Third Circuit Court of Appeals stated that the RICO statute is silent on the issue of *mens rea* for purposes of RICO, and that the legislative history sheds no further light on the issue. The court further noted that some courts have held that RICO imposes no special *mens rea* requirement beyond the *mens rea* required for the underlying predicate acts. *Id.* (citing *United States v. Biasucci,* 786 F.2d 504, 512 (2d Cir.1986), *cert. denied,* 479 U.S. 827 (1986)). In Genty, the court assumed for the purposes of the case that there was no special *mens rea* requirement beyond the commission of the predicate acts. *Id.* The court then discussed the required *mens rea* for the predicate acts at issue in the case-mail fraud pursuant to 18 U.S.C. § 1341. *Id.* In discussing the *mens rea* required for mail fraud, the court held that "the defendants must have knowledge of the illicit objectives of the fraudulent scheme and willfully intend that those large objectives would be achieved." *Id.* at 908-09 (citing *United States v. Pearlstein,* 576 F.2d 531, 541 (3d Cir.1978)).

In this case, Plaintiff has sufficiently plead the *mens rea* for mail and wire fraud required to survive a motion to dismiss. Plaintiff has alleged that Defendants acted "intentionally" in conducting the surveillance, with intent to terminate Plaintiff's benefits. (Compl. ¶¶ 8-10, Doc. 2 Ex. A.) Plaintiff further alleges that Defendants acted with intent to fraudulently claim that Plaintiff's daughter was the

Plaintiff. (*Id.* ¶ 13.) Plaintiff alleges that the report sent to the doctors "willfully, maliciously, and falsely states that the person followed from Pennsylvania to New Jersey was the Plaintiff, when the Defendants knew that it was not." (*Id.* ¶ 19.) Plaintiff further alleges that these tapes were sent to third parties, "to falsely claim that the Plaintiff was able to perform the physical activities of her prior employment, when in fact the Defendants knew she could not, and to falsely manipulate the opinion of [the third parties]." (*Id.* ¶ 22.)

**\*8** Therefore, the Plaintiff has successfully plead the *mens rea* requirement for mail and wire fraud for the purposes of surviving a motion to dismiss.

### 3. Injury to Business or Property

A plaintiff must allege injury "in his business or property" caused by the violation of RICO. 18 U.S.C. § 1964. In order to properly allege a RICO violation, the plaintiff must claim damage to business or property, and cannot allege injury by nature of mental distress. *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1169 (3d Cir.1987). In *Zimmerman,* the Third Circuit Court of Appeals noted that a plaintiff seeking recovery pursuant to RICO must allege injury "in his business or property" which was caused by a violation of the act. *Id.* (Citing 18 U.S.C. § 1964). Citing the Supreme Court case of *Reuter v. Sonotone,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), the *Zimmerman* court noted that the *Reuter* Court construed identical language found in the Clayton Act. The Supreme Court held that Congress intended the phrase "business or property" to exclude personal injury. *Zimmerman,* 834 F.2d at 1169 (citing *Reuter,* 442 U.S. at 339). In *Zimmerman,* the court noted that the plaintiff only alleged injury in the form of mental distress, which is not an injury in business or property. *Id.* Therefore, the court held that he had no cause of action under RICO. *Id.*

In *Maio v. Aetna, Inc.,* 221 F.3d 472 (3d Cir.2000), the Third Circuit Court of Appeals held that a lack of damages constituted a lack of standing. *Id.* at 482 n. 7. In *Aetna,* the issue before the court was whether the plaintiffs alleged a valid RICO injury to business or property sufficient to give them standing to sue pursuant to RICO. *Id.* at 482. Plaintiffs sued their HMO alleging that they received an "inferior health care" product. *Id.* They did not claim a denial of benefits or treatment, but stated that Defendant's misrepresentations caused them to overpay their premiums. *Id.* To have standing to sue, a plaintiff must demonstrate injury to business or property. *Id.* (citing *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *DeMauro*

*v. DeMauro,* 115 F.3d 94, 96 (1st Cir.1997); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* 140 F.3d 494, 520-21 (3d Cir.1998)).

The Third Circuit Court of Appeals noted that there are two distinct parts of the standing requirement of 18 U.S.C. § 1964(c)-(1) that the plaintiff suffered an injury to business or property and (2) that the injury was proximately caused by the defendant's RICO violation. *Id.* The court further noted that " 'a showing of injury requires proof of a concrete financial loss and not mere injury to a valuable intangible property interest.' " *Id.* (quoting *Steele v. Hosp. Corp. Of Am.,* 36 F.3d 69, 70 (9th Cir.1994)). Such an injury may be satisfied by allegation of actual monetary loss, such as an out-of-pocket loss. *Id.* However, the *Maio* court held that although the diminution in value of tangible property may create a RICO injury, the plaintiffs' interest was merely a contractual one. *Id.* at 488-89.

**\*9** In this case, Plaintiff alleges that she has been injured in her property because she was deprived of funds legally entitled to her, was required to draw upon funds in savings and retirement plans, paid legal fees, had her reputation harmed, and suffered emotional distress. The damages of harmed reputation and emotional distress do not constitute a RICO injury, as they are personal in nature as per the court in *Zimmerman.* However, her allegations of drawing upon retirement and savings accounts, and the payment of legal fees, are not personal injuries, and are injuries proper to a RICO claim. *See Weiss v. First Unum Life Ins. Co.,* 482 F.3d 254, 258 n. 2 (3d Cir.2007). Such costs are out-of-pocket, as noted in the *Aetna* case. Furthermore, the *Weiss* court held that allegations, such as "having had to sell his home and personal property below the property's fair market value as well as having incurred fees and penalties were out-of-pocket expenses fairly traceable to [the defendant's] conduct, and thus qualify as an injury to property for RICO purposes." *Id.* Therefore, as the plaintiff has alleged an "actual monetary loss" in the form of attorneys fees to reinstate her benefits, and loss to savings and retirements accounts caused by the denial of benefits, Plaintiff has properly alleged a RICO injury.

### 4. Proximate Cause

Defendants also argue that Plaintiff failed to show that the alleged Section 1962 violation proximately caused the plaintiff's injury to business or property. The Third Circuit Court of Appeals in *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912 (3d Cir.1999) held that proximate cause is necessary for standing in a RICO claim. In *Steamfitters,* the court held that the

Case 2:12-cv-06371-SDW-MAH  Document 89-1  Filed 03/31/14  Page 132 of 163 PageID: 2072
Pappa v. Unum Life Ins. Co. of America, Not Reported in F.Supp.2d (2008)
RICO Bus.Disp.Guide 11,466, 43 Employee Benefits Cas. 2389

plaintiff's complaint lacked proximate cause because of the remoteness of the alleged injury from the defendants' alleged wrongdoing. *Id.* at 921.

In this case, Plaintiff's complaint does not demonstrate the level of remoteness found in *Steamfitters. Id.* The *Steamfitters* court held that the RICO suit brought by union health and welfare funds against tobacco companies to recover for the funds' cost of treating fund participants who had smoking related diseases demonstrated an injury that was too remote from the activity to satisfy causation. In this case, Plaintiff alleges that Defendants sent a fraudulent videotape to Plaintiff's physicians, who then concluded that Plaintiff was physically able to return to work. (Compl. ¶¶ 22-23, Doc. 2 Ex. A.) Plaintiff further alleges the physician relied on this fraudulent videotape in arriving at this conclusion. (*Id.* ¶ 24.) Based upon that recommendation, Defendants then terminated Plaintiff's disability benefits, leading to the injuries of the Plaintiff, such as the liquidation of her retirement and savings funds, as well as the costs of her attorneys to reinstate her benefits. (*Id.* ¶¶ 31-32.) Therefore, for purposes of a motion to dismiss, Plaintiff has sufficiently alleged the proximate causation between the Section 1962 violation and the injury suffered by the Plaintiff.

### B. *Section 1962(c)* Overview

**\*10** Section 1962(c) provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Plaintiff alleges Section 1962(c) RICO violations in Counts I and III. The difference between the two allegations is that Count I alleges a violation against Unum Life, Examination Management, and ICS, whereas Count III alleges a violation against an additional Defendant, UnumProvident. Furthermore, Count I alleges that UnumProvident acted as the enterprise, whereas in Count III, Plaintiff alleges an association-in-fact between the four (4) Defendants.

To make a claim pursuant to this provision, the Plaintiff must plead four elements: (1) the existence of an enterprise affecting interstate commerce; (2) that Defendant was employed by or associated with the enterprise; (3) that the Defendant participated, directly or indirectly, in the conduct or affairs of the enterprise; and (4) that the Defendant participated through a pattern of racketeering activity that

must include the allegation of at least two racketeering acts. *Hollis-Arrington v. PHH Mortg. Corp.,* 205 Fed. App'x 48, 53 (3d Cir.2006) (no n-p recede ntial) (citing *Annulli v. Panikkar,* 200 F.3d 189, 198 (3d Cir.1999)); *Shearin v. E.F. Hutton Group, Inc.,* 885 F.2d 1162, 1165 (3d Cir.1989) (citing *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350, 1352 (5th Cir.1985)), *abrogated on other grounds in Beck v. Prupis,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000); *see also Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)), *abrogated on other grounds in Beck v. Prupis,* 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

Defendants argue that Plaintiff has failed to allege a prima facie case because she filed to allege pattern of racketeering activity and that Defendants operated or managed the affairs of the enterprises alleged in Counts I and III. Defendants also argue that Plaintiff failed to allege a cognizable RICO enterprise-in-fact. Finally, Defendants argue that the claims should be dismissed because they are plead without the required level of specificity.

### C. *RICO Enterprise*

An essential requirement of RICO is the existence of an enterprise. *See, e.g.,* 18 U.S.C. § 1962(b) and (c). An enterprise "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The Supreme Court in *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981) delineated three (3) factors in establishing an association-in-fact enterprise. There must be (1) "an ongoing organization, formal or informal"; (2) that "the various associates function as a continuing unit"; and (3) the enterprise exists "separate and apart from the pattern of activity in which it engages." *Id.* The enterprise consists of a "group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* The Third Circuit Court of Appeals has expanded *Turkette* by requiring that the enterprise acts as an ongoing organization with a framework for making or carrying out decisions, that the various associates function as a continuing unit, and that the enterprise is separate and apart from the pattern of racketeering activity. *United States v. Irizarry,* 341 F.3d 273, 286 (3d Cir.2003) (quoting *United States v. Riccobene,* 709 F.2d 214, 222 (3d Cir.1983)). The ongoing nature of an enterprise does not require that all of the members participate from beginning to end. *United States v. Parise,* 159 F.3d

790, 795 (3d Cir.1998) (quoting *United States v. Feldman,* 853 F.2d 648, 659 (9th Cir.1988)). However, the enterprise must maintain a shared organizational pattern and system of authority. *Id.* (citing *United States v. Lemm,* 680 F.2d 1193, 1199 (8th Cir.1982)).

*11 Defendants in this case argue that the Plaintiff has not satisfied the requirements of *Turkette* and *Riccobene.* First, Defendants argue that the Plaintiff has failed to allege the requisite decision-making structure as required by *Riccobene.* Second, Defendants argue that Plaintiff has failed to allege that the enterprise-in-fact is separate and apart from the alleged racketeering activity.

At the early juncture of a motion to dismiss, a plaintiff is not required to satisfy the *Turkette* factors. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786, 789 (3d Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). "*Riccobene* and *Turkette* certainly stand for the proposition that a plaintiff, to recover, must prove that an alleged enterprise possesses the three described attributes. But neither case speaks to what must be pleaded in order to state a cause of action." *Id.* at 790. Rather, the Plaintiff must satisfy the definition of 18 U.S.C. § 1961(4) in her pleading. As held by the *Seville* court, "it is enough that a complaint put the defendants on notice of the claims against him.... In the present case, Seville identified that four entities it believed were the enterprises that had been marshalled against it. The rules of pleading require nothing more at this early juncture than that bare allegation." *Id.*

Therefore, Plaintiff is not required to demonstrate the *Turkette* and *Riccobene* factors enunciated by the Third Circuit Court of Appeals to demonstrate a RICO enterprise. Rather, Plaintiff need only allege the existence of an enterprise.

In *Moravian Dev. Corp. v. Dow Chem. Co.,* 651 F.Supp. 144 (E.D.Pa.1986), the district court for the Eastern District of Pennsylvania discussed the creation of a RICO enterprise. The court noted that "none of the corporate entities named as persons in [the plaintiff's] complaint can *individually* assume the role of the requisite 'enterprise.' " *Id.* at 146. However, the court held that an association of corporate entities can create a RICO enterprise. *Id.* at 147. Although a group of corporations is not specifically listed in 18 U.S.C. § 1961(4), the court held that the list is non-exclusive, and that RICO did not intend to limit the meaning of an "enterprise" to exclude an association of corporate entities. *Id.* The defendants in *Moravian* argued

that the plaintiff failed to allege an enterprise that was different from the acts that formed the pattern of racketeering activity. *Id.* Specifically, the *Moravian* defendants argued that the association of the various corporations had no separate and independent existence. *Id.* However, the court held that "[a]t this stage of the proceedings, a plaintiff is not required to show that the enterprise is separate from the pattern of racketeering activity in its pleading, but must simply identify the enterprise." *Id.* (citing *Seville,* 742 F.2d at 789-90).

*12 The present case is similar to *Moravian,* as Plaintiff alleges an enterprise between various corporations as an association-in-fact-Defendants Unum Life, UnumProvident, Examination Management, and ICS in Count III. As in *Moravian,* an association of enterprises may form a RICO enterprise for purposes of pleadings. Such an allegation is sufficient to survive a motion to dismiss. In Count I, Plaintiff alleges that Defendant UnumProvident acted as an enterprise pursuant to 18 U.S.C. § 1961(4). Although such an allegation may not survive the *Turkette* factor that the enterprise be separate from the person, such an allegation is sufficient to survive a motion to dismiss.

