IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Care One Management, LLC et al.,<br><br>Plaintiffs,<br><br>-v-<br><br>United Healthcare Workers East, SEIU 1199 and New England Healthcare Employees Union, District 1199,<br><br>Defendants. | Civil Action No. 2:12-cv-06371-SDW-MAH |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

R. Scott Thompson
LOWENSTEIN SANDLER LLP

65 Livingston Avenue
Roseland, NJ 07068
Phone: (973) 597-2500
Fax: (973) 597-2400
*Counsel for Defendants*

Robert M. Weinberg*
W. Gary Kohlman*
Leon Dayan*
Kathleen Keller*
Jacob Karabell*
Caitlin Kekacs*
BREDHOFF & KAISER, PLLC
805 Fifteenth Street NW, Suite 1000
Washington, DC 20005
Phone: (202) 842-2600
Fax: (202) 842-1888
*Counsel for Defendants*

Richard A. Levy*
David M. Slutsky
Susan J. Cameron
LEVY RATNER, PC
80 8th Avenue, 8th Floor
New York, NY 10011
Phone: (212) 627-8100
Fax: (212) 627-8182
*Counsel for Defendant UHWE*
*Admitted *pro hac vice*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

PRELIMINARY STATEMENT ...............................................................1

I.    PLAINTIFFS HAVE NOT SUFFICIENTLY PLED THAT
DEFENDANTS ENGAGED IN ANY "RACKETEERING ACTIVITY" ....1

    A.    Plaintiffs' Mail/Wire Fraud Theory Is Legally Defective ...................1

    B.    Plaintiffs Have Not Sufficiently Pled That Defendants
Committed RICO Predicate Acts of Extortion "Chargeable
Under State Law" .................................................................................5

        1.    The Permissibility, for RICO Extortion Purposes, of
the Defendants' Alleged Peaceful Economic Pressure
Activities Is Governed by the Third Circuit's *Brokerage
Concepts* Decision .................................................................6

        2.    Under the *Brokerage Concepts* Rule, Plaintiffs' "Extortion
Through Use of Economic Pressure" Claims Fail  ............10

        3.    Plaintiffs Have Failed To Plead a Basis for Attributing the
Alleged Acts of Sabotage to the Defendant Unions............16

    C.    Plaintiffs Have Not Sufficiently Pled That Defendants
Committed RICO Predicate Acts of Extortion Under the
Travel Act..........................................................................................18

II.    PLAINTIFFS CONCEDE THAT NO "PATTERN" OF SABOTAGE
HAS BEEN ALLEGED ..............................................................................19

III.    COUNTS I AND II FAIL TO ALLEGE THE REQUISITE RICO
INJURY" ...................................................................................................19

IV.    PLAINTIFFS SHOULD NOT BE GIVEN ANOTHER OPPORTUNITY
TO AMEND THEIR COMPLAINT ...........................................................20

i

# TABLE OF AUTHORITIES

## CASES

*Adcock v. Freightliner LLC*, 550 F.3d 369 (4th Cir. 2008) ....................................14

*Beck v. Prupis*, 529 U.S. 494 (2000) ......................................................................20

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).................................4

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*,
140 F.3d 494 (3d Cir. 1998) ........................................................ 6, 7, 10, 11, 12

*C&W Constr. Co. v. Local 745*, 687 F. Supp. 1453 (D. Haw. 1988) .......................8

*Cintas Corp. v. UNITE HERE*, 601 F. Supp. 2d 571 (S.D.N.Y.),
*aff'd*, 355 F. App'x 508 (2d Cir. 2009).............................................................7, 8

*Desmond v. Siegel*, 2012 WL 3228681 (D.N.J. Aug. 6, 2012) ..............................10

*HERE Local 57 v. Sage Hospitality Res.*, 390 F.3d 206 (3d Cir. 2004)........... 13, 14

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) ........................20

*Kimm v. Lee*, 2005 WL 89386 (S.D.N.Y. Jan. 13, 2005) .........................................3

*Mendez Internet Mgmt. Servs., Inc. v. Banco Santander de P.R.*,
621 F.3d 10 (1st Cir. 2010) ................................................................................2, 3

*Mulhall v. UNITE HERE Local 355*, 667 F.3d 1211 (11th Cir. 2012)............. 13, 14

*Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971).............................................9

*Phila. Marine Trade Ass'n v. Local 1291*, 909 F.2d 754 (3d Cir. 1990)................17

*Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir. 2001)...................5

*Santiago v. Warminster Twp.*, 629 F.3d 121 (3d Cir. 2010) ........................... 17, 18

*Scheidler v. NOW, Inc.*, 537 U.S. 393 (2003)...........................................................7

*Sekhar v. United States*, 133 S. Ct. 2720 (2013) ............................................. 15, 16

