# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

Civil Action No. 2:12-cv-06371-SDW-MAH

---

Care One Management, LLC; HealthBridge Management, LLC; Care One, LLC; Care Realty, LLC; Care One at Birchwood, LLC, d/b/a Care One at The Highlands; Care One at East Brunswick, LLC, d/b/a Care One at East Brunswick; Care One at Hamilton, LLC, d/b/a Care One at Hamilton; Care One at Madison Avenue, LLC, d/b/a Care One at Madison Avenue; Care One at Mercer, LLC, d/b/a Care One at Ewing; Care One at Parsippany- Troy Hills, LLC, d/b/a Care One at Morris; Care One at Teaneck, LLC, d/b/a Care One at Teaneck; Care One at Wall, LLC, d/b/a Care One at Wall; Care Two, LLC, d/b/a Care One at Livingston; CareOne at Moorestown, LLC, d/b/a Care One at Moorestown; Elmwood Evesham Associates, LLC, d/b/a Care One at Evesham; HCC, LLC, d/b/a Care One at Holmdel; King James Care Center of Middletown, LLC, d/b/a Care One at King James; Millennium Healthcare Centers II, LLC, d/b/a Care One at Dunroven; Millennium Healthcare Centers II, LLC, d/b/a Care One at Valley; Millennium Healthcare Centers, LLC, d/b/a Care One at Pine Rest; Millennium Healthcare Centers, LLC, d/b/a Care One at The Cupola; 11 History Lane Operating Company, LLC, d/b/a Care One at Jackson; 301 Union Street, LLC, d/b/a Care One at Wellington; 493 Black Oak Ridge Road, LLC, d/b/a Care One at Wayne; the Rehabilitation Center at Raritan Bay Medical Center, LLC dba Care One at Raritan Bay Medical Center; Care One at Trinitas, LLC, d/b/a LTACH – CareOne at Trinitas Regional Medical Center; Care One at Harmony Village, LLC, d/b/a CareOne Harmony Village at Moorestown; 600 Kinderkamack Road Operating Company, LLC, d/b/a Oradell Health Care Center; 800 River Road Operating Company, LLC, d/b/a Woodcrest Health Care Center; 2 Cooper Plaza Operating Company, LLC, d/b/a South Jersey Health Care Center; 1621 Route 22 West Operating Company, LLC, d/b/a Somerset Valley Rehabilitation and Nursing Center; 341 Jordan Lane Operating Company II, LLC, d/b/a Wethersfield Health Care Center; 1 Burr Road Operating Company II, LLC, d/b/a Westport Health Care Center; 107 Osborne Street Operating Company II, LLC, d/b/a Danbury  Health Care Center; 240 Church Street Operating Company II, LLC, d/b/a Newington Health Care Center; 245 Orange Avenue Operating Company II, LLC, d/b/a West River Health Care Center; 710 Long Ridge Road Operating Company II, LLC, d/b/a Stamford Health Care Center; 162 South Britain Road Operating Company II, LLC, d/b/a River Glen Health Care Center; 2028 Bridgeport Avenue Operating Company II, LLC, d/b/a Golden Hill Health Care Center; 745 Highland Avenue Operating Company, LLC, d/b/a The Highlands Health Care Center; 135 Benton Drive Operating Company, LLC, d/b/a Redstone Health Care Center; 178 Lowell Street Operating Company, LLC, d/b/a Lexington Health Care Center; 19 Varnum Street Operating Company, LLC, d/b/a Lowell Health Care Center; 199 Andover Street Operating Company, LLC, d/b/a Peabody Glen Health Care Center; 2101 Washington Street Operating Company, LLC, d/b/a Newton Healthcare Center;  221 Fitzgerald Drive Operating Company, LLC, d/b/a New Bedford Health Care Center; 260 Easthampton Road Operating Company, LLC,

d/b/a Holyoke Rehabilitation Center; 312 Millbury Avenue Operating Company, LLC, d/b/a Millbury Health Care Center; 49 Thomas Patten Drive Operating Company, LLC, d/b/a Cedar Hill Health Care Center; 548 Elm Street Operating Company, LLC, d/b/a Calvin Coolidge Nursing and Rehab. Center for Northhampton; 57 Old Road to Nine Acre Corner Operating Company, LLC, d/b/a Concord Health Care Center; 64 Performance Drive Operating Company, LLC, d/b/a Weymouth Health Care Center; 750 Woburn Street Operating Company, LLC, d/b/a Wilmington Health Care Center; Park, and Marion and Vernon Streets Operating Company, LLC, d/b/a Brookline Health Care Center; 265 Essex Street Operating Company, LLC, d/b/a Essex Park Rehabilitation Center; and DES Senior Care Holdings LLC, d/b/a Sweet Brook Care Centers,

Plaintiffs,

vs.

United Healthcare Workers East, SEIU 1199;
New England Health Care Employees Union, District 1199; and
Service Employees International Union,

Defendants.

---

**SECOND AMENDED COMPLAINT FOR MONETARY AND EQUITABLE RELIEF**

---

**K&L GATES LLP**
One Newark Center - Tenth Floor
Newark, New Jersey 07102
(973) 848-4000
Attorneys for Plaintiffs

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................1

PARTIES AND OTHER PARTICIPANTS ......................................................................13

I.      The Plaintiffs.............................................................................................................13

II.     The Defendants .........................................................................................................14

III.    Non-Party Participants..............................................................................................17

        A.      Union Officers and Employees.................................................................17

        B.      Elected Officials...........................................................................................20

        C.      Student Groups.............................................................................................21

        D.      Public Relations Consultants and Contractors .......................................21

IV.     Enterprises.................................................................................................................22

        A.      The 1199 Enterprise ....................................................................................22

        B.      The UHWE Pension Enterprise and the NEHCEU Pension Enterprise ...............24

        C.      The UHWE Pension Plan and the NEHCEU Pension Plan...................26

        D.      The Care One Watch Enterprise ...............................................................26

        E.      The SEIU Enterprise ...................................................................................27

        F.      The UHWE and NEHCEU Enterprises ...................................................28

JURISDICTION AND VENUE ........................................................................................30

FACTUAL BACKGROUND.............................................................................................30

I.      The Unions' Overarching Goals and Admitted Pattern of Reliance on Criminal
        Activity in Conducting Corporate Campaigns.....................................................30

        A.      Substantial Financial Pressure Facing the NEHCEU and UHWE........30

        B.      The Unions' Growth Strategy ....................................................................32

        C.      The Use of Corporate Campaigns to Achieve the SEIU's
                Organizing Mandates ..................................................................................35

D.      The SEIU and its Affiliated Locals Follow the Manual to Extort Money and Other Concessions from Employers ...................................................................39

E.      The Unions' Control Over Member Activities ......................................................43

II.     The Unions' Corporate Campaign Directed Against Plaintiffs ............................................45

A.      Formation of the Conspiracy ...............................................................................45

B.      Defendants' Pattern of Racketeering Activity .....................................................51

        1.      Relatedness ...............................................................................................52

        2.      Continuity ..................................................................................................54

C.      The Unions' Scheme to Defraud...........................................................................55

D.      The Property Rights Defendants Seek to Obtain .................................................58

        1.      The Transferable Nature of the Property Defendants Seek .......................58

        2.      Money and Other Tangibles........................................................................59

        3.      Access to Private Property ..........................................................................60

        4.      Control Over Use of Business Assets .........................................................61

        5.      Confidential Business Information ..............................................................62

        6.      Communication Rights ................................................................................62

E.      The Illegal Tactics Employed by the Unions........................................................62

        1.      Criminal Acts of Sabotage ..........................................................................63

        2.      Abusing the Legal Process...........................................................................67

                a.      Interfering with Straus's development projects in New York..........................................................................67

                b.      "Ten Taxpayer" Petitions in Massachusetts ..................................68

                c.      Improper Influence of Connecticut Elected Officials....................70

                d.      Baseless Claims to Connecticut Regulators...................................72

        3.      Dissemination of False and Misleading Information about Plaintiffs .......74

a.      "Care One Watch" and "HealthBridge Watch" Websites ............75

b.      False and Misleading Print and Media Advertisements ...............77

c.      False and Misleading Statements on Traveling Billboards............86

4.      Attacks on Mr. Straus ..................................................................89

5.      Defendants' Efforts to Conceal their Misconduct ....................................94

F.      Under the Corporate Campaign Model, Extortion Is Defendants' Regular
Way of Doing Business ..........................................................................95

1.      Beth Israel Deaconess Medical Center ....................................................96

2.      Yale-New Haven Hospital ........................................................................97

3.      Iroquois Nursing Homes ........................................................................100

4.      Other Examples.....................................................................................101

G.      The Effects of the Defendants' Illegal Campaign................................105

FIRST CAUSE OF ACTION
Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(a)
(Against Each Defendant).........................................................................107

SECOND CAUSE OF ACTION
Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(b)
(Against Each Defendant).........................................................................110

THIRD CAUSE OF ACTION
Violation of 18 U.S.C. § 1962(c)
(Against UHWE and NEHCEU) ...............................................................112

FOURTH CAUSE OF ACTION
Violation of 18 U.S.C. § 1962(c)
(Against SEIU)..........................................................................................116

FIFTH CAUSE OF ACTION
Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)
(Against UHWE and NEHCEU) ...............................................................119

SIXTH CAUSE OF ACTION
Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)
(Against SEIU)..........................................................................................124

SEVENTH CAUSE OF ACTION
Defamation
(Against Each Defendant)........................................................................................128

EIGHTH CAUSE OF ACTION
Trade Libel
(Against Each Defendant)........................................................................................129

PRAYER FOR RELIEF .................................................................................................130

JURY DEMAND ..........................................................................................................131

CERTIFICATION UNDER L. CIV. R. 11.2..................................................................132

LOCAL RULE 201.1 CERTIFICATION......................................................................133

## SECOND AMENDED COMPLAINT FOR MONETARY AND EQUITABLE RELIEF

For their Second Amended Complaint against Defendants 1199 SEIU United Healthcare Workers East ("UHWE"), New England Health Care Employees Union, District 1199 ("NEHCEU"), and the Service Employees International Union ("SEIU") (collectively "Defendants" or the "Unions"), the above-captioned Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs Care One Management, LLC ("Care One") and HealthBridge Management, LLC ("HealthBridge") are contract managers of sub-acute care, long term nursing care and assisted living healthcare facilities for the elderly.  Care One manages or managed or managed 23 plaintiff facilities located throughout the State of New Jersey (the "Care One Facilities").[1]  HealthBridge manages or managed 29 plaintiff facilities located throughout the

---

[1] The Care One Facilities are the following plaintiffs:  Care One at Birchwood, LLC, d/b/a Care One at The Highlands ("the Highlands"); Care One at East Brunswick, LLC,  d/b/a Care One at East Brunswick ("East Brunswick"); Care One at Hamilton, LLC, d/b/a Care One at Hamilton ("Hamilton"); Care One at Madison Avenue, LLC, d/b/a Care One at Madison Avenue ("Madison Avenue"); Care One at Mercer, LLC, d/b/a Care One at Ewing ("Ewing"); Care One at Parsippany-Troy Hills, LLC, d/b/a Care One at Morris ("Morris"); Care One at Teaneck, LLC, d/b/a Care One at Teaneck ("Teaneck"); Care One at Wall, LLC, d/b/a Care One at Wall ("Wall"); Care Two, LLC, d/b/a Care One at Livingston ("Livingston"); CareOne at Moorestown, LLC, d/b/a Care One at Moorestown ("Moorestown"); Elmwood Evesham Associates, LLC, d/b/a Care One at Evesham ("Evesham"); HCC, LLC, d/b/a Care One at Holmdel ("Holmdel"); King James Care Center of Middletown, LLC, d/b/a Care One at King James ("King James"); Millennium Healthcare Centers II, LLC, d/b/a Care One at Dunroven ("Dunroven"); Millennium Healthcare Centers II, LLC, d/b/a Care One at Valley ("Valley"); Millennium Healthcare Centers, LLC, d/b/a Care One at Pine Rest ("Pine Rest"); Millennium Healthcare Centers, LLC, d/b/a Care One at The Cupola ("the Cupola");11 History Lane Operating Company, LLC, d/b/a Care One at Jackson ("Jackson"); 101 Whippany Road Operating Company, LLC d/b/a Care One at Hanover Township ("Hanover"); 301 Union Street, LLC, d/b/a Care One at Wellington ("Wellington"); 493 Black Oak Ridge Road, LLC, d/b/a Care One at Wayne ("Wayne"); the Rehabilitation Center at Raritan Bay Medical Center, LLC dba Care One at Raritan Bay Medical Center ("Raritan Bay"); Care One at Trinitas, LLC, d/b/a LTACH – CareOne at Trinitas Regional Medical Center ("Trinitas"); and Care One at Harmony Village, LLC, d/b/a CareOne Harmony Village at Moorestown ("Harmony Village").

States of New Jersey, Connecticut, and Massachusetts (the "HealthBridge Facilities").[2]  Plaintiff

Care One, LLC ("COLLC") owns the Care One facilities.  Plaintiff Care Realty, LLC ("Care

Realty") owns the HealthBridge facilities.  Care One, COLLC, HealthBridge, Care Realty, the

Care One Facilities, and the HealthBridge Facilities (collectively referred to herein as

"Plaintiffs") bring this action under the Racketeer Influenced and Corrupt Organizations Act, 18

U.S.C. § 1961 *et seq.* ("RICO"), and under state law, to vindicate their ability to provide safe and

---

[2] The HealthBridge Facilities are the following plaintiffs:  600 Kinderkamack Road Operating Company, LLC, d/b/a Oradell Health Care Center ("Oradell"); 800 River Road Operating Company, LLC, d/b/a Woodcrest Health Care Center ("Woodcrest"); 2 Cooper Plaza Operating Company, LLC, d/b/a South Jersey Health Care Center ("South Jersey"); 1621 Route 22 West Operating Company, LLC, d/b/a Somerset Valley Rehabilitation and Nursing Center ("Somerset"); 341 Jordan Lane Operating Company II, LLC, d/b/a Wethersfield Health Care Center ("Wethersfield"); 1 Burr Road Operating Company II, LLC, d/b/a Westport Health Care Center ("Westport"); 107 Osborne Street Operating Company II, LLC, d/b/a Danbury Health Care Center ("Danbury"); 240 Church Street Operating Company II, LLC, d/b/a Newington Health Care Center ("Newington"); 245 Orange Avenue Operating Company II, LLC, d/b/a West River Health Care Center ("West River"); 710 Long Ridge Road Operating Company II, LLC, d/b/a Stamford Health Care Center ("Long Ridge"); 162 South Britain Road Operating Company II, LLC, d/b/a River Glen Health Care Center ("River Glen"); 2028 Bridgeport Avenue Operating Company II, LLC, d/b/a Golden Hill Health Care Center ("Golden Hill"); 745 Highland Avenue Operating Company, LLC, d/b/a The Highlands Health Care Center ("Highlands Health Care"); 135 Benton Drive Operating Company, LLC, d/b/a Redstone Health Care Center ("Redstone"); 178 Lowell Street Operating Company, LLC, d/b/a Lexington Health Care Center ("Lexington"); 19 Varnum Street Operating Company, LLC, d/b/a Lowell Health Care Center ("Lowell"); 199 Andover Street Operating Company, LLC, d/b/a Peabody Glen Health Care Center ("Peabody"); 2101 Washington Street Operating Company, LLC, d/b/a Newton Healthcare Center ("Newton"); 221 Fitzgerald Drive Operating Company, LLC, d/b/a New Bedford Health Care Center ("New Bedford"); 260 Easthampton Road Operating Company, LLC, d/b/a Holyoke Rehabilitation Center ("Holyoke"); 312 Millbury Avenue Operating Company, LLC, d/b/a Millbury Health Care Center ("Millbury"); 49 Thomas Patten Drive Operating Company, LLC, d/b/a Cedar Hill Health Care Center ("Cedar Hill"); 548 Elm Street Operating Company, LLC, d/b/a Calvin Coolidge Nursing and Rehab. Center for Northhampton ("Northhampton"); 57 Old Road to Nine Acre Corner Operating Company, LLC, d/b/a Concord Health Care Center ("Concord"); 64 Performance Drive Operating Company, LLC, d/b/a Weymouth Health Care Center ("Weymouth"); 750 Woburn Street Operating Company, LLC, d/b/a Wilmington Health Care Center ("Wilmington"); Park, Marion and Vernon Streets Operating Company, LLC, d/b/a Brookline Health Care Center ("Brookline"); 265 Essex Street Operating Company, LLC, d/b/a Essex Park Rehabilitation Center ("Essex Park"); and DES Senior Care Holdings LLC, d/b/a Sweet Brook Care Centers ("Sweet Brook").

effective care and their right to conduct their businesses free from Defendants' ongoing campaign of intimidation, interference, threats, deceptive trade practices, abuse of process, vandalism, and other illegal and extortionate conduct.

2.      This case is not about traditional labor activity.  Rather, it is about the SEIU and two of its local unions that have abandoned ordinary labor relations practices in favor of extortion and other criminal and fraudulent tactics as a means of enhancing their market share in the long term care industry.  It is about the "corporate campaign," a tactic set out in the SEIU's widely publicized "Contract Campaign Manual" (the "Manual") and scrupulously followed by the three Defendants in this case.  A copy of the Manual is attached as Exhibit A.

3.      Defendant SEIU is one of the most powerful labor unions in the United States.  It seeks continually to expand its jurisdiction and often pursues its goals through unconventional and illegal behavior.  Its locals are no exception.  In this case, Defendants UHWE and NEHCEU, facing significant underfunded pension liabilities and other considerable debt, conspired together to launch a coordinated and multi-faceted "corporate campaign" against Plaintiffs and Daniel E. Straus, who is a direct or indirect owner of the Plaintiffs.  The campaign – which the Defendants alternatively call "Care One Watch" and/or "HealthBridge Watch" – has three interrelated objectives, the first two of which are: (1) bludgeon Plaintiffs into allowing Defendant UHWE to unionize Plaintiffs' non-union employees in New Jersey and elsewhere; (2) force Plaintiffs, on behalf of the facilities in Connecticut at which Defendant NEHCEU represents the employees, to accept exorbitant, outsized and unnecessary contract demands covering those facilities.  In both instances, Defendants seek to extort substantial money and property from Plaintiffs in the form of increased union membership, union dues, contributions to Defendants' pension funds, unwanted and superfluous labor services and direct payments to Defendants in the form of

3

contributions to their training funds.  If those two objectives fail, then the Defendants seek to destroy Plaintiffs and drive them out of business.

4.    In carrying out their scheme against Plaintiffs, Defendants have closely followed the tactics set out in the SEIU's Manual.  The Manual represents the antithesis of the orderly process established under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("NLRA"). The Manual, which was attached as an exhibit to the pleading in a similar RICO action filed against the SEIU and other affiliated unions and individuals, condones and encourages illegal, immoral and unethical behavior in the pursuit of the SEIU's and its local unions' goals.  It instructs SEIU members, and members of its local unions, to destroy businesses, ruin reputations, and invoke legal process improperly.  It candidly admits that breaking the law is often required to obtain organizing and bargaining goals and glamorizes extortionate behavior.  It discourages members from following the advice of counsel and instructs that a lawyer's job "is not to make decisions about when and how to obey the law."  *See* Exhibit A at 48.  It reflects the simple fact that the standard operating procedure of the SEIU – and affiliated locals including Defendants – is to do whatever it takes to accomplish their goals, however unlawful, extortionate, or fraudulent those tactics may be.

5.    Facing significant underfunded pension liabilities and other considerable debt, Defendants launched a coordinated and multi-faceted "corporate campaign" against Plaintiffs and Mr. Straus in an effort to extort substantial money and property from Plaintiffs.  Defendants' members have followed the Manual's advice to ignore the law in their corporate campaign against Plaintiffs.   Their conduct has been extortionate and fraudulent and is part of a longstanding pattern of criminal behavior.  Their conduct has been endorsed and facilitated by elected officials in the State of Connecticut beholden to the Defendants as a result of outsized campaign contributions.  Their conduct has even gone beyond destroying businesses and the

4

owners of businesses.  It has put at direct and immediate risk the lives of elderly and frail patients entrusted to Defendants' members care.

      6.    Defendants have made their plan and intent clear to Plaintiffs through a series of blunt communications.  Plaintiffs must relinquish their rights, agree to Defendants' extortionate demands, or have their businesses and the lives of their owners destroyed.  All Defendants have directly and indirectly communicated their demands to Plaintiffs on multiple occasions.  Just by way of example:

- David Pickus, NEHCEU's President, told two representatives of Plaintiffs during a meeting on August 4, 2011, that HealthBridge needed to sign its "pattern" collective bargaining agreement that NEHCEU was insisting upon -- which, among other things, requires contributions to NEHCEU's training and pension funds -- or else the Union would run HealthBridge and the HealthBridge facilities out of the State of Connecticut through relentless illegal and extortionate corporate campaign attacks against Healthbridge and the Connecticut-based plaintiffs.

- Defendants made good on this threat.



- This "escalating campaign" continued unabated.



- Meanwhile, Ricky Elliott, UHWE's Vice President, candidly admitted to a now-former high-ranking UHWE organizer that UHWE has decided to deemphasize the traditional NLRA-sanctioned legal framework for organizing employees into unions in favor of a coordinated corporate campaign directed against Plaintiffs. The UHWE's goal, according to Mr. Elliott, is to bring the Plaintiffs "to their knees" through its relentless illegal and extortionate corporate campaign so that the Plaintiffs would have no choice but to recognize Defendant UHWE as the exclusive collective bargaining representatives at all of the facilities managed by Plaintiff Care One, without regard to the wishes of their employees, or else Defendant UHWE would destroy Plaintiffs' businesses. The UHWE does not represent the employees of any of the Care One Plaintiffs.

- This plan was confirmed by Elisabeth L. Daley, another senior UHWE official, in a telephone call with a representative of Plaintiffs in September 2012. During this call, Daley told Plaintiffs that UHWE would consider withdrawing its baseless hearing requests on applications for improvements to HealthBridge Facilities in Massachusetts if HealthBridge would agree to NEHCEU's pattern contract and agree to remain "neutral" in response to efforts by the Defendants to organize Plaintiffs' non-unionized facilities.

- 

7.     Defendants have employed many means in furtherance of their unlawful scheme. Among other things, Defendants enlisted elected officials in the State of Connecticut to deprive Plaintiffs of normal legal processes and threaten groundless actions against them. They instituted baseless legal actions against Plaintiffs, for the sole purpose of harming their businesses, and "bringing them to their knees." They began a campaign of false statements designed to damage Plaintiffs' businesses. They attempted to block unrelated business ventures of Daniel E. Straus. They engaged in a campaign of false statements and attacks on Mr. Straus

and his family.  And most shockingly of all, they took actions against the frail and often helpless patients at Defendants' facilities – patients that the Defendants' members were legally and ethically charged to care for.  The message could not be more clear.  Agree to the Defendants' demands or lives and property would be lost.

8.      For example, on July 2 and 3, 2012, prior to the start of a strike at the HealthBridge Facilities in Connecticut, Defendant NEHCEU members committed numerous serious criminal acts designed to harm the elderly and frail patients under their care in an effort to force the Plaintiffs to accede to their extortionate demands.  These acts included:

- Removing patient identification wrist bands from more than 30 patients

- Changing name plates on patient doors

- Removing name bands on patient wheel chairs

- Removing dietary stickers indicating how patients could safely be fed

- Switching the names of patients in a memory care unit

- Tampering with medication records

- Removing handles from equipment used to safely lift patients in and out of bed

- Hiding or damaging blood pressure cuffs and stethoscopes

- Throwing patient linens on the floor and rendering a facility washing machine inoperable due to damage

9.      The potential impact of these criminal actions is obvious, severe and life-threatening.  Many of the memory care patients whose bracelets were removed and whose records were tampered with were unable to assist in their care, leaving the patients and replacement workers to fend for themselves.  As a consequence of Defendants' criminal acts, these patients' lives were made dependent upon the ability of Plaintiffs to unravel the criminal deceit, sort out the tampered records, and discover and remedy the tampered-with equipment

before fatal harm occurred.  The Defendants were well aware of this fact and, apparently did not care.  Connecticut Attorney General George Jepsen was well aware of this fact when he spurned Plaintiffs' petition for assistance, but apparently he did not care.  Knowing full well of this criminal conduct and the risk it imposed on Connecticut's most vulnerable citizens, he appeared on the picket line to support Defendants, and recused himself from the dispute only after negative press compelled him to do so.  Connecticut Governor Dannell Malloy was aware of this fact when he appeared on the picket line with Defendants, and apparently he did not care.  Defendants contributed approximately $400,000 to his last campaign and organized extensive grass roots support.

10.     As if the aforementioned unspeakable acts were not enough, the NEHCEU pressured religious leaders from a church across the street from Plaintiff Newington to discontinue providing religious services to Newington's patients despite repeated requests from several patients and Newington for the continuation of such services. Only a plea from the Connecticut Long Term Care Ombudsman Program to the Archdiocese in Connecticut finally afforded Newington's patients the dignity of receiving religious services.

11.     These tactics were not the isolated acts of individual disgruntled strikers.  Rather, they were coordinated actions by NEHCEU organizers and are part of a long and shameful pattern of criminal conduct by Defendant NEHCEU calculated to maximize the devastation to the employer when the Union members threaten to, or go on strike.  For example, in an April 10, 2001 report entitled, "Nursing Home Strike Incidents," the Division of Criminal Justice of the Connecticut Chief State's Attorneys Office determined that numerous similar heinous acts of sabotage took place prior to the arrival of replacement workers following a 2001 strike by NEHCEU's members at ten nursing homes unrelated to HealthBridge.  A copy of the report is attached as Exhibit B.  The report noted that "these types of incidents are common during work

actions at facilities of this nature." *See* Exhibit B at 9.   The Connecticut Chief State's Attorneys Office noted that many of these incidents mirrored the actions perpetrated by NEHCEU members in the hours leading up to a 1998 strike.

