NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

CARE ONE MANAGEMENT, LLC, et al.,

                      Plaintiffs,

      v.

UNITED HEALTHCARE WORKERS
EAST, SEIU 1199, et al.,

                      Defendants.

Civ. No. 12-6371(SDW)(MAH)

**OPINION**

October 28, 2019

**WIGENTON**, District Judge.

Before the Court are: 1) Plaintiffs Care One Management, LLC, HealthBridge

Management, LLC ("HealthBridge"), the Care One Facilities,[1] and the HealthBridge Facilities'[2]

---

[1] Care One manages 21 facilities located throughout the State of New Jersey including the following: Care One at Birchwood, LLC, d/b/a Care One at The Highlands; Care One at East Brunswick, LLC, d/b/a Care One at East Brunswick; Care One at Hamilton, LLC, d/b/a Care One at Hamilton; Care One at Madison Avenue, LLC, d/b/a Care One at Madison Avenue; Care One at Mercer, LLC, d/b/a Care One at Ewing; Care One at Parsippany- Troy Hills, LLC, d/b/a Care One at Morris; Care One at Teaneck, LLC, d/b/a Care One at Teaneck; Care One at Wall, LLC, d/b/a Care One at Wall; Care Two, LLC, d/b/a Care One at Livingston; Care One at Moorestown, LLC, d/b/a Care One at Moorestown; Elmwood Evesham Associates, LLC, d/b/a Care One at Evesham; HCC, LLC, d/b/a Care One at Holmdel; King James Care Center of Middletown, LLC, d/b/a Care One at King James; Millennium Healthcare Centers II, LLC, d/b/a Care One at Dunroven; Millennium Healthcare Centers II, LLC, d/b/a Care One at Valley; Millennium Healthcare Centers, LLC, d/b/a Care One at Pine Rest; Millennium Healthcare Centers, LLC, d/b/a Care One at The Cupola; 11 History Lane Operating Company, LLC, d/b/a Care One at Jackson; 101 Whippany Road Operating Company, LLC d/b/a Care One at Hanover Township; 301 Union Street, LLC, d/b/a Care One at Wellington; and 493 Black Oak Ridge Road, LLC, d/b/a Care One at Wayne; the Rehabilitation Center at Raritan Bay Medical Center, LLC d/b/a Care One at Raritan Bay Medical Center; Care One at Trinitas, LLC, d/b/a LTACH – CareOne at Trinitas Regional Medical Center; and Care One at Harmony Village, LLC, d/b/a CareOne Harmony Village at Moorestown (collectively referred to herein as the "Care One Facilities"). (D.E. 242 at 1 n.1.)

[2] The HealthBridge Facilities include the following: 600 Kinderkamack Road Operating Company, LLC, d/b/a Oradell Health Care Center; 800 River Road Operating Company, LLC, d/b/a Woodcrest Health Care Center; 2 Cooper Plaza Operating Company, LLC, d/b/a South Jersey Health Care Center; 1621 Route 22 West Operating Company, LLC, d/b/a Somerset Valley Rehabilitation and Nursing Center; 341 Jordan Lane Operating Company II, LLC, d/b/a Wethersfield Health Care Center; 1 Burr Road Operating Company II, LLC, d/b/a Westport Health Care Center; 107 Osborne Street Operating Company II, LLC, d/b/a Danbury Health Care Center; 240 Church Street Operating Company II, LLC, d/b/a Newington Health Care Center; 245 Orange Avenue Operating Company II, LLC, d/b/a West River Health Care Center; 710 Long Ridge Road Operating Company II, LLC, d/b/a Stamford Health Care Center; 162 South Britain Road Operating Company II, LLC, d/b/a River Glen Health Care Center; 2028 Bridgeport Avenue Operating Company II, LLC, d/b/a Golden Hill Health Care Center; 745 Highland Avenue

(collectively, "Plaintiffs" or "Care One") Motion for Summary Judgment pursuant to Federal

Rule of Civil Procedure ("Rule") 56; and 2) Defendants 1199SEIU United Healthcare Workers

East ("UHWE"), New England Health Care Employees Union, District 1199 ("NEHCEU"), and

Service Employees International Union's ("SEIU") (collectively "Defendants" or "Defendant

Unions") Motion for Summary Judgment pursuant to Rule 56.  Jurisdiction is proper pursuant to

28 U.S.C. § 1331, 28 U.S.C. § 1337, and 28 U.S.C. § 1367.  Venue is appropriate pursuant to 28

U.S.C. § 1391.  This opinion is issued without oral argument pursuant to Rule 78.  For the

reasons stated herein, Plaintiffs' motion for summary judgment is **DENIED** and Defendants'

motion for summary judgment is **GRANTED**.

## I.    BACKGROUND AND PROCEDURAL HISTORY

The core of the instant dispute is whether Defendants have permissibly pursued collective

bargaining and unionization by means of "robust and often hard-charging speech and advocacy

critical of the business and labor practices of Care One and its owner/CEO Daniel Straus

("Straus")," (D.E. 402 at 7[3]; Kekacs Decl. Ex 1 at 3 and Schedule 1)[4], or instead, have

---

Operating Company, LLC, d/b/a The Highlands Health Care Center; 135 Benton Drive Operating Company, LLC, d/b/a Redstone Health Care Center; 178 Lowell Street Operating Company, LLC, d/b/a Lexington Health Care Center; 19 Varnum Street Operating Company, LLC, d/b/a Lowell Health Care Center; 199 Andover Street Operating Company, LLC, d/b/a Peabody Glen Health Care Center; 2101 Washington Street Operating Company, LLC, d/b/a Newton Healthcare Center; 221 Fitzgerald Drive Operating Company, LLC, d/b/a New Bedford Health Care Center; 260 Easthampton Road Operating Company, LLC, d/b/a Holyoke Rehabilitation Center; 312 Millbury Avenue Operating Company, LLC, d/b/a Millbury Health Care Center; 49 Thomas Patten Drive Operating Company, LLC, d/b/a Cedar Hill Health Care Center; 548 Elm Street Operating Company, LLC, d/b/a Calvin Coolidge Nursing and Rehab. Center for Northhampton; 57 Old Road to Nine Acre Corner Operating Company, LLC, d/b/a Concord Health Care Center; 64 Performance Drive Operating Company, LLC, d/b/a Weymouth Health Care Center; 750 Woburn Street Operating Company, LLC, d/b/a Wilmington Health Care Center; Park, Marion and Vernon Streets Operating Company, LLC, d/b/a Brookline Health Care Center; 265 Essex Street Operating Company, LLC, d/b/a Essex Park Rehabilitation Center; and DES Senior Care Holdings LLC, d/b/a Sweet Brook Care Centers (collectively referred to herein as the "HealthBridge Facilities").  (D.E. 242 at 2 n.2.)
[3] Citations to "D.E." refer to docket entries in the Court's Electronic Case Filing System for this matter and any internal citations contained therein.
[4] Defendants submitted three separate declarations from Caitlin Kekacs containing nearly 400 exhibits.  *See* D.E. 403-406 (filed March 15, 2019); 415 (filed April, 29, 2019); D.E. 421 (filed May 31, 2019).  For ease of reference, this Opinion treats these three submissions as a single declaration which will be cited as "Kekacs Decl."  Similarly, Plaintiffs submitted three separate declarations from Rosemary Alito containing over 300 exhibits.  *See* D.E. 401,

