# 3d Supp. Kekacs Decl. Ex. 372

Page 1

```
 1   UNITED STATES DISTRICT COURT
 2   FOR THE DISTRICT OF NEW JERSEY
 3   Civil Action No. 2:12-cv-06371-SDW-MAH
 4   ------------------------------------x
     CARE ONE MANAGEMENT, LLC,
 5
              Plaintiff,
 6
 7
          - against -
 8
 9
     UNITED HEALTHCARE WORKERS EAST,
10   SEIU 1199, et al.,
11            Defendants.
     ------------------------------------x
12            July 18, 2018
              12:09 p.m.
13
14
15       Videotaped Deposition of JOSEPH BECK,
16   taken by Defendants, pursuant to Subpoena,
17   held at the offices of Raymond James and
18   Associates, 630 Fifth Avenue, New York, New
19   York, before Todd DeSimone, a Registered
20   Professional Reporter and Notary Public of
21   the State of New York.
22
23            Veritext Legal Solutions
                 Mid-Atlantic Region
              1250 Eye Street NW - Suite 350
24              Washington, D.C.  20005
25
```

Page 6

1  A. No, I have not.
2  Q. So I'm going to go over a
3  couple of what the lawyers like to call
4  ground rules or ideas.
5  A. Okay.
6  Q. The first thing is that the
7  court reporter is obviously typing down
8  everything we say.
9  A. Correct.
10 Q. And so unlike in normal
11 conversation, a verbal shake of the head or
12 a shrug of the shoulders doesn't really
13 convey to the court reporter, so it is
14 important that all your answers and my
15 questions be verbalized. Does that make
16 sense?
17 A. Great. Sounds good.
18 Q. The next thing is that, again,
19 unlike normal conversation, it is really
20 important that we don't talk over one
21 another. So I will try really hard to ask
22 my questions --
23 A. Right.
24 Q. -- and let you answer and not
25 start answering -- not ask another question

Page 7

1  until you have finished.
2      It is also possible that your
3  lawyer or one of the other lawyers in the
4  room may object or may say something. If
5  that happens, please let them finish, and
6  unless your lawyer instructs you not to
7  answer the question, then I will ask you to
8  answer the question.
9  A. Okay.
10 Q. I will try to ask really clear
11 questions. I may not always succeed. If I
12 don't succeed, please ask me for
13 clarification, but if you answer the
14 question I'm going to assume that you
15 understood it. Does that make sense?
16 A. Okay, yeah.
17 Q. And, similarly, if for any
18 reason while we're talking today if you
19 realize that an earlier answer was
20 incomplete or incorrect in some way, please
21 just let me know and we can always -- you
22 can always go back and clarify anything you
23 need to.
24 A. Sounds good, thank you.
25 Q. Finally, you can take a break

Page 8

1  at any point.
2  A. Okay.
3  Q. I would only ask that you not
4  take a break while a question is pending,
5  but if at any point you need to stop for
6  any reason, just let us know, and assuming
7  everybody else in the room agrees --
8  A. Thank you very much.
9      MS. ALITO: Before we go
10 forward, Exhibit 1 does not appear to be
11 the subpoena that was served on us.
12     MS. CARTER: It is a copy of
13 the -- I personally can't speak to whether
14 or not it was served on you. I know that
15 it is the copy of the subpoena that was
16 served on Mr. Beck and his counsel.
17     MR. KARABELL: Yes, I know that
18 there was a mixup and the version that was
19 sent to plaintiffs only had a date and time
20 I think of 7-18, some year far in the
21 future, with no time. So that's our fault.
22     MS. ALITO: Okay.
23     MR. KARABELL: This is
24 definitely what we sent to --
25     MS. ALITO: I'm not trying to

Page 9

1  make a fuss about the timing. I'm just
2  noting for the record that this is not
3  identical to the subpoena that was sent to
4  us.
5  Q. So, Mr. Beck, how long have you
6  worked for Raymond James?
7  A. Oh jeez. I don't know,
8  Allison, when did we join Raymond James?
9  About seven or eight years ago.
10 Q. So approximately 2010, 2011?
11 A. I would have to go back and
12 check my records because we were part of a
13 company called Morgan Keegan, and Morgan
14 Keegan was acquired by Raymond James. But
15 I have essentially worked for the current
16 business for, you know, 20 years.
17 Q. And did there come a time
18 sometime in 2011 when you were involved in
19 a deal in which ArchCare was going to sell
20 a facility called Kateri?
21 A. Absolutely.
22 Q. And at the time of that deal
23 did you work for Morgan Keegan or Raymond
24 James; do you remember?
25 A. I don't recollect whether it

