# 3d Supp. Kekacs Decl. Ex. 373

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - -x

Care One Management, LLC, et al.,

Plaintiffs,

-against- Civil Action No. 2:12-cv-06371-SDW-MAH

United Healthcare Workers East, SEUI 1199, et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - -x

Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New, New York 10019

November 21, 2018
9:00 a.m.

VIDEOTAPED EXAMINATION BEFORE TRIAL of SCOTT LARUE, the Witness herein, held at the above-mentioned time and place, pursuant to Notice, before Ilysa A. Linzer, a Notary Public in and for the State of New York.

MAGNA LEGAL SERVICES
320 West 37th Street, 12th Floor
New York, New York 10018
(866) MAGNA-21



S. LARUE

follows:

EXAMINATION BY

MS. ALITO:

Q. Good morning, Mr. LaRue. My name is Rosemary Alito. I am a lawyer representing Care One, LLC, and some other Plaintiffs in the case that has been brought against the Service Employees International Union, and to an extent the locals.

As you know, we are here today to take your deposition. Have you ever had your deposition taken before?

A. Yes.

Q. Okay. I am still going to go over just a few of the ground rules to make sure we are on the same wavelength. I am going to be asking you a series of questions; you are obligated to answer truthfully and to the best of your ability.

The court reporter has sworn you in. The oath that you have taken in this conference room means the same thing

S. LARUE

as it would if we are in a court in front of a judge and jury. Do you understand that?

A. I do.

Q. If I ask you a question that you don't understand, please let me know, I will try to rephrase it so you do understand. If you answer a question, everybody is going to assume that you understood it. If you don't know the answer to a question, just let us know. No one wants you to testify about things that you don't know or don't remember.

During normal conversation we tend to start to speak before the other person finishes because we think we know what the end of sentence is. That doesn't work in a deposition because the court reporter can't take down two people speaking at once, so please let me finish before you start to speak, and I will do the same for you.

Also in normal conversation we tend to answer by nods of heads, or

S. LARUE

"uh-huh" or "uh-uh," that again doesn't work in a deposition, so please try and keep all of your responses verbal.

I don't think we are going to be here a long time today. If you want to take a break before anybody else in the room does, don't hesitate to say so. We can take a break any time you want. The only proviso to that is that if there is a question pending, I am going to ask you to answer that question before we take a break; otherwise at any time feel free. We don't want you to testify while you are feeling uncomfortable, or have a phone call on your mind, or something else.

Is there any reason why you wouldn't be able to testify to the best of your ability today such as medications, or illness, or anything else?

A. No.

Q. Did you do anything to prepare for your deposition today besides speak

S. LARUE

with your attorney?

A. No.

Q. Did you review any documents to prepare for today other than documents selected by your attorney?

A. No.

Q. Did you speak to anybody else besides your attorney about the deposition?

A. No.

Q. You are currently employed?

A. Yes.

Q. By whom?

A. Catholic Health Care System.

Q. How long have you worked at Catholic Health Care System?

A. A little over 11 years.

Q. And your current position?

A. President and CEO.

Q. How long have you held that position?

A. A little over eight years.

Q. And what was your position before that?



S. LARUE

A. Chief operating officer.
Q. Any other positions with Catholic Health Care?
A. Senior vice president of administration.
Q. Was that your first position?
A. Yes.
Q. Now, how many facilities does Catholic Health Care own or operate?
A. What do you mean by facilities?
Q. Senior health care facilities.
A. You have to clarify what you mean by facilities because we have programs that aren't necessarily bricks and mortar. I am not sure what you are asking.
Q. Okay. Let's start with bricks and mortar facilities?
A. Five.
Q. Does SEIU represent the employees at all of those facilities?
A. Yes.
Q. Now, you mentioned you also run programs. Do those programs have

S. LARUE

employees?
A. Yes.
Q. Are they represented by SEIU?
A. Some.
Q. About how many employees does Catholic Health Care have that are represented by SEIU?
A. Roughly 3,000.
Q. Are all of them represented by 1199, or are other locals involved?
A. There are other locals involved.
Q. What are the other SEIU locals?
A. Oh, I misunderstood your question.
Q. Oh, okay. We will back up. Of the approximately 3,000 Catholic Health Care employees represented by SEIU, are they all represented by 1199?
A. Yes.
Q. What other unions represent your employees?
A. NYSNA and Local 272, I believe.
Q. What union is Local 272

