# 3d Supp. Kekacs Decl. Ex. 388

**From:** Ryan, Matthew [MRyan@HL.com]
**Sent:** Thursday, August 01, 2013 4:24 PM
**To:** Mantzoukas, William; Walsh, Michael
**CC:** Samuels, Eric; Singapuri, Owais
**Subject:** Athena Proposal
**Attachments:** doc01259420130801153928.pdf; ATT00001.txt; ATT00002.htm

Please find attached the Athena proposal. Can we discuss your thoughts in the morning? I need to run out of the office shortly.



HOULIHAN LOKEY

**Matthew J. Ryan**
Director

123 North Wacker Drive 4th Floor
Chicago, IL 60606-1700
312.456.4707 **Direct**
773.2551237 **Mobile**
MRyan@HL.com
HL.com



EXHIBIT 10
Mantzoukas
R. Grogan 5-17-16

MHG-0000100



August 1, 2013

Matt Ryan
Director
Houlihan Lokey
123 North Wacker Drive
4th Floor
Chicago, IL 60606

Re: Revised Letter of Interest Regarding Memorandum of Sale for Merrimack Health Group Portfolio ("Memorandum").

Dear Mr. Ryan:

We appreciate the opportunity to submit this revised letter of interest regarding the portfolio set forth in the Memorandum for Merrimack Health Group and its affiliates ("MHG") dated May 2013. Athena Health Care Systems ("Athena") currently owns and/or manages 33 long-term care facilities in Connecticut, Massachusetts and Rhode Island. We believe that our knowledge of the healthcare industry, management expertise, access to capital and our desire to expand will accelerate the completion of this transaction. The proposed terms regarding our interest are as follows:

1. Transaction Structure. Newly formed "for-profit" affiliates/assignees of Athena ("Buyer"), propose to separately purchase the assets of the following:

    a) Each of the five licensed skilled nursing facilities, a licensed transitional care facility, management company and two existing management agreements to not for profit facilities:
    1) Lanessa Extended Care Center a 96 bed skilled facility located in Webster, MA,
    2) Marlborough Hills Healthcare Center a 194 bed skilled facility located in Marlborough, MA
    3) The Oxford Rehabilitation and Nursing Care Center a 120 bed skilled facility located in Haverhill, MA,
    4) Parsons Hill Care Center a 162 bed skilled facility located in Worcester, MA,
    5) Webster Manor Healthcare Center a 135 bed skilled facility located in Webster, MA,
    6) TCU at Hubbard a 21 bed transitional care facility located in Webster, MA, and
    7) Existing management company assets and costs as determined by solely by Buyer, and
    8) Assignment to Buyer in full management agreements with Lafayette Rehabilitation and Skilled Nursing Facility and Fairhaven Healthcare Center.

135 South Road · Farmington, CT 06032 · 860-751-3900 · Fax 860-751-3905
athenahealthcare.com

MHG-0000101

Each of the facilities above are referred herein individually as a "SNF Facility" or collectively as the "SNF Facilities",

The SNF Facility or SNF Facilities and the management company assumption are collectively defined herein as the "Seller" or "Sellers".

Upon Closing as herein after defined, each Buyer shall enter into a two year pharmacy contract with affiliate of Seller at terms and conditions similar to existing contracts.

Each Buyer shall purchase each Sellers' assets including, but not limited to, all real property and improvements thereto, certificates of need, personal property, equipment, non personal vehicles, warranties, inventories, deposits, intangibles, licenses, permits, approvals, plans, resident rent rolls, contracts and patient/resident agreements, client base, payment rates and operations ("Assets") of the Sellers. The collective Assets of all Sellers shall be defined herein as the "Portfolio". Specifically excluded from the Portfolio are investments, cash, cash equivalents and accounts receivable, except as provided in Section 6 below.

