<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CARE ONE MANAGEMENT, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED HEALTHCARE WORKERS EAST, SEIU 1199, et al., <br><br> Defendants. | Civil Action No. 12-6371 (SDW) (MAH) <br><br> **OPINION** <br><br> March 28, 2024 |

**WIGENTON**, District Judge.

Before the Court is Defendants 1199SEIU United Healthcare Workers East ("UHWE"), New England Health Care Employees Union, District 1199 ("NEHCEU"), and Service Employees International Union's ("SEIU") (collectively "Defendants" or "Unions") Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56 ("Motion"). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1337, and 1367. Venue is appropriate pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendants' Motion is GRANTED.

I.  <u>**FACTUAL AND PROCEDURAL HISTORY**[1]</u>

---

[1] Citations to "D.E." refer to the docket entries for the Complaint and the parties' motion papers, including briefs, affidavits, declarations, and exhibits attached thereto. Facts cited in this opinion are drawn from Defendants' Statement of Undisputed Material Facts (D.E. 495-2), Plaintiffs' Response to Defendants' Rule 56.1 Statement (D.E. 498-1), and the parties' briefings and exhibits for their 2019 motions for summary judgment. (D.E. 399, 402, 414, 416, 421, 422.) The facts are undisputed unless noted otherwise.

Because the parties' history is contentious and complex, this Court will only address those facts necessary to the determination of the instant motion.[2]

### A.  Factual Background

Plaintiffs Care One Management, LLC, HealthBridge Management, LLC ("HealthBridge"), the Care One Facilities,[3] and the HealthBridge Facilities[4] (collectively, "Plaintiffs" or "Care One") manage nursing homes and assisted living facilities for the elderly in New Jersey, Connecticut, and Massachusetts.  (D.E. 242 (Second Am. Compl. ("SAC")) ¶¶ 1, 25–30; D.E. 402-1 ¶¶ 2–3.)  Defendants are labor unions whose members are care providers at Plaintiffs' facilities.[5]  (*Id.* ¶ 118.)

In 2010 and 2011, the Unions filed complaints against Care One with the National Labor Relations Board ("NLRB"), alleging that Care One had improperly terminated or threatened employees, improperly ended benefits, wrongfully suppressed union communications at its Connecticut facilities, and engaged in unfair labor practices at its Somerset facility in New Jersey. *See Care One Mgmt., LLC v. United Healthcare Workers E., SEIU 1199*, No. 12-6371, 2019 WL 5541410, at *2 (D.N.J. Oct. 28, 2019) (citation omitted).  The NLRB responded by charging Care One with interfering with rights guaranteed by the National Labor Relations Act ("NLRA"), including the refusal to bargain collectively and in good faith.  *See id.* (citation omitted).

---

[2] For more detail on the factual background of this case, see *Care One Mgmt., LLC v. United Healthcare Workers E., SEIU 1199*, No. 12-6371, 2019 WL 5541410, (D.N.J. Oct. 28, 2019), *aff'd in part, vacated in part, remanded sub nom. Care One Mgmt. LLC v. United Healthcare Workers E.*, 43 F.4th 126 (3d Cir. 2022).

[3] Care One manages twenty-one facilities in the State of New Jersey, which are collectively referred to herein as the "Care One Facilities."  *See Care One*, 2019 WL 5541410, at *1 n.1.

[4] The "HealthBridge Facilities" include numerous healthcare facilities.  *See id.* n.2.

[5] SEIU is an international union. UHWE and NEHCEU are SEIU's local affiliates.  *See* D.E. 402-3 ¶ 24; SAC ¶ 33.

In January 2011, while the NLRB's complaints were pending, NEHCEU and Plaintiffs began negotiations to renew the Collective Bargaining Agreements ("CBAs") for six of Plaintiffs' facilities in Connecticut ("Connecticut Facilities"). *Id.* at *3 (citation omitted). The parties were unable to reach an agreement, and NEHCEU called a strike at those facilities beginning on July 3, 2012. *Id*. (citation omitted). On the night of July 2, 2012, the Connecticut Facilities were vandalized and sabotaged by unknown persons.[6] *Id.* (citation omitted). The State of Connecticut investigated the incidents, but the investigation yielded no suspects or charges. *Care One*, 43 F.4th at 133.

Prior to this event, in 2011, NEHCEU and UHWE, with assistance from SEIU, launched a "public speech and advocacy campaign" (the "Campaign") critical of Care One's business and labor practices. *Care One*, 2019 WL 5541410, at *3 (citation omitted). The Campaign's websites, advertisements, and flyers questioned the propriety of Plaintiffs' billing practices and standards of patient care, challenged Plaintiffs' opposition to unionization, and publicized the NLRB's complaints against Plaintiffs. *Id*. The Campaign also staged peaceful protests and demonstrations targeting Care One and its owner and CEO, Daniel Straus ("Straus"). *Id.* (citation omitted).

