<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CARE ONE MANAGEMENT, LLC, et al., | Civil Action No. 12-6371 (SDW) (MAH) |
| Plaintiffs, | |
| v. | **OPINION** |
| UNITED HEALTHCARE WORKERS EAST, SEIU 1199, et al., | May 2, 2025 |
| Defendants. | |

**WIGENTON**, District Judge.

Before this Court are various Motions *in Limine* and *Daubert* Motions filed by Plaintiffs Care One Management, LLC, HealthBridge Management, LLC, the Care One Facilities,[1] and the HealthBridge Facilities[2] (collectively "Plaintiffs" or "Care One") and Defendants 1199SEIU United Healthcare Workers East ("UHWE"), New England Health Care Employees Union, District 1199 ("NEHCEU"), and Service Employees International Union's ("SEIU") (collectively "Defendants" or "Unions"). Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1337, and 1367. Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument

---

[1] Care One manages twenty-one facilities in the State of New Jersey, which are collectively referred to herein as the "Care One Facilities." *See Care One Mgmt., LLC v. United Healthcare Workers E., SEIU 1199*, No. 12-6371, 2019 WL 5541410, at *1 n.1 (D.N.J. Oct. 28, 2019).

[2] The "Healthbridge Facilities" include numerous healthcare facilities. *See id.* n.2.

pursuant to Rule 78 and Local Civil Rule 78.1. Having considered all the submissions filed in connection with these Motions, this Court makes the following determinations.

## I.  **FACTUAL & PROCEDURAL BACKGROUND**

### A.  Facts

Plaintiffs manage nursing homes and assisted living facilities for the elderly in New Jersey, Connecticut, and Massachusetts. (D.E. 242 (Second Am. Compl. ("SAC")) ¶¶ 1, 25–30; D.E. 402-1 ¶¶ 2–3.)[3] Defendants are labor unions whose members are care providers at Plaintiffs' facilities.[4] (SAC ¶¶ 31–33.)

In 2010 and 2011, the Unions filed complaints against Care One with the National Labor Relations Board ("NLRB"), alleging that Care One had improperly terminated or threatened employees, improperly ended benefits, wrongfully suppressed union communications at its Connecticut facilities, and engaged in unfair labor practices at its Somerset facility in New Jersey. *See Care One Mgmt., LLC v. United Healthcare Workers E., SEIU 1199*, No. 12-6371, 2019 WL 5541410, at *2 (D.N.J. Oct. 28, 2019). The NLRB responded by charging Care One with interfering with rights guaranteed by the National Labor Relations Act ("NLRA"), including the refusal to bargain collectively and in good faith. *See id.* at n.7 (citation omitted).

In January 2011, while the NLRB's complaints were pending, NEHCEU and Plaintiffs began negotiations to renew the Collective Bargaining Agreements ("CBAs") for six of Plaintiffs' facilities in Connecticut ("Connecticut Facilities"). *Id.* at *3 (citation omitted). The parties were unable to reach an agreement, and NEHCEU called a strike at those facilities beginning at six in the morning on July 3, 2012. *Id.* On the night of July 2, 2012, the Connecticut Facilities were

---

[3] Citations to "D.E." refer to docket entries in the Court's Electronic Case Filing System for this matter and any internal citations contained therein.

[4] SEIU is an international union. UHWE and NEHCEU are SEIU's local affiliates. (*See* D.E. 402-3 ¶ 24; SAC ¶ 33.)

vandalized and sabotaged by unknown persons.  *Id.*  The State of Connecticut investigated the incidents, but the investigation yielded no suspects or charges.  *Care One Mgmt. LLC v. United Healthcare Workers E.*, 43 F.4th 126, 133 (3d Cir. 2022).

From July through November 2011, Defendants also filed petitions for public hearings on Care One's "Determinations of Need" ("DoN") applications to obtain approval from the Massachusetts Department of Public Health for capital improvement projects at its facilities.  *Care One*, 2019 WL 5541410 at *3 (citation omitted).  Plaintiffs allege the Unions' objections to their DoN applications delayed the applications' approval.  (SAC ¶¶ 182–87.)

Additionally, in February 2012 the Unions asked Senator Richard Blumenthal to investigate what they contended were questionable billing practices by Plaintiffs.  *Care One*, 2019 WL 5541410 at *3 (citation omitted).  Subsequently, the Senator sent a letter to the Secretary of Health and Human Services asking the Department to "audit Healthbridge's billing practices to Medicare and take any necessary enforcement actions."  *Id.* (citation omitted).

## B.  Procedural History

On October 10, 2012, Plaintiffs filed suit in this Court.  (D.E. 1.)  After initial motion practice, Plaintiffs filed a Second Amended Complaint ("SAC") (D.E. 242) which alleges violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961 *et. seq.* ("RICO") (Counts I to VI), defamation (Count VII), and trade libel (Count VIII) and remains the operative pleading.  Plaintiffs allege the Unions engaged in a pattern of racketeering activity violative of RICO by "launch[ing] a coordinated and multi-faceted 'corporate campaign' against Plaintiffs and [Care One CEO] Mr. Straus in an effort to extort substantial money and property from Plaintiffs."  (SAC ¶ 5.)  Plaintiffs aver Defendants were behind the acts of sabotage that took place on July 2, 2012; "enlisted elected officials in the State of Connecticut to deprive Plaintiffs

of normal legal processes and threaten groundless actions against them"; "instituted baseless legal actions"; mounted a negative advertising campaign "designed to dissuade patients, their family members, and referral sources from doing business with Plaintiffs" as well as a public smear campaign against Care One CEO Daniel Straus ("Straus"); and "abus[ed] the legal process on unrelated matters solely to drive up costs for Plaintiffs."  (SAC ¶¶ 3, 7, 8, 16, 17, 168.)

### 1.  Motion for Summary Judgment

On October 28, 2019, this Court issued an opinion denying Plaintiffs' Motion for Summary Judgment ("MSJ"), granting Defendants' MSJ as to Counts I through VI ("the RICO claims"), and dismissing Counts VII and VIII (the "state law claims").  *Care One*, 2019 WL 5541410 at *11.

This Court noted the relevant inquiry for the RICO claims was "whether Defendants engaged in activity constituting 'predicate acts' under RICO."  *Id.* at *5.  Plaintiffs alleged the following predicate acts:  extortion under state law through sabotage and the use of economic pressure tactics; mail and/or wire fraud; violation of the Travel Act, 18 U.S.C. § 1952; and conspiracy to violate Section 1962(d) of RICO.[5]  (SAC ¶¶ 3, 17, 21, 134, 169–71, 182–237, 287– 392; D.E. 416 at 19–66; D.E. 399-1 at 4, 61–64, 72–76.)  As to sabotage, this Court concluded that while there was no dispute that sabotage/vandalism occurred, the record contained no admissible evidence that individual union members committed them, or that the Unions had authorized or

---

[5] This Court's opinion addressed Plaintiffs' argument that Defendants committed the following acts of sabotage: "tampering with patient identifying information, altering medical records, and damaging and/or hiding medical and other equipment."  (D.E. 437 at 12 (citing SAC ¶¶ 169–70).)  Under the economic pressure theory, Plaintiffs argued Defendants committed extortion by:  demanding Plaintiffs "agree to NEHCEU's proposed 'pattern' contracts or be driven out of Connecticut"; calling for the unionization of Plaintiffs' Somerset and Woodcrest facilities prior to the resolution of the legal challenges to the representation elections, (D.E. 416 at 42–43); objecting to Plaintiffs' Determinations of Need ("DoN") applications by filing "Ten Texpayer" Petitions in Massachusetts, (D.E. 399-1 at 20–21; D.E. 416 at 44); asking United States Senator Richard Blumenthal to investigate Plaintiffs after preparing a memorandum entitled "Questionable Medicare Billing Practices at Connecticut HealthBridge Nursing Homes," (D.E. 399-1 at 22–24); interfering with Plaintiffs' application for the Wethersfield, Connecticut facility's closure and then asking the State of Connecticut to place said facility in a receivership, (*id.* at 34–35); protesting at Plaintiffs' headquarters in Fort Lee, New Jersey and engaging students to protest at NYU School of Law, (*id.* at 26–37).

ratified, such conduct. *Care One*, 2019 WL 5541410 at *6. In considering Plaintiffs' arguments that Defendants' used demonstrations and regulatory and legal processes to pressure Plaintiffs into complying with its demands, this Court noted the key issue was whether the means used or the goals sought by Defendants were wrongful. *Id.* at *7. This Court determined the Unions' goals and tactics used to achieve said goals were not wrongful and that Plaintiff failed to point to evidence to the contrary. *Id.* at *7–8. Ultimately, having found neither sabotage nor wrongful economic pressure, this Court found Defendants' actions did not constitute extortion. *Id.* at *9. Having found no extortion, this Court also granted Defendants' MSJ as to Plaintiffs' Travel Act claim. *Id.* at *10.

Regarding Plaintiffs' mail and/or wire fraud claim, this Court concluded Plaintiffs failed to adduce admissible evidence from which a reasonable jury could conclude that Defendants had the specific intent to deceive given that Defendants had a fact-checking and legal vetting procedure and there was no evidence showing Defendants strayed from this process. *Id.* at *9–10. Thus, there was no genuine issue of material fact as to Defendants' culpability for mail and/or wire fraud. *Id.* at *10. Given that there was no genuine issue of material fact as to whether Defendant committed the predicate acts of either extortion or mail and/or wire fraud, this Court granted summary judgment on Plaintiffs' underlying RICO conspiracy claims and declined to exercise supplemental jurisdiction over Plaintiff's state law defamation and trade libel claims. *Id.* at *10–11.