### C. Association with and Participation in the Enterprise

A plaintiff must establish that the defendants were associated with and participated in the "operation or management" of the enterprise. *Reves v. Ernest & Young,* 507 U.S. 170, 184, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). In *Reves,* the Supreme Court concluded that "to conduct or participate" in the affairs of a RICO enterprise, a defendant must, in some capacity, direct the affairs of the enterprise. *Id.* at 178-79. In *Univ. of Maryland at Baltimore v. Peat, Marwick, Main & Co.,* 996 F.2d 1534, 1539 (3d Cir.1993), the Third Circuit Court of Appeals held that the standard for participation in an enterprise applies in the context of a motion to dismiss.

In determining whether the *Reves* operation or management test is fulfilled, the *University of Maryland* court stated that "[s]imply because one provides goods or services that ultimately benefit the enterprise does not mean that one becomes liable under RICO as a result." *Id.* Rather, "[t]here must be a nexus between the person and the conduct in the affairs of an enterprise. The operation or management test goes to that nexus. In other words, the person must knowingly engage in '*directing* the enterprise's affairs' through a pattern of racketeering activity." *Id.* (quoting *Reves,* 507 U.S. at 179 (emphasis added)).

RICO Bus.Disp.Guide 11,466, 43 Employee Benefits Cas. 2389

The *Reves* Court discussed several ways in which a defendant may operate or manage the enterprise. First, the Court held that operation or management could occur by those associated with the enterprise, but not employed by the enterprise. *Reves,* 507 U.S. at 184. The Court gave an example of such behavior, and stated that a defendant could manage or operate an enterprise's affairs through bribery. *Id.* However, the Court held that a defendant need not have a significant amount of control over or within the enterprise. *Id.* at 179 n. 4. Plaintiff cites *Reves* for the proposition that "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it." *Reves,* 507 U.S. at 184. However, the *Reves* Court declined to determine "how far § 1962(c) extends down the ladder of operation because it is clear that [the defendant] was not acting under the direction of [the enterprise's] officers or board." *Id.* at 184 n. 9.

**\*13** The Third Circuit Court of Appeals has held that, under *Reves,* "RICO liability may extend to those who do not hold a managerial position within an enterprise, but who do nonetheless knowingly further the illegal aims of the enterprise by carrying out the directives of those in control." *United States v. Parise,* 159 F.3d 790, 796 (3d Cir.1998).

Plaintiff argues that she has properly alleged numerous acts of operation and management, including the alleged video surveillance (Compl. ¶¶ 11-16, Doc. 2 Ex. A), the mailing of the videotape to the physicians (Id. ¶¶ 20-25), and the erasure of portions of the video footage. (Id. ¶¶ 34-41.) Defendants argue that ICS and Examination Management were not alleged to have operated or managed the enterprise. However, as asserted by the Plaintiff in her Complaint, Defendants Unum Life and UnumProvident requested that Examination Management and ICS conduct video of the Plaintiff. (Id. ¶ 8.) The Complaint further alleges that when Examination Management and ICS failed to videotape the Plaintiff, they began following Plaintiff's daughter with the intent to claim the daughter was the Plaintiff. (Id. ¶ 13.) In the course of following Plaintiff's daughter, Defendants Examination Management and ICS exchanged multiple phone calls with Unum Life and UnumProvident. (Id. ¶ 14.) The allegations that Defendants ICS and Examination Management completed the videotape of Plaintiff's daughter satisfies the pleading requirement for the operation or management of the enterprise. As required by *Parise,* these Defendants "nonetheless knowingly further[ed] the illegal

aims of the enterprise by carrying out the directives of those in control." *Parise,* 159 F.3d at 796.

### D. Racketeering Activities

In the Complaint, Plaintiff alleges that racketeering activity occurred through acts of mail and wire fraud. (Compl. ¶ 50, Doc. 2 Ex. A.) *See* 18 U.S.C. §§ 1341, 1343, 1961(5). To properly allege a RICO violation, there must be a pattern of racketeering activity, which "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Mail and wire fraud are included in the definition of racketeering activity.

In *H.J. Inc. v. Nw. Bell Tel. Co.,* 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Supreme Court discussed the requirements of pleading a "pattern of racketeering activity." First, the Court noted that the requirement of "at least" two (2) instances of racketeering activity indicating " 'that while two acts are necessary, they may not be sufficient.' " *Id.* at 237-38 (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, n. 14, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). While a "fairly flexible" concept of pattern is permissible, such a pattern is not formed by "sporadic activity." *Id.* at 239 (citing S.Rep. No. 91-617 at 158)). The legislative history further demonstrated that RICO liability was not intended to attach to two (2) " 'widely separated and isolated criminal offenses.' " *Id.* (quoting 116 CONG. REC., at 18940 (1970) (Sen.McClellan)). To demonstrate a pattern, there must be a showing that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* at 239 (emphasis in original). " 'A short term scheme threatening no future criminal activity will not suffice.' Where allegations of the complaint, taken as true, do not support the existence of either long term criminal conduct or threat thereof, dismissal is appropriate." *Hollis-Arrington v. PHH Mortgage Corp.,* 205 Fed App'x 48, 54 (3d Cir.2006) (no n-p recede ntial) (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1412 (3d Cir.1991) and citing *Marshall-Silver Constr. Co. v. Mendel,* 894 F.2d 593, 598 (3d Cir.199)).

**\*14** Plaintiff alleges that instances of racketeering activity through mail and wire fraud, including various phone calls and mailings between the Defendants and to the third party physicians. (Compl. ¶¶ 8-10, 14-16, 20-22, 25, Doc. 2 Ex. A.) The federal mail and wire fraud statutes prohibit the use of interstate mail or wires for the

purpose of carrying out a scheme to defraud. 18 U.S.C. §§ 1341, 1343. Therefore, Plaintiff argues that it has satisfied the requirement of alleging at least two (2) acts of racketeering activity. Furthermore, Plaintiff also alleges in her Complaint Defendants UnumProvident and Unum Life has been involved in similar practices in 1998 where surreptitious video surveillance was taken of the child of a disabled claimant, and the claimant's benefits were then denied. (Compl. ¶ 28, Doc. 2 Exs. A, F.) Plaintiff also cites to an agreement signed by Defendant Unum Life and attached to the Complaint, which discusses the claim handling practices of the company. (Compl. Doc. 2 Ex. E.)

For racketeering activities to form a RICO violation, there must be a pattern of racketeering activity shown by relatedness and continuity. The *H.J.* Court discussed the meaning of relatedness in its discussion of a pattern of racketeering activity. In this regard, the Supreme Court cited the legislative History of Title X of the Dangerous special Offender Sentencing Act, 18 U.S.C. § 3575 *et seq.* Relatedness was defined as "acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *H.J.,* 492 U.S. at 239 (quoting 18 U.S.C. § 3575(e)). Plaintiff argues that she has established relatedness, as the predicate acts of wire and mail fraud alleged occurred in the same transaction. In contrast, Defendant argues that the 1998 incident discussed in the Complaint, and further described in Exhibit F to the Complaint, is unrelated to the current case. Defendant argues that because the video surveillance was conducted by a different company, the different sets of actors lead to a finding of unrelatedness.

The Supreme Court then defined "continuity" as both either a closed- or open-ended concept. *Id.* at 241. Continuity may be shown by "a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* (citing *Barticheck v. Fidelity Union Bank/ First Nat'l State,* 832 F.2d 36, 39 (3d Cir.1987)). Multiple schemes are not required to demonstrate continuity. *Id.* at 241. A plaintiff may show continuity through related predicate acts in furtherance of a single scheme if the acts present a threat of long-term continuous criminal activity. *Id.* at 240. The Court further held that

A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months

and threatening no future criminal conduct do not satisfy this requirement:

**\*15** Congress was concerned in RICO with long-term criminal conduct. Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the threat of continuity is demonstrated.

*Id.* at 242. Plaintiff argues that she has sufficiently alleged continuity through the allegations in her Complaint that a similar activity occurred in Florida in 1998, involving a claimant who lost his benefits after his son was filmed. (Compl. Doc. 2 Ex. F.) In contrast, Defendants argue that the Plaintiff has failed to allege continuity, as the 1998 incident and the current incident are isolated events, and the predicate acts in the current incident alone do not satisfy continuity.

Both tests for relatedness and continuity depend heavily on the facts of the case. *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1412 (3d Cir.1991). Here, the Plaintiff has failed to properly allege a pattern of racketeering activity. Plaintiff alleged a combination of four (4) predicate acts in the form of wire and mail fraud, as well as a paragraph describing similar circumstances where Defendant Unum Life was involved in case where a claimant's son was videotaped, and his benefits were terminated. As stated in *Kehr,* "not every single scheme comprising two or more predicate acts will constitute a pattern." *Kehr,* 926 F.2d at 1412. The Third Circuit Court of Appeals noted that the court had previously dismissed two (2) cases containing allegations that lasted less than eight (8) and seven (7) months respectively, with no future threat of illegal activity. *Id.* at 1413.

In the present case, Plaintiff alleges that she was receiving benefits in May 2005 for her disability. (Compl. ¶ 7, Doc. 2 Ex. A.) She further alleges that in the spring of 2005, interstate wire transmissions were made regarding the video surveillance of Plaintiff. (*Id.* at ¶ 8.) That video surveillance was conducted on May 3, 4, and 5, 2005. (*Id.* at ¶ 11.) Dr. Nakkache rendered his opinion regarding Plaintiff's condition on May 10, 2005, as per the opinion attached to the Complaint. (Compl.Doc. 2.Ex. C.) Dr. Costello was contacted by the Defendants on June 3, 2005, as per documentation attached to the Complaint. (Compl. Doc. 2 Ex. D.) The writ of summons was filed in the Court of Common Pleas for Lackawanna County in May 17, 2006. Therefore, the time between the first predicate act and the writ of summons in state court was only approximately one year. The predicate acts themselves-meaning the wire and mail fraud-took place

within the span of approximately one (1) month. This clearly does not satisfy the requirement of continuity for a pattern of racketeering acts. Furthermore, there is no threat of continued illegal activity, as Plaintiff's disability benefits have been reinstated, and there is no allegation that there is a continued threat to discontinue those benefits on fraudulent grounds.

 **\*16**  Plaintiff claims that there is continuity in her RICO claims based on two grounds. First, Plaintiff points to an agreement signed by Unum Life regarding claim handling practices. Second, Plaintiff alleges a similar circumstance, where a Florida claimant had his benefits terminated when his son was videotaped under surreptitious surveillance in 1998. These allegations do not meet the relatedness requirement, first, because they involve different surveillance companies. The previous instance also arose in a different state approximately eight (8) years ago. Here, Plaintiff has alleged " 'widely separated and isolated criminal offenses.' " *H.J.,* 492 U.S. at 239 (quoting 116 CONG. REC., at 18940 (1970) (Sen.McClellan)). The predicate acts must be *both* related and continuous. Plaintiff here has failed to allege acts that satisfy both prongs of the test. There is no allegations that these instances are related.

Therefore, Counts I and III will be dismissed for failure to plead a pattern of racketeering activity.

### E. Pleading Pursuant to *Federal Rule of Civil Procedure 9(b)*

When a plaintiff relies on mail and wire fraud for the basis of a RICO claim, the allegations of fraud must comply with *Federal Rule of Civil Procedure 9(b)*, which states that allegations of fraud must be pled with specificity. *See Lum v. Bank of America,* 361 F.3d 217, 223 (3d Cir.2004). However, as Plaintiff has failed to properly allege a pattern of racketeering activity, the Court need not reach the issue of the specificity of the allegations.

### II. Counts II and IV-Violation of 18 U.S.C. § 1962(d)

Plaintiff's second Count alleges that Defendants conspired to violate RICO, in violation of 18 U.S.C. § 1962(d). *Section 1962(d)* provides, "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." The Third Circuit Court of Appeals in *Shearin* set forth the pleading requirements for a RICO conspiracy civil cause of action. *Shearin,* 885 F.2d at 1166-67. To properly plead such a conspiracy, the "plaintiff must set forth allegations that address the period

of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose." *Id.* at 1166. "Additional elements include agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity." *Id.* at 1166-67 (citing *Odesser v. Continental Bank,* 676 F.Supp. 1305, 1312-13 (E.D.Pa.1987)).

Plaintiff alleges Section 1962(d) RICO violations in Counts II and IV. The main difference between the two allegations is that Count II alleges a violation against Unum Life, Examination Management, and ICS, whereas Count IV alleges a violation against an additional Defendant, UnumProvident.

Defendants argue that the Plaintiff's claim for a RICO conspiracy fails on several grounds. First, the Defendants argue that the conspiracy claim fails because the Plaintiff has failed to allege a violation of Section 1962(c). Defendants also argue that Plaintiff has failed to allege the basic elements of conspiracy. Finally, the Defendants argue that the Plaintiff did not allege facts supporting her allegations that the Defendants conspired to operate and manage the affairs of the enterprise.

 **\*17**  As stated in *Lum v. Bank of America,* 361 F.3d 217, 227 n. 5 (3d Cir.2004), " '[a]ny claim under section 1962(d) based on conspiracy to violate other subsections of 1962 necessarily must file if the substantive claims are themselves deficient.' " *Id.* (quoting *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1192 (3d Cir.1993)). In this case, Plaintiff has alleged a violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c).