*Shaw v. Rolex Watch U.S.A., Inc.*, 726 F. Supp. 969 (S.D.N.Y. 1989) ...................5

*Smithfield Foods, Inc. v. UFCW*, 585 F. Supp. 2d 789 (E.D. Va. 2008)..................8

*Teamsters Local 372 v. Detroit Newspapers*,
   956 F. Supp. 753 (E.D. Mich. 1997) ....................................................................7

*Texas Air Corp. v. ALPA*, 1989 WL 146414 (S.D. Fla. July 14, 1989) ..................5

*UBC v. Bldg. & Constr. Trades Dep't*, 911 F. Supp. 2d 1118 (E.D. Wash. 2012) ...8

*United States v. Capo*, 791 F.2d 1054 (2d Cir. 1986), *rev'd on other grounds*,
   817 F.2d 947 (2d Cir. 1987) ...................................................................................9

*United States v. Caggiano*, 2014 WL 104968 (W.D.N.Y. Jan. 9, 2014)..................8

*United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004) ........................................4

*Wackenhut v. SEIU*, 593 F. Supp. 2d 1289 (S.D. Fla. 2009)..................................16

*Wilkie v. Robbins*, 551 U.S. 537 (2007).................................................................7

## STATUTES

18 U.S.C. § 1951(b)(2)..............................................................................................6

18 U.S.C. § 1962(a) .................................................................................................19

18 U.S.C. § 1962(b) .................................................................................................19

18 U.S.C. § 1962(d) .................................................................................................19

18 U.S.C. § 1964(c) .................................................................................................19

18 U.S.C. § 1341 .......................................................................................................2

18 U.S.C. § 1343 .......................................................................................................2

29 U.S.C. § 186 ....................................................................................................13

42 U.S.C. § 1983 ..................................................................................................17

## PRELIMINARY STATEMENT

In opposing Defendants' motion to dismiss their Amended Complaint, Plaintiffs attempt to brush off this Court's earlier opinion as merely identifying a "handful of pleading deficiencies" in Plaintiffs' original Complaint. Dkt. 89 ("Pls.' Br.") 1. In doing so, Plaintiffs ignore this Court's bottom-line holding: that there was an "underlying defect" in the Complaint. And that "underlying defect" was by no means technical; it was that Plaintiffs had failed to plead facts meeting RICO's core requirement that Defendants have committed "predicate acts . . . to support a pattern of racketeering activities." Dkt. 32 ("Opinion") at 16-17.

In all relevant respects, Plaintiffs' Amended Complaint is no different in substance from the original. To obscure that reality, Plaintiffs distort their own Amended Complaint, Defendants' brief, and even directly-on-point decisions from the Supreme Court, the Third Circuit, and this Court. When those distortions are peeled away, the same fatal "underlying defect" remains. The Court thus should dismiss the RICO and pendent state-law claims again, this time with prejudice.

## I.   PLAINTIFFS HAVE NOT SUFFICIENTLY PLED THAT DEFENDANTS ENGAGED IN ANY "RACKETEERING ACTIVITY"

### A.   Plaintiffs' Mail/Wire Fraud Theory Is Legally Defective

In their brief, Plaintiffs contend that, because the Amended Complaint alleges that the Defendant Unions used the mails and wires as part of a campaign "to deceive third parties into believing [Plaintiffs] are bad companies . . . for the

purpose of inducing those persons to discontinue or refrain from doing business with Plaintiffs," it sufficiently pleads the RICO predicate acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343. Pls.' Br. 12. As we showed in our opening brief, this was Plaintiffs' theory underlying their fraud allegations in the *original* Complaint. Dkt. 55 ("Defs.' Br.") 11-13. And the Court rejected that theory, holding that, instead of pleading "a specific scheme for fraud," Plaintiffs had made only "general allegations of defamatory statements." Opinion at 16.

Undaunted, Plaintiffs again attempt to defend their already-rejected theory of mail and wire fraud. In our opening brief, we reiterated that, consistent with basic common-law fraud principles, and in order to maintain the distinction between the state-law *tort* of defamation and the federal *crimes* of mail and wire fraud, the courts have limited the reach of the phrase "scheme or artifice to defraud" under the federal fraud statutes to situations in which one or both of the following has been shown: (i) the knowing falsehood was intended to deprive the deceived person of his property; or (ii) the knowing falsehood was intended to allow the deceiver to obtain property through the deceit. Defs.' Br. at 9-11. Where *neither* type of intent has been alleged, the courts have rejected efforts to equate defamation with fraud and dismissed RICO claims based on such efforts. *Id.* (citing, *e.g.*, *Mendez Internet Mgmt. Servs., Inc. v. Banco Santander de P.R.*, 621

F.3d 10, 15 (1st Cir. 2010) and *Kimm v. Lee,* 2005 WL 89386, at *5 (S.D.N.Y. Jan. 13, 2005)).[1]

As further set out in our opening brief, there is a compelling reason (in addition to adherence to basic common-law fraud principles) why the courts, in RICO cases like *Mendez*, have rejected the frequent RICO plaintiff's gambit of labeling allegations sounding in defamation as allegations of "fraud" in an effort to convert garden-variety defamation suits into RICO treble-damages suits: Judicial acceptance of that gambit would sweep into the federal *criminal* fraud statutes every defamatory statement about a business communicated through the mail or the internet, including statements by non-competitors who simply are engaging in public criticism of a business without trying to obtain that business's customer base for themselves. Such an expansion would have radical implications, not only for federalism but for the First Amendment. Defs.' Br. 13.