12.   Similarly, in connection with the 2001 strike by NEHCEU members, law enforcement confirmed that the acts of vandalism and sabotage occurred.   However, the individuals responsible were not held accountable "due to the heavily politically charged environment as well as the fear and inability of patients to assist in the investigation."  Exhibit B at 9.

13.   Defendants' actions in support of their extortionate demands did not stop with their actions against patients.  Defendant UHWE interfered with applications for improvements to HealthBridge Facilities in Massachusetts designed for the betterment of patients' and employees' quality of life at those facilities.   UHWE admitted that it has no substantive objections to the filed applications, but merely interfered in order to force Plaintiffs to accede to the Defendants' extortionate demands.

14.   Defendants' campaign has also involved officials beholden to Defendants depriving and seeking to deprive Plaintiffs of their rights under law.  For example, Defendants caused HealthBridge's efforts to obtain state approval of a routine closure of a facility in Connecticut -- which under law is to be granted within 90 days -- to be delayed for many months.  The delay was on order from state officials beholden to Defendants, resulting in more than six million dollars of damages.

15.   Defendants have even convinced government officials to threaten baseless legal action against Plaintiffs on trumped-up grounds unrelated to any labor-related grievances.  True to Defendants' threat that Plaintiffs should agree to a pattern contract or be run out of Connecticut, Plaintiffs have been advised of threatened, baseless receivership  actions against

their facilities in Connecticut and indirectly received an unsolicited message from Governor Malloy's office to contact a prospective purchaser's counsel for the sale of the Connecticut Plaintiffs' facilities.

16.     Consistent with their "Manual," Defendants have also advanced their corporate campaign by harming Plaintiffs' business interests.  They have widely disseminated false and misleading information – much of it over the Internet and using the mails – for the purpose of impugning the Plaintiffs' quality of care and financial practices.  For example, Defendants have sought to deflect blame for their acts of sabotage by falsely claiming over the Internet that HealthBridge "staged" the vicious acts directed toward the elderly and frail patients of the HealthBridge Facilities in Connecticut and by disseminating the baseless and sensational claim that non-union workers killed a patient.  Defendants engaged in this and other conduct described more fully below for the purpose of exerting unfair pressure to force the Plaintiffs to stop resisting Defendants' demands.

17.     Also consistent with their Manual, Defendants' campaign has involved personal attacks on Mr. Straus and his unrelated business interests designed to invade his privacy, harass him, and impede his other business activities.  For example, Mr. Straus has been a trustee of New York University ("NYU") School of Law for many years.   In September 2009, the school inaugurated The Straus Institute for the Advanced Study of Law & Justice, thanks to a generous donation from Mr. Straus. The mission of the Straus Institute is to welcome Fellows from around the world and facilitate their high level research and scholarship on topics falling within a broad definition of law and justice.  Defendants enlisted the NYU Student Labor Action Movement to apply pressure to the school's president to remove Daniel Straus as a trustee unless Plaintiffs accede to Defendants' forced unionization and contract demands.

18.     Defendants have also enlisted their members to attempt to block Mr. Straus's unrelated real estate ventures in New York.  Among other things, they have testified at the New York Landmark Commission, in an attempt to block approval of a real estate development involving an investment of approximately $100 million dollars.  And coincidently, in the days leading up to the strike in Connecticut, unknown individuals, impersonating Mr. Straus, contacted various financial institutions with which he does business, attempting to obtain his account information.

19.     Defendants' illegal shakedown of Plaintiffs is not an anomaly.  Rather, as the Manual professes and Defendants' recent actions demonstrate, it is their regular and ordinary way of conducting business.

20.     The primary goal of Defendants' extortionate campaign is self-enrichment.   As described further below, Defendants seek to obtain valuable property and property rights from Plaintiffs, including, among other things: millions of dollars in payments toward the crushing underfunded pension liabilities of the pension plans sponsored by Defendants; physical access to properties managed by Plaintiffs; Plaintiffs' rights under the NLRA to require a secret-ballot election for the selection of any collective bargaining representative; and effective control over Plaintiffs' business operations.

21.     Defendants' goals are part of a longstanding pattern of unlawful activities.  In fact, for many years, Defendants have used extortionate and fraudulent methods against facilities in the healthcare industry, including those managed by Plaintiffs, to improperly seek to organize Defendants' employees outside of the traditional legal framework for doing so in order to enjoy the financial benefits of new dues-paying members.

22.     As Defendants' tactics in Connecticut have demonstrated, even gaining a foothold into facilities Plaintiffs manage will not stop Defendants' extortionate, fraudulent, and other

unlawful conduct.  Rather, under the guise of seeking to obtain collective bargaining agreements, Defendants will engage in unlawful conduct in an effort to extort substantial sums of money from Plaintiffs to pay down Defendants' crushing underfunded pension liabilities; to gain physical access to properties managed or owned by Plaintiffs; and to gain effective control over Plaintiffs' business operations.

23.    Moreover, even if Plaintiffs acceded to all of Defendants' current demands, Defendants' criminal harassment of Plaintiffs would not stop.  Defendants will continue to harass, intimidate, interfere with, smear and financially injure Plaintiffs until Defendants have achieved their organizing and unionization objectives at each of the current and future facilities managed by Plaintiffs.  Demands change over time, and Plaintiffs will face the same extortionate tactics over and over again as long as Defendants are allowed to get away with these tactics. Defendants have made it clear that unless Plaintiffs relinquish all of their rights and submit to every one of Defendants' extortionate demands, Defendants will continue to extort money and property from Plaintiffs and continue in their myriad attempts to destroy Plaintiffs' business and those of Mr. Straus.

24.    In an already challenging economy, Defendants' campaign of fraud and extortion has irreparably damaged some of Plaintiffs' relationships with their customers, impacted patient care and caused their employees to spend substantial time and effort dealing with each new attack.  Plaintiffs are filing this action to bring Defendants' pattern of illegal conduct to an end and to recover the substantial damages they have incurred as a result of Defendants' unlawful actions.  This action is not about strikes or union organizing or collective bargaining.  It is about a corporate campaign, endorsed and effectuated by Defendants and facilitated by the politicians they support, that is in its essence a shake-down by a lawless enterprise.

## PARTIES AND OTHER PARTICIPANTS

**I.     The Plaintiffs**

25.     Plaintiff Care One is a limited liability company organized and operating under the laws of the State of New Jersey and is the contract manager of the Care One Facilities in New Jersey.  Its principal office is located at 173 Bridge Plaza North, Fort Lee, New Jersey 07024.

26.     The Care One Facilities are 23 limited liability companies managed by Care One and organized under the laws of the State of New Jersey, each owning and operating a skilled nursing facility in the State of New Jersey.

27.     Plaintiff HealthBridge is a limited liability company organized and operating under the laws of the State of New Jersey and is the contract manager of four HealthBridge Facilities in New Jersey (Oradell, Woodcrest, South Jersey, and Somerset); nine HealthBridge Facilities in Connecticut (Wethersfield, Westport, Danbury, Newington, West River, Long Ridge, River Glen, Golden Hill,  and Highlands Health Care); and 16 HealthBridge Facilities in Massachusetts (Redstone, Lexington, Lowell, Peabody, Newton, New Bedford, Holyoke, Millbury, Cedar Hill, Northhampton, Concord, Weymouth, Wilmington, Brookline, Essex Park, and Sweet Brook) each organized under the laws of the State of Delaware.  Its principal office is located at 173 Bridge Plaza North, Fort Lee, New Jersey  07024.

28.     The HealthBridge Facilities are 29 limited liability companies managed by HealthBridge and organized under the laws of the State of Delaware.   Four (Oradell, Woodcrest, South Jersey, and Somerset) are located in New Jersey.  Nine (Wethersfield, Westport, Danbury, Newington, West River, Long Ridge, River Glen, Golden Hill, and Highlands Health Care) are located in Connecticut.  Sixteen (Redstone, Lexington, Lowell, Peabody, Newton, New Bedford,

Holyoke, Millbury, Cedar Hill, Northhampton, Concord, Weymouth, Wilmington, and Brookline, Essex Park, and Sweet Brook are located in Massachusetts.

29.     The Plaintiffs are leaders in providing a continuum of care including Post-Hospital Care, Rehabilitation, Long-Term Care, Alzheimer's/Memory Care, Assisted Living, Medical Specializations, Respite Care and Long-Term Acute Care.   Plaintiffs develop specialized care coordination programs for outcome-oriented, cost-effective care plans for all major diagnoses, and pioneered the "Next Step Home" program for patient and family education and discharge preparation.

30.     The Plaintiffs are directly or indirectly owned in part by Daniel E. Straus, a citizen and resident of the State of New Jersey.   As part of their coordinated effort to extort additional money and concessions from Plaintiffs, Defendants have leveled personal attacks against Daniel Straus and other unrelated businesses in which he has an interest.

## II.   The Defendants

31.     Defendant NEHCEU is an unincorporated labor organization with its principal place of business located at 77 Huyshope Ave., Hartford, Connecticut 06106.   It is a local affiliate of the SEIU.   NEHCEU is funded in part by dues collected from its members.   Each member of NEHCEU pays a fixed percentage of his or her wages to the union as dues. NEHCEU has approximately 29,000 members in Connecticut and Rhode Island.   NEHCEU contributed more than $3.5 million to the SEIU in per capita dues in the fiscal year ending June 30, 2010.   NEHCEU has collective bargaining relationships with six HealthBridge-managed facilities located in Newington, Westport, Danbury, Milford, Hartford, and Stamford Connecticut.   It is abusing those relationships by seeking to extort substantial sums of money from Plaintiffs and the facilities managed by Plaintiffs to help the NEHCEU pay down its crushing underfunded pension liabilities through its pattern contract.   If Plaintiffs do not agree to

that pattern contract, NEHCEU is intent on expelling the Connecticut Plaintiffs from doing business in that State through its illegal and extortionate conduct as more particularly described below and outlined in its Manual.  In exchange for fees in the form of union dues, which it collects from member-employees, NEHCEU provides services related to the terms and conditions of employment as well as other products and services.  NEHCEU transacts business activities in interstate commerce and on a national scale, including in this judicial district.

32.     Defendant UHWE is an unincorporated labor organization with its principal place of business located at 310 West 43rd Street, New York, New York 10036.   It is a local affiliate of the SEIU.  UHWE is funded in part by dues collected from its members.  Each member of UHWE pays a fixed percentage of his or her wages to the union as dues.  The UHWE is one of the largest local unions of the SEIU, with approximately 350,000 members.   The UHWE contributed almost $40 million to the SEIU in per capita dues in 2010.  UHWE has been actively and thus far unsuccessfully seeking to unionize workers of facilities managed by Plaintiff Care One to derive the financial benefit of more dues-paying members and to help it pay down its severely underfunded pension plan.   In exchange for fees in the form of union dues, which it collects from member-employees, UHWE provides services related to the terms and conditions of employment as well as other products and services.  UHWE transacts business activities in interstate commerce and on a national scale, including in this judicial district.

33.     Both NEHCEU and UHWE are affiliated with Defendant SEIU but are legally distinct entities.  The SEIU is an unincorporated labor organization with its principal office at 1800 Massachusetts Ave. N.W., Washington, DC 20036.   Currently, the SEIU claims to represent over 2.1 million workers in North America and touts that it is the fastest-growing union and the largest healthcare union.  The SEIU exists to organize new members and to maintain existing members.  It provides training to new organizers employed by the local unions affiliated

with the SEIU.  It does not generate revenue, other than investment income, without its dues-paying members.  The SEIU transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

34.     In addition to making substantial monetary contributions to the SEIU, both NEHCEU and UHWE appoint delegates who participate in the SEIU's governance at quadrennial and special SEIU conventions.  Although the NEHCEU and the UHWE are legally distinct entities from the SEIU, the SEIU's website explains that each local union "is a chartered branch that carries forth the mission and goals of the [SEIU] while representing the specific interests of locally based memberships." (http://www.the SEIU.org/local/).  A copy of the webpage is attached as Exhibit C.  As noted above and as shown further below, the "mission and goals" of the SEIU include the expansion of membership and extraction of substantial monies from employers through corporate campaigns.

35.     Indeed, the SEIU's 2012 Constitution vests in its senior leaders power over unionization campaigns, stating that "[t]he International President shall have general supervision and direction of the organizing efforts" of SEIU. (Art. VIII, § 1(e)). Additionally, the SEIU's Constitution shows that SEIU's affiliated locals are constitutionally bound to commit resources and finances to the execution of any aggressive unionization efforts SEIU decrees, including unlawful unionization campaigns. (Art. VIII, § 1(e), Art. XV, § 16(a)).   In fact, the SEIU's Constitution also:  (i) gives the SEIU jurisdiction over the locals and its members (Art. III, § 2(a)); dictates the very existence of a local union (id., Art. XIV, §§ 1-2); (ii) imposes financial requirements upon the locals, including how much money the locals must contribute to the SEIU (id., Art. XV, §§ 6(a)-(d)); (iii) determines whether a local is in good standing (id., Art. VIII, § 3); (iv) dictates the requirements for officers of the locals (id., Art. XV, § 2); and (v) requires the

locals to follow the SEIU's constitution and the SEIU to approve the locals' constitutions and by-laws (id., Art. XV, § 3).

## III.    Non-Party Participants

36.    The Unions have been assisted in their extensive corporate campaign against Plaintiffs and other wrongdoing described throughout this Complaint by a number of non-parties, described more fully in this section and elsewhere in the Amended Complaint ("Non-Party Participants").

### A.    Union Officers and Employees

37.    Included among the Non-Party Participants are or were various officers and employees of the Unions who have directly or indirectly participated in the Corporate Campaign against Plaintiffs.  These officers and employees include, but are not limited to, the following:

- Mary Kay Henry, President, SEIU.  As President of the SEIU, Ms. Henry has been intimately involved in planning, directing, and implementing the corporate campaign against Plaintiffs, in coordination with UHWE and NEHCEU. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

- Kirk Adams, Executive Vice President, SEIU HealthCare.  In addition to implementing instructions from Ms. Henry as described above, Mr. Adams was ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

17



- David Pickus, NEHCEU's President. In addition to orchestrating and directing many of the predicate acts described more fully below, he told representatives of Plaintiffs during a meeting on August 4, 2012, that HealthBridge needed to sign its "pattern" collective bargaining agreement that NEHCEU was insisting upon, or else it would have to leave the State of Connecticut.

- Ricky Elliott, UHWE's Vice President (deceased). In addition to orchestrating and directing many of the predicate acts described more fully below, he candidly admitted to a now-former high-ranking UHWE organizer that UHWE has decided to deemphasize the traditional NLRA-sanctioned legal framework for organizing employees into unions in favor of a coordinated corporate campaign directed against Plaintiffs. The UHWE's goal, according to Mr. Elliott, is to bring the Plaintiffs "to their knees" so that the Plaintiffs would have no choice but to recognize Defendant UHWE as the exclusive collective bargaining representatives at all of the facilities managed by Plaintiff Care One, or else have their businesses destroyed.

- Elisabeth L. Daley, senior UHWE official. In a telephone call with a representative of Plaintiffs in September 2012, Daley told Plaintiffs that it would consider withdrawing UHWE's baseless hearing requests on applications for improvements to HealthBridge Facilities in Massachusetts if HealthBridge would agree to NEHCEU's contract demands and agree to remain "neutral" in response to efforts by the Defendants to organize non-unionized facilities managed by Plaintiffs.

- Dave Bates, Communications Director for UHWE, and Amanda Torres Price, UHWE Senior Communications Specialist, New Organizing. Both have substantial responsibility within UHWE for the UHWE's dissemination of numerous false and misleading advertisements about Plaintiffs.

- Organizers and participants in acts of strike-related sabotage and vandalism at the Newington, Danbury, and Stamford Plaintiffs on July 2 and 3, 2012, including lead union organizers who have been under criminal investigation and who, upon information and belief, directed the sabotage and vandalism; and the unknown

participants in the sabotage.  These acts of sabotage are described more fully below.

- Deborah Chernoff, Communications Director for NEHCEU.  Among other things, she falsely posted online the allegation that HealthBridge "staged" the vicious acts of strike-related sabotage,



- Chas Walker, Elected Organizer from NEHCEU.

- Jennifer Smith, Political Director for NEHCEU.  As Political Director, Smith enlisted numerous elected politicians beholden to Defendants to take or threaten to take baseless regulatory actions against Plaintiffs in furtherance of Defendants' corporate campaign. Unknown NEHCEU members who trespassed at the corporate headquarters of Care One Management LLC and HealthBridge Management LLC on August 23, 2012, in furtherance of Defendants' ongoing corporate campaign directed against Plaintiffs.

- Dennis Rivera.  Rivera is the former president of the UHWE and Co-Chair of the 1199SEIU Funds, which oversees the underfunded UHWE Pension Plan.  Rivera also previously served as Chair of the SEIU's Healthcare Division, which was responsible for disseminating a false and misleading report accusing HealthBridge and the facilities it manages of engaging in "Questionable Medicare Billing Practices at Connecticut HealthBridge Nursing Homes."

- Julie Popper, Communications Coordinator, SEIU. She joined the NEHCEU's communications campaign directed towards HealthBridge in 2011. As part of NEHCEU's HealthBridge communications team, Ms. Popper provided support from the SEIU to NEHCEU by assisting with strategic planning, drafting flyers, internal messaging/talking points, press advisories and press releases, fielding media inquiries, and building media lists, among other tasks.

19

- Mayrym I. Ramos, Deputy Director, SEIU's Geography Department. She assists SEIU locals in corporate campaigns against employers in different geographic regions, and she provided substantial information and assistance to the UHWE and NEHCEU in the preparation of a false and misleading radio advertisement campaign in Puerto Rico about Aveta, Inc., another entity for which Plaintiffs' owner/indirect owner Daniel Straus served as Principal Stockholder and a Board Member, and its subsidiary, MMM. Ms. Ramos candidly admitted that the goal of these advertisements was not to organize employees or to obtain collective bargaining concessions, but quite simply, to hurt MMM.

**B.      Elected Officials**

38.      The Non-Party Participants also include elected government officials beholden to

Defendants as a consequence of outsized campaign contributions. These elected officials

include, but are not limited to:

- Connecticut Governor Dannell Malloy. Malloy is the beneficiary of $400,000 in campaign expenditures by the SEIU and an affiliated local union for his 2010 election campaign. He has assisted the Unions in their corporate campaign against Plaintiffs by, among other things: joining workers on the picket line at the Newington Health Care Center on July 11, 2012 despite the acts of sabotage and vandalism that occurred eight days earlier against the HealthBridge- managed facilities' patients; and initially refusing to allow HealthBridge's application to close the Wethersfield facility to be processed until a lockout with union members at another HealthBridge facility was resolved; and threatening to take the assets of the Connecticut facilities managed by Plaintiff HealthBridge under receivership.

- Connecticut Attorney General George Jepsen. When HealthBridge reported incidents of strike-related sabotage on July 2 and 3, 2012 to Jepsen's office, he refused to offer meaningful assistance and directed HealthBridge to file separate police reports with local law enforcement authorities. Then, on July 17, 2012, Attorney General George Jepsen walked the picket lines with striking employees. A day later, he recused himself from matters involving HealthBridge and NEHCEU, citing the apparent conflict of interest.

- U.S. Senator Richard Blumenthal, U.S. Congresswoman Rosa DeLauro, Connecticut State Senator John Fonfara, Connecticut State Senator Gayle Slossberg, and Connecticut State Assemblyman Russell Morin. These politicians are among the many elected officials to whom the Defendants directed false and misleading statements about Plaintiffs, and whom the Defendants otherwise influenced and/or sought to influence, in an effort to generate support for their unlawful corporate campaign against Plaintiffs. Senator Blumenthal's office was particularly receptive to the NEHCEU's communications, urging the U.S. Department of Health and Human Services to investigate the SEIU's allegations

20

of "Questionable Medicare Billing Practices at Connecticut HealthBridge Nursing Homes," and collaborating with the NEHCEU on a press release and open letter to the National Labor Relations Board on the NEHCEU's behalf.  Previously, Congresswoman DeLauro joined NEHCEU members on the picket line and spoke out publicly against the Plaintiffs in July 2012, just days after the incidents of strike-related sabotage recounted below.   Defendants also enlisted Fonfara, Slossberg, and Morin, among other politicians, to interfere with Plaintiffs' efforts to close the Wethersfield facility, among other actions.

### C.     Student Groups

39.     The Non-Party Participants have also included students of New York University ("NYU") and NYU student groups, whom the Unions have enlisted in further support of their corporate campaign against Plaintiffs and Mr. Straus.  These student and student groups include, but are not limited to, members of the NYU for Occupy Wall Street, NYU Student Labor Action Movement, and Law Students for Economic Justice.

### D.     Public Relations Consultants and Contractors

40.     The Non-Party Participants also include public relations consultants and contractors retained by the Unions to disseminate false and misleading information about the Plaintiffs, including, but not limited to, the following:

- Checkmate Consulting Group ("Checkmate").  Checkmate, headquartered in 461 Main Street, East Greenwich, Rhode Island 02818, holds itself out as a full-service strategic communications firm specializing in public relations, media relations, political consulting, marketing, advertising, digital communications, government relations, grassroots advocacy, and Netroots advocacy.  Upon information and belief, both UHWE and NEHCEU have retained Checkmate to prepare or assist in the preparation, design development, and/or implementation of the numerous false and misleading communications, described more fully below, in furtherance of the Unions' scheme to defraud and campaign of extortion directed against Plaintiffs.

- Gorilla Trucking Company ("Gorilla Trucking").   Gorilla Trucking is a corporation or other legal entity that specializes in leasing trucks containing traveling billboard advertisements.   Upon information and belief, UHWE and NEHCEU have retained Gorilla Trucking to transmit the Unions' numerous false and misleading statements about Plaintiffs throughout New York, New Jersey, Connecticut, and Massachusetts on traveling billboards, described more fully

below, also in furtherance of the Unions' scheme to defraud and campaign of extortion directed against Plaintiffs.

- BerlinRosen Public Affairs ("Berlin Rosen"). Berlin Rosen is a corporation or other legal entity which, upon information and belief, is headquartered in 15 Maiden Lane, Suite 1600, New York, NY 10038. Berlin Rosen holds itself as a public relations consultants firm that offers "high impact political and cause oriented communications, media strategy, pr and creative services." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## IV.    Enterprises

41.    At all relevant times, a number of "enterprises" have existed within the meaning of 18 U.S.C. §1961(4). Each of these enterprises is an entity that engaged in activities affecting interstate commerce, and each was an enterprise at all times relevant to this Amended Complaint.

42.    Four of the enterprises – the 1199 Enterprise; the UHWE Pension Enterprise; the NEHCEU Pension Enterprise; and the Care One Watch Enterprise – are association-in-fact enterprises. The remaining enterprises are all entities with a legal existence. *See* 18 U.S.C. §1961(4). Each of the non-Plaintiff enterprises is described below.

### A.    The 1199 Enterprise

43.    At all relevant times there has been and continues to be an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "1199 Enterprise"). The 1199 Enterprise consists of at least UHWE, NEHCEU, the UHWE Pension Plan, and the NEHCEU Pension Plan.

44.    At all relevant times the 1199 Enterprise has been and continues to be engaged in activities affecting interstate commerce, including but not limited to representing employees for collective bargaining purposes and providing pension benefits for UHWE and NEHCEU

members, retirees, and their family members.

45.      The 1199 Enterprise is separate and distinct from the Defendants and from each of the other members of the 1199 Enterprise.  The 1199 Enterprise is an ongoing organization and exists to advance the interests of the individual entities that comprise its membership.

46.      The 1199 Enterprise exists for the legitimate purpose of representing employees for collective bargaining and providing pension benefits for UHWE and NEHCEU members, retirees, and their family members.  However, Defendants conspired to conduct or participate in the conduct of the affairs of the 1199 Enterprise through a separate and distinct "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), described more fully in this Complaint.

47.      The 1199 Enterprise has operated as a continuing unit since at least January 1, 1991, the date on which both the UHWE Pension Plan and the NEHCEU Pension Plan were formed.  Prior to that date, employees represented by the UHWE and the NEHCEU participated in the National Pension Fund for Hospital and Health Care Employees ("Prior Plan").  However, on January 1, 1991, the Prior Plan was separated into five regional pension plans:  the UHWE Pension Plan, the NEHCEU Pension Plan, and three other regional pension plans.

48.      Each member of the 1199 Enterprise performs a role in the group consistent with its organizational structure, which furthers the activities of the 1199 Enterprise.  For example, the UHWE Pension Plan and the NEHCEU Pension Plan provide pension benefits for UHWE and NEHCEU members, retirees, and their family members.  The UHWE and NEHCEU seek to recruit new members and obtain money from employers in order to adequately fund the UHWE Pension Plan and the NEHCEU Pension Plan.

49.      Moreover, all four entities are associated with the SEIU and frequently work together to advance the interests of the 1199 Enterprise.  As described more fully below, each

Union took actions to advance the interests of the other Defendant and its pension plan. Moreover, as noted above, the UHWE Pension Plan and the NEHCEU Pension Plan were formed from the Prior Plan and continue to work together to advance the interests of each other and the 1199 Enterprise through, *inter alia*, a reciprocity agreement.   The UHWE Pension Plan's address (330 W. 42nd Street, 10th Floor, New York NY 10036) is in close proximity to the address of UHWE's headquarters (310 West 43rd Street, New York, New York 10036), and UHWE's Secretary Treasurer, Maria Castaneda, is also a trustee on the UHWE Pension Plan. The NEHCEU Pension Plan's address (77 Huyshope Ave., Hartford, Connecticut 06106) is the same address as that of NEHCEU's headquarters, and upon information and belief, the NEHCEU's Secretary Treasurer, Almena Thompson, is also a trustee on the NEHCEU Pension Plan.

**B**.      **The UHWE Pension Enterprise and the NEHCEU Pension Enterprise**

50.      At all relevant times, there have been and continue to be smaller-scale bilateral association-in-fact enterprises within the meaning of 18 U.S.C. § 1961(4).  One such enterprise consists of at least the UHWE and the UHWE Pension Plan (the "UHWE Pension Enterprise"). Another such enterprise consists of at least the NEHCEU and the NEHCEU Pension Plan (the "NEHCEU Pension Enterprise").