impermissibly engaged in a "campaign of intimidation, interference, threats, deceptive trade practices, abuse of process, vandalism, and other illegal and extortionate conduct," that violates federal and state law, (D.E. 242 (Second Am. Compl. ("SAC")) ¶ 1). Because the parties' history is contentious and complex, this Court will only address those facts necessary to the determination of the instant motions.

Plaintiffs manage nursing homes and assisted living facilities for the elderly in New Jersey, Connecticut, and Massachusetts. (SAC ¶¶ 1, 25-30; D.E. 402-1 ¶¶ 2-3; Kekacs Ex. 1-3, 6 at 7.) Defendants are labor unions whose members are care providers at Plaintiffs' facilities. (SAC ¶ 118.)[5] In Connecticut, Plaintiffs and NEHCEU negotiated and executed Collective Bargaining Agreements ("CBAs") at six of Plaintiffs' facilities ("the Connecticut Facilities") which established standards of wages, hours and other working conditions for union employees between December 31, 2004 through March 16, 2011. (Kekacs Decl. Ex. 11-16; Alito Decl. Ex. 15 ¶¶ 2-4.) In New Jersey, UHWE helped unionize Plaintiffs' facility in Somerset ("Somerset Facility"), and was elected as the exclusive bargaining representative for that location in 2010. (D.E. 402-8 ¶¶ 2-5; 402-4 ¶ 7; Kekacs Decl. Ex. 278 at 73:22-74:14, 121:2-8; Ex. 274 at 45:11-22; *see also 1621 II*, 725 F. App'x at 134-36.)

Beginning in 2010 and continuing through 2011, Defendants filed charges against Plaintiffs with the National Labor Relations Board ("NLRB") alleging that Plaintiffs had: 1) improperly terminated or threatened employees, discontinued benefits, and wrongfully suppressed union communications at the Connecticut Facilities; and 2) engaged in unfair labor practices during and after the union election in Somerset in order to impede employees' exercise

407 (filed March 15, 2019); 417 (filed April 29, 2019); 422 (filed May 31, 2019). For ease of reference, this Opinion treats these three submissions as a single declaration which will be cited as "Alito Decl."
[5] SEIU is an international union. UHWE and NEHCEU are local affiliates of SEIU. "International unions and their local affiliates are separate and distinct legal entities." *1621 Route 22 W. Operating Co., LLC v. NLRB*, 725 F. App'x. 129, 136 (3d Cir. 2018) ("*1621 II*"); *see also* D.E. 402-3 ¶ 24; SAC ¶ 33.

of labor rights.[6]  *See HealthBridge Mgmt., LLC v. NLRB*, 902 F.3d 37, 40-42 (2d Cir. 2018);

*HealthBridge Mgmt., LLC v. NLRB*, 798 F.3d 1059, 1064-66 (D.C. Cir. 2015); *1621 Route 22 W.*

*Operating Co., LLC v. NLRB*, 825 F.3d 128, 133-37 (3d Cir. 2016) ("*1621 I*"); *1621 II*, 725 F.

App'x. at 133-35.  The NLRB subsequently issued Complaints and Notices of Hearing pursuant

to those charges, alleging that Plaintiffs were "interfering with, restraining, and coercing

employees in the exercise of their rights guaranteed" by the National Labor Relations Act, 29

U.S.C. § 151 *et seq*. ("NLRA"), and "refusing to bargain collectively and in good faith with the

exclusive collective bargaining representative of" their employees.  (*See* Kekacs Decl. Ex. 234 –

238.)[7]

    In January 2011, while these complaints were pending, NEHCEU and Plaintiffs'

representatives began negotiations to renew the Connecticut Facilities' CBAs.  (D.E. 402-1 Sec.

D.)  Negotiation topics included wages, work hours, retirement and pension benefits, health care

premiums, staffing ratios, and education/training.  (*See e.g.*, Kekacs Decl. Ex. 26-33, 35.)

Despite engaging in thirty-eight bargaining sessions, the last of which was held on May 31,

2012, the parties were unable to finalize successor agreements.  (D.E. 402-1 ¶ 40; D.E. 402-2 ¶¶

19-20; Alito Decl. Ex. 194-197, 200-201; Kekacs Decl. Ex. 26-33, 35.)    On June 22, 2012,

NEHCEU called a strike at the Connecticut Facilities, which was to begin on July 3, 2012 at 6

a.m.  (D.E. 402-1 ¶¶ 315-19; D.E. 402-2 ¶ 84.)  On the night of July 2, 2012, the Connecticut

---

[6] Defendant NEHCEU brought charges in Connecticut which were consolidated into three separate NLRB Region 34 Complaints.  *See* Kekacs Decl. Ex. 234 (consolidating Case Nos. 34-CA-12715, 12732, 12765, 12766, 12767, 12768, 12769, 12770, and 12771); Ex. 235 (Case No. 34-CA-12964); Ex. 238 (consolidating Case Nos. 34-CA-070823, 072875, 073303, 075226, and 083335).  Defendant UHWE brought charges in New Jersey, which were consolidated into three separate NLRB Region 22 Complaints.  *See* Kekacs Decl. Ex 233 (consolidating Case Nos. 22-CA-29599 and 29628); Ex. 236 (Case. No. 22-CA-64426); Ex. 237 (Case No. 22-CA-069152).