Page 10

1  was actually Morgan Keegan or Raymond James
2  at that point.
3      Q.    How did you first get involved
4  in the sale of Kateri?
5      A.    Well, we were advisors to the
6  Archdiocese of New York on certain
7  healthcare matters, and ArchCare is a
8  division essentially or, you know, a
9  related company of the Archdiocese of New
10 York. So we had a client relationship with
11 the people at the Archdiocese and with
12 ArchCare and we were recommended to advise
13 them on certain matters such as the
14 potential sale of their nursing homes.
15     Q.    And when you say we were
16 advisors, who is the "we"?
17     A.    Well, it is either Raymond
18 James or Morgan Keegan, depending on what
19 date.
20     Q.    And in connection with that
21 sale, what was your company's role? What
22 was your job?
23     A.    We were the strategic advisor
24 to ArchCare and we were eventually hired
25 after an assessment of their businesses to

Page 11

1  sell certain of the nursing homes,
2  including Kateri.
3      Q.    Who else at the company worked
4  in connection with this sale of Kateri?
5      A.    This company here, Raymond
6  James?
7      Q.    Yes.
8      A.    I'm trying to remember now. I
9  think one of my colleagues, Richard
10 Lorenti, was involved, and we had usually
11 three or four people staffing an assignment
12 like this. I can't recollect exactly who
13 worked on it with me.
14     Q.    At the time what was
15 Mr. Lorenti's job title?
16     A.    Managing director.
17     Q.    And what was your job title?
18     A.    Managing director.
19     Q.    So were you all sort of
20 co-equals? How did you all -- what was
21 your relationship?
22     A.    We were co-equals. I mean,
23 ArchCare and the Archdiocese was
24 principally my client, as I had originated
25 the relationship with them. But we work

Page 12

1  collegially here. And Richard is also the
2  co-head of the Healthcare Group with me
3  here at Raymond James anyway. We had been
4  partners, colleagues, together for many
5  years.
6      Q.    And how did you and Mr. Lorenti
7  sort of divide the work of the sale of
8  Kateri?
9      A.    Well, I was the head partner or
10 the head professional on the assignment
11 because it was essentially my client, but
12 we worked collegially. You know, I would
13 review everything and be part of all of the
14 discussions or presentations and so forth.
15     Q.    And how long before -- how long
16 had you had a relationship with the
17 Archdiocese?
18     A.    At that point several years
19 before. I know there was another
20 transaction we worked on I believe for the
21 Archdiocese several years earlier that
22 related to the sale of New York Medical
23 College.
24     Q.    And who at the Archdiocese did
25 you interact with in connection with the

Page 13

1  sale of Kateri?
2      A.    Well, ArchCare was the entity
3  that we really were retained by. At the
4  end of the day the Archdiocese appointed
5  the board of ArchCare, so there was some
6  involvement or review and discussions with
7  people at the Archdiocese, but principally
8  the day-to-day interaction was with
9  ArchCare.
10     Q.    And who were the individuals at
11 ArchCare?
12     A.    Scott LaRue would be the CEO.
13 I believe -- yeah, Scott was CEO then I'm
14 pretty sure. And Annmarie Covone was the
15 CFO. They would be the two principal
16 people we reacted. We also dealt with the
17 board as well.
18     Q.    How did you go about finding
19 buyers to --
20     A.    How would we look at finding
21 buyers?
22     Q.    For Kateri.
23     A.    Well, you would look at the
24 large public and private nursing home
25 companies that were active nationally, but

4 (Pages 10 - 13)