S. LARUE

associated with?
A. It is a security guard.
Q. But is it Local 272 of steelworkers or you don't know?
A. I don't know.
Q. Okay. Catholic Health Care's relationship with SEIU is important to it; correct?
A. Yes.
Q. Are you involved in collective bargaining with 1199?
A. Are you asking do I do the collective bargaining? I am not sure what you are asking.
Q. Are you involved in the bargaining in any way? I assume you don't sit at the table?
A. Correct. Yes.
Q. Do you communicate personally with representatives of 1199?
A. Related to collective bargaining, or in general?
Q. In general.
A. Yes.

S. LARUE

Q. Who are the people at 1199 that you communicate with?
A. I don't currently know their names.
Q. Okay. What type of issues would you get involved in with 1199 in your current position?
A. Broad strategic policy kind of issue.
Q. Can you give me an example?
A. Reimbursement to the nursing homes, and advocacy before state government.
Q. Have there been issues on which Catholic Health Care and 1199 have jointly advocated, for example, on reimbursement rates, or things like that, have there been instances where Catholic Health Care has joined with SEIU in advocating to state or federal agencies?
A. There are issues of which we have common positions and beliefs, yes.
Q. Can you give me an example?
A. Proper reimbursement to the



S. LARUE
nursing homes.
Q. During the time that you worked at Catholic Health Care, has 1199 gone on strike?
A. No.
Q. Any lockouts?
A. No.
Q. There came time when a decision was made to sell the Kateri residences, is that the correct way of pronouncing it? I have heard it pronounced a number of different ways; Kateri, Kateri.
A. The Pope refers to it as Kateri.
Q. I am going to have to go with the Pope.
There came a time when the decision was made to sell the Kateri facility; correct?
A. Yes.
Q. And who made that decision?
A. It was a collective decision between the various stakeholders.
Q. Who were the stakeholders?

S. LARUE
A. My board, and our sponsor.
Q. Who is the sponsor?
A. The Archdiocese of New York.
Q. Excuse me if this is a stupid question, but what do you mean when you say your sponsor? What does it mean to be the sponsor, as you use that term?
A. I don't want to quote not for profit law, but with a not for profit corporation someone appoints the board so there are members of the not for profit corporation. Those members are individuals from the Archdiocese.
Q. When was that decision made?
A. I don't recall.
MR. TRACY: You are referring to the decision to sell the Kateri?
MS. ALITO: Yes, thank you. The decision to sell the Kateri.
Q. What were the reasons why it was decided to sell Kateri?
A. We believed that there was a

S. LARUE
move away from institutionally based services to homely community-based services. And as a ministry of the Church we needed to have the capital necessary to do that expansion, and it was determined that the best way to fund that expansion would be through the sale of Kateri.
Q. Was Kateri losing money?
A. Off and on.
Q. At the time the decision was made, was that a time when it was losing money?
A. I believe at the time that the decision was made to sell it was having a negative operating margin.
Q. Morgan Keegan was engaged to assist with the sale; correct?
A. Yes.
Q. And what was their role?
A. Advisors to the transaction.
Q. Can you explain what you mean by that?
A. They helped us establish a

S. LARUE
process for completing the transaction.
Q. What was your role in the sale?
A. Coordinating the various stakeholders, and ensuring that we achieving the objectives of the sale.
Q. Were there objectives of the sale other than obtaining capital for the newly focused programs?
A. Yes.
Q. What were they?
A. Being a mission-based organization, we were very concerned about what would happen to the residents of the facility, and ensuring that we were comfortable that they would be well taken care of, and whoever the operator of the facility going forward would do so in a manner consistent with what we would expect.
Q. Anything else?
A. We were focused on ensuring that we had a transaction that we could bring to a successful conclusion.
Q. What, if any, instructions did



S. LARUE

these were recommendations Raymond James was sending to us to consider.