2. Purchase Price. Based on the Memorandum provided to us by Houlihan Lokey, Buyer has valued the Portfolio between Eighty Three Million Dollars and Eighty Seven Dollars ($83,000,000 - $87,000,000) ("Purchase Price Range"). The final purchase price shall be determined from actual EBITDAR for the period May 1, 2013 to November 30, 2013 as set forth in Exhibit A ("Purchase Price"). The Purchase Price shall be paid as follows: (a) the Deposit and accrued interest thereon as hereinafter defined; (b) mortgage and mezzanine financing as set forth in Section 5.1 herein; (c) a Seller Note in the amount as determined from the Purchase Price as set forth in Exhibit A; which shall bear interest at a rate of 5.5% annually, and to be repaid in quarterly equal installments over ten years subsequent to the closing date; and (d) the balance paid at Closing in cash by wire transfer, certified funds or cashier's check. The Seller note shall be collateralized by the SNF Facilities to the extent allowed by lenders. Allocations of the Purchase Price between the Assets of each Seller shall be at Buyers reasonable discretion. However, in no event shall the allocation of the Purchase Price negatively impact any Buyer's reimbursement under State or Federal reimbursement programs.

3. Purchase Agreement. The parties hereto shall, subsequent to the completion of the due diligence period set forth in Section 8 herein, proceed with the further negotiation, preparation and execution of a Purchase/Sale Agreement containing, but not limited to, the terms and conditions contained in this letter of interest (the "Purchase Agreement"). Upon the execution of the Purchase Agreement, Buyer shall deposit One Hundred Thousand Dollars ($100,000.00) into a mutually agreed escrow account (the "Deposit"). The Deposit shall represent a good faith deposit, and shall be, together with any accrued interest thereon, credited toward the Purchase Price at the Closing of the sale or returned to Buyer if this transaction is terminated for any reason other than Buyer's default of the Purchase Agreement.

4. Closing. Within 45 days of the satisfaction of the Buyer Contingencies set forth in Section 5 herein (the "Closing").

5. Buyer Contingencies. Buyer agrees upon execution of this letter of intent to make all reasonable efforts to expeditiously satisfy the contingencies set forth below.

   5.1   Financing Contingency. Buyer plans to finance this transaction at the Closing with a combination of equity, mortgage financing, mezzanine financing and the Seller Note. The purchase of the Portfolio is contingent upon Buyer receiving from lenders firm mortgage and mezzanine financing commitments acceptable to Buyer ("Financing"). Buyer reserves the right to reallocate the above amounts based on the appraised values from Section 5.5 herein. Any other Financing terms and/or conditions must be acceptable to Buyer in its sole discretion. Buyer believes its relationships and credibility with lenders would facilitate such Financing. Seller shall provide information to lender as may be requested.

   5.2   Rate Contingency. Buyer must receive within one hundred twenty (120) days of execution of the Purchase Agreement, in writing confirmation from the State of Massachusetts that Buyer will continue to receive post closing, the current SNF Facilities' Medicaid rate for State aided residents and assumption of all third-party contracts minimally at rates in currently in existence. Collectively all of the above rates are herein defined as "Rates". Any other provisions, including but not limited to any successor liability amounts, regarding the Rates shall be subject to Buyer's approval at its sole and absolute discretion.

   5.3   Licensure Approvals. This proposed transaction is contingent upon the approvals of State, Federal or other governmental agencies as may be required. Buyer shall have the option to terminate if any conditions mandated by a change in ownership or other State, Federal or Local government agency exceed $2,000,000.00 for the Portfolio unless the Rates in Section 5.2 above are adjusted sufficiently to reimburse for such mandates. Such adjustments shall be approved by Buyer at its sole and absolute discretion.

   5.4   Environmental Issues. Receipt by Buyer by the date as required by lender such environment audit reports as required by lender and acceptable to Buyer and lender. Such report shall be prepared at Buyer's sole cost and expense by an environmental engineering firm acceptable to and addressed to Buyer's lender. Sellers shall provide Buyer with copies of any previous environmental reports obtained by Sellers.

   5.5   Appraisal. Receipt by Buyer as required by lender such appraisal reports for the Portfolio as required and acceptable to Buyer and Buyer's lender prepared at Buyer's sole cost and expense by an appraisal firm acceptable to and addressed to Buyer's lender. Such appraisal report shall be acceptable to Buyer or its lender in their sole and absolute discretion.

   5.6   Survey. Receipt by Buyer as required by lender such land or as built surveys as required by lender for each Seller acceptable to Buyer and Buyer's lender prepared at Buyer's sole cost and expense by a survey firm acceptable to and addressed to Buyer's lender. Such survey shall be acceptable to Buyer or its lender in their sole and absolute discretion. Seller shall provide Buyer with copies of any previous surveys obtained by Seller.