From July through November 2011, Defendants also filed petitions for public hearings on Care One's applications for "determinations of need" to obtain approval from the Massachusetts Department of Public Health for capital improvement projects at its facilities. *Id.* (citation omitted). The Unions' objections delayed the approval of Care One's applications. In February 2012, the Unions asked Senator Richard Blumenthal to look into what they contended were questionable billing practices by Plaintiffs. *Id.* (citation omitted). Subsequently, the Senator sent

---

[6] The damage done to the facilities included tampering with patient identifying information (including patient wristbands, door name plates, and dietary requirements), altering medical records, damaging and/or hiding medical equipment, and vandalizing laundry equipment. *Care One*, 2019 WL 5541410, at *3.

a letter to the Secretary of Health and Human Services asking the Department to "audit Healthbridge's billing practices to Medicare and take any necessary enforcement actions." *Id.* (citation omitted).

**B. Facts Relevant to the Lost-Acquisition Damages Claim**

In 2011 and 2013, a non-party subsidiary of Care One named Green Field-DES, LLC ("Green Field") was bidding on two property-acquisition opportunities: the Kateri Residence, a nursing home in New York owned by the Catholic Healthcare System of the Archdiocese of New York ("Catholic Healthcare"); and a group of nursing homes in Massachusetts owned by Merrimack Health Group, Inc. ("Merrimack Facilities").  (D.E. 495-1 at 15, 17.)

 In November 2011, Green Field expressed to Catholic Healthcare its interest in purchasing the Kateri Residence for $90 million and later increased the offer to $95 million.  (*Id.* at 5, 8, 10.) The Kateri Residence had certain employees who were represented by Defendant UHWE.  (*Id.* at 2.)  Catholic Healthcare considered Green Field's offer but decided to proceed with an earlier, lower offer submitted by Care Rite Centers LLC, citing "complications" with Green Field's offer, including concerns about Green Field's financial capacity, its inexperience in operating a nursing facility, whether Green Field would continue to operate the Kateri Residence as a nursing facility as desired by Catholic Healthcare, and Care One's negative experience with SEIU.  (*Id.* at 9–11.)

In early 2013, William Mantzoukas, the owner of the Merrimack Facilities, wanted to sell the Merrimack Facilities for about $85 million.  (*Id.* at 19.)  At all relevant times, none of the Merrimack Facilities had employees who were represented by a union.  (*Id.*)  In July 2013, Athena Health Systems ("Athena") made an initial proposal to buy the Merrimack Facilities, which was followed by a revised offer to purchase the facilities for $83–87 million.  (*Id.* at 19–20.)  After Green Field made an offer for $85 million in August 2013, Athena revised its offer again in

4

September 2013 to purchase the facilities for $85 million as well.  (*Id.* at 20–21.)  According to Mantzoukas, the terms of the revised offer had been heavily negotiated between Athena and him, and he believed that "the terms set forth in Athena's letter of intent would not change as the parties negotiated the final purchase-and-sale agreement."  (*Id.* at 21.)  He further testified that he understood that the group behind Green Field had a reputation for bargaining down the price after submitting an initial indication of interest at a higher price.  (*Id.* at 22.)  He also admitted that he had heard that there were problems in Connecticut between SEIU and Care One but stated that they were "a very, very minor, non-factor."  (*Id.* at 24–25.)  Mantzoukas sold the Merrimack Facilities to Athena for $85 million.  (*Id.*)

In the fall of 2013, the Catholic Health Care Services of the Archdiocese of Philadelphia ("CHCS") operated six skilled nursing facilities and one independent/assisted living facility (collectively "CHCS Facilities").  (*Id.* at 29.)  The CHCS Facilities had some employees who were represented by AFSCME District 1199C, a Philadelphia-based union that is unrelated to the Defendant Unions in this case.  (*Id.* at 30.)  In December 2013, Straus joined the bidding group for the CHCS facilities, led by Charles Edouard Gros, in his personal capacity after investing $1.1 million of his personal funds.  (*Id.* at 31–32.)  Thereafter, Gros told Straus that members of the group had "some union-related concerns" because Philadelphia was "very pro-union and bringing in somebody that had a poor history with dealing with unions could affect the bid."  (*Id.* at 33.)  Gros returned Straus' $1.1 million deposit and Straus withdrew from the group.  (*Id.* at 33–34.)