## 2. Third Circuit Opinion

Plaintiffs appealed this Court's October 28, 2019 grant of summary judgment in favor of Defendants. (D.E. 439.) The Third Circuit initially affirmed this Court's October 28, 2019 decision. *Care One Mgmt. LLC v. United Healthcare Workers E.*, 22 F.4th 128, 151 (3d Cir.

2021).  Then, Plaintiffs filed a petition for rehearing *en banc*.  Pet. Reh'g, *Care One Mgmt. LLC* (No. 19-3693), ECF No. 89.  The Third Circuit denied the *en banc* request but granted a rehearing on the matter.  *Care One Mgmt., LLC v. United Healthcare Workers E.*, No. 19-3693, 2022 WL 1115133, at *1 (3d Cir. Apr. 14, 2022).  After rehearing oral argument, the Third Circuit affirmed in part and vacated in part this Court's October 28, 2019 decision.  *Care One*, 43 F.4th at 149.[6]

In its opinion, the Third Circuit first considered whether this Court erred in granting Defendants' MSJ because the record would allow a jury to conclude Defendants committed the predicate act of mail and wire fraud.  *Id.* at 136.  Care One relied on UHWE Assistant for Strategic Organizing Amy Gladstein's deposition, a union employee's admission "that communications were published without prior approval," and a communications employee's statement that in her senior role she could send things "without her supervisor's 'review'" to argue there were material disputes of fact as to whether Defendant had fact-checking and vetting procedures in place and followed them.  *Id.*  The Third Circuit rejected this argument, finding that none of that evidence contradicted the process Defendants outlined and that the affidavits provided by Defendants sufficiently averred the affiants' beliefs in the advertisements' truthfulness and accuracy.  *Id.* at 136–37.  The Court also declined to find liability based on four ads "point[ing] out a presumed disparity between HealthBridge's behavior and some subjective standard" published by Defendants recognizing that Defendants "did not need to present a balanced view" because the law "does not hold either party to a labor dispute to a given level of objectivity."  *Id.* at 138–39.  The Third Circuit affirmed this Court's prior judgment on the mail and wire fraud claims.  *Id.* at 139.

---

[6] For the sake of brevity, this Court only addresses the Third Circuit's 2022 decision in this opinion.

Next, the Court considered whether a jury could reasonably find clear proof that Defendants authorized or ratified the acts of sabotage taking place the night before the scheduled strikes at the Connecticut facilities. *Id.* at 132–33, 141. The Third Circuit made clear that at summary judgment, district courts are to apply the "clear, unequivocal, and convincing proof" standard required by § 6 of the Norris-LaGuardia Act. *Id.* at 139–41 (discussing 29 U.S.C. § 106). The Third Circuit rejected Care One's mass action theory argument and noted the Connecticut State Attorney's investigation identified no suspects, but still concluded that based on the record— taken in the aggregate—a reasonable jury could find clear proof that Union members committed the sabotage and that the Unions authorized such conduct. *Id.* at 141–42.

The Court highlighted the following evidence in the record: the Unions' prior statements; the coordinated timing of the sabotage; the Unions' use of "inflammatory rhetoric" encouraging labor organizers to "become angry about their working conditions" and members to "take on 'greater and more militant levels of activity'"; and the NEHCEU's President's statement to members that "'the law takes too long' and that the Unions 'could be destroyed by the time the law was able to stop [Care One's] behavior.'" *Id.* at 142–43 (alteration in original).

Similarly, the Third Circuit concluded a jury could reasonably find clear proof of ratification and should be allowed to assess and weigh the evidence as it presented "a very close call." *Id.* at 144–45. In support of its argument that a jury could find Defendants ratified the sabotage because they failed to cooperate with law enforcement, Care One highlighted two emails and an article written by NEHCEU's Communications Director Deborah Chernoff. *Id.* at 143–144.

In the first email, Chernoff discussed a Freedom of Information Act ("FOIA") request made by the Unions to the Connecticut Department of Public Health ("CTDPH"). *Id.* at 143. The

Third Circuit determined that contrary to Plaintiffs' mischaracterization that the Unions sought to make things unclear, Chernoff's email explained that the information received from the CTDPH "'muddie[d] the waters and support[ed] the contention of the workers that' patients may have removed their identifying bracelets themselves rather than saboteurs." *Id.* (alterations in original) (citation omitted). In her second email, addressed to UHWE's Elected Organizer Chas Walker, Chernoff wrote that "[the Unions] ha[ve] an obligation to [their] members even when they are totally in the wrong, if that proves to be the case," as well as "that it would be 'a very bad idea' to participate in the police investigation." *Id.* (alterations in original) (citations omitted).

Care One referenced the article to argue the Unions authored "a baseless article suggesting that [Care One] 'staged the sabotage to make [NEHCEU] look bad.'" *Id.* at 144 (alterations in original) (citation omitted). Yet the Third Circuit found Chernoff's article attributed the statement that "[Care One] 'staged the sabotage to make [NEHCEU] look bad'" to union members who disbelieved the sabotage allegations. *Id.* Nonetheless, the Court determined a jury should be called upon to assess the significance of the article's publication, the emails, and Care One's argument that union officials made little to no attempt to disassociate themselves from the July 2, 2012 acts. *Id.* at 143–45.

Turning to Plaintiffs' extortion through fear of economic loss claim, the Third Circuit stated liability would be premised on whether Plaintiffs could show by clear and convincing evidence that the Unions' uncontested authorization of both its use of the regulatory and criminal processes and the public speech and publicity campaign amounted to extortion under state law and were "generically classifiable as extortionate." *Id.* The Court considered the claim of right defense initially discussed in *United States v. Enmons*,[7] subsequent precedent applying the defense in a

---

[7] 410 U.S. 396 (1973).

non-labor context, as well as *United States v. Jackson*[8] to draw out the relevant inquiry and considerations for this claim. *Id.* at 145–47.

Ultimately, the Court determined the Unions' liability turns on "whether Care one had the right to pursue its business interests free of the fear that the Unions would (1) use the regulatory and criminal processes, and/or (2) campaign using negative advertising." *Id.* at 147. Applying *Jackson*, the Court stated the relevant inquiry should specifically consider "whether there is a reasonably close relationship—a nexus—between the alleged extortionate acts and the objective sought." *Id.* The Court noted, however, that liability should not be imposed for "either protected commercial speech, peaceful off-site picketing, or threats of economic harm related to a labor dispute such as a strike or the threat of a strike" for fear of chilling or risking further erosion of associative rights. *Id.* at 147–48. The Third Circuit concluded Care One did not have a right to pursue its business interests free of the fear that the Unions would use the regulatory and criminal processes and a negative advertising campaign. *Id.* at 148.

Applying the "nexus" inquiry to the Unions' negative advertising campaign, the Court concluded there was a clear relationship between the campaign and a legitimate labor objective—to obtain higher wages and better benefits for the Unions' members. *Id.* at 149. Similarly, the Court determined there was a "clear nexus" between the advertising campaign directed at Care One CEO Daniel Straus—utilized as a pressure tactic—and the Unions' objective of "receiving higher wages and better benefits from Care One." *Id.* The Court reasoned the Unions "could logically assume pressuring Strauss in this manner would increase the likelihood that he would cause Care One to capitulate to the Unions' demands." *Id.* Thus, the Third Circuit found summary judgment in favor of the Unions was appropriate for these claims. *Id.*

---

[8] 180 F.3d 55 (2d Cir. 1999).

Considering the Unions' use of the regulatory and criminal processes, the Court concluded the Unions "had a right to pursue favorable terms in a collective bargaining agreement by employing such tactics, but *only if* there is a nexus between this objective and the means used." *Id.* at 148. After evaluating some of the evidence in the record—specifically, the Unions' contact with Senator Blumenthal—the Court concluded the record was inconclusive as to whether there was a nexus between the Unions' use of the regulatory and criminal processes and pursuing favorable terms in a CBA. *Id.* Thus, summary judgment was inappropriate and the matter ripe for a jury's consideration. *Id.*

In sum, the Third Circuit affirmed summary judgment in favor of the Unions as to Plaintiffs' mail and wire fraud claim, *id.* at 139, and Plaintiffs' theory that the Unions' advertisement campaign against Care One and its CEO amounted to extortion, *id.* at 149. As per the Third Circuit's decision, on remand a jury is to consider whether there is clear and convincing evidence: (1) that "the Unions either authorized or ratified" the acts of sabotage taking place on July 2, 2012, *id.* at 141; and (2) of a nexus between the Unions' use of the regulatory and criminal processes and the Unions' legitimate labor objective of obtaining favorable CBA terms, *id.* at 148.

### 3. Second Motion for Summary Judgment

On March 28, 2024, this Court granted partial summary judgment in favor of Defendants on Plaintiffs' defamation, trade libel, and lost-acquisition damages claims. *Care One Mgmt., LLC v. United Healthcare Workers E., SEIU 1199*, No. 12-6371, 2024 WL 1327972, at *3, 11 (D.N.J. Mar. 28, 2024).