As Plaintiff has failed to allege a violation of 18 U.S.C. § 1962(c), the claims in Counts II and IV for conspiracy to violate that section must fail, and Counts II and IV will be dismissed.

### III. State Law Claims

At this juncture, the Plaintiff has no federal claims remaining, and therefore, no jurisdiction pursuant to federal question. 28 U.S.C. § 1331. Although the complaint filed in the Lackawanna County Court of Common Pleas did not allege diversity jurisdiction, the removal petition clearly does so. (Removal Petition ¶¶ 6-11, Doc. 1.) "These allegations of diversity jurisdiction comport with the requirements of 28 U.S.C. § 1332 (1976)." *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.,* 626 F.2d 280, 282 n. 1 (3d

Cir.1980). "A federal court's jurisdiction must clearly appear from the face of the complaint or removal petition." *Id.* (quoting *Whitelock v. Leatherman,* 460 F.2d 507, 514 (10th Cir.1972)). As jurisdiction appears on the removal petition pursuant to diversity, the Court will consider the remaining state law claims on that basis.

### *A. Count V-Defamation*

Count V of the Complaint alleges that the Defendants Unum Life, UnumProvident, Examination Management, and ICS defamed the plaintiff by providing the false and altered DVD footage of Erika Pappa to Dr. Nakkache and Dr. Costello, and further making misrepresentations to them. (Compl. ¶ 71, Doc. 2 Ex. A.) Under Pennsylvania law, a plaintiff in a defamation action has the burden of proving, when the issue is properly raised: (1) the defamatory character of the communication; (2) its publication by the defendant; (3) its application to the plaintiff; (4) the understanding by the recipient of its defamatory meaning; (5) the understanding by the recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. 42 PA. CONS.STAT. ANN. § 8343(a).

Defendants argue that the claim must be dismissed because neither Dr. Nakkache nor Dr. Costello could understand the DVD or the report to be of a "defamatory character." In a defamation case, "[t]he trial court must determine as a matter of law whether the communication is capable of having defamatory meaning; if not, the claim should be dismissed." *Remick v. Manfredy,* 238 F.3d 248, 261 (3d Cir.2001) (citing *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399, 402 (Pa.1987)). If the court determines that a statement is capable of a defamatory meaning, it is then for the jury to determine if the statement was so understood by the recipient of the communication. *Vitteck v. Washington Broad. Co., Inc.,* 256 Pa.Super. 427, 389 A.2d 1197, 1199 (Pa.Super.Ct.1979) (quoting *Corabi,* 273 A.2d at 904).

**\*18** A statement is defamatory pursuant to Pennsylvania law "if it 'tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.' " *Remick,* 238 F.3d at 261 (quoting *Tucker v. Fischbein,* 237 F.3d 275, 282 (3d Cir.2001) (quoting *Corabi v. Curtis Publ'g Co.,* 441 Pa. 432, 273 A.2d 899, 904 (Pa.1971)). The court must view the statement " 'in context' with an eye toward 'the effect the [statement] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average

person among whom it is intended to circulate.' " *Id.* (quoting *Baker,* 532 A.2d at 402 (quoting *Corabi,* 273 A.2d at 907)). Thus, the court must determine if the statement " 'tends to blacken a person's reputation or to expose him to public hatred, contempt, or ridicule, or to injure him in his business or profession.' " *Id.* (quoting *Corabi,* 273 A.2d at 904).

Taken in context, the videotape surveillance sent to Dr. Nakkache and Dr. Costello is capable of having a defamatory meaning. By sending the videotape of Plaintiff's daughter Erika Pappa driving from Pennsylvania to New Jersey, the Defendants could be implying that Plaintiff was lying regarding her injuries, potentially committing insurance fraud, and was actually capable of returning to work. Whether the doctors actually understood the videotape to have such a meaning is a question of fact. At this time, Plaintiff has properly alleged that the tape could have defamatory meaning in her Complaint. Such a communication may be reasonably construed to convey a defamatory character of the Plaintiff. Therefore, Defendants' motion to dismiss the defamation claim will be denied.

### *B. Count VI-Intentional Infliction of Emotional Distress*

"To prove a claim of intentional infliction of emotional distress, the following elements must be established: (1) the conduct must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; (4) that distress must be severe." *Hoy v. Angelone,* 456 Pa.Super. 596, 691 A.2d 476, 482 (Pa.1997). Extreme and outrageous conduct is conduct which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Strickland v. University of Scranton,* 700 A.2d 979, 987 (Pa.Super.Ct.1997). Generally, "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'outrageous'!" *Id.* In addition, to prevail on an intentional infliction of emotional distress cause of action, a plaintiff must provide competent medical evidence to prove the existence of emotional distress. *Kazatsky v. King David Memorial Park, Inc.,* 515 Pa. 183, 527 A.2d 988, 995 (Pa.1987); *see Hunger v. Grand Central Sanitation,* 447 Pa.Super. 575, 670 A.2d 173 (Pa.Super.Ct.1996) (holding that, to prevail on intentional infliction of emotional distress claim, a plaintiff must prove that the defendant's conduct was extreme and outrageous and that the plaintiff suffered a medically confirmed injury).

**\*19**  Defendants argue that it is undisputed that this matter concerns the handling of Plaintiff's disability benefits claim under a group disability policy governed by ERISA, 29 U.S.C. § 1001 *et seq.* Section 514(a) of ERISA provides that it "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).

The Supreme Court has expressly held that causes of action based upon the improper processing of benefits are preempted. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 48, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). The phrase relate to "has been given the broadest common sense meaning, such that a state law 'relates to' a benefit plan if it has connection with or reference to such a plan." *Shiffler v. Equitable Life Assurance Soc'y of the United States,* 838 F.2d 78, 82 (3d Cir.1988). Defendants cite numerous cases where ERISA has preempted an intentional infliction of emotional distress claim.

"State law claims of emotional distress arising out of the administration of an ERISA employee benefit plan are also preempted." *Pane v. RCA Corp.,* 868 F.2d 631, 635 (3d Cir.1989) (dismissing a claim of emotional distress in a severance agreement case). The intentional infliction of emotional distress claim both relates to the ERISA plan and arises out of the administration of that plan. Plaintiff's distress is based upon the Defendants' actions in videotaping her bedroom and bathroom windows, as well as the actions in videotaping Plaintiff's daughter and providing a false video to her physicians. (Comp. ¶¶ 75-81, Doc. 2 Ex. A.) The alleged trespass arose from the administration of the plan, as was the sending of the videotape to Plaintiff's physicians.

Therefore, Plaintiff's intentional infliction of emotional distress claim is preempted by ERISA, and will be dismissed.

*C. Count VII-Invasion of Privacy (Intrusion Upon Seclusion)*

The Defendants move to dismiss Count VII of Plaintiff's Complaint, alleging the tort of invasion of privacy through an intrusion on seclusion. The tort is committed when one "intentionally intrudes, physically or otherwise, on the solitude or seclusion of another person, or the person's private affairs or concerns ... [that] would be highly offensive to [a] reasonable person." *DeBlasio v. Pignoli,* 918 A.2d 822, 824-25 (Pa.Commw.Ct.2007) (quoting Pennsylvania jury instructions).

Pennsylvania applies the Restatement (Second) of Torts in Intrusion on Seclusion cases. *E.g., Harris by Harris v. Easton Publ'g. Co.,* 335 Pa.Super. 141, 483 A.2d 1377, 1383 (Pa.Super.Ct.1984). Under the Restatement, the act of intrusion, which can take the form of "physical intrusion, ... use of the defendant's senses ... to oversee or overhear the plaintiff's private affairs, ... or some other form of investigation or examination into plaintiff's private concerns." RESTATEMENT (SECOND) OF TORTS § 652B cmt. b.

The Pennsylvania Supreme Court has held that when an investigation is based upon reasonable suspicion, and the manner of investigation is reasonable, surveillance by investigators will not invade a plaintiff's right to privacy. *Forster v. Manchester,* 410 Pa. 192, 189 A.2d 147, 150 (Pa.1963). In *Forster,* the court held that when a private investigator for an insurance company followed a plaintiff during her daily activities, videotaped her movements and whereabouts, and followed the plaintiff's car, the investigators' actions were reasonable. *Id.* The court held that "by making a claim for personal injuries [plaintiff] must expect reasonable inquiry and investigation to be made of her claim and to this extent her interest in privacy is circumscribed." *Id.* However, the court specifically noted that all of the surveillance took place in the open where the plaintiff could be observed by the public. *Id.* The court contrasted this scenario with a person in her home, and held that "[t]o the extent [plaintiff] has exposed herself to public observation and therefore is not entitled to the same degree of privacy that she would enjoy within the confines of her own home." *Id.* In determining that the private investigator's actions were reasonable, the court found that "there was no trespassing on [plaintiff's] property nor spying through her windows." *Id.* The court then cites a Louisiana case where the investigators allegedly trespassed upon the plaintiff's property and peeked into their windows. *Id.* at 150 n. 8 (citing *Souder v. Pendelton Detectives, Inc.,* 88 So.2d 716 (La.App.1956)). Although the Defendants argue that the windows of the Plaintiff's home are open to the public, the Supreme Court of Pennsylvania has distinguished the surveillance of a claimant's windows from other public surveillance.

**\*20**  At this time, Plaintiff has sufficiently pled an intrusion upon her seclusion by alleging that Defendants looked through her bedroom and bathroom windows in conducting

their investigation. Therefore, Defendants' motion to dismiss on this count will be denied.


## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the Defendants' motion to dismiss. Counts I and III based upon 18 U.S.C. § 1962(c) will be dismissed for failure to allege a pattern of racketeering activity. Count II and IV for conspiracy will be dismissed, as the underlying substantive claims have been dismissed. Count VI will also be dismissed, as ERISA preempts Plaintiff's ability to bring an intentional infliction of emotional distress claim. The motion to dismiss on Counts V and VII will be denied, as Plaintiff has properly alleged a claim for defamation and for intrusion upon seclusion.

An appropriate Order follows.


## *ORDER*

**NOW,** this *18th* day of March, 2008, **IT IS HEREBY ORDERED** that Defendants' motion to dismiss (Docs.8, 9) is **granted in part** and **denied in part** as follows:

(1) Defendants' motion to dismiss Count I based upon 18 U.S.C. § 1962(c) is **GRANTED.** Count I is **DISMISSED** against all Defendants.

(2) Defendants' motion to dismiss Count II based upon 18 U.S.C. § 1962(d) is **GRANTED.** Count II is **DISMISSED** against all Defendants.

(3) Defendants' motion to dismiss Count III based upon 18 U.S.C. § 1962(c) is **GRANTED.** Count III is **DISMISSED** against all Defendants.

(4) Defendants' motion to dismiss Count IV based upon 18 U.S.C. § 1962(d) is **GRANTED.** Count IV is **DISMISSED** against all Defendants.

(5) Defendants' motion to dismiss Count V for defamation is **DENIED.**

(6) Defendants' motion to dismiss Count VI for intentional infliction of emotional distress is **GRANTED.** Count VI is **DISMISSED** against all Defendants.

(7) Defendants' motion to dismiss Count VII for intrusion upon seclusion is **DENIED.**


## Parallel Citations

RICO Bus.Disp.Guide 11,466, 43 Employee Benefits Cas. 2389

---

**End of Document**                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT J**

SCI Illinois Services, Inc. v. Coli, Slip Copy (2012)

2012 WL 2152829
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois.

SCI ILLINOIS SERVICES, INC.
v.
COLI, John T., Sr., et al.

No. 11 C 7762. | June 5, 2012.

**Attorneys and Law Firms**

Jeffrey S. Batoff, Michael Scott Pepperman, Michael Vincent Phillips, Obermayer Rebmann Maxwell & Hippel LLP, Philadelphia, PA, Chad W. Moeller, Neal, Gerber & Eisenberg, Chicago, IL, for SCI Illinois Services, Inc.

Marvin Gittler, Heidi Brooke Parker, Asher, Gittler, Greenfield, Cohen & D'Alba, Chicago, IL, for Coli, John T., Sr., et al.

**Opinion**

**STATEMENT**

ZAGEL, District Judge.

**\*1** Before the court is Defendants' motion to dismiss Plaintiff's two-count complaint alleging injuries to business or property by reason of violations of the Racketeer Influenced Corrupt Organization Act (RICO), 18 U.S.C. § 1964(c). For the following reasons, the motion is granted in part and denied in part.

**Statement of Facts**

Plaintiff is an Illinois Corporation that owns and operates funeral homes across North America. Defendant Teamster Local 727 is a local chapter of the International Brotherhood of Teamsters ("the Union"), located in Park Ridge, Illinois. Defendants John T. Coli, Sr., William Coli and John T. Coli, Jr. (the "Coli Defendants") hold leadership positions within the Local 727 chapter, and serve as trustees (John Sr. and John Jr.) and administrator (William) of the Local 727 Health and Welfare, Pension, and Legal and Educational Assistance Funds (collectively, "the Funds").

Plaintiff employs several Local 727 members. Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA") and Plaintiff's collective bargaining agreement ("CBA") with the Union, Plaintiff is required to pay certain amounts into the Funds for each of its eligible Local 727 employees. Plaintiff's contributions to the Funds are determined through an audit process set forth in the Funds' Statement of Audit Procedures.

The gravamen of the complaint is that Defendants have manipulated a series of audits to fraudulently inflate the amounts for which the Funds billed Plaintiff. Specifically, the complaint alleges that beginning in August 2002 and continuing to the present, Defendants have deliberately withheld records from auditors, signed off on final auditing reports that they know to be materially flawed, imposed unreasonably burdensome procedures on Plaintiff to challenge the audits, and sued Plaintiff to collect payments to which they were not entitled. For years, Plaintiff capitulated to the fraud by settling rather than incurring the costs of litigating each individual audit. The complaint states that, between April 2004 and April 2008, Plaintiff settled seven lawsuits with Defendants for amounts far exceeding what Plaintiff actually owed the Funds.