Plaintiffs offer no response at all to this critical point. Nor do Plaintiffs contend that the Amended Complaint's allegations bring this case within *either* of the fact patterns that we have identified where courts *have* allowed fraud allegations to proceed under RICO. Plaintiffs are thus left only to grossly

---

[1] Contrary to Plaintiffs' assertion (Pls.' Br. 14) it is they who "grossly misconstrue" *Mendez*. Plaintiffs contend that *Mendez* rejected the RICO wire fraud claims there on the ground that "there was no allegation of reliance at all." *Id.* at 14. Not so. *Mendez*'s only mention of reliance was in a footnote, which restated the long-established rule that "mail and wire fraud does not require *first-party* reliance," *i.e.*, reliance by the plaintiff itself. 621 F.3d at 15 n.5 (emphasis added).

mischaracterize our argument. Plaintiffs first pretend that we argue that the federal fraud statutes contain a "*requirement* that the deceived person . . . be deprived of his or her property." Pls.' Br. 13 (emphasis added). We never have so argued. Instead, as we repeatedly have made clear, this is *one of two ways* in which a "scheme or artifice to defraud" can be established. *United States v. Hedaithy*, 392 F.3d 580 (3d Cir. 2004), on which Plaintiffs heavily rely, is an example of such a situation: the defendants in that case were found guilty of fraud for "depriv[ing]" the deceived party (the Educational Testing Service ("ETS")) of its own property (the confidentiality of an exam owned by ETS). *See id.* at 594, 595.

Plaintiffs next pretend that Defendants have argued that it is "a *requirement* for 'the deceiver to obtain property through the deceit.'" Pls.' Br. 13 (emphasis added). But here too we have made clear—again consistent with *Hedaithy*—that this is the other way in which a party who makes intentional false statements can be found to have committed a "scheme or artifice to defraud." The Supreme Court's decision in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), another case on which Plaintiffs heavily rely, is an example of this situation: There, the plaintiffs alleged that the defendants (bidders at public auctions for tax liens) intentionally made false statements in order to "obtain[ ]" the victims' property (a disproportionate share of these liens at auction). *Id.* at 642-44.[2]

---

[2] In a related vein, Plaintiffs cast our position as "leav[ing] no room for third-party

Once Plaintiffs' distortions of our position are set aside, it is clear that Plaintiffs *still* have not cited a single case in which a court presented with the argument has concluded that it constitutes mail or wire fraud—as opposed to defamation—for a critic of a business entity falsely to disparage the entity in order to persuade members of the public to think less favorably about it, where the critic neither deprived the deceived persons of property nor obtained property for itself through its disparagement.[3] As we have shown, the courts presented with the argument on such facts uniformly have held that the business entity may pursue its critic through a defamation suit *but not* a RICO treble-damages suit.

## B. Plaintiffs Have Not Sufficiently Pled That Defendants Committed RICO Predicate Acts of Extortion "Chargeable Under State Law"

Plaintiffs also attempt to plead RICO predicate acts of extortion "chargeable under state law." We first address Plaintiffs' allegations that Defendants committed extortion by using speech, petitioning, and other peaceful activities to put economic pressure on Plaintiffs to agree to the Defendant Unions' demands. We

---

reliance—which has been expressly approved by the Supreme Court in *Bridge*." Pls.' Br. 15. That misstates our position, which is that the fraud statutes *do* allow suit where a third party, but not the plaintiff, relies on the defendant's misrepresentations, so long as the defendant intends to obtain property through the deceit. *E.g.*, *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539 (5th Cir. 2001).

[3] *Shaw v. Rolex Watch U.S.A., Inc.*, 726 F. Supp. 969 (S.D.N.Y. 1989), and *Texas Air Corp. v. ALPA*, 1989 WL 146414 (S.D. Fla. July 14, 1989), cited by Plaintiffs, do not fill the void. *Shaw* was not even a public disparagement case. And, in *Texas Air Corp.*, the defendant never raised, and the court never considered, the fraud/defamation distinction underlying the Rule 12(b)(6) dismissal of the putative RICO claims in cases such as *Mendez* and *Kimm*.