51.      At all relevant times both the UHWE Pension Enterprise and the NEHCEU Pension Enterprise have been and continue to be engaged in activities affecting interstate commerce, including but not limited to representing employees for collective bargaining purposes and providing pension benefits for UHWE and NEHCEU members, retirees, and their family members.

52.      The UHWE Pension Enterprise is separate and distinct from the Defendants and from each of the members of the enterprise, and is an ongoing organization that exists to advance

the interests of the entities that comprise its membership.  The NEHCEU Pension Enterprise is likewise separate and distinct from the Defendants and from each of the members of the enterprise, and is an ongoing organization that exists to advance the interests of the entities that comprise its membership.

53.    Both the UHWE Pension Enterprise and the NEHCEU Pension Enterprise exist for the legitimate purpose of representing employees for collective bargaining purposes and providing pension benefits for UHWE and NEHCEU members, retirees, and their family members.  However, Defendants conspired to conduct or participate in the conduct of the affairs of both the UHWE Pension Enterprise and the NEHCEU Pension Enterprise through a separate and distinct "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), described more fully in this Complaint, and have successfully done so.

54.    The UHWE Pension Enterprise has operated as a continuing unit since at least January 1, 1991, the date on which the UHWE Pension Plan was formed.  The NEHCEU Pension Enterprise has likewise operated as a continuing unit since at least January 1, 1991, the date on which the NEHCEU Pension Plan was also formed.

55.    Moreover, each member of the UHWE Pension Enterprise and the NEHCEU Pension Enterprise performs a role in its respective enterprise consistent with its organizational structure, which furthers the activities of the respective enterprise.  For example, the UHWE Pension Plan provides pension benefits for UHWE members, retirees, and their family members; the UHWE, in turn, seeks to recruit new members and obtain money from employers in order to adequately fund the UHWE Pension Plan.  Similarly, the NEHCEU Pension Plan provides pension benefits for NEHCEU members, retirees, and their family members; the NEHCEU, in turn, seeks to recruit new members and obtain money from employers in order to adequately fund the NEHCEU Pension Plan.

### C.    The UHWE Pension Plan and the NEHCEU Pension Plan

56.    Since their formation on January 1, 1991, both the UHWE Pension Plan and the NEHCEU Pension Plan have also constituted enterprises within the meaning of 18 U.S.C. § 1961(4).    The UHWE Pension Plan is an independent legal entity and employee welfare plan within the meaning of 29 U.S.C. § 1002(2)(A), that exists for the purposes of providing pension benefits for UHWE members, retirees, and their family members. The NEHCEU Pension Plan is likewise an independent legal entity and employee pension benefit plan within the meaning of 29 U.S.C. § 1002(2)(A) that exists for the purposes of providing pension benefits for NEHCEU members, retirees, and their family members.    However,  Defendants conspired to conduct or participate in the conduct of the affairs of both the UHWE Pension Plan and the NEHCEU Pension Plan through a separate and distinct "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), described more fully in this Complaint, and have successfully done so.

### D.    The Care One Watch Enterprise

57.    At all relevant times there has been and continues to be an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Care One Watch Enterprise").  The Care One Watch Enterprise consists of the UHWE, NEHCEU, and one or more of the Non-Party Participants.

58.    At all relevant times the Care One Watch Enterprise has been and continues to be engaged in activities affecting interstate commerce.  While Defendants UHWE and NEHCEU separately represent employees for collective bargaining purposes, through the Non-Party Participants, the Care One Watch Enterprise functions as the vehicle through which Defendants have carried out their conspiracy against Plaintiffs.

59.     The Care One Watch Enterprise is separate and distinct from the Defendants themselves.   Unlike the 1199 Enterprise, the Care One Watch Enterprise has no legitimate purpose.   It exists only because of the Defendants' decision to synergize their efforts and enlist the aid of the Non-Party Participants in attempt to obtain Plaintiffs' property rights through an unlawful corporate campaign. The Defendants conspired to conduct or participate in the conduct of the affairs of the Care One Watch Enterprise through a separate and distinct "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), described more fully in the Complaint.

60.     The Care One Watch Enterprise has operated as a continuing unit since at least in or around 2010 when Defendants launched the "Care One Watch" and "HealthBridge Watch" internet sites described below.

61.     Each member of the Care One Watch Enterprise performs a role in the group consistent with its organizational structure, which furthers the activities of the Care One Watch Enterprise.  For example, NEHCEU carries out the majority of the Defendants' unlawful attacks against Plaintiffs in Connecticut; UHWE carries out the majority of Defendants' unlawful attacks against Plaintiffs in New Jersey, New York, Massachusetts and elsewhere; and the Non-Party Participants assist the Unions in carrying out these attacks by providing organizational, logistical, public relations and political support, among other forms of assistance.

**E.      The SEIU Enterprise**

62.     Defendant SEIU is an enterprise within the meaning of 18 U.S.C. §1961(4).  The SEIU is an independent legal entity and is an unincorporated labor organization that has a separate legal existence from its local unions.

63.     In this case, Defendants UHWE and NEHCEU have conducted and participated directly in the operation and management of the SEIU Enterprise's affairs through a pattern of

27

racketeering activity, which is described in detail below.  Defendants UHWE and NEHCEU knowingly furthered the aims of the SEIU Enterprise by participating in and implementing management decisions or carrying out the instructions of those in control of the enterprise.  As described in detail below, such participation has included the appointment of delegates to participate in high-level enterprise decision-making related to increasing unionization and, as a result, control over the healthcare industry.  It has also included the service of some of the Non-Party Participants and other officers of the UHWE and NEHCEU, in dual roles on behalf of the SEIU Enterprise.  Examples include UHWE President George Gresham's service as a Vice President of the SEIU; former UHWE President Dennis Rivera's service as Chair of the SEIU's Healthcare Division; and NEHCEU President David Pickus' dual role as President of one of the SEIU's state councils.

64.     Each of the acts of racketeering activity committed by UHWE and NEHCEU has had a relationship to the SEIU Enterprise.  The aforementioned Defendants were enabled to commit the racketeering activity by virtue of their involvement in the affairs of the SEIU Enterprise, and the racketeering activity benefitted the SEIU Enterprise and was in fact authorized, promoted and endorsed by the SEIU Enterprise.  All of this is demonstrated by numerous allegations of fact below, including Defendants UHWE's and NEHCEU's use of tactics against Plaintiffs that are endorsed by the SEIU in its Contract Campaign Manual, and allegations related to the SEIU's retention of ultimate and centralized control over decisions related to corporate and contract campaigns.

**F.      The UHWE and NEHCEU Enterprises**

65.     The UHWE and NEHCEU are also enterprises within the meaning of 18 U.S.C. §1961(4).  Both the UHWE and NEHCEU are independent legal entities and are unincorporated labor organization, each with a separate legal existence from each other and from the SEIU.

66.     In this case, the SEIU has conducted and participated directly in the operation and management of the UHWE's and the NEHCEU's affairs through a pattern of racketeering activity, which is described in detail below.  The SEIU knowingly furthered the aims of both the UHWE and the NEHCEU by participating in and implementing management decisions or carrying out the instructions of those in control of the enterprise.  As described in detail below, such participation has again included the appointment of delegates to participate in high-level enterprise decision-making related to increasing unionization and, as a result, control over the healthcare industry. Again, it has also included the service of some of the Non-Party Participants and other officers of the UHWE and NEHCEU, in dual roles on behalf of the SEIU Enterprise, described above.  It has also included, among other things, direct involvement by the SEIU in training union organizers employed by the SEIU and the NEHCEU, and direct involvement by the SEIU in the conception, preparation, and funding of negative advertisements and other false and misleading communications about Plaintiffs and other unrelated business interests of Mr. Straus.

67.     Given the SEIU's role in directing the UHWE's and NEHCEU's affairs, it also played a role in directing the affairs of other enterprises listed above -- more particularly, the 1199 Enterprise, the UHWE Pension Enterprise, the NEHCEU Pension Enterprise, and the Care One Watch Enterprise, the UHWE Pension Plan and the NEHCEU Pension Plan -- since UHWE and NEHCEU are key members of, or (in the case of the pension plan enterprises) key operators, of these other enterprises.

68.     Each of the acts of racketeering activity committed by SEIU has had a relationship to the UHWE and the NEHCEU enterprises.  The SEIU was enabled to commit the racketeering activity by virtue of its involvement in the affairs of both the UHWE and the NEHCEU enterprises, and the racketeering activity benefitted the UHWE and NEHCEU and was

in fact authorized, promoted and endorsed by the UHWE and the NEHCEU.  This is also demonstrated by numerous allegations of fact below, including Defendants UHWE's and NEHCEU's use of tactics against Plaintiffs that are endorsed by the SEIU in its Contract Campaign Manual, and allegations related to the SEIU's retention of ultimate and centralized control over decisions related to corporate and contract campaigns.

## JURISDICTION AND VENUE

69.     Plaintiffs' claims for relief include alleged violations of 18 U.S.C. § 1961 *et seq.* This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1961 *et seq.*, 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (commerce jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

70.     Personal jurisdiction and venue in this district are proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) because all of the Defendants have sufficient minimum contacts with the State of New Jersey and, as alleged below: (i) the Defendants are found in, have agents in, and/or transact their business and affairs in this district; (ii) a substantial part of the events or omissions giving rise to the claims for relief occurred in this district; and (iii) the ends of justice require that those of the Defendants residing outside this district be brought before the Court to answer for their conduct engaged in and directed toward this District.

## FACTUAL BACKGROUND

I.     **The Unions' Overarching Goals and Admitted Pattern of Reliance on Criminal Activity in Conducting Corporate Campaigns.**

A.     **Substantial Financial Pressure Facing the NEHCEU and UHWE**

71.     Organizing campaigns require substantial funds, and the requirement that 20% of the annual budget be committed to such campaigns is burdensome, particularly given that many unions – including the NEHCEU and the UHWE – spend significant sums of their members' dues on political and lobbying activities.

72.     In addition, it has been publicly reported that the pension plans sponsored by both NEHCEU and the UHWE are substantially underfunded.  For example, on April 24, 2009, the NEHCEU Pension Plan announced that its enrolled actuary certified that it was in an endangered status for the plan year beginning in January 1, 2009.  By letter dated July 21, 2009, its actuaries informed the NEHCEU Pension Plan that it would require minimum contributions of in excess of nine percent of payroll from each of its members in order to avoid endangered or critical status. Its Pension Plan Form 5500 for 2010 continued to report accrued liabilities of $471,132,762 far exceeding the reported value of assets of $363,664,704 for a total deficit of over 107 million dollars.

73.     Meanwhile, the UHWE Pension Plan also has a history of serious financial problems.  On March 31, 2009 and again on March 31, 2010, the plan actuary for the UHWE Pension Plan certified to the U.S. Department of Treasury that the plan was in critical status for the plan years beginning January 1, 2009 and January 1, 2010.  According to notices issued by the U.S. Department of Labor, the plan was considered to be in "critical status" for those plan years because it had "funding or liquidity problems, or both," and that the "the plan's actuary determined that over the next three Plan years, the plan is projected to have an accumulated funding deficiency beginning in the 2011 plan year."

74.     Thus, the NEHCEU and the UHWE face considerable pressure to increase their revenues and grow their membership.  Because union dues are a fixed percentage of members' wages, it is politically expedient for affiliates of the SEIU, such as the NEHCEU and the UHWE, to increase revenues by growing their membership.  Also, the NEHCEU and the UHWE need additional members and continuing, increased pension contributions to avoid increasing unfunded pension liabilities of the UHWE Pension Plan and the NEHCEU Pension Plan.

### B.    The Unions' Growth Strategy

75.    The Unions' overarching goal is to expand their membership by organizing non-union facilities.  The SEIU and its local unions have become particularly aggressive in targeting industries for unionization and launching vast and expensive forced unionization campaigns.

76.    The SEIU purports to be the largest healthcare union in North America, and its former president, Andrew Stern, has publicly targeted the healthcare industry as a focus of its organizing efforts for more than a decade.  (*See, e.g.*, Steve Proffitt, Interview with Andrew Stern: Jumping into the Health-Care Fray as the Voice of the Medical Classes, L.A. Times (July 4, 1999)).

77.    In 2008, the SEIU amended its constitution to expand the powers of its chief officer, the International President, over organizing efforts and to toughen the constitutional requirement that local unions devote 20% of their annual budgets on organizing efforts consistent with the SEIU's "union-wide strategic unity plan."  (SEIU Const. Art. XV, Sec. 16).

78.    The NEHCEU and the UHWE have been heavily involved in the SEIU's aggressive organizing in the healthcare industry, and both have added numerous bargaining units at multiple healthcare facilities in recent years.

79.    The common institutional and individual goal of the Defendants is to increase revenues by building dues paying union membership throughout the United States and abroad. The SEIU's and its local unions' self-governing documents, resolutions and mission statements establish: (1) SEIU and its local affiliates, including but not limited to the Union Defendants, work together and in concert to achieve their paramount goal through coordinated corporate campaigns (described in further detail below); (2) SEIU and its local affiliates, including but not limited to the Union Defendants, commit substantial financial resources to corporate campaign

32

efforts; and (3) the Union Defendants are constitutionally obligated to work together and with the SEIU on such campaigns in coordinated fashion.

80.     The SEIU's Constitution (both in prior versions and in its current form) exposes SEIU's primary organizational goal as achieving increased membership and the resulting revenues that go along with such membership at all costs.  At its 1996 Convention, SEIU amended its Constitution to provide for a commitment of 50% of its financial resources to organizing campaigns.  This was a greater financial commitment to organizing activities than any other labor union had ever made; it effectively diverted funds away from servicing then-current SEIU members.

81.     SEIU again dramatically increased its commitment to organizing at its 2000 Convention by adopting the so-called "New Strength Unity Plan," which enabled the union to develop new models of organizing that unite workers on a far greater scale than before.  The SEIU Steward's Manual describes the "New Strength Unity Plan" as having been established to "unit[e] all workers who do the same type of work by bringing into the union many more workers who are in the same industries or do the same kind of work" by enabling SEIU and its affiliated locals, among other things, "to launch a massive effort to pressure employers not to interfere with workers' freedom to choose a voice at work by forming a union."

82.     At its 2008 Convention, SEIU adopted more aggressive constitutional amendments aimed at increased membership through corporate campaigns.  In a series of recommendations titled "Justice for All" (attached as Exhibit OO), the SEIU and its local leaders advocated even greater commitment of resources to, and centralization of, unionization efforts. They recommended, for example, that every SEIU local affiliate be made to earmark 20% of its post per capita budget (meaning after per capita taxes/dues have been paid to SEIU) for organizing.  They further recommended that SEIU have one strategy for uniting more workers,

including an organizing objective of 500,000 new members, and pledged the International's resources to implement this strategy.  Stated plainly, SEIU proposed to pool the resources of its locals, including but not limited to the Union Defendants, to increase the use of corporate campaigns in lieu of traditional labor organizing and bargaining techniques.

83.    These recommendations were adopted and incorporated into SEIU's 2008 Constitution (attached as Exhibit PP), which greatly consolidates power over organizing campaigns.  It provides "[t]he International President shall have general supervision and direction of the organizing efforts" of SEIU, and "shall have power to appoint organizers, representatives, coordinators and organizing committees and to make such loans or grant such subsidies to Local Unions and affiliated bodies as he or she deems necessary."  (*Id*. at Art. VIII, § 1(e)).  The Constitution also increased the "New Strength Unity Standard" by requiring every local union to "implement an annual local union organizing budget equivalent to 20% of the local's budget (after payment of all per capita tax obligations)."  (*Id*. at Art. XV § 16(a)).  This shows the SEIU's affiliated locals, including but not limited to the UHWE and NEHCEU, are constitutionally bound to commit their resources and finances to the execution of corporate campaign activities ordered by SEIU.  Similarly, the governing documents of Defendants UHWE and NEHCEU indicate they are to be construed in accordance with the SEIU's Constitution. (*See* Exhibits QQ, RR).

84.    The SEIU's Healthcare Division also adopted a "Strategic Unity Plan and Program to Win" at the 2008 convention.  The program sought to organize over 350,000 members in the healthcare industry over a four year period.  Dave Regan, the former president of SEIU 1199 (covering several mid-western states) said at the time: "We don't believe the way we get to 350,000 [new employees] is the way we've done it previously, which is NLRB elections. We have to look to employers in the health systems, long-term care industry and emerging

healthcare industries across this country."   Regan's implication was that the SEIU needed to pursue more forced unionization campaigns in the healthcare industry.   Thus, Defendants' attempts to bludgeon Plaintiffs into forced unionization in their non-union facilities are an expected outgrowth of the aggressive expansion strategy articulated by the SEIU International and its Healthcare Division in 2008.

85.     Defendants' self-enrichment objectives do not stop at forced unionization of non-union employers.  While achieving recognition typically leads to an increase in revenues for the prevailing union in the form of additional dues-paying members, unions such as Defendants have used the collective bargaining process that follows to maximize their economic spoils.  For example, Defendant NEHCEU has insisted for many years that unionized health care facilities agree to a "pattern" set of economic conditions which have resulted in payment of exorbitant sums to Defendant NEHCEU or its various funds.   The NEHCEU's preferred "pattern" bargaining demands include contribution of 1% of an employer's gross payroll to a training fund on a monthly basis.   Defendant NEHCEU also demands unrealistically high employer contributions to its pension fund.

86.     Additionally, Defendants have pressured health care employers to maintain unreasonably high staffing levels comprised of dues-paying union members.  For example, the unionized HealthBridge facilities in Connecticut maintain staffing levels that exceed by almost double the state's minimum staffing levels.

C.     **The Use of Corporate Campaigns to Achieve the SEIU's Organizing Mandates**

87.     The SEIU's primary method of exacting concessions from an employer is the so-called "corporate campaign," a comprehensive series of maneuvers designed to bring outside pressure to bear on the employer.  Often, such pressure has nothing whatsoever to do with the

35

actual labor dispute and is designed merely to impede the employer's business until it gives the union whatever it wants.

88.     Corporate campaigns are designed to destroy public confidence in the target employer, dissuade its customers and potential customers from doing business with it, and impede its normal business operations. Ray Rogers, who led one of the first successful corporate campaigns, has described the method as follows: "The ultimate goal of the corporate campaign was, if necessary, to polarize the entire corporate and Wall Street community away from [the target employer], thereby pulling that company's most crucial underpinnings out from underneath it." (Ray Rogers, How to Confront Corporations: The Man Who Devised the Corporate Campaign Against JP Stevens Offers Some Advice, Bus. & Soc'y Rev. 1981).

89.     As courts have noted, a union corporate campaign "encompasses a wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer ... [including] litigation, political appeals, requests that regulatory agencies investigate and pursue employer violations of state or federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public." *Food Lion, Inc. v. UFCW*, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997) (quoted by *Smithfield Foods, Inc. v. UFCW*, 633 F. Supp. 2d 214, 219 (E.D. Va. 2008)).

90.     Corporate campaigns are different in kind from traditional union organizing and contract-negotiating campaigns.  In a traditional union organizing campaign, the union seeks to convince employees that unionization is in their best interests.  The union recognition process governed by the NLRA and administered by the National Labor Relations Board ("NLRB") contemplates the union initially making informal contact with a group of non-union employees. Once at least 30% of the workers in a potential bargaining unit are convinced, they can require a secret-ballot election, which the union must win in order to be certified as the bargaining agent

for the employee group.  Similarly, in conventional contract negotiations, the union seeks to obtain better wages, benefits and working conditions for its constituents through good-faith bargaining, and, if necessary, through lawful strikes and pickets.  The union may also publicize its position in an effort to arouse community support for its position.

91.    In a corporate campaign, on the other hand, unions seek to avoid the NLRB-regulated election process.  Instead, they bring outside pressure to bear on the employer in order to force the unionization of the employer's employees without regard to the overall wishes of the employee bargaining group, often by forcing the employer to: (1) forego its right to a secret-ballot election in favor of a "card-check" system in which the union need only obtain the signature of more than 50% of the workers at issue in order for the union to be recognized; (2) forego its right to speak to its employees about the disadvantages to unionization during an organizing effort; (3) provide the union with open access to its property and facilities, and give out confidential information about its employees; and (4) recognize the union outright as the bargaining agent for a particular group of employees.

92.    Similarly, in a corporate campaign relating to union collective bargaining demands, the union brings outside pressure unrelated to the workers' legitimate bargaining position in an effort to economically cripple the employer until it accedes to the union's demands.  Corporate campaigns often smear the target employer and its owners and managers on matters wholly unrelated to wages and working conditions.  The goal is not to convince the public that the union's demands on behalf of the bargaining group are reasonable and/or to obtain better wages or benefits for the employees.  Rather, the goal is to harm the employer's business and/or personally embarrass its managers and owners to force submission to the union's demands for concessions that benefit the union directly, such as monetary contributions to

37

training and pension funds into which the unions do not contribute, but rather rely on an employer (or group of employers) to fund by itself.

93.     Unions employ corporate campaign tactics because of the substantial economic benefits that result from battering employers into acquiescence.  Union recognition automatically gives the union a substantial say over the employer's operations, and it results in an influx of new cash in the form of union dues, pension contributions, training fund contributions, and, in some cases, direct payments from the employer to the union.  The employer and union must engage in bargaining over *all* terms and conditions of the represented workers' employment, including the most minor details of the workers' jobs.  Most importantly, the union gains access to a new revenue stream that is largely under its control, as all wage rates for unionized employees must be approved by the union.

94.     Similarly, collective bargaining negotiations give the union an opportunity to couch demands for direct payments and other economically beneficial concessions, such as the funding of unfunded liabilities, within the context of "good-faith" bargaining over employee wages and benefits.  And, because unions are not entitled to dues during any gap periods between collective bargaining agreements, unions have a strong incentive to bring contract negotiations to a quick close, which makes the use of pressure-driven corporate campaign tactics all the more attractive.

95.     The corporate campaign philosophy was aptly summarized in or around August 2007 by a representative of Change to Win -- an umbrella organization of which the SEIU is a founding member – who stated: "It's no longer sufficient to use a strike or other work disturbance to pressure a company to do the right thing. Increasingly, it's necessary to pressure a company by causing a crisis of confidence among its customers, shareholders, directors or other

constituents." (http://mydd.com/2007/8/10/yearlykos-catching-up-with-change-to-win).  A copy of the webpage is attached as Exhibit D.

96.     At bottom, corporate campaigns relieve unions of the burden of persuading employees and community members that their demands are reasonable.  Instead, they need only convince the target employer that the union's campaign of smear, deception, interference, vandalism, and threats will harm the employer's business and the managers' and owners' personal lives.  Through a corporate campaign, union organizing and contract negotiations go from being fair processes with uncertain outcomes to being old-fashioned, mafia-style shakedowns in which the employer has no choice but to surrender its money to the unions in return for a temporary end to the union's illicit attacks.

**D.     The SEIU and its Affiliated Locals Follow the Manual to Extort Money and Other Concessions from Employers**

97.     The SEIU and its affiliated local unions follow the SEIU's widely publicized Manual in developing and executing corporate campaigns. The Manual candidly admits that effective corporate campaigns often require breaking the law. (See Exhibit A, Manual at 3-47).

98.     In the section called "Pressuring the Employer," the Manual details how unions can bring outside pressure to bear on employers through the use of smear and intimidation tactics. According to the Manual, one goal of outside pressure is to "jeopardize[e] relationships between the employer and lenders, investors, stockholders, customers, clients, patients, tenants, politicians, or others on whom the employer depends for funds."  The Manual advises that: "You have to put pressure in many ways so that the total cost of your campaign to the employer begins to outweigh the benefits of rejecting your proposals." (*See* Exhibit A, Manual at 3-2 to 3-3).

99.     In a section called "Evaluating Possible Tactics," the Manual lists the first goal of any pressure campaign as "**Costing the employer money**."  In that vein, the Manual advises campaigners to consider whether a potential tactic will:

- Reduce productivity?

- Increase costs?

- Affect a private company's relationship with sources of income, such as customers, clients, investors, or lenders?

  . . . .

- Create bad publicity, which would, in turn, affect the relationships described above?

- Cause the courts or regulatory agencies to enforce laws or regulations the employer has failed to obey?

- Directly affect the careers or other interests of individual management officials. (See Exhibit A, Manual at 3-6).

100.   That same section lists another goal as "**Making daily life difficult for management**."  On that front, the Manual advises campaigners to consider whether a proposed tactic will:

- Distract management officials from other work they need to do?

- Embarrass them in front of their superiors, associates, families, neighbors, or friends in the community?  (*Id.*)

101.   According to the Manual, bringing outside pressure to bear on the employer is often the key to a successful corporate campaign.  Thus, the Manual notes that employers depend on customers and other stakeholders to provide funds to operate the business.  "The most effective outside pressure tactics are often those which could put that flow of funds in jeopardy."  The Manual further notes that owners and managers value their "reputations" and "privacy."  By implication, tactics that harm their reputation and invade their privacy are recommended.  (*Id.* at 3-18).

102.   With regard to attacking customer relationships, the Manual admits that customers are unlikely to care about the union's demands.  "Therefore, it is often necessary to show how *they* [the customers] are affected by employer practices – how prices or taxes are

40

higher, products or services are of lower quality, or public health or safety are threatened." (*Id.* at 3-19). Notably, these attacks need not have anything to do with the union's demands. As noted above, the goal is simply to "put [the employer's] flow of funds in jeopardy."

103. The Manual also advises employees to seek out violations of the employer's legal obligations. The purpose in doing so is not to seek legitimate redress of legal violations, but rather to ratchet up the expense and negative publicity associated with the campaign. The Manual candidly admits that the violations of law may be "completely unrelated to bargaining issues." That is not a problem because the employer will still face:

- Extra expense to meet regulatory requirements or qualify for necessary permits or licenses.

- Costly delays in operations while those requirements are met.

- Fines or other penalties for violating legal obligations.

- Damage to the employer's public image, which could jeopardize political or community support, which in turn could mean less business or public funding. (*Id.* at 3-21).