[7] Those claims were ultimately found to have merit and were upheld on appeal.  *See HealthBridge Mgmt., LLC*, 902 F.3d at 40-42; *HealthBridge Mgmt., LLC*, 798 F.3d at 1064-66; *1621 II*, 725 F. App'x at 132; *1621 I*, 825 F.3d at 133.  Later charges, filed in 2012, again determined that Plaintiffs had violated federal labor laws and were also upheld on appeal.  *See 800 River Rd. Op. Co. v. NLRB*, 846 F.3d 378, 381 (D.C. Cir. 2017); *800 River Rd. Op. Co. v. NLRB*, 784 F.3d 902, 918 (3d Cir. 2015); *Care One at Madison Ave, LLC v. NLRB*, 832 F.3d 351, 355 (D.C. Cir. 2016).

Facilities were vandalized and sabotaged by unknown persons. (D.E. 402-1 ¶¶ 322-23; SAC ¶ 169.) The damage done to the facilities included tampering with patient identifying information (including patient wrist bands, door name plates, and dietary requirements), altering medical records, damaging and/or hiding medical equipment, and vandalizing laundry equipment. (Alito Decl. Ex. 250-52, 254-59; Kekacs Decl. Ex. 140, 366.) Although numerous police and incident reports were filed, the persons responsible were never identified. (*See* Alito Decl. Ex. 250-52, 254-59; Kekacs Decl. Ex. 129 at CareOne_99539 (noting that "efforts to identify those responsible for [sabotage] have been unsuccessful").)

Prior to this event, in 2011, NEHCEU and UHWE, with assistance from SEIU, launched what Defendants describe as a "public speech and advocacy campaign" (the "Campaign")[8] critical of Plaintiffs' business and labor practices. (*See* D.E. 402-1 ¶¶ 85-88; 402-3 ¶¶ 27-29; 402-4 ¶¶ 18-20; 402-6 ¶ 15.) The Campaign included: 1) the launch of websites entitled, "Care One Watch" and "HealthBridge Watch" (collectively, "COW"); 2) publication of print and radio advertisements, including billboards; and 3) dissemination of flyers. (SAC ¶¶ 126, 208.) The Campaign's websites, advertisements, and flyers questioned the propriety of Plaintiffs' billing practices and standards of patient care, challenged Plaintiffs' opposition to unionization, and publicized NLRB complaints filed against Plaintiffs. (*See* SAC ¶¶ 209-37, Ex. M-II; Kekacs Decl. Ex. 39, 40, 42, 72, 79, 83, 84, 86, 90, 105, 106, 151, 152, 286[9].) The Campaign also staged peaceful protests and demonstrations, including one held on August 23, 2012 at Care

---

[8] This type of campaign (sometimes referred to as a "contract campaign" or a "corporate campaign") "encompasses a wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer" which "may include . . . litigation, political appeals, requests that regulatory agencies investigate and pursue employer violations of state or federal law, and negative publicity campaigns . . . ." *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, AFL-CIO-CLC*, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997); *see also Smithfield Foods, Inc. v. United Food & Commercial Workers Int'l Union*, 633 F. Supp. 2d 214, 219 (E.D. Va. 2008).

[9] Exhibit 286 contains a chart identifying "the 125 publications that Plaintiffs have identified" as being "false, misleading or baseless" and includes "Plaintiffs' reason for contending that each itemized publication is allegedly fraudulent." (Kekacs Ex. 286.)

One's offices which included the delivery of petitions to Straus that called for fair collective bargaining, (D.E. 402-2 ¶ 103; 402-4 ¶ 96; 402-5 ¶¶ 57-61; 402-10 ¶ 6; 402-16 ¶ 4; Kekacs Decl. Ex. 142-44), and one at New York University Law School ("NYU") at which demonstrators handed out materials that questioned Straus's values, specifically what Defendants called the "hypocrisy" of endowing the Institute for the Advanced Study of Law & Justice at NYU while "breaking labor law." (*See* SAC Ex. JJ, KK, MM, NN, AAA; Kekacs Decl. Ex. 54, 55, 57, 58.)

Defendants also engaged in regulatory activity. In July 2011 and continuing through November, in response to Plaintiffs' filing of Determination of Need ("DoN") applications with the Massachusetts Department of Health to obtain approval for capital improvement projects at several of its skilled nursing facilities in that state, (SAC Ex. I; Kekacs Decl. Ex. 145; Alito Decl. Ex. 133 at 25:21-27:16), UHWE filed petitions for public hearings on three of Plaintiffs' applications. (Kekacs Decl. 149, 150; *see also* 105 Mass. Code Regs. 100.445 (providing that public hearings may be held to "allow any Person to make their views known with respect to [a DoN]" and to present "any comment(s) that may be relevant to the consideration of an Application").)[10] In February 2012, Defendants asked Richard Blumenthal, a United States Senator for Connecticut, to look into what Defendants contended were questionable billing practices by Plaintiffs. (Alito Decl. Ex. 118 at 97:4-20.) On February 22, 2012, the Senator sent a letter to the Secretary of Health and Human Services asking that the Department "audit Healthbridge's billing practices to Medicare and take any necessary enforcement actions." (Kekacs Decl. Ex. 102.)

On October 10, 2012, Plaintiffs filed suit in this Court alleging that Defendants have ceased with traditional organizing and negotiation tactics in favor of extortion and fraud in

---

[10] A petition for public hearing may be brought by any "ten Taxpayers, organized as a group, which may participate in the review of an Application for Determination of Need . . . . " 105 Mass. Code Regs. 100.100.

violation of federal and state law. (D.E. 1.) The current operative pleading is the SAC, filed on June 16, 2015, which alleges that Defendants violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*. ("RICO") (Counts One through Six)[11], and engaged in Defamation (Count Seven) and Trade Libel (Count Eight). (D.E. 242.) At its core, the SAC alleges that Defendants used force and violence in concert with unlawful economic pressure to force Plaintiffs to accede to Defendants' bargaining and unionization demands. (*See* SAC ¶ 168 (alleging that Defendants "(1) engag[ed] in vandalism and other criminal acts to endanger patients and . . . bring about negative outcomes before the Connecticut regulatory authorities; (2) disseminat[ed] false, misleading, and defamatory information about Plaintiffs . . . ; (3) publicly smear[ed] [Straus] and his other businesses . . .; and (4) abus[ed] the legal process . . . .".) The parties filed their respective motions for summary judgment on March 15, 2019, and all briefs were timely filed. (D.E. 398-407, 414-18, 420-22, 424-26.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). A fact is only "material" for purposes of a summary judgment motion if a

---

[11] Plaintiffs' specific RICO claims are as follows:
- Violation of 18 U.S.C. § 1962(d) by conspiring to violate § 1962(a) (Count I against all Defendants)
- Violation of 18 U.S.C. § 1962(d) by conspiring to violate § 1962(b) (Count II against all Defendants)
- Violation of 18 U.S.C. § 1962(c) (Count III against UHWE & NEHCEU)
- Violation of 18 U.S.C. § 1962(c) (Count IV against SEIU)
- Violation of 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c) (Count V against UHWE & NEHCEU)
- Violation of 18 U.S.C. § 1962(d) by conspiring to violate § 1962(c) (Count VI against SEIU)

(SAC ¶¶ 287- 392.)

dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of

proof," then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002).