Page 34

1  what they view as the more substantive
2  issues of an offer.
3      A.   So the Catholic Church has
4  certain ethical and religious directives
5  which are well known, published by the
6  Catholic Bishops, which sets standards for
7  the conduct of healthcare, what things can
8  and can't be done, such as abortions,
9  termination, end of life issues, things of
10 that nature.  You can go on the website and
11 look at them.
12         So, in theory, that could be a
13 requirement.  They could ask the
14 successive -- the successor, the winning
15 bidder, to operate the facility according
16 to the Catholic directives, and that
17 happens quite frequently in other
18 transactions in healthcare for Catholic
19 owned or operated facilities.
20     Q.   But in the case of this
21 particular sale for the divestiture of
22 Kateri and St. Teresa's, they were
23 removing the --
24     A.   They decided not to include
25 that as a condition, yes.  That looks to be

Page 35

1  the case, right.
2      Q.   So the last paragraph in that
3  cover e-mail talks about "As we discussed,
4  you will distribute this version to the
5  subcommittee for their review and
6  sign-off."
7      A.   Uh-huh.
8      Q.   Do you know who the
9  subcommittee was?
10     A.   It probably was a group of the
11 ArchCare board that would be overseeing the
12 process.  Typically clients like this have,
13 you know, a dedicated group of trustees
14 that would review with management kind of
15 the process and the decision before it was
16 taken to the final board for approval.
17     Q.   I would like to direct your
18 attention to the attached business
19 considerations and sort of ask you some
20 questions about them.
21     A.   Okay.
22     Q.   So, first, was this a document
23 that you were involved in reviewing or
24 editing?
25     A.   Yeah, I assume we discussed

Page 36

1  this and helped frame it.
2      Q.   So under Roman II, paragraph 1,
3  for Kateri, so this paragraph appears to be
4  requiring a minimum of five years to
5  operate Kateri as a skilled nursing
6  facility and, if not -- if the condition is
7  not met, there is an additional $10 million
8  payment.
9      A.   Right, right, right.
10     Q.   So what was the -- am I correct
11 that the goal of that additional $10
12 million payment was to deter the buyer from
13 turning around after purchase and selling
14 it or converting it into condos or
15 something?
16     A.   Well, yeah.  I mean, so, again,
17 working on imperfect memory, we may have
18 recognized that if the facility might have
19 been worth more as a real estate asset for
20 multifamily housing or other kinds of uses
21 than it would be for a nursing home, the
22 desire was to sell it as a nursing home.
23         We recognized that if we -- if
24 somebody just closed it right away we could
25 have sold it to somebody else for an

Page 37

1  alternative use and would have gotten more
2  money and that was not the desire, so they
3  said well, let's ask for more money if they
4  decide they want to do it so we don't look
5  stupid.
6          That's my conjecture based on
7  what I would think we would have -- the
8  kind of discussion we might have had with
9  the board at that point.
10     Q.   Okay.  Do you recall what your
11 discussion was with the board?
12     A.   I can't really recall it now,
13 I'm sorry.  It is several years ago, a
14 couple of hundred deals under the -- over
15 the dike.
16     Q.   On this page I would now like
17 to ask about Roman V, Employees.
18     A.   Yes.
19     Q.   Am I correct this is a
20 requirement that the purchaser is going to
21 offer employment and then it is implicit in
22 the understanding that they are going to
23 negotiate an agreement with SEIU?
24     A.   Right.
25     Q.   Why was that important, if at

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 158

1  asset could impede the closing and could
2  create ill will, and as we pointed out,
3  ArchCare also had other operations where
4  SEIU was involved.
5       So you would like to maintain,
6  all things being equal, good employee/union
7  relationships if you have other businesses
8  where you are working closely with the
9  union. So it just sort of seemed to me
10 prima facie sort of a normal business
11 concern.
12    Q.   Do you have any reason to
13 believe that the union had any objections
14 to CareOne or Greenfield's purchase of
15 Kateri?
16    A.   I assume if the union was asked
17 they probably wouldn't be ecstatic about
18 it. But no, that was not discussed to the
19 best of my knowledge with SEIU.
20    Q.   So, as far as you know, any
21 objection SEIU may or may not have had to
22 the purchase of Greenfield -- the purchase
23 of Kateri by Greenfield or CareOne was not
24 part of ArchCare's decision-making process?
25       MS. ALITO: I object to form.