Q. Number Roman numeral five on here, "employee retention - buyer to offer all nonadministrative employees a position post-close. Also negotiate an agreement with the SEIU."

Was that a requirement that was established by the committee?

A. Yes.

Q. Was that done in consultation with the -- with 1199?

A. I am not sure what you are asking in that question.

Q. Well, it appears that from the outset of planning for this transaction, ArchCare, or Catholic Health Care, had as a requirement that any purchaser recognized SEIU, and negotiated an agreement with SEIU. Was that requirement established solely by the committee or someone else at Catholic Health Care, or was that requirement somehow negotiated with 1199, or

S. LARUE

established in consultation with 1199?

MS. CARTER: Objection to form.

MR. TRACY: Objection.

You can answer.

Q. So we are going to be -- your lawyer probably explained this to you. There will be objections throughout the deposition today with most of them they will just be noted and if necessary a judge will rule at some point in time. There will be an occasion, I doubt it will come up, where there is a privileged issue and your counsel will instruct you not to answer. With the normal objections to form you can answer and the lawyers will fight it out at some point.

Do you need that question read back?

A. Yes.

(Whereupon, a portion of the testimony was read back.)

A. It was a foundational principle that was established originally without

S. LARUE

discussion with 1199.

Q. Let me ask you a background question. We have got ArchCare and we have got Catholic Health Care. Can you explain what the relationship is between those two entities, or are they just different names for the same thing?

A. ArchCare is a DBA for Catholic Health Care System.

Q. Roman numeral six on here Exhibit 1, "preferred manager care provider agreement with ArchCare with ArchCare Advantage, ArchCare Senior Life, and any other programs."

Can you explain that requirement for me?

A. We had programs that residents of Kateri were benefitting from outside of the licensed nursing home that we felt was important to ensure the continuity and quality of care going forward that we added this to the transaction.

Q. What is ArchCare Advantage?

A. It is a Medicare advantage plan

S. LARUE

with a designation as an institutional special needs plan which is for residents who are nursing home eligible either residing within the walls of the nursing home or in the community.

Q. What is ArchCare Senior Life?

A. A pace program.

Q. I am sorry?

A. A pace program.

MS. ALITO: Let's mark Exhibit 2.

(Whereupon, Bates stamped Arch 002534 was marked as LaRue Exhibit 2 for identification, as of this date.)

Q. Would you take a look at the exhibit, and let me know when you are ready.

A. (Perusing.)

Q. This is -- Exhibit 2 is an e-mail from a Corliss Henley with an 1199 e-mail address to you, copies to Suzanne Alio, Hugo Pizarro, and Joyce Neil,



S. LARUE

subject "Kateri nursing home sale question mark," July 25, 2011. Who is -- the message is, "hi, Scott. Joyce would like to have an urgent response to Kateri possibly being sold. Thank you."
Who is Joyce?
A. She worked for the Union.
Q. Do you know what her position was?
A. I do not.
Q. Did you speak to her about the possible sale of Kateri in July of 2011?
A. I don't recall.
Q. Do you recall any conversations with the Union about possible sale of Kateri in summer of 2011?
A. I need the timeline in front of me. I don't recall what the timeline of the sale was.
Q. Did you have discussions with 1199 about the sale of Kateri before the successful bidder was selected?
A. Yes.
Q. Who from the Union did you

S. LARUE

speak with?
A. Again, I don't recall the names. These people change --
Q. Okay.
A. -- regularly. It would have been leadership people that at my level I am dealing with.
Q. Okay. How many discussions did you have?
A. I have no idea.
Q. What did you -- what was the substance of the discussions?
A. My main message to the Union was that the employees at Kateri were highly valued by ArchCare or Kateri, and that during the course of a transaction we would want to ensure that whoever the buyer was recognized the fact that the employees were represented by SEIU.
Q. Do you remember any comments made by the Union representatives during these conversations?
A. I do not.
Q. Did you discuss any of the