    5.7    Other Lender Reports. Receipt by Buyer as required by lender such other reports as may be required by the lender. Such reports shall be acceptable to Buyer or its lender in their sole and absolute discretion.

    5.8    Purchase Price. The Closing and Purchase Price as set forth in Section 2 are contingent upon simultaneous closing on the purchase of all Assets of the Portfolio.

6. Working Capital, Assumed Liabilities and Accounts Receivable. Buyers shall collect after closing on behalf of itself and Sellers all receivables of the Portfolio outstanding on the day of closing. Buyer shall be entitled to retain the proceeds of all receivables paid by Medicaid, Medicare and any third party payers for periods prior to Closing but received during the 120-day period after the Closing up to a maximum amount of $5,000,000 to provide Buyers with working capital to fund operating expenses ("Working Capital"). In return for providing the Buyer the Working Capital, Buyer shall assume specific accounts payable or other accrued liabilities at an amount equal to the Working Capital ("Assumed Liabilities"). The detail of such Assumed Liabilities shall be determined by Buyer and Seller from Sellers' accounts payable and accrued liabilities listings 10 days prior to the Closing.

Any receivables collected by Buyer during such 120-day period in excess of the Assumed Liabilities and any receivables collected after such period will be first offset against any liabilities paid but not assumed by Buyer and then promptly remitted to Seller.

Buyer shall not assume any liabilities, contingent or otherwise, of Seller or its Facilities except as specifically assumed above. Buyer shall not be liable for any recoupment or other amounts due, including but not limited to any credit balances, user fees or rate recoupment due to any governmental agency incurred for any periods prior to the Closing. Any such item recouped from Buyer shall be promptly paid by Seller to Buyer and/or offset against any receivables collected in excess of the Working Capital above or the Seller Note. No additional cash escrow will be required of Sellers.

Seller shall provide to Buyer, thirty (30) days prior to Closing, a list of all employees of the Seller (including each employee's title, general responsibilities, length of service, and current rate of compensation and benefits). Buyer reserves the right to decide in its sole and absolute discretion which employees Buyer will hire upon Closing. Seller shall provide Buyer with a list of all employee benefit and welfare benefit plans provided to employees as well as any accrued liabilities for employee paid time off or other benefit accruals. Buyer shall not be responsible for or assume any accrued wages or benefits or other employee costs or sponsor or participate in any benefit plans unless specifically assumed by Buyer as part of the Assumed Liabilities herein.

7. Transaction-Related Expenses. Buyer and Seller will each bear their own legal and other expenses with respect to the transaction. Any brokerage, agent or commission fees for representatives employed or contracted by Seller shall be paid by Seller prior to or at the Closing. Any state or local conveyance taxes shall be paid by Seller.

8. Access to Information/Due Diligence. Buyer would need to conduct a business, legal and accounting due diligence effort on the Facilities and management company. Immediately after the execution of this letter of interest, Seller will grant Buyer and its representatives at reasonable times and with notice full and complete access to and the right to inspect the physical Facilities and the management company, their financial statements and records, contracts, certificate of need approvals, MMQ's, MDS' and other reimbursement records, audits, litigation, regulatory and environmental compliance, payrolls, employee benefits, lease and financing agreements, operational and financial statistics to assess their business prospects. Buyer shall conduct all such due diligence review in a manor that minimizes disruption to residents and staff of the Portfolio. Buyer will complete the due diligence to its satisfaction within 90 days of the execution of this letter of intent. Seller shall disclose to Buyer or its representatives all books, agreements, papers, worksheets, cost reports, tax returns, health inspection reports, contracts, employee benefit manuals, leases accounts payable, accounts receivable, general ledgers, tax returns, payrolls, employee benefits and any other records reasonably requested by Buyer or its representatives. If after Buyer's due diligence, Buyer determines that the Portfolio is not suitable for Buyer's intended use, Buyer may terminate this Agreement in its sole discretion.

9. Termination. Either party may terminate this letter of intent if the Purchase Agreement has not been entered into on or before November 30, 2013 ("Termination Date") without any liability to the other party, in which case Buyer and Seller shall be released from all obligations and agreements set forth herein except for Buyer's obligation to keep information confidential which shall survive any such termination.