### C.  Procedural History

On October 10, 2012, Plaintiffs filed suit in this Court alleging that Defendants have ceased with traditional organizing and negotiation tactics in favor of extortion and fraud in violation of federal and state law.  (D.E. 1.)  On May 22, 2015, Magistrate Judge Michael A. Hammer issued

an oral opinion granting Plaintiffs' motion to file a Second Amended Complaint. Specifically, Judge Hammer held that, although Plaintiffs may amend their Complaint to add claims of defamation and trade libel, those claims are preempted by federal law unless Plaintiffs can show that Defendants made defamatory statements with "actual malice" pursuant to *New York Times v. Sullivan*, 376 U.S. 254 (1964). (D.E. 236 at 27:5–15, 30:25–32:11.)

The current operative pleading is the SAC, filed on June 16, 2015, which alleges that Defendants violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") (Counts One through Six), and engaged in defamation (Count VII) and trade libel (Count VIII). (D.E. 242.) The parties timely filed their respective motions and briefs for summary judgment on March 15, 2019. (D.E. 398–407, 414–18, 420–22, 424–26.) On October 28, 2019, this Court granted Defendants' motion for summary judgment and dismissed the SAC. (D.E. 437.) Plaintiffs timely appealed. (D.E. 439.)

On August 23, 2022, the United States Court of Appeals for the Third Circuit vacated and remanded the case to this Court, (D.E. 466), concluding that there are genuine issues of material fact on the record as to whether "the Unions authorized or ratified conduct that could constitute extortion or that they wrongfully exploited threats of economic harm." *Care One*, 43 F.4th at 131. On remand, and in the instant motion, Defendants move for partial summary judgment to dismiss Plaintiffs' defamation and trade libel claims and claims for lost-acquisition damages, and the parties timely completed briefing. (D.E. 494, 495-1, 498, 500.)

## II.   <u>LEGAL STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is only "material" for purposes of a summary judgment motion if a dispute over that

fact "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must "set forth specific facts showing the existence of . . . an issue for trial." *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001) (citing Fed. R. Civ. P. 56(e)).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325).  Further, the nonmoving party is required to "point to concrete evidence in the record [that] supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004) (citing *Celotex Corp.*, 477 U.S. at 322–23).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law.  *Celotex Corp.*, 477 U.S. at 322–23.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Liberty Lobby*, 477 U.S. at 255).  Instead, the district court "must view all of the facts in the light most favorable to the non-moving party," who is entitled to "every reasonable inference that can be drawn from the record," and if "there is a disagreement

about the facts or the proper inferences to be drawn from them, a trial is required to resolve the conflicting versions of the parties." *Reedy v. Evanson*, 615 F.3d 197, 209 (3d Cir. 2010) (citations omitted).

### III. <u>DISCUSSION</u>

#### A. Plaintiffs' Defamation and Trade Libel Claims (Counts VII & VIII)

Plaintiffs argue that their defamation and trade libel claims should be permitted to go forward because the actual malice standard does not apply here and that there are genuine disputes of material facts as to whether the statements at issue were made outside the context of a labor dispute. Plaintiffs' arguments are contrary to Supreme Court and Third Circuit precedent and they have not presented any evidence of actual malice. Accordingly, Counts VII and VIII will be dismissed.

##### 1. *Whether the actual malice standard applies here*

The Supreme Court has held that federal labor law preempts defamation in the context of a labor dispute unless the plaintiff could show "actual malice." *Linn v. United Plant Guard Workers of Am., Loc.*, 383 U.S. 53, 64–65 (1966). Actual malice requires proof that when the speaker made a statement he either (1) knew that the statement was false or (2) acted with reckless disregard of whether the statement was true or false. *See id.*

In granting Plaintiffs' motion to file a Second Amended Complaint, Judge Hammer held that the actual malice standard applies to the defamation and trade libel claims after reviewing *Linn* and its line of cases. (*See* D.E. 236 at 27:5–31:4.) Subsequently, Plaintiffs stated in their 2019 brief in opposition to summary judgment that "it is for the jury to decide whether Defendants published the statements with actual malice" and acknowledged that their state law claims "need[]

to be predicated on statements made with actual malice to avoid federal labor law preemption."
(D.E. 416 at 58.)

Plaintiffs now contend for the first time that the applicable standard is negligence instead
of actual malice because the statements at issue are not related to a labor dispute.  According to
Care One, "many of Defendants' defamatory and libelous statements at issue in this case do not
address, and are not suggestive of, a labor dispute . . . ."  (*See* D.E. 498 at 6–7.)  Plaintiffs'
argument, however, is foreclosed by Supreme Court precedent and the Third Circuit's 2022 *Care
One* opinion.

       a.  <u>Supreme Court precedent</u>

Plaintiffs' position that the negligence standard should apply to their defamation and trade
libel claims because those claims did not arise from a labor dispute is incompatible with Supreme
Court precedent.