This Court concluded the alleged defamatory statements at issue were made in the context of a labor dispute, meaning the actual malice standard, as opposed to the negligence standard, applied. *Id.* at *5. This Court reasoned Plaintiffs admitted as much in their prior briefings to this

Court and considered the Supreme Court's broad construction of the definition of "labor dispute" under the Norris-LaGuardia Act as well as its adoption of the actual malice standard in *Linn v. United Plant Guard Workers of America, Local 114*,[9] in a civil action for libel brought in the context of a labor dispute. *Id.* at *5–6. Further, this Court found the Third Circuit's conclusion that the Unions' communications arose in the context of a labor dispute foreclosed Plaintiffs' argument claiming otherwise. *Id.* at *6. Applying the actual malice standard, this Court concluded the Third Circuit's finding that Defendants did not act with intent to deceive or reckless disregard for the truth similarly foreclosed finding in favor of Plaintiffs, particularly since Plaintiffs' mail and wire fraud, defamation, and trade libel claims were based on the same set of communications the Third Circuit considered.[10] *Id.* at *7–8.

This Court also dismissed Plaintiffs' claim for lost-acquisition damages. *Id.* at *9. Plaintiffs argued Defendants pressured sellers to forego doing business with Straus and Green Field-DES, LLC ("Green Field"), a non-party subsidiary of Care One, on three property-acquisition deals, allegedly causing Plaintiffs $400 million in-lost acquisition damages. *Id.* at *2, 9. But because Green Field is a wholly owned subsidiary of Care One, LLC, and Straus owned a majority interest in Care One, LLC at all relevant times, this Court found Care One lacked standing to recover for Green Field's alleged injury. *Id.* at *9–10. Also, this Court found Plaintiffs failed to show Defendants' actions proximately caused the alleged injury. *Id.* at *10–11.

### 4. Trial

---

[9] 383 U.S. 53 (1966).

[10] In the alternative, this Court found the communications and/or statements were not defamatory. *Id.* at *8–9. Relevant to this opinion, this Court concluded the "Questionable Medicare Billing Practices at Connecticut HealthBridge Nursing Homes" Memorandum drafted by Defendants was not defamatory. *Id.* at *8.

Trial is scheduled to begin in this matter on June 3, 2025.[11]

## II.   **LEGAL STANDARDS**

"Although the Federal Rules of Evidence do not explicitly authorize *in limine* rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984).  Courts rule on pretrial *in limine* motions to "shield the jury from unfairly prejudicial or irrelevant evidence." *Faragalla v. Otundo*, 626 F. Supp. 3d 783, 785 (D.N.J. 2022) (quoting *Ebenhoech v. Koppers Indus., Inc.*, 239 F. Supp. 2d 455, 461 (D.N.J. 2002)).  Motions *in limine* "foster[] efficiency for the court and for counsel by preventing needless argument at trial." *Ebenhoech*, 239 F. Supp. 2d at 461.  However, "[t]he Federal Rules of Evidence embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *Holbrook v. Lykes Bros. Steamship Co.*, 80 F.3d 777, 780 (3d Cir. 1996) (internal quotation marks omitted).

"Under the Federal Rules of Evidence, a trial judge acts as a 'gatekeeper' to ensure that any and all expert testimony or evidence is not only relevant, but also reliable." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)).  Federal Rule of Evidence 702[12] and *Daubert v. Merrell Dow*

---

[11] When the parties met with the Honorable Michael A. Hammer, U.S.M.J., for their Final Pretrial Conference, Judge Hammer mentioned the trial's three-week duration multiple times.  (*See* D.E. 522 10:2-5, 19:5-8, 37:3-17.)  The parties acknowledged the trial's three-week duration in their December 20, 2024 submission of the Proposed Joint Final Pretrial Order ("Proposed JFPTO").  (*See* D.E. 555 at 283 ("The Court has instructed that trial will be no longer than three weeks.")  Lastly, the Joint Final Pretrial Order contains the same verbiage as the Proposed JFPTO.  (*See* D.E. 607-1 at 140.)

[12] The Rule reads:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony.  Expert testimony is admissible if:  (1) the proffered witness is an expert, (2) the expert testifies about matters requiring "scientific, technical, or specialized knowledge, i.e., reliability," and (3) the expert's testimony assists the trier of fact, "i.e., fit."  *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (brackets omitted) (quoting *Pineda*, 520 F.3d at 244).  The proffering party must demonstrate the expert's testimony is admissible which requires showing the testimony is reliable by a preponderance of the evidence.  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

## III.    MOTIONS *IN LIMINE*

### A. Defendants' First Motion *in Limine* (D.E. 523 & 524)

Defendants argue that under the law of the case doctrine, this Court should exclude the following:  (1) evidence of the Unions' negative advertising campaigns; (2) the Contract Campaign Manual (the "Manual"); (3) evidence as to the soundness of the methodology used in producing the "Questionable Medicare Billing Practices at Connecticut HealthBridge Nursing Homes" Memorandum (the "Memo"); (4) an email written by Plaintiffs' agent, William Gady, to UHWE researcher Elisabeth Daley ("Gady's email"); (5) evidence as to why the Connecticut Chief State's Attorney's Office investigation was unsuccessful; and (6) evidence related to the demonstration at Plaintiffs' Fort Lee offices.[13]  (*See generally* D.E. 524.)

At the outset, this Court reiterates that although the Third Circuit's remand allows Plaintiffs to establish whether various acts were all part of a broader effort by Defendants to extort Plaintiffs,

---

Fed. R. Evid. 702.

[13] Plaintiffs withdrew the facts pertinent to the demonstration at its Fort Lee offices from the Final Pretrial Order ("FPTO"), rendering that argument moot by Defendants' own admission.  (*See* D.E. 585 at 19.)  Accordingly, this Court does not address that matter.

the remand was limited in scope.  *See Care One*, 43 F.4th at 142, 144–45.  Under the law of the case doctrine, relitigation of an issue is limited "once it has been decided in an earlier stage of the same litigation."  *Hamilton v. Leavy*, 322 F.3d 776, 786 (3d Cir. 2003).  "[O]n remand for further proceedings after [a] decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal," implementing "both the letter and spirit of the mandate."  *United States v. Kennedy*, 682 F.3d 244, 252–53 (3d Cir. 2012) (second alteration in original) (quoting *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 949 (3d Cir. 1985)).

As to the evidence of the Unions' negative advertising campaign, Gady's email, and the Manual, this Court finds the evidence is inadmissible at trial.  In its opinion considering this Court's summary judgment ruling, the Third Circuit addressed the evidence pertinent to the advertising campaign, finding summary judgment in favor of Defendants was proper.  *Care One*, 43 F.4th at 149.  Given that holding, along with a motion *in limine*'s function of "preventing needless argument at trial," this Court finds the advertising campaign evidence inadmissible.  *See Ebenhoech*, 239 F. Supp. 2d at 461; *Kennedy*, 682 F.3d at 252–53.  As to the email and the Manual, because the Third Circuit did not address Plaintiffs' contentions as to these specific pieces of evidence, this Court's holding remains the controlling decision.  *See* Brief for Appellant at 13, 38–40, *Care One Mgmt., LLC v. United Healthcare Workers E.*, 43 F.4th 126 (3d Cir. 2022) (No. 19-3693).  Under the discretionary law of the case doctrine, this Court declines to revisit its conclusions of law as to the Gady email and the Manual.  *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) ("A court has the power to revisit prior decisions of its own . . . although as a rule courts should be loathe to do so in the absence of extraordinary circumstances.").  Plaintiffs cannot repackage their arguments about the negative advertising campaign, Gady's

email, and the Manual to now prove extortion through sabotage.  As such, Defendants' Motion is granted as to this evidence.

Defendants "invoke the *Noerr-Pennington* doctrine, which immunizes petitions to government officials, like the Memo, from liability," in support of their argument that because the issue of the Unions' belief in the Memo's accuracy has been decided, evidence concerning the methodology used to produce the Memo should not be permitted.  (D.E. 524 at 12 n.2 (citing *Campbell v. Pa. Sch. Bds. Ass'n*, 972 F.3d 213, 219 (3d Cir. 2020).)  Although the Third Circuit's opinion settled the question of whether the Unions had fact checking and vetting procedures and followed them, *Care One*, 43 F.4th at 136–37, 148 n.152, and this Court's Second MSJ opinion settled the issue of whether the Memo was defamatory, *Care One*, 2024 WL 1327972 at *8, Plaintiffs may still introduce relevant evidence as to whether Defendants' preparation and distribution of the Memo has a nexus to legitimate labor goals.  Plaintiffs correctly note that the Third Circuit recognized as much when it considered the Memo in its examination of the Unions' use of regulatory and criminal processes.  *See Care One*, 43 F.4th at 148 n.152.  Plaintiffs may introduce some evidence relevant to the methodology used to prepare the Memo that was later sent to Senator Blumenthal with a limiting instruction.

Similarly, Plaintiffs may introduce some evidence addressing why the investigation into the sabotage proved unfruitful.  Notwithstanding that the investigation here "yielded no suspects and implicated no union members," the Third Circuit noted the Unions' failure to investigate could be deemed ratification and that a jury should assess "the totality of the evidence." *Id.* at 144–45.  However, the evidence offered should not be speculative, but rather must specifically go to the question of whether *Defendants* affected the investigation.  Importantly, the Connecticut Chief State's Attorney's Office's investigatory techniques are not the subject of trial here.