The most recent scheme allegedly involved an employer-wide audit covering all of Plaintiff's funeral homes in the State of Illinois. Plaintiff alleges that Defendant deliberately withheld information from the auditing firm which "caused the draft audit report to have intentional misrepresentations," such as the inclusion of non-Local 727 employees, as well as employees and funeral homes covered by previous settlement agreements.

On June 22, 2009, Defendants filed an ERISA claim in this court seeking to collect $528,522.16 in purported delinquent contributions and fees. In connection with the case, Plaintiff took the deposition of Defendant Coli Sr. on June 1, 2011. Throughout the deposition, Defendant Coli Sr. was, to put it mildly, uncooperative. The complaint states that he abruptly left the deposition before it was completed, reporting that he had received a call from Mayor Rahm Emanuel's office requesting him to come in. Defendant Coli Sr.'s attorney represented that his client would return later that afternoon, but he never appeared. After a court order was entered compelling his presence, Coli Sr.'s deposition was completed on July 5, 2011. Five days later, on the night of July 10, 2011, three of Plaintiff's funeral homes were vandalized. Plaintiff alleges this was an attempt by Defendants to intimidate the Plaintiff into paying into the funds and a warning not

to call Defendant Coli Sr. as a witness at trial.

**\*2** On December 16, 2011, Plaintiff entered into a settlement agreement with Defendant Teamsters Local No. 727, releasing Plaintiff from all claims related to the payment of contributions to the Funds in connection with its employees from January 1, 2002 to June 30, 2007 in exchange for $155,000.

## Analysis

Under RICO, "any person injured in his business or property by reason of a violation of Section 1962 of this chapter may sue therefor in any appropriate United States district court ..." 18 U.S.C. § 1964(cc). To state a claim under § 1964(c) a Plaintiff must plead "(1) an injury in its business or property (2) by reason of (3) the defendants' violation of section 1962." *DeGuelle v. Camilli,* 664 F.3d 192, 198 (7th Cir.2011) (internal quotation marks and brackets omitted).

To survive a motion to dismiss, "a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief, which is sufficient to provide the defendant with fair notice of the claim and its basis." *Maddox v. Love,* 655 F.3d 709, 718 (7th Cir.2011). In addition to providing adequate notice, the complaint must state a "plausible" claim for relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## A. *Preliminary Issues*

Defendants' first argument is that the complaint must be dismissed because ERISA provides the exclusive statutory framework through which Plaintiff can raise claims concerning its liability to the Fund. However, Defendants cite no case law to support the proposition and this court has explicitly held otherwise. *Zalesiak v. UnumProvident Corp.,* No. 06 C 4433, 2007 U.S. Dist. LEXIS 31592, at \* 10–12, 2007 WL 1280646 (N.D.Ill. Apr. 30, 2007). As Plaintiff correctly notes, ERISA is not designed to vindicate employers' interests-it is designed to protect benefit plan participants and their designated beneficiaries. *See generally* 29 U.S.C. § 1001b. Plaintiff lacks standing to bring an ERISA enforcement action, 29 U.S.C. § 1132(a), and Defendants' argument that Plaintiff's ability to raise affirmative defenses in past ERISA proceedings means that it should now be stripped of its RICO claims is both illogical and legally

unfounded.

Plaintiff's RICO claims are not "preempted" by the NLRA, nor does the NLRB have primary jurisdiction over the claims. "Federal statutes do not 'preempt' other federal statutes." *Baker v. IBP, Inc.,* 357 F.3d 685, 688 (7th Cir.2004). And the underlying conduct at issue here is not wrongful "only by virtue of the labor laws." *Talbot v. Robert Matthews Distributing Co.,* 961 F.2d 654, 662 (7th Cir.1992)-if the allegations contained in the complaint are true, several criminal laws that could be prosecuted directly have been committed. *See Baker,* 357 F.3d at 689.[1] The claims are properly before this court.

## B. *Section 1962(c) and (d)*

**\*3** Plaintiff's first RICO claim alleges that Defendant violated § 1962(c) which makes it unlawful for an employee of an enterprise engaged in interstate commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." 18 U.S.C. § 1962(c). To state a claim under § 1962(c), Plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern of racketeering activity." *DeGuelle,* 664 F.3d at 199. Defendants argue that Plaintiff has failed to adequately allege acts of racketeering or a pattern of racketeering. I address both arguments in turn.

The complaint adequately alleges acts of racketeering. " 'Racketeering activity' is limited to the specific acts statutorily enumerated in 18 U.S.C. § 1961(1)." *DeGuelle,* 664 F.3d at 199. The complaint adequately alleges predicate acts of mail and wire fraud (18 U.S.C. §§ 1341 and 1343), witness tampering (18 U.S.C. § 1512(b)), obstruction of justice (18 U.S.C. § 1503) and unlawful influence of an employee benefit plan (18 U.S.C. § 1954)—all of which are enumerated under 18 U.S.C. § 1961.[2] Defendants' argument that "Plaintiff conceals the predicate acts of extortion behind the [other] predicate acts" makes no sense. Even if Plaintiff was pleading § 1951 extortion as a predicate act—which it is not—that would not cancel out the other predicate acts which have been properly pled. And the complaint identifies with adequate particularity which Defendants are responsible for the individual acts. *See Stone v. Washington Mutual Bank,* No. 10–C6410, 2011 WL 3678838 (N.D.Ill. Aug 19, 2011).

The complaint also adequately alleges a "pattern of racketeering activity." A "pattern" requires the commission of at least two predicate acts of racketeering activity occurring within ten years of each other. 18 U.S.C. § 1961(5). Further, the Plaintiff must demonstrate

SCI Illinois Services, Inc. v. Coli, Slip Copy (2012)

a relationship between the predicate acts and a threat of continuing activity. *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Defendants argue that Plaintiff has not demonstrated continuity because 1) the Seventh Circuit has stated that numerous acts of mail and wire fraud do not necessarily support a finding of continuity; 2) Plaintiff has alleged only a single scheme; and 3) the alleged predicate acts are conducted pursuant to ERISA. All of these arguments fail.

First, it is true that "the mere fact that there may have been numerous mailings does not necessarily support a finding of continuity." *Bajorat v. Columbia–Breckenridge Development Corp.,* 944 F.Supp. 1371, 1380 (N.D.Ill.1996). However, Plaintiff has alleged that the predicate acts of mail and wire fraud constitute "a regular way of conducting Defendant's ongoing legitimate business." *H.J. Inc.,* 492 U.S. at 243. Taking the well-pled facts as true, the threat of continued fraudulent audits would appear to continue for as long as Plaintiff employs Local 727 members. Second, Defendants are wrong that Plaintiff alleges only one scheme—the complaint lists at least eight. And even if the eight are viewed as components of one overarching scheme, that does not preclude a showing of continuity. *Id.* at 240 ("[I]t is implausible to suppose that Congress thought continuity might be shown *only* by proof of multiple schemes."). Finally, the fact that the disputed audits are conducted pursuant to ERISA is no defense. It is not the act of being audited that constitutes the fraud, it is Defendants' alleged tampering with the results in order to extract payment to which they are not entitled under ERISA and the CBA

(and the federal criminal statutes they violate in doing so).

**\*4** The complaint contains enough facts to infer the existence of an agreement between Defendants to violate § 1962(c). The conspiracy claim stands. Causation and injury have been sufficiently pled—there is no question that Plaintiff has payed out hundreds of thousands of dollars to the Funds in order to settle ERISA actions based on disputed audits.

The motion is denied with respect to claims against the Coli Defendants and the Union.[3]

**C.** *John Doe Defendants*

The claims against the John Doe Defendants are dismissed without prejudice. To simply be "associated with or controlled by the Coli Defendants" does not make someone part of the alleged enterprise. Nor does it provide adequate notice to those who may be liable. Plaintiff is granted leave to re-plead with greater specificity as to the general identity of the John Doe Defendants (i.e. Local 727 officers, auditing firm employees, etc.) and their general conduct.

**D.** *Conclusion*

For the foregoing reasons, Defendants' motion to dismiss is denied with respect to the Coli Defendants and the Union, and granted without prejudice with respect to the John Doe Defendants.

Footnotes

1    A word of caution to Defendants: I regard the failure to cite *Baker* and the deliberate dropping of the word "only" from the *Talbot* standard as highly questionable. I expect more candid pleading in the future.

2    While there is no hard evidence linking Defendants to the acts of vandalism, Plaintiff is only required to make plausible allegations at this stage. The timing and targeted nature of the vandalism nudges the claims from conceivable to plausible. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

3    Defendants would have been wise to focus their motion more on the factual rather than the legal deficiencies of the complaint. The most obvious gap in Plaintiff's theory concerns the complicity, or at least utter negligence, of the auditing firms. The complaint never firmly states whether the auditors were in on the fraud or just had the wool pulled over their eyes by the Coli Defendants. Neither theory is particularly plausible, but I decline to dismiss *sua sponte* on these grounds.

---

**End of Document**                                         © 2013 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT K**

1989 WL 146414
United States District Court, S.D. Florida.

TEXAS AIR CORP. and Eastern Air Lines, Inc.
v.
AIR LINE PILOTS ASSOCIATION
INTERNATIONAL, et al.

No. 88–0804. | July 14, 1989.

Opinion

**Order Denying Motion to Dismiss**

*Introduction*

HOEVELER, District Judge.

**\*1** This cause came for consideration upon several motions to dismiss by the defendants. Texas Air Corporation (Texas Air) and its wholly-owned subsidiary, Eastern Air Lines Inc. (Eastern), bring an action against Eastern's two principal unions—the Air Line Pilots Association (ALPA), the International Association of Machinists and Aerospace Workers (IAM)—District 100 of the IAM, the Eastern Master Executive Council of ALPA and 38 individual members of the union. The activities complained take place in the context of a prolonged dispute between management and labor over contract negotiations taking place after Texas Air's acquisition of Eastern. The plaintiffs bring 6 counts under the Racketeer Influenced and Corrupt Organizations Act (RICO), alleging that the unions have been using illegal tactics in a conspiracy to coerce Texas Air into having Eastern sold to the unions. The plaintiff alleges similar counts under the Florida Criminal Practices Act and counts under state law for disparagement, defamation, tortious interference with business, and inducement of breach of fiduciary duty.

The defendants have moved to dismiss the first amended complaint, asserting that the complaint fails to state a claim under RICO, 18 U.S.C. § 1961 *et seq.* and under Florida state law, that it conflicts with federal labor laws, that it lacks the specificity to put the defendants on notice of the alleged wrongdoing, and that it contains allegations involving speech protected by the First Amendment. They also move to dismiss for failure to state a compulsory counterclaim pursuant to Fed.R.Civ.P. 13(a) in *IAM v.*

*Eastern Air Lines, et al.,* No. 88–0870 (D.D.C.) and other consolidated cases (The DC litigation); in the alternative, they move to transfer the case to the District of Columbia pursuant to 28 U.S.C. § 1404(a).

The court heard oral argument on the various motions on January 23, 1989. Although the court is troubled by the use of the RICO statute in the context of a labor dispute, the plaintiffs have stated an adequate paper claim under RICO and Florida law. It cannot yet be ascertained whether the acts which are the basis for the allegations in the complaint encompass conduct which is best left to the labor laws. For the reasons stated below, the motions to dismiss shall be denied, except as to the 33 individual defendants whose conduct was not pled with sufficient specificity required under rule 9(b). As to these 33 individuals, the complaint shall be dismissed without prejudice and with leave to amend.

*Facts*

A court may not grant a motion to dismiss a complaint unless it appears that the plaintiffs can prove no set of facts in support of the claims asserted that would entitle them to relief. Fed.R.Civ.Pro. 12(b)(6). *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957). The material allegations of the complaint are taken as true for purposes of this court's review of the motion to dismiss. *St. Joseph's Hospital v. Hospital Corp. of America,* 795 F.2d 954 (11th Cir.1986).

**\*2** The plaintiffs in a lengthy complaint explains the background to the conflict between the airlines and the unions. They allege that IAM and ALPA have engaged in a concerted illegal campaign to force Texas Air to sell Eastern. They allege five basic categories of illegal activities: (1) that the unions have defamed the reputations of Texas Air and Eastern through contacts with the press and a public campaign meant to publicize safety problems of Eastern. The defendants have kept the press informed of the unions' view on the safety problems of Eastern. The plaintiffs assert that the information given was not true and was maliciously motivated; (2) The unions have instigated a sickout campaign to interrupt Eastern's flight service; (3) The unions have instigated a work slow down; (4) The unions have directed inaccurate information to the employees of Eastern; (5) The unions have interfered with the financial advisors of Eastern. The plaintiffs allege that the unions have threatened to remove their pension funds from Merrill Lynch unless it ceases the financing of Texas Air companies.

Texas Air Corp. v. Air Line Pilots Ass'n Intern., Not Reported in F.Supp. (1989)

113 Lab.Cas. P 11,776, RICO Bus.Disp.Guide 7331

## I. *Compulsory Counterclaim and Transfer of Venue*

While this RICO law suit is related to the law suit concerning collective bargaining in the District of Columbia, the acts which are at issue in the RICO action are sufficiently distinct to warrant the maintenance of a separate law suit in this district. Three consolidated actions brought by Eastern's labor unions are pending in the United States District Court for the District of Columbia. *IAM v. Eastern Air Lines*, No. 88–0870; *ALPA v. Eastern Airlines*, No. 87–2002; and *Transport Workers' Union v. Eastern Air Lines*, No. 88–0864.