5

then turn to Plaintiffs' theory that Defendants committed extortion by allegedly

authorizing unidentified persons to commit non-peaceful acts of sabotage at three

of Plaintiffs' facilities in Connecticut on July 2 and 3, 2012.

      1.    The Permissibility, for RICO Extortion Purposes, of the Defendants'
              Alleged Peaceful Economic Pressure Activities Is Governed by the
              Third Circuit's *Brokerage Concepts* Decision

It is common ground that in order for a party to commit the RICO predicate

act of extortion "chargeable under state law," "'the conduct must be capable of

being generically classified as extortionate.'" Opinion at 10-11. And, as the Court

stated in its earlier opinion, to commit generic extortion, a party must *both*

"obtain[ ] something of value from another" *and* do so through the "*wrongful use*

of force, fear, or threats." *Id.* (emphasis added). These twin elements are, in all

relevant respects, indistinguishable from the federal Hobbs Act elements of

"obtaining property from another" through the "*wrongful use* of actual or

threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2) (emphasis added).

Nonetheless, Plaintiffs contend that the Third Circuit's decision in

*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir. 1998),

setting forth the test to determine whether the use of economic fear satisfies the

"wrongful use" requirement of extortion is inapplicable to Plaintiffs' state-law

extortion predicate allegations because "*Brokerage Concepts* is a Hobbs Act case."

Pls.' Br. 25. Plaintiffs' position is untenable under the controlling Supreme Court

precedents identified below, which makes it unsurprising that this Court rejected it in its earlier opinion. Specifically, after noting that Plaintiffs "do not allege predicate acts under the Hobbs Act, but rather, state law," the Court devoted a full paragraph of its opinion to the *Brokerage Concepts* rule, explaining that, in *Brokerage Concepts*, "[t]he Third Circuit has held that a party that seeks to induce another to enter into a 'legitimate' business transaction, not through force or violence, but through 'economic fear in business negotiations between private parties' does not commit extortion or render a defendant guilty of 'attempted extortion.'" Opinion at 11 (quoting *Brokerage Concepts*, 140 F.3d at 523).[4]

In any event, Plaintiffs' assertion that *Brokerage Concepts* does not apply to RICO predicate acts of extortion "chargeable under state law" is flatly inconsistent with the Supreme Court's controlling decisions in *Scheidler v. NOW, Inc.*, 537 U.S. 393, 409 (2003), and *Wilkie v. Robbins*, 551 U.S. 537, 567 (2007). Indeed, *Cintas Corp. v. UNITE HERE*, 601 F. Supp. 2d 571, 578 (S.D.N.Y.), *aff'd*, 355 F. App'x 508 (2d Cir. 2009), so holds in a case that Plaintiffs acknowledge is on all fours with this one. Pls.' Br. 28 n.6.

Plaintiffs' cases aimed at evading this Court's application of these controlling Supreme Court precedents are unavailing. *Teamsters Local 372 v.*

---

[4] Plaintiffs' explanation of the paragraph of the Court's opinion discussing *Brokerage Concepts*—that the Court was only "focused on the 'obtaining property' element of an extortion claim," Pls.' Br. 23—is fanciful, inasmuch as the *Brokerage Concepts* court did not even *address* that element.

*Detroit Newspapers*, 956 F. Supp. 753 (E.D. Mich. 1997) and *C&W Constr. Co. v. Local 745*, 687 F. Supp. 1453 (D. Haw. 1988), were decided before *Scheidler* and *Wilkie* and have been superseded on this point. The holding in *Smithfield Foods, Inc. v. UFCW*, 585 F. Supp. 2d 789 (E.D. Va. 2008)—that the *Brokerage Concepts* "wrongful use" test does not apply in RICO state-law extortion predicate cases— defies *Scheidler* and *Wilkie* and thus is not good law either, as the court in *UBC v. Bldg. & Constr. Trades Dep't*, 911 F. Supp. 2d 1118 (E.D. Wash. 2012), recognized. *Id.* at 1128-30 (refusing to follow *Smithfield*'s holding because "[t]he Supreme Court has spoken very clearly on this point" in *Scheidler* and *Wilkie*). And *United States v. Caggiano*, 2014 WL 104968 (W.D.N.Y. Jan. 9, 2014), is even further afield; that case distinguished *Cintas*, *id.* at *2, but did not reject it, as Plaintiffs would have this Court do without regard for the controlling Supreme Court decisions correctly invoked and applied in *Cintas*.

Moreover, although Plaintiffs contend that the Third Circuit's definition of "wrongful use" in *Brokerage Concepts* is inapplicable to RICO predicate acts "chargeable under state law" as extortion, they provide the Court with no alternative definition, let alone one that would prevent ordinary hard bargaining or other common economic pressure tactics, including tactics protected by the First Amendment, from coming within the sweep of RICO's criminal prohibitions if a State simply decided to *label* such tactics as "wrongful" acts of "extortion."