104. The Manual advises employees to bring political pressure to bear on the employer. In particular, the Manual suggests that employees tell management that, if their demands are not met, they will push for legislative action in unrelated areas that will adversely affect the target employer, such as "changes in the way employers are taxed, awarded public funds, or required to provide services." (*Id.* at 3-25).

105. The Manual further advises exerting outside pressure on individual owners and managers. The Manual specifically suggests that employees seek and publicize "dirt" on owners and managers, focusing on such things as: (1) involvement in lawsuits, including divorce actions, (2) ties to other businesses involved in controversies, (3) past controversial activities, and (4) links with politicians. The Manual admits that threatening to release such information if an owner or manager does not accede to the union's demands "**may be a violation of blackmail**

41

**and extortion laws**."   Nonetheless, the Manual encourages union members to "uncover and publicize" such information about individual owners and managers because "there is no law against union members who are angry" engaging in such activities.   (*Id.* at 3-27; emphasis added).   In other words, the Manual encourages unions to violate extortion laws and then pretend that the idea to dig up and disclose "dirt" originated with individual union members.

106.   The Manual also advises employees to use the media in their campaigns. According to the Manual, a primary goal in using the media is to "[g]ive customers, clients, investors and others in the community reasons to cut off economic ties with the employer."   In keeping with the Manual's general theme, the media attention need not be related to the union's position or alleged grievances.   Rather, it can simply be designed to "make businesses or individuals feel that they don't want to be involved with the employer while it is getting such bad publicity," whatever the cause of such publicity.   This tactic is also designed to enhance the effect of any potential "dirt" that employees may gather, as the Manual states that "[owners or managers who] see that you have the ability to use the media successfully . . . may worry that you will be able to publicize unfavorable information about their activities." (*Id.* at 3-56).

107.   Complying with the law is decidedly not the goal of a corporate campaign.   To the contrary, the Manual notes that pressure tactics may violate laws against "libel, slander, and extortion."   Nonetheless, the Manual encourages employees to consider breaking these laws by likening their activities to civil disobedience "in the tradition of Dr. Martin Luther King and Mahatma Gandhi."   The Manual discourages employees from taking the advice of legal counsel by noting that a lawyer's job "is not to make decisions about when and how to obey the laws." Rather, employees should "weigh the risks and benefits of potential action," which includes weighing the risk of illegal action against the benefits associated with "doing what it takes to win a fair contract."   (*Id.* at 3-47).   The Manual further notes that employers may not follow-up on

employees' violations of the law because, among other things, legal action will require the employer to engage in discovery, and some illegal acts may raise public sympathy for the union. Finally, the Manual urges employees to consider the potential penalty for violating the law, overtly suggesting that illegal activity may be worth it if the penalty is low or a judgment against the employee would be difficult to collect. (*Id.* at 3-48).

108.    The central message of the Manual is clear: the SEIU encourages employees and local unions to abandon traditional organizing and bargaining in favor of multi-faceted extortion schemes designed to bring pressure entirely unrelated to any legitimate labor-related concerns in order to beat employers into submission. No subject is off-limits; in fact, the invasion of owners' and managers' privacy is actively lauded. Legality is, at best, a minor concern that can easily be overridden in favor of "doing what it takes to win."

### E.    The Unions' Control Over Member Activities

109.    In carrying out the SEIU's forced unionization and contract campaign mandates, the Defendants exercise almost total control over the actions of their members. The NEHCEU bylaws state that its President "shall direct, coordinate, guide and supervise all of the affairs of the District and the activities of its Officers, Organizers and personnel." (*See* Exhibit QQ, Art. VII §2 (a)). The President is in charge of collective bargaining and required to sign all collective bargaining agreements on behalf of the Union. (*Id.* at §2 (h)(k)). He also has the power to appoint and terminate Union representatives and organizers. (*Id.* at §2 (l)). NEHCEU's Secretary-Treasurer is responsible for managing NEHCEU's funds and for administering all of its health, welfare and pension programs. (*Id.* at §3).

110.    NEHCEU is controlled by an Executive Board which has the power:

(a)    to approve and authorize the disbursement of funds as necessary to "promote the aims and objectives of the [Union];"

(b)      to "invest or reinvest the funds of the [Union] in such property, real or personal, tangible or intangible, as it shall consider prudent;"

(c)      to "formulate plans, programs and policies for the [Union];"

(d)      to "call strikes, subject to the approval of the members directly involved."

(*Id.* at § 10).

111.    The UHWE exercises similar control over its affairs and the actions of its members.  Its Constitution notes the President is the "Chief Executive of the Union" and is empowered to "direct, coordinate, guide and supervise all of the affairs of the Union and the activities of its Officers, Organizers and personnel."  (*See* Exhibit RR at Art. VII §2 (a)).   His authority includes signing all "official documents," making disbursements on behalf of the Union, directing collective bargaining, and appointing and assigning organizers.  (*Id.* at § 2). The Secretary-Treasurer is responsible for collecting, managing and disbursing all of the UHWE's funds.  (*Id.* at § 3).  UHWE also has an Executive Council which has the power:

(a)      to formulate all plans, programs and policies for the Union;

(b)      to "invest or reinvest the funds of the Union in such property, real or personal, tangible or intangible, as it shall consider prudent;"

(c)      to "approve and authorize the disbursements of such funds as in its discretion may be required to promote the aims and objects of the Union;"

(d)      to "appoint and assign organizers;"

(e)      to "call strikes, subject to the approval of the members directly involved."

(*Id.* at § 9).

112.    Thus, and in keeping with the SEIU's and its Healthcare Division's decree that member unions are constitutionally bound to increase their numbers – and, necessarily, their revenues – through aggressive corporate campaigns, the Defendants carry out that mandate with almost total control.  In other words, the activities and events described herein are not a series of disconnected coincidences over which the Defendants had no operational control.  None of the

events described in this Amended Complaint would ever have taken place had the SEIU not made it a constitutional mandate that its local unions use aggressive corporate campaign attacks to achieve their goals, and had the Defendants not explicitly authorized and executed such events.  Moreover, the SEIU is responsible for all organizing activities of all of its locals, as the express language of its own constitution makes clear.

113.



## II.     The Unions' Corporate Campaign Directed against Plaintiffs

### A.     The Formation of the Conspiracy

114.    The Defendants' actions described herein are the result of an illicit conspiracy to batter Plaintiffs into providing them with exorbitant forced unionization and contract concessions designed to benefit the Defendants economically, or alternatively, to drive Plaintiffs out of business. The Defendants' motives and the manner in which they planned and executed their corporate campaign against Plaintiffs are described below.

115.

116. ███████████████████████████████████████████

███████████████   ███████████████████████████████

█████████████████████████████████

117.    The Defendants' campaign has two interrelated objectives, both rooted in Defendants' self-interest.  **First**, Defendants seek to compel Plaintiffs to agree to NEHCEU's "pattern" agreement or be run out of business in Connecticut.  Defendants seek to compel Plaintiffs to make millions of dollars in contributions to the grossly underfunded pension liabilities of the pension plans they sponsor that would be required under the "pattern" agreement, to make recurring contributions to the UHWE Training Fund and NEHCEU Training Fund; and to maintain the bloated and unnecessary employee staffing levels that pad Defendants' member rolls and bank account.  **Second**, in the Plaintiffs' facilities where there are no established collective bargaining relationships – including the Care One and HealthBridge Facilities in New Jersey; three non-union HealthBridge Facilities in Connecticut; and fifteen HealthBridge Facilities in Massachusetts – Defendants want to compel Plaintiffs to unionize their non-union employees on terms they dictate, or else be brought to their knees and destroyed. Defendants want more unionized facilities which translate into more revenue from dues-paying members and more money to pay down the underfunded pension liabilities of the pension plans sponsored by Defendants.  Since Plaintiffs have, to date, not capitulated to Defendants' demands, Defendants are making good on their threats to drive Plaintiffs out of the State of Connecticut and completely destroy Plaintiffs' businesses wherever found.

118.    NEHCEU has collective bargaining relationships with six HealthBridge-managed facilities in Connecticut.  In the course of seventeen months of ultimately unsuccessful negotiations for successor collective bargaining agreements, NEHCEU steadfastly insisted that HealthBridge agree to NEHCEU's "pattern" collective bargaining agreement under which,

among other things, HealthBridge would need to keep in place the existing arrangement for the HealthBridge Facilities to increase their contribution to NEHCEU's underfunded pension plan and continue making contributions to the NEHCEU Training Fun among other payments.

119.    UHWE, on the other hand, does not have any collective bargaining relationships with Plaintiffs, but seeks them for the same reasons as NEHCEU – to increase its dues-paying membership and obtain additional contributions into its own underfunded pension plan and other funds.  Dissatisfied with the progress it has made to organize Plaintiffs' non-union facilities using the traditional NLRA-sanctioned legal framework for organizing employees into unions, Defendant UHWE decided to abandon that process in favor of forced unionization tactics.

120.    Sensing an opportunity to synergize their efforts, Defendants devised a scheme to extort these various concessions out of Plaintiffs.  In order to maximize the pressure they could apply, Defendants conspired to utilize their collective resources to unleash a wide-ranging and illegal corporate campaign.  Consistent with the teachings of SEIU's Manual, Defendants agreed to use their combined political, social and financial strength to bring debilitating economic and other pressures on Plaintiffs by attacking them in the public arena; unlawfully interfering with Plaintiffs' existing and prospective business relationships; orchestrating baseless legal and regulatory actions against Plaintiffs; recruiting third-parties such as consulting firms and college students to take part in campaign planning or other events; and engaging in illegal and dangerous sabotage of Plaintiffs' facilities and patients.

121.    As further described below, Defendants also devised a scheme to defraud the general public and Plaintiffs' patients and other business partners into believing Plaintiffs' facilities were unsafe and that they overbill the government, among other things.  These smears were designed to direct business away from Plaintiffs in an effort to increase the effectiveness of the Defendants' parallel extortionate attacks.

122.     To help carry out their illicit plans, Defendants recruited the assistance of several Non-Party Participants.    Upon information and belief, Defendants retained Checkmate Consulting to prepare or assist in the preparation, design, development and/or implementation of numerous campaign communications, described more fully below, in furtherance of Defendants' campaign.  Defendant NEHCEU compensated Checkmate Consulting for its role in Defendants' attacks against Plaintiffs.    Defendant NEHCEU's LM-2s for 2011 and 2012 reveal that NEHCEU made over $200,000 in payments to Checkmate during the time period relevant to this action.

123.     Defendants also recruited the assistance of Gorilla Trucking to help transmit the Unions' numerous false and misleading statements about Plaintiffs throughout New York, New Jersey, Connecticut, and Massachusetts on traveling billboards, described more fully below. Defendant NEHCEU compensated Gorilla Trucking for its role in Defendants' attacks against Plaintiffs.

124.  ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

125.     Defendants secured additional assistance from student groups such as Student Labor Action Movement, Law Students for Economic Justice and NYU for Occupy Wall Street to assist in their personal attacks against Mr. Straus.

126.     To maximize the pressure of their campaign, Defendants repeatedly have staged "newsworthy" events and then promoted those events through media releases, blog posts and the

like.  In addition, in or around 2010, Defendants, together with other third parties, launched internet sites entitled "Care One Watch" (http://www.careonewatch.org) and "HealthBridge Watch" (http://healthbridgewatch.org) (hereinafter "COW") through which they have disseminated false and misleading information about Care One, HealthBridge and Mr. Straus. Although COW purports to be a "coalition of concerned citizens and nursing home caregivers dedicated to quality care and healthy communities," in reality these websites are nothing more than a vehicle through which Defendants have communicated the majority of their smears and attacks.

127.    Defendants have also directly communicated the objectives of their illicit campaign to Plaintiffs on multiple occasions.   For example, during a meeting with representatives of Plaintiffs on August 4, 2011 at the Hilton Garden in Milford, Connecticut, NEHCEU's President, David Pickus, stated that HealthBridge would need to agree to NEHCEU's "pattern" collective bargaining agreement and increase payments into the underfunded pension plan sponsored by NEHCEU; otherwise it would force HealthBridge to leave the State of Connecticut.  The relentless illegal corporate campaign was in full force.

128.    Since HealthBridge did not agree, Defendants have made good on their threat to drive HealthBridge out of Connecticut.   Among other things, Defendants are:  seeking to compel the sale of HealthBridge's Connecticut facilities; filing legal process and prompting regulatory and compliance actions in Connecticut for improper purposes, and exerting political pressure from elected officials beholden to Defendants as a consequence of outsize campaign contributions.

129.    In addition, in or around the Fall of 2011 and following a meeting of the UHWE "brain trust," UHWE Vice President Ricky Elliot candidly admitted to a now-former high-ranking UHWE organizer that UHWE had decided to deemphasize the traditional NLRA-

sanctioned election process in favor of coordinated corporate campaign designed to bring Plaintiffs "to their knees" so that the Plaintiffs would have no choice but to recognize the UHWE as the exclusive collective bargaining representatives at all of the facilities managed by Plaintiff Care One, or else have their businesses destroyed.

130.    Defendant UHWE's plan was confirmed by Elisabeth L. Daley, another senior UHWE official, in a telephone call with a representative of Plaintiffs in September 2012.  During this call, Daley told Plaintiffs that UHWE would consider withdrawing its baseless hearing requests on applications for improvements to HealthBridge Facilities in Massachusetts (described below) if HealthBridge would agree to NEHCEU's contract demands and agree to remain "neutral" in response to efforts by the Defendants to organize non-unionized facilities managed by Plaintiffs.

131.    Ultimately, Defendants want Plaintiffs to cede to them the many valuable property rights that come along with forced unionization and contract concessions.  These include (i) the millions of dollars of Plaintiffs' money, in the form of contributions to the Defendants' underfunded pension plans, and training and other funds; (ii) unnecessary services resulting from Defendants' demand for unnecessarily high member staffing levels; (iii) dues money collected from new union members organized as a result of Defendants' forced unionization scheme; (iv) Plaintiffs' recognition of both Defendants as the exclusive collective bargaining agent of current non-union employees at current and at future facilities managed by Plaintiffs; (v) physical access to Plaintiffs' properties to facilitate Defendants' forced unionization objectives; (vi) Plaintiffs' communication rights regarding whether their employees should unionize or not; and (vii) ultimately, control over Plaintiffs business operations as the result of forced union recognition, because recognition of a union as the exclusive bargaining

50

representative of Plaintiffs' employees gives the union the immediate right to have a significant say in the operation of the employer's business affairs.

132.     Defendants' endless barrage of corporate campaign attacks, described in detail below, is intentionally designed to have a cumulative effect on the Plaintiffs, their patients, employees, managers, business partners, and the public.  Specifically, Defendants desire that their countless sensational allegations regarding Plaintiffs' business and human relations practices, if repeated often enough and in enough places, will cause Plaintiffs' constituents to terminate, or decline to enter, business relationships with Plaintiffs.  In this way, each and every staged event, internet posting, handbill, and public protest described herein was specifically calculated by Defendants and their agents to: (1) create additional pressure on Plaintiffs; (2) remind Plaintiffs that Defendants – through their various and diverse attacks – were making good on the explicit threats described above.

### B.     Defendants' Pattern of Racketeering Activity

133.     Defendants' acts and threats in furtherance of their corporate campaign, described in detail below, represent a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).  Beginning in or around 2010 and continuing up to and including the present, as stated more fully herein, the Defendants conspired to and did manage or operate the affairs of the SEIU, the 1199 Enterprise, the UHWE Pension Enterprise, the NEHCEU Pension Enterprise, the UHWE Pension Plan, and the NEHCEU Pension Plan, through a pattern of racketeering activity. As stated more fully herein, the Defendants conspired to receive income from a pattern of racketeering activity and to use or invest that income in the operation of the SEIU, the 1199 Enterprise, the UHWE Pension Enterprise, the NEHCEU Pension Enterprise, the UHWE Pension Plan, and the NEHCEU Pension Plan.  Finally, as stated more fully herein, the

Defendants conspired to acquire or maintain an interest in, or control of, the Plaintiff Enterprises through a pattern of racketeering activity.

134.    The Defendants' racketeering activity includes:

(a)    acts or threats involving extortion that are chargeable under Connecticut law (Conn. Gen Stat. Ann §§53a-48, 119(5), 122(a)) and punishable by imprisonment for more than one year;

(b)    acts or threats involving extortion that are chargeable under Massachusetts law (Mass. Gen. Laws ch. 265 § 25) and punishable by imprisonment for more than one year;

(c)    acts or threats involving extortion that are chargeable under New Jersey law (N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1) and punishable by imprisonment for more than one year;

(d)    acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343;

(e)    violations of the Travel Act, 18 U.S.C. § 1952.

135.    Each predicate act of extortion, mail and wire fraud, and violation of the Travel Act, is described in detail in Sections III.D and III.E below.  The Defendants' racketeering acts together have the following features:

**1.    Relatedness**

136.    The Defendants' acts of racketeering are not isolated events.  Rather, all are related to each other in that they have similar purposes, results, participants, victims, methods of commission, and other distinguishing characteristics.  Relatedness is also established by the fact that all of the acts were done for the benefit and in furtherance of the SEIU's organizing and growth agenda.

137.    The Defendants' acts of racketeering were all directed at the same overarching goal: maximum market share and control over the healthcare industry, either by causing Plaintiffs and other employers to succumb to Defendants' extortionate demands, or by driving then out of business.  Market density was and is the paramount goal not only of the UHWE and

52

NEHCEU in their respective jurisdictional regions, but also of the SEIU throughout the United States and beyond. (*See* Exhibit SS, Preamble, identifying the SEIU's goal to secure "control over our industries and labor markets").

138.   As described in Section I.B above, acting through the SEIU, the UHWE, NEHCEU, and other locals established and approved a "New Strength Unity" Plan, through which the Defendants and other local unions in the healthcare industry would pool collective resources for use in corporate campaigns directed at employers.  New Strength Unity included a healthcare industry division plan and involved a specified budget.  (*See* Exhibit SS, Article XV §16 (a)).   All of the specific acts described herein were thus related in that they furthered the goals of and benefitted the SEIU.

139.   The Defendants targeted Plaintiffs as part of this broader goal of industry dominance.  They sought to obtain Plaintiffs' money and property via forced unionization of Plaintiffs' facilities and through labor contract concessions at those facilities already unionized. Defendants have a legal right to none of the property they demanded and used wrongful and unlawful means in pursuit of their goals.  Defendants also sought to punish Plaintiffs financially through a mail and wire fraud scheme, the intent of which was to divert business from Plaintiffs' facilities and to damage Plaintiffs economically until Plaintiffs acceded to Defendants' unlawful demands to join the ranks of such facilities.  The Plaintiffs are the intended and actual victims of each separate act of racketeering described herein.

140.   The Defendants participated in, authorized, and/or ratified all racketeering activity alleged.  Defendants and their cohorts, including others in the SEIU, created strategic organizing and contract campaign plans to serve as blueprints for achieving their goals through the various tactics actually carried out and published information about the tactics on the various websites described below.  Defendants retain paid employee "organizers" specifically for the purpose of

planning and overseeing the tactics described herein.  These persons and all other individuals who personally committed the acts of racketeering acted at all times as agents of the Defendants.

141.    The Defendants expressly take credit for much of the racketeering activity.  With respect to other acts, the evidence (described below) overwhelmingly demonstrates Defendants' involvement and coordination.  The Defendants, and all of the officers of these entities, approved of the racketeering acts, participated actively or by knowing tolerance in the acts, and/or intentionally drew upon those acts for their continued and snowballing force.  Alternatively, and at a minimum, the Defendants and all of their officers were actually made aware of the racketeering acts and, despite having the appropriate power and authority to prevent them (*see* Section I.E, above)), failed to act on that knowledge to prevent or to curb further acts of the same criminal nature.

142.    The same methods were used in commission of the acts of racketeering.  (See Section I above; Section II.E, below).

### 2.    Continuity

143.    The Defendants' related racketeering acts have extended over a substantial period of time, beginning in at least 2010 as described in Section I above and Section II.E and II.F, below.

144.    The related predicate acts also involve a continued threat of long-term racketeering activity.  There is no foreseeable ending point to Defendants' acts of racketeering against Plaintiffs or any other victim in the healthcare industry.  Rather, the clear threat is of a never-ending cycle of forced unionization of Plaintiffs' existing facilities and any purchased/operated in the future, followed by extraction from each of increasingly onerous contract concessions indefinitely into the future, or driving Plaintiffs out of business.  The Defendants' objective of "securing control over our industries and labor markets" by itself

proves that the threat is "long term" because at present Defendants and the SEIU Enterprise fall far short of their ambition.

145.    In addition to the many racketeering acts Defendants have already committed in furtherance of their attempts to bludgeon the Plaintiffs into forced unionization and onerous contract concessions, Defendants' scheme contemplates the commission of countless <u>future</u> racketeering acts.  For example, participation in Defendant NEHCEU's Training Fund requires a monthly contribution to the Fund of one percent of the gross payroll of bargaining unit employees.  Much like the store owner who is forced to pay "protection money" to organized crime on a regular basis, each monthly contribution by Plaintiffs to the Fund represents a separate transfer of property from Plaintiffs to Defendant NEHCEU, and therefore a separately indictable act of extortion under applicable state law.

146.    In addition, as described in detail in Section II.F below, the predicate acts and offenses described herein are the Defendants' regular way of doing business and thereby threaten long-term criminal conduct against other employers in the healthcare industry.

### C.    The Unions' Scheme to Defraud

147.    As part of their overall pattern of racketeering activity, Defendants committed multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.  As set forth below, Defendants: (a) used the mails and wire communications services; (b) in the foreseeable furtherance; (c) of a scheme or artifice to defraud; (d) involving material deceptions; (e) with the intent to deprive Plaintiffs of property.

148.    As described above, Defendants' scheme has been to deceive third parties into believing that the Plaintiffs are bad companies that mistreat residents and cause other harm to their communities for the purpose of inducing those persons to discontinue or refrain from doing business with Plaintiffs.  This would serve to advance Defendants' overarching goal of

maximizing market share in the healthcare industry in one of two ways.  Ideally to Defendants, the loss of business would compel Plaintiffs to capitulate to their demands for forced unionization and contract concessions.  Alternatively, however, the acts of fraud would increase market share by diverting Plaintiffs' existing and future customers to Defendants' preferred unionized facilities—to the point of driving Plaintiffs out of business entirely so that Plaintiffs would no longer exist as a competitor and the same services could instead be provided by a favored unionized partner of the Defendants.

149.    Defendants, and their officers and agents, used the wires and mails to effectuate this scheme by transmitting material misrepresentations and/or omissions about Plaintiffs to third parties related to the overarching themes of their extortionate corporate campaign.  These misrepresentations include, but are not limited to, claims that Plaintiffs' facilities are not safe; that Plaintiffs mistreat their patients; and that Plaintiffs' overbill their patients.  Defendants have disseminated such misrepresentations in furtherance of their scheme to defraud on dozens of separate occasions.  The time, place, and nature of these misrepresentations are described more fully in Section II.E below (including, *inter alia*, in Paragraphs 197, 198, 200, 201, 202, 208, 209, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 226, 227, 248, 251, and in Plaintiffs' discovery responses to date, including but not limited to Plaintiffs' First Supplemental Response to Defendants' Interrogatory No. 7 (copy annexed hereto as Exhibit AAA) and the documents referenced therein; and many of Defendants' misrepresentations are reprinted in their entirety as exhibits to this Complaint (*see*, *e.g.*, Exhibits F, L, M, N, O, P, U, AA, BB, CC, DD, TT, UU, VV, WW, XX, YY, ZZ).

150.    Defendants' false representations were material in that they were capable of influencing the decisions of those to whom the statements were directed in ways having a direct financial impact on Plaintiffs.  Deprivation of Plaintiffs' property was not only foreseeable, but

was the specifically intended result of Defendants' scheme of deception.  Defendants intended for those persons deceived to act in reliance on their material misrepresentations by discontinuing and/or refusing to enter contractual relationships with Plaintiffs or by convincing their friends, families, and loved ones to act in the same manner.

151.   In fact, many deceived third parties have relied on Defendants' material misrepresentations to Plaintiffs' detriment, precisely as Defendants intended.   Based on Defendants' factual misrepresentations about the Plaintiffs and their businesses, residents have moved out of Plaintiffs' facilities, prospective residents have selected other living arrangements, and referral sources have stopped referring patients and residents to Plaintiffs' facilities. Plaintiffs were thereby deprived of money and other property via lost contracts and business opportunities with persons deceived into believing Defendants' lies—the direct and intended result of Defendants' scheme of deception.

152.   These acts do not merely satisfy the elements of a claim for defamation (or any other hypothetical state law claim).  They also satisfy the additional legal elements of a claim for mail and wire fraud.   Defendants acted: (1) with the specific intent to deceive, and (2) for the purpose of depriving Plaintiffs of property, both of which are elements of mail and wire fraud and not elements of defamation.   Defendants' fraudulent scheme did not involve mere reputational injury, but it also injured Plaintiffs in their other legal rights and interests, such as Plaintiffs' contract rights and business expectancies.  Defendants specifically intended to cause Plaintiffs to suffer such a deprivation of their property.

153.   Defendants are legally responsible for all of the acts of mail and wire fraud alleged below, each of which was performed by persons acting as agents on behalf of the Defendants.  Defendants funded the acts of mail and wire fraud.  In fact, Defendants expressly take credit for many of the acts of mail and wire fraud—their names litter the many corporate

campaign handbills, flyers, legal complaints and other publications made in furtherance of their deceptive scheme.

### D. The Property Rights Defendants Seek to Obtain

154. Through their vicious corporate campaign attacks, Defendants have obtained, or attempted to obtain, the following property from Plaintiffs:

- Wages and benefits to be paid pursuant to labor contracts;

- Millions of dollars in contributions to the underfunded UHWE Pension Plan and NEHCEU Pension Plan;

- Payment of 100% of employees' health insurance costs;

- Substantial monetary contributions to the NEHCEU Training Fund and UHWE Training Fund;

- Wages and benefits for unwanted, unnecessary, and superfluous labor in the form of bloated and unnecessary staffing levels at Plaintiffs' unionized facilities;

- Inflated wages for needed labor at rates higher than market value;

- Dues moneys, agency fees, and per capita taxes for the Defendants and their associates, including the SEIU International;

- Access to Plaintiffs' private property;

- Control over Plaintiffs' business assets in the form of participation in the corporate governance process;

- Confidential business information; and

- Plaintiffs' communication rights.