## III. DISCUSSION

### A. RICO Claims

RICO, 18 U.S.C. § 1961 *et seq.*,[12] "gives civil remedies to '[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962].'" *Wilkie v. Robbins*, 551 U.S. 537, 563 (2007) (alterations in original); *see also United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Constr. Trades Dep't, AFL-CIO*, 770 F.3d 834, 837 (9th Cir. 2014) ("UBC"). To bring a civil RICO claim, a plaintiff must show: 1) conduct; 2) of an enterprise; 3) through a

---

[12] The substance of the act is as follows:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code . . . any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . ..
>
> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.
>
> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
>
> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962(a)-(d).

pattern;[13] 4) of racketeering activity (known as "predicate acts"). 18 U.S.C. § 1962(c); *see also Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). The crimes/"predicate acts" that constitute "racketeering activity" for RICO purposes are set out in § 1961(1) and include in relevant part: extortion; mail and/or wire fraud; and violation of the Travel Act, 18 U.S.C. § 1952. *See* 18 U.S.C. § 1961(1); *see also Annulli v. Panikkar*, 200 F.3d 189, 200 (3d Cir. 1999) (noting that the list is "exhaustive"); *Liberty Bell Bank v. Rogers*, 726 F. App'x 147, 151-52 (3d Cir. 2018). Because the parties limit their briefing to the fourth element, this Court begins its analysis there as well, focusing on the question of whether Defendants engaged in activity constituting "predicate acts" under RICO.

### 1. Extortion

Plaintiffs first allege that Defendants committed the predicate act of extortion in violation of Connecticut, New Jersey, and Massachusetts state law. (SAC ¶ 134.)[14] "Violations of state

---

[13] A "pattern" is defined as "at least two acts of racketeering activity" within ten years of each other. 18 U.S.C. § 1961(5).

[14] Connecticut state law provides that a person commits extortion when:

> he compels or induces another person to deliver such property to himself or a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will: (A) Cause physical injury to some person in the future; or (B) cause damage to property; or (C) engage in other conduct constituting a crime; or (D) accuse some person of a crime or cause criminal charges to be instituted against him; or (E) expose a secret or publicize an asserted fact, whether true or false, tending to subject some person to hatred, contempt or ridicule; or (F) cause a strike, boycott or other collective labor group action injurious to some person's business; except that such a threat shall not be deemed extortion when the property is demanded or received for the benefit of the group in whose interest the actor purports to act; or (G) testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or (H) use or abuse his position as a public servant by performing some act within or related to his official duties, or by failing or refusing to perform an official duty, in such manner as to affect some person adversely; or (I) inflict any other harm which would not benefit the actor.
>
> CONN. GEN. STAT. ANN. § 53a-119 (West).

New Jersey state law provides in relevant part that a person commits extortion when he purposely threatens to:

> a. Inflict bodily injury on or physically confine or restrain anyone or commit any other criminal offense;
> b. Accuse anyone of an offense or cause charges of an offense to be instituted against any person;

extortion statutes *may* qualify as RICO predicate acts, but only if such violations are also

'capable of being generically classified as extortionate.'" *United States v. Kirsch*, 903 F.3d 213,

225 (2d Cir. 2018) (citing *Wilkie*, 551 U.S. at 567 (2007) (emphasis in original)); *see also*

*Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003) (recognizing that conduct

alleged to be extortionate under state law must fall within a "generic definition of extortion");

*United States v. Ferriero*, 866 F.3d 107, 115 (3d Cir. 2017) (noting that [w]hen a federal scheme

incorporates state law, whether a state-law violation qualifies as a federal predicate depends on

whether the state offense falls within the crime's generic definition").  "Such 'generic' extortion

is defined as 'obtaining something of value from another with his consent induced by the

wrongful use of force, fear, or threats." *Scheidler*, 537 U.S. at 409 (quoting *United States v.*

*Nardello*, 393 U.S. 286, 290 (1969); *see also UBC*, 770 F.3d at 843 (noting that "under the

generic definition, use of fear must be 'wrongful' to be extortionate").  As a threshold matter,

therefore, this Court will first examine whether Defendants used "wrongful" force, fear, or

threats against Plaintiffs.

---

c. Expose or publicize any secret or any asserted fact, whether true or false, tending to subject any person to hatred, contempt or ridicule, or to impair his credit or business repute;

d. Take or withhold action as an official, or cause an official to take or withhold action;

e. Bring about or continue a strike, boycott or other collective action, if the property is not demanded or received for the benefit of the group in whose interest the actor purports to act;

f. Testify or provide information or withhold testimony or information with respect to another's legal claim or defense; or

g. Inflict any other harm which would not substantially benefit the actor but which is calculated to materially harm another person.

N.J. STAT. ANN. § 2C:20-5 (West).

Massachusetts state law provides that a person commits extortion if he:

verbally or by a written or printed communication, threatens an economic injury to another, or threatens to deprive another of an economic opportunity, with intent to compel that person to do any act, involving the use or disposition of anything of value against his will . . .

MASS. GEN. LAWS ANN. ch. 271, § 39(b) (West).

a) *Sabotage/Vandalism*

Plaintiffs contend that, in July 2012, union members committed criminal acts "designed to harm the elderly and frail patients under their care in an effort to force Plaintiffs to accede to [NEHCEU's] extortionate demands" and that those acts were committed "at the direction of lead organizers employed by the NEHCEU." (SAC ¶¶ 8-9, 169, 171.) Plaintiffs argue that those acts, which involved tampering with patient identifying information, altering medical records, and damaging and/or hiding medical and other equipment, demonstrate a wrongful use of violence and force which constitute the predicate act of extortion sufficient to prove racketeering activity under §1962(c). (SAC ¶¶ 169-170.) There is no dispute that the sabotage/vandalism occurred, and Defendants concede that the acts themselves were criminal. (*See* Alito Decl. Ex. 123 at 206:4-19, 210:2-227:9, 228:5-229:19, 232:1-234:6, 244:12-248:7; Ex. 173 at 152:1-156:7, 173:13-177:5, 180:16-23, 182:17-183:25; Ex. 253 at 106:22-107:9, 119:1-122:12, 178:14-179:3; Ex. at 250-52, 254-59; Kekacs Decl. Ex. 129 at CareOne_99539; D.E. 402 at 8-9.)