Page 159

1     A.   Well, I think -- I think it
2  clearly was part of it, if in fact
3  Mr. LaRue and O'Brien's conversation was
4  reflective of it. I think it would be --
5  it would be normal for a buyer, pardon me,
6  a seller to consider that. But, you know,
7  I have no specific knowledge of any
8  discussions that occurred between ArchCare
9  and SEIU on the matter.
10    Q.   Okay. And the sum total of the
11 sort of union issues that you think might
12 have been part of the discussion is those
13 sort of bullet point sentences in LaRue's
14 e-mail?
15    A.   Yeah, right, I think that was
16 what was summarized by Mr. LaRue in his
17 correspondence with Mr. O'Brien that I'm
18 looking again for the first time in eight
19 or ten years.
20    Q.   And do you know how much,
21 whether or not there was a union issue in
22 Connecticut --
23    A.   I don't, you know, I just
24 really don't have a recollection of what
25 that was per se.

Page 160

1     Q.   And to the extent --
2     A.   You two guys probably do. I
3  don't. I'm sorry.
4     Q.   To the extent that there was a
5  union issue or that ArchCare believed there
6  was a potential for an issue, do you know
7  to what extent that played into ArchCare's
8  decision to reject the CareOne/Greenfield
9  offer?
10    A.   I can't tell you to what
11 extent. I just don't have that knowledge.
12 Clearly it was on the table.
13    Q.   But you don't know what
14 ArchCare did with that information?
15    A.   I do not know.
16    Q.   I wanted to ask you a question
17 about New York State approval of operators
18 for nursing homes.
19    A.   Uh-huh, right.
20    Q.   In the proposed
21 CareOne/Greenfield deal in which Joseph
22 Zupnik was going to be the operator as the
23 lessee --
24    A.   Right, right, right.
25    Q.   -- in approving that operator,

Page 161

1  does New York State, if you know, look at
2  the operator's financial capabilities
3  standing alone?
4     A.   I believe they do, yes.
5  Because the operator is the licensed entity
6  that has the license to provide healthcare.
7  So the State, as I understand it, and,
8  again, you know, I'm not an expert on this,
9  though I did work for the State of New York
10 many, many moons ago, you know, considers
11 the financial resources and the ability of
12 the operator to sustain the business.
13 That's one of the criteria.
14    Q.   And am I correct that you as
15 the broker were raising concerns about --
16    A.   Just one point. We do not like
17 to be referred to as a broker. We like to
18 be referred to as investment bankers.
19    Q.   I'm sorry.
20    A.   That's quite all right.
21    Q.   Sorry, it is a whole new world
22 to me.
23       So in your role as an
24 investment advisor to ArchCare, you were
25 raising a concern that the State might not

41 (Pages 158 - 161)

## Page 166

1             CERTIFICATION
2
3     I, TODD DeSIMONE, a Notary Public for
4  and within the State of New York, do hereby
5  certify:
6     That the witness whose testimony as
7  herein set forth, was duly sworn by me; and
8  that the within transcript is a true record
9  of the testimony given by said witness.
10    I further certify that I am not related
11  to any of the parties to this action by
12  blood or marriage, and that I am in no way
13  interested in the outcome of this matter.
14    IN WITNESS WHEREOF, I have hereunto set
15  my hand this 18th day of July, 2018.
16
17
18            *   *   *
19                     *Todd DeSimone*
20                     TODD DESIMONE

## Page 167

Care One Mgmt v. United Healthcare Workers East, Seiu 1199
Joseph Beck

INSTRUCTIONS TO THE WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

2954742

## Page 168

Care One Mgmt v. United Healthcare Workers East, Seiu 1199
Joseph Beck

       E R R A T A
       - - - - -

PAGE   LINE   CHANGE

___   ___   _____
Reason: _____

___   ___   _____
Reason: _____

___   ___   _____
Reason: _____

___   ___   _____
Reason: _____

___   ___   _____
Reason: _____

___   ___   _____
Reason: _____

___   ___   _____
Reason: _____

___   ___   _____
Reason: _____

___   ___   _____
Reason: _____

2954742

## Page 169

Care One Mgmt v. United Healthcare Workers East, Seiu 1199
Joseph Beck

ACKNOWLEDGMENT OF DEPONENT

    I, _____, do hereby certify that I have read the foregoing pages and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

_____   _____
DATE                         SIGNATURE

2954742