S. LARUE

potential bidders with the Union?
A. I don't believe I ever discussed specific bidders with the Union prior to a transaction being consummated.
Q. You say you don't believe you discussed them. Is it possible that you discussed the bidders with the Union?
A. It was seven years ago.
Q. Okay.
MS. ALITO: Let's mark the next exhibit.
(Whereupon, Bates stamped RJA-Case One Mgmt-029985 was marked as LaRue Exhibit 3 for identification, as of this date.)
MR. TRACY: Was this part of a larger document produced?
MS. ALITO: Not that I am aware of, but we can check.
Q. This is a list of outstanding items dated October 5, 2011. It says

S. LARUE

ArchCare at the top, Morgan Keegan at the bottom. Roman numeral one is Extell Development Company. Was Extell a bidder for Kateri?
A. I believe they expressed an interest. Whether they were a bidder, I don't recall.
Q. Okay. But it is your recollection they were at least in the mix somehow?
A. Yes.
Q. Under Extell it says, "SEIU experience." Do you know what that refers to?
A. I do not.
Q. Was experience with the SEIU a factor with regard to the bidders, the bidding process?
A. Yes.
Q. In what respect was SEIU experience a factor?
A. Going back to one of our principles of the transaction, which was ensuring that we can get to a close, I



S. LARUE

at this point in December Care One was still the highest bidder by 15 million; correct?

A. Yes.

Q. Go one page further, 5035. On your post-close employment, for each bidder there is a discussion of how they would treat employees. Care One and ML Equity Partners both reference SEIU. ML Equity says, "offer to all SEIU employees, and consideration to management employees, but will not employ executive director and administrator."

Care One says, "offer to employ all qualified non-executive employees, and will recognize SEIU as exclusive bargaining agent." Then it says, "maybe other SEIU considerations with bidder."

What were the other SEIU considerations?

A. From this document, I don't know.

Q. Did you discuss what this bullet point meant with Joe Beck or

S. LARUE

anybody else from Morgan Keegan?

A. If they shared this document with me, we would have discussed this. I don't recall the conversations specific to this document.

MS. ALITO: Let's take a short break.

THE VIDEOGRAPHER: We are now off the record. The time is 10:31 a.m.

(Whereupon, a short break was taken at this time.)

THE VIDEOGRAPHER: We are now on the record. The time is 10:45 a.m.

MS. ALITO: Exhibit 12.

(Whereupon, Bates stamped RJA-Case One Mgmt-034447 and 034448 was marked as LaRue Exhibit 12 for identification, as of this date.)

A. (Perusing.)

Q. Page two of Exhibit 12 includes

S. LARUE

a red line of the asset purchase agreement, and this was an agreement with CareRite; correct? CareRite was selected?

A. I don't know if this document was with CareRite. It doesn't reference it, but we did sell the facility to CareRite.

Q. Okay. And around the middle of the page where the red lining appears it is added in "buyer recognizes and acknowledges that seller's non-management employees are organized and represented by the Surface Employee International Union, and buyer shall offer comparable employment, et cetera."

And this is -- this was added into the asset purchase agreement in accordance with what you indicated was a foundational principle of the sale, correct, that the purchaser recognize SEIU?

MR. TRACY: Objection.

You can answer.

S. LARUE

A. Yes, again, having a page taken out of the document without the signed final version in front of me, I couldn't say, but we did have a clause similar to that in the final document.

MS. ALITO: Exhibit 13.

(Whereupon, Bates stamped RJA-Case One Mgmt-041990 was marked as LaRue Exhibit 13 for identification, as of this date.)

A. (Perusing.) Okay.

Q. After selecting CareRite as the successful bidder, it took quite some time to reach closing; correct?

A. I don't know how you define quite some time.

Q. About a year and a half?

MS. CARTER: Objection to the form. Foundation.

A. I don't recall the timeline from the selection of the bidder until the date we closed. I know when we closed it was, I think, July, summer.



S. LARUE

maybe we can take a break, and I can figure out what those are.

THE VIDEOGRAPHER: We are now off the record. The time is 11:01 a.m.

(Whereupon, a short break was taken at this time.)

THE VIDEOGRAPHER: We are now on the record. The time is 11:56 a.m.