10. No Change in Operations. From the date of execution of this initial letter of intent until the execution of the Closing, Seller shall not make any material change in the business or operation of the Portfolio or the Assets of the Portfolio. Sellers shall not enter, either jointly or separately, into any other significant contract or commitment or any other transaction with respect to the Portfolio without the prior written consent of Buyer, which shall not be unreasonably withheld. Also, there shall be no material adverse change in the Seller business condition or the Portfolio prior to the close of the transaction.

11. Exclusivity. Buyer expects to invest significant resources in order to consummate this transaction with Seller. From the execution date hereof until the earlier of the closing of this transaction, the Termination Date only if a Purchase Agreement is not entered into or any other termination by Buyer or Seller as stated herein; Seller, its affiliates and shareholders and their respective officers, directors, employees, agents and representatives shall terminate all negotiations and other discussions and shall not solicit, encourage, or initiate inquiries, offers or proposals from, or participate in any discussions or negotiations with, any person, party or entity (other than Buyer) with respect to any proposed investment, acquisition (whether by merger, consolidation, equity purchase or otherwise), or business combination or purchase of all or any portion of the Assets of Seller.

12. Representations and Warrantees. Sellers shall transfer title to the Assets by instruments of conveyance warranting title free and clear of any and all liens, except those specifically assumed by Buyer. Any assumed debt, leases or contract agreements for the Portfolio is

subject to approval at amounts, terms and conditions acceptable to Buyer. Sellers shall provide to Buyer all usual and customary representations and warranties associated with this transaction.

13. <u>Expiration of Proposal</u>. This proposal shall expire at 5:00 p.m., Eastern Standard Time on August 15, 2013 if not previously executed by both parties.

We are excited about the prospect of completing a transaction with MHG on the basis described herein and Buyer is prepared to proceed immediately with all aspects of this transaction. This letter is only a statement of our present interest and notwithstanding any provision hereof, except for Sections 7, 10 and 11 above, which constitute binding agreements on the part of Seller and Buyer, this letter is not a binding contract, commitment or agreement to agree on our part or on the part of Seller with respect to the subject matter hereof, or an offer which can create such a legally binding commitment.

Sincerely,
**ATHENA HEALTH CARE SYSTEMS**

By: _/s/ Lawrence Santilli_
Lawrence Santilli
President


ACCEPTED AND AGREED TO BY:

**MERRIMACK HEALTH GROUP**


By: _____
Name:
Its:

## Exhibit A
## Purchase Price Range Calculation

| Actual EBITDAR Range | Purchase Price | Seller Note |
|---|---|---|
| 8,300,000 - 8,999,999 | $ 83,000,000 | $ 12,500,000 |
| 9,000,000 - 9,599,999 | $ 85,000,000 | $ 11,000,000 |
| 9,600,000 and above | $ 87,000,000 | $ 10,000,000 |

EBITDAR will be annualized for the period 5/1/2013 - 11/30/2013 in the format below for 5/1/2013 - 6/30/2013

### Actual EBITDAR for 5/1/2013 - 6/30/2013

| | |
|---|---|
| **Revenues** | |
| Room & Board | $9,650,465 |
| Therapy Services | $177,718 |
| Other Revenue | $20,267 |
| **Total Revenue** | **$9,848,450** |
| | |
| **Operating Expenses:** | |
| Admin & General | $1,082,507 |
| Employee Benefits | $755,241 |
| Plant Operations/Utilities | $400,300 |
| Laundry | $101,404 |
| Housekeeping | $196,600 |
| Dietary | $635,689 |
| Recreation | $146,686 |
| Social Services | $131,011 |
| Ancillaries/Therapy | $968,159 |
| Nursing | $3,533,308 |
| Provider Taxes/Other | $724,368 |
| Rent (TCU) | $16,870 |
| **Operating Expenses** | **$8,692,143** |
| | |
| EBITDAR | $1,156,307 |
| Add: Man Fee Actual | $603,567 |
| Less: Man Fee at 4% of Revenue | ($393,938) |
| **Adjusted EBITDAR** | **$1,365,936** |
| Annualized Adjusted EBITDAR | $8,309,444 |

MHG-0000107