First, the Norris-LaGuardia Act, 29 U.S.C. § 113(c), which the Third Circuit applied in
analyzing Plaintiffs' RICO claims, *see Care One*, 43 F.4th at 139, defines the term "labor dispute"
to include "any controversy concerning terms or conditions of employment."  *Jacksonville Bulk
Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 709 (1982) (citing 29 U.S.C. §
113(c)).  The Supreme Court has stated that "[the] economic interests commonly associated with
labor unions" generally concern "terms and conditions of employment in the narrower sense of
wages, hours, unionization, or betterment of working conditions."  *Id.* at 714.  These are precisely
the issues that Care One and NEHCEU tried to negotiate but failed to agree on.  *See Care One*,
2019 WL 5541410, at *2 ("In Connecticut, Plaintiffs and NEHCEU negotiated and executed
[CBAs] . . .  which established standards of wages, hours and other working conditions for union
employees between December 31, 2004 through March 16, 2011.")

Plaintiffs admitted in previous briefings to this Court that the allegedly wrongful acts by Defendants were carried out in a labor dispute.  For example, Care One stated in its 2019 summary judgment motion brief that "the Unions sought to compel Plaintiffs to accept unionization in their non-union facilities on terms the Unions dictated, and to accept outsized contract demands at their five unionized facilities in Connecticut."  (D.E. 399-1 at 16.)  Clearly, the Unions' alleged wrongdoing concerns "terms or conditions of employment," thereby making this case a labor dispute.

Second, the Supreme Court has consistently characterized the definition of "labor dispute" under the Norris-LaGuardia Act, as broad.  *See Burlington N. R. Co. v. Bhd. of Maint. of Way Emps.*, 481 U.S. 429, 441 (1987) ("Congress made the definition of 'labor dispute' broad because it wanted it to be broad") (internal brackets and quotation marks removed).  Equally expansive is the test that the Supreme Court fashioned for determining whether a particular controversy is a labor dispute.  "The critical element" is whether "the employer-employee relationship is the matrix of the controversy."  *Jacksonville Bulk Terminals*, 457 U.S. at 713 (internal bracket and citation omitted).

Applying the employer-employee relationship test, this Court concludes that the statements at issue arose out of a labor dispute.  The litigants in this case are the employers and the unions representing the employees, and the dispute concerns Defendants' actions undertaken to pressure Care One to accede to their demands.  The employer-employee relationship is thus the matrix of this controversy, making it a labor dispute.  *See id.*

Third, Care One's argument is in direct conflict with *Linn*.  In *Linn*, the Supreme Court articulated the necessity to carefully balance a state's interest in redressing malicious libel with "the federal interest in uniform regulation of labor relations."  *Linn*, 383 U.S. at 57.  The Supreme

10

Court expressed concern that "the availability of libel actions may pose a threat to the stability of labor unions," hinder "free debate on issues that divide labor and management," and "such suits might be used as weapons of economic coercion." *Id.* at 62, 64.   Therefore, it adopted the malice test enunciated in *New York Times* to "effectuate the statutory design" of the NLRA, which is to "guard[] against abuse of libel actions and unwarranted intrusion upon free discussion" of labor conflict.  *Id.* at 65.   Thus, *Linn* compels this Court to reject Care One's argument.   Applying anything less than the actual malice standard here will weaken the statutory protection afforded to labor activities as intended by Congress.

   b. <u>The Third Circuit's 2022 opinion</u>

  Plaintiffs contend, without any support from legal authority, that Defendants' "false and defamatory materials made in the course of [their] campaign lacked a sufficient nexus to a labor dispute and, therefore, are not subject to *Linn*'s actual malice standard."  (D.E. 498 at 16.)  The Third Circuit's 2022 *Care One* opinion forecloses this argument.