15

**B. Defendants' Second Motion *in Limine* (D.E. 525 & 526)**

Defendants move to preclude Plaintiffs from introducing evidence pertaining to the following acts ("Other Petitioning Acts"): (1) NEHCEU's opposition to Plaintiffs' closure request for Care One's facility in Wethersfield, Connecticut; (2) NEHCEU's requests that Plaintiffs' facilities be placed in a receivership—initially solely for the Wethersfield facility, but subsequently for all unionized facilities in Connecticut once those facilities filed for bankruptcy; and (3) NEHCEU's opposition to Plaintiffs' Westport facility's rezoning application while NEHCEU members were on strike. (*See generally* D.E. 526.) Defendants argue that none of the Other Petitioning Acts were appealed to the Third Circuit, such that Plaintiffs are now prohibited from putting them at issue before a jury. (*Id.* at 2–5.) More specifically, as to the Wethersfield closure and the Westport re-zoning application, Defendants contend that Plaintiffs only briefly referenced these in a post-argument Federal Rule of Appellate Procedure 28(j) letter, which is insufficient to preserve an issue. (*Id.* at 5–6.) Moreover, Defendants submit that the Third Circuit considered each of the acts that were appealed individually, such that they did not implicitly remand the Other Petitioning Acts to this Court. (*Id.* at 6.)

In opposition, Plaintiffs submit that because of the Third Circuit's holding that this Court applied the incorrect legal standard in rejecting Plaintiffs' extortion claims, Plaintiffs are now "permitted to present all facts supporting their claims of extortion" for a jury to evaluate. (D.E. 564 at 1, 12.) Plaintiffs also contend that they framed their issue on appeal broadly enough that it encompassed all the Other Petitioning Acts. (*Id.* at 16.) Lastly, Plaintiffs argue they only included certain acts[14] in their brief because those were the only acts this Court addressed in its MSJ opinion,

---

[14] Namely that of Defendants' alleged interference with Plaintiffs' Determination of Need ("DoN") applications and Defendants' authorship and distribution of the Memo to Senator Blumenthal. (D.E. 564 at 5.)

but that omission of the Other Petitioning Acts in their Third Circuit brief is of no moment because they also addressed these in two Rule 28(j) Statements.  (*Id.* at 15–16.)

First, Plaintiffs' argument about the accurate legal standard rings hollow given the Third Circuit's recognition that this Court's error "benefitted Care One because it afforded Care One a less stringent standard of proof for surviving summary judgment."  *Care One*, 43 F.4th at 141.  Second, an opening brief must contain "a statement of the issues presented for review" as well as "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies," such that an issue is deemed waived if not raised.  Fed. R. App. P. 28(a)(5), (8)(A); *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).  "Particularly where important and complex issues of law are presented, a far more detailed exposition of argument is required to preserve an issue."  *Frank v. Colt Indus., Inc.*, 910 F.2d 90, 100 (3d Cir. 1990).

Only evidence pertaining to Defendants' alleged opposition to the Wethersfield facility's closure will be admissible at trial, given that this was the sole Other Petitioning Act included in Plaintiffs' appellate brief.  *See* Brief for Appellant at 15; *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 88 (3d Cir. 1987) ("The [district] court reasoned that because these contentions were not presented to this court at the time of the first appeal, they could not properly be considered by the district court in considering our limited remand to it.  We agree. . . . Appellants' alternative theory of recovery was not before this court in the earlier appeal; *a fortiori*, it could not be remanded to the district court.").  Plaintiffs argue this Court did not address the Other Petitioning Acts in its first MSJ opinion, yet they did not appeal same to the Third Circuit.  Plaintiffs had ample opportunity to include the Other Petitioning Acts in their appeal, but did not do so, which is also detrimental to their Rule 28(j) argument.  *See United States v. Santos Diaz*, 66 F.4th 435, 438 n.1

(3d Cir. 2023) ("We cannot consider new evidence or arguments under Rule 28(j)."); *Beazer E., Inc. v. Mead Corp.*, 525 F.3d 255, 264 (3d Cir. 2008) ("Parties cannot normally use Rule 28(j) letters to present additional arguments.").  Defendants' Motion is granted in part and denied in part.

### C.  Defendants' Third Motion *in Limine* (D.E. 527 & 528)

In their third *in limine* motion, Defendants move to exclude four categories of hearsay evidence relevant to Plaintiffs' sabotage claim.  (D.E. 528 at 5.)

First, Defendants move to exclude evidence related to alleged strike sabotage which took place in Connecticut in 2001—namely the Connecticut State's Attorney's Preliminary Report ("the 2001 Report") and a related press advisory.  (*Id.* at 6.)  Defendants argue the 2001 Report is inadmissible under Federal Rule of Evidence 803(8) given the Report's tentative and inconclusive nature.  (*Id.* at 7.)  Alternatively, Defendants argue the 2001 Report is inadmissible due to its lack of relevance—as NEHCEU was never deemed responsible—and highly prejudicial nature given the Report's lack of temporal proximity to the events at issue in this case.  (*Id.* at 7–9.)

This Court grants Defendants' Motion as to the 2001 Report.  Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  "In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor."  *Huddleston v. United States*, 485 U.S. 681, 689 (1988).  Here, a jury could not reasonably conclude either about the 2001 Report.  Not only was the 2001 Report a "preliminary

report" which did not reach any conclusions as to *who* was behind the incidents, but the facilities it investigated were also non-Plaintiffs' facilities, such that there is no link or conclusion that Defendants were involved in any way.[15]  (*See* D.E. 547-5 at 2, 11.)  This, coupled with the fact that these incidents took place eleven years prior to the alleged sabotage in this case render this improper Rule 404(b) evidence.

Second, Defendants move to exclude evidence related to allegations of wristband removal at Plaintiffs' Danbury facility, including allegations by Jack Kelly, the Danbury facility's Administrator.  (D.E. 528 at 9.)  Defendants argue Kelly lacks the requisite personal knowledge to testify about the wristbands because his knowledge is based on what Jean Riley, another facility employee who is not a proposed lay witness, reported to him.  (*Id.* at 9–10.)  Defendants also contend that the hearsay exception for business records is inapplicable because Plaintiffs cannot demonstrate they had a regular practice of auditing to ensure all patients had name bracelets and making a record of such wristband audits.  (*Id.* at 10–11.)

Third, Defendants move to exclude the following:  (1) the contents of a formal complaint made by Plaintiffs' attorney Maureen Weaver to the Connecticut State Attorney's Office and subsequent correspondence with law enforcement, including a letter from the Chief State Attorney updating Weaver on the investigation's status; (2) witness statements and officers' preliminary suspicions contained in police reports; (3) hearsay related to Care One's efforts to publicize the sabotage allegations; and (4) internal communications on the investigation efforts.  (D.E. 528 at 13–20.)  Lastly, Defendants seek to exclude NEHCEU employee Charles Nystrom's text message "passing along a 'rumor' he had heard from a third party."  (*Id.* at 20.)

---

[15] Plaintiffs fail to point to any evidence in the record suggesting otherwise.  *Cf. New England Health Care, Emps. Union, Dist. 1199, SEIU/AFL-CIO v. Rowland*, 221 F. Supp. 2d 297, 341 n.50 (D. Conn. 2002) (finding there was insufficient evidence that the alleged incidents of sabotage during the 2001 strikes were "unusual in the course of nursing-home care and that, if they were unusual, members of District 1199 were responsible").

It is well established that an out-of-court statement offered to prove the truth of the matter asserted is hearsay and generally inadmissible. Fed. R. Evid. 802. But "a statement is not hearsay if offered for some other purpose other than as proof of the matter asserted." *Crowley v. Chait*, No. 85-2441, 2004 WL 7338421, at *14 (D.N.J. Dec. 29, 2004) (citing Fed. R. Evid. 801(c)). "[T]he best time for raising hearsay objections is at trial, where a court may better consider specific evidentiary proffers in the context of live proceedings." *Id.* At present, it is premature for this Court to rule on hearsay objections with respect to broad categories of evidence without first seeing how the testimony takes course and develops at trial. However, this Court does note that personal knowledge is key to the admissibility of a witness's testimony. Fed. R. Evid. 602. This Court also underscores that trial will not focus on the Connecticut State Attorney's investigation into the 2001 incidents and the fact that no suspects were identified as that will waste time and cause jury confusion. This Court reserves judgment on categories two, three, and four of Defendants' third motion *in limine*.

### D. Defendants' Fourth Motion *in Limine* (D.E. 529 & 530)

Defendants' fourth motion *in limine* seeks to exclude the following evidence related to Plaintiffs' allegations about Defendants' leadership and finances: (1) SEIU's annual revenues and per-capita contributions as well as its travel and political expenditures over a five- and six-year period, respectively; (2) four consulting agreements executed by SEIU between 2010 and 2012 with two D.C.-based companies for political and legislative consulting; (3) the NEHCEU staff members' decision to go with another union as their representative during the bargaining process; and (4) NEHCEU's Vice President Suzanne Clark's testimony concerning her role and knowledge as the NEHCEU Pension Fund's Trustee. (*See generally* D.E. 530.) Plaintiffs' contention in opposition is that this evidence is necessary to provide background and context for the Unions'

conduct, (D.E. 567 at 6, 7, 14); will help establish the Unions' motive to extort, (*id.* at 4, 10, 12, 15); and will not be time-consuming or lead to a trial within a trial, (*id.* at 6, 9).