Rule 13(a) requires that a party assert a claim as a compulsory counterclaim only if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed.R.Civ.P. 13(a). An action arises out of the same transaction or occurrence where "the same operative facts serve as the basis of both claims." *Republic Health Corp. v. Lifemark Hospitals of Florida, Inc.,* 755 F.2d 1453, 1455 (11th Cir.1985). While the two law suits stem from the on going dispute between Eastern and its unions, they concern different series of events each of which form the basis for each respective case. In the DC litigation, the unions allege that Texas Air and Eastern improperly transfered various assets and work opportunities to Texas Air or its affiliated companies. The unions argue that these allegedly unlawful transactions were designed to destroy the unions in violation of the status quo provisions of the Railway Labor Act (RLA). The complaint in this case, by contrast, address union activities which are alleged to be aimed at inflicting injury on the plaintiffs free for the purpose of forcing the sale of Eastern. Because the causes of actions stated in the RICO complaint do not arise from the same transactions or occurrence, the motion to dismiss under 13(a) is denied.

**\*3** The alternative motion to transfer venue of this action to the District of Columbia is also denied. A plaintiff's choice of forum is entitled to deference. *Tenneco Oil Co. v. Environmental Protection Agency,* 592 F.2d 897, 900 (5th Cir.1979). To displace the plaintiff's choice, the court must determine that the convenience of the parties and witnesses and the interests of justice require a transfer. 28 U.S.C. § 1404(a). The conveniences of the parties and the interests of justice warrant the maintenance of the suit in this district. The plaintiffs' choice of venue in the Southern District of Florida is proper. Eastern has its corporate headquarters and its principal place of business in this district; both District 100 of the IAM and the Eastern Master Executive Council of ALPA are located in this district. The motion to transfer venue is, therefore, denied.

## II. *Sufficiency of RICO Claim*

The issue presented is whether the complaint sufficiently alleges the predicate acts and the pattern requirement to state a RICO claim. Defendants assert that the plaintiffs have failed to allege the elements necessary to support a RICO claim. 18 U.S.C. section 1961 *et seq.* A RICO claim must be based on allegations of criminal acts constituting prescribed "racketeering activities," which, in turn, must form a "pattern" which affects a RICO "enterprise" in any of three prohibited ways. Finally, such activities must be the proximate cause of injury to the plaintiffs' business or property. Stated more technically, a private civil RICO complaint must allege (either substantively or by way of conspiracy): (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in [section 1962(a) ], or maintains [or acquires] an interest in [section 1962(b) ], or participates in [or conducts the affairs of, section 1962(c) ] (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce [and (8) that the plaintiff] ... was "injured in his business or property by reason of a violation of section 1962." *Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 17 (2d Cir.1983), cert. denied, 465 U.S. 1025 (1984).

In counts one and two, the plaintiffs allege that defendants have conspired to acquire or gain control over Eastern and Texas Air through a pattern of racketeering activity in violation of 18 U.S.C. § 1962. In counts three and four, plaintiffs allege that the defendants formed an "association in fact" enterprise among themselves with the purpose of either forcing Texas Air to sell Eastern or of acquiring Texas Air itself. In counts five and six, they allege that the defendants have conducted or participated in the conduct of ALPA's and IAM's affairs through a plan of racketeering activity for the same purpose. Counts three through six plead violations of 18 U.S.C. § 1962(c).

### A. *Specificity under rule 9(b)*
**\*4** The plaintiffs have named as defendants, ALPA, IAM, District 100 of the IAM, and the Eastern Master Executive Council of ALPA. The plaintiffs have also named as defendants 38 individuals, most of whom are alleged to be or have been members of either District 100 governing body or of the Eastern Master Executive Council of ALPA. The defendants argue that the pleadings fail to provide the defendants, particularly the individual defendants, adequate notice of their individual roles in the alleged RICO conspiracy under rules 9(b), 8(a), and 8(e).

Texas Air Corp. v. Air Line Pilots Ass'n Intern., Not Reported in F.Supp. (1989)

113 Lab.Cas. P 11,776, RICO Bus.Disp.Guide 7331

The court finds that the pleadings against the union defendants satisfy the notice and particularity requirements of the federal rules. Because specific allegations of wrongdoing have been pleaded against defendants Bryan, Bavis, McClure, Cole, and Breslin, the notice and particularity requirements against these individual defendants are met. The pleadings provide insufficient notice to the remaining individual defendants of their roles in the alleged RICO conspiracy. Absent allegations of participation by the individual defendants regarding in the acts in dispute, these individuals have inadequate notice of their alleged wrongdoing. Allegations of responsibility for group decision making will not suffice for a RICO claim in this context. The claims against the 33 individual defendants whose acts are not alleged are accordingly dismissed with leave to amend.

**B. *Predicate acts***
Defendants argue that the complaint fails to adequately articulate the predicate acts of racketeering activity required under RICO. The predicate acts which the plaintiffs allege as the basis for the RICO claims are wire fraud and mail fraud, 18 U.S.C. § 1341 and 1343; the Hobbs Act (Extortion), 18 U.S.C. section 1951; the Travel Act, 18 U.S.C. § 1952; and, by way of incorporation through the Travel Act, the Florida extortion statute, Fla.Stat. § 836.05.

**1. *Mail and Wire Fraud***
The plaintiffs allege that the defendants used the interstate mail and wires to deceive the public and the federal government into believing that Eastern is an unsafe airline and to deceive Eastern employees into believing that the plaintiffs were "bent on their destruction." The plaintiffs allege that the object of these fraudulent practices was to inflict economic injury on the plaintiffs and to deprive them of both tangible and intangible property rights. The important issue presented is whether a party injured in fact by mail or wire fraud has a claim under RICO, when initially third parties are deceived.

The mail fraud and wire fraud statutes make it unlawful to use the mails or interstate wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. section 1341, 1343. The mail fraud statute consists of two elements; a scheme or artifice to defraud; and the use of the mails in execution or furtherance of that scheme. See *United*

*States v. Italiano,* 837 F.2d 1480, 1482 (11th Cir.1988); *United States v. Sawyer,* 799 F.2d 1494, 1501–02 (11th Cir.1986), cert. denied, 107 S.Ct. 961 (1987).

**5** The party injured by the acts of mail and wire fraud may state a claim, even though the parties deceived—public, the government, and Eastern's employees—differ from the parties deprived of property as a result of the deception. See *Lewis v. Lhu,* 696 F.Supp. 723 (D.D.C.1988) (plaintiffs had standing to pursue mail and wire fraud claims even though they were not the persons deceived); *Galerie Furstenberg v. Coffaro,* 697 F.Supp. 1282 (S.D.N.Y.1988); *S.J. Advance Technology & Mfg. Co. v. Junkunc,* 627 F.Supp. 572 (N.D.Ill.1986) (mail and wire fraud adequately pled when plaintiff's competitor intentionally misrepresented to plaintiff's suppliers and customers by mail and telephone in an effort to convince them to cease dealing with plaintiff, even though the immediate targets of the deception were plaintiff's customers and suppliers and not the plaintiff). But see *Corcoran v. American Plan Corporation,* Lexis 13307 (E.D.N.Y.1988) (convergence between the party deceived and the party injured necessary to state a mail fraud claim); *United States v. Evan,* 844 F.2d 36, 40 (2d Cir.1988) (expressing support in dicta on issue of whether the convergence of party deceived and party injured is required, but noting that "the case before us ... does not require us to decide this general question"); *United States v. Keane,* 678 F.Supp. 708 (N.D.Ill.1987).

Defendants argue that in order to state a claim of mail or wire fraud the party deceived must also be the party injured, citing *McNally v. United States,* 107 S.Ct. 2875, 2881 (1987). The issue presented in *McNally* was whether the mail fraud statute extended to a citizen's intangible right to an honest and impartial government. The Court held that the mail fraud statute is limited to the protection of property rights. *McNally* at 2879. The court in *McNally* did not hold, state, or imply that the party deceived and the party deprived must be one and the same.

Nothing in the statute exempts from prosecution persons who achieve fraudulent objective through the deception of third parties. Plaintiffs have alleged that defendants' scheme of publicly "disseminating false information about Eastern's safety and its treatment of employees" constitutes mail and wire fraud.

**2. *Hobbs Act***
Extortion as defined by the Hobbs Act is "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear." 18 U.S.C. § 1951(b)(2). See *United States v.*

Texas Air Corp. v. Air Line Pilots Ass'n Intern., Not Reported in F.Supp. (1989)

113 Lab.Cas. P 11,776, RICO Bus.Disp.Guide 7331

DeParias, 805 F.2d 1447, 1450 (11th Cir.1986), cert. denied, 107 S.Ct. 3189 (1987). Intangible property rights are protected by the Hobbs Act even though they are not considered as property under RICO. See United States v. Nadaline, 471 F.2d 340 (5th Cir.) cert. denied, 411 U.S. 951 (1973) (right to solicit business is a property right protected under Hobbs Act). Plaintiffs allege that defendants conspired to destroy the companies financially by interfering with the companies' intangible property, namely the ability to conduct their business and to solicit business from the public.

**\*6** Defendants assert that the plaintiffs' complaint encompasses only legitimate labor union conduct which is not covered by the Hobbs Act, citing United States v. Enmons, 410 U.S. 396 (1973). The court in Enmons held that the Hobbs Act does not outlaw all use of fear, but only the "wrongful" use. Defendants use United States v. Enmons, supra, to say that union activities (even including violence) designed to advance the economic interests of the union and its members generally cannot constitute a "wrongful" use even if they induce economic fear on the part of the employee. They go on to say that since defendants' ultimate alleged ends—maintenance of high wages and job security through, if necessary, takeover of Eastern and Texas Air—were legitimate labor objectives, and since their alleged improper activities arose out of and directly related to an otherwise legitimate labor dispute, Enmons is controlling.

In Enmons, the Supreme Court focused on the work "wrongful" in the language of the Hobbs Act, and reasoned that because it would be redundant to speak of "wrongful violence" or "wrongful force," Congress must have intended "wrongful" to limit the Act's coverage to "those instances where the obtaining of the property would itself be 'wrongful' because the extortionist has no lawful claim to the property." Enmons, 410 U.S. at 400. In Enmons the Court concluded that there is no "wrongful" taking of employer's property when union members receive wages and benefits in exchange for genuine services bargained for by the employer.

Enmons does not warrant a dismissal of this claim for two reasons, although the case does highlight the concern of this court where a RICO claim is brought in the context of a labor dispute. Numerous courts have effectively limited Enmons to its facts, creating an exception to the Hobbs Act only for what was at issue in that case—violence committed during the course of a lawful strike called for the purpose of inducing an employer's agreement to legitimate collective-bargaining demands. See United States v. Jones, 766 F.2d 994, 1002 (6th Cir.), cert. denied, 474 U.S. 1006 (1985); United States v. Parcaro,

648 F.2d 753, 760 (1st Cir.1981) (Enmons is a labor case dealing with the "unique problem of strike violence"). This court is reluctant to extend the application of Enmons to the case at bar for the allegations in the RICO complaint do raise different concerns.

Second, in the event that Enmons should apply to labor activities beyond strike violence, the defendants are not immunized from liability where the goal of their activities is not a "legitimate labor objective." Enmons 410 U.S. at 404. In other contexts, the Supreme Court has made clear that to constitute "legitimate labor objectives," the goal defendants were seeking to accomplish must have been "intimately related to wages, hours and working conditions." Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 689–90 (1965). See Connell Const. Co. v. Plumbers & Steamfitters, 421 U.S. 616, 624 (1975). At this stage of the proceedings, the court must accept as true the plaintiffs' allegations that defendants' objectives are to force the owners of Eastern to relinquish ownership of the airline by interfering with the normal operations of the airline. The forced sale of a business is not a "legitimate labor objective" for another fundamental reason. In this case, defendants have no "lawful claim to the property," i.e., ownership of Eastern or Texas Air, and obtaining that property through racketeering activities, as alleged cannot fairly be characterized as a fair exchange "bargained for" by plaintiffs. Accordingly, defendants' alleged use of extortionate fear in their campaign to compel the sale of a business, provides the basis for a claim for relief within the meaning of the Hobbs Act.

### 3. Travel Act and the Florida Extortion Act

**\*7** The Travel Act makes unlawful both interstate travel and the use of interstate facilities to carry out "unlawful activity." 18 U.S.C. § 1952(a)(3). "Unlawful activity" includes extortion in violation of state law. § 1952(b). Plaintiff allegations under the Travel Act are predicated on the "unlawful activity" of extortion prohibitted by Fla.Stat. § 836.05.

Defendants principal challenge to the Travel Act is that the Enmons decision should be applied to the Travel Act as well. For the same reasons that the court finds that Enmons does not foreclose a claim under the Hobbs Act, it does not foreclose a claim under the Travel Act. Moreover, courts have rejected extending Enmons beyond the Hobbs Act. See e.g., MHC, Inc. v. United Mine Workers, 685 F.Supp.1370 (E.D.Ky.1988).

Defendants argue that the plaintiffs have failed to adequately allege threats of injury within the meaning of Fla.Stat. § 836.04. Florida cases construing that statute,

Texas Air Corp. v. Air Line Pilots Ass'n Intern., Not Reported in F.Supp. (1989)

113 Lab.Cas. P 11,776, RICO Bus.Disp.Guide 7331

however, make clear that what constitutes improper coercion is an issue of fact to be determined in the context of the circumstances at issue, and that "vague, indirect and inferential coercion" can constitute extortion. See, e.g., *Carricarte v. State,* 384 So.2d 1261 (Fla.), cert. denied, 449 U.S. 874 (1980); *Matthews v. State,* 363 SO.2d 1066, 1069 (Fla.1978), cert. denied, 442 U.S. 911 (1979). Under these principles, the plaintiffs' pleadings sufficiently allege the elements of the Florida extortion statute.