For example, on Plaintiffs' understanding of RICO, a State could label as a "wrongful use of … fear" for purposes of its "extortion" statute an employer's effort to exploit an employee's economic vulnerability in a tough economy to bargain down the employee's wages. *Compare U.S. v. Capo*, 791 F.2d 1054, 1062-63 (2d Cir. 1986) (noting that such conduct, while involving the use of economic fear, is "hard bargaining," not the wrongful use of economic fear criminalized by the Hobbs Act), *rev'd on other grounds*, 817 F.2d 947 (2d Cir. 1987) (en banc). Likewise, on Plaintiffs' view of RICO, a State desirous of protecting businesses from leafleting, picketing, or other peaceful pressure tactics by protesters seeking to cause a business to alter its investment decisions—for example by divesting from countries run by repressive regimes and investing elsewhere—could label those tactics a "wrongful use … of fear" and "extortionate" and thereby make federal RICO remedies available for use against the protesters. *Compare Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971) (holding that conduct in the nature of leafleting and picketing to pressure a business to change its ways, while "coercive," is protected by the First Amendment).

In contrast, under the *Brokerage Concepts* rule, if a party utilizes only non-violent economic pressure to induce another party to enter into a "legitimate" business transaction, the pressuring party's conduct is not extortionate as a matter of law. Thus, not only is the application of the *Brokerage Concepts* rule here

9

compelled by Supreme Court precedent and this Court's earlier opinion, it is fundamentally necessary in order to prevent routine "hard bargaining" and core First Amendment petitioning activity from constituting *criminal* RICO violations carrying a sentence of up to 20 years in prison and treble-damages liability.[5]

### 2. Under the *Brokerage Concepts* Rule, Plaintiffs' "Extortion Through Use of Economic Pressure" Claims Fail

Under *Brokerage Concepts*, the Defendant Unions' alleged non-violent economic-pressure tactics—the speech, petitioning, and other non-violent activities critical of Plaintiffs' business practices—are not extortionate so long as the Unions were using these tactics in an attempt to induce Plaintiffs to agree to "legitimate" demands. *See* Defs.' Br. 18. The demands about which Plaintiffs complain are: *first*, Defendant NEHCEU's alleged demand for a "pattern" collective bargaining agreement at Plaintiffs' unionized facilities in Connecticut; and, *second*, the Defendants' alleged demand for an organizing-ground-rules agreement at Plaintiffs' non-unionized facilities. *Id.* 18, 23. As we show, Plaintiffs' effort to characterize these demands as "illegitimate" is futile.

---

[5] Plaintiffs attempt to elude the Third Circuit's *Brokerage Concepts* rule by citing *Desmond v. Siegel*, 2012 WL 3228681 (D.N.J. Aug. 6, 2012). In *Desmond*, the court held that plaintiff sufficiently pled predicate acts of extortion by alleging that the defendant's objective was to "extract[ ] money" from the plaintiff by, *inter alia*, claiming that the plaintiff "stole intellectual property" from the defendant's company. *Id.* at *10, *12. Under these facts, the defendant, despite claiming that he only wanted to enter into a "commercial arrangement" with the plaintiff, actually was seeking a naked personal payoff—the prime example of an illegitimate, and "wrongful," business transaction under *Brokerage Concepts*. *See* 140 F.3d at 524.

a.  Plaintiffs' first "illegitimacy" argument—that Defendant NEHCEU's collective bargaining demands, if accepted, would not result in a legitimate "mutually beneficial exchange of property" under *Brokerage Concepts* because Defendants "unilaterally" are pursuing those demands, which are "unwanted" from Plaintiffs' perspective, Pls.' Br. 25, 26—stands *Brokerage Concepts* on its head. A "mutually beneficial exchange of property" under *Brokerage Concepts* is simply an exchange in which each party secures something of objective value; it is *not* an exchange with which each party is so content that each would agree to it without the other's use of hard bargaining.

Indeed, the whole point of *Brokerage Concepts* is that, in the competitive American economy, organizations routinely resort to tough (but non-violent) pressure tactics to secure agreements with other organizations; and that Congress could not possibly have intended to subject such tactics to criminal sanctions. In *Brokerage Concepts* itself, the alleged victim of the tactic claimed to be extortionate did not *want* to yield to the defendant's economic pressure, which succeeded in forcing the victim to discontinue its desired business relationship with the plaintiff and enter into an *unwanted* business relationship with the defendant. *See* 140 F.3d at 501. Nevertheless, the Third Circuit overturned the plaintiffs' RICO extortion judgment for failure to meet the "wrongful use" element, because the business relationship, though unwanted by the putative victim, involved the

11

exchange of consideration on both sides. *Id.* at 526. Here, the collective bargaining terms sought by NEHCEU undeniably would involve the exchange of consideration on both sides, as the workers represented by NEHCEU would perform work for Plaintiffs in their Connecticut facilities. Defs.' Br. 20. The peaceful economic pressure tactics that NEHCEU allegedly used in support of these objectives therefore cannot constitute acts of RICO extortion.