### 1. The Transferable Nature of the Property Defendants Seek

155. Defendants did not engage in their vicious corporate campaign attacks merely to harm the Plaintiffs for no reason.  Instead, Defendants at all times acted with pecuniary motive. They used the extortionate and other illegal tactics described herein in an attempt to obtain the above-described property for themselves and their associates.  Each of these property rights

constitutes something of value that can be exercised, transferred, or sold.  With respect to the demanded interests in property that are intangible, Defendants intended to obtain those rights in order to exercise them in a way that would profit Defendants and their associates financially.

156.    All of the property demanded by Defendants is transferable from Plaintiffs to Defendants under well-settled principles of property, commercial, and contract law.   The property demanded is either: (1) money or another, similar tangible item, or (2) a right or legal interest in property that is intangible, but of a type: commonly bought and sold in exchange for money; licensed or assigned; or otherwise capable of passing from one person to another.   Here, Defendants demanded a direct transfer of all of the listed tangible and intangible property from Plaintiffs to Defendants and their associates in the manner described below and in Plaintiffs' discovery responses to date, including but not limited to Plaintiffs' First Supplemental Response to Defendants' Interrogatory No. 13 (copy annexed hereto as Exhibit BBB) and the documents referenced therein.

### 2.    Money and Other Tangibles

157.    Defendant NEHCEU's collective bargaining demands require the transfer of substantial sums of money from Plaintiffs directly to Defendant NEHCEU and its associates. This money is in the form of Union dues paid directly from Plaintiffs to Defendants, increased wages for represented members, contributions to Defendant NEHCEU's severely underperforming pension funds, payment of health plan fees and coverage costs, and contributions to the NEHCEU Training Fund, all of which infuse the Defendant NEHCEU and its various funds with more cash.

158.    Defendant NEHCEU's collective bargaining strategy also includes demands that Plaintiffs maintain staffing levels at their unionized facilities in Connecticut that are far in excess of the nurse-patient ratios needed to maintain patient and worker safety.  As described above, the

59

staffing ratios to which Defendant NEHCEU has demanded Plaintiffs agree far outpace those required by Connecticut state law.  In this way, Defendant NEHCEU has made demands that impose unwanted, unnecessary and superfluous labor on Plaintiffs.

159.    A transfer from Plaintiffs to Defendants and their associates of substantial sums of money would also flow directly from recognition of UHWE as the exclusive bargaining agent for the employees in Plaintiffs' non-unionized facilities.  The moneys transferred would be similar to those transferred from Plaintiffs to Defendant NEHCEU in organized facilities: union dues to the UHWE; agency fees and per capita taxes to the SEIU; well as additional wages and benefits for unwanted, unneeded, and superfluous labor; additional pension fund contributions; additional fees for health plans, and contributions to the UHWE Training Fund.

160.    The transfer of these moneys from Plaintiffs to Defendants, their pension funds, and their agents, is not hypothetical.  It is instead the specific object of Defendants' corporate campaign attacks and would result directly and proximately from Plaintiffs' capitulation to Defendants' contract and forced unionization demands.

### 3.    Access to Private Property

161.    Plaintiffs have a well-established right to exclusive occupancy of their private property, a corresponding right to exclude others from their property, and the right to demand consideration in exchange for access to their property.  The right of access is an interest that can be transferred via leasehold agreements, easements, and other similar rights of way.  Defendants' various demands for property access – either to handle union affairs in unionized facilities or to accost Plaintiffs' non-union employees into joining the Unions – are akin to demands that Plaintiffs transfer to Defendants a portion of Plaintiffs' occupancy rights.  This transfer is similar to the transfer involved in a rental agreement, except in this case Defendants have demanded

physical access to Plaintiffs' property on their own, dictated terms and without payment of any "lease" or "rental" moneys to Plaintiffs.

### 4.    Control Over Use of Business Assets

162.    Plaintiffs also have a long-recognized property right to exclusive control over the use of their business assets.  Control over a business and a voice in the affairs of that business are transferable rights commonly bought and sold, such as the right to vote on matters of corporate governance and to share in business profits and losses.  These rights are bought and sold in the form of Company stock, buy-in as a business partner, and the like.

163.    Defendants demanded a transfer of Plaintiffs' control over the use of their business assets similar to the transfer of control involved in the sale of an ownership interest in an existing business to a new business partner.  Specifically, Defendants demanded the right to participate in significant business planning on issues having a direct impact on Plaintiffs' profits and losses. Defendants' objective, of course, was to secure a portion of Plaintiffs' profits for themselves, except without having to invest anything of their own in order to gain entitlement to those profits.   In essence, Defendants attempted to obtain these rights for free through their various demands and corporate campaign attacks.

164.    The connection between Plaintiffs' ability exclusively to control the operation of its business affairs, and Plaintiffs' concrete profits and losses—as well as the allocation of profits between Plaintiffs on the one hand and Defendants and their associates on the other—is not attenuated or hypothetical.  Causation is direct. Defendants had a specific pecuniary motive in demanding the transfer of control that necessarily results from unionization and collective bargaining concessions, which syphon substantial sums of money from Plaintiffs to Defendants.

### 5.       Confidential Business Information

165.    Confidential business information is a property right having objective and monetary value.  It is commonly bought, sold, or otherwise transferred.  Proprietary information demanded by Defendants, such as lists of, and contact information for, Plaintiffs' non-union employees, is a property right that is capable of being sold, similar to the sale of lists of customers and contact information for solicitation purposes.  Here, Defendants demanded that Plaintiffs transfer to Defendants and their associates, for free, confidential business information in the form of names and contact information for Plaintiffs' non-unionized employees. Defendants did so with the specific intent to use this property for financial gain.

### 6.       Communication Rights

166.    Communication rights are commonly transferred between people and entities. This is demonstrated by various types of contractual provisions requiring the silence of one or both parties, such as non-disparagement clauses, confidentiality clauses, and non-solicitation agreements.  These types of obligations are often enforced through litigation and liquidated damages provisions, reflecting the concrete monetary value of the rights accorded through and protected by such transactions.

167.    Defendant UHWE demanded transfer of control over Plaintiffs' communications, like the right often transferred in confidentiality and noncompetition agreements, by demanding that Plaintiffs refrain from lawfully voicing their opinions related to labor unions generally and to the Defendant UHWE specifically during future organizing campaigns.  By demanding Plaintiffs' silence and/or their affirmative statements of support for unionization, Defendant UHWE attempted to effectuate a transfer of control over this legal right to itself, with no intent to compensate Plaintiffs in return for transfer of the right.  Defendant UHWE did so with the specific intent to exercise this right for its own financial gain.

### E. The Illegal Tactics Employed by the Unions

168. Defendants' corporate campaign has utilized four (4) principal tactics: (1) engaging in vandalism and other criminal acts to endanger patients and disrupt Plaintiffs' ability to provide quality services and bring about negative outcomes before the Connecticut regulatory authorities; (2) disseminating false, misleading, and defamatory information about Plaintiffs designed to dissuade patients, their family members, and referral sources from doing business with Plaintiffs; (3) publicly smearing Mr. Straus and his other businesses concerning items completely unrelated to any labor-related grievances; and (4) abusing the legal process on unrelated matters solely to drive up costs for Plaintiffs.

### 1. Criminal Acts of Sabotage

169. On July 3, 2012, NEHCEU members employed by the Connecticut facilities managed by Plaintiff HealthBridge went on strike. In connection with the strike, at the direction of lead organizers employed by NEHCEU, employees committed numerous criminal acts that jeopardized the lives and safety of the elderly and frail patients of these facilities. These acts included but were not limited to the following:

- At the Newington Health Care Center, employees: (1) purposefully mixed up names on patient's doors for the Alzheimer's ward and the photos attached to their medical records, making it nearly impossible to identify and care for patients; (2) removed dietary stickers which provided how patients could safely be fed; (3) lost, hid, or stole all stethoscopes and blood pressure cuffs; (4) vandalized half the building's Hoyer lifts; (5) lost or stole patient safety lift handles, pads and foot rests; (6) removed the label from a wheelchair; (7) removed photos; (8) mismatched cushions; (9) removed labels from all of the flow books; (10) placed screwdrivers in the ceiling tiles; and (11) removed June 2012 activities of daily living flow sheets.

- At the Danbury Health Care Center, employees: (1) dropped clean linens on the floor; (2) placed patients' clean personal laundry in the laundry chute; (3) removed approximately 30 patients' identification wristbands; (4) removed patient identifiers from room doors and wheelchairs; (5) placed clean patient safety lift pads and linens in garbage bags; and (6) tampered with washing machine settings so that soap was not dispensed during wash.

- At the Stamford facility, employees: (1) smashed a washing machine door; and (2) removed a call-bell cord.

170. These acts of sabotage put the lives and safety of the patients at these facilities in grave danger. They delayed and disrupted the medical treatment for these patients and exposed these patients to injury and unsanitary conditions. Moreover, they constitute attempted violations of Connecticut's elder abuse statute, Conn. Gen. Stat. § 53a-320 et seq.

171. These acts of sabotage were authorized in advance by lead organizers employed by NEHCEU, who as a result came under criminal investigation by the Connecticut Chief State's Attorney's office. All of these lead organizers were acting on behalf of NEHCEU when they directed these acts of sabotage. Moreover, upon information and belief, these lead organizers were acting at the direction of NEHCEU, SEIU, and/or UHWE in furtherance of their campaign of extortion directed against Plaintiffs. Indeed, not only were the tactics employed by the strikers on July 3, 2012, consistent with acts of sabotage that occurred on the eve of prior NEHCEU strikes, these tactics are consistent with tactics employed by numerous SEIU locals following the Corporate Campaign Model.

172. In this regard, Defendant NEHCEU's Bylaws specifically provide Union members may be disciplined for engaging in "conduct calculated to bring [the NEHCEU] into disrepute." To Plaintiffs' knowledge, not a single Union member has been charged under this section of Defendant NEHCEU's Bylaws as a result of the blatant criminal activity engaged in during the strikes. The Bylaws themselves strongly suggest that Defendants authorized these actions. In fact, only the NEHCEU's Executive Board may call for a strike and members may be punished for "refusing to participate in a duly organized strike or other collective job action."

173. HealthBridge reported each of these incidents to the state and local authorities, including the Connecticut Department of Public Health and the Connecticut Attorney General's

office.  The Attorney General refused to offer meaningful assistance and directed HealthBridge to file separate police reports with local law enforcement authorities.  Copies of these police reports are attached as Exhibit E.  Then, on July 17, 2012, Attorney General George Jepsen walked the picket lines with striking employees. A day later the Attorney General recused himself from matters involving HealthBridge and NEHCEU, citing the apparent conflict of interest.  Following Jepsen's recusal and at Healthbridge's request, the Connecticut Chief State's Attorney opened a criminal investigation into the strike-related sabotage by NEHCEU members.

174.    While the Chief State's Attorney's office, in a letter to Plaintiff's counsel dated February 21, 2013, advised that it was unsuccessful in identifying the specific individuals responsible for these acts of sabotage, it was able to substantiate the allegations that "1) some patient nametags had been removed or switched; 2) some dietary restriction stickers had been removed or defaced; and 3) stethoscopes and sphygmomanometers had been misplaced."  Given, *inter alia*, the timing of the acts of sabotage in relation to the NEHCEU's strikes, the similarity of these acts of sabotage to those that occurred on the eve of prior NEHCEU strikes, and the fact that striking NEHCEU members had exclusive access to the work areas where these acts of sabotage occurred, there can be no question that these acts of sabotage were carried out on Defendants' behalf.

175.    Despite the fact that Plaintiffs first reported these incidents on July 3, 2012, Deborah Chernoff, NEHCEU's Communications Director, falsely claimed, in a Connecticut News blog that she posted on the Internet on July 20, 2012, that HealthBridge "staged" the sabotage to make the union look bad and falsely asserted that HealthBridge waited for "two whole weeks" after the sabotage to report the incidents.  A copy of the blog post is attached as Exhibit F.

176.    Meanwhile, Ms. Chernoff knew full well that HealthBridge had not "staged" the sabotage. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

177.    Instead, NEHCEU ratified the misconduct. ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

178.    These acts of sabotage are jarringly similar to those conducted by NEHCEU members during the 2001 strikes, making it all the more obvious that these acts were a coordinated effort orchestrated by the Defendants, ████████████████████████████

████████████████████████

179.    On the heels of these events, on August 23, 2012, Defendants bused approximately 100 members from Connecticut who were joined by several UHWE members to participate in a further public disruption targeting Plaintiffs' headquarters in Fort Lee, New Jersey.   In order to create maximum chaos and further Defendants' extortionate goals, the protestors marched across the George Washington Bridge to get to Plaintiffs' headquarters. Approximately 16 members of Defendants then gained unauthorized access to the building and attempted to confront Daniel Straus and other senior Care One and HealthBridge Management officials and present them with their extortionate demands, including their demand to continue

66

contributing to the NEHCEU's underfunded pension.  The police had to be called to remove the trespassers from the building.

### 2.    Abusing the Legal Process

#### a.    Interfering with Straus's development projects in New York

180.    Defendants have also attempted to compel agreement to their demands by disrupting and attempting to block a condominium development planned by JZS Madison, a company in which Daniel Straus has an interest.  On October 18, 2011, Defendants attempted to block required approvals for the project by staging a satirical street theater performance and having members of Defendants protest outside the Landmark Preservation Committee hearing on the project at One Centre Street in New York City.  Flyers calling the project a "DISRUPTIVE, TASTELESS, MONSTROSITY with the charm of a railroad boxcar" and promoting the COW website were distributed outside the hearing.   Attached as Exhibit G is a copy of the "DISRUPTIVE, TASTELESS, MONSTROSITY" flyer distributed outside the Landmark Preservation Committee hearing on October 18, 2011.

181.    Another flyer, paid for by SEIU, NEHCEU and UnitedNY.org and distributed at the event, disparaged Daniel Straus' development project, claiming that "[h]e can afford to put people before profits."  Attached as Exhibit H is a copy of the "99% of Americans are struggling but Daniel Straus is not one of them" flyer.  Defendants also had former employees testify before the Committee.  One former employee of a facility managed by HealthBridge and an agent of Defendants, who protested outside the Landmark Preservation Committee hearing, testified under oath that it was her understanding from one of the Defendants that "the purpose of going there was to block business activities of Mr. Straus."  Neither the protest nor testimony had anything to do with the merits of the project or anything germane to the Committee.  Both were merely attempts by the Unions to interrupt and abuse the process, for the purpose of compelling

agreement to their demands or to cause Daniel Straus to suffer embarrassment, increased costs, delay and loss of the benefit of a substantial investment, for the ultimate purpose of enriching the Defendants.

### b.      "Ten Taxpayer" Petitions in Massachusetts

182.    In the Fall of 2011, several HealthBridge-managed facilities located in Brookline, Concord and Lexington, Massachusetts submitted Applications for Need with the Massachusetts Department of Public Health ("DPH").  These Applications for Need were filed to enable these facilities to complete necessary upgrades and renovations to provide better care for the patients in these facilities.  The requested renovations include:  (i) transitioning to electronic medical record systems to improve the quality of care and reduce the risk of medication errors, among other benefits; (ii) important upgrades to these facilities' power generators and heating, air conditioning, and electrical systems; and (iii) other upgrades and renovations designed to enhance the safety and quality of life of these facilities' patients and employees.

183.    Seeking to apply additional pressure on Plaintiffs, Defendant UHWE attempted to interfere with HealthBridge's planned facility improvements.  The Union filed three "Ten Taxpayer" petitions with the State to object to Healthbridge's Applications.  Attached as Exhibit I are letters from the Commonwealth of Massachusetts acknowledging receipt of the "Ten Taxpayer" petitions.

184.    By filing Ten Taxpayer petitions, UHWE delayed the processing of the Applications for nearly a year, substantially increased the costs associated with the Applications for Need, created costly and unnecessary delays in their approval, and dissuaded potential patients from these facilities.  Hearings on the proposed applications, which generally are approved expeditiously, were significantly delayed, and the applications were not approved until January 2013.

185.    Moreover, as a consequence of these petitions, Applications for Need submitted by other HealthBridge-managed facilities in Massachusetts were also delayed.

186.    UHWE candidly admitted to the governmental agency authorized to process the applications that it had no substantive objection to the Applications for Need.  In fact, in an e-mail exchange and telephone conversation between September 20-24, 2012, Elisabeth L. Daley, UHWE's Senior Research Analyst, openly admitted to HealthBridge's outside auditor that the UHWE filed the "Ten Taxpayer" petitions in response to HealthBridge's collective bargaining disputes with the NEHCEU.  The UHWE representative stated that the UHWE would consider withdrawing its objections and request for a hearing if Plaintiffs would agree to the NEHCEU's contract demands – including the demand that Plaintiffs help pay down the NEHCEU's underfunded pension liabilities as part of its pattern contract – and if Plaintiffs would agree to remain "neutral" in response to efforts by the Defendants to organize non-unionized facilities managed by Plaintiffs.  (*See* Exhibit K).

187.    Since Healthbridge refused Defendants' extortionate demands, Ms. Daley confirmed in her ominous email to DPH dated September 20, 2012 that UHWE intended to proceed with hearings on the baseless "Ten Taxpayer Petitions." Thus, these petitions were admitted abuses of the legal process by Defendants that had no purpose other than to compel Plaintiffs' agreement with Defendants' demands by causing Plaintiffs to suffer increased costs, delay, the loss of the benefit of a substantial investment and, worst of all, the negative impact upon the quality of life of Plaintiffs' patients and employees.

188.    In fact, in staff summaries on the Determinations of Need dated December 12, 2012, the Massachusetts DPH commented on the so-called "objections" raised by the UHWE as part of these "Ten Taxpayer Petitions," and found them to be completely irrelevant to the Determinations of Need applications.

189.    To further Defendants' smear campaign against Plaintiffs and cause even more harm, Ms. Daley falsely represented to DPH in her September 20, 2012, email that Wethersfield closed its facility in Connecticut without State approval, when in fact, the State had granted Wethersfield such approval on June 11, 2012. (*See* Exhibit K; *cf.* Exhibit J). Ms. Daley's September 20, 2012 e-mail makes it clear that, just as Mr. Pickus and the NEHCEU are seeking to drive Plaintiffs out of Connecticut unless Plaintiffs agree to Defendants' extortionate demands, the UHWE is likewise intent on driving the Massachusetts Plaintiffs out of the Commonwealth of Massachusetts unless those Plaintiffs accede to Defendants' demands.

### c.    Improper Influence of Connecticut Elected Officials

190.    Governor Malloy has publicly expressed support for NEHCEU's positions. Malloy, the beneficiary of $400,000 in campaign expenditures by the SEIU and an affiliated local union for his 2010 election campaign, joined workers on the picket line at the Newington Health Care Center on July 11, 2012 despite the acts of sabotage and vandalism that occurred eight days earlier against the HealthBridge managed facilities' patients.

191.    On November 2, 2011, HealthBridge filed an application with the State of Connecticut, seeking approval to close its Wethersfield facility. Upon information and belief, as part of its extortionate corporate campaign, the Unions interfered with HealthBridge's closure of this facility by exerting its political influence over Connecticut State legislators and Governor Dannel Malloy. Governor Malloy's office initially refused to allow HealthBridge's application to be processed until a lockout with union members at another HealthBridge facility was resolved.

192.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████ █

█████████████████████████████████████ caused the decision maker to issue a

request for certain unnecessary financial information -- a procedural delaying tactic that the State

of Connecticut Department of Social Services later found in a final decision issued on or about

October 20, 2014, was both unprecedented and improper.

193.    On or around March 6, 2012, the state of Connecticut initially rejected

HealthBridge's application for closure of its Wethersfield facility, claiming that Wethersfield's

application was incomplete. As the State of Connecticut Department of Social Services found in

its October 20, 2014, final decision, the information sought that supposedly rendered the

application "incomplete" had never been sought of any other applicant seeking closure.

194.    Ultimately, on June 11, 2012, the State Department of Social Services approved

the closure of Wethersfield Health Care Center.  However, the Unions' interference with the

closure process resulted in a delay of approximately six months, and cost Wethersfield in excess

of six million dollars.

195.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

196.    Upon information and belief, Defendants were able to persuade Connecticut

Governor Dannell Malloy and the Connecticut Attorney General's office to threaten to take the

assets of the Connecticut facilities managed by Plaintiff HealthBridge under receivership.  On

August 13, 2012, Mr. Straus learned from a Connecticut Receiver that a broker "approached [this

Receiver] about some facilities, apparently of your[s], that the AG's office in [Connecticut] will

be taking and giving to an interim operator."  To Plaintiffs' knowledge, there is no legal basis for

declaring a receivership over any of the HealthBridge-managed facilities.  Upon information and belief, this receivership threat has been made at the behest of Defendant NEHCEU as part of Defendants' corporate campaign against Plaintiffs.

### d.    Baseless Claims to Connecticut Regulators

197.    In February 2012, one or more of the Defendants sent a memo dated February 7, 2012, authored by the SEIU's Healthcare division, entitled "Questionable Medicare Billing Practices at Connecticut HealthBridge Nursing Homes," to the office of U.S. Senator Richard Blumenthal.  " A copy of the Memo is attached as Exhibit L.  Upon information and belief, the Unions sent this memo to Senator Blumenthal's office via e-mail, fax, and/or U.S. mail.

198.    The memo falsely accuses HealthBridge of engaging in fraudulent Medicare billing practices.  The Unions claim that HealthBridge receives the highest standardized daily payment rate of any system in Connecticut, resulting in "over $15 million in potentially excess payments" from 2006-2010.  (See Exhibit L at 1).  It also alleges that HealthBridge receives $50 more per patient per day from Medicare than the average Connecticut facility despite the SEIU's conclusion that there is no significant difference in HealthBridge's patients that could explain the "questionable billing."  (*Id.*)  Following the Manual's guidance yet again, the memo also raises a completely unrelated claim concerning another entity where Daniel Straus is also the Principal Stockholder and a Board member, Aveta, Inc. (the largest Medicare Advantage plan in Puerto Rico).  (Id. at 2).  The Memo falsely suggested that the existence of an investigation of the company necessitated a thorough investigation of management decisions at HealthBridge.

199.    As a result, on February 22, 2012, at the behest of one or more of the Defendants, Senator Blumenthal authored a letter to the Hon Kathleen Sebelius, Secretary of the U.S. Department of Health and Human Services (copied to, among others, HHS Inspector General Daniel R. Levinson, and Attorney General Eric Holder), repeating almost verbatim the SEIU's

allegations on the first page of the SEIU's "Questionable Medicare Billing Practices" memorandum.  Senator Blumenthal added that, "Initial inquiries made by my staff have led me to be concerned that this amount may be only a small fraction of potential overpayments occurring at HealthBridge, and its sister company, Care One, which operate more than 70 nursing homes and other healthcare facilities in ten states around our nation."    However, to Plaintiffs' knowledge, Senator Blumenthal never directed any of these "[i]nitial inquiries" to Plaintiffs or anyone acting on behalf of Plaintiffs.  Nonetheless, Senator Blumenthal urged Secretary Sebelius to "immediately audit HealthBridge's billing practices to Medicare, and take any necessary enforcement actions."

200.    On June 21, 2012, one day after Connecticut union members met to vote on a strike, one or more of the Defendants resent this memo to the Connecticut Department of Public Health, to the Connecticut Department of Social Services and, upon information and belief, to the U.S. Department of Health and Human Services - Office of Inspector General.    Upon information and belief, the Unions sent this memo to these agencies via e-mail, fax, and/or U.S. mail.

201.    In addition, sometime prior to July 5, 2012, upon information and belief, one or more of the Defendants sent the "Questionable Medicare Billing Practices" memorandum to the offices of U.S. Congressman Chris Murphy, via e-mail, fax, and/or U.S. mail.  As a result, on July 5, 2012, at the behest of one or more of the Defendants, Representative Murphy also authored a letter to Secretary Sebelius asking her to examine the billing practices of HealthBridge again repeating the SEIU's allegations on the first page of its memorandum.  Like Senator Blumenthal, Representative Murphy concluded his letter by urging Secretary Sebelius to conduct an audit of HealthBridge's billing practices.

202.    Upon information and belief, and as a result of the Unions' memo, the United States Attorney's Office for Connecticut issued a subpoena to the HealthBridge managed facility River Glen Health Care Center ("River Glen") seeking information concerning its billing practices. River Glen has expended a substantial amount of time and money in responding to the U.S. Attorney's Office's inquiry and that inquiry is ongoing.

### 3.    Dissemination of False and Misleading Information about Plaintiffs

203.    Despite Plaintiffs' laudable record for patient care, and consistent with the extortionate practices described in the SEIU's Manual, Defendants have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs. Defendants have often disseminated this false and misleading information over through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail, in furtherance of Defendants' scheme to defraud described more fully in Section II.C above.  Upon information and belief, Defendants engaged the services of Checkmate Consulting Group and

███████████████████████████████████████████████████████

███████████████████████████

204.    Defendants have engaged in this scheme of disseminating the false, fraudulent, and misleading information about Plaintiffs in furtherance of their larger corporate campaign objectives with the specific intent of discouraging the community, patients, potential patients, and their family members from doing business with Plaintiffs, and increasing the costs through frivolous filings, on the theory that such illegal tactics will eventually force them to accede to Defendants' extortionate demands or force Plaintiffs out of business.