The record, however, contains no admissible evidence that individual union members committed, or the union itself directed or ratified, those acts. First, as to the conduct of individual union members, although Plaintiffs' pleadings are rife with conjecture and supposition, nothing in the record supports a finding that any union member acted to sabotage or vandalize the Connecticut Facilities. Although police and incident reports noted that union employees had access to the sites and the union strike may have been related to the sabotage, no suspects or witnesses were ever identified. (*See* Alito Decl. Ex. 250-52, 254-59; D.E. 402-1 ¶¶ 356-58.)[15] Even if individual union members had been identified and/or charged with the

---

[15] Counsel for Healthbridge filed a formal complaint with the Connecticut Chief State's Attorney ("CSA") implying that the unions might have been involved with the sabotage, but did not provide any proof of their contention. (Alito Decl. Ex. 260.) Plaintiffs' suggestion that the CSA investigation was willfully compromised or wrongfully

sabotage, they are not named defendants in this action, and their membership in the NEHCEU alone does not make the union responsible for their actions. *See Phila. Marine Trade Ass'n v. Local 1291, Int'l Longshoremen's Ass'n*, 909 F.2d 754, 757 (3d Cir. 1990) (noting that "union members *qua* members are not automatically agents of the union"). Rather, the named union defendants can only be held responsible for the actions of their members if the unions ratified or authorized the acts at issue. *See U.S. v. White*, 322 U.S. 694, 702 (1944) (holding that "[t]he actions of one individual member no more bind the union than they bind another individual member unless there is proof that the union authorized or ratified the acts in question"); *see also Carbon Fuel v. Mine Workers*, 444 U.S. 212, 216-17 (1979) (applying the common law test for agency in holding that a union is not liable for the acts of its members where the union had not "authorized, participated in, or ratified" those acts); *Consol. Coal Co. v. Mine Workers*, 725 F.2d 1258, 1263 (10th Cir. 1984) (noting that "just as a corporation ordinarily is not liable for the acts of a stockholder, so recognition of a labor organization as a juristic personality prevents imposing liability on it for the acts of its members") (internal citation omitted).

Plaintiffs have introduced no evidence that Defendants knew of, encouraged, or directed the damage to the Connecticut Facilities before it occurred.[16] Indeed, union officers specifically

---

truncated because Connecticut politicians have received sizable campaign contributions from the unions is supported only by innuendo, not facts. (*See* Alito Decl. Ex. 264; D.E. 416-2 at 7-9.)

[16] Plaintiffs attempt to show union direction and support for the sabotage and vandalism by pointing to a "Contract Campaign Manual" (the "Manual") produced by SEIU in 1988 which had previously provided guidance to its affiliates as to how to "exert pressure on employers" in order to achieve bargaining goals. (*See generally* Alito Decl. Ex. 1; Ex. 140 at 28:20-29:6.) The Manual was revised in 2004, but by 2007 or 2008, the SEIU no longer distributed it to its affiliates. (Alito Decl. Ex. 326; Ex. 140 at 35:8-38:19; D.E. 414-7.) An additional attempt to revise the Manual in 2011/2012 was never finalized. (Alito Decl. Ex. 140 at 41:12-44:1, 48:1-49:14; Ex. 5, 6.)

Plaintiffs argue that the Manual directly opposes the orderly process established under the NLRA and encourages union affiliates to engage in illegal extortionate behavior - pointing to sections of the Manual that discuss coercive bargaining tactics and applying economic, political, financial, and reputational pressure on employers. (*See, e.g.*, D.E. 399-2 ¶¶ 9-20; SAC ¶ 4 (asserting that the Manual "instructs SEIU members, and members of its local unions, to destroy businesses, ruin reputations, and invoke legal process improperly").) Assuming for the sake of argument that Plaintiffs' contentions are true (an assumption that is not clearly supported by the language in the Manual), there is nothing in the Record to suggest that the Manual was used, consulted, or relied upon by any union employee

13

denied having such prior knowledge or directing union members to commit those acts. (*See* D.E. 402-3 ¶¶ 88-90 (NEHCEU president David Pickus declaring that "[a]t no time prior to the July 3, 2012 strike . . . did I – or, to the best of my knowledge, any NEHCEU officer or employee – participate in or authorize any act of sabotage or vandalism"); D.E. 402-7 ¶¶ 18-22 (SEIU Executive Vice President Leslie Frane declaring that "[a]t no point did I – or to the best of my knowledge, anyone at SEIU – direct any employee of Plaintiffs to commit any act of sabotage or vandalism"); D.E. 402-1 ¶¶ 330, 333.) Internal union communications after the fact indicate that Defendants disapproved of the damage done at the Connecticut Facilities. (*See* Alito Decl. Ex. 266 (discussing issuing a "very strongly worded denunciation of WHOEVER is responsible, WHATEVER their job or position" and stating that "anyone with a peasized brain would realize this isn't a tactic we would undertake"); Ex. 267 (expressing concern that "some small number of members might have thought this was a good idea to 'mess up the scabs,' not thinking about likelihood of harm to the residents (or to the union's reputation, either)" and proposing to "strongly repudiate the acts, [and] be very clear that, whoever was responsible – union members or not – this is totally contrary to everything we stand for and believe in").) Defendants further informed the Connecticut governor's office that "they weren't sure what happened" but gave assurances that they would "redouble their efforts, to tell their members not to engage in anything resembling this behavior." (Alito Decl. Ex. 151 at 133:11-23.) As a result, a reasonable jury could neither find that union members vandalized or sabotaged the Connecticut Facilities, nor that Defendants are liable for those acts.