EXAMINATION BY.
MS. CARTER:

Q. Good morning, Mr. LaRue. My name is Abigail Carter. I represent the Defendant, the various Union entities in this. I just wanted to ask you a couple of questions about two documents, then we should be done.

So first I am going to hand you what has been marked is Exhibit 16, which is Bates label Arch 49 to 51, and it has previously ben marked as Exhibit 685 in the underlying case.

S. LARUE

(Whereupon, Bates stamped Arch 000049 through 000051 was marked as LaRue Exhibit 16 for identification, as of this date.)

MR. TRACY: So this is Exhibit --

MS. CARTER: 16.

A. (Perusing.)

Q. So as I am sure you saw, the sort of bottom e-mail which starts on the bottom of the first page and carries on is an e-mail that we saw earlier today, and then the top portion appears to be an e-mail from Mr. O'Brien to yourself and several other people; does that seem fair?

MS. ALITO: Object to form.

A. I am sorry. I didn't hear.

MR. TRACY: Ms. Alito objected. You can still answer the question if you understand it.

S. LARUE

A. Yes.

Q. In the third paragraph of this e-mail to you, the paragraph begins, "my view is that we turn them down because they are not credible buyers in our judgment"; do you see that?

A. Yes.

Q. What was your understanding of any way in which they were not credible buyers?

MS. ALITO: Object to form.

A. Based on our advisor's input, they were concerned about the lack of experience in New York, and getting them through the regulatory approval process. There was concern that they were primarily focused on a real estate transaction and not maintaining the nursing home and the mission going forward. And there was concern that the offer wasn't a real offer, meaning the experience that our advisors had had, they put a higher number out there, but

S. LARUE

then you would be fighting with them all the way up until closing and not end up at the number that you started with anyhow.

(Whereupon, Bates stamped RJA-Case One Mgmt-037502 through 037505 was marked as LaRue Exhibit 17 for identification, as of this date.)

Q. I am going to show you another document, which has been marked as Exhibit 17 in this deposition. It is Bates number RJA Case One Management 037502 to 505, previously marked as Exhibit 686 in this case.

And for purposes of your review, I am going to be asking you questions mostly about paragraph three of the top of the second page.

A. (Perusing.) Okay.

Q. Is the TCC Redevelopment Task Force Subcommittee of the Planning Committee -- I will just ask, what is



S. LARUE

form.

A. One of the principles of the transaction is that we were selling it only to a buyer that we were convinced as we could be would continue to operate it as an nursing home, and that was not just an Archdiocesan principle, it was a principle of our board, and it was a principle of myself in the entire transaction. We did not want a real estate deal.

Q. Is it fair to say that one of the significant concerns that you had about the Care One offer was that the purchase price suggested they were not interested in continuing to operate it as a nursing home in the long term?

MS. ALITO: Objection to form.

A. Yes.

Q. Do you recall having any -- so -- well, I am going to ask a different question. The last paragraph under this bullet point three states that a

S. LARUE

discussion ensued regarding the offers. Then it says, "the consensus of the trustees on the task force was to proceed with the CareRite offer"; do you see that?

A. Yes.

Q. What role, if any, did the trustees on the task force have in connection with the ultimate decision to sell the facility to CareRite?

A. I am going to ask you to repeat the question again.

Q. Sure. What was the role of the trustees on the task force in connection with the sale of Kateri?

A. To make a final recommendation in terms of who the buyer of the facility would be.

Q. And that was a recommendation that was passed on to the Archdiocese?

A. Again, because you need canonical approval, we had to ensure that I had all of the key constituents on the same page, and that was one of the

S. LARUE

purposes of the subcommittee. So yes, ultimately it canonically had to go to the bishop, and the bishop had to make a recommendation to Rome, which is why it was extraordinarily important that we had covered all of our bases as it relates to what was going to happen to the residents in the facility, and we weren't caught in a situation that somebody, you know, was shutting the doors and discharging 520 elderly people into the community.

Q. So just to be sure I understand the process, the task force came up with its recommendation, which was made to the bishop. The bishop then made a recommendation to Rome, and that was the final step in the process?