  The Third Circuit's finding that factual issues remain as to whether Defendants are liable for extortion through sabotage and fear of economic loss does not take the statements at issue outside of the labor dispute context.  *See Care One*, 43 F.4th at 143–45, 147–48.  In affirming this Court's grant of summary judgment in favor of the Unions on the mail and wire fraud claims, the Third Circuit specifically stated that the Unions' advertisements about Care One were published during a labor dispute.  *See id.* at 138 ("[I]t is neither realistic nor legally required that either side of a *labor dispute* will present a balanced view in advertisements about the other side arising from the dispute.") (emphasis added).[7]

---

[7] Even if the Third Circuit's opinion calls into question whether the statements at issue were made in the context of a labor dispute—and it does not—the existence of a labor dispute is a question of law and not a factual issue.  *See Burlington N. Santa Fe Ry. Co. v. Int'l Bhd. of Teamsters Loc.* 174, 203 F.3d 703, 707 (9th Cir. 2000).  Therefore,

In sum, the Third Circuit found that the Unions' communications arose in the context of a labor dispute.  The actual malice standard applies to the defamation and trade libel claims, which may only survive summary judgment if Plaintiffs can show Defendants acted with actual malice.

2.   *Whether the allegedly defamatory statements met the actual malice standard*

Plaintiffs allege that Defendants published various statements, through advertisements and other forms of communication, that falsely alleged or insinuated that Care One: overprescribed antipsychotic drugs to its patients, overbilled the residents at its facilities, understaffed its facilities, and provided poor quality of care.  (*See, e.g.,* D.E. 399-1 at 19–20, 48–59; D.E. 416 at 53, 56–57, 69–70.)   In addition, Plaintiffs also allege that the following statements by Defendants are defamatory: (1) a memorandum entitled "Questionable Medicare Billing Practices at Connecticut HealthBridge Nursing Homes" ("Medicare Billing Memo"); (2) email communications related to the closure of the Wethersfield facility; and (3) statements related to the vandalism at three of Plaintiffs' facilities.  (D.E. 498 at 12–15.)   Plaintiffs' defamation and trade libel claims will be dismissed, however, because there is no evidence of actual malice.  This Court will address each of the allegedly defamatory statements in turn.

a.   The elements of defamation

To establish a claim of defamation, a plaintiff must prove, in addition to damages, "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting [to actual malice] by the publisher." *DeAngelis v. Hill*, 847 A.2d 1261, 1267–68 (N.J. 2004) (citation omitted).  To satisfy the actual malice standard, a "plaintiff must establish by clear and convincing evidence, that defendant

---

Plaintiffs cannot overcome summary judgment by arguing that factual issues exist as to whether Defendants' statements were made outside of the context of a labor dispute.

published the statement with 'knowledge that it was false or with reckless disregard of whether it was false.'" *Id.* at 1268 (citing *New York Times*, 376 U.S. at 279–80, 285–86).

A defamatory statement is one that is false and injurious to a party's reputation. *Taj Mahal Travel, Inc. v. Delta Airlines Inc.*, 164 F.3d 186, 189 (3d Cir. 1998). "Whether a statement is defamatory is an issue of law, but one that depends on the content, verifiability, and context of the challenged statements." *See Li v. Metro. Life Ins. Co.*, No. 16-1845, 2016 WL 5477994, at *2 (D.N.J. Sept. 26, 2016) (citing *Ward v. Zelikovsky*, 643 A.2d 972, 978 (N.J. 1994)). As the Third Circuit has noted, "[t]o survive a motion for summary judgment on a defamation claim, the plaintiff 'must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication. A vague conclusory allegation is not enough.'" *Robles v. U.S. Env't Universal Servs., Inc.*, 469 F. App'x 104, 109 (3d Cir. 2012) (quoting *Zoneraich v. Overlook Hosp.*, 514 A.2d 53, 63 (N.J. Super. App. Div. 1986)).

  b. <u>Analysis</u>

Plaintiffs' defamation and trade libel claims are foreclosed by the Third Circuit's opinion. Defamation claims are dismissed at the summary judgment stage, where the record evidence shows that defendants were "convinced of the truthfulness of their statements." *Care One*, 43 F.4th at 137 (internal quotation mark omitted) (citing *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 276 (3d Cir. 1980)). Applying "[t]he law of defamation," the Third Circuit found that Defendants did not act with reckless disregard for the truth with respect to any of the communications that gave rise to Plaintiffs' mail and wire fraud claims. *Id.* at 137–38.

Defendants argue, and Plaintiffs do not refute, that the "[mail/wire] fraud claims and state-law claims were based on the Unions' publication of the same statements about Plaintiffs' labor and business practices." (D.E. 495-1 at 8–9.) In fact, Plaintiffs declared in their opposition brief

that they "agree that [the Third Circuit's] findings [relating to the mail and wire fraud claims] would likewise foreclose defamation and trade libel claims insofar as an 'actual malice' standard applies." (D.E. 498 at 10.)