This Court grants Defendants' Fourth Motion *in Limine* in its entirety. The Third Circuit's decision calls upon a jury to determine whether there is a nexus "between the alleged extortionate acts and the objective sought" in light of the evidence taken in the aggregate. *Care One*, 43 F.4th at 147. However, Plaintiffs have not shown how the evidence above is relevant or directly related to Plaintiffs' claims as required under Federal Rule of Evidence 401.[16] For example, Plaintiffs fail to articulate a sound basis as to why Defendants' provision of first-class travel to its full-time employees and travel expenses from 2009 to 2014 make it more or less likely that the Unions authorized or ratified the acts of sabotage. The limited evidentiary value of the proposed evidence counsels against its admission because of the undue delay and/or waste of time it would likely cause. *See* Fed. R. Evid. 403[17]; *United States v. Figueroa*, 729 F.3d 267, 276 (3d Cir. 2013) (concluding the district court did not err in excluding police reports offered into evidence where the reports had little probative value and providing them to the jury would waste time).

### E. Defendants' Fifth Motion *in Limine* (D.E. 531 & 532)

In their fifth Motion *in Limine*, Defendants move to exclude evidence of sixteen other campaigns (the "Other Campaigns" evidence) which Plaintiffs seek to introduce to prove that "Defendants have engaged in similar, if not identical, leverage behavior in numerous campaigns against other employers." (D.E. 532 at 1 (quoting Pls.' Statement of Contested Facts ("PSCF") ¶ 143, Joint Final Pretrial Order, D.E. 607).) Defendants contend the evidence is irrelevant to

---

[16] Rule 401 provides that "[e]vidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

[17] Under Rule 403, a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

proving a pattern of racketeering activity because the conduct in the Other Campaigns was lawful, such that it cannot constitute "racketeering activity" under 18 U.S.C. § 1961(1), instead constituting improper propensity evidence under Federal Rule of Evidence 404(b).  (D.E. 532 at 5–10; D.E. 589 at 7–10.)  Alternatively, Defendants argue the evidence should be excluded even if found relevant because Defendants would have to spend so much time rebutting it that its probative value is outweighed.  (*Id.* at 10–12.)  Plaintiffs submit that the Other Campaigns evidence is admissible under Rule 404(b) because it shows Defendants' motive, intent, pattern, and *modus operandi* in abusing regulatory and criminal processes.  (D.E. 568 at 8.)

Federal Rule of Evidence 404(b) is a rule of general exclusion, such that the party seeking to admit other acts evidence bears the burden of proving the proffered evidence:  (1) is offered for a non-propensity purpose; (2) is relevant to its non-propensity purpose; (3) satisfies Rule 403; and (4) is accompanied by a limiting instruction, if requested.  *United States v. Repak*, 852 F.3d 230, 241 (3d Cir. 2017).  Here, Plaintiffs have not met their burden as they have failed to establish whether the prior conduct was unlawful.  Plaintiffs have not shown how the chain of inferences necessary to link the prior acts to the conduct at issue in this case would serve a non-propensity purpose.  *See United States v. Smith*, 725 F.3d 340, 345 (3d Cir. 2013); *United States v. Morley*, 199 F.3d 129, 133 (3d Cir. 1999) ("[A] proponent's incantation of the proper uses of such evidence under the rules dos not magically transform inadmissible evidence into admissible evidence."); *Becker v. ARCO Chem. Co.*, 207 F.3d 176, 192 (3d Cir. 2000) (finding the district court impermissibly allowed other acts evidence where the evidence's proponent failed to articulate how the evidence fit "into a chain of logical inferences" proving intent "without involving the inference that because [the defendant] committed the first act it was more likely to have committed the second").  This Court also finds that admitting this evidence would unnecessarily lengthen the trial

and confuse the jury. Further, in this Court's purview, there is no limiting instruction that could help avoid the many problems inherent in the propensity inferences behind the Other Campaigns evidence. Accordingly, Defendants' Fifth Motion is granted.

### F. Defendants' Sixth Motion *in Limine* (D.E. 533 & 534)

Defendants move to exclude statements made by Plaintiffs' consultant, William Gady, about the Determination of Need ("DoN") Program and the effect of Defendant UHWE's filing of Ten Taxpayer Petitions ("TTPs") for three of Plaintiffs' DoN applications. (D.E. 534 at 4.) Defendants contend Gady's statements are inadmissible hearsay because Gady lacked the requisite personal knowledge, as his statement "was not based on any information provided by identifiable sources" and repeats hearsay statements made by Bernard Plovnick, the DoN Program's Director. (*Id.* at 7–10.)

With respect to Defendants' Sixth Motion, this Court will reserve its decision until trial, when it can consider the specific portions of Gady's testimony Plaintiffs seek to introduce and permit Defendants to cross-examine Gady about his personal knowledge or lack thereof. Both parties agree that a ruling can be deferred. (D.E. 569 at 5, 14; D.E. 590 at 4, 12–13.) This Court will address any issues with Gady's testimony as they arise during trial.

### G. Defendants' Seventh Motion *in Limine* (D.E. 535 & 536)

In their penultimate motion *in limine*, Defendants move to exclude Plaintiffs' labor relations attorney Jonathan Kaplan's testimony recounting statements made to him by Defendant UHWE's former organizer Jean Venette about Defendant UHWE's strategy.[18] (*See generally* D.E.

---

[18] Defendants specifically challenge Kaplan's testimony that "Venette told him that 'his boss,' Ricky Elliot, had said, during 'a meeting of organizers,' that UHWE wanted to 'destroy the company and bring it to its knees.'" (D.E. 536 at 6 (quoting D.E. 547-6, Ex. 94 ("Kaplan Tr.") 207:22-211:4).) Notably, however, by Kaplan's own admission the two meetings were "blurred in [his] mind," such that he could not recall precisely whether "what Mr. Venette said about Mr. Elliott whether it was in the second meeting or the first meeting or some of both." (Kaplan Tr. 207:22-208:5.)

536.)  Defendants argue that when Venette met with Kaplan on February 13, 2012—four days after tendering his resignation and on the eve of his final day of employment with Defendant UHWE—and subsequently sometime in March 2012, any statements he made were not made in an agent capacity such that the statements are inadmissible under Rule 801(d)(2)(D).  (*Id.* at 10–13.)

Plaintiffs maintain that Venette's statements to Kaplan are admissible because he was still employed by Defendant UHWE on February 13, 2012.  (D.E. 570 at 8–10.)[19]  Plaintiffs argue Venette's February 13, 2012 statements are admissible because they were within the scope of his employment as an UHWE organizer.  (*Id.* at 10–13.)

A statement is not hearsay if it is "offered against an opposing party and was made by the party's agent or employee on a matter within the scope of that relationship while it existed." Fed. R. Evid. 801(d)(2)(D).  Given that "the Federal Rules of Evidence do not define 'agent' or 'servant,'" the Third Circuit applies federal common law rules of agency to determine whether a statement comes within Rule 801(d)(2)(D).  *Lippay v. Christos*, 996 F.2d 1490, 1497 (3d Cir. 1993).  Under agency principles, an agent's authority terminates if the agent "acquires adverse interests" or is "otherwise guilty of a serious breach of loyalty to the principal" without the principal's knowledge.  Restatement (Second) of Agency § 112 (Am. Law Inst. 1958).  Further, "[a]uthority terminates if the principal or the agent manifests to the other dissent to its continuance." *Id.* § 118.

Here, there is no question that when Venette tendered his resignation on February 9, 2012, he manifested his dissent to the continuance of his employment relationship with Defendant UHWE.  *See id.*  By Venette's own admission he reached out to Care One while he was still

---

[19] Plaintiffs do not address Defendants' arguments concerning the statements made at the March 2012 meeting.

employed with UHWE because he was seeking employment with Care One, which this Court finds amounts to "acquiring adverse interests" such that he no longer had authority as Defendant UHWE's agent.  (D.E. 547-6 at 66–67.)  This Court finds that Venette was not UHWE's agent when he met with Kaplan in February 2012 and therefore his statements are inadmissible under Rule 801(d)(2)(D).  Additionally, Plaintiffs concede Venette was not an UHWE employee when he met with Kaplan in March 2012—making those statements inadmissible too.  *See Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, No. 15-1168, 2024 WL 125186, at *2 (D. Del. Jan. 11, 2024) (granting the plaintiff's motion *in limine* where the defendant failed to respond to substantive arguments raised by the plaintiff).  Even if the statements were admissible, they would only be admissible as to UHWE, the only Union that employed Venette.  *See Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1190, 1238 (E.D. Pa. 1980), *rev'd in part and aff'd in part*, 723 F.3d 238 (1983*), rev'd on other grounds*, 475 U.S. 574 (1986)  ("[S]tatements admitted under 801(d)(2)(B), (C) and (D) are admissible only against parties who have adopted the statement, or who bear the specified relationship to the declarant.").  Defendants' Seventh Motion *in Limine* is granted.