**C.** *Pattern of Racketeering Activity*
One of the essential elements necessary to prove a RICO claim is to establish that there has been a "pattern" of racketeering engaged in by the defendant. See *Sedima S.P.R.L. v. Imrex, Co.,* 473 U.S. 479 (1985). Defendants interpret case law to mean that the fundamental requirement of pleading facts which constitute at least two predicate acts of "racketeering activity," must not arise out of a single scheme. *Id.* at 497 n. 14 (1985). The RICO statute defines "pattern of racketeering activity" to "required[ ] at least two acts of racketeering activity" committed within ten years of each other (excluding any period of imprisonment). 18 U.S.C. section 1961(5).

In construing this term, the Eleventh Circuit and this Court specifically have held that allegations that a defendant has committed two or more related acts of "racketeering," as defined in 18 U.S.C. section 1961(1) are sufficient to satisfy the "pattern" requirement. See *United States v. Alexander,* 850 F.2d 1500, 1506 (11th Cir.1988); *Riggs Nat'l Bank v. Freeman,* 684 F.Supp. 1086 (S.D.Fla.1988). This rule holds even if the defendants engaged in "racketeering activity" solely in the course of a single scheme or episode. See, e.g., *Bank of America v. Touche Ross & Co.,* 782 F.2d 966, 971 (11th Cir.1986). While other circuits have rejected the position taken by the Eleventh Circuit, this court is bound by the holding. See *H.J. Inc. v. Northwestern Bell Tel. Co.,* 829 F.2d 648 (8th Cir.1987), cert. granted, 108 S.Ct. 1219 (1988). At this juncture, the court is also satisfied that plaintiffs' pleadings adequately state that the racketeering activity is "related," "on-going," and "continuous" to satisfy RICO pleading requirements.

**III.** *RLA and RICO*
**\*8** Defendants' argue that Federal Labor Law precludes Plaintiffs' attempt to litigate this labor dispute under the federal RICO statute or Florida State Law, asserting that the conflict is within the exclusive realm of the Railway Labor Act, 45 U.S.C. §§ 151–188.

Defendants allege that Congress has repeatedly demonstrated a preference for regulating labor disputes through a specialized labor policy, rather than through more generalized rules of law. See *United States v. Hutcheson,* 312 U.S. 219, 228–37 (1941); *Jacksonville Bulk v. Hutcheson,* 457 U.S. 702 (1982); *Burlington Northern R.R. v. Bhd. of Maintenance of Way Employees,* 107 S.Ct. 1841, 1847–48 (1987).

Labor disputes should ordinarily be resolved under the RLA but it is not required that the act should be the exclusive remedy when another federal law also provides remedies. The developing RICO law recognizes that Congress did not intend to remove peaceful union economic activities during labor disputes "from the ambit of the exclusive jurisdiction of the labor law." *Butcher's Union, Local 498 v. S.D.C. Investment, Inc.,* 631 F.Supp. 1001, 1009 (E.D.Cal.1986). However, the allegations in this complaint do not illustrate peaceful activities.

"[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551 (1974). Only when the two statutes irreconcilably conflict will the more specific statute prevail over the more general statute. *Id.* at 550. Plaintiffs are entitled to pursue their RICO claims, absent an irreconcilable conflict between RICO and the RLA. See, e.g., *Atchison, Topeka & Santa Fe Ry. Co. v. Buell,* 480 U.S. 557 (1987) (employees cannot be deprived of right to bring action under Federal Employers Liability Act simply because injury was caused by conduct subject to RLA minor dispute-resolution procedures); *United States v. Green,* 350 U.S. 415 (1956) (nothing in RLA prevents employer from maintaining action under Hobbs Act against labor union for unlawful acts or threats of force or fear); *McAlester v. United Air Lines, Inc.,* 851 F.2d 1249 (10th Cir.1988) (availability of remedy under RLA does not preclude independent tort-like cause of action under 42 U.S.C.1981).

**IV.** *First Amendment Protection*
Defendants assert that virtually all of the alleged misconduct involves speech and speech-related activity which are privileged under the first amendment. The several arguments which the defendants assert are not adequate to permit those activities as alleged. "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language ..." *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502 (1949). Much of the

**Texas Air Corp. v. Air Line Pilots Ass'n Intern., Not Reported in F.Supp. (1989)**

113 Lab.Cas. P 11,776, RICO Bus.Disp.Guide 7331

complaint addresses allegedly wrongful conduct, such as interference with flight operations and work slowdowns.

**\*9** False Statements of fact do not enjoy constitutional protection, e.g., *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340 (1974); nor do statements of opinion which imply the existence of undisclosed defamatory facts that are false, e.g., *Keller v. Miami Herald Publishing Co.,* 778 F.2d 711, 718 (11th Cir.1985). Statements of pure opinion are privileged. *Id.* The statements attributed to the defendants consist of factual statements and statements of mixed fact and opinion.

Although defendants assert that their activities are protected by the petition activity permitted under the first amendment, the petition clause does not "include an unqualified right to express damaging falsehoods." *McDonald v. Smith,* 472 U.S. 479, 484 (1985). The constitutional protection accorded petitioning activity is no greater than that afforded speech generally. *Id.* at 484–85.

**V.** *State Law Claims*

In addition to pleading causes of action under the federal RICO statute, plaintiffs assert pendent claims under the Florida Civil Remedies for Criminal Practices Act (CRCP), Fla.Stat. § 772.1010 *et seq.,* as well as claims for disparagement of property, defamation, tortious interference with actual and prospective business relations, and inducing breaches of fiduciary duty. These latter causes of action are pled under common law of Florida. Although defendants have raised a series of challenges to the to the state law claims, the plaintiffs' state law pleadings are sufficient to withstand dismissal under rule 12(b).

*Conclusion*

Although the court is troubled by the use of RICO in the context of a labor dispute, the motion to dismiss shall be denied, because the basic elements of a RICO claim have been properly pled. The court shall later revisit these issues on motions for summary judgment at which time the factual basis for the dispute will be clarified by discovery. Having considered the motions and being otherwise advised in the premises,

It Is Ordered and Adjudged as follows:

1. The motion to dismiss by the union defendants and by individual defendants Bryan, Bavis, McClure, Cole, and Breslin are denied. They shall file and serve their answers to the complaint within twenty days from the date of this order.

2. The motion to dismiss for failure to state a compulsory counterclaim is denied, and the motion to transfer venue is denied.

3. The motion to dismiss the remaining individual defendants is granted for failure to provide an adequate statement of their alleged wrongful acts. The plaintiff shall have 20 days to amend the complaint as to these defendants.

**Parallel Citations**

113 Lab.Cas. P 11,776, RICO Bus.Disp.Guide 7331

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

**EXHIBIT L**



Slip Copy, 2014 WL 104968 (W.D.N.Y.)
**(Cite as: 2014 WL 104968 (W.D.N.Y.))**

H

Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
UNITED STATES of America,
v.
Michael J. CAGGIANO, et al., Defendants.

No. 07–CR–304S (2)(4)(6)(7)(8)(9)(12).
Jan. 9, 2014.

Anthony M. Bruce, Charles B. Wydysh, Edward H. White, U.S. Attorney's Office, Buffalo, NY, Robert Steven Tully, U.S. Department of Justice/Organized Crime Section, Washington, DC, for United States of America.

Thomas J. Eoannou, Michael G. O'Rourke, Joseph M. Latona, Andrew C. Lotempio, Rodney O. Personius, Brian Melber, Personius Melber LLP, Paul J. Cambria, Jr., Lipsitz, Green, Scime, Cambria, LLP, Mark J. Mahoney, Harrington and Mahoney, Patrick J. Brown, Lotempio & Brown, Kevin W. Spitler, Joel L. Daniels, Buffalo, NY, William E. Grande, Law Office of William E. Grande, Kenmore, NY, Cheryl Meyers Buth, Murphy Meyers LLP, Orchard Park, NY, Mark R. Uba, Williamsville, NY, Daniel J. Henry, Jr., Villarini & Henry, L.L.P., Hamburg, NY, for Defendants.

**DECISION AND ORDER**
WILLIAM M. SKRETNY, Chief Judge.

**\*1** In their Supplemental Joint Pretrial Memorandum, Defendants argue that Supreme Court rulings require that "state law RICO predicates involve all the conduct required of 'generic extortion' under the Hobbs Act," therefore the New York law predicate racketeering acts charged in the instant case have the same elements as those required by the Hobbs Act,

except for the interstate commerce requirement. (Defs' Joint Supp Pretrial Mem at 1, Docket No. 429.) Defendants assert that, as a result, the New York RICO predicate extortion offenses must be read—and instructed to the jury—as containing the *Enmons* legitimate labor objective exception. (*Id.* at 6.) They therefore request that the jury not be "confuse[d]" with two sets of instructions on the core elements of "extortion." (*Id.* at 1.)

Racketeering activity includes, among other things, "any act or threat involving ...... extortion ... which is chargeable under State law and punishable by imprisonment for more than one year" as well as any act which is indictable under the Hobbs Act, 18 U.S.C. § 1951. *See* 18 U.S.C. § 1961(1). However, even where a defendant's alleged conduct would be "chargeable under State law and punishable by imprisonment for more than one year," 18 U.S.C. § 1961(1)(A), "it cannot qualify as a predicate offense for a RICO suit unless it is 'capable of being generically classified as extortionate,' " *Wilkie v. Robbins,* 551 U.S. 537, 567, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) (quoting *Scheidler v. Nat'l Org. for Women, Inc.,* 537 U.S. 393, 409, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003)). "[G]eneric extortion" as recognized by the Supreme Court, is defined as "obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." *Scheidler,* 537 U.S. at 409.

The Hobbs Act similarly defines "extortion" as "the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (emphasis added). As has been discussed at length in this Court's prior decisions, the Supreme Court in *United States v. Enmons* concluded that the Hobbs Act "did not sweep within its reach violence during a strike to achieve legitimate

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 104968 (W.D.N.Y.)
**(Cite as: 2014 WL 104968 (W.D.N.Y.))**

collective-bargaining objectives." 410 U.S. 396, 404, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). Such conduct is therefore not "wrongful" within the meaning of the Hobbs Act. "Under *Enmons,* when the objective is wrongful (i.e., to obtain property to which one "has no lawful claim"), then the means (e.g., exploitation of fear) are also wrongful, but the converse is not necessarily true." *Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union,* 585 F.Supp.2d 789, 798 (E.D.Va.2008) (citing *Viacom Int'l, Inc. v. Icahn,* 747 F.Supp. 205, 210 (S.D.N.Y.1990)).

Defendants rely on *Wilkie* for their conclusion that the *Enmons* legitimate labor objective exception applies to both Hobbs Act and New York state law RICO predicate extortion offenses. In *Wilkie,* however, the Supreme Court considered the scope of 'generic extortion:' "The Hobbs Act does not speak explicitly to efforts to obtain property for the Government rather than a private party, and that leaves defendants' contention to turn on the common law conception of 'extortion,' which we presume Congress meant to incorporate when it passed the Hobbs Act in 1946." 551 U.S. at 563. The Court concluded that there was no liability under the common law crime of extortion where the U.S. Government was the intended beneficiary of the allegedly extortionate acts. *Wilkie,* 551 U.S. at 563. Accordingly, the state law predicate charge against the Government was also incapable of being " 'generically classified as extortionate.' " *Id.* at 567.

**\*2** In contrast, the Supreme Court's determination in *Enmons* that Hobbs Act extortion does not impose liability when wrongful means, specifically violence, are used to achieve a legitimate labor objective was not based on an interpretation of 'generic' or common law extortion. Instead, the Court analyzed the "legislative framework" of the Hobbs Act in concluding that it did "not apply to the use of force to achieve legitimate labor ends." *Enmons,* 410 U.S. at 401; *see Smithfield Foods,* 585 F.Supp.2d at 800. Based on that analysis, the Court narrowed the scope of extortionate

acts for which a defendant could be found liable under that act. Thus, unlike *Wilkie, Enmons* does not modify or clarify the generic definition of extortion, and the application of the legitimate labor objective exception is therefore limited to Hobbs Act extortion charges. *Smithfield Foods,* 585 F.Supp.2d at 800–1. Indeed, both the majority and the concurrence in *Enmons* recognized a reluctance to define federal crimes as coextensive with state crimes. *See Enmons,* 410 U.S. at 411, 412 (certain strike violence aimed at a legitimate end is not covered by the Hobbs Act, but instead "is subject to state criminal prosecution"); *Smithfield Foods,* 585 F.Supp.2d at 800. This Court therefore agrees with those cases holding that to use *Enmons* "to legalize conduct made criminal under state law would turn *Enmons* upside down." *Smithfield Foods,* 585 F.Supp.2d at 801 (quoting Herbert R. Northrup & Charles H. Steen, *Union Corporate Campaigns As Blackmail: The RICO Battle at Bayou Steel,* 22 Harv. J.L. & Pub. Pol'y 771, 815 (1999)); *but see United Broth. of Carpenters & Joiners of Am. v. Building and Const. Trades Dept.,* 911 F.Supp.2d 1118, 1128–29 (E.D.Wash.2012) (finding that the elements necessary to establish a RICO predicate act of extortion are the same under state law and the Hobbs Act).