Plaintiffs' next argument—that this case falls outside of the *Brokerage Concepts* rule because the Amended Complaint makes the legal assertion that Defendants' proposed collective bargaining agreement would require Plaintiffs to employ "superfluous" workers, Pls.' Br. 25—is equally infirm. As we showed in our opening brief, the *factual allegation* underlying this legal assertion is that the proposed collective bargaining agreement would require Plaintiffs to staff their facilities above Connecticut's *statutory minimum* nurse-to-patient ratios—*not* that it would result in paying nurses for standing around during their shifts with no work expected of them, which is what the reference to "superfluous" labor means for purposes of applying the *Brokerage Concepts* rule. *See* Defs.' Br. 21-22. In their brief, Plaintiffs simply ignore this dispositive point. They likewise ignore the consequence of their legal theory: that every time a union demanded a contract providing for wages, benefits, or working conditions above the bare minima compelled by public law, that union would have proposed an "illegitimate"

transaction under *Brokerage Concepts* and thereby committed the RICO predicate act of attempted extortion. *See id.* 22. That is not the law.

b.  Plaintiffs' attack on the legitimacy of Defendants' alleged organizing-ground-rules demands also fails, for those demands are plainly legitimate under the Third Circuit's decision in *HERE Local 57 v. Sage Hospitality Resources*, 390 F.3d 206, 219 (3d Cir. 2004), as this Court has recognized. *See* Opinion at 11 n.11. To try to escape from *Sage Hospitality*, Plaintiffs cite the Eleventh Circuit's opinion in *Mulhall v. UNITE HERE Local 355*, 667 F.3d 1211 (11th Cir. 2012). But the Eleventh Circuit did not "distinguish[ ]" *Sage Hospitality*, as Plaintiffs contend, Pls.' Br. 27; it simply disagreed with *Sage Hospitality*.

The Third Circuit in *Sage Hospitality* and the Eleventh Circuit in *Mulhall* dealt with the same issue: whether an employer-union organizing-ground-rules agreement violated 29 U.S.C. § 186, a criminal statute prohibiting an employer from "pay[ing], lend[ing], or deliver[ing] . . . any money or other thing of value" to a union. In *Mulhall*, the Eleventh Circuit reviewed *Sage Hospitality*'s holding, correctly describing it as follows: "[R]egardless of whether the [organizing-ground-rules] agreement benefitted an employer and a union, there was no [§ 186] violation because the organizing assistance does not qualify as a payment, loan, or delivery." 667 F.3d at 1214. The *Mulhall* court then expressed its contrary view that, in certain circumstances, such agreements could be prohibited

13

depending on the parties' intent. *Id.* at 1215. The *Mulhall* dissent would have followed the Third Circuit's holding in *Sage Hospitality* that ground-rules agreements are lawful and legitimate *per se*. *Mulhall*, 667 F.3d at 1216 (Restani, J., dissenting) ("I conclude that the reasoning of our sister circuits is correct.") (citing *Sage Hospitality* and *Adcock v. Freightliner LLC*, 550 F.3d 369 (4th Cir. 2008)). There is no need to belabor the point; Plaintiffs cannot rely on a decision that is contradicted by binding Third Circuit precedent.

Separately, Plaintiffs attempt to distinguish the facts of *Sage Hospitality* by claiming that, unlike in that case, Defendants are attempting to "force Plaintiffs to recognize Defendants at Plaintiffs' non-unionized facilities." Pls.' Br. 24. The fatal flaw in Plaintiffs' "forced unionization" argument is that Plaintiffs' 112-page Amended Complaint pleads *no facts* supportive of the assertion in their brief that Defendants "seek recognition where they are not authorized to act on behalf of Plaintiffs' employees." *Id.* 28 n.6. What Plaintiffs *do* plead is that Defendants demanded that Plaintiffs agree to three specific union organizing campaign ground rules: (1) "to remain 'neutral' in response to efforts by the Defendants to organize non-unionized facilities managed by Plaintiffs"; (2) to give Defendants "physical access to properties managed by Plaintiffs" in conjunction with an organizing campaign; and (3) to give Defendants "names and contact information for Plaintiffs' non-unionized employees" as part of such a campaign. Dkt. 37 ("Am.