205.    Not only were many of these false and misleading statements made in furtherance of Defendants' scheme to defraud described more fully in Section II.C above, they were also in furtherance of Defendants' efforts to extort Plaintiffs. ███████████████████████



206. ██████████████████████████████████████

207. ██ ██ ███ ███ ██ ██ ███ ████ ███ ███

██████████████████████████████████████"

### a.    "Care One Watch" and "HealthBridge Watch" Websites

208.    As described above, a central feature of Defendants' illegal campaign includes dissemination of false, misleading, and/or incendiary allegations regarding Plaintiffs and Mr. Straus through websites called "CareOne Watch" (http://careonewatch.org/) and "HealthBridge Watch" (http://HealthBridgewatch.org) (hereinafter "COW").  While COW purports to be "a coalition of concerned citizens and nursing home caregivers dedicated to quality care and healthy

communities" and both sites are deceptively designed to look like a grassroots community effort, they are actually created by UHWE, NEHCEU, and/or one or more of the Non-Party Participants.  The express purpose of the COW websites, as acknowledged by Defendants in internal e-mails, is to cause Plaintiffs' customers to "reconsider" Plaintiffs' nursing homes as a place for their loved ones.

209.    The COW websites contain numerous false and misleading statements about Plaintiffs transmitted over the wires in furtherance Defendants' scheme to defraud described more fully in Section II.C above.  These attacks include:

- A page on the COW website entitled, "Who is in Charge at Care One Nursing Homes," citing alleged turnover at Care One-managed facilities, falsely and misleadingly suggests that there is a quality-of-care problem at Care One facilities by claiming that turnover in a nursing home's administrator "has been linked to quality-of-care deficiencies including higher rates of bed sores."  The page concludes with: "Should we be concerned for our loved ones in Care One nursing homes?"  (*See* Exhibit M at 1).

- A page on the COW website entitled, "About CareOnewatch," states that "[o]verbilling and violations of labor law at Care One and HealthBridge facilities may indicate a pattern of valuing profits above people."  The page makes the false representation that the Plaintiffs have engaged in a "pattern" of "overbilling" and have jeopardized the care of their patients.  (*See* Exhibit M at 2).

- A page on the COW website entitled "Management Forces Concessions on Caregivers" states that "HealthBridge chose to put quality of care at risk by removing caregivers from the bedsides of their patients," falsely suggesting that HealthBridge left its patients uncared for when the union members elected to go on strike.  (*See* Exhibit M at 3-4).

- A page on the COW website entitled "Overbilling" advises customers to "Check Your Bill!" and asks: "Have you or a loved one been overbilled at a Care One or HealthBridge facility?"  The page further implies that customers have suffered "unexplained charges," "charges for services you did not consent to or did not receive," "charges for equipment you did not receive," "calculation errors," "sharp increases in charges from your previous bill," "increase in charges for the same or lesser services," or "charges for services provided to another resident" and provides a link for customers to "tell their overbilling story."  The only basis cited for these inflammatory inquiries and implied accusations is a single alleged billing issue at a single facility managed by Care One wherein no overbilling even occurred.  This page is designed to provoke a visceral reaction against Care One and HealthBridge for alleged financial mismanagement and overbilling and to

76

deter patients from using their facilities lest they be overcharged. This page is extremely misleading and misrepresents the facts of one isolated alleged case at an assisted living facility. In that instance, the resident involved required an immediate change to a higher level of care. The family was informed, and while at first there was a misunderstanding about the applicable charges for this higher level of care, the bill was in fact 100% accurate and fair. (*See* Exhibit M at 5).

210. Contrary to these false and misleading statements on COW's website, there is neither a quality-of-care problem nor an overbilling problem at facilities managed by Care One or HealthBridge. Nearly 60% more centers managed by Plaintiffs and their affiliates have been awarded Five Star or Four Star ratings from the Centers for Medicare & Medicaid Services than the average statewide. 94% of patients at facilities managed by Plaintiffs report high satisfaction with their rehabilitation program. Further, patients at facilities managed by Plaintiffs realized a 90% discharge rate to their prior living situation following a sub-acute stay, versus an average of 39.5% nationwide. They also realized 94.6% of goal in Functional Mobility and exceeded 100% of goal in Activities of Daily Living and Speech and Language. Facilities managed by Plaintiffs surpassed national averages on key quality measures, in some instances by over 50%. For example, they performed 52.5% better than the national average in annual quality surveys on keeping patients safe and secure in 2011. Moreover, the fall rate at these centers averaged 16.9% less than the national average in 2011.

211. Additionally, Plaintiffs coordinate and manage more than 120,000 claims for payment each year. Every bill is subject to a pre-bill validation and reconciliation process, involving up to four disciplines and up to 29 separate verifications. Financial statements for Plaintiffs' facilities are certified annually by independent auditors for accuracy and compliance. Plaintiffs have never been cited by any consumer protection agency for billing errors.

**b.      False and Misleading Print and Media Advertisements**

212. In addition to the misinformation on the COW website, Defendants have distributed flyers and taken out media advertisements urging patients to check their bills, falsely

insinuating that patients of facilities managed by Care One and HealthBridge are regularly overbilled when they are not. Many of these advertisements have been transmitted over the mail and wires in furtherance Defendants' scheme to defraud described more fully in Section II.C above.

213.    For example, on or about September 17, 2011, Union organizers in Connecticut and New Jersey provided patients' family members with a flyer inquiring whether they were "Overbilled at a Care One Facility?" and encouraging them to look for various errors in their Care One bills.    Upon information and belief, copies of these flyers were sent to family members of patients via U.S. mail.  Copies of that same flyer were distributed to families of patients at some of the non-unionized facilities managed by Care One in New Jersey on November 4, 2011.  Again, upon information and belief, copies of that flyer were sent to these family members of patients via U.S. mail.  A copy of that flyer is attached as Exhibit N.

214.    Despite the fact that NEHCEU does not represent any of the employees at any of the facilities managed by Plaintiff HealthBridge in Massachusetts, on November 17, 2011, NEHCEU sponsored an advertisement in the *Boston Herald* urging people to check their HealthBridge bills for overbilling, and listing each of HealthBridge-managed facilities in Massachusetts.  Upon information and belief, one or more of the Unions disseminated this advertisement to the *Boston Herald* via e-mail, fax, and/or U.S. mail before the *Boston Herald* printed it.

215.    On November 23, 2011, NEHCEU sponsored a similar advertisement in the *Hartford Courant* and *Milford Mirror*.  On December 2, 2011, NEHCEU sponsored a similar advertisement in the *Newington Town Crier*, urging patients and their families to check their bill and directing them to HealthBridgeWatch.org for more information.  Attached as Exhibits O, P and Q are copies of the November 17, 2011 *Boston Herald*, November 23, 2011 *Hartford*

*Courant* and *Milford Mirror*, and December 2, 2011 *Newington Town Crier* advertisements, respectively.  Again, upon information and belief, one or more of the Unions disseminated these advertisements to these publications via e-mail, fax, and/or U.S. mail before these publications printed them.

216.    As part of its media blitz, in or around November 2011, Defendants sponsored a radio advertisement in the New York metropolitan area, on CBS affiliate 880am, falsely stating that Care One and HealthBridge were engaged in overbilling the elderly.  In addition, an advertisement with the same content aired on New England Cable News (NECN).  Several family members of patients heard these advertisements on or around November 22, 2011, and reported to Plaintiffs that they were upset by their content.

217.    This "overbilling" smear campaign is intentionally false and deceptive because it is based on a single alleged miscommunication at one private pay assisted living facility managed by Care One in New Jersey (a facility in which Defendants do not represent any of the employees), when no such overbilling took place.  The flyers and advertisements have been distributed far and wide.  Defendants know they lack evidence of an overbilling problem at any of the facilities managed by Plaintiffs and are merely attempting to destroy public confidence in Plaintiffs and the facilities they manage.

218.    In addition to the false representations on the COW website that the facilities managed by Plaintiffs were overbilling and jeopardizing the care of patients, Defendants distributed flyers with similar false and deceptive statements – carrying out the practice as suggested by the Manual – of scare tactics, fear-mongering and illegal behavior, including, but not limited to, the following:

- On April 6, 2011, a NEHCEU sponsored flyer entitled "BUSTED" was found at the Danbury Health Care Center.  The flyer stated that "HealthBridge Management / Care One LLC will do ANYTHING – even violate labor law-in

79

their ruthless pursuit of more profit." The flyer further "reported" that HealthBridge / Care One accepts hundreds of millions of dollars in public funding from Medicaid and Medicare and stated that "[t]hese dollars should be used for patient care-not lining the pockets of the owners," falsely and maliciously suggesting that the Owners are engaging in Medicaid and Medicare fraud. The flyer further stated that HealthBridge / Care One were "exploiting the elderly…to boost their own bottom line." On April 13, 2011, a similar "BUSTED" leaflet was distributed outside HealthBridge's Wethersfield, Stamford and Milford unionized facilities. That same day, the "BUSTED" flyer was also distributed outside HealthBridge's Southbury non-unionized facility. The following day, April 14, 2011, a similar "BUSTED" leaflet was distributed at the Westport Health Care Center. Copies of the "BUSTED" flyer distributed at the HealthBridge's Danbury and Westport facilities are attached as Exhibits R and S, respectively.

- As part of its scheme to instill fear in Plaintiff's customers and the public, the Defendants also sponsored "BUSTED" advertisements in various media platforms. On April 6, 2011, the History Channel aired a television commercial sponsored by Defendants that specifically named each of the HealthBridge's six unionized Connecticut facilities and alleged that there was poor quality of care at those facilities. Defendants sponsored the television commercial again during a baseball game on ESPN on April 10, 2011.

- Defendants also sponsored "BUSTED" advertisements in the *Newington Town Crier* and the *Stamford Advocate* on April 8, 2011, suggesting that HealthBridge was engaged in "scare tactics, fear-mongering and illegal behavior to get their way." A similar "BUSTED" advertisement appeared in the Danbury News-Times around April 7, 2011. A copy of the "BUSTED" advertisement from the *Newington Town Crier* is attached as Exhibit T.

219. Defendants used their rhetoric to increase the pressure on Plaintiffs by continuing to republish this inflammatory content by different means through multiple media outlets, to reach a wider audience. Many of these flyers and other statements were also transmitted over the mail wires in furtherance Defendants' scheme to defraud described more fully in Section II.C above. For example:

- On May 2, 2011, NEHCEU distributed a brochure entitled "HealthBridge Nursing Home Negotiations: The Real Story—Demands Destroy Standards for Caregivers and Patients" to Plaintiffs' staff physicians, purporting to summarize the status of the negotiations at the Danbury Health Care Center. Upon information and belief, NEHCEU disseminated this brochure over the Internet, via facsimile, and/or by U.S. mail. The brochure included baseless accusations of "reckless behavior" on the part of HealthBridge and claimed that they "continue[] to violate both the law and all standards of human decency." The back page of

the brochure further inaccurately suggests that resident care had suffered or was suffering with the section title "Cuts for workers = decline in quality care." A copy of the "Real Story" brochure is attached as Exhibit U.

- NEHCEU repurposed and reused the content of the same brochure at the HealthBridge-managed Westport Health Care Center and Newington Health Care Center on or about May 13, 2011, when it distributed a brochure entitled "A Mother's Day Message For Our Patients, Families and Friends From the Caregivers at Westport Health Care Center." This Mother's Day Message was designed to provoke anxiety and alarm concerning the baseless allegations of "reckless behavior" and substandard care that a reader would infer the HealthBridge provided. A copy of the "Mother's Day Message" is attached as Exhibit V.

- On or about December 16, 2011 NEHCEU distributed a flyer at the HealthBridge-managed Danbury, Connecticut facility entitled "What Kind of Employer Locks Out Trusted Caregivers And Leaves Patients Alone With Strangers on Christmas?" inviting recipients of the flyer to "Call HealthBridge …Tell them that stable care comes from stable caregivers." A copy of this flyer is attached as Exhibit W. Without justification, this flyer recklessly and falsely suggests that HealthBridge provides substandard care to its patients.

- On December 19, 2011, NEHCEU issued an invitation to a Candlelight Vigil, which stated that HealthBridge was "forcing caregivers into the cold and leaving patients alone with total strangers 12 days before Christmas." To further incite sympathy and fear, the flyer intimated that HealthBridge had "put our frail and elderly at risk." A copy of the Candlelight Vigil invitation is attached at Exhibit X.

- On February 8, 2012, residents of the town of Milford, Connecticut received a flyer designed to provoke fear and distrust. The flyer sought a Milford citizens call to action and declared as its central premise that "RESIDENTS ARE AT RISK." The flyer falsely claimed that "The Residents at West River Health Care Center are in Real Danger and in the Hands of Strangers…," that patients were "being dropped on the floor," and that "wrong medications given – patients hospitalized." The flyer provided contact information for the local mayor, state senator, state representative, congresswoman, and a United States senator. Along with that flyer, patients received a NEHCEU flyer purporting to provide a status update on negotiations that again denounced the quality of care given by "strangers" to nursing home patients. Upon information and belief, Defendants distributed these flyers via U.S. mail to Milford citizens' homes. A copy of the "PATIENTS ARE AT RISK" and status update flyers are attached as Exhibit Y.

- In February 2012, Defendants distributed a flyer at an open house at a non-union facility in Morris, New Jersey managed by Care One. This flyer falsely suggests that high levels of administrator turnover at Care One's facilities led to "higher rates of catheterization, pressure sores, psychoactive drug administration, and more quality-of-care deficiencies" and directed those concerned to the COW

81

website for more information.  A copy of the "Who's in charge?" flyer is attached
as Exhibit Z.  A billboard truck carrying a similar message was driven in front of
several facilities managed by Care One, as discussed *infra*.

- On May 2, 2012, NEHCEU issued a press release in which its President David
  Pickus falsely and defamatorily accused HealthBridge of showing willingness to
  "destroy workers' lives and sacrifice the quality of care for the frail elderly
  entrusted to their care, all to increase investors' profits" and, without any basis,
  claimed that HealthBridge was "siphoning off millions of taxpayer dollars in
  Medicaid and Medicare reimbursement for elder care."  A copy of the press
  release is attached as Exhibit AA.

220.    On or about July 4, 2012, NEHCEU sponsored a flyer entitled, "Thinking about
Where to Turn for your loved ones" aimed at HealthBridge's Westport Health Care Center in
Westport, Connecticut.  The flyer incites fear by making unfounded claims that "[d]uring
negotiations this corporation repeatedly exploited the concerns of nursing home patients and
their families, just so they could maximize their bottom-line profits-at workers' expense."  A
similar flyer was distributed near HealthBridge's West River Health Care Center the next day, as
well as at the Milford Post Mall on July 17, 2012.  Attached as Exhibit BB is a copy of the flyer
entitled, "Thinking about Where to Turn for your loved one's."

221.    Also on July 17, 2012, NEHCEU sponsored a similar flyer aimed at family
members of patients at the Newington Health Care Center.  This flyer questions whether
HealthBridge can be trusted "to care for your loved ones" in Newington or at any facility and
suggests that replacement workers are "strangers, creating fear, mistrust and uncertainty about
the future of resident care."  Attached as Exhibit CC is the flyer titled "Who should you trust to
care for your loved ones?"

222.    On July 30, 2012, NEHCEU posted a headline on the social media Internet site,
Facebook, entitled, "Did 'replacement' care lead to one resident's death at a HealthBridge
nursing home?"  (https://www.facebook.com/NEHCEU1199/timeline?filter=3).  A screenshot of
the Facebook post is attached as Exhibit DD.  NEHCEU's Facebook post links to a newspaper

story with a different headline.  The text of the story neither states nor implies that replacement care led to a patient's death.  Accordingly, the NEHCEU post is false, defamatory, and intentionally deceptive.  It is designed to erode public confidence in the Plaintiffs and the facilities they manage.

223.    In or around September 2012, the NEHCEU sent to multiple people via U.S. mail a flyer that warned, "It might be time to think twice about West River Health Care Center … or any HealthBridge facility."  In this flyer, NEHCEU falsely claimed that replacement workers at the facility created "fear, mistrust and uncertainty about the future of resident care."   A copy of this mailer, which was received at the Westport and West River Health Care Center on or around September 11, 2012, is attached as Exhibit TT.

224.    The Unions' tactics did not stop even after Plaintiffs filed this action.  Commencing in or around December 2012, the Unions began an offensive in which they disseminated false and misleading statements over the mail and wires, in furtherance of the scheme to defraud described more fully in Section II.C above, falsely suggesting that the quality of care at Plaintiffs' facilities was deficient because these facilities allegedly administered anti-psychotic drugs at rates higher than state and national averages.   These false and misleading statements included, but were not limited to, the following:

- An article posted on the COW website on or around December 14, 2012 (attached as Exhibit UU), describing supposedly high rates of anti-psychotic drug use at HealthBridge and Care One-managed facilities in Massachusetts, Connecticut, and New Jersey, including:  Holyoke Rehabilitation Center; Lowell Health Care Center; Newton Health Care Center; Highlands Health Care Center; Care One at Madison Avenue.

- An advertisement sponsored by UHWE and published in the *Cheshire Herald* on December 18, 2012 (attached as Exhibit VV), entitled, "Is HealthBridge Giving Your Loved Ones Antipsychotic Drugs?" describing supposedly high rates of anti-psychotic drug use at Danbury Health Care Center and "other homes run by HealthBridge."

- A nearly identical advertisement sponsored by UHWE and published in the *Boston Globe* on December 18, 2012, describing supposedly high rates of anti-psychotic drug use at Holyoke Rehabilitation Center, Lowell Health Care Center, Newton Health Care Center, and other HealthBridge-managed facilities.

- A similar advertisement sponsored by UHWE and published in the *Bergen Record* on December 23, 2012 (attached as Exhibit WW), entitled "Is Care One Giving Your Loved Ones Anti-Psychotic Drugs?" describing supposedly high rates of anti-psychotic drug use at Care One at Madison Avenue and Somerset Valley Rehabilitation Center.

- A similar advertisement sponsored by UHWE and published in the *Hartford Courant* on December 30, 2012 (attached as Exhibit XX), describing supposedly high rates of anti-psychotic drug use at Danbury Health Care Center.

- Radio advertisements sponsored by UHWE and/or NEHCEU on or about December 18, 2012, played on radio station 93.1 WHYN, describing supposedly high rates of anti-psychotic drug use at HealthBridge and Care One-managed facilities.   UHWE and NEHCEU also published audio files of these advertisements on the COW website.  (*See* Exhibit UU).

- A radio commercial sponsored by UHWE that aired on February 1, 2013, on Radio 101.5; another radio commercial sponsored by UHWE that aired on Radio 1010 WINS on February 4, 2013; and another radio commercial sponsored by UHWE that aired on KC 101 on February 4, 2013; describing supposedly high rates of anti-psychotic drug use in dementia patients at Care One at Madison.

- A full page advertisement sponsored by UHWE and published in the February 28, 2013 issue of the *Cheshire Herald*, describing supposedly high rates of anti-psychotic drug use at The Highlands Health Care Center.

- Another full page advertisement sponsored by UHWE and published in the *Hartford Courant* on March 2 or 3, 2013, describing supposedly high rates of anti-psychotic drug use at The Highlands Health Care Center.

- Another full page advertisement sponsored by UHWE and published in the *Boston Globe* on March 3, 2013, describing supposedly high rates of anti-psychotic drug use at HealthBridge-managed facilities.

- Another full page advertisement sponsored by UHWE and published in the *Bergen Record* on March 3, 2013, by describing supposedly high rates of anti-psychotic drug use at Plaintiffs' facilities.

- A link on NEHCEU's Facebook page, placed by NEHCEU on March 6, 2013, (https://www.facebook.com/NEHCEU1199/photos), linking to some of the aforementioned advertisements relating to anti-psychotic drug use at Plaintiffs' facilities.

225. 

226.    Defendants' statements regarding anti-psychotic drug use at Plaintiffs' facilities are false and misleading and are in furtherance of Defendants' overall scheme to defraud described more fully in Part III.B.  Moreover, as described above, Defendants disseminated these statements using the mail and wires, including, but not limited to:  in text and audio format on the COW website (*see* Exhibit UU); in radio advertisements; on NEHCEU's Facebook page; and, upon information and belief, by sending the print advertisements described above via e-mail, fax, and/or U.S. mail to the newspapers that printed them.

227.    The Defendants' pattern of racketeering activity continues to this day.  For example, in November 2013, the Defendants engaged in another offensive using the mails and wires in which they continued to falsely impugn the quality of care at Plaintiffs' facilities based on allegedly low staffing levels.  These false and misleading statements have included, but are not limited to, a full page advertisement sponsored by UHWE and published in the *Hartford Courant* on November 17, 2013, entitled, "HealthBridge Nursing Homes Employing Enough Care Givers for our loved ones?" (copy attached as Exhibit YY), falsely claiming that staffing levels are below state and national averages.  Defendant UHWE sponsored very similar

advertisements published in the *Boston Globe* and *Star Ledger* on or about November 17, 2013. Again, upon information and belief, one or both Unions sent these advertisements via e-mail, fax, and/or U.S. mail to the newspapers that printed them.  The UHWE and NEHCEU posted a similar article on the COW website on or about November 17, 2013 (copy attached as Exhibit ZZ).

**c.**     **False and Misleading Statements on Traveling Billboards**

228.    The Unions have also engaged in their pattern of disseminating false and misleading information about Plaintiffs by hiring trucks – in at least some cases driven by non-union drivers – displaying billboards containing false and misleading information about the Plaintiffs.

229.    For example, in or around November 2011, the Unions hired a billboard truck to drive throughout Connecticut and New Jersey and display the "overbilled" message outside facilities managed by Plaintiffs.  The billboard also directed the public to the COW website. That truck was spotted in front of the Highlands Health Care Center on November 18, 2011, and was at each of the Connecticut facilities managed by HealthBridge – both union and non-union – over the course of the next several days following the November 18th sighting.

230.    In or around May 2012, the Unions hired additional trucks containing the billboard entitled, "Who's in Charge at HealthBridge Nursing Homes?"  The billboard suggested that substandard care at HealthBridge facilities led to "higher catheterization rates, bed sores" and other deficiencies.  This billboard truck was at HealthBridge's Wethersfield Health Care Center in Wethersfield, Connecticut on May 1, 2012.

231.    The same or a similar billboard truck was outside HealthBridge's West River facility in Milford, Connecticut on May 2, 2012; at its River Glen facility in Southbury, Connecticut on May 3, 2012; at its Westport Health Care Center on May 4, 2012; and at its

86

Newington facility on May 9, 2012.  These billboards falsely and maliciously insinuate that administrator turnover at the HealthBridge-managed facilities has led to chaos and poor care. Attached as Exhibit EE is a photo of this truck.  In fact, Defendants know that they lack any evidence of substandard care linked to administrator turnover and are merely attempting to destroy public confidence in HealthBridge and the facilities it manages.

232.    In or around August 2012, the Unions again hired billboard trucks to park at or near facilities in New Jersey managed by Care One. The billboards attempt to dissuade patients and their family members from doing business with Care One by falsely insinuating that Care One-managed facilities provide low-quality care.  For example, one billboard asks, "Should we be concerned for our loved ones in Care One nursing homes?"  The only evidence cited for such concern is an incident that allegedly occurred at a North Carolina facility managed by an affiliate of Plaintiffs, but the billboard implies that "quality of care problems" are prevalent throughout "all" of Plaintiffs operations.  The billboard directs viewers to the COW website for additional information.

233.    On August 8 and 9, 2012, a truck displaying this billboard message was parked outside Care One's headquarters in Fort Lee, New Jersey.  Attached as Exhibit FF is a photograph of the billboard truck.  On August 10, the same or similar billboard sign trucks were parked outside Care One's Moorestown and Hamilton, New Jersey facilities.  Attached as Exhibits GG and HH are photos of these billboard sign trucks seen outside the Moorestown and Hamilton facilities, respectively.  The billboards are designed to evoke a visceral reaction against doing business with Care One and HealthBridge despite the absence of evidence of poor-quality care at any of the facilities at which the billboard is displayed.

234.    In addition to the defamatory content of the billboards, the trucks intentionally impeded Care One and HealthBridge's businesses by trespassing on the property of the facilities

it manages, blocking access to the facilities, and forcing residents and visitors to park in fire lanes and/or away from the facility on certain occasions. For example, on August 10, 2012, the driver of the billboard truck parked outside of the Hamilton facility obstructed traffic, interfered with parking the facility, and forced some visitors to park in the fire zone. The police were called after the driver refused to move when asked to do so by the Administrator. Upon the arrival of the police, the driver confirmed that he was a non-union driver employed by "Gorilla Trucking Company" located in southern New Jersey. He stated that drivers employed by his company had been ordered to stay in front of specific Care One sites for one hour and then move on to the next site, and he had one more Care One site to visit that day.

235.    On August 23, 2012, Defendants again unleashed their COW billboard trucks carrying the billboards asking "Should we be concerned for our loved ones in Care One nursing homes?" and deceptively suggesting that Care One has prevalent "quality of care problems" that put patients in "immediate jeopardy." This billboard was seen at various locations throughout northern New Jersey on August 22nd, 23rd and 24th, 2012. A photograph of the billboard truck is attached as Exhibit HH.

236.    Commencing on or around December 17, 2012, Defendants unleashed billboard trucks carrying the above-described advertisements falsely suggesting that the quality of care at Plaintiffs' facilities was deficient because these facilities allegedly administered anti-psychotic drugs at rates higher than state and national averages. Billboard trucks containing such advertisements were seen at various locations throughout New Jersey, Connecticut, and Massachusetts, including:

- On December 17, 2012, at the Woodcrest Healthcare Center in New Jersey;

- On February 26, 2013, again driving past the Woodcrest HealthCare Center in New Jersey;

- On February 27, 2013, at Lexington Health Care Center in Massachusetts;

- On March 3, 2013, across the street from The Highlands Health Care Center in Connecticut

- On Wednesday, March 6, 2013, parked near the front entrance of the Weymouth Health Center in Massachusetts

- On March 7, 2013, and at least one other time that week, parked at the Lowell Health Care Center in Massachusetts

237.   None of the false or misleading statements disseminated by Defendants are motivated by legitimate concern for patient care or well-being.  Rather, their purpose is to deceive the community, patients, prospective patients, and their family members into thinking that facilities managed by Plaintiffs are unsafe and/or run improperly so that all of the facilities will lose money and be forced to accede to Defendants' extortionate demands or be driven out of business.