---

allegedly involved in the acts at issue here. (D.E. 414-2 ¶¶ 48-50.) As such, whatever the Manual did or did not advocate has no bearing on this matter.

b)	*Economic Pressure*

Plaintiffs next allege that Defendants used demonstrations/protests and regulatory and legal processes to wrongfully pressure Plaintiffs into complying with illegitimate bargaining and unionization demands.	(SAC ¶¶ 3 (claiming that Defendants intended to force Plaintiffs to allow UHWE "to unionize Plaintiffs' non-union employees in New Jersey and elsewhere" and to "accept exorbitant, outsized and unnecessary contract demands" from NEHCEU at the Connecticut Facilities), 6, 17, 21, 91-92, 117, 148, 180-202; D.E. 399-1 at 4.) Defendants concede that they used those tactics to put economic pressure on Plaintiffs but dispute that either the ends they sought or the means by which they pursued them were wrongful.	(See D.E. 414 at 4 (acknowledging that Defendants wanted "better terms for employees in collective bargaining," "recogni[tion of] UHWE where it won elections in New Jersey," a cessation of "labor-law violations," and a "remedy [for] past violations").)	Therefore, the only question before this Court is whether the Defendants' end goals or the tactics they employed in their Campaign were "wrongful."

"Unlike the use or threatened use of force or violence, the use of economic fear in business negotiations between private parties is not 'inherently' wrongful" and "the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business transactions."	*Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, 523 (3d Cir. 1998).	The threat of economic loss may constitute "fear" for purposes of an extortion analysis, but it does not include "the fear of economic loss in the context of hard business bargaining . . . ."	*Id.* at 522.	In disputes between unions and management, the word "wrongful" is an important qualifier.	Without it, unions would be unable to impose any economic pressure on management, because every strike, contract negotiation, or attempt at unionization could be

deemed extortionate, so long as an employer feared some financial harm. With this limitation in mind, Plaintiffs have failed to present evidence sufficient to show that Defendants acted wrongfully.

First, the evidence would not permit a reasonable jury to conclude that Defendants pursued illegitimate ends in the collective bargaining or unionization process. Because it is not unlawful to pursue "a union contract calling for higher wages and other monetary benefits," *United States v. Enmons*, 410 U.S. 396, 409 (1973), NEHCEU was well within its rights to pursue higher wages and better benefits for its members when negotiating successor CBAs for the Connecticut Facilities. Indeed, both parties aggressively pursued their own financial interests during those negotiation sessions. (See generally Alito Decl. Ex. 194-97, 200, 201; D.E. 402-1 ¶ 32 (setting out the parties' initial positions); Kekacs Decl. Ex. 35, 280.) The scope of permissible bargaining includes Defendants' push to maintain existing staffing ratios, a topic which is "standard fare for collective bargaining," *Tr. of Columbia Univ.*, 364 NLRB No. 90, 2016 WL 4437684, at *13 (2016), but which Plaintiffs allege was instead an attempt to create "do-nothing" or "no-show" positions. (See SAC ¶¶ 131, 158.) However, the record is clear that Defendants believed the existing staffing ratios were appropriate and necessary for the provision of patient care, (D.E. 402-2 ¶¶ 27-35; 402-3 ¶¶ 10-13; Kekacs Decl. Ex. 24 at 2), and Plaintiffs' preference for higher ratios does not render Defendants' position illegitimate. *See UBC*, 770 F.3d at 839 (noting that subjective disagreements of the value of a service is not sufficient to support a civil RICO claim).[17]

---

[17] Plaintiffs also allege that Defendants sought to force Plaintiffs to adopt "pattern" CBAs instead of engaging in good-faith negotiations, (See SAC ¶¶ 118, 127), but once again, the record lacks evidentiary support for this claim. Indeed, the hard bargaining that took place during the thirty-eight negotiation sessions is squarely at odds with a demand for the acceptance of a pattern agreement.

Nor was UHWE's unionization of the Somerset Facility unlawful; both the NLRB and federal appellate courts ratified UHWE's election as the exclusive bargaining representative at that location.[18] In fact, the Third Circuit Court of Appeals found that it was Plaintiffs who had violated the NLRA during the unionization process by improperly questioning employees about their union sympathies, discharging or replacing employees in retaliation for their unionization activities, and refusing to bargain with UHWE. *See 1621 II*, 725 F. App'x at 134-35, 141-44; *1621 I*, 825 F.3d at 136, 145.[19]

Second, the tactics employed by Defendants in pursuit of their collective bargaining and unionization goals were not wrongful. As to Defendants' participation in regulatory processes, (*see* SAC ¶¶ 182-89, 197-202; D.E. 416 at 34-35), there is nothing improper about "private citizens or public officials exercise[ing] their rights to notify the appropriate agencies or mobilize public opinion about a serious violation of the law." *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 159 (3d Cir. 1988). In Massachusetts, Defendants believed that Plaintiffs' labor practices were relevant to the DoN process and submitted information about those practices for consideration. (*See* D.E. 402-5 ¶¶ 64-67; Alito Decl. Ex. 147 at 231-235.) The record does not include admissible evidence to support Plaintiffs' contention that Defendants offered to withdraw those petitions if Plaintiffs entered into a neutrality agreement or

---

[18] Outside of Defendants' unionization efforts at Somerset, Plaintiffs allege that Defendants' push to unionize other facilities was unlawful because they demanded a neutrality agreement in exchange for ending the Campaign. (SAC ¶ 130.) The record does not support this claim. (*See* D.E. 402-3 ¶ 33; 402-4 ¶ 24; 402-9 ¶ 11; 402-7 ¶ 8.) Even if there were, a neutrality agreement is merely a contract in which an employer agrees to remain neutral during a union's attempt to organize a workforce. There is nothing wrongful about requesting such an agreement. Indeed, these agreements "benefit[] both parties with efficiency and cost-saving . . . ." *Hotel Emp. & Rest. Emp. Union, Local 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 219 (3d Cir. 2004).

[19] Plaintiffs also argue that Defendants' desire to unionize was wrongful because it was driven almost entirely by the need to increase membership in order to fund "significant underfunded pension liabilities and other considerable debt." (SAC ¶¶ 3, 5, 72-86, 119 (alleging that "SEIU's primary organizational goal [w]as achieving increased membership and the resulting revenues that go along with such membership").) Even if Defendants' financial situation is as precarious as Plaintiffs suggest, the goal of increasing union membership is not illegitimate, whether to shore up finances or to increase union bargaining power. Given that the record indicates that Defendants moved to unionize the Somerset Facility legally, the possibility that they were financially motivated to do so is irrelevant.

submitted to any specific collective bargaining demands. (*See* D.E. 402-12 ¶¶ 3-8; Alito Decl. Ex. 129 at 84:9-17; Ex. 133 at 183:21-24, 184:18-22; Kekacs Decl. Ex. 250; SAC Ex. K at 2.[20]) In Connecticut, the record evidence shows only that Defendants asked United States Senator Richard Blumenthal to investigate what Defendants believed to be questionable billing practices by Plaintiffs, and that they did so without advance notice to Plaintiffs. (D.E. 402-4 ¶¶ 61-64; 402-3 ¶¶ 82-84; 402-9 ¶¶ 24-26.). Therefore, Defendants' request could not have been used as a threat to force Plaintiffs to comply with any demand.