A. I would say that our advisors made a recommendation to the committee. The committee reviewed the recommendations of the advisors, came to their conclusion, and then selected a buyer which was then referred with the recommendation up the canonical ladder.

S. LARUE

The details of the canonical ladder, I am not an expert in.

Q. I would never claim to even come close to knowledge of the details of those ladders, so that's fine.

MR. TRACY: I actually took a canon law class in law school, but we didn't discuss property sales in nursing homes.

MS. CARTER: Property sale is not probably a big agenda item in the canon law syllabus.

Q. If these are meeting minutes from the meeting of the task force, or the task force subcommittee planning committee on Monday, December 12th, do you recall if there was any further meeting of the trustees of the task force as to the decision to proceed with the CareRite offer, or was this it?

A. I don't recall. If that was the final recommendation, then my job at



12 Bates stamped RJA-Case One Mgmt-034447 and 034448 59

13 Bates stamped RJA-Case One Mgmt-041990 61

14 Bates stamped Arch 004824 65

15 Bates stamped Arch 005145 67

16 Bates stamped Arch 000049 through 000051 71

17 Bates stamped RJA-Case One Mgmt-037502 through 037505 73

C E R T I F I C A T E

I, ILYSA A. LINZER, a Shorthand Reporter and Notary Public of the State of New York, do hereby certify:

That, SCOTT LARUE, the Witness whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by such Witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

ILYSA A. LINZER DECEMBER 3, 2018





WINDELS MARX
Windels Marx Lane & Mittendorf, LLP

windelsmarx.com

**James Tracy**
**212.237.1180**
**jtracy@windelsmarx.com**

January 8, 2019

**Via Federal Express**

Customer Service Department
Magna Legal Services
1635 Market Street, 8th Floor
Philadelphia, PA 19103

**Re:** ***CareOne Management, LLC et al v. United Healthcare Workers East, SEIU 1199, et al***
**United States District Court, District of New Jersey**
**Civil Action No.: 12-cv-06371**

To Whom It May Concern:

Please find enclosed the signed and notarized errata sheet and signature page for the deposition of Scott LaRue, which was held on November 21, 2018. Should you have any questions or need any further information, please do not hesitate to contact me.

Very truly yours,

James Tracy

cc: Rosemary Alito, Esq. (via email)
Caitlin Kekacs, Esq. (via email)

Enclosure

{11656044:1}

# ERRATA SHEET

**Case Name:** ***CareOne Management, LLC et al v. United Healthcare Workers East, SEIU 1199, et al***
**United States District Court, District of New Jersey**
**Civil Action No.: 12-cv-06371**

**Date of Deposition:** **November 21, 2018**

**Name of Witness:** **Scott LaRue**

| **Page and Line** | **Correction** | **Reason** |
|---|---|---|
| p. 16, line 3 | "homely" should be "home" | Transcription error |
| p. 40, line 8 | "COM" should be CON | Transcription error |
| p. 41, line 20 | "hurtles" should be "hurdles" | Transcription error |
| p. 54, line 15 | "missioning" should be "mission" | Transcription error |
| p. 62, line 12 | "tact partly" should be "Taft Hartley" | Transcription error |

SCOTT LaRUE

Subscribed and sworn to before
before me this 31st day of December, 2018

Sarah D Strum
NOTARY PUBLIC

SARAH D STRUM
NOTARY PUBLIC
STATE OF NEW YORK
New York County
02ST6349925
COMMISSION EXPIRES OCTOBER 31, 2020

{11651046:1}



ACKNOWLEDGMENT OF DEPONENT

I, Scott LaRue, do hereby certify that I have read the foregoing pages, 1 - PGS, and that the same is a correct transcription of the answers given by me to the questions therein propounded, except for the corrections or changes in form or substance, if any, noted in the attached Errata Sheet.

WITNESS NAME DATE

Subscribed and sworn to before me this 31 st day of December, 2018.

My commission expires: 10/31/2020

Sarah D Strum

Notary Public

SARAH D STRUM
NOTARY PUBLIC
STATE OF NEW YORK
New York County
02ST6349925
COMMISSION EXPIRES OCTOBER 31, 2020