The Third Circuit affirmed this Court's conclusion that "the record did not support a finding of specific intent to deceive because the Unions had fact-checking and vetting procedures in place, and the people who researched, drafted, and approved the publications believed the advertisements to be truthful." *Care One*, 43 F.4th at 136.  With respect to the Unions' online, print, and radio advertisements, the Third Circuit concluded that "[n]one of the portions of the record Care One relies on raises a genuine issue of disputed fact sufficient to defeat the Unions' motion for summary judgment." *Id.* at 137.  The Third Circuit found that there was sufficient evidence in the record that Defendants "believed that all the material in the advertisements was truthful and accurate" and they did not act with reckless disregard for the truth when they published the advertisements at issue. *Id.*

In sum, because Care One's mail/wire fraud, defamation, and trade libel claims are based on the same set of communications and the Third Circuit found that the Unions did not act with intent to deceive or reckless disregard for the truth with respect to the statements underlying the RICO claims, the Third Circuit's findings have foreclosed Care One's defamation and trade libel claims. *Id.* at 138.

Even if the Third Circuit's findings do not foreclose claims of defamation and trade libel based on non-advertisement statements, none of the non-advertisement statements are defamatory.[8]

---

[8] The Third Circuit stated that "Care One's claims of mail and wire fraud are based on the allegedly false and misleading advertisements," but it is unclear whether the Third Circuit's findings would apply to statements not part of the advertisements. *Care One*, 43 F.4th at 136.

Care One argues that the email from UHWE employee Elizabeth Daley to Plaintiffs' representative Bill Gady and the Massachusetts Department of Public Health contained false statements.  Care One contends that the email falsely alleged that: (1) it closed the Wethersfield facility "without permission from the state"; and (2) "HealthBridge decided that it would take its toys and go home[] []when workers in CT tried to stand up for themselves."  (D.E. 498 at 14.) None of these statements are defamatory.

Plaintiffs contend that the allegation that they closed the Wethersfield facility without the state's permission was false and defamatory and cited a state administrative decision stating that, in June 2012, the state had approved the facility's closure.  (D.E. 401-1 Ex. 67.)  Plaintiffs, however, fail to show how or why Daley knew or should have known that the state approved the Wethersfield closure.  Furthermore, Plaintiffs have not proffered any evidence to explain why the statements in the email are defamatory when considering the email's content, verifiability, and context.  *See Metro. Life Ins. Co.*, 2016 WL 5477994, at *2.  A statement is not defamatory if it is not false and injurious to a party's reputation.  *See Taj Mahal Travel, Inc.*, 164 F.3d at 189. Plaintiffs have not pointed to any evidence that the email's content had caused any injury to their reputation.  Therefore, the statements regarding the Wethersfield facility are not defamatory.

Next, Plaintiffs contend that Defendants shared the Medicare Billing Memo, which contained defamatory statements, with a United States Senator and a Congressman from Connecticut.  (*See* D.E. 498 at 12–13.)  According to Plaintiffs, the Medicare Billing Memo accused the HealthBridge nursing homes of improper billing to the Medicare system based on a now discredited statistical analysis of the billing practices at these facilities.  (*See id.*)  Defendants' use of statistics to insinuate impropriety does not constitute reckless disregard for the truth.  As

the Third Circuit noted, neither side of a labor dispute is legally required to "present a balanced view" about the other side.  *Care One*, 43 F.4th at 138.

The same conclusion applies to the Defendants' use of statistics to draw the public's and government officials' attention to an issue of public concern—improper billing of Medicare. Plaintiffs do not present any evidence to show how the Medicare Billing Memo caused them reputational injuries or how Defendants knew or had reason to know that the allegations in the Medicare Billing Memo were false but nevertheless disseminated the document to elected officials. Accordingly, Plaintiffs' defamation and trade libel claims cannot proceed based on the Medicare Billing Memo.

Plaintiffs also argue that Defendants falsely accused them of staging the sabotage that occurred in July 2012 in an article written by Deborah Chernoff, NEHCEU's Communications Director ("Chernoff article").   (D.E. 498 at 15.)  Plaintiffs fail to present any evidence as to why this article is false and defamatory but rely on a mischaracterization of the Third Circuit's 2022 opinion.  Contrary to what Plaintiffs argue, the Third Circuit did not conclude that this article supported the inference that the Defendants ratified the acts of sabotage.  *Care One*, 43 F.4th at 144.  The Third Circuit found the article attributes the "stage the sabotage" statement to union members who did not believe that the Unions were responsible for the sabotage, but it should be considered by the jury whether the Unions ratified the acts of sabotage.  *Id.*  Law enforcement investigation yielded neither suspects nor charges.  *Id.* at 133.  There is no evidence in the record to prove that the sabotage was not staged or that members of the union who made that statement knew that it was not staged but recklessly made a false statement.  Thus, Plaintiffs' defamation and trade libel claims cannot proceed on the "staged the sabotage" statement in the Chernoff article.