### H.  Defendants' Eighth Motion *in Limine* (D.E. 537 & 538)

In their final *in limine* motion, Defendants seek to exclude Plaintiffs' proposed Exhibit 84 ("PX-0084" or "the Exhibit")—an email between NEHCEU's Communications Director Deborah Chernoff and an employee of BerlinRosen, a public relations firm NEHCEU was working with, in which Chernoff describes "cleaning out [her] email box" in response to a subpoena from HealthBridge—and any cross examination on said Exhibit, as Federal Rule of Evidence 608(b) renders it inadmissible.  (D.E. 538 at 4.)  In opposition, Plaintiffs argue PX-0084 is admissible under Rule 404(b)(2) to demonstrate "Chernoff's intent in not cooperating with lawful searches

for information pertaining to the Unions' interactions with the Plaintiffs." (D.E. 571 at 11.) Defendants rebut by arguing the subpoena request referenced in the email dealt with another National Labor Relations Board ("NLRB") proceeding unrelated to this ligation and the sabotage alleged herein. (D.E. 592 at 6–9.)

This Court finds PX-0084 does not meet Rule 404(b)(2)'s requirements. Plaintiffs have not met their burden of demonstrating that they will use the email for a purpose other than to show a propensity to destroy evidence. *See Repak*, 852 F.3d at 241. The Third Circuit determined a jury should assess "the import and intent" behind Chernoff's email to union leaders and Chas Walker, a UHWE organizer, stating it would be "a very bad idea" to participate in the police investigation conducted in the aftermath of the July 2, 2012 acts of sabotage "in context with any other evidence on this record." *Care One*, 43 F.4th at 143. Yet unlike the email discussed in the Third Circuit's opinion, the Exhibit at issue here is unconnected to the sabotage allegations; the subpoena discussed in PX-0084 is for an *unrelated* NLRB proceeding and Defendant NEHCEU received it *prior* to the start of this litigation. The email has little to no probative value, particularly since Plaintiffs can point to no evidence indicating Chernoff indeed destroyed or deleted emails. *See* Fed. R. Evid. 401. Defendants' Motion is granted.

### I.  Plaintiffs' Motion *in Limine* (D.E. 549)

Plaintiffs move to preclude Defendants from offering evidence or argument relating to the Unfair Labor Practices ("ULP") charges Defendants filed with the NLRB concerning Care One.[20]

---

[20] Defendants filed charges beginning in 2010 and through 2011. *Care One*, 2019 WL 5541410 at *2. For example, from a period beginning approximately in August 2010 to February 2011, Defendant UHWE brought various NLRB charges in New Jersey which were then consolidated into three separate NLRB Region 22 Complaints. *Id.* at *2 n.6. Similarly, from approximately June 2010 to February 2011, NEHCEU brought several charges in Connecticut which the NLRB's Acting General Counsel consolidated into three separate NLRB Region 34 Complaints. *Id.* Pursuant to the charges filed by Defendants, the NLRB issued Complaints and Notices alleging Plaintiffs were "interfering with, restraining, and coercing employees in the exercise of their rights guaranteed" by the National Labor Relations Act, 29 U.S.C. § 151 *et. seq.*, and "refusing to bargain collectively and in good faith with the exclusive collective bargaining

(*See generally* D.E. 549-1.) Plaintiffs argue the evidence is irrelevant because it is collateral to the extortion issues the jury must decide. (*Id.* at 17–18.) Plaintiffs contend that because the NLRB's final decisions substantiating the charges brought by Defendants were rendered *after* the acts of sabotage and interference had already taken place, those decisions cannot serve as proof of Defendants' motivation. (*Id.* at 18–19.)

Alternatively, Plaintiffs argue for exclusion under Rule 403, contending the ULP evidence would unfairly prejudice Plaintiffs by "painting [them] as serial labor law violators" undeserving of a remedy for the conduct at issue in this case, (*id.* at 20); distract a jury and confuse the issues because NLRB proceedings are "fundamentally different," (*id.* at 20–21); and spawn trials within a trial "as to the validity of claims at issue in the NLRB proceedings and their applicability" here, (*id.* at 22–30).

Defendants oppose, arguing that to determine whether there is a nexus between the alleged extortionate acts and legitimate labor objectives sought, a jury must assess what the Unions' objectives were, which it could not do if deprived of such evidence. (D.E. 560 at 12–14.) More specifically, Defendants argue the NLRB proceedings' outcomes are admissible and relevant circumstantial evidence of Defendants' motivations. (*Id.* at 14–15.) Defendants contend the ULP evidence provides context fundamental to the nexus determination the jury must make and ask this Court to take judicial notice of the NLRB's findings under Rule 201 and to implement a limiting instruction under Rule 403. (*Id.* at 17–20, 25–28.)

This Court finds the ULP evidence is relevant to the nexus inquiry the jury is called upon to determine. The ULP evidence has a tendency to make certain disputed facts that impact the nexus question "more or less probable" than they would be without the evidence. *See* Fed. R.

---

representative of" their employees. *Id.* at *2 (citing (D.E. 406-2, Exs. 234–38).) The charges were found meritorious and were upheld on appeal. *Id.* at *2 n.7 (citations omitted).

Evid. 401.  Importantly, the ULP evidence provides vital context; the jury should be aware of the history between the parties as that history will inform its determination of whether there is clear and convincing evidence of a nexus between the Unions' use of the regulatory and criminal processes and the Unions' legitimate labor objective of obtaining favorable CBA terms.  *See Care One*, 43 F.4th at 148.  To exclude this information would cause confusion and fail to provide the jury with the full picture.[21]

Further, this Court finds that Rule 403's enumerated dangers do not substantially outweigh the probative value of the ULP evidence, save for the NLRB's Casehandling Manual ("NLRB Manual"). This Court grants Plaintiffs' motion in part as to the NLRB Manual; admission of the entire NLRB Manual is unnecessary and will result in undue delay and a waste of time compared to the minimal evidentiary value it offers.[22]  As to the remainder of the ULP evidence, a limiting instruction will appropriately ensure that trial does not devolve into a trial concerning the validity of the NLRB's findings or result in jury confusion.  The parties are instructed to meet and confer to provide the Court with an appropriate limiting instruction and/or stipulations concerning the ULP evidence.[23]  The remainder of Plaintiffs' Motion is denied.

## IV.   *DAUBERT* MOTIONS

### A.  Defendants' Motion to Exclude Edward Casas's Testimony (D.E. 539 & 540)

---

[21] According to Plaintiffs, Defendants could not have been motivated by the ULP evidence because Defendants utilized data mining to identify Plaintiffs as "potential campaign targets" in 2009, long before the alleged ULPs occurred. (D.E. 549-1 at 6.) That is a factual determination for the jury.  Similarly, it will be the jury's role to determine what weight to assign, if any, to the fact that the final administrative or judicial decisions in the NLRB proceedings came after the alleged acts of sabotage and extortion.

[22] There may be some specific portion that would be admissible, but Defendants have not identified any to date.

[23] The proposed limiting instruction provided by Defendants is lengthy and potentially confusing for the jury.

Defendants seek to preclude Plaintiffs' damages expert Edward Casas from testifying. Defendants argue Casas's testimony fails each of Federal Rule of Evidence 702's criteria. (D.E. 540 at 5, 10–11.)  More specifically, Defendants argue Casas's opinions quantifying Plaintiffs' lost profits due to the Unions' interactions with regulators regarding the Ten-Taxpayer Petitions (TTP) are speculative, unsupported and contradicted by the record, and that his Wethersfield closure-related opinions are premised on a mathematical error.  (*Id.* at 11–24.)  Defendants also contend Casas's estimated damages relevant to the sabotage claim should be excluded because Casas is not an expert in sabotage or property repair and his opinions lack reliability and fit.  (*Id.* at 32–37.)  Lastly, Defendants submit Casas's mechanical summation of legal, accounting, and security invoices are inadmissible as they lack reliability and fit.  (*Id.* at 37–41.)

Plaintiffs counter Defendants' Motion by arguing Casas is qualified to testify about Plaintiffs' damages given his "extensive experience in business, finance, and healthcare" despite his more general experience with the DoN application process.  (D.E. 572 at 10–12.)  Plaintiffs admit that Casas's Report does not account for a lump sum payment made in November 2012 in its analysis of the alleged resultant damages following the delay of the Wethersfield facility's closure and utilized the incorrect number of Medicaid days.  (*Id.* at 20–22.)  Plaintiffs maintain that despite such errors—which they argue go to weight and credibility—Casas should be permitted to testify and correct his errors.  (*Id.* at 22.)  Lastly, Plaintiffs contend Casas's sabotage calculations and testimony on damages shown through invoices are admissible because his conclusions are supported by the record and Casas can be cross-examined.  (*Id.* at 26–33.)

Rule 702's requirements can be summed up in three words:  qualification, reliability, and fit.  *Schneider ex rel. Est. of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  Rule 702 also has "a liberal policy of admissibility."  *In re Paoli*, 35 F.3d at 741.  This Court finds Casas's

29

proposed testimony satisfies Rule 702 and *Daubert*'s requirements.  Casas's qualifications include: a Doctor of Medicine, Master of Management/Business Administration and a Master of Public Health degree as well as over thirty years of representative healthcare experience "provid[ing] a broad range of advisory services including operational and capital restructuring, negotiation of sale transactions, recapitalizations, and fiduciary management on behalf of operators, investors, and financial institutions."  (D.E. 547-1 ("Casas Op.") at 11–12; D.E. 575-1 ("Casas Dep. Vol. 1") 34:21–35:4.)  *See In re Paoli*, 35 F.3d at 741 ("Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts.  We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications.").  Here, for example, Casas testified that he is familiar with DoN laws and that he has dealt with the latter at a high level, which this Court finds sufficient.  (Casas Dep. Vol. 1 35:11–20; 36:11-23.)