Contrary to Defendants' further argument, *Cintas Corp. v. Unite Here* does not affect this conclusion. 601 F.Supp.2d 571 (S.D.N.Y.2009), *aff'd,* 355 Fed. App'x 508 (2009). In *Cintas,* the district court considered whether the defendants' use of the plaintiff's fear of economic loss to obtain a "card-check/neutrality agreement" violated the Hobbs Act. *Id.* at 577. "Generally, fear of economic loss *is not inherently wrongful,* except 'when employed to achieve a wrongful purpose.' " *Id.* (emphasis added) (quoting *United States v. Clemente,* 640 F.2d 1069, 1077 (2d Cir.1981)). "And precisely because of this fact, the 'objective' of the party employing fear of economic loss will have a bearing on the lawfulness of its use." *Clemente,* 640 F.2d at 1076.

Thus, in *Cintas,* the district court considered the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 104968 (W.D.N.Y.)
**(Cite as: 2014 WL 104968 (W.D.N.Y.))**

defendants' objective to determine whether their conduct was wrongful. The court concluded that, because the plaintiff received some benefit from the agreement sought, it was obtained as a result of lawful "hard-bargaining" rather than the wrongful use of the fear of economic loss. *Cintas,* 601 F.Supp.2d at 577–8. In short, the court found that the *means* used by defendants—the fear of economic loss—was not wrongful. Thus, there is no reason to conclude that the district court's summary dismissal of the state law predicate extortion offenses, and the Second Circuit's affirmance of that decision, was based on anything other than the finding that defendants did not employ wrongful means. *Cintas* therefore does support the position that the Hobbs Act's dual requirements of both wrongful means *and* a wrongful objective must be read into every state law extortion predicate offense, including those where the means utilized by the defendant are, in contrast with *Cintas,* inherently wrongful.

**\*3** Finally, because New York Penal Law exempts from extortion liability only the threat to cause "a strike, boycott or other collective labor group action injurious to some person's business ... when the property is demanded or received for the benefit of the group in whose interest the actor purports to act," § 155.05(2)(e)(vi), the alleged federal and state law RICO extortion predicate offenses are not identical. Defendants' request to charge the jury as such is therefore denied.

SO ORDERED.

W.D.N.Y.,2014.
U.S. v. Caggiano
Slip Copy, 2014 WL 104968 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**EXHIBIT M**



Slip Copy, 2013 WL 5573046 (W.D.N.Y.), 197 L.R.R.M. (BNA) 2746
**(Cite as: 2013 WL 5573046 (W.D.N.Y.))**

H

United States District Court,
W.D. New York.
UNITED STATES of America,
v.
Carl A. LARSON, et al., Defendants.

Nos. 07–CR–304S, 07–CR–304S–1, 07–CR–304S–2,
07–CR–304S–4, 07–CR–304S–6, 07–CR–304S–7,
07–CR–304S–8, 07–CR–304S–9, 07–CR–304S–10,
07–CR–304S–11, 07–CR–304S–12.
Oct. 9, 2013.

Anthony M. Bruce, Charles B. Wydysh, U.S. Attorney's Office, Buffalo, NY, Robert Steven Tully, U.S. Department of Justice/Organized Crime Section, Washington, DC, for United States of America.

Thomas J. Eoannou, Buffalo, NY, William E. Grande, Law Office of William E. Grande, Kenmore, NY, for Defendants.

**DECISION AND ORDER**
WILLIAM M. SKRETNY, Chief Judge.
**I. INTRODUCTION**
*1 This is a criminal action brought under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq., and the Hobbs Act, 18 U.S.C. § 1951. Briefly, over the course of about eleven years, Defendants, members of a labor union known as "Local 17," are alleged to have engaged in threats, physical violence, and property damage in an attempt to force construction employers in Western New York to hire Local 17 members for their projects. Pending before this Court is Defendants' joint motion to dismiss the Second Superseding Indictment pursuant to Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure for failure to state an offense. This

Court finds the matter fully briefed and oral argument unnecessary.

This is Defendants' third attempt to dismiss the pending indictment, and familiarity with the facts is assumed. In the present motion, Defendants argue that the Second Superseding Indictment does not state sufficient allegations of extortable property as defined by the Supreme Court's recent ruling in *Sekhar v. United States,* 133. S.Ct. 2720, —— U.S. ——, 133 S.Ct. 2720, 186 L.Ed.2d 794 (June 26, 2013).

**II. DISCUSSION**
**A. Motion to Dismiss the Indictment**
Rule 7(c) (1) of the Federal Rules of Criminal Procedure provides that an indictment "must be a plain, concise and definite written statement of the essential facts constituting the offense charged." An indictment must also "provide enough detail so that [a defendant] may plead double jeopardy in a future prosecution based on the same set of events." *United States v. De La Pava,* 268 F.3d 157, 162 (2d Cir.2001); *United States v. Goodwin,* 141 F.3d 394, 401 (2d Cir.1997), *cert denied,* 525 U.S. 881 (1998). It need not be perfect, however, and "common sense and reason are more important than technicalities." *De La Pava* 268 F.3d at 162. Accordingly, a pre-trial motion to dismiss an indictment under Rule 12 must satisfy a "high standard." *United States v. Larson,* 807 F.Supp.2d 142, 151 (W.D.N.Y.2011); *United States v. Lazore,* 90 F.Supp.2d 202, 203 (N.D.N.Y.2000). In considering whether to dismiss an indictment for failure to state a criminal offense, a court must assume the truth of the allegations in the indictment and determine whether the indictment is valid on its face. *United States v. Bicoastal Corp.,* 819 F.Supp. 156, 158 (N.D.N.Y.1993).

The Second Superseding Indictment charges Defendants with one count of racketeering conspiracy

Slip Copy, 2013 WL 5573046 (W.D.N.Y.), 197 L.R.R.M. (BNA) 2746
**(Cite as: 2013 WL 5573046 (W.D.N.Y.))**

under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), and alleges that the object of the conspiracy was the extortion of property from various construction firms throughout Western New York. The Indictment further charges one count of Hobbs Act extortion conspiracy, 18 U.S.C. § 1951(a), and six counts of attempted Hobbs Act extortion. (Docket No. 280.)

*1. Hobbs Act Extortion*

The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). As has been explained by the Supreme Court, "Congress used two sources of law as models in formulating the Hobbs Act: the Penal Code of New York and the Field Code, a 19th-century model penal code." *Scheidler v. Nat'l Org. for Women* ("Scheidler II"), [FN1] 537 U.S. 393, 403, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003); *see Sekhar*, 133 S.Ct. at 2725. "The New York statute contained, in addition to the felony crime of extortion, a new (that is to say, nonexistent at common law) misdemeanor crime of coercion." *Sekhar*, 133 S.Ct. at 2725. Where extortion required the acquisition of property, the crime of coercion "required merely the use of threats 'to compel another person to do or to abstain from doing an act which such other such person has a legal right to do or to abstain from doing.' " *Id.* (quoting N.Y. Penal Law § 530 (1909), *earlier codified in* N.Y. Penal Code § 653 (1881)). In enacting the Hobbs Act, "Congress did not copy the coercion provision. The omission must have been deliberate, since it was perfectly clear that extortion did not include coercion." *Sekhar*, 133 S.Ct. at 2725. In light of this deliberate distinction, the 'obtaining' element of extortion requires both the deprivation and acquisition of property. *Sekhar*, 133 S.Ct. at 2725; *Scheidler II*, 537 U.S. at 404.

> FN1. As noted by the Second Circuit in *United States v. Gotti*, 459 F.3d 296, 301 n. 1 (2d Cir.2006), *cert. denied*, 551 U.S. 1144,

127 S.Ct. 3001, 168 L.Ed.2d 726 (2007), *Scheidler* was before the Supreme Court on three separate occasions: in 1994, 2003, and again in 2006.

**\*2** The Supreme Court's holding in *Sekhar* is not new. The distinction between extortion and coercion was initially examined at length by the Court in *Scheidler II*. There, the Court considered whether protesters at abortion clinics committed extortion under the Hobbs Act by using or threatening to use force, violence, or fear to obtain certain property rights, specifically "a woman's right to seek medical services from a clinic, the right of the doctors, nurses or other clinic staff to perform their jobs, and the right of the clinics to provide medical services free from wrongful threats, violence, coercion and fear." 537 U.S. at 400–1. The Court stated:

> There is no dispute in these cases that petitioners interfered with, disrupted, and in some instances completely deprived respondents of their ability to exercise their property rights.... But even when their acts of interference and disruption achieved their ultimate goal of 'shutting down' a clinic that performed abortions, such acts did not constitute extortion because petitioners did not 'obtain' respondents' property. Petitioners may have deprived or sought to deprive respondents of their alleged property right of exclusive control of their business assets, but they did not acquire any such property. *Petitioners neither pursued nor received something of value from respondents that they could exercise, transfer, or sell.*

> *Scheidler II*, 537 U.S. at 404–5 (internal quotation marks omitted, emphasis added).

In considering the effect of *Scheidler II*, the Second Circuit relied on the Supreme Court's statement that it was not reaching, much less rejecting, this Circuit's decision in *United States v. Tropiano*. See

Slip Copy, 2013 WL 5573046 (W.D.N.Y.), 197 L.R.R.M. (BNA) 2746
**(Cite as: 2013 WL 5573046 (W.D.N.Y.))**

*United States v. Gotti,* 459 F.3d 296, 323 (2d Cir.2006), *cert. denied,* 551 U.S. 1144, 127 S.Ct. 3001, 168 L.Ed.2d 726 (2007) (citing *Tropiano,* 418 F.2d 1069, 1075 (2d Cir.1969), *cert. denied,* 397 U.S. 1021 (1970)); *see also Scheidler II,* 537 U.S. at 402 n. 6 (characterizing the right at issue in *Tropiano* as "the intangible right to solicit refuse collection accounts"). In *Tropiano,* the Circuit court recognized that "[t]he concept of property under the Hobbs Act, as devolved from its legislative history and numerous decisions, is not limited to physical or tangible property or things." 418 F.2d at 1075. *Scheidler II* was therefore interpreted as "only tightening the 'obtaining' requirement," thereby "leaving intact this Circuit's precedent that intangible property rights can qualify as extortable property under the Hobbs Act and as simply clarifying that before liability can attach, the defendant must truly have obtained (or, in the case of attempted extortion, sought to obtain) the property right in question." *Gotti,* 459 F.3d at 323. Further, the Second Circuit "read the Court's emphasis [in *Scheidler II* ] on the possibility of exercising, transferring, or selling the property as a concern with the extortionist's *intent* with respect to the property at issue." *Gotti,* 459 F.3d at 323 (emphasis in original).

**\*3** Following *Scheidler II* and *Gotti,* the key inquiry in this Circuit for the purposes of Hobbs Act extortion has been "whether the defendant is (1) alleged to have carried out (or in the case of attempted extortion, attempted to carry out) the deprivation of a property right from another, with (2) the intent to exercise, sell, transfer, or take some other analogous action with respect to that right." *Gotti,* 459 F.3d at 324; *United States v. Cain,* 671 F.3d 271, 282–83 (2d Cir.2012), *cert. denied,* —— U.S. ——, 132 S.Ct. 1872, 182 L.Ed.2d 655 (2012); *see also United States v. Shi Xing Dong,* 513 Fed. App'x 70, 72 (2d Cir.2013); *United States v. Hui Chen,* 350 Fed. App'x 520, 522–23 (2d Cir.2009), *cert. denied,* 559 U.S. 961, 130 S.Ct. 1564, 176 L.Ed.2d 149 (2010). Transferable property has been found to include union members' rights to free speech and democratic participation in

union affairs where defendants intended to exercise those rights for themselves, *Gotti,* 459 F.3d at 325; an employee's salary and right to be employed where defendants sought to replace that employee with their own preferred candidate, *id.* at 326; and "intangible property rights to make business decisions ... free from outside pressure" where defendants sought not to shut down the business, but to make themselves silent partners, *id.* at 327. Similarly, the use of threats and force to induce competitors to abandon work for the purpose of enlarging the defendant's market share was a permissible theory of extortion consistent with *Schedler II* and *Tropiano. Cain,* 671 F.3d at 282. Such a theory has been compared to an attempt to force entry into a non-competition agreement for the benefit of defendants. *Gotti,* 459 F.3d at 323–4; *Hui Chen,* 350 Fed. App'x at 522.

This was the state of the relevant law when the Second Circuit heard *United States v. Sekhar* in 2012. *See* 683 F.3d 436 (2d Cir. June 26, 2012), *rev'd,* —— U.S. ——, 133 S.Ct. 2720, 186 L.Ed.2d 794 (June 26, 2013). At issue was whether the defendant was guilty of attempted extortion for threatening to disclose that the general counsel for the New York State Comptroller's Office was having an affair unless the counsel recanted a recommendation to the Comptroller. *Id.* at 437. The general counsel had recommended that the Comptroller not issue a nonbinding "Commitment" approving an investment by the state employee pension fund with a fund managed by defendant's company. *Id.* at 438. The Second Circuit rejected the defendant's argument that there was no attempt to obtain property within the meaning of Hobbs Act extortion. Citing *Tropiano* and *Gotti,* the Circuit court reiterated that the right to pursue a lawful business free from threats and the ability to make business decisions free from outside pressure have long been recognized as a property rights. *Sekhar,* 683 F.3d at 440–41. The Circuit court then affirmed the conviction, stating that the defendant "Sekhar attempted to deprive the [g]eneral [c]ounsel of his right to make a recommendation consistent with his legal judgment and at-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5573046 (W.D.N.Y.), 197 L.R.R.M. (BNA) 2746
**(Cite as: 2013 WL 5573046 (W.D.N.Y.))**

tempted to exercise that right by forcing the [g]eneral [c]ounsel to make a recommendation determined by *Sekhar." Id.* at 442 (emphasis in original).