Compl.") ¶¶ 20, 121, 156; *see also id.* ¶¶ 6, 36, 86, 122, 145, 152, 174. All of these allegedly demanded ground rules are lawful and legitimate under *Sage Hospitality*, because far from denying Care One employees a free choice in whether to unionize, the rules, if agreed to by Plaintiffs, would provide a process through which Care One employees could express such a choice. *See* Defs.' Br. 23-24.

    c.  Plaintiffs' organizing-ground-rules allegations fail, not only to satisfy the "wrongful use" element of extortion, but also to satisfy the separate "obtaining property" element, as we have shown. *See* Defs.' Br. 25-26. In response, Plaintiffs assert that they have cured the deficiency that the Court identified on this point. *See* Opinion at 13. They haven't: As we showed in our opening brief, the organizing ground rules Defendants allegedly are demanding do *not* constitute "obtainable property" under *Sekhar v. United States*, 133 S. Ct. 2720 (2013).

    Plaintiffs' rejoinder that Defendants would obtain "money" if Plaintiffs acceded to Defendants' alleged organizing-ground-rules demands, Pls.' Br. 19, is flat wrong. On Plaintiffs' own allegations, an organizing-ground-rules agreement merely permits a union to "obtain the signature of more than 50% of the workers at issue in order for the union to be recognized" as the workers' bargaining agent, instead of having to prevail in an election supervised by the National Labor Relations Board. Am. Compl. ¶ 86. A union obtains no *money* from such an agreement; it receives only the opportunity to become the bargaining agent and, in

turn, to seek higher wages and benefits for workers. That was insufficient to meet the "obtaining property" element even before *Sekhar,* as the court held in the directly-on-point case of *Wackenhut v. SEIU*, 593 F. Supp. 2d 1289, 1296 (S.D. Fla. 2009). And *Sekhar* confirms that *Wackenhut* was right. 133 S. Ct. at 2723 (holding that defendant's demand that a government attorney render favorable legal opinion was not demand for obtainable money or property, even though legal opinion would have provided defendant's company an opportunity to earn money).

> ### 3.   Plaintiffs Have Failed To Plead a Basis for Attributing the Alleged Acts of Sabotage to the Defendant Unions

Plaintiffs separately allege that Defendants should be held responsible for acts of sabotage allegedly committed by unidentified union members on July 2 and 3, 2012, in connection with a strike at Plaintiffs' facilities in Connecticut. We showed in our opening brief that Plaintiffs' allegations in this respect were not materially different from the allegations in their original Complaint, which this Court found to be deficient. Defs.' Br. 27-29; Opinion at 15.

Plaintiffs respond by citing cases holding that an employer can be held vicariously liable under RICO for the wrongful acts of its *employees*. But these cases do not speak to the question presented here, which is whether Plaintiffs have alleged sufficient non-conclusory facts, as required by *Twombly* and *Iqbal*, to satisfy the common-law rule of agency respecting the imposition of liability on a union for the wrongful acts of the union's *non-employee members.* And, under that

16

rule, a union can be held liable for the wrongful acts of its non-employee members *only* if the union "has instigated, participated in or actively encouraged its members" to commit those acts. *Phila. Marine Trade Ass'n v. Local 1291*, 909 F.2d 754, 758 (3d Cir. 1990).

Plaintiffs have *not* pled facts that would satisfy this agency standard. They rely almost entirely on paragraph 162 of their Amended Complaint, *see* Pls.' Br. 31, 32; but there is only one allegation in that paragraph that speaks to whether the acts of sabotage allegedly committed by the individual *members* can be attributed to either of the Defendant *Unions*. That allegation—that "[t]hese acts of sabotage were authorized in advance by lead organizers employed by NEHCEU" and/or "directed" by those organizers—is nothing more than a conclusory paraphrase of the agency standard and is thus deficient under *Santiago v. Warminster Twp.*, 629 F.3d 121, 131 (3d Cir. 2010). There, the Third Circuit rejected as "fundamentally conclusory" an indistinguishable allegation: that defendants were liable because they "directed others" to commit an unlawful act. *Id.*; *see* Defs.' Br. 28.

Plaintiffs purport to distinguish *Santiago* on the ground that the claims in that case were brought under 42 U.S.C. § 1983. Pls.' Br. 29-30. That is beside the point. The holding in *Santiago* is that, for a plaintiff to plead that a defendant is legally responsible for another individual's actions, a plaintiff must do more than simply plead "naked assertions" that track the applicable agency standard. 629

17

F.3d at 132. But "naked assertions" are all that Plaintiffs have pled in support of their claim that the Defendant Unions are responsible for the alleged sabotage—a point the Court recognized in its earlier opinion when addressing nearly identical conclusory allegations of agency. Opinion at 15.[6]

### C.   Plaintiffs Have Not Sufficiently Pled That Defendants Committed RICO Predicate Acts of Extortion Under the Travel Act

Plaintiffs concede, as they must, that extortion is the only "unlawful activity" that they claim Defendants committed in violation of the Travel Act. Pls.' Br. 33. And Plaintiffs do not and cannot dispute that their Travel Act extortion theory survives only if they have alleged facts sufficient to satisfy the elements of "generic" extortion, *see* Defs.' Br. 29-33—elements that are set out above in our discussion of RICO extortion "chargeable under state law," *see supra* p. 6. As a result, because Plaintiffs' state-law extortion theory is deficient, *see supra* pp. 5-18, Plaintiffs' Travel Act extortion theory necessarily is deficient as well.