### 4.      Attacks on Mr. Straus

238.   In an effort to place additional pressure on Plaintiffs, Defendants have targeted Mr. Straus for personal attacks designed to embarrass him, invade his privacy, and impede his business ventures completely unrelated to Plaintiffs.

239.   For example, a page on the COW website entitled "Bad Neighbors?" focuses on a Manhattan development planned by JZS Madison, a company in which Daniel E. Straus has an ownership interest.   The page claims that "neighbors and representatives of neighborhood community groups" have unidentified "concerns" with the project.  Without any factual basis, the page insinuates that there is something wrongful or nefarious about the project.  It is designed to discourage members of the public from doing business with Daniel Straus or Plaintiffs.  A copy of the page is attached as Exhibit II.  The Defendants have also distributed flyers and other materials to the same effect and enlisted their members in a campaign to sabotage Daniel Straus'

unrelated businesses, and to force him to have Plaintiffs accede to their demands in bargaining or be deprived of the benefits of his substantial investment in JZS.

240.    Defendants have also sought to embarrass Mr. Straus, who served as a trustee of NYU Law School, by disparaging him in front of the NYU community.  A page on the COW website entitled "Institute for Injustice" promoted a demonstration conducted by the Defendants and others outside NYU Law School on September 8, 2011.  At the event, performers staged a mock opening of the "Straus Institute for Worker Injustice," contending that it was replacing the presently named Straus Institute for the Advanced Study of Law and Justice, which is endowed by Daniel Straus.  The Defendants further attempted to shame Daniel Straus by distributing flyers welcoming people to the newly-named facility.  Attached as Exhibit JJ is a copy of the "Welcome to the Straus Institute for Worker Injustice" flyer distributed at the event.  According to the page on COW's website, "[o]ne performer proposed to do a project on how to get workers to work for longer hours with less pay. 'Free no-doze and Red Bull for everyone,' she said. Another suggested cutting staffing ratios because, 'What nursing home resident needs more than 30 seconds of care in a day?' She explained how to best fire workers without getting in trouble – 'You just hire them back at lower wages!'"  The page claims that the performance "drew largely from real occurrences in the nursing homes."  Thus, the page falsely charges that Care One and HealthBridge provide low-quality service that endangers the lives of their patients.  The page is designed to discourage members of the public from doing business with Plaintiffs or Daniel Straus.

241.    Following their attack on Mr. Straus at NYU on September 8, 2011, the Unions distributed a flyer describing its efforts to publicly denigrate him and the Institute for the Advanced Study of Law & Justice at NYU that he endowed. The Unions acknowledged that they "distributed leaflets to passing NYU students, tourists and neighbors" to attempt to dissuade

them from supporting the Institute.  In the September 8, 2011 flyer, the Unions revealed that their true motive and plan was that it was going to continue the campaign of extortion against Plaintiffs and Mr. Straus in any way that they could, including lodging accusations at Mr. Straus's entirely unrelated business ventures until they forced the Plaintiffs to accede to their demands.  The flyer stated that the Unions were "**taking this fight to them, wherever they are**." (emphasis in original).  A copy of this flyer is attached as Exhibit KK.

242.   On September 24, 2011, NEHCEU President David Pickus emailed Straus Institute Fellows, explaining why Defendants staged the "Welcome to the Straus Institute for Worker Injustice" event in an attempt to further embarrass Straus in front of esteemed NYU officials.  Again following the Manual's suggested extortion procedures, on October 30, 2011, David Pickus emailed Straus Institute Fellows, requesting that they use their position of influence (albeit entirely unrelated to the on-going labor negotiations between Defendants and Plaintiffs) to contact Daniel Straus about Defendants' disputes with Plaintiffs.  Both emails to the Straus Institute Fellows contained false, misleading, and defamatory information about Plaintiffs designed to gain sympathy and assistance from high-ranking officials in the NYU community.  For example, both emails referenced LPNs in New Jersey who allegedly were wrongfully terminated for standing up for their patients and themselves, when in fact, LPNs like Jillian Jacques were terminated for grave errors in patient care.  This was in furtherance of Defendants' corporate campaign described throughout this Complaint.  It was also transmitted over the wires in furtherance of Defendants' scheme to defraud described more fully in Section II.C above.

243.   The Defendants repeated their threats in a document entitled, "1199 Nursing Home Contract Update," discussing the status of NEHCEU's new contracts with other nursing homes in Connecticut.  In that publication issued on October 18, 2011, NEHCEU confirmed that it was building support for its campaign "among family members, patients and local clergy and

91

elected officials, isolating HealthBridge and demanding that they follow the pattern" set in other nursing homes.  A copy of this publication is attached as Exhibit LL.

244.    On January 30, 2012, Defendants coordinated a street performance of "Sheriff 99% and the 1% Corporate Outlaw" outside NYU law school.  At the event, members of the Unions, students and street performers ominously announced a "manhunt" against Daniel Straus, handing out flyers and displaying posters that "NYU Law School Trustee and Corporate Outlaw Daniel Straus" was "Wanted for Corporate Greed & Robbing Workers of Their Rights." Attached as Exhibit MM is a copy of the "Wanted for Corporate Greed & Robbing Workers of Their Rights" flyer.

245.    The Defendants have worked in concert with NYU students, including members of the Student Labor Action Movement, Law Students for Economic Justice and NYU for Occupy Wall Street to advance their agenda.  For example, NYU students worked in tandem with the Defendants in providing pre and post-promotion of the "manhunt" event.  On January 29, 2012, NYU for Occupy Wall Street, a student group that worked in concert with the Unions on numerous occasions, issued a press release promoting the event, which contained a number of links to the NEHCEU's website.  On January 31, 2012, the NYU Local, a pro-union student blog, published an article entitled, "Sheriff 99% And The 1% Corporate Outlaw: NYU Law School," further advancing the Unions' agenda.

246.    Approximately 50 NEHCEU and UHWE members protested alongside students near NYU Law School on July 25, 2012.  During the protest, an undergraduate student delivered a letter on behalf of NEHCEU to Professor J.H.H. Weiler, Director of the Straus Institute, seeking to induce HealthBridge to continue paying into NEHCEU's severely underfunded pension plan and stating," [w]hile caregivers are seeing $30 million in wages, pensions and health benefits destroyed, their boss continues to endow NYU Law with money unlawfully taken

from their pockets."  Attached as Exhibit NN is a copy of the Appeal to Prof J.H.H. Weilman, Director of the Straus Institute delivered on July 25, 2012.

247.    The Defendants have also enlisted NYU students to support their effort to have NYU remove Mr. Straus from his position as a trustee at NYU Law School.  In a February 12, 2012 email sent to the Law Students for Economic Justice distribution list, a representative of the student organization solicited help "[o]btaining the by-laws regarding the process by which trustees are appointed to the NYU law school board."  The email alleges that "Care One has been engaging in some pretty terrible union-busting tactics" and offers to put interested parties "in touch with our contacts at SEIU 1199, who is organizing the labor force."

248.    In furtherance of the Unions' objective to remove Straus as a trustee, on March 19, 2012 the NYU Local published a union-friendly article "Know Your Trustees: Daniel E. Straus."  The article is eerily similar to the propaganda promulgated by the Unions in their crusade against Plaintiffs.  For example, the article misrepresents the aforementioned termination of employees in Care One's New Jersey facilities.  The article also falsely reports of "inaccurate medications and stress resulting from the replacement of familiar comfortable caregivers with temporary labor," without providing any basis for such reports.  On March 26, 2012, NEHCEU provided a link to the article on its Facebook page.

249.    An NYU student group, the Law Students for Economic Justice, subsequently petitioned the law school to oust Daniel Straus from its board.  In fact, when Mr. Straus announced on May 1, 2014, that he was stepping down from the Board, NEHCEU President David Pickus publicly hailed this action as a "victory" for the Defendants. The Defendants' efforts to remove Mr. Straus as a trustee of NYU Law School is another example of their willingness to use any means to compel Straus and Plaintiffs to cede to unionization and negotiation extortionate demands.

93

250. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████   ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████.

251.     In addition, in the Fall of 2012, the SEIU, the UHWE, and the NEHCEU cooperated on a campaign of disparaging radio advertisements in Puerto Rico targeting Aveta, Inc. and MMM, unrelated businesses owned by Daniel Straus.  The goal of this campaign, according to one of the SEIU's directors, was not to obtaining legitimate labor goals, to carry out the specific and illegitimate purpose of harming Aveta and MMM.

**5.     Defendants' Efforts to Conceal their Misconduct**

252. ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

253. ███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████   ███████████

██████████████

## F.   Under the Corporate Campaign Model, Extortion Is Defendants' Regular Way of Doing Business

254.   Illegal corporate campaigns are Defendants' regular means of conducting business, particularly in the context of organizing employees and extracting substantial sums of money from employers to fund the severely underfunded pension plans of its affiliated locals.

255.   Both within and outside the healthcare industry, Defendants and other SEIU locals have recently conducted extortionate corporate campaigns against numerous corporations and other organizations, including, but not limited to: Sodexo USA; Beth Israel Deaconess Medical Center; Iroquois Nursing Homes; Prime Healthcare Services; Beverly Enterprises; Executive Management Services; Sutter Health; Bank of America; Yale-New Haven Hospital; Wackenhut Services Inc.; Somers Building Maintenance; Professional Janitorial Services; JPMorgan Chase; Brookfield Properties; Catholic Healthcare West; Pocono Medical Center; Aramark; Corporation of Fine Arts Museums; Fresno County; Fresno County, California; Wal-Mart; General Growth Properties; Enloe Medical Center; Catholic Healthcare Partners; Advocate Health Care; Tenet Healthcare Corp. Genesis Health Ventures Inc.; Vencor, Inc.; Carlyle Group, and Prime Healthcare Services, Inc.

256.   The campaigns against these other organizations have been similar to those launched against Plaintiffs in that they used tactics from the Manual to apply pressure completely unrelated to any labor-related concerns, all to force the target company into unionization or additional contract concessions.

95

257.    Set forth below are descriptions of several of Defendants' attempts to extort other various forms of property from other employers:

1.    **Beth Israel Deaconess Medical Center**

258.    Beth Israel Deaconess Medical Center ("BIDMC") is a major teaching hospital located in Boston, MA.  In or around October 2008, Defendant UHWE launched a corporate campaign against BIDMC in an effort to extort the hospital into a forced unionization agreement.

259.    Following the SEIU's standard corporate campaign modus operandi, Defendant UHWE's campaign, which it called "Eye On BI,"  involved widespread publication of negative and baseless information about BIDMC over the internet, and through protests and media events. Most of the Eye On BI campaign conduct and its associated allegations and complaints, on their face, were completely unrelated to union or labor issues such as wages and conditions of employment.  The union's purpose in conducting their attacks and publicizing these tangential concerns was not to promote any change with respect to the actual issues addressed, but to disparage BIDMC and impose such a high cost on BIDMC's operations that it would have no choice but to cede to Defendant UHWE's unionization demands.

260.    In furtherance of its corporate campaign, Defendant UHWE launched a website called www.EyeOnBI.org, the content of which was devoted almost exclusively to the disparagement of BIDMC.  On this website, Defendant UHWE makes many outrageous and baseless claims against the hospital administration, including allegations the hospital overcharges patients, taxpayers, state and federal governments, fails to offer charitable care to the poor, and suffers from "serious patient care issues."

261.    Defendant UHWE's slanderous website postings also contain accusations that: (a) certain hospital departments are without "permanent leadership," which has led to "serious patient care problems;" (b) the hospital inappropriately charges a "late night" ER fee; (c)

96

BIDMC runs the most expensive ER for medicare in all of Massachusetts; and (d) BIDMC overcharged Medicare in 2005 – an accusation the Defendants have hurled at Plaintiffs.   The website also includes personal attacks against then CEO Paul Levy.

262.   In addition to this website, Defendant UHWE leveled these same public disparagements through the use of other multi-media ads, including radio, television, and print as well as billboard and bus shelters.   For instance, Defendant UHWE published full page ads in various newspapers claiming that BIDMC had a higher readmission rate than the national average – this accusation was made with the intent of frightening the public about trusting their healthcare to BIDMC.   Defendant UHWE also publically questioned the quality of BIDMC's patient care and its commitment to follow-up care after discharging patients from the hospital. All of these public statements and efforts to publically disparage BIDMC were calculated to hurt BIDMC financially, embarrass its senior executives, and turn public sentiment against the hospital in order to force BIDMC to unionize its employees and pay the monies associated with unionization including dues, higher wages and pension payments.

263.   Defendant UHWE, through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under State law and punishable by imprisonment for more than one year, at least including, but not limited to, Mass. Gen. Laws. Ch. 265 § 25.

### 2.      Yale-New Haven Hospital

264.   Yale-New Haven Hospital ("Y-NH") is part of the Yale University hospital system and is located in Southern Connecticut.   For over ten years, Defendant NEHCEU engaged in a relentless corporate campaign against Y-NH in an effort to force the hospital into unionizing its employees with Defendant by giving up its rights under the NLRA and agreeing to card check and neutrality.

265.    In furtherance of its corporate campaign, Defendant NEHCEU filed or caused to be filed baseless lawsuits and regulatory actions against Y-NH.  For instance, in 2003, Defendant SEIU filed a lawsuit against Y-NH for allegedly overcharging low-income patients and "harassing" them to pay their bills.  The Union also publically claimed that despite Y-NY having "free-care funds" available to low income individuals, the hospital "has hidden these funds from those who need them."  In 2004, Defendant NEHCEU filed a complaint with the Occupational Safety and Health Administrator (OSHA) challenging the hospital's selection of safety syringes.  Defendant NEHCEU accused Y-NH of making its selection of safety syringes based on a restrictive buying agreement with a Group Purchasing Organization (GPO).  The Union criticized Y-NH for not having based its decision on employee feedback.

266.    In 2004, Defendant NEHCEU also took egregious measures to block N-YH's attempted construction of a $430,000,000 cancer center.  The center, which represented the most comprehensive cancer center of its kind in New England, was designed to consolidate cancer services into a central location and establish Y-NH as a major force in cancer research.  Caring nothing for the fact that its obstructionism might prevent the delivery of cancer treatment services to patients in the New Haven area, Defendant NEHCEU cynically used the cancer center project as leverage to bludgeon Y-NH into recognizing the Union as the exclusive bargaining agent of Y-NH's 1,800 hospital workers.  In doing so, Defendant NEHCEU created fake issues to block approval of the project.  It raised concerns with neighborhood parking, criticized employee hiring and training proposals, and advocated for zoning amendments that would have imposed such high costs on the project that it would not have been financially viable.

267.    Defendant NEHCEU also used surrogates to increase the pressure on Y-NH's project.  For instance, the Union solicited the assistance of U.S. Representative Rosa DeLauro (D-Conn.) and Representative George Miller of California to pressure on Y-HN.  Rep DeLauro

and Miller held "hearings" in New Haven purportedly to "learn" from the workers at Y-NH about their difficulties in securing unionization.

268.   At the direction of Defendant NEHCEU, surrogate Community Organized for Responsible Development ("CORD") held public rallies demanding that the hospital contribute money to housing, job training and youth recreation needs to compensate the community for the development of the proposed cancer center.  CORD also publically demanded free parking and higher wages for future workers, a first right of refusal to new jobs for city residents, and that the community be given access to affordable treatment.  CORD canvassed the community gathering "input" from over 800 community members on the hospital's cancer project.  Not surprisingly, CORD reported that these community members wanted certain demands met before the hospital's proposal was approved.

269.   The Mayor of New Haven, John DeStefano Jr., who was publically backed by the SEIU for governor during this time, also impeded the approval of the cancer center as a means to force Y-NH into agreeing to Defendant NEHCEU's unionization demands.  DeStefano met with SEIU members and union surrogates, including the SEIU Health Care Division Director Larry Fox, 1199 spokesman William Meyerson, and Andrea van den Heever, the president of the Connecticut Center for a New Economy (an advocacy organization underwritten by the SEIU). These meetings were purportedly held to discuss the union's possible "proposals for amendments" to the hospital's plans.  Immediately thereafter, DeStefano reiterated the union's threats to Y-NH by publically stating that he did not feel "optimistic" the project would happen unless the parties found common ground.  In the end, DeStafano shamelessly used his political position to aid the Union in delaying the project for over eighteen months, a delay that was estimated to add another $1.5 million each month to Y-NH's construction costs.  The project was only approved and allowed to begin once Y-NH capitulated to the public pressure created by

Defendant NEHCEU's corporate campaign assault, and ceded to the Union's organization demands.

270.    Defendant NEHCEU, through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under State law and punishable by imprisonment for more than one year, at least including, but not limited to, Conn. Gen. Stat. Ann. § 53a-48, -119, -122(a).

### 3.    Iroquois Nursing Homes

271.    In or around March 2008, Defendant UHWE won an election at Iroquois Nursing Homes, a skilled nursing facility in upstate New York.  When the negotiations for an initial collective bargaining agreement did not proceed to the union's liking, it launched a corporate campaign against a third party, Community General Hospital, a hospital located in Syracuse, New York, with the intent to cause Community to bring pressure on Iroquois during the negotiation process.

272.    In September 2008, members of UHWE picketed the home of Tom Quinn, President and CEO of Community General Hospital. UHWE did so to exert pressure over Mr. Quinn so that he would assert his influence over one of his employees who also served on the Board of Iroquois Nursing Home.  Furthermore, Al Davidoff, SEIU Vice President, personally harassed Mr. Quinn by calling him and confronting him face to face.  When Mr. Quinn informed Mr. Davidoff that Community did not view Board members at Iroquois as puppets of Community's administration and that he would not succumb to the union's tactics, Mr. Davidoff threatened that the union would continue to publically disparage Community General Hospital, until Mr. Quinn capitulated and exerted his influence over the Iroquois Board.

273.    Defendant UHWE through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under State law and

punishable by imprisonment for more than one year, at least including, but not limited to, N.Y. Pen. Law. § 155.05(e).

### 4.    Other Examples

274.    These and other examples demonstrate that the campaign against Plaintiffs is not an anomaly; rather, the extortionate tactics used are the Defendants' ordinary and regular means of conducting unionization drives and contract negotiations.

275.    Likewise, the concerted sabotage and vandalism carried out at the HealthBridge Connecticut facilities is typical of the Unions' regular way of doing business designed to extort employers in the course of strikes.

276.    For example, in March 2001, in an effort to extort collective bargaining concessions from ten Connecticut healthcare facilities unrelated to Plaintiffs, members of Defendant NEHCEU purportedly committed numerous criminal acts prior to the arrival of replacement workers designed to endanger the patients and impede business operations at the striking facilities. These unlawful acts were documented in an April 10, 2001 report of the Connecticut Chief State's Attorneys Office – Division of Criminal Justice entitled, "Nursing Home Strike Incidents," which noted that these types of incidents are common during work actions at facilities of this nature."  (*See* Exhibit B at 9).  These acts, which are strikingly similar to those perpetrated against patients in Plaintiffs' HealthBridge Facilities in Connecticut in July 2012, included:

- Patient wristbands were removed from 67 patients

- Patient photographs were removed from Kardex

- Damage to blood pressure cuffs

- The removal or theft of mechanical patients lift chains

- The loosening of bolts to a mechanical patients lift resulting in its collapse while being used to lift a patient

- Non-narcotic medications were found missing from a medcart on one of the wings

- Doors to offices and the oxygen storage room had super glue or its equivalent injected into the lock mechanism

- A shower was smeared with feces

- The distribution of chocolates by a staff member to patients despite their dietary restriction

- The pulling of a false fire alarm (a suspect was arrested)

- The theft of license plates from an employee's car

- Patient name plates were switched

- The jamming of fax machines

- The loosening of a door jam and the removal of a hinge pin in a patient's room

- Towels and face clothes that were thrown into a dumpster

- The puncture of inner seals of formula feeding bottles (with the outer seals being replaced concealing the contamination)

- The use of an unsterile urethral catheter kit on a patient. The kit's condition was not discovered as punctures to it had been concealed. Multiple kits were found to have been damaged in this manner

- Patient's narcotics cards were put in disarray

- Johnny coats (hospital gowns) were tied in knots

- A supply room was ransacked and sprayed with shaving cream

- The temperature log which reflects daily temperature readings of water was missing from the kitchen

- The thermostats were turned up in various patient rooms

277. Although law enforcement authorities determined that NEHCEU members perpetrated these heinous acts in the hours leading up to the 2001 strike, the individuals

responsible were not held accountable "due to the heavily politically charged environment as well as the fear and inability of patients to assist in the investigation."  (*See* Exhibit B at 9).

278.    Prior to these incidents, in 1998, NEHCEU members purportedly engaged in similar heinous conduct in the hours leading up to another strike, again with the goal of seeking to extort substantial monetary concessions from the employers involved in this 1998 strike.

279.    Moreover, Defendants' unlawful tactics are consistent with the SEIU's and its other affiliated locals' regular way of doing business.  For example, the SEIU and its affiliated locals have engaged in the following conduct:

- Launching a brutal smear campaign against Sodexo USA, utilizing a myriad of tactics designed to harm the company including but not limited to:  throwing plastic roaches onto food at a high-profiled event catered by Sodexo; scaring hospital patients by insinuating that Sodexo food contained bugs, rat droppings, mold and flies; lying to interfere with Sodexo business and sneaking into elementary schools to avoid security; violating lobbying laws to steer business away from the company; and threatening Sodexo employees with public exposure of alleged wrongdoing, all to force Sodexo to recognize the SEIU, to the exclusion of other unions, without a secret-ballot election.  Sodexo filed a RICO action against the SEIU in March 2011 (1:2011cv00276) and the matter settled in September 2011 following the denial of the SEIU's motion to dismiss.

- Threatening criminal charges against Prime Healthcare Services' senior executives unless they agreed to the SEIU's contract demands, and, after Prime refused, the SEIU made numerous false public claims about the safety of Prime's facilities.

- Attempting to divert customers from Beverly Enterprises by publishing false reports about workers tying nursing home patients to their beds and allowing them to remain in their own urine and excrement for hours, all because Beverly did not accede to the SEIU's unionization demands.

- Attempting to strong-arm Executive Management Services, Inc. ("EMS") into signing a neutrality agreement and telling EMS's Chief Executive Officer, "[w]e enjoy conversation, but we embrace confrontation. We are going to attack you, your employees, and your customers in the next 90 days."

- Attempting to force the unionization of the employees of Sutter Health in Northern California through numerous tactics including blocking development projects, calling on the state to revoke its tax-exempt status, and urging donors to stop contributing to the organization.

103

- Launching a smear campaign in numerous cities (including New Haven) against Aramark, disseminating falsehoods that the company does not practice safe food distribution as part of the SEIU's effort to obtain a card-check neutrality agreement and gain union recognition.

- Organizing a rally and press conference to release a report misrepresenting the workforce of the Enloe Medical Center outside the office of the investment firm owned by the vice chair of Enloe's board of trustees as a ploy during a disputed the SEIU election.

- Launching a smear campaign against the Catholic Healthcare Partners ("CHP") in which the SEIU disseminated publications with misrepresentations about the hospitals' financial arrangements for the uninsured and questioned CHP's charitable purpose to advance the SEIU's goal of unionizing CHP workers.

- Launching a smear campaign against the non-profit healthcare system, Advocate Health Care, disseminating falsehoods that Advocate overcharges the uninsured and harasses patients who cannot pay with the goal of organizing Advocate's healthcare workers.

- Launching a smear campaign against Tenet Healthcare Corp.; distributing publications that questioned Tenet's patient safety and nurse staffing levels; and exerting political influence over California regulators and lawmakers leading to scrutiny that Tenet effectively gouged Medicare and charged excessive hospital rates.

- Disseminating a report disparaging the quality of patient care at Genesis Health Ventures Inc. ("GHV") in an effort to damage the reputation and stock value of GHV that GHV would unilaterally allow the SEIU to unionize all of its facilities unopposed.

- Launching a smear campaign against healthcare provider Vencor, Inc. to influence insurers and investors to turn against the company and force Vencor out of California.   After initially claiming that the "Vencor/Hillhaven Family & Advocates Network" was established by "a group of family members" and was "not related to contract negotiations," the SEIU later admitted that the network was created as an economic weapon to achieve their bargaining goals in labor negotiations with Vencor.

- Targeting equity buyout funds, including the Carlyle Group in a "Behind the Buyouts" smear campaign (www.behindthebuyouts.org) with the motive of winning union representation at Plaintiffs partly or fully owned by the equity firms.   Union members wearing business suits busted into a conference at Manhattan's Waldorf-Astoria Hotel, where the Carlyle Group's co- founder was giving a speech, holding up a sign "Why does he pay taxes at a lower rate than the hotel's doorman?"  One Halloween, union members wore masks in the likeness of the Carlyle Group's co-founder and paraded in front of Carlyle offices handing out Sugar Daddy candy bars.

- Launching a campaign of extortionate assaults against Prime Healthcare Services, Inc. ("Prime"), a California-based hospital management company, targeting Prime's relationships with its patients, business partners, future business partners, and the core of Prime's business, and offering to stop these activities only if Prime agrees to the SEIU's and its affiliated local's forced unionization demands. This conduct is recounted more fully in a lawsuit recently filed by Prime in the United States District Court for the Northern District of California, and captioned, *Prime Healthcare Services, Inc. v. Service Employees International Union et al.*, Case No. 3:14-cv-3831 (N.D. Cal. filed Aug. 25, 2014).

### G.   The Effects of the Defendants' Illegal Campaign

280.   Defendants' corporate campaign onslaught has caused Plaintiffs to suffer significant financial harm.  In addition to the pecuniary losses described above, Plaintiffs have suffered millions of dollars in lost or reduced business generally and lost potential new business opportunities.  In this regard, an untold number of prospective patients have declined to enter Plaintiffs' facilities as a result of Defendants' sensational corporate campaign attacks.  Plaintiffs have additionally incurred millions of dollars in time, person-hours and other administrative expenses in defending against Defendants' unlawful attacks.   As alleged throughout the Amended Complaint, Defendants have desired to cause Plaintiffs precisely these types of devastating business losses.