Further, the protests and demonstrations Defendants engaged in were peaceful, did not involve violence or threats of violence, and did not result in arrests or criminal charges being brought against any person or entity. (D.E. 414-12 ¶¶ 11-13; 414-13 ¶ 34.) The protest on August 23, 2012 involved picketing by UHWE and NEHCEU members outside of Care One headquarters and the delivery of petitions to a receptionist inside the facility. The protestors did not break into the building; they walked in through an open door, entered the elevators, and once they reached their destination, calmly requested permission to leave the binders, and departed immediately when asked. (Kekacs Decl. Ex. 143, 144.)[21] At no time did any of the participants threaten anyone and no one was arrested for trespass or any other charge. (Kekacs Decl. Ex. 144, 320 (reporting that the protest was "peaceful[]"), 321, 322.) Demonstrations and union

---

[20] There is some dispute as to both the substance and admissibility of Exhibit K to the SAC, which documents an email exchange between Elisabeth Daley ("Daley"), a Senior Research Analyst for UHWE and Bill Gady ("Gady"), an attorney representing Plaintiffs in the DoN application process. The first email in the chain, from Daley to Gady, states that Defendants "plan to go forward" with their petitions for public hearings in order "to make sure that the DoN process for these facilities provides workers with an opportunity to tell the state and the public about this operator, and to have an open discussion about the future of this operator in Massachusetts." (SAC Ex. K at 2.) Gady's follow-up email purports to summarize the substance of a phone call between Gady and Daley during which Gady suggests that Daley offered to withdraw the petitions if Plaintiffs "cede to your Connecticut sister union's demands in regarding a dispute over an apparent unfunded pension, pattern contract; or neutrality agreement." (*Id.* at 1.) Gady's email is inadmissible hearsay and therefore, does not provide support for Plaintiffs' contention that Defendants offered to withdraw their petitions if Plaintiffs complied with other demands.

[21] Defendants have submitted four videotapes into the record, all of which contain footage of the August 23, 2012 protest. (Kekacs Decl. Ex. 143, 144, 321, 322.) "When, as here, there is reliable video footage of the facts in the record," the court "view[s] the facts in the light as depicted by the videotape." *Morgan v. Borough of Fanwood*, 680 F. App'x 76, 80 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

activities at New York University School of Law, designed to draw public attention to Straus' role in Plaintiffs' business and labor practices and to further Defendants' unionization and bargaining goals, (*see* D.E. 402-4 ¶ 39; 402-3 ¶ 57), were also peaceful. Although Straus may have disliked having the propriety of his business and philanthropic ventures questioned, Defendants were within their rights to make such public challenges. *See, e.g.*, *Metro. Opera Ass'n v. Local 100*, 239 F.3d 172, 177-78 (2d Cir. 2001) (noting that "within the labor context, in seeking to exert social pressure on [plaintiff], the Union's methods may be harassing, upsetting or coercive" but they remain protected). As such, there is no genuine issue of material fact as to whether Defendants' actions were wrongful.

Overall, the record shows only that Defendants engaged in lawful, albeit aggressive, bargaining and unionization efforts which involved a public campaign critical of Plaintiffs in order to advocate for its members. Plaintiffs' obvious frustration with these efforts, however, is insufficient to render Defendants' actions "wrongful." While it might be preferable if these types of disputes did not necessitate the intense and coercive measures adopted by the parties, this Court finds that Defendants' actions do not constitute extortion.[22]

---

[22] Because the Court finds there is no genuine issue of material fact as to the legality of Defendants' actions, it need not address the whether Plaintiffs have sufficiently shown that Defendants sought to obtain property belonging to Plaintiffs. The Court notes, however, that Plaintiffs allege that that property includes:

> Wages and benefits to be paid pursuant to labor contracts; Millions of dollars in contributions to the underfunded UHWE Pension Plan and NEHCEU Pension Plan; Payment of 100% of employees' health insurance costs; Substantial monetary contributions to the NEHCEU Training Fund and UHWE Training Fund; Wages and benefits for unwanted, unnecessary, and superfluous labor in the form of bloated and unnecessary staffing levels at Plaintiffs' unionized facilities; Inflated wages for needed labor at rates higher than market value; Dues moneys, agency fees, and per capita taxes for the Defendants and their associates, including the SEIU International; Access to Plaintiffs' private property; Control over Plaintiffs' business assets in the form of participation in the corporate governance process; Confidential business information; and Plaintiffs' communication rights.

(SAC 154.)

In addition, because this Court finds that there is no genuine issue of material fact as to the legality of Defendants' actions under the generic definition of extortion, it need not analyze Plaintiffs' claims under the state extortion statutes.

2.      <u>Mail & Wire Fraud</u>

Plaintiffs next claim that a "central feature" of the Campaign included using the COW, flyers, and media advertisements to "disseminat[e] . . . false, misleading, and/or incendiary allegations regarding" Plaintiffs' business and labor practices and Straus's personal and professional life with the goal of depriving Plaintiffs "of their property by deceiving third-parties into believing that Plaintiffs are bad health care providers . . ." (SAC ¶¶ 208, 239; *see also generally* ¶¶ 209-51; D.E. 416 at 41.)  In so doing, Plaintiffs allege that Defendants committed mail and/or wire fraud.

The elements of wire/mail fraud are: (1) a scheme or artifice to defraud, (2) culpable participation by the defendant (*i.e.*, specific intent to defraud), and (3) use of the mails or wire transmissions to effectuate the scheme.  *See e.g.*, *Nat'l Sec. Sys. v. Iola*, 700 F.3d 65, 105 (3d Cir. 2012); *see also United States v. Riley*, 621 F.3d 312, 329 (3d Cir. 2010); *U.S. v. Dobson*, 419 F.3d 231, 236-37 (3d Cir. 2005); *United States v. Al Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) (discussing the elements of mail fraud under 18 U.S.C. § 1341).[23]  "Additionally, the object of

---

[23] The substantive crime of wire fraud itself is defined in relevant part as:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

The substantive crime of mail fraud itself is defined in relevant part as:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is

the alleged scheme or artifice to defraud must be a traditionally recognized property right." *Al Hedaithy*, 392 F.3d at 590 (internal citation omitted).