For the foregoing reasons, Plaintiffs' defamation and trade libel claims will be dismissed.

**B.  Care One's Claim for Lost-Acquisition Damages**

Plaintiffs allege that Defendants "thwarted" three of their attempts to purchase nursing home properties by pressuring the sellers not to do business with Straus and Green Field, causing Plaintiffs to lose nearly $400 million in business opportunities.  They now seek to recover damages for these so-called "lost-acquisition" opportunities.  Plaintiffs, however, have no standing to recover lost-acquisition damages for the injuries suffered by non-parties Green Field and Straus.  In addition, Plaintiffs cannot show that Defendants' actions caused the alleged damages.  Therefore, Plaintiffs' claim for lost-acquisition damages will be dismissed.

*1.  A parent and a subsidiary are distinctive legal entities, each with its own legal rights*

Courts have held that a parent company does not have standing to recover for damages suffered by its subsidiary.[9]  "[I]njury arising solely out of harm done to a subsidiary corporation is generally insufficient to confer standing or status as real party in interest on a parent corporation." *Tullett Prebon, PLC v. BGC Partners, Inc.*, No. 09-5365, 2010 WL 2545178, at *5 (D.N.J. June 18, 2010) (dismissing the complaint because plaintiff lacked standing "to recover for injury inflicted on the companies it owns"), *aff'd*, 427 F. App'x 236 (3d Cir. 2011) (citation omitted).  Thus, "[w]rongdoing to a subsidiary does not confer standing upon the parent company, even where the parent is the sole shareholder of the subsidiary." *Id.* at *4; *see also Paris Partners, L.P., v. Russo*, No. 94-5684, 1995 WL 746585, at *5 (S.D.N.Y. Dec.14, 1995) (holding that plaintiff partnership which advanced money to its subsidiary to do business with a third-party

---

[9] It is a well-settled principle that a parent company is a distinct legal entity from a subsidiary.  *See Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001).  A litigant "must assert his own legal rights and interests[] and cannot rest his claim to relief on the legal rights or interests of third parties." *U.S. Dep't of Lab. v. Triplett*, 494 U.S. 715, 720 (1990) (citation omitted).

corporation that became insolvent due to defendants' fraud had suffered only a derivative injury and thus did not have standing to sue under RICO).

Plaintiffs fail to demonstrate that they meet "the basic standing requirement that a plaintiff may seek to vindicate only its own rights, not those of a third party." *Tullett*, 2010 WL 2545178, at *6.  It is undisputed that Green Field is a wholly-owned subsidiary of Care One, LLC, and that Straus owned a majority interest in Care One, LLC at all relevant times.  (D.E. 498-1 at 7.) Plaintiffs argue that Care One typically uses Green Field to make bids for confidentiality reasons and that had the sellers of Kateri or Merrimack selected Green Field, the newly purchased property would have been transferred to a special purpose entity owned by Care One.  (D.E. 498 at 39.) Even assuming this is true and that Green Field is nothing more than "a hollow shell," Care One cannot rest its claim to relief on the legal rights or interests of a non-party subsidiary.  (*Id.*)

Plaintiffs also argue that although it was Straus, and not Care One, who participated in the bidding group for the CHCS facilities, Straus participated only to invest his own money to allow Care One to be involved in the bidding group and it was always Straus's intent to have Care One partner in the purchase of CHCS.  (*See id.*)  Plaintiffs, however, do not cite any case law to show why such an arrangement would confer standing on Care One.  *But see Feinberg v. Katz*, No. 99-045, 2002 WL 1751135, at *6 (S.D.N.Y. July 26, 2002) ("A corporation does not have standing to assert claims belonging to a related corporation, simply because their business is intertwined.")

Regardless of how Care One tries to re-characterize the alleged harm, the named Plaintiffs in this action do not include Green Field or Straus.  Care One impermissibly seeks to recover for injury inflicted on Straus and Green Field—a subsidiary it owns.  *See Diesel Systems, Ltd. v. Yip Shing Diesel Eng'g Co., Ltd.*, 861 F. Supp. 179, 181 (E.D.N.Y. 1994) ("[W]here plaintiff's sister corporation was party to subject contract[,] plaintiff corporation was not real party in interest and

therefore lacked standing to bring tortious interference claim.")  Accordingly, Plaintiffs' lost-acquisition damages claim will be dismissed for lack of standing.