As to reliability, Rule 702 and *Daubert* require an expert's opinion to be "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief."  *In re Paoli*, 35 F.3d at 742 (citing *Daubert*, 509 U.S. at 590).  Courts generally consider a variety of factors set out by the Supreme Court in *Daubert*, yet those factors are "neither exhaustive nor applicable in every case."  *Pineda v. Ford Motor Co.*, 520 F.3d 237, 248 (3d Cir. 2008) (quoting *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806–07 (3d Cir. 1997)).  Ultimately, the trial court's inquiry focuses "on principles and methodology and not on the conclusions they generate.  The analysis of the conclusions themselves is for the trier of fact when the expert is subjected to cross-examination." *Kannankeril*, 128 F.3d at 807 (citing *In re Paoli*, 35 F.3d at 744).

In this matter, Casas represented his analyses relied on "techniques that are well-accepted in the fields of financial, valuation and economic analysis." (Casas Op. at 12.)  Given that the bulk of Defendants' challenges to Casas's testimony and Report go to the weight of the proffered testimony and evidence, the balance of Defendants' arguments will be addressed at trial.  *See Reilly v. Home Depot U.S.A., Inc.*, No. 20-13030, 2024 WL 4025041, at *2 (D.N.J. June 11, 2024) (denying motions *in limine* where the defendants' arguments challenging expert reports concerned the weight of the evidence rather than the experts' ability to testify as experts in the case).

However, Casas will not be permitted to testify about those issues which are conceded errors in his Report.  Under Federal Rule of Civil Procedure 26(e)(1), an expert opinion previously disclosed must be supplemented when a party "learns that in some material respect the information disclosed is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  Fed. R. Civ. P. 26(e)(1); *Paris v. R.P. Scherer Corp.*, No. 02-1044, 2006 WL 2177253, at *2 (D.N.J. July 31, 2006); *Raritan Baykeeper, Inc. v. NL Indus., Inc.*, No. 09-4117, 2022 WL 815846, at *3 (D.N.J. Mar. 17, 2022) ("[P]roper expert supplementation under Rule 26(e) requires *timely* corrections of material errors or omissions.") (emphasis added).  Moreover, failure to comply with either Rule 26(a) or (e) prohibits a party from using the information it failed to provide "to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  In applying Rule 37(c)(1), this Court also considers five factors known as the *Pennypack* factors.[24]  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 298

---

[24] These factors include:

> (1) "the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified" or the excluded evidence would have been offered; (2) "the ability of that party to cure the prejudice"; (3) the extent to which allowing such witnesses or evidence would "disrupt the orderly and efficient trial of the case or of other cases in the court"; (4) any "bad faith or willfulness in failing to comply with the court's order"; and (5) the importance of the excluded evidence.

(3d Cir. 2012) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977)).

Defendants argue that "Plaintiffs and Casas have known of Casas' error since August 2019." (D.E. 582 at 13.) Casas's Initial Report is dated June 19, 2019 and his Final Report December 30, 2022; Casas's deposition took place on October 12 and 13, 2023. (D.E. 547-1 at 2, 168; D.E. 575-1 at 593, 601.) Even if this Court considered only the Final Report's date, it cannot ignore that Plaintiffs failed to raise the errors in Casas's Report after being made aware of them through questioning at his deposition *and* Defendants' rebuttal expert Seth Fliegler until January 6, 2025 in a declaration accompanying Plaintiffs' Opposition Brief to this Motion. (*See* D.E. 572-1, January 6, 2025 Declaration of Edward Casas at 3–5 (correcting errors).) The disclosure is untimely and cannot be rectified by way of declaration at this late stage.

Moreover, Defendants would be unduly prejudiced if Casas were permitted to amend his Report through his testimony because Defendants were unable to depose Casas on the updated conclusions. To remedy the prejudice this Court would have to reopen expert discovery, which has been closed since November 16, 2023 (D.E. 493), and permit Defendants' rebuttal expert to supplement his report. To allow Casas to amend his Report through his testimony would flout Rule 26's purpose. *See Hioutakos v. SimplexGrinnell LP*, No. 10-4505, 2014 WL 1255197, at *3 (D.N.J. Mar. 26, 2014) ("[C]ounsel's duty under Fed. R. Civ. P. 26(e)(2) to correct materially incomplete or erroneous information should not be misused to circumvent deadlines or turn an expert report into a moving target."); *see also Pfizer Inc. v. Ivax Pharm., Inc.*, No. 07-174, 2009 WL 2905454, at *4–5 (D.N.J. Sept. 9, 2009) (granting a motion *in limine* to prohibit an expert from testifying about certain topics where the expert did not supplement or amend his reports and

---

*ZF Meritor*, 696 F.3d at 298 (quoting *Pennypack*, 559 F.2d at 904–05).

the opposing party did not have an opportunity to depose him on said issues); *Patterson v. Howard*, No. 06-4334, 2010 WL 1050052, at *5–6 (D.N.J. Mar. 18, 2010) (proscribing an expert physician from opining "on the issues of causation, permanency[,] or future prognosis" in his trial testimony where the physician failed to opine on those issues in his report because that would "cause [the d]efendant unfair surprise and undue prejudice"); *cf. Raritan Baykeeper*, 2022 WL 815846, at *1, 3–4 (affirming a magistrate judge's decision denying the plaintiffs' request to supplement their expert reports where expert discovery closed in 2015, the plaintiffs did not move to alter or supplement their expert reports when their experts received new sources, and the plaintiffs made their request nine days before the Final Pretrial Order deadline and thirteen days before the Final Pretrial Conference).

Thus, Defendants' Motion is granted in part and denied in part.

**B. Defendants' Motion to Limit Rebuttal Expert Gregory Russo's Testimony (D.E. 541 & 542)**

Defendants move to limit Gregory Russo's, Plaintiffs' rebuttal expert on the Memo's methodology, anticipated testimony as it relates to seven specific opinions offered in his Report ("Russo Report").[25]   Defendants argue these specific conclusions must be excluded under Rule 702, and alternatively for some opinions, Rule 403.   Defendants challenge the foundation, soundness, and relevance of many of Russo's conclusions.   (*See generally* D.E. 542.) Additionally, Defendants argue that Russo's failure to disclose the experiential basis for some of his opinions under the cloak of "privileged conversations" renders them unreliable and inadmissible.   (*Id.* at 33–39.)  Plaintiffs counter by arguing Russo's opinions are well-supported

---

[25] Russo's Report and testimony opine on Defendants' expert, Dr. David Grabowski's, Report.  Dr. Grabowski's report discusses the reasonableness of the methodology used to prepare the Memo.

by the record, are relevant, and that it is the jury's province to determine what weight and credibility to assign to his Report. (*See generally* D.E. 573.)

Having reviewed both sides' expert reports discussing the reasonableness of the methodology used in crafting the Memo, along with the parties' briefs, this Court denies Defendants' Motion. Plaintiffs have demonstrated that Russo's Report and testimony are reliable and will assist the jury by a preponderance of the evidence. *See In re Paoli*, 35 F.3d at 744. As noted by the Third Circuit, the reliability requirement should not be used as a tool of exclusion. *See id.* The jury should be permitted to hear Russo's testimony and assess its flaws as "an important part of assessing what conclusion [is] correct" when it comes to the competing expert reports. *See id.* at 745. Defendants can cross-examine Russo on his findings at trial. Further, Defendants should have raised their concerns about privilege long ago given their notice and access to Russo's Report and its bases since early 2019.

### C. Defendants' Motion to Exclude Ethan Kra's Expert Testimony (D.E. 543 & 544)

Defendants move to exclude Plaintiffs' actuarial expert, Ethan Kra's, testimony because it does not fit this case, arguing NEHCEU's proposed continuing contribution plans—not Kra's testimony about the NEHCEU Fund's funding levels—bear on the question of "whether the Unions conspired to violate" RICO. (D.E. 544 at 12–13.) Alternatively, even if Kra's testimony is relevant, Defendants contend it is inadmissible under Rule 403 for it would "unavoidably waste significant time and confuse the issues," as Defendants would be forced to call their rebuttal actuarial expert. (*Id.* at 14.)

Plaintiffs respond by arguing Kra's testimony does not lack fit and will assist the jury in "evaluating whether the financial pressures facing [Defendants' pension] funds or Plaintiffs' alleged unfair labor practices motivated Defendants' extortionate conduct." (D.E. 574 at 12.)

Additionally, Plaintiffs note Defendants' rebuttal expert agreed on many "key issues," such that Kra's testimony will not unduly prolong trial. (*Id.* at 17.)

Defendants' Motion is denied without prejudice; as trial runs its course, this Court can better consider what admitted evidence or testimony would support use of this expert. *See In re Paoli*, 35 F.3d at 741. Kra's testimony could be useful in aiding the jury's comprehension of how the pension funds fit in the broader factual timeline, but such determination cannot be made prior to trial.

### D. Plaintiffs' Motion to Exclude Seth R. Flieger's Expert Testimony (D.E. 545)

Plaintiffs move to preclude Defendants' rebuttal expert on damages, Seth Fliegler, from testifying. Plaintiffs argue Fliegler is unqualified to offer an expert opinion on the damages suffered by senior care companies, particularly those associated with the DoN process, Medicaid rate increases, and lost employee productivity time, (D.E. 545 at 10–12); and damages flowing from Connecticut's legal requirements regarding strike-related security costs and the shutdown of a senior care facility, (*id.* at 13). Plaintiffs contend Fliegler's "general expertise" in valuation and accounting is insufficient and that he has little to no experience with the latter issues. (*Id.* at 14.) In addition, Plaintiffs argue that Fliegler's testimony and accompanying Report do not offer "expert analysis to rebut the methodology or conclusions in the Casas Report," instead merely summarizing or questioning disputed facts or impermissibly opining on liability, which will not aid the jury in its damages determination and calculation. (*Id.* at 14–23.)

In opposition, Defendants argue Fliegler's "extensive experience valuing businesses, assessing commercial damages, and practicing forensic accounting in a variety of industries" satisfies Rule 702's liberal standard for expert qualification. (D.E. 559 at 11.) Defendants also add that Fliegler's failure to offer his own assessment of damages is of no moment; instead,

Fliegler permissibly "identifies various respects in which Casas ignored or misstated" the DoN process's details, "render[ing] Casas'[s] calculations unsupported and unreliable." (*Id.* at 14.) Defendants assert Fliegler's testimony is reliable and fits the case. (*Id.* at 19–30.)

As with Casas's testimony and Report, this Court finds Fliegler's testimony and Report meet Rule 702's requirements and are thus admissible. Fliegler's expertise is sufficient for valuation; he need not have specific experience with the DoN process or Connecticut laws to opine on damages. *See Krys v. Aaron*, 112 F. Supp. 3d 181, 200–01 (D.N.J. 2015) (rejecting the plaintiffs' argument that the defendants' rebuttal expert could not provide narrow conclusions on the plaintiffs' hypothetical bankruptcy claim given his limited bankruptcy consulting experience where the expert was otherwise qualified as a Certified Public Account and Certified Financial Forensic expert); *Physicians Dialysis Ventures, Inc. v. Griffith*, No. 06-2468, 2007 WL 3125197, at *10–11 (D.N.J. Oct. 24, 2007) (rejecting argument that the defendant's expert's limited to no experience in conducting valuations for dialysis centers precluded her from offering expert opinion where the proffered expert was qualified as an expert in business valuations). For many of the issues the parties are contesting, e.g. the standard approval days, "[b]oth parties will present their experts to the jury to testify in a clear manner, and the jury will decide what weight, if any, to give the experts' testimony." *In re Gabapentin Patent Litig.*, No. 00-2931, 2011 WL 12516763, at *10 (D.N.J. Apr. 8, 2011) (denying the defendants' motion to exclude a specific expert's testimony after recognizing both sides were presenting competing testimony on the issue of the use of the ratio of slopes); *see also In re Front Loading Washing Mach. Class Action Litig.*, No. 08-51, 2013 WL 3466821, at *4–5 (D.N.J. July 10, 2013) (permitting the rebuttal testimony of an expert who did not conduct his own testing, but instead relied on testing conducted by other experts and looked at photographs to fashion his opinion); *Rhoads Indus., Inc. v. Shoreline Foundation, Inc.*, No. 15-

921, 2021 WL 2778562, at *29 (D.N.J. July 2, 2021) ("[I]t is permissible for Grover, as a rebuttal expert, to have reviewed Rhoads' experts reports and to have applied his experience and training to opine as to whether those reports are sound.").  Nonetheless, Fliegler's testimony cannot venture into issues regarding liability (i.e. whether acts were committed or ratified by the Union and whether those acts were sabotage), but should focus on damages and the computation thereof.  His testimony should "bring to the jury more than the lawyers can offer in argument."  *Crowley v. Chait*, 322 F. Supp. 2d 530, 553 (D.N.J. 2004) (quoting *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992)).

## V.    LENGTH OF TRIAL

This Court is in receipt of Plaintiffs' March 27, 2025 Letter (D.E. 610) requesting a minimum of a three-week trial extension and Defendants' Opposition to said request (D.E. 611). The history of this case through litigation has been extensive, but the remaining issues for trial are limited.  In addition to the partial remand of the Third Circuit in 2022, after the issuance of this Court's last partial Summary Judgment opinion in March of 2024, all parties were fully aware of the matters that would be presented before a jury.  In August 2024, the parties were advised of the April 3, 2025 trial date.[26]  They were further advised of the three-week timeframe and commenced preparation of the Final Pre-Trial Order with that knowledge.  (*See supra* note 11.)  Multiple conferences were held with Magistrate Judge Hammer to address issues associated with the Final Pre-Trial Order and other pre-trial filings.  No objections or concerns were expressed regarding the length of trial.  "A district court has inherent power 'to control cases before it,' provided it exercises the power 'in a manner that is in harmony with the Federal Rules of Civil Procedure.'"

---

[26] Judge Hammer's Order stated trial would begin on April 3, 2024.  (D.E. 508 at 1.)  Notwithstanding the erroneous year, the parties understood trial was scheduled for April 3, 2025.  This Court adjourned the trial date from April 3, 2025 to June 3, 2025 following the parties' request.  (D.E. 521.)

*Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 609 (3d Cir. 1995) (quoting *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d 648, 652 (7th Cir. 1989)).  In setting a three-week trial, this Court considered the record and the Third Circuit's limited remand.  *See id.* at 610.  The initial claims set forth in the Second Amended Complaint have been whittled down; at issue are very discrete and particular factual and legal questions.  As per the Third Circuit's decision, on remand a jury is to consider whether there is clear and convincing evidence:  (1) that "the Unions either authorized or ratified" the acts of sabotage taking place on July 2, 2012 and (2) of a nexus between the Unions' use of the regulatory and criminal processes and the Unions' legitimate labor objective of obtaining favorable CBA terms.  *Care One*, 43 F.4th at 141, 148.

Notwithstanding many opportunities to object or raise concerns about the length of trial, Plaintiffs waited until this late stage.  Further, Plaintiffs continue to view this case in an expansive manner.  Repeated references to the language used by the Third Circuit regarding the "totality of the circumstances" seem to undergird attempts to include extensive testimony and evidence to prove Plaintiffs' claims.  This Court is loathe to instruct any party as to how they should present their case at trial, however, restraint should be employed.  Although discovery and appeals have taken more than thirteen (13) years, even permitting a very generous timeline, the primary focus of trial will be events which occurred between 2009 and 2013—a four (4) year period.  Judicial economy, over-burdened dockets, numerous criminal matters and court resources militate against extending the scheduled length of trial in this civil matter.  Further, alteration to the length of trial would impact the presentation of the case for Defendants, who have prepared their case in accordance with the directives of this Court.  It should also be noted that Defendants requested an

adjournment of the June 3, 2025 trial date to accommodate a witness, which was denied.[27] Accordingly, Plaintiffs' request is denied.

## VI.  **CONCLUSION**

For the reasons stated above, **IT IS** on this 2nd day of May 2025,

**ORDERED** that the Unions' Motion *in Limine* No. 1 (D.E. 523 & 524) is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that ruling on the Unions' Motion *in Limine* No. 2 (D.E. 525 & 526) is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that the Unions' Motion *in Limine* No. 3 (D.E. 527 & 528) is **GRANTED IN PART** only as to the 2001 Connecticut State's Attorney's Preliminary Report and a related press advisory, with the Court **DEFERRING** its ruling on the remaining categories of hearsay evidence; it is further

**ORDERED** that the Unions' Motion *in Limine* No. 4 (D.E. 529 & 530) is **GRANTED**; it is further

**ORDERED** that the Unions' Motion *in Limine* No. 5 (D.E. 531 & 532) is **GRANTED**; it is further

**ORDERED** that ruling on the Unions' Motion *in Limine* No. 6 (D.E. 533 & 534) is **DEFERRED**; it is further

**ORDERED** that the Unions' Motion *in Limine* No. 7 (D.E. 535 & 536) is **GRANTED**; it is further

**ORDERED** that the Unions' Motion *in Limine* No. 8 (D.E. 537 & 538) is **GRANTED**; it is further

---

[27] D.E. 577 (denying Defendants' request for a two-week adjournment).

**ORDERED** that the Unions' *Daubert* Motion regarding Casas's testimony (D.E. 539 & 540) is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that the Unions' *Daubert* Motion regarding Russo's testimony (D.E. 541 & 542) is **DENIED**; it is further

**ORDERED** that the Unions' *Daubert* Motion regarding Kra's testimony (D.E. 543 & 544) is **DENIED WITHOUT PREJUDICE**; it is further

**ORDERED** that Care One's Motion *in Limine* (D.E. 549) is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that the Care One's *Daubert* Motion regarding Fliegler's testimony (D.E. 545) is **DENIED**; and it is further

**ORDERED** that Care One's request for a three-week extension of trial time (D.E. 610) is **DENIED**.

**SO ORDERED.**


       /s/ Susan D. Wigenton
      **SUSAN D. WIGENTON, U.S.D.J.**


Orig:  Clerk
cc:    Parties
      Michael A. Hammer, U.S.M.J.