**\*4** The Supreme Court reversed. The Court found that, even assuming the personal right at issue was property, "it certainly was not *obtainable property* under the Hobbs Act." 133 S.Ct. at 2726 (emphasis in original). Considering the government's description of the general counsel's "intangible property right to give his disinterested legal opinion to his client free of improper outside interference," the Court asked, "But what, exactly, would the [defendant] have obtained for himself? A right to give his own disinterested legal opinion to his own client free of improper interference? Or perhaps, a right to give the general counsel's disinterested legal opinion to the general counsel's client?" *Id .* at 2727 (emphasis removed). Either formulation was "absurd" because the defendant's goal was not to acquire the general counsel's right to make a recommendation, but instead "to force the general counsel to offer advice that accorded with [the defendant's] wishes." *Id.* This, the Court concluded, "is coercion, not extortion." *Id.*

2. *Property Allegations in the Second Superseding Indictment*

Defendants contend that, following the Supreme Court's decision in *Sekhar,* the Second Superseding Indictment fails to sufficiently charge extortion in connection with any of the charges, and therefore it must be dismissed. They argue that all four property allegations underlying the charges in the indictment fail to satisfy *Sekhar's* requirement of transferability. Those allegations are that Defendants attempted to gain by extortion:

a. Property of construction contractors consisting of wages and benefits to be paid pursuant to labor contracts with Local 17 at construction projects in Western New York.

b. Property of non-union construction laborers consisting of the jobs being performed by those non-union laborers and the wages and benefits associated with those jobs at construction projects in Western New York.

c. Property of construction contractors and businesses consisting of the right to make business decisions free from outside pressure at construction projects in Western New York.

d. Property of construction contractors consisting of wages and employee benefit contributions paid or to be paid by said contractors for unwanted, unnecessary, and superfluous labor.

(Sec. Sup. Indict. ¶ 8, Docket No. 280.) Defendants assert that each of these categories of property "are all derivations of [a] core accusation—that the defendants sought to deprive contractors of the right to make business decisions free from outside pressure, in particular by forcing them to enter into union contracts." (Defs' Mem of Law at 7, Docket No. 367.) They therefore argue that, post-*Sekhar,* this type of claim "equates to an accusation of coercion, not extortion." (*Id.* at 5.)

The Government responds that *Sekhar* is distinguishable in light of the particular property at issue in this case, a labor contract and its accompanying wages and benefits.

i. *Wages and Benefits Pursuant to a Labor Contract*

**\*5** The first property allegation asserts that Defendants sought wages and benefits to be paid by construction contractors "pursuant to labor contract with Local 17." Defendants argue that "this so-called extortion objective constitutes nothing more than the decision of who to hire," and therefore amounts merely to coercion. (Defs' Mem of Law at 8.) This Court disagrees. First, the fact that a contractor could choose to hire union workers is not dispositive. "The

Slip Copy, 2013 WL 5573046 (W.D.N.Y.), 197 L.R.R.M. (BNA) 2746
**(Cite as: 2013 WL 5573046 (W.D.N.Y.))**

Hobbs Act speaks of extortion as 'the obtaining of property from another, *with his consent,* induced by wrongful use of actual or threatened force." *Cain,* 671 F.3d at 283 (emphasis in original) (citing 18 U.S.C. § 1951(b)(2)). "The essential requirement to establish extortion is thus that the victim retain 'some degree of choice in whether to comply with the extortionate threat, however much of a Hobson's choice that may be.' " *Cain,* 671 F.3d at 283 (quoting *United States v. Zhou,* 428 F.3d 361, 371 (2d Cir.2005)). "Indeed, this element of consent is the razor's edge that distinguishes extortion from robbery." *Zhou,* 428 F.3d at 371.

Second, this argument ignores the fact that a contract and contractual rights can be assigned, and therefore constitute something of value that can be exercised, transferred, or sold. Cf. *Scheidler II,* 537 U.S. at 405 (no extortion liability where the defendants neither pursued nor received something of value from respondents that they could exercise, transfer, or sell); *see Gotti,* 459 F.3d at 323 (intangible property rights such as "noncom petition or exclusivity agreements [ ] are certainly things of value that are capable of being exercised, transferred, or sold"); *see generally Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 172 (2d Cir.2006) (noting that assignment of contractual rights is generally permitted); *Hotel 71 Mezz Lender LLC v. Falor,* 14 N.Y.3d 303, 313–14, 900 N.Y.S.2d 698, 926 N.E.2d 1202, 1209 (2010) (intangible contract right could be assigned, and therefore constituted property subject to attachment); *ABKCO Indus. v. Apple Films,* 39 N.Y.2d 670, 674, 385 N.Y.S.2d 511, 350 N.E.2d 899, 901 (1976) (same). Further, this Court has already rejected Defendants' contention that a labor contract was a legitimate union objective and therefore their alleged actions were not wrongful under *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). *See United States v. Larson,* 807 F.Supp.2d 142, 156–58 (W.D.N.Y.2011). This allegation therefore sufficiently states "obtainable property" in support of a charge of extortion.

*ii. Wages and Benefits for Unwanted, Unnecessary, and Superfluous Labor*

Defendants' contention that this allegation is "vague" and just another "version of the Government's claim that the [D]efendants were seeking labor union contracts" (Defs' Mem of Law at 9) ignores the history of the enactment of the Hobbs Act.

The Hobbs Act was passed after this Court had construed s 2 of the Federal Anti–Racketeering Act of 1934, 48 Stat. 979, in *United States v. Local 807,* 315 U.S. 521, 62 S.Ct. 642, 86 L.Ed. 1004. Subsection (a) of s 2 barred, with respect to interstate commerce, exaction of valuable considerations by force, violence or coercion, 'not including, however, the payment of wages by a bona-fide employer to a bona-fide employee'. We held in Local 807 that this exception covered members of a city truck drivers' union offering superfluous services to drive arriving trucks to their city destination with intent, if the truck owners refused offer, to exact the wages by violence. In the Hobbs Act, 60 Stat. 420, carried forward as 18 U.S.C. s 1951, 18 U.S.C.A. s 1951, which amended the Anti–Racketeering Act, the exclusion clause involved in the Local 807 decision was dropped. The legislative history makes clear that the new Act was meant to eliminate any grounds for future judicial conclusions that Congress did not intend to cover the employer-employee relationship.

**\*6** *United States v. Green,* 350 U.S. 415, 418–19, 76 S.Ct. 522, 100 L.Ed. 494 (1956).

Further, the Supreme Court specified in *Green* that criminal behavior was not limited to situations where unions or union officials used threats of force or violence "to obtain property for the personal benefit of the union or its agent." *Id.* at 420.

The city truckers in the Local 807 case similarly

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5573046 (W.D.N.Y.), 197 L.R.R.M. (BNA) 2746
**(Cite as: 2013 WL 5573046 (W.D.N.Y.))**

were trying by force to get jobs and pay from the out-of-state truckers by threats and violence. The Hobbs Act was meant to stop just such conduct. And extortion as defined in the statute in no way depends upon having a direct benefit conferred on the person who obtains the property.

Id.; see *Enmons,* 410 U.S. at 403 (the Act was designed to "prevent both union members and non union people from making use of robbery and extortion under the guise of obtaining wages in the obstruction of interstate commerce" (citation omitted)). Nothing in the Court's decision in *Sekhar* limits its original intent. The conclusion that "jobs and pay"—in other words, "wages and benefits"—constitute obtainable property under the Hobbs Act is therefore inescapable. *Green,* 350 U.S. at 420.

*iii. Right to Make Business Decisions Free from Outside Pressure*

As noted above, the Second Circuit continued to recognize "intangible property rights to make business decisions ... free from outside pressure" following the Supreme Court's decision in *Scheidler II. See Gotti,* 459 F.3d at 327. In *Gotti,* the Second Circuit reasoned that the element of obtainable property was met where the defendants sought to exercise the extortion victim's right to make business decisions for their own benefit. *Id.* In so concluding, the Circuit court distinguished *Scheidler II* on the ground that, there, the ultimate goal of the protesters was only to shut down clinics that performed abortions. *Id.* at 323 (citing *Scheidler II,* 537 U.S. at 405).

This did not constitute acquisition in the eyes of the *Scheidler II* Court, we believe, because there was no further intended activity on the part of the protestors, and mere interference with the clinics' right to conduct their business, even to the point of getting them to cease conducting their business altogether, was closer to coercion than extortion. But had the protestors sought to take further action after having deprived the clinics of their right to conduct their

business as they wished—by, for example, *forcing the clinic staff to provide different types of services,* forcing the clinic to turn its operations over to the protestors, or selling the clinic or its property to a third party—we believe they would have satisfied the *Scheidler II* Court's definition of "obtaining."

*Gotti,* 459 F.3d at 323–24 (emphasis added).

This analysis does not survive the Supreme Court's decision in *Sekhar.* There, the Supreme Court found the government's argument "unconvincing" when it attempted to distinguish *Scheidler II* on the same basis:

**\*7** In [the government's] view, had the protesters sought to force the clinics to provide services other than abortion, extortion would have been a proper charge. [The defendant] committed extortion here, the [g]overnment says, because he did not merely attempt to prevent the general counsel from giving a recommendation but tried instead to force him to issue one. That distinction is, not to put too fine a point on it, nonsensical. It is coercion, not extortion, when a person is forced to do something and when he is forced to do nothing.

*Sekhar,* 133 S.Ct. at 2726 n. 4.

This conclusion does not, however, form a basis for dismissing all or part of the Second Superseding Indictment in the instant case. No predicate racketeering act or Hobbs Act charge relies on the contractors' right to make business decisions free from interference as the *sole* supporting property allegation. Instead, every charge alleges that the property sought to be obtained by Defendants included either wages and benefits to paid pursuant to labor contracts with Local 17 or wages and benefits to be paid for unwanted, unnecessary, and superfluous labor. As concluded above, these allegations sufficiently state "obtainable property" for the purpose of the Hobbs

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5573046 (W.D.N.Y.), 197 L.R.R.M. (BNA) 2746
**(Cite as: 2013 WL 5573046 (W.D.N.Y.))**

Act, and therefore no charge fails to state an offense. Thus, this issue is one better discussed in connection with the jury instructions.

*iv. Wages and Benefits belonging to Non–Union workers*

The Second Superseding Indictment also charges that Defendants attempted to obtain the "[p]roperty of non-union construction laborers consisting of the jobs being performed by those non-union laborers and the wages and benefits associated with those jobs." (Sec.Sup.Ind.¶ 8(b).) This Court has already concluded that wages and benefits associated with construction jobs constitute property obtainable from construction contractors. The issue therefore is whether these wages and benefits are also obtainable *from the non-union laborers,* as opposed to their contractor-employers. However, the parties have not addressed this issue as currently framed. Further, because every predicate racketeering act and Hobbs Act charge is supported by at least one allegation sufficiently stating extortable property, as noted above, resolution of this issue does not affect the disposition of the current motion to dismiss.

**B. Disclosure of Grand Jury Minutes**

Defendants request that, in the event the motion to dismiss is denied, this Court direct the disclosure of the grand jury transcripts to the defense. Rule 6 of the Federal Rules of Criminal Procedure permits a court to order such disclosure where, among other things, a defendant "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Cr. P. 6(e)(3)(E)(ii).

This Court rejects Defendants' argument that there are grounds to believe "that the grand jury was not instructed about the critical distinction between extortion and coercion as delineated by the *Sekhar* Court and as set forth in the applicable New York State [extortion and coercion] statutes." (Defs' Mem of Law at 16.) As noted above, this delineation is not new, but was discussed at length in the Supreme

Court's 2003 *Scheidler* II case and has been applied in this Circuit since that decision. *Scheidler II,* 537 U.S. at 402–406; *Gotti,* 459 F.3d at 319–325. Further, although *Sekhar* does preclude the Second Circuit's prior interpretation of 'the right to make business decisions free from outside pressure' as obtainable property for the purpose of extortion, "narrowing the scope of an indictment, whether through proof of a lesser offense offered at trial, or by redaction, does not offend the notice and review functions served by a grand jury's issuance of an indictment." *United States v. Smith,* 918 F.2d 1032, 1036 (2d Cir.1990), *cert denied,* 498 U.S. 1125, 111 S.Ct. 1086, 112 L.Ed.2d 1191 (1991) (district court did not err in failing to order the government to re-present an indictment properly purged of intangible non-property right fraud charges after narrowing of the law). "As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime." *United States v. Miller,* 471 U.S. 130, 136, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985); *Smith,* 918 F.2d at 1036. Defendants have failed to meet their burden of establishing a particularized need for disclosure of the proceedings before the grand jury. *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 400, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959). The request is therefore denied.

**III. CONCLUSION**

**\*8** This Court finds that the Second Superseding Indictment sufficiently states the offenses charged, including the attempted extortion of obtainable property by Defendants. The joint motion to dismiss the Second Superseding Indictment or, alternatively, for disclosure of the grand jury proceedings, is denied.

**IV. ORDERS**

IT HEREBY IS ORDERED, that Defendants' Joint Motion to Dismiss the Second Superseding Indictment or, alternatively, for Grand Jury Disclosure (Docket No. 367) is DENIED in its entirety; and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5573046 (W.D.N.Y.), 197 L.R.R.M. (BNA) 2746
**(Cite as: 2013 WL 5573046 (W.D.N.Y.))**


FURTHER, that Defendants' Motion for Oral Argument on the same (Docket No. 373) is DENIED.


SO ORDERED.


W.D.N.Y.,2013.
U.S. v. Larson
Slip Copy, 2013 WL 5573046 (W.D.N.Y.), 197 L.R.R.M. (BNA) 2746

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.