---

[6] Another "fact" alleged in paragraph 162—that NEHCEU's lead organizers were "investigat[ed] by the Connecticut Chief State's Attorney's Office"—also is of no help to Plaintiffs. This allegation does not allow the Court plausibly to infer that the organizers actually authorized or directed the sabotage—especially considering that, nearly two years after the incidents occurred, charges have not been brought against any NEHCEU organizers or NEHCEU itself. *See* Am. Compl. ¶ 36 (noting that lead organizers "have been under criminal investigation").

## II.     PLAINTIFFS CONCEDE THAT NO "PATTERN" OF SABOTAGE HAS BEEN ALLEGED

For the reasons stated in Part I.B.3, Plaintiffs' allegations that Defendants should be held responsible for the alleged acts of sabotage are deficient. But Plaintiffs' RICO claims fail and this action should be dismissed even if this Court were to conclude otherwise. That is so because: (1) Plaintiffs have conceded in their brief that they do not allege any *pattern* of sabotage or violence, and that the July 2-3, 2012 incident therefore cannot, standing alone, support their RICO claims, *see* Pls.' Br. 35 ("Plaintiffs have never relied on the acts of sabotage on July 2-3, 2012, standing alone, to satisfy the continuity requirement [of the RICO pattern element]."); and (2) Plaintiffs have failed to allege facts showing that any of Defendants' *non-violent* conduct constituted a predicate offense under RICO, *see supra* at pp. 1-16, 18.

## III.    COUNTS I AND II FAIL TO ALLEGE THE REQUISITE RICO "INJURY"

We argued in our opening brief that, independent of all other grounds for dismissal, Counts I and II of the Amended Complaint should be dismissed for failure to satisfy RICO's "injury" requirement set out in 18 U.S.C. § 1964(c). That argument raises a pure question of law: whether a civil RICO plaintiff who sues a defendant for conspiring with others under 18 U.S.C. § 1962(d) to violate a particular RICO substantive provision—such as, here, §§ 1962(a) or (b)—must, in

order to satisfy the § 1964(c) "injury" requirement, plead that at least one co-conspirator completed an injury-causing violation of such substantive provision.

We showed at Defs.' Br. 36-40 that the Supreme Court's reasoning in *Beck v. Prupis*, 529 U.S. 494 (2000)—under which common-law civil damages principles apply to civil RICO conspiracy claims—compels an affirmative answer to this question. In response, Plaintiffs assert that the Third Circuit rejected our position in footnote 72 of *In re Insurance Brokerage Antitrust Litigation*, 618 F.3d 300 (3d Cir. 2010). *See* Pls.' Br. 38. But that footnote expressly declines to reach the question here. Our argument based on *Beck v. Prupis* thus stands unrebutted, and, at a minimum, Counts I and II should be dismissed.

## IV.   PLAINTIFFS SHOULD NOT BE GIVEN ANOTHER OPPORTUNITY TO AMEND THEIR COMPLAINT

Remarkably, Plaintiffs conclude their brief by asking the Court for another chance to amend their 112-page Amended Complaint if this Court again dismisses. Plaintiffs have had an opportunity to cure the "underlying deficiency" that the Court identified in its earlier opinion. Despite adding 42 pages and 128 paragraphs to their already-sprawling Complaint, they have not done so. Because, at this point, it is apparent that Plaintiffs cannot allege facts to state any RICO claims against Defendants, this Court should dismiss—this time with prejudice.

Respectfully submitted,

/s/ R. Scott Thompson

20

R. Scott Thompson
LOWENSTEIN SANDLER LLP
65 Livingston Avenue
Roseland, NJ 07068
Phone: (973) 597-2500
Fax: (973) 597-2400

*Counsel for Defendants*

Robert M. Weinberg*
W. Gary Kohlman*
Leon Dayan*
Kathleen Keller*
Jacob Karabell*
Caitlin Kekacs*
BREDHOFF & KAISER, PLLC
805 Fifteenth Street NW, Suite 1000
Washington, DC 20005
Phone: (202) 842-2600
Fax: (202) 842-1888

*Counsel for Defendants*

Richard A. Levy*
David M. Slutsky
Susan J. Cameron
LEVY RATNER, PC
80 8th Avenue, 8th Floor
New York, NY 10011
Phone: (212) 627-8100
Fax: (212) 627-8182

*Counsel for Defendant UHWE*

*Admitted *pro hac vice*

21