281.   The severe economic harm Plaintiffs have suffered, unfortunately, is not the only fallout from Defendants' illegal conduct.  In already difficult economic times, particularly in the elder care industry, continued attacks by the Defendants have interfered with Plaintiffs' relationships with their patients.  These attacks are also likely to lead to unprofitable facilities that may be forced to close, layoffs of union and non-union employees, and additional monetary losses for the owners of the Plaintiffs.

282.   Worst of all, there is no end in sight to Defendants' campaign against Plaintiffs. In fact, in accordance with the Manual's emphasis on constant escalation of activity, the

campaign grows bigger and more obtrusive by the day.  It will not stop until the Courts or law enforcement officials compel an end to it.

283.    Even acceding to Defendants' current demands would not end the pattern of extortionate behavior.  Plaintiffs manage numerous non-union facilities in several states.  It will take the Defendants many years of sustained effort to unionize them all.  Even then, collective bargaining agreements are not static, and, in each round of contract negotiations, whether they occur when a contract expires or simply when Defendants' demand change, Defendants will bring the same extortionate conduct to bear on Plaintiffs and Daniel Straus.    The cycle of extortion will continue indefinitely.

284.    Although the NEHCHU currently represents some workers in Connecticut in five currently operating facilities managed by HealthBridge, these union employees represent a very small fraction of the total number of employees who work at Plaintiffs' facilities.  Defendants have no legal right to engage in collective bargaining with, or make demands of the Plaintiffs on behalf of the non-union employees in Plaintiff's facilities.

285.    Nonetheless, Defendants' extortionate corporate campaign will continue until the Plaintiffs accept their demands and accord recognition to each of the Defendants in this case or, as Defendants hope, Plaintiffs are driven out of business.

286.    And even if Defendants succeed in driving Plaintiffs out of business, Defendants' conduct will still continue.  Consistent with their regular way of doing business and their own internal e-mails, Defendants will simply turn their attention to another employer and use the example of what happened to Plaintiffs "as a signal to other employers who may want to take us on."

**FIRST CAUSE OF ACTION**
**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(a)**
**(Against Each Defendant)**

287.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

288.    Each of the Plaintiffs is a "person" under 18 U.S.C. § 1961(3).

289.    Each of the Defendants is a "person" under 18 U.S.C. § 1961(3).

290.    The 1199 Enterprise is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).  The 1199 Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

291.    The UHWE Pension Enterprise is another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).  The UHWE Pension Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

292.    The NEHCEU Pension Enterprise is another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).  The NEHCEU Pension Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

293.    The UHWE Pension Plan is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).  The UHWE Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

294.    The NEHCEU Pension Plan is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).  The NEHCEU Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

295.    Defendant UHWE is an "enterprise" within the meaning of meaning of 18 U.S.C. §§ 1961(4) and 1962(a).  Defendant UHWE was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

296.    Defendant NEHCEU is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).  The NEHCEU Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

297.    Each of the Defendants conspired among themselves and/or with one or more Non-Party Participants or other co-conspirators within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a).  Specifically, each of the Defendants, and/or each of the Defendants with one or more Co-Conspirators, agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor(s): that income, in the form of employer payments, union dues, pension and training fund contributions, unwanted or superfluous labor, and other payments and financial concessions, would be received by Defendants; such income would be derived from a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).  An object of Defendants' conspiracy to violate 18 U.S.C. §1962(a) was and is that the income described herein, or the proceeds of such income, would thereafter be used and invested in the operation of the aforementioned enterprises for numerous legitimate and illegitimate purposes including, inter alia, the conduct of additional extortionate corporate campaigns against Plaintiffs and other employers, the payment of salaries and fees to co-conspirators for their participation in the corporate campaign against Plaintiffs described herein, and the ongoing operation of the enterprises described above.

298.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) includes multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Plaintiffs' property rights described above, at least including, but not limited to, the following: Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a);

Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.  Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

299.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.   As set out more fully above, Defendants have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs to a large number of recipients.  Defendants have engaged in this scheme with the specific intent to defraud – specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to the Defendants' extortionate demands.   Moreover, Defendants have disseminated these false and misleading communications through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

300.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous violations of the Travel Act, 18 U.S.C. § 1952.  As discussed more fully above, Defendants have:  (i) travelled in interstate commerce, and used the mails and other facilities in interstate commerce; (ii) with the intention of promoting, managing, establishing, carrying on, or facilitate the promotion, management, establishment or carrying on their unlawful activity within the meaning of 18 U.S.C. § 1952; and (iii) have performed or attempted to perform one or more additional acts in furtherance of this unlawful activity.  This unlawful activity includes extortion and attempted extortion in violation of Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.

301.    Defendants' activities described herein have obstructed, delayed, or otherwise affected commerce.

302.    As a direct result of Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of Defendants' unlawful conspiracy described herein, the Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from patients leaving the Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, and (ii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

**SECOND CAUSE OF ACTION**
**Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(b)**
**(Against Each Defendant)**

303.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

304.    Each of the Plaintiffs is a "person" under 18 U.S.C. § 1961(3).

305.    Each of the Defendants is a "person" under 18 U.S.C. § 1961(3).

306.    Plaintiffs are each an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b).  Each was engaged in activities affecting interstate commerce at all times relevant to this Complaint.

307.    Each of the Defendants conspired among themselves and/or with one or more Non-Party Participants or other co-conspirators within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b). Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to acquire or maintain, directly or indirectly, an interest in or control of Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

308.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) includes multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Plaintiffs' property rights described above, at least including, but not limited to, the following: Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.  Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

309.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  As set out more fully above, Defendants have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs to a large number of recipients.  Defendants have engaged in this scheme with the specific intent to defraud – specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to Defendants' extortionate demands.  Moreover, Defendants have disseminated these false and misleading communications through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

310.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous violations of the Travel Act, 18 U.S.C. § 1952.  As discussed more fully above, Defendants have:  (i) travelled in interstate commerce, and used the mails and other facilities in interstate commerce; (ii) with the intention of promoting, managing, establishing, carrying on, or facilitate the promotion, management, establishment or carrying on their unlawful activity within the meaning of 18 U.S.C. § 1952; and (iii) have performed or

111

attempted to perform one or more additional acts in furtherance of this unlawful activity.  This unlawful activity includes extortion and attempted extortion in violation of Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.

311.    Defendants' activities described herein have obstructed, delayed, or otherwise affected commerce.

312.    As a direct result of Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of Defendants' unlawful conspiracy described herein, Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from patients leaving the Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, and (ii) the costs in time,  person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

### THIRD CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(c)
### (Against UHWE and NEHCEU)

313.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

314.    Each of the Plaintiffs is a "person" under 18 U.S.C. § 1961(3).

315.    Defendants UHWE and NEHCEU are each a "person" under 18 U.S.C. § 1961(3).

316.    The SEIU is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The SEIU was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

317.    The 1199 Enterprise is another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The 1199 Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

318.    The UHWE Pension Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The UHWE Pension Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

319.    The NEHCEU Pension Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The NEHCEU Pension Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

320.    The UHWE Pension Plan is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The UHWE Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

321.    The NEHCEU Pension Plan is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  NEHCEU Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

322.    The Care One Watch Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c).  The Care One Watch Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

323.    UHWE and NEHCEU were each and are associated with the SEIU, and each has conducted or participated, directly or indirectly, in the management and operation of the affairs of the SEIU in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

324.    UHWE and NEHCEU also were each and are associated with the 1199 Enterprise, and each has conducted or participated, directly or indirectly, in the management and

113

operation of the affairs of the 1199 Enterprise in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

325.   UHWE and NEHCEU, or at least Defendant UHWE, was and is associated with the UHWE Pension Enterprise and/or the UHWE Pension Plan and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the UHWE Pension Enterprise and/or the UHWE Pension Plan in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

326.   UHWE and NEHCEU, or at least Defendant NEHCEU, was and is associated with the NEHCEU Pension Enterprise an/or the NEHCEU Pension Plan, and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the NEHCEU Pension Enterprise and/or the NEHCEU Pension Plan in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

327.   UHWE and NEHCEU were each and are associated with the Care One Watch Enterprise and have conducted or participated, directly or indirectly, in the management and operation of the affairs of the Care One Watch Enterprise in relation to Plaintiffs through a pattern of racketeering activity under 18 U.S.C. §1961(1) and (5).

328.   The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) includes multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would have resulted in obtaining the property rights described above, at least including, but not limited to, the following: Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1. Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

329.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  As set out more fully above, UHWE and NEHCEU have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs to a large number of recipients.  UHWE and NEHCEU have engaged in this scheme with the specific intent to defraud – specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to the Defendants' demands.  Moreover, UHWE and NEHCEU have disseminated these false and misleading communications through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

330.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous violations of the Travel Act, 18 U.S.C. § 1952.  As discussed more fully above, NEHCEU and UHWE have:  (i) travelled in interstate commerce, and used the mails and other facilities in interstate commerce; (ii) with the intention of promoting, managing, establishing, carrying on, or facilitate the promotion, management, establishment or carrying on their unlawful activity within the meaning of 18 U.S.C. § 1952; and (iii) have performed or attempted to perform one or more additional acts in furtherance of this unlawful activity.  This unlawful activity includes extortion and attempted extortion in violation of Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.

331.    UHWE's and NEHCEU's activities described herein have obstructed, delayed, or otherwise affected commerce.

332.     As a direct result of UHWE's and NEHCEU's violation of 18 U.S.C. § 1962(c), the Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from patients leaving the Plaintiffs'  facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, and (ii) the costs in time, person-hours and other administrative expense because of UHWE's and NEHCEU's unlawful attacks described herein.

### FOURTH CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(c)
### (Against SEIU)

333.     Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

334.     Each of the Plaintiffs is a "person" under 18 U.S.C. § 1961(3).

335.     Defendant SEIU is a "person" under 18 U.S.C. § 1961(3).

336.     UHWE and NEHCEU are each an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  UHWE and NEHCEU were both engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

337.     The 1199 Enterprise is another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The 1199 Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

338.     The UHWE Pension Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The UHWE Pension Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

339.     The NEHCEU Pension Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The NEHCEU Pension Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

116

340.    The UHWE Pension Plan is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The UHWE Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

341.    The NEHCEU Pension Plan is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  NEHCEU Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

342.    The Care One Watch Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c).  The Care One Watch Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

343.    The SEIU was and is associated with both the UHWE and NEHCEU, and the SEIU has conducted or participated, directly or indirectly, in the management and operation of the affairs of both the UHWE and the NEHCEU in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

344.    The SEIU also was and is associated with the 1199 Enterprise, and each has conducted or participated, directly or indirectly, in the management and operation of the affairs of the 1199 Enterprise in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

345.    The SEIU was and is associated with the UHWE Pension Enterprise and/or the UHWE Pension Plan and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the UHWE Pension Enterprise and/or the UHWE Pension Plan in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

346.    The SEIU was and is associated with the NEHCEU Pension Enterprise an/or the NEHCEU Pension Plan, and has conducted or participated, directly or indirectly, in the

management and operation of the affairs of the NEHCEU Pension Enterprise and/or the NEHCEU Pension Plan in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

347.    The SEIU was and is associated with the Care One Watch Enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the Care One Watch Enterprise in relation to Plaintiffs through a pattern of racketeering activity under 18 U.S.C. §1961(1) and (5).

348.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) includes multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would have resulted in obtaining the property rights described above, at least including, but not limited to, the following: Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1. Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

349.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  As set out more fully above, the SEIU has engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs to a large number of recipients.  The SEIU has engaged in this scheme with the specific intent to defraud – specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to the Defendants' demands.  Moreover, the SEIU has disseminated these false and misleading communications through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

350.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous violations of the Travel Act, 18 U.S.C. § 1952.  As discussed more fully above, the SEIU has:  (i) travelled in interstate commerce, and used the mails and other facilities in interstate commerce; (ii) with the intention of promoting, managing, establishing, carrying on, or facilitate the promotion, management, establishment or carrying on their unlawful activity within the meaning of 18 U.S.C. § 1952; and (iii) has performed or attempted to perform one or more additional acts in furtherance of this unlawful activity.  This unlawful activity includes extortion and attempted extortion in violation of Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.

351.    The SEIU's activities described herein have obstructed, delayed, or otherwise affected commerce.

352.    As a direct result of the SEIU's violation of 18 U.S.C. § 1962(c), the Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from patients leaving the Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, and (ii) the costs in time, person-hours and other administrative expense because of the SEIU's unlawful attacks described herein.

### FIFTH CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)
### (Against UHWE and NEHCEU)

353.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

354.    Each of the Plaintiffs is a "person" under 18 U.S.C. § 1961(3).

355.    Defendants UHWE and NEHCEU are each    a "person" under 18 U.S.C. § 1961(3).

356.    The SEIU is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).   The SEIU was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

357.    The 1199 Enterprise is another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).   The 1199 Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

358.    The UHWE Pension Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).   The UHWE Pension Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

359.    The NEHCEU Pension Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).   The NEHCEU Pension Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

360.    The UHWE Pension Plan is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).   The UHWE Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

361.    The NEHCEU Pension Plan is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).   The NEHCEU Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

362.    The Care One Watch Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c).   The Care One Watch Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

363.    UHWE and NEHCEU each conspired among themselves and/or with one or more of the Non-Party Participants or other co-conspirators, within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c), by agreeing, intending, and/or adopting the goal of furthering or facilitating, the following endeavor(s):   to conduct or participate, directly or indirectly, in the management and operation of the affairs of the SEIU in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

364.    UHWE and NEHCEU each conspired among themselves and/or with one or more of the Non-Party Participants or other co-conspirators, within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).   Specifically, UHWE and NEHCEU each agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the 1199 Enterprise in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

365.    The UHWE and NEHCEU, or at least Defendant UHWE, conspired with the other and/or with one or more of the Non-Party Participants or other co-conspirators, within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).   Specifically, UHWE and NEHCEU, or at least Defendant UHWE, agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the UHWE Pension Enterprise and/or the UHWE Pension Plan in relation to the Plaintiffs through a pattern of racketeering activity 18 U.S.C. § 1961(1) and (5).

366.    UHWE and NEHCEU, or at least Defendant NEHCEU, conspired with the other and/or with one or more of the Non-Party Participants or other co-conspirators, within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c).   Specifically, UHWE and

NEHCEU, or at least Defendant NEHCEU, agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the NEHCEU Pension Enterprise and/or the NEHCEU Pension Plan in relation to the Plaintiffs through a pattern of racketeering activity 18 U.S.C. § 1961(1) and (5).

367.   The UHWE and NEHCEU conspired among themselves and/or with one or more of the Non-Party Participants or other co-conspirators, within the meaning of 18 U.S.C. §1962(d) to violate 18 U.S.C. §1962(c).  Specifically, UHWE and NEHCEU agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the Care One Watch Enterprise in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

368.   The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) includes multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would have resulted in obtaining the property rights described above, at least including, but not limited to, the following: Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1. Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

369.   The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  As set out more fully above, UHWE and NEHCEU have engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs to a large number of recipients.  UHWE and NEHCEU have engaged in this scheme with the

specific intent to defraud – specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to Defendants' demands. Moreover, UHWE and NEHCEU have disseminated these false and misleading communications through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

370.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous violations of the Travel Act, 18 U.S.C. § 1952. As discussed more fully above, UHWE and NEHCEU have:  (i) travelled in interstate commerce, and used the mails and other facilities in interstate commerce; (ii) with the intention of promoting, managing, establishing, carrying on, or facilitate the promotion, management, establishment or carrying on their unlawful activity within the meaning of 18 U.S.C. § 1952; and (iii) have performed or attempted to perform one or more additional acts in furtherance of this unlawful activity. This unlawful activity includes extortion and attempted extortion in violation of Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.

371.    UHWE's and NEHCEU's activities described herein have obstructed, delayed, or otherwise affected commerce.

372.    As a direct result of UHWE's and NEHCEU's  racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of UHWE's and NEHCEU's unlawful conspiracy described herein, Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from patients leaving the Plaintiffs' facilities and prospective patients being dissuaded

from joining the Plaintiffs' facilities, and (ii) the costs in time, person-hours and other administrative expense because of UHWE's and NEHCEU's unlawful attacks described herein.

### SIXTH CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)
### (Against SEIU)

373.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

374.    Each of the Plaintiffs is a "person" under 18 U.S.C. § 1961(3).

375.    Defendants SEIU is a "person" under 18 U.S.C. § 1961(3).

376.    UHWE and NEHCEU are each an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  UHWE and NEHCEU were both was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

377.    The 1199 Enterprise is another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The 1199 Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

378.    The UHWE Pension Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The UHWE Pension Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

379.    The NEHCEU Pension Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The NEHCEU Pension Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

380.    The UHWE Pension Plan is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The UHWE Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

381.    The NEHCEU Pension Plan is yet another "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).  The NEHCEU Pension Plan was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

382.    The Care One Watch Enterprise is yet another "enterprise" within the meaning of 18 U.S.C. §§1961(4) and 1962(c).  The Care One Watch Enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

383.    The SEIU conspired with one or more of the Non-Party Participants or other co-conspirators, within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c), by agreeing, intending, and/or adopting the goal of furthering or facilitating, the following endeavor(s):  to conduct or participate, directly or indirectly, in the management and operation of the affairs of the UHWE and NEHCEU in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

384.    The SEIU conspired with one or more of the Non-Party Participants or other co-conspirators, within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c). Specifically, the SEIU agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the 1199 Enterprise in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

385.    The SEIU conspired with one or more of the Non-Party Participants or other co-conspirators, within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c). Specifically, the SEIU agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the UHWE Pension Enterprise and/or the UHWE Pension Plan in relation to the Plaintiffs through a pattern of racketeering activity 18 U.S.C. § 1961(1) and (5).

386.    The SEIU conspired with one or more of the Non-Party Participants or other co-conspirators, within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c). Specifically, the SEIU agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the NEHCEU Pension Enterprise and/or the NEHCEU Pension Plan in relation to the Plaintiffs through a pattern of racketeering activity 18 U.S.C. § 1961(1) and (5).

387.    The SEIU conspired with one or more of the Non-Party Participants or other co-conspirators, within the meaning of 18 U.S.C. §1962(d) to violate 18 U.S.C. §1962(c). Specifically, the SEIU agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the Care One Watch Enterprise in relation to the Plaintiffs through a pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5).

388.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) includes multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would have resulted in obtaining the property rights described above, at least including, but not limited to, the following: Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1. Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

389.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  As set out more fully above, the SEIU has engaged in a coordinated scheme to disseminate false, fraudulent, and misleading information about Plaintiffs to a large number of recipients.  The SEIU has engaged in this scheme with the specific intent to defraud –

specifically, to deceive the community, patients, prospective patients, and their family members into thinking that the facilities managed by Plaintiffs are unsafe and/or run improperly so that Plaintiffs will lose money and be forced to accede to Defendants' demands, or else, be driven out of business.  Moreover, the SEIU has disseminated these false and misleading communications through the wires (for example, by facsimile, by e-mail, over the Internet, and over the radio) and via U.S. mail.

390.    The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5) also includes multiple, repeated, and continuous violations of the Travel Act, 18 U.S.C. § 1952.  As discussed more fully above, the SEIU has:  (i) travelled in interstate commerce, and used the mails and other facilities in interstate commerce; (ii) with the intention of promoting, managing, establishing, carrying on, or facilitate the promotion, management, establishment or carrying on their unlawful activity within the meaning of 18 U.S.C. § 1952; and (iii) have performed or attempted to perform one or more additional acts in furtherance of this unlawful activity.  This unlawful activity includes extortion and attempted extortion in violation of Conn. Gen. Stat. Ann. §§ 53a-48, -119(5), -122(a); Mass. Gen. Laws ch. 265 § 25; and N.J. Stat. Ann. §§ 2C:20-5, 2C:5-1.

391.    The SEIU's activities described herein have obstructed, delayed, or otherwise affected commerce.

392.    As a direct result of the SEIU's racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of the SEIU's unlawful conspiracy described herein, Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from patients leaving the Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs'

facilities, and (ii) the costs in time, person-hours and other administrative expense because of UHWE's and NEHCEU's unlawful attacks described herein.

## SEVENTH CAUSE OF ACTION
### Defamation
### (Against Each Defendant)

393.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

394.    As set forth above, Defendants have made, published, and/or caused to be published intentionally false statements tothe public, to current and prospective customers of Plaintiffs, to government agencies,  and others, concerning the Plaintiffs, the facilities Plaintiffs manage, the quality of health care Plaintiffs provide, their billing practices, and other matters, all designed to interfere with customer's relationships with the Plaintiffs, to deter potential customers from doing business with Plaintiff, and otherwise to harm Plaintiffs.

395.    Defendants made, published, and/or caused to be published these intentionally false statements with actual malice.  That is, Defendants knew the statements they made to be false, and/or made these statements with reckless disregard for their truth or falsity.  Defendants did not enjoy any privilege to make these intentionally false statements.

396.    As a result of Defendants' conduct, the Plaintiffs have suffered damages, including but not limited to (i) lost revenue from patients leaving Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, (ii) reputational injury, and (iii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

397.    Defendants' engaged in the foregoing practices willfully, wantonly, intentionally, and maliciously, for the express purpose of causing Plaintiffs the above losses.

## EIGHTH CAUSE OF ACTION
### Trade Libel
### (Against Each Defendant)

398.    Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

399.    The Plaintiffs and the Defendants are engaged in the conduct of trade and/or commerce.

400.    As set forth above, Defendants have made, published, and/or caused to be published intentionally false statements the public, to current and prospective customers of Plaintiffs, to government agencies,  and others, concerning the Plaintiffs, the facilities Plaintiffs manage, the quality of health care Plaintiffs provide, their billing practices, and their overall business practices, all designed to interfere with customer's relationships with the Plaintiffs, to deter potential customers from doing business with Plaintiff, and otherwise to harm Plaintiffs.

401.    Defendants made, published, and/or caused to be published these intentionally false statements with actual malice.  That is, Defendants knew the statements they made to be false, and/or made these statements with reckless disregard for their truth or falsity.  Defendants did not enjoy any privilege to make these intentionally false statements.

402.    As a result of Defendants' conduct, the Plaintiffs have suffered damages, including but not limited to (i) lost revenue from patients leaving Plaintiffs' facilities and prospective patients being dissuaded from joining the Plaintiffs' facilities, (ii) reputational injury, and (iii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

403.    Defendants' engaged in the foregoing practices willfully, wantonly, intentionally, and maliciously, for the express purpose of causing Plaintiffs the above losses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against all Defendants, jointly and severally, as follows:

1.     Compensatory and consequential damages resulting from injury to Plaintiffs' business and property in the millions of dollars, as set forth above and to be further established at trial;

2.     Treble the damages sustained by Plaintiffs as described above;

3.     The costs of this suit (including reasonable attorneys' fees) and post-judgment interest;

4.     Exemplary and/or punitive damages under applicable State law for Defendants' intentional, willful, wanton, outrageous or malicious misconduct, characterized by their evil or rancorous motive, ill will and intent to injure Plaintiffs; or Defendants' gross recklessness or gross negligence evincing a conscious disregard for Plaintiffs' rights;

5.     Equitable relief as might be appropriate pursuant to applicable law, including but not limited to enjoining Defendants from continuing their scheme to extort Plaintiffs as follows:

i.     Enjoining Defendants from continuing to interfere unlawfully with the Plaintiffs' contractual and/or economic business relationships by wrongfully inducing the Plaintiffs' patients to end and/or not renew their contractual and/or business relationships with the Plaintiffs;

ii.     Enjoining Defendants from continuing to make threats to harm the Plaintiffs unless and until Plaintiffs deliver to Defendants the property described herein;

iii.     Enjoining Defendants from engaging in independent violations of federal, state and local laws with regard to Plaintiffs' business relations, including but not limited to the violations of the manner and type described in the Complaint;

130

          iv.     Imposing reasonable restrictions on the future activities and conduct of any of the Defendants; and

          v.     Any other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury for each and every one of the foregoing claims so triable.

Respectfully submitted,

**K&L GATES LLP**

One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Fax:  (973) 848-4001

*Attorneys for Plaintiffs Care One Management, LLC, HealthBridge Management, LLC, Care One, LLC, and Care Realty, LLC*

By:  /s/ Rosemary Alito
       Rosemary Alito

**CRITCHLEY, KINUM & VAZQUEZ, LLC**

75 Livingston Avenue
Roseland, New Jersey 07068
(973) 422-9200

*Attorneys for all other Plaintiffs*

By:  /s/ Michael Critchley
       Michael Critchley

Dated:  June 16, 2015

## <u>CERTIFICATION UNDER L. CIV. R. 11.2</u>

I certify that the matter in controversy is not the subject matter of any other action pending in any court or of any pending arbitration or administrative proceeding.

Respectfully submitted,

**K&L GATES LLP**

One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Fax:  (973) 848-4001

*Attorneys for Plaintiffs Care One Management, LLC, HealthBridge Management, LLC, Care One, LLC, and Care Realty, LLC*

By:   /s/ Rosemary Alito_____
        Rosemary Alito

**CRITCHLEY, KINUM & VAZQUEZ, LLC**

75 Livingston Avenue
Roseland, New Jersey 07068
(973) 422-9200

*Attorneys for all other Plaintiffs*

By:   /s/ Michael Critchley_____
        Michael Critchley

Dated:  June 16, 2015

132

## <u>LOCAL RULE 201.1 CERTIFICATION</u>

I certify under penalty of perjury that the matter in controversy is not eligible for compulsory arbitration because the damages recoverable by Plaintiffs exceed the sum of $150,000, exclusive of interest and costs.

Respectfully submitted,

**K&L GATES LLP**

One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Fax:  (973) 848-4001

*Attorneys for Plaintiffs Care One Management, LLC, HealthBridge Management, LLC, Care One, LLC, and Care Realty, LLC*

By:   /s/ Rosemary Alito_____
       Rosemary Alito

**CRITCHLEY, KINUM & VAZQUEZ, LLC**

75 Livingston Avenue
Roseland, New Jersey 07068
(973) 422-9200

*Attorneys for all other Plaintiffs*

By:   /s/ Michael Critchley_____
       Michael Critchley

Dated:  June 16, 2015