In order to prove wire fraud, Plaintiffs need to do more than present a lengthy list of statements they allege were false and misleading. (*See* SAC ¶¶ 209-237, Ex. M-KK, MM, NN, AAA; Kekacs Ex. 286.) They must introduce admissible evidence from which a reasonable jury could conclude that Defendants had the specific intent to deceive. They have not. First, the record shows that Defendants had in place fact-checking and vetting procedures that they adhered to before publishing any statement. That process involved gathering factual information, drafting a communication based on that information, providing the material to counsel for fact-checking and legal vetting, and then requesting approval for authorization to publish the communication. (D.E. 402-1 at 98-105.) There is no indication that Defendants strayed from this process for the publications at issue in this case. In addition, the record is clear that the individuals who researched, drafted and/or approved the challenged publications believed their contents to be truthful. (*See* D.E. 402-6 ¶¶ 4-8, 22; 402-4 ¶ 13, 30-87; 402-2 ¶¶ 70-73, 105-108; 402-3 ¶¶ 15-19; 38-40; 58-62, 71-75, 106-111; 402-5 ¶¶ 7-11; 402-7 ¶¶ 11-12; 402-9 ¶¶ 16-21, 29; 402-13 ¶¶ 4-36; 402-14 ¶¶ 3-12; 414-14 ¶¶ 2-12; Alito Decl. Ex. 165 at 27:5-14; Ex. 118 at 81:18-82:7; Ex. 135 at 208:25-209:6.)[24] While the Campaign may have used

---

addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C.A. § 1341.

Cases construing the elements of mail fraud are equally applicable to wire fraud cases. *See Al Hedaithy*, 392 F.3d at 590 (establishing the elements to "prove mail or wire fraud"); *United States v. Giovengo*, 637 F.2d 941, 944 (3d Cir. 1980).

[24] The record here consists largely of declarations from union employees and/or officers who participated in the research, drafting, vetting, and approval process for the union publications at issue. Plaintiff's argument that this Court should discount these declarations solely because they are "self-serving," (D.E. 422-1 ¶ 2), has no merit, particularly given that the deposition testimony from those persons is not inconsistent with their declarations. *See U.S. v. Stern*, 881 F.3d 853, 857 (11th Cir. 2018) *en banc* (noting that there is nothing that "prohibits an affidavit from being self-serving" and recognizing that "a litigant's self-serving statements based on personal knowledge or observation can defeat summary judgment").

forceful, critical, hyperbolic, and sometimes satirical statements regarding Plaintiffs' practices and Straus's actions, that is not the same as publishing false or misleading statements with the intent to deceive the public.[25]  As such, there is no genuine issue of material fact as to Defendants' culpability for mail and/or wire fraud.

        3.      <u>Travel Act</u>

The Travel Act makes it a crime to travel

> in interstate or foreign commerce or [use] the mail or any facility in interstate or foreign commerce, with intent to-- (1) distribute the proceeds of any unlawful activity; or (2) commit any crime of violence to further any unlawful activity; or (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform [an act listed].

18 U.S.C. § 1952.

For Plaintiffs' claim under the Travel Act to survive summary judgment, Plaintiffs must show Defendants intended to promote unlawful activity.  *See Brokerage Concepts*, 140 F.3d at 529.  "Unlawful activity" is "extortion, bribery, or arson in violation of the laws of the state in which committed or of the United States."  18 U.S.C. § 1952(b)(2).  As a result, Plaintiffs' "Travel Act claim hinges on the success of its" extortion claims.  *Brokerage Concepts*, 140 F.3d at 529.  Because this Court will grant Defendants' motion for summary judgment as to Plaintiffs' extortion claims, Plaintiffs' Travel Act claim also necessarily fails.

        4.      <u>Conspiracy</u>

Plaintiffs also allege that Defendants conspired to violate the substantive provisions of RICO in violation of Section 1962(d).  (SAC ¶¶ 287-392; *see also* 18 U.S.C. 1962(d) (providing

---

[25] Because this Court finds that Defendants did not act with a specific intent to deceive the public, it need not address the contents of each of the challenged publications.  This Court notes, however, that approximately 40 of the challenged publications do not appear to have been published by the Defendants and the vast majority appear, at least in part, to assert non-actionable opinion.  (*See* Kekacs Ex. 286.)

that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section").) However, "'[a]ny claim under section 1962(d) based on conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient.'" *Magnum v. Archdiocese of Phila.*, 253 F. App'x 224, 229 (3d Cir. 2007) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993)); *see also District 119P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 529-30 (3d Cir. 2011) (dismissing conspiracy claim where Plaintiff failed to properly allege a substantive RICO claim). There being no genuine issue of material fact as to Defendants' substantive RICO liability, Defendants' motion for summary judgment as to Plaintiffs claims for conspiracy shall be granted and Plaintiffs' motion shall be denied.

B. State Law Claims

Under 28 U.S.C. § 1367, federal courts may exercise jurisdiction over state law claims, however, "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *see also Stehney v. Perry*, 907 F. Supp. 806, 825 (D.N.J. 1995) ("[A] federal district court may decline to exercise its supplemental jurisdiction over state law claims if all federal claims are dismissed."); *Washington v. Specialty Risk Servs.*, Civ. No. 12-1393, 2012 WL 3528051, at *2 (D.N.J. Aug. 15, 2012) (noting that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims") (alterations in original) (citing *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)) (internal citations omitted).

Here, having found no genuine issues of material fact as to Plaintiffs' RICO claims and having granting summary judgment in favor of Defendants on those claims, the only claims

remaining are state law defamation and trade libel.  This Court declines to exercise supplemental jurisdiction over those claims and they will be dismissed without prejudice.

## IV.     CONCLUSION

For the reasons set forth above, this Court **DENIES** Plaintiffs' Motion for Summary Judgment (D.E. 398) and **GRANTS** Defendants' Motion for Summary Judgment (D.E. 400) as to Counts One through Six.  Counts Seven and Eight are **DISMISSED**.  An appropriate order follows.


___/s/ Susan D. Wigenton_____
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:          Clerk
cc:            Parties
               Michael. A. Hammer, U.S.M.J.