     *2.  Causation*

Plaintiffs also lack standing to recover lost-acquisition damages under RICO as a matter of law because Plaintiffs fail to show that Defendants' actions *caused* Green Field and Straus to lose the bid for the Kateri, Merrimack, and the CHCS facilities.[10]

A civil RICO plaintiff "only has standing if, and can only recover to the extent that, [it] has been injured in [its] business or property by the conduct constituting the violation."  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985).  Simple "but for" causation does not establish RICO standing.  *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 267 (1992).  Instead, "a RICO plaintiff must show that defendants' acts proximately caused its injuries."  *Emcore Corp. v. PricewaterhouseCoopers LLP*, 102 F. Supp. 2d 237, 242–43 (D.N.J. 2000).  In contrast, "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a distance to recover."  *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 642 (3d Cir. 2015).

     a.  <u>Kateri Facility</u>

Plaintiffs do not dispute that Catholic Healthcare, the owner of the Kateri facility, had determined that Green Field was not a suitable purchaser because of (1) concerns about Green Field's lack of experience and ability to get through the regulatory process; and (2) Green Field's primary interest was in a real estate deal and not operating a nursing home consistent with Catholic Healthcare's mission.  (*See* D.E. 498-1 ¶¶ 14–16.)  Instead, Plaintiffs argue that Defendants failed

---

[10] The New Jersey Appellate Court has said that "if the alleged defamation is not actionable, then its consequences are also not actionable."  *G.D. v. Kenny*, 984 A.2d 921, 933 (N.J. Super. App. Div. 2009), *aff'd*, 15 A.3d 300 (N.J. 2011).  Because Care One has failed to establish claims of defamation and trade libel, this Court need not analyze whether any statement at issue was the cause of Care One's lost-acquisition damages.

to mention that Catholic Healthcare also had concerns about Plaintiffs' "very negative experience with SEIU" in Connecticut.  (*Id.*)  Even if it is true that Catholic Healthcare also considered Plaintiffs' labor conflicts in its decision process about the Kateri facility, there is no evidence that Catholic Healthcare's specific concerns about Green Field's inexperience and incompatibility with its mission alone would not have resulted in the same outcome.

   b. <u>Merrimack</u>

  As for the Merrimack deal, there is no material factual dispute that (1) Athena made an initial offer to purchase the Merrimack facilities about two months before Green Field; (2)  Athena made a revised offer to purchase the facilities for $85 million—the same price offered by Green Field; (3) Athena and Mantzoukas negotiated the terms heavily; and (4) Manztoukas believed that the terms would not change as the parties negotiated the final purchase-and-sale agreement.  (*See id.* ¶¶ 27–31.)

  Furthermore, Plaintiffs do not dispute Mantzoukas' testimony that by the time Green Field submitted its bid, he was "far along" in negotiations with Athena and "committed to move forward with Athena," and that the investment group behind Green Field's bid was "known for bargaining down the price after they've made an initial indication of interest."  (D.E. 495-1 at 19.)  The undisputed facts establish that it was unlikely that Mantzoukas would have sold the facilities to Green Field even if he had no knowledge[11] of the labor conflict between Care One and the Unions. Simply put, Plaintiffs have not shown that Defendants *caused* Green Field to fail in its bid for the Merrimack deal.

   c. <u>CHCS</u>

---

[11] This Court does not opine on what or how much Mantzoukas knew about the labor disputes between the parties at the time of the bidding process for the Merrimack facilities.

In December 2013, Straus invested his personal funds to become a member of a bidding group for the CHCS facilities, which had employees who were represented by a Philadelphia-based union that is unaffiliated with Defendants in this case. (D.E. 498-1 ¶ 39.) Straus was asked to withdraw from the bidding for the CHCS facilities because others in the group had concerns that he "might not be a good fit" because Philadelphia was "very pro-union and bringing in somebody that had a poor history with dealing with unions could affect the bid." (*Id.* ¶¶ 43–44.)

Although Plaintiffs argue that Straus was pushed out of the bidding group due to Defendants' actions, Plaintiffs offer no evidence that even without Defendants' alleged influence, he was likely to have been a successful bidder for the CHCS facilities. Similarly, there are no facts in the record to show that Gros thought CHCS was pressured by Defendants to exclude Straus from the bidding group or that Defendants were even aware of Straus' interest in purchasing the CHCS facilities at the time Straus was part of the bidding group. (*Id.* ¶¶ 49–50.) Therefore, Plaintiffs have not established a causal link between Defendants' actions and any lost-acquisition damages related to the CHCS facilities.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, Defendants' Motion is **GRANTED**. An appropriate order follows.

_____/s/ Susan D. Wigenton_____
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:       Clerk
cc:         Michael A. Hammer, U.S.M